
Mark K. Schonfeld (MS-2798)
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, New York  10281
(212) 336-0077 (Gizzi)

# 05 CV 5231

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION            :

                Plaintiff,            :

         - against -            :

                         :            **COMPLAINT**

AMERINDO INVESTMENT ADVISORS INC.,            :
ALBERTO WILLIAM VILAR, and
GARY ALAN TANAKA,            :

                  :

          Defendants.            :

------------------------------------------------------------x



       The plaintiff Securities and Exchange Commission ("Commission") alleges the following

against defendants Amerindo Investment Advisers Inc. ("Amerindo"), Alberto William Vilar

("Vilar"), and Gary Alan Tanaka ("Tanaka") (collectively the "Defendants"):

## SUMMARY

    1.     The Commission brings this enforcement action against Amerindo, an investment

adviser, and its principals, Vilar and Tanaka.  The Defendants, among other things, engaged in a

scheme to defraud at least one Amerindo client.

    2.     Amerindo served as the investment adviser to, and therefore as a fiduciary for, a

client, L.C.  In February 2005, L.C. requested that Amerindo close her account and transfer all

funds and securities to a separate brokerage account. At the time, according to the last account statement Amerindo had provided as of September 30, 2004, L.C.'s account held investments valued at over $9 million. Amerindo, however, refused to transfer her investments to the separate account. Amerindo did not transfer L.C.'s investments to her because at least one of these investments valued at $5 million did not exist. Indeed, Amerindo, Vilar and Tanaka had previously misappropriated L.C.'s funds for their own business and personal purposes.

3.      Specifically, in approximately June 2002, Vilar solicited L.C., an investor and close personal friend, to invest $5 million in the Amerindo Venture Fund LP, a limited partnership that was purportedly being organized to qualify and be operated as a Small Business Investment Company ("SBIC"). After L.C. wired $5 million to a brokerage account as Amerindo had instructed, Tanaka began to transfer a portion of her funds to other accounts Vilar and Amerindo controlled. Specifically, within several days of L.C.'s investment, Tanaka signed letters of authorization ("LOAs") directing the transfer of at least $1.65 million to other accounts, including $1 million to a personal checking account held in Vilar's name, and $650,000 to a bank account Amerindo controlled. Vilar then used the funds he received from L.C.'s investment to pay personal expenses, including transferring $540,000 to Washington and Jefferson College, his alma mater to which he had pledged large sums, and $177,000 to the American Academy in Berlin, an institution to which Vilar had donated money in the past.

4.      Subsequently, L.C. inquired about the status of her SBIC investment after Amerindo failed to make promised quarterly payments. Vilar informed her that, although the Small Business Administration ("SBA") had approved Amerindo's application for a SBIC license, Amerindo had to reapply for a license because of personnel turnover at the SBA. Further, Vilar stated that, while this process was ongoing, Amerindo had to deposit funds for the

2

SBA, and that her investment constituted part of the $10 million Amerindo was required to escrow to initiate the fund.

5.      Vilar's statements were false. The SBA never approved a license for the Amerindo Venture Fund LP (or any other Amerindo affiliated fund). Further, Amerindo, the purported adviser to the fund, never deposited any funds or otherwise escrowed $10 million for the SBA.

6.      Amerindo and Vilar have ignored L.C.'s requests that Amerindo redeem her investment in the SBIC fund, because no such investment ever existed.

7.      On May 26, 2005, the United States Attorney's Office for the Southern District of New York arrested Vilar and Tanaka based on many of the same allegations giving rise to this complaint. Given that they have both been incarcerated since May 26, Vilar and Tanaka have been unable to continue to run Amerindo.

8.      Following news of Vilar's and Tanaka's arrests, clients have contacted, and will continue to contact, Amerindo to inquire about the safety and custody of their funds and securities, and some have sought to terminate their relationship with Amerindo.

9.      At this time, other than Vilar or Tanaka, there does not appear to be an individual at Amerindo with full decision-making authority, who has the resources to address client concerns and account for all funds and investments held by Amerindo on behalf of its clients. Accordingly, a receiver should be appointed.

## VIOLATIONS OF FEDERAL SECURITIES LAWS

10.     By virtue of the conduct alleged herein:

      a.      Defendants, directly or indirectly, singly or in concert, have engaged and are engaging in acts, practices and courses of business, that constitute

3

violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a).

b.    Defendants, directly or indirectly, singly or in concert, have engaged and are engaging in acts, practices and courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

c.    Defendant Amerindo, aided and abetted by defendants Vilar and Tanaka, directly or indirectly, singly or in concert, engaged and is engaging in acts, practices and courses of business, that constitute violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4).

11.    Unless Amerindo is preliminarily and permanently restrained and enjoined, it will continue to engage in the acts, practices and courses of business set forth in this Complaint and in acts, practices and courses of business of similar type and object.

12.    Unless Vilar and Tanaka are permanently restrained and enjoined, they will continue to engage in the acts, practices and courses of business set forth in this Complaint and in acts, practices and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

13.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9, seeking to restrain and enjoin permanently Amerindo, Vilar, and Tanaka from engaging in the acts, practices and

courses of business alleged herein.

14.    The Commission also seeks, as immediate relief, a temporary restraining order and preliminary injunction order against Amerindo, the appointment of a temporary receiver over Amerindo, an accounting from Amerindo, and an order prohibiting Amerindo from destroying or altering documents.

15.    Finally, the Commission seeks a judgment ordering Amerindo, Vilar, and Tanaka to disgorge ill-gotten gains with prejudgment interest thereon, and ordering Amerindo, Vilar, and Tanaka to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e) and 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

17.    Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Certain of the transactions, acts, practices, and courses of business alleged herein occurred within the Southern District of New York. For instance, Amerindo maintains a place of business in New York, New York, Vilar resides in New York City, and defendants misappropriated investor funds for personal use from an account at a broker-dealer located in New York, New York.

18.    Defendants, directly or indirectly, have each made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or

communication in interstate commerce, and/or the mails, in connection with the transactions,

acts, practices, and courses of business alleged herein.

## DEFENDANTS

19.     **Vilar**, age 64, is a resident of New York, New York.  Vilar, together with Tanaka,

is a co-founder and principal of Amerindo, Amerindo Investment Advisors, Inc. ("Amerindo

Panama"), and various affiliated entities.  Vilar is the Chief Executive Officer of Amerindo.

Vilar has been involved in emerging technology investment strategies for over 25 years.

20.     **Tanaka**, age 61, is a resident of London, England.  Tanaka, together with Vilar, is

a co-founder and principal of Amerindo, Amerindo Panama, and Amerindo Investment Advisors

(U.K.) Limited, and other affiliated entities.  Tanaka is the Executive Vice-President of

Amerindo.  Like Vilar, Tanaka has been involved in emerging technology investment strategies

for over 25 years.

21.     **Amerindo** is a California corporation with a principal place of business in San

Francisco, California.  Amerindo also maintains offices in New York, New York and London,

England.  Amerindo has been a registered investment adviser since 1985, and has served as the

investment adviser to various clients.  For example, Amerindo is the investment adviser to

Amerindo Funds, Inc., a registered open-end investment company, with one outstanding series,

the Technology Fund.  As of January 31, 2005, this fund's aggregate net asset value was

approximately $122 million.  Amerindo describes itself as a specialist in "emerging technology

growth stocks."

## FACTS

### Amerindo, Vilar, and Tanaka Defrauded At Least One Client

#### *L.C. Became A Client Of Amerindo*

22.     L.C. is an investor who has maintained an investment advisory relationship with Amerindo since approximately 1987.

23.     Over time, L.C. and Vilar developed a close, almost familial, relationship, and L.C. placed her trust in Vilar to manage her investments.

24.     Since approximately 1987, Amerindo has advised L.C. concerning her investments, and periodically, Amerindo sent L.C. account statements reflecting her various investments.

25.     During the late 1990s, L.C. received account statements from Amerindo indicating that her account had increased significantly in value. At its peak, Amerindo represented that L.C.'s investments were valued at approximately $18 million.

#### *Vilar Induced L.C. to Invest in a SBIC Fund*

26.     In or about June 2002, Vilar recommended that L.C. invest $5 million in a fund that Vilar and Tanaka were to manage as an SBIC, and which would seek a license from the SBA.

27.     Vilar told L.C. that he and Tanaka were starting an investment fund that would invest in technology companies, and that the SBA would provide matching funds. Vilar explained to L.C. that it was quite unusual for the SBA to authorize an investment in technology companies, but that he nonetheless was confident that the application would be approved.

28.     L.C. agreed to make the investment, and on or about June 20, 2002, she caused $5 million to be wired to an account that Amerindo had designated, the Amerindo Management,

7

Inc. Account ("AMI Account") at a broker-dealer (the "Broker-Dealer").

29.    At the time of her investment, Amerindo, Vilar and Tanaka failed to provide L.C.

with any documentation concerning the investment, such as a private placement memorandum

("PPM"), subscription agreement, or other document reflecting the investment itself.

30.    Subsequently, L.C. did not receive any quarterly payments that Vilar had

promised to pay from her investments with Amerindo.

31.    In the Fall of 1993, L.C. and her advisors questioned Vilar about the investment.

L.C. and her advisors told Vilar that she needed the payments to pay her expenses.

32.    On or about March 25, 2004, Vilar sent a letter on Amerindo letterhead to L.C.'s

accountant, which contained the following:

> It is well known that it is next to impossible to get an SBIC for a
> technology-oriented venture capital fund. Amerindo spent years
> applying for such a license at considerable expense, which was
> finally approved about three years ago. Unfortunately, largely due
> to personnel changes at the [SBA] pursuant to our approval, we
> were required to reapply about 18 months ago for the same license.
> While this has taken far longer than we anticipated, we
> nevertheless had to deposit the requisite key money for the SBA,
> which we did. . . . Far more importantly, the prices of technology
> private-placements continued to decline throughout this waiting
> period. This means that we did not use a single penny of [L.C.'s]
> investment during this declining period, and if and when, as
> expected, we start to make investments upon securing the renewal
> of our license later this year, we will be looking at the best prices
> probably even seen in the four decade plus history of technology
> based, venture capital.

33.    Amerindo sent L.C. statements of her account. As of September 30, 2004, the

statement Amerindo sent to L.C. included an entry indicating "FUNDS ON DEPOSIT WITH

SBIC (value date 06.20.02)," which was valued at $5 million, and "INTEREST ON SBIC

DEPOSIT," which was valued at $225,000.

34.    On October 25, 2004, Vilar sent a memorandum on Amerindo letterhead to L.C.'s

attorney to explain the account statement, which Vilar said was prepared "at our London office." Regarding the entry for "Funds on Deposit with SBIC, for $5 million," Vilar wrote that "[t]echnically this represents an escrow deposit for a technology-based SBIC. [L.C.] has effectively coinvested with Gary and myself in a new fund that has been approved for Investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war. This is an eight year fund which we remain extremely optimistic about, given our very positive view on wireless broadband convergence."

35.    In the Fall of 2004, after L.C. raised questions about the SBIC investment, Vilar finally supplied L.C. with the PPM for the SBIC fund. This PPM indicated that the fund was named the Amerindo Venture Fund, LP. After reviewing the PPM, L.C. and her advisors determined that it was not an appropriate investment for L.C. and requested that her $5 million (plus interest) be returned.

36.    Further, on December 9, 2004, Vilar sent L.C.'s attorney a letter on Amerindo letterhead that "[i]f [L.C.] does not wish to retain the SBIC investment she agreed to make, we will have to undertake on a best efforts basis the sale of her participation to another prospective investor. As could be expected, we are not at liberty to liquidate that investment on demand, as it constitutes part of the $10 million minimum the General Partner was required to come up with to initiate the fund." Vilar also wrote that "it is nevertheless quite likely that prospective investors for [L.C.'s] investment will now require the commencement of government-matched funding," and that "[t]his unfortunately involves a political timetable completely beyond our immediate control." Finally, Vilar wrote that "all we can do is keep you posted of our efforts on her behalf to pursue this very unusual request, which, as noted above, will remain constrained by

the special funding program attached to it."

37.     As is explained below, Vilar's statements reflected in paragraphs 27, 32-34, and 36 above were materially false and misleading.

38.     Although Amerindo began the application process to obtain a license, the SBA never approved an application to license the Amerindo Venture Fund, LP, or any other Amerindo affiliated fund.

39.     The SBA also never held any funds in escrow on behalf of the Amerindo Venture Fund, LP, or any other Amerindo affiliated fund.

40.     In addition, the SBA never required the Amerindo Venture Fund, LP, or any other Amerindo affiliated fund to keep funds in escrow.

41.     Moreover, by approximately March 2004, it was clear the Amerindo Venture Fund, LP and its adviser would not obtain a license.  Specifically, in early 2004, the SBA posted a notice on its website to advise that financing for the Participating Securities SBIC program (for which the Amerindo Venture Fund, LP had applied) would terminate on September 30, 2004, and that to be eligible to receive such financing, a potential applicant would need to file an application by March 31, 2004, which Amerindo did not do.

### Amerindo, Vilar and Tanaka Misappropriated L.C.'s Funds

42.     Vilar never invested L.C.'s funds in the Amerindo Venture Fund, LP or otherwise placed her $5 million investment in escrow pending the SBA's approval of a license.

43.     Rather, on approximately June 20, 2002, L.C. transferred her $5 million into the AMI Account at the Broker-Dealer, as Amerindo directed.

44.     The AMI Account was not a new account opened for the SBIC fund.  Rather, the account was an existing Amerindo affiliated account, which had been opened years before.

45.     Moreover, as of May 31, 2002, the account had a negative cash balance of $428,122 and held equities with a value of $758,847, for a net equity of $330,725.

46.     Within days of L.C.'s $5 million transfer, Tanaka directed the Broker-Dealer to transfer a portion of L.C.'s funds out of the account.

47.     Indeed, eventually, virtually all of L.C.'s funds were transferred out of the account to various other third parties and entities.

48.     Specifically, on June 25, 2002, Tanaka directed the Broker-Dealer to transfer $1 million of L.C.'s funds to Vilar's personal checking account.

49.     According to bank records for the period from approximately June 9, 2002 through July 8, 2002, the Vilar personal checking account had a balance of approximately $87,564.45 immediately prior to the incoming wire transfer of $1 million on or about June 25, 2002.  No other funds were then deposited in the account during the statement period, and the closing balance of the Vilar checking account was approximately $132,677.72.  Thus, all but approximately $45,000 of the funds wired into the Vilar checking account from L.C.'s SBIC investment were dissipated within two weeks of their deposit.

50.     The withdrawals from the Vilar checking account during that two week period included:

- An electronic check in the amount of $540,000 made payable to "Washington and Jefferson" (Vilar has pledged millions of dollars to various programs at his alma mater Washington & Jefferson College);
- A check in the amount of approximately $177,000 made payable to "American Academy in Berlin" (according to the Academy's website, www.americanacademy.de, "Alberto Vilar" has made significant donations to this institution);
- An electronic check in the amount of approximately $17,000 made payable to Alberto Vilar;
- A check in the amount of approximately $14,640 made payable to what appears to be a catering service, with a memo line which reads: "AV Party 4/18);

- A transfer in the amount of approximately $10,000 for the benefit of "Albert W. Vilar";
- A check in the amount of approximately $7,000 made payable to an individual with the last name "Vilar", with a memo line which reads "Allowance-May";
- A check in the amount of approximately $255.56 payable to an appliance service for "Dishwasher Repair" for Vilar's home address; and
- Approximately $1,000 in ATM cash withdrawals.

51.    Additionally, on June 26, 2002, Tanaka directed the Broker-Dealer to transfer $650,000 of L.C.'s funds to Amerindo's business checking account.  Amerindo's bank records indicated that within approximately one month, these funds were spent on what appear to be routine business expenses Amerindo incurred.

52.    Finally, Tanaka eventually directed the Broker-Dealer to transfer virtually all of the remaining portion of L.C.'s funds to other third party bank accounts, including a bank account in Luxemburg.

53.    Amerindo had custody of Cates' funds, and Amerindo failed to segregate Cates' funds and properly maintain her funds in an account in the name of the adviser as agent or trustee for its client.

### *Amerindo, Vilar and Tanaka Refused to Redeem L.C.'s Investments*

54.    L.C.'s attorney has made a number of written redemption requests with respect to the SBIC investment as well as other investments with which Amerindo has failed to comply. For instance, on February 17, 2005, L.C.'s attorney wrote to Vilar and indicated that L.C. wished to close her Amerindo account, which a September 30, 2004 account statement indicated had a value in excess of $12 million.  (The September 30, 2004 account statement indicated that L.C.'s investments were valued at $12,217,191.85.  Because approximately $2,872,058 of this amount was invested through an external account at the Broker-Dealer, L.C. was able to revoke Amerindo's discretionary authority over the account.  L.C. subsequently transferred the funds in

this external account to another personal brokerage account she maintained. Therefore, not including the investments held in the external custody account, L.C.'s investment with Amerindo as of September 30, 2004 was purportedly worth approximately $9,345,133,85.)

55.     Vilar responded in a February, 23, 2005 letter that, pursuant to the terms of an investment management agreement, L.C. needed to notify "the office where the account is lodged of its decision to terminate its service in writing." Vilar further advised that L.C. should write to Amerindo Panama, where her account was located.

56.     Despite the fact that L.C. primarily dealt with Vilar and Tanaka, and did not believe her account was held at Amerindo Panama, L.C.'s attorney then sent a request on February 28, 2005 to Amerindo Panama, which was copied to Amerindo offices in New York and London, confirming her intention to close her account.

57.     On May 20, 2005, Vilar responded to a request for information from Commission staff asking about the status of L.C.'s $5 million investment. Vilar repeated to the staff that L.C.'s account was held by Amerindo Panama. Vilar also stated in the letter that he and Tanaka had sold Amerindo Panama in 2001 and that, therefore, Amerindo Panama was no longer affiliated with Vilar and Amerindo. However, this representation contradicts representations made by Amerindo and Vilar in documents filed with the Commission. For example, on Amerindo's most recent Form ADV (required to be filed annually with the Commission by all registered investment advisers), dated May 2003, but which Vilar signed on July 15, 2004, Amerindo Panama is listed as an entity that is affiliated with Amerindo in the United States.

58.     To date, neither Vilar nor any Amerindo entity or employee, has confirmed receipt of L.C.'s request to close her account, and no funds or securities have been transferred to L.C.

13

**Vilar and Tanaka Have Been Arrested**

59.     On May 26, 2005, the United States Attorney's Office for the Southern District of New York arrested Vilar and Tanaka based on many of the same allegations giving rise to this complaint. Given that they have both been incarcerated since May 26, Vilar and Tanaka have been unable to continue to run Amerindo.

60.     Following news of Vilar's and Tanaka's arrests, clients have contacted, and will continue to contact, Amerindo to inquire about the safety and custody of their funds and securities, and some have sought to terminate their relationship with Amerindo.

61.     At this time, other than Vilar or Tanaka, there does not appear to be an individual at Amerindo with full decision-making authority, who has the resources to address client concerns and account for all funds and investments held by Amerindo on behalf of its clients. Accordingly, a receiver should be appointed

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (Against Amerindo, Vilar, and Tanaka)

62.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-61.

63.     From at least 2002 through the present, Amerindo, Vilar, and Tanaka, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by the use of the mails, directly and indirectly, have employed and are employing devices, schemes and artifices to defraud.

64.     From at least 2002 through the present, Amerindo, Vilar, and Tanaka, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by the use of the mails, directly and indirectly, have

14

obtained and are obtaining money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and have engaged and are engaging in transactions, practices or courses of business which operate as a fraud and deceit upon their clients.

65.      Amerindo, Vilar, and Tanaka knowing or recklessly participated in the fraudulent scheme, and they knew or were reckless in not knowing that the representations and omissions set forth herein were false and misleading.

66.      By reason of the activities described herein, Amerindo, Vilar, and Tanaka have violated and are violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Amerindo, Vilar, and Tanaka)

67.      The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 61.

68.      From at least 2002 through the present, Amerindo, Vilar, and Tanaka, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, have employed and are employing devices, schemes and artifices to defraud; have made and are making untrue statements of material fact and have omitted and are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged and are engaging in acts, practices and courses of business which operate as a fraud and deceit upon investors.

69.      Amerindo, Vilar, and Tanaka knowingly or recklessly participated in a fraudulent

scheme, and they knew or were reckless in not knowing that the representations and omissions set forth herein were false and misleading.

70.     By reason of the activities described herein, Amerindo, Vilar, and Tanaka have violated and are violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

## THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### (Against Amerindo)

71.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 61.

72.     From at least 2002 through the present, Amerindo, an investment adviser, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, employed and is employing devices, schemes and artifices to defraud investors, and has engaged and is engaging in transactions, practices and courses of business which operate as fraud and deceit upon these investors.

73.     Amerindo participated in a fraudulent scheme, and it knew or was reckless in not knowing that the representations and omissions set forth herein were false and misleading.

74.     By reason of the activities described herein, Amerindo has violated, and is violating, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act
### (Against Vilar and Tanaka)

75.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-61.

76.     From at least 2002 through the present, Vilar and Tanaka, directly or indirectly,

16

singly or in concert, aided and abetted Amerindo's violations of Sections 206(1) and 206(2) of the Advisers Act. Specifically, Vilar and Tanaka knowingly provided substantial assistance to Amerindo in participating in the scheme to defraud, and making materially false and misleading representations, omitting to disclose material information, and misappropriating assets alleged herein.

77.     Amerindo, Vilar, and Tanaka knowing or recklessly participated in the scheme to defraud and they knew or were reckless in not knowing that the representations and omissions set forth herein were false and misleading.

78.     By reason of the activities described herein, Vilar and Tanaka have aided and abetted violations, and are aiding and abetting violations, of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

### FIFTH CLAIM FOR RELIEF
**Violations of Section 206(4) and Rule 206(4)-2(a) of the Advisers Act
(Against Amerindo)**

79.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-61.

80.     From at least 2002 through the present, Amerindo, directly or indirectly, singly or in concert, violated Section 206(4) of the Advisers Act and Rule 206(4)-2(a). Specifically, Amerindo engaged in an act, practice or course of business which is fraudulent, deceptive or manipulative, in that Amerindo had custody of a client's account and it failed to properly maintain the account, by, among other things, failing to segregate the client's securities and funds, and failing to maintain the funds in an account in the name of the adviser as agent or trustee for the client.

81.     Amerindo knowing or recklessly engaged in this act, practice or course of

business which is fraudulent, deceptive or manipulative.

82.     By reason of the activities described herein, Amerindo has violated, and is violating, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2(a), 17 C.F.R. § 275.206(4)-2(a).

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 206(4) and Rule 206(4)-2(a) of the Advisers Act (Against Vilar and Tanaka)

83.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-61.

84.     From at least 2002 through the present, Vilar and Tanaka, directly or indirectly, singly or in concert, aided and abetted Amerindo's violations of Section 206(4) of the Advisers Act and Rule 206(4)-2(a). Specifically, Vilar and Tanaka knowingly provided substantial assistance to Amerindo in engaging in an act, practice or course of business which is fraudulent, deceptive or manipulative, in that Amerindo had custody of a client's account and it failed to properly maintain the account, by, among other things, failing to segregate the client's securities and funds, and failing to maintain the funds in an account in the name of the adviser as agent or trustee for the client.

85.     Amerindo, Vilar, and Tanaka knowing or recklessly engaged in this act, practice or course of business which is fraudulent, deceptive or manipulative.

86.     By reason of the activities described herein, Vilar and Tanaka have aided and abetted violations, and are aiding and abetting violations, of Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2(a), 17 C.F.R. § 275.206(4)-2(a).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

An Order temporarily and preliminarily, and a Final Judgment permanently, restraining and enjoining Amerindo, its agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4).

### II.

A Final Judgment permanently restraining and enjoining Vilar, and Tanaka, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4).

### III.

An Order appointing a temporary receiver for Amerindo: (1) to preserve the status quo; (2) to ascertain the financial condition of Amerindo, and the disposition of client funds; (3) to prevent further dissipation of Amerindo's property and assets, to prevent loss, damage, and injury to clients; (4) to preserve Amerindo's books, records, and documents; and (5) to be

available to respond to investor inquiries.

## IV.

An Order directing Amerindo to file with this Court and to serve upon the Commission, a full accounting of all assets, liabilities, and property currently held directly or indirectly by or for the benefit of such defendant, and an accounting of all clients' funds and securities holdings.

## V.

An Order enjoining and restraining Amerindo, and any person or entity acting at its direction or on its behalf, from destroying, altering, concealing, or otherwise interfering with the access of the Commission to relevant documents, books and records.

## VI.

A Final Judgment ordering Amerindo, Vilar, and Tanaka to disgorge all ill-gotten gains, plus prejudgment interest that they obtained from their fraudulent conduct.

## VII.

A Final Judgment ordering Amerindo, Vilar, and Tanaka to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9.

## VIII.

Such other and further relief as the Court may deem just and proper.


Dated: New York, New York
     June  **1**, 2005


                  Mark K. Schonfeld (MS-2798)

                  Attorney for the Plaintiff
                  Securities and Exchange Commission
                  3 World Financial Center
                  New York, New York  10281
                  Telephone (212) 336-0077 (Gizzi)


Of Counsel:

Helene T. Glotzer
Kay L. Lackey
Paul G. Gizzi
Mark D. Salzberg