Mark K. Schonfeld (MS-2798)
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, New York  10281
(212) 336-0077 (Gizzi)

**05 CV 5231**

**JUDGE SWAIN**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------------x
```
SECURITIES AND EXCHANGE COMMISSION                    :
                                                      :
                        Plaintiff,                    :
                                                      :
                     - against -                      :
                                                      :
AMERINDO INVESTMENT ADVISORS INC.,                    :
ALBERTO WILLIAM VILAR, and                            :
GARY ALAN TANAKA,                                     :
                                                      :
                        Defendants.                   :
                                                      :
```
-----------------------------------------------------------------------x
```

**LOCAL RULE 6.1(d) DECLARATION OF PAUL G. GIZZI IN
SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING
ORDER, PRELIMINARY INJUNCTION, ORDER TO SHOW CAUSE,
AND OTHER RELIEF**

I, Paul G. Gizzi, pursuant to 28 U.S.C. 1746, declare as follows:

1.      I am over 18 years of age and I am an attorney on the staff of the plaintiff

Securities and Exchange Commission ("Commission").  I am employed as a Branch Chief with

the Commission's Northeast Regional Office.  I make this declaration in support of the

Commission's Emergency Application for a Temporary Restraining Order, Preliminary

Injunction, Order to Show Cause, and Other Relief (the "Application") directing defendant

Amerindo Investment Advisors Inc. ("Amerindo") to show cause why an order should not be entered, pending a final disposition of this action:

(1)    (a)    preliminarily enjoining

            (i)    Amerindo from violating Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5;

            (ii)    Amerindo from violating Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4), and Rule206(4)-2(a) thereunder, 17 C.F.R. § 275.206(4)-2;

    (b)    appointing a receiver for Amerindo;

    (c)    directing Amerindo to provide a verified accounting immediately; and

    (d)    prohibiting the destruction or alteration of documents.

(2)    Pending adjudication of the foregoing, an Order

    (a)    temporarily restraining Amerindo from violating the aforementioned statutes and rules;

    (b)    appointing a temporary receiver for Amerindo;

    (c)    directing Amerindo to provide a verified accounting immediately;

    (f)    prohibiting the destruction or alteration of documents; and

    (g)    providing that the Commission may take expedited discovery in preparation for a hearing on this Order to Show Cause.

    2.    I am a member of the Bar of State of New York and am admitted to practice

before this Court. I make this declaration pursuant to Local Civil Rule 6.1(d) to show that good and sufficient reasons exist for bringing this matter before the Court by an application and order to show cause rather than by notice of motion. The Commission makes this Application for emergency relief by application and order to show cause: (i) to preserve the *status quo* pending adjudication of the Application; (ii) to ensure that any future judgment of this Court for disgorgement, prejudgment interest, and penalties will not be rendered meaningless; (iii) to halt ongoing violations of the federal securities laws; and (iv) to prevent the destruction or fabrication of evidence. The Commission believes that to proceed by notice of motion may jeopardize the Court's ability to grant full and effective relief both as to this Application and the merits of the Commission's Complaint filed in this action.

3.      As is described in the Commission's Complaint filed June 1, 2005, the supporting declarations and exhibits thereto, the Affidavit of Margaret T. Dennin dated June 1, 2005 (attached as Exhibit 1), and the accompanying memorandum of law, since at least June 2002, Amerindo has been defrauding at least one investor in investment vehicles for which defendant Amerindo and affiliated entities serve as investment advisers, has been transferring investor funds to Amerindo and others' bank and brokerage accounts, and has ignored investor redemption requests. Unless temporarily restrained and preliminarily enjoined, Amerindo will continue to violate the antifraud and investment adviser provisions of the federal securities laws. Because of the substantial harm to the investing public that would result from Amerindo's continued fraudulent conduct, it is essential that the Commission seek the relief requested in the Application by way of an order to show cause.

**A.      Defendant's Fraudulent Conduct**

4.      This matter concerns ongoing fraudulent conduct concerning Amerindo, an

3

investment adviser located in New York, New York.  Alberto William Vilar ("Vilar") and Dr.

Gary Alan Tanaka ("Tanaka") are Amerindo's principals.  The fraudulent conduct involves,

among other things, Vilar and Tanaka making material misrepresentations and/or failing to

disclose material information to at least one Amerindo investor.  In addition, from at least June

2002 to the present, Amerindo and Tanaka have transferred at least $4.5 million of investor

funds to accounts belonging to Amerindo, Vilar and others.  Finally, Amerindo has ignored

and/or failed to honor valid investor redemption requests.

   5.  For example, in February 2005, L.C., a client of Amerindo, requested that

Amerindo close her account and transfer all funds and securities to a separate brokerage account.

At the time, according to the last account statement Amerindo had provided as of September 30,

2004, L.C.'s account held investments valued at approximately $12 million.  Amerindo,

however, has refused to transfer L.C.'s investments to the separate account.  Documents that the

Commission has obtained demonstrate that Amerindo has not transferred L.C.'s funds to her

because Amerindo never in fact made at least some of the investments that it reported to L.C.

that it had made on her behalf.  Moreover, Amerindo, Vilar, and Tanaka diverted at least $4.5

million of L.C.'s funds for their own business and personal purposes, and to other third party

accounts.

   6.  More specifically, in June 2002, Vilar solicited L.C., a wealthy investor and close

personal friend, to invest $5 million in a limited partnership, the Amerindo Venture Fund LP,

that was purportedly organized to qualify and be operated as a Small Business Investment

Company ("SBIC").  Vilar told L.C. that he and Tanaka were organizing the SBIC to invest in

technology companies, and that the U.S. Small Business Administration ("SBA") would provide

matching funds.  L.C. agreed to make the investment, and on June 20, 2002, she wired $5 million

to an account that Amerindo had designated, the Amerindo Management, Inc. account ("AMI

Account"), at a broker-dealer (the "Broker-Dealer").

       7.     In 2003, L.C. began to inquire as to the status of the purported SBIC investment.

On or about March 25, 2004, Vilar sent a letter on Amerindo letterhead to L.C.'s accountant,

which contained the following:

> It is well known that it is next to impossible to get an SBIC for a
> technology-oriented venture capital fund.  Amerindo spent years
> applying for such a license at considerable expense, which was
> finally approved about three years ago.  Unfortunately, largely due
> to personnel changes at the [SBA] pursuant to our approval, we
> were required to reapply about 18 months ago for the same license.
> While this has taken far longer than we anticipated, we
> nevertheless had to deposit the requisite key money for the SBA,
> which we did. . . . **This means that we did not use a single
> penny of [L.C.'s] investment during this declining period,** and
> if and when, as expected, we start to make investments upon
> securing the renewal of our license later this year, we will be
> looking at the best prices probably even seen in the four decade
> plus history of technology based, venture capital.

(Emphasis added.)

       8.     Subsequently, Amerindo sent L.C. a statement of her account as of September 30,

2004, which reflected "FUNDS ON DEPOSIT WITH SBIC (value date 06.20.02)" of $5 million,

and "INTEREST ON SBIC DEPOSIT" of $225,000.  On October 25, 2004, Vilar sent a

memorandum on Amerindo letterhead to L.C.'s attorney to explain the account statement, which

Vilar said was prepared "at our London office."  Regarding the entry for "Funds on Deposit with

SBIC, for $5 million," Vilar wrote that "[t]echnically this represents an escrow deposit for a

technology-based SBIC.  [L.C.] has effectively coinvested with Gary and myself in a new fund

that has been approved for investment, but the actual funding leverage-supplement has been

delayed owing to budgetary problems in Washington, due to the increase in the deficit and the

Iraqi war.  This is an eight year fund which we remain extremely optimistic about, given our

very positive view on wireless broadband convergence."

9.      Further, on December 9, 2004, Vilar sent L.C.'s attorney a letter on Amerindo letterhead that provided "[i]f [L.C.] does not wish to retain the SBIC investment she agreed to make, we will have to undertake on a best efforts basis the sale of her participation to another prospective investor. As could be expected, we are not at liberty to liquidate that investment on demand, as it constitutes part of the $10 million minimum the General Partner was required to come up with to initiate the fund." Vilar also wrote that "it is nevertheless quite likely that prospective investors for [L.C.'s] investment will now require the commencement of government-matched funding," and that "[t]his unfortunately involves a political timetable completely beyond our immediate control." Finally, Vilar wrote that "all we can do is keep you posted of our efforts on her behalf to pursue this very unusual request, which, as noted above, will remain constrained by the special funding program attached to it."

10.     Although Amerindo explored obtaining a SBA license, the SBA never approved an application to license the Amerindo Venture Fund, LP. Further, Amerindo never placed any funds on deposit with the SBA, or otherwise placed L.C.'s $5 million investment in escrow.

11.     More significantly, brokerage account records establish that Vilar never invested L.C.'s funds in the Amerindo Venture Fund, LP or otherwise placed her $5 million investment in escrow pending the SBA's approval of a license. Rather, on June 20, 2002, L.C. transferred $5 million into the AMI Account at the Broker-Dealer, as Vilar directed. This account was not a new account opened for the purported SBIC fund. Rather, the account was an existing Amerindo affiliated account, which had a cash debit of $428,122 and equities worth $758,847, for a net equity balance of $330,725 as of May 31, 2002. Within days of L.C.'s $5 million transfer on June 20, 2002, Amerindo and Tanaka began to transfer funds out of the account. Specifically, on

June 25-26, 2002, transfer instructions bearing Tanaka's signature directed the Broker-Dealer to transfer $1.65 million to two accounts: $1 million to an account bearing Vilar's name, and $650,000 to an account bearing Amerindo's name.

12.     With respect to the $1 million that Tanaka transferred to Vilar on June 26, 2002, these funds went to a checking account in the name of "Alberto W. Vilar" at JP Morgan Chase. According to a criminal complaint filed against Vilar on or about May 26, 2005, bank records for the period from approximately June 9, 2002 through July 8, 2002 indicate that this account had a balance of approximately $87,564.45 immediately prior to the incoming wire transfer of one million dollars. No other funds were then deposited in the account during the statement period, and the closing balance of the Vilar checking account was approximately $132,677.72. Thus, all but approximately $45,000 of the funds wired into the Vilar checking account from L.C.'s SBIC investment were dissipated within two weeks of their deposit. The withdrawals from the Vilar checking account during that two week period included:

- An electronic check in the amount of $540,000 made payable to "Washington and Jefferson" (Vilar has pledged millions of dollars to various programs at his alma mater, Washington & Jefferson College);
- A check in the amount of approximately $177,000 made payable to "American Academy in Berlin" (according to the Academy's website, www.americanacademy.de, lists "Alberto Vilar" as an individual who has made donations);
- An electronic check in the amount of approximately $17,000 made payable to Alberto Vilar;
- A check in the amount of approximately $14,640 made payable to what appears to be a catering service, with a memo line which reads: "AV Party 4/18");
- A transfer in the amount of approximately $10,000 for the benefit of "Albert W. Vilar";
- A check in the amount of approximately $7,000 made payable to an individual with the last name "Vilar", with a memo line which reads "Allowance-May";
- A check in the amount of approximately $255.56 payable to an appliance service for "Dishwasher Repair" for Vilar's home address; and
- Approximately $1,000 in ATM cash withdrawals.

13.     With respect to the $650,000 that Tanaka transferred to an account bearing Amerindo's name on or about June 26, 2002, records received from JP Morgan Chase indicate that these funds were transferred into a business checking account held in the name of Amerindo. These records indicate that within approximately one month, L.C.'s $650,000 was spent on what appear to be routine business expenses that Amerindo incurred.

14.     Recently, Amerindo, Vilar, and Tanaka have ignored several redemption requests that L.C. has made. For instance, on February 17, 2005, L.C.'s attorney wrote to Vilar and indicated that L.C. wished to close her Amerindo account, which a September 30, 2004 account statement indicated had a value in excess of $12 million. (Approximately $2.2 million of this amount was invested through an external account at the Broker-Dealer.) Vilar responded in a February, 23, 2005 letter that, pursuant to the terms of an investment management agreement, L.C. needed to notify "the office where the account is lodged of its decision to terminate its service in writing." Vilar further advised that L.C. should write to Amerindo Panama, where her account was located.

15.     L.C.'s attorney then sent a request on February 28, 2005 to Amerindo Panama, which was copied to Amerindo offices in New York and London, confirming her intention to close her account. By letter dated February 28, 2005, L.C. wrote to Amerindo and affiliated entities. In her February 28, 2005 letter, L.C. clearly and unambiguously directed that her account be closed, and revoked any authority that she had previously given to defendants to act with regard to her investments through Amerindo.

16.     In spite of these clear instructions, Amerindo has not redeemed her $5 million investment in the purported SBIC fund or returned any funds to L.C. (With respect to the approximately $2.2 million held in an external account at the Broker-Dealer, L.C. was able to

revoke Amerindo's discretionary authority over the account and transfer this sum to another personal brokerage account.)

17.     Based on the foregoing, Amerindo and Vilar misrepresented the status of the proposed SBIC fund as well as the existence of L.C.'s investment in any such fund. Vilar also misrepresented the reasons why he was not able to return L.C.'s investment to her. Specifically, Vilar misrepresented: (i) that the SBA had approved the application, which it had not; (ii) that Amerindo could not return her money until another investor could be found, which was not true; (iii) that her $5 million investment was in escrow, which it was not; and (iv) that Amerindo had not used a single penny of her money, which was not true. Vilar never disclosed to L.C. that he and Tanaka transferred at least $4.5 million, which she advanced to invest in the Amerindo Venture Fund, LP, to Vilar and to other individuals' and entities' accounts. Amerindo has failed to return L.C.'s investments to her despite her clear demand that it do so.

**B.      Reasons for Proceeding Ex Parte**

18.     On Thursday, May 26, 2005, the United States Attorney's Office for the Southern District of New York arrested both Vilar and Tanaka based, in part, on the facts detailed above. Both Vilar and Tanaka have been incarcerated since May 26, 2004.

19.     Amerindo's periodic filings with the Commission indicate that Vilar and Tanaka are principally responsible for managing Amerindo's investments. While they remain incarcerated, they are incapacitated from carrying out their management roles at Amerindo. In light of the conduct they have engaged in, as reflected in the criminal charges against them and the allegations in the Commission's complaint, they should not be permitted to continue to exercise management authority over Amerindo's clients' investments.

20.     According to Amerindo's counsel, on May 27 and 31, 2005, clients of Amerindo

began to contact Amerindo concerning the status of their accounts.

21.     According to Amerindo's counsel, the firm expects that many clients will contact the firm to request that their relationship with Amerindo be terminated.

22.     I have been informed that United States Postal Inspectors executed a search warrant at Amerindo's offices on or about Friday May 27, 2005, and that in carrying out the search postal inspectors seized, among other things, Amerindo's computer systems.

23.     Consequently, it is critical that a temporary receiver be appointed to preserve the status quo, review Amerindo's client records, make sure all client accounts are secure, and handle client requests to transfer their funds and securities.  The appointment of an independent receiver is particularly important because it is unclear whether current Amerindo employees will have the ability to take these actions that are essential to protecting Amerindo's clients.

24.     In addition, counsel for the Broker-Dealer has informed me that the Broker-Dealer supports the request for a receiver.  The Broker-Dealer has custody of several omnibus accounts, such as hedge funds, for which Amerindo serves as investment adviser, but the Broker-Dealer does not know the identities of the beneficial owners of the accounts.  Consequently, a receiver is necessary to ensure that assets located in Amerindo-related accounts at the Broker-Dealer are distributed to the proper owners of the assets.

25.     The Commission staff has coordinated activities concerning this matter with other agencies, and will advise the Court of those activities should the Court permit an oral presentation of this Application.

26.     No previous request has been made for the relief sought in the Application.


I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       June 1, 2005


_____
       Paul G. Gizzi

# Exhibit 1

## AFFIDAVIT OF MARGARET T. DENNIN

**DISTRICT OF COLUMBIA**        ) SS.:

MARGARET T. DENNIN, being duly sworn, under penalty of perjury declares the following:

1.      I am a resident of Davidsonville, MD. I am employed as the Chief Administrative Officer of the Investment Division of the United States Small Business Administration ("SBA") in Washington, D.C. In that position I have been involved in administering the SBA's program through which small businesses seek a SBA license to operate as a Small Business Investment Company ("SBIC").

2.      In connection with my work at SBA, I have participated in meetings and reviewed materials submitted by or on behalf of Amerindo Investment Advisors Inc. ("Amerindo") during the period from January 2000 to May 2004. Amerindo sought to obtain a SBA license for a proposed investment fund known as a "Participating Securities" SBIC. At the time, SBA had a program through which approved Participating Securities SBICs could seek federally-guaranteed financing in amounts up to twice the SBIC's private capital. This program ended as of September 30, 2004.

### The SBIC Licensing Process

3.      The SBIC licensing process is summarized in a document entitled "Is the SBIC Program Right for You?" which is publicly available on SBA's website at www.sba.gov.

4.      By way of background, the process for obtaining a license as a Participating Securities SBIC can be summarized as follows. First, a potential applicant may, but is not required to, contact a program development specialist, who may ask the applicant to submit to SBA the resumes of its management team for an initial evaluation of the management team's experience. The next step is to submit a Management Assessment Questionnaire ("MAQ"). In

the MAQ, the potential applicant explains its plans for the prospective SBIC and discloses the qualifications of its management team.  SBA's Program Development staff then reviews the MAQ and presents the MAQ, as well as the staff's analysis, to the Investment Division's Investment Committee.  If the Investment Committee finds that the management team meets certain minimum qualifications, and that the MAQ is otherwise adequate, the Investment Committee will vote as to whether to invite the applicant's management team in for an interview.  Following the interview, the Investment Committee will vote on whether to issue a "go forth" letter inviting the applicant to submit a formal license application.  The applicant then has twelve months to submit an application, and may request an additional six-month extension.

5.     Prior to receiving a "go forth" letter and submitting an application, an applicant is not required to escrow any funds, or to have received signed commitments from investors.  A critical aspect of the application, however, is the applicant's demonstrated ability to meet SBA's $10 million minimum funding commitment for a Participating Securities SBIC.  Thus, before a formal license application can be submitted, the applicant for a Participating Securities SBIC must have secured signed commitments and/or paid in capital equal to $10 million.

6.     In addition, the application for licensing as a Participating Securities SBIC must demonstrate that the potential SBIC has met SBA's management ownership diversity requirements (i.e., that management is separate from the investors).  An applicant must demonstrate management ownership diversity, and obtain the secured signed commitments and/or paid in capital referenced above, before its application can be accepted by SBA for consideration.  Once accepted, an application is processed by SBA's Investment Division and submitted to the Investment Division's Divisional Licensing Committee for approval.  If approved by the Divisional Licensing Committee, the application is then forwarded to the

Agency Licensing Committee, which is composed of SBA senior management, for approval.
Prior to presentation to the Agency Licensing Committee, however, the applicant must certify,
among other things, that it has $2.5 million in cash, and approved pre-licensing investments
and/or approved management expenses.

7.     If the Agency Licensing Committee approves the application, the applicant then
submits fully executed final documents, and the application is forwarded to the SBA
Administrator for final approval. If the SBA Administrator approves the application, an SBIC
license will be issued to the applicant. Prior to final Administrator approval, a rejection by any
reviewing committee would terminate the processing of that application, although an applicant
may re-apply.

8.     Under the Participating Securities financing program in effect through September
30, 2004, after an SBIC license is issued, an SBIC could request a commitment in the form of
Participating Securities federally-guaranteed financing through SBA.

9.     In early 2004, SBA posted a notice on its web site to advise the public that after
September 30, 2004, no requests for new leverage commitments in the form of Participating
Securities federally-guaranteed financing would be granted, and that applications for
Participating Securities SBIC licenses had to be filed with SBA by March 31, 2004. At present,
SBA is not issuing new Participating Securities commitments for federally-guaranteed financing.

**Amerindo's Pursuit of a SBA License**

10.    In or about January 2000, Amerindo submitted an initial MAQ to the SBA's
Investment Division concerning a proposed application for licensing of a Participating Securities
SBIC. The Investment Division then met with Amerindo's management team.

11.    In or about April 2000, the Investment Division interviewed Amerindo's

3

management team and issued a "go forth" letter to Amerindo concerning the initial MAQ.

12.     In or about August 2000, Amerindo submitted an application for a license as a Participating Securities SBIC.

13.     In or about the fall of 2000, the SBA's Investment Division informed Amerindo that, based on the information contained in the application, SBA would not accept the application for processing.

14.     In or about May 2002, Amerindo submitted a second MAQ. SBA's Investment Committee did not reach a decision concerning the second MAQ because of certain information contained therein.

15.     In or about September 2002, Amerindo submitted a third MAQ.

16.     In or about December 2002, SBA's Investment Committee reviewed Amerindo's third MAQ. On or about December 27, 2002, I wrote to Mr. Vilar to inform him that the Investment Committee had decided not to invite Amerindo's management team to come in for an interview. (A redacted copy of my December 27, 2002, letter is attached hereto as Exhibit A.)

17.     Subsequently, in or about April 2003, SBA's Investment Committee agreed to meet with Amerindo's management team. The Investment Committee met with Amerindo's management team in or about July 2003. Thereafter, the Investment Committee did not issue a "go forth" letter to Amerindo, and did not invite Amerindo to submit an application for licensing as a SBIC.

18.     In February 2004, Amerindo submitted a fourth MAQ to SBA. I assigned Kristi Craig, a Program Development Financial Analyst in SBA's Investment Division under my supervision, to conduct a review and analysis of the MAQ. Upon information and belief, after she conducted a preliminary review the MAQ in or about February 2004, Ms. Craig informed

4

Amerindo's representative, Carlos Castellanos, that she required additional information before she could complete her review of the MAQ and present it to the Investment Committee.

19.     Upon information and belief, and in or about March 2004, Ms. Craig received the additional information she had requested. On April 6, 2004, she received an email from Carlos Castellanos advising her that he had resigned from Amerindo, and that she should contact Alberto Vilar or David Mainzer by telephone to continue the licensing process.

20.     Upon information and belief, and within several days, Ms. Craig called Mr. Vilar, and left him a voicemail message requesting that he call her to discuss the MAQ and the fact that Mr. Castellanos had resigned from the management team. She did not receive a return call, but received an email on May 28, 2004, from Mr. Vilar indicating that SBA would be contacted by Amerindo's consultant, who was authorized to make inquiries on its behalf. Thereafter, no Amerindo representative contacted Mr. Craig or me.

21.     Since receiving Amerindo's fourth MAQ, the Investment Division has not invited Amerindo's management team in for an interview and has not issued a "go forth" letter.

22.     Neither I nor Ms. Craig has had any communication with any Amerindo representative concerning Amerindo's pursuit of a Participating Securities SBIC license since in or about May 2004.

23.     SBA has never approved an application for Amerindo or any Amerindo-related entity for licensing as a Participating Securities SBIC, and has never advanced any federally-guaranteed financing to any Amerindo-related SBIC.

24.     Under SBA's SBIC program, there is no mechanism by which an SBIC applicant can deposit funds with SBA to be held on behalf of the applicant or its investors. Further, because Amerindo's SBIC application was never submitted to SBA's Agency Licensing

5

Committee for approval, SBA has never required Amerindo to demonstrate any funds on deposit

with respect to a potential Participating Securities SBIC license.

Margaret T. Dennin

Sworn to before me this
/__ day of June, 2005

Notary Public

**QUEEN ESTHER V. SCOTT
NOTARY PUBLIC DISTRICT OF COLUMBIA
COMMISSION EXPIRES JUNE 30, 2008**

6

# Exhibit A
# to Affidavit of Margaret T. Dennin

December 27, 2002

Dear Mr. Vilar,

This is in response to the Management Assessment Questionnaire (MAQ) and supplemental information dated September 16, 2002, that you submitted to the Investment Division of the U.S. Small Business Administration (SBA) as part of the process to be licensed as a Small Business Investment Company (SBIC).  At our Investment Committee meeting of December 10, 2002, the judgment was made that your submission ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On that basis, your management team is not being invited by the Committee to our offices for an interview.

As you are aware, Amerindo SBIC Venture Fund, L.P. received a "go forth" letter on April 25, 2000 based on your presentation on April 18, 2000.  On August 9, 2000, you filed a License Application.  This application was not accepted for processing since ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A second MAQ was submitted in May 2002. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The third MAQ was received on September 16, 2002. Review of the third MAQ by the Investment Committee produced numerous areas of concern.

The SBIC program experienced very heavy losses in the late 1980s and early 1990s, with a default rate of 44.5% of the leverage that SBA guaranteed.  As a result, Congress seriously considered ending the program.  Instead, it restructured the program and amended the law governing it.  Section 301(c)(3) of the Small Business Investment Act of 1958, as amended, now reads:

> "In reviewing and processing any application under this subsection, the Administrator- (A) shall determine whether...(ii) the management of the applicant is qualified and has the knowledge, experience, and capability necessary to comply with this Act."

The main cause of the failures of a decade ago was the inexperience of many SBIC managers.  An old adage in the venture business states that "Twenty-five percent of the success of a venture firm takes place prior to the first closing, and 75% of the success is based on activities subsequent to closing."  Thus, success in the venture world is very heavily influenced by the intangibles that a venture fund brings to every investment.  For this reason,

● Page 1

we at the SBA look for a management team that has some meaningful venture experience that we can analyze and calibrate.

We do keep in mind, however, that the SBIC program is a government program with a public policy purpose of funding businesses that are generally smaller than those funded by non-SBICs, and located in a much broader geographic area than those concentrations of non-SBICs. We are also conscious of the need to have venture capital be more broadly available to minority-owned businesses, to women-owned firms, and to companies located in rural areas or within inner cities.

As a result of these considerations, we are not looking to restrict SBIC licenses to a narrow universe of managers having a *10 year track record as a team*, as is the general criteria among institutions for their investments in venture capital firms. Nonetheless, we do need to find that prospective SBIC managers have had meaningful hands-on experience in a number of key areas.

We start by asking ourselves whether the *general partners or officers* demonstrate a satisfactory level of experience in the types of investing that the SBIC plans to do. We specifically look to see that the management team possesses *demonstrated successful competency in all* of the following seven areas:

1. It is essential that at least some of your full-time general partners or officers have made small business equity investments that have successfully matured. Just having made them is insufficient. There has to have been positive results since if licensed you will, in effect, be investing the public taxpayers' money, and we have a responsibility to safeguard that money.

2. The group should also have the demonstrated ability to generate good deal flow. There is a direct correlation between volume of deal flow and quality of investments made. History has shown that firms with inadequate deal flow make poorer investments because the pool of deals to choose from is too small.

3. There needs to be significant experience in performing effective due diligence and analysis of *small private companies of the type* that your firm intends to invest in. For example, if the SBIC intends to invest in hi-tech startups, we want to see that within the team, there is a history of investing successfully in hi-tech startups.

4. It is necessary to have a meaningful history of experience in implementing the types of private equity deal structures that you intend to use. This does not just relate to pricing but also refers to having negotiated contracts with the types of terms customarily utilized within investment agreements to optimize the upside potential while minimizing losses.

5. Probably, the most critical activity that is usually lacking in a potential applicant is in the *demonstrated* monitoring experience required to oversee an investment over a *multi-year period of time*. We want to be able to see that, over an

extended period of time, the members of the team have made meaningful contributions to the progress of companies in which they have invested.

6. The converse of these skills relates to working through troubled situations which, unfortunately, seem inevitable. We wish to see that the general partners or officers have turned around failing companies, and that they also have experience in liquidating investment positions, when necessary.

7. Finally, we look for a demonstrated competence in knowing how to effectively exit an investment in a multitude of ways.

I am sorry to have to write this letter to you, but we feel that if we proceeded, after receiving three submissions to date, that it would be at considerable time and expense to your team (as well as ourselves), and that ultimately, the Agency Licensing Committee would reject your

application.   If there are certain issues you feel must be explained, please send your response to the address below.

Sincerely,

M. Terri Dennin
Chief Administrative Officer

Investment Division
409 3rd Street S.W. Suite 6300
Washington, DC 20416