Mark K. Schonfeld (MS-2798)
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-0077 (Gizzi)

05 CV 5231

JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | : |
| Plaintiff, | : |
| - against - | : |
| AMERINDO INVESTMENT ADVISORS INC., ALBERTO WILLIAM VILAR, and GARY ALAN TANAKA, | : |
| Defendants. | : |

**DECLARATION OF ELZBIETA WRAGA IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, ORDER TO SHOW CAUSE, AND OTHER RELIEF**

I, Elzbieta Wraga, pursuant to 28 U.S.C. 1746, declare as follows:

1. I am over twenty-one years of age, and I am employed as an examiner on the staff of the plaintiff Securities and Exchange Commission ("Commission"). I make this declaration in support of the Commission's Emergency Application for a Temporary Restraining Order, Preliminary Injunction, Order to Show Cause, Order Appointing a Receiver, and Other Relief as to defendant Amerindo Investment Advisors Inc. ("Amerindo"). I make this declaration based

upon information and belief. The sources of my information and the bases of my belief are my participation in the Commission's formal investigation of Amerindo, documents produced pursuant to subpoenas issued by Commission staff, documents filed with, or obtained and reviewed by, members of the Commission's staff, conversations with other members of the Commission's staff, interviews of an Amerindo client, L.C., and documents annexed as exhibits to this declaration.

***Investor L.C.***

2. I have reviewed account statements and other records demonstrating that, since approximately 1987, L.C., has maintained an investing relationship with Alberto William Vilar ("Vilar") and Gary Alan Tanaka ("Tanaka") through Amerindo. These account statements set forth L.C.'s various investments with Amerindo from approximately 1987 through September 30, 2004.

3. I have learned that, in approximately June 2002, Vilar advised L.C. that he and Tanaka were starting an investment fund (the "SBIC") that would invest in technology companies, and that the United States Small Business Administration ("SBA") would provide matching funds. Vilar recommended that L.C. invest in the SBIC.

4. According to L.C., she agreed to make the investment based solely upon Vilar's oral description of the investment opportunity.

5. On or about June 20, 2002, L.C. caused $5 million to be wired to an account in the name of "Amerindo Management Inc." (the "AMI Account") at a Broker-Dealer in which Amerindo and L.C. both have accounts (the "Broker-Dealer") (a copy of the letter of authorization is attached as Exhibit 1.)

6. According to the account opening documents associated with this account, the

AMI Account was not a new account opened for the SBIC; rather it was an existing account in the name of an Amerindo affiliate.

7. As set forth in greater detail in paragraphs 31-34 below, rather than investing L.C.'s money in the SBIC, Vilar, Tanaka and Amerindo transferred the funds out of the AMI Account, including to a personal checking account held in Vilar's name, a business checking account held in Amerindo's name and an offshore account.

8. During the winter of 2002-2003, L.C. and her advisors questioned Vilar about the investment in the SBIC.

9. In a March 13, 2003 letter from Vilar to L.C., Vilar explained that Amerindo had not invested any funds from the SBIC, and that her $5,000,000 investment was being held in escrow. (A copy of the March 13, 2003 letter is attached as Exhibit 2.) Specifically, Vilar wrote that "the monies put into escrow for the new [SBIC] remain at full value." Further, Vilar wrote that:

> Moreover, we got very lucky on the SBA. We received initial approval in 2000. For a number of internal reasons, we decided not to start investing, which in retrospect, was absolutely the right thing to have done. Any private investment made during this horrific period would have declined significantly. Now, we're hoping to start investing when private investments are probably at their lowest levels of valuation in the last forty years. I think your investment in the SBA vehicle is going to be simply extraordinary.
>
> . . .
>
> . . . .
>
> Let me get back to the positive side of the story, namely, what lies ahead and what will benefit you and us together. As you know, our dual expertise in private and public technology companies led us to apply several years ago to the U.S. Small Business Administration for a jointly managed SBA Fund for private equities. Ninety-nine plus percent of all money managers are turned down for SBA Funds. We were approved for this in early 2000, which we were very proud of securing. Fortuitously, in retrospect, as I pointed out, we did not proceed at that time with the investment because of the bear market. We are now awaiting

> permission to commence investing the funds we have placed into escrow, which we expect to happen fairly soon.

10. According to L.C., after she received this letter, she and her advisors continued to question Vilar and Tanaka about the SBIC.

11. In a March 25, 2004 letter from Vilar to L.C.'s accountant, Vilar wrote the following:

> It is well known that it is next to impossible to get an SBIC for a technology-oriented venture capital fund. Amerindo spent years applying for such a license at considerable expense, which was finally approved about three years ago. Unfortunately, largely due to personnel changes at the Small Business Administration pursuant to our approval, we were required to reapply about 18 months ago for the same license. While this has taken far longer than we anticipated, we nevertheless had to deposit the requisite key money for the SBA, which we did. . . . Far more importantly the prices of technology private-placements continued to decline throughout this waiting period. This means that we did not use a single penny of [L.C.]'s investment during this declining period, and if and when, as expected, we start to make investments upon securing the renewal of our license later this year, we will be looking at the best prices probably even seen in the four decade plus history of technology based, venture capital.

(A copy of the March 25, 2004 letter is attached as Exhibit 3.)

12. According to an account statement dated September 30, 2004, L.C.'s investments with Amerindo had an aggregate value of approximately $12 million. (A copy of the September 30, 2004 account statement is attached as Exhibit 4.) The account statement included entries for "FUNDS ON DEPOSIT WITH SBIC (value date 06.20.02)" of $5 million, and "INTEREST ON SBIC DEPOSIT" of $225,000.

13. In an October 25, 2004 memorandum on Amerindo letterhead from Vilar to L.C.'s attorney, Vilar explained the entry on the September 30, 2004 account statement for "Funds on Deposit with SBIC" as follows:

> Technically this represents an escrow deposit for a technology-based SBIC. [L.C.] has effectively coinvested with Gary and myself in a new fund that has been approved for Investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war. This is an eight year fund which we remain extremely optimistic about, given our very positive view on wireless broadband convergence.

(A copy of the October 25, 2004 memorandum is attached as Exhibit 5.)

14.     I have learned that, during the fall of 2004, Vilar supplied L.C.'s attorney with documents concerning the SBIC. The private placement memorandum indicated that the fund was named the Amerindo Venture Fund, LP. After reviewing the private placement memorandum, L.C.'s attorney and L.C. determined that it was not an appropriate investment for her.

15.     In a December 7, 2004 letter from L.C.'s attorney to Vilar and Amerindo, L.C.'s attorney instructed Amerindo and Vilar to "wire transfer the $5 million and interest accrued to date to [L.C.]'s personal account at [the Broker-Dealer]" on or before February 6, 2005. (A copy of the December 7, 2004 letter is attached as Exhibit 6.)

16.     In a December 9, 2004 letter from Vilar to L.C.'s attorney, however, Vilar replied:

> If [L.C.] does not wish to retain the SBIC investment she agreed to make, we will have to undertake on a best efforts basis the sale of her participation to another prospective investor. As could be expected, we are not at liberty to liquidate that investment on demand, as it constitutes part of the $10 million minimum the General Partner was required to come up with to initiate the fund. . . . [I]t is nevertheless quite likely that prospective investors for[L.C.]'s investment will now require the commencement of government-matched funding. This unfortunately involves a political timetable completely beyond our immediate control. Any changeover in ownership will thus take time. At this stage, all we can do is keep you posted of our efforts on her behalf to pursue this very unusual request, which, as noted above, will remain

constrained by the special funding program attached to it.

(A copy of the December 9, 2004 letter is attached as Exhibit 7.)

17. In a February 17, 2005 letter from L.C.'s attorney to Vilar and Amerindo, L.C.'s attorney wrote to "confirm in writing that [L.C.] desires to close her account with Amerindo." (A copy of the February 17, 2005 letter is attached as Exhibit 8.) Further, L.C.'s attorney wrote that "[L.C.] hereby rescinds any discretionary authority Amerindo believes it may have with respect to her account."

18. In a February 21, 2005 letter from L.C. to Vilar and Amerindo, L.C. wrote to "confirm that I want to close my account with Amerindo and revoke any discretionary authority Amerindo believes it has with respect to my account." (A copy of the February 21, 2005 letter is attached as Exhibit 9.)

19. In a February 23, 2005 letter from Vilar to L.C.'s attorney, Vilar wrote that "[t]he Investment Management Agreement requires that the client notify the office where the account is lodged of its decision to terminate its service in writing." (A copy of Vilar's February 23 letter, which was incorrectly dated as 2004, is attached as Exhibit 10.) Vilar indicated that L.C. needed to notify Amerindo Investment Advisors, Inc., an affiliate located in Panama ("Amerindo Panama"), and to send a copy of the letter to Amerindo's office in London, England, of her decision to close the account.

20. According to L.C., she had primarily dealt with Vilar and Tanaka and believed that she was a client of Amerindo.

21. Nonetheless, in a February 28, 2005 letter from L.C. to Amerindo's offices in Panama, New York, and London, L.C. wrote to confirm that "I have instructed Amerindo to close my account with Amerindo, and that I have revoked any discretionary authority Amerindo

believes it has with respect to my account." (A copy of the February 28, 2005 letter is attached as Exhibit 11.)

22.      According to L.C., to date, no one associated with any Amerindo entity has confirmed receipt of her instruction to close her account, and no one has transferred any funds or securities to her. (However, because $2,248,094.29 of her account was invested through an external account at the Broker-Dealer, L.C. was able to revoke Amerindo's discretionary authority over the account and transfer this sum to another personal brokerage account she maintained) In particular, neither Amerindo nor Vilar has returned her $5 million investment in the SBIC or the interest earned on the investment.

23.      In a March 31, 2005 letter from L.C.'s attorney to the Commission staff, L.C.'s attorney advised the Commission of Amerindo's failure to honor L.C.'s redemption request. (A copy of the March 31, 2005 letter is attached as Exhibit 12.)

24.      The Commission staff then forwarded the letter to Amerindo and requested that Amerindo respond.

25.      In a May 20, 2005 letter from Vilar to the Commission staff, Vilar responded to the complaint, claiming, in part, that L.C. was a client of Amerindo Panama and that such entity had been sold to independent owners in 2001 (A copy of the May 20, 2005 letter is attached as Exhibit13.)

26.      Finally, a copy of Amerindo's most recent Part I of its Form ADV, filed with the Commission on July 15, 2004 is attached as Exhibit14.  The Form ADV includes Amerindo Panama as an entity affiliated with Amerindo.

***Summary Account Analysis and Conclusions***

27. I have reviewed monthly account statements and other records pertaining to the AMI Account at the Broker-Dealer. My purpose in reviewing the account records was to determine the recipients of the $5 million that L.C. had wired to the AMI Account on June 20, 2002.

28. Based on my analysis, I have concluded that, during June 2002 and July 2002 alone, at least $650,000 of L.C.'s funds were transferred from the AMI Account to an account in the name of Amerindo at Chase Manhattan bank (the "Amerindo Chase Account"), at least $1 million of L.C.'s funds were transferred from the AMI Account to an account at Chase Manhattan bank bearing the name "A.W. Vilar" (the "Vilar Chase Account") and over $3 million were transferred from the AMI Account to overseas accounts.

29. I have also reviewed the affidavit of U.S Postal Inspector Cynthia M. Fraterrigo (the "Fraterrigo Affidavit"). (The Fraterrigo Affidavit is attached as Exhibit 15.) My purpose in reviewing the Fraterrigo Affidavit was to determine the ultimate recipient of the funds following the transfers from the AMI Account. In the Fraterrigo Affidavit, Ms. Fraterrigo concluded that all but approximately $45,000 of the funds wired into the Vilar Chase Account from the AMI Account were dissipated within two weeks of their deposit and all of the initial $650,000 of the funds wired into the Amerindo Chase Account were spent by Amerindo within one month of receipt on what Ms. Fraterrigo believes to be business expenses.

***Detailed Account and Transaction Analysis***

30. As of May 31, 2002, the AMI Account had a negative cash balance of ($428,121), held securities valued in the aggregate at $758,847, and thus had a net equity balance of $330,725.

31.     On June 20, 2002, L.C. transferred $5 million into the AMI Account, and

$428,121.59 was applied to cover the negative cash balance in the account and $786.43 was used

to cover the interest due on the negative cash balance. (There was no activity in the account

from June 1, 2002 through June 19, 2002.)

32.     On June 25, 2002, transfer instructions bearing Tanaka's signature directed the

Broker-Dealer to transfer $1 million to the Vilar Chase Account and $500,000 to an account at

the Bank of New York bearing the name of a trust (the "Trust Account"). (Copies of these

transfer instructions are attached as Exhibits 16 and 17.)

33.     On June 26, 2002, a transfer instruction bearing Tanaka's signature directed the

Broker-Dealer to transfer $650,000 to the Amerindo Chase Account. (A copy of this transfer

instruction is attached as Exhibit 18.)

34.     On July 9, 2002, $3,102,958.85 was transferred to an account at Bank One

bearing the name "Lynx" with a reference to an account in Luxemburg (the "Lynx Bank One

Account") (A copy of the transfer instruction bearing Tanaka's signature is attached as Exhibit

19.)

35.     At the close of the July 2002 statement period, the cash balance in the AMI

Account was approximately $555,222.63.

36.     I have learned that, according to the affidavit of Cynthia M. Fraterrigo, the Vilar

Chase Account is a personal checking account at JP Morgan Chase held in the name of "Alberto

W. Vilar." According to records covering the period between on or about June 9, 2002 through

July 8, 2002, the Vilar Chase Account had a balance of approximately $87,564.46 immediately

prior to the incoming wire transfer of $1,000,000 from the AMI Account on or about June 25,

2002. No other funds were deposited in the Vilar Chase Account during the statement period,

and the closing balance of the Vilar Chase Account on July 8, 2002 was approximately $132,677.72. Thus, Ms. Fraterrigo concludes that all but approximately $45,000 of the funds wired into the Vilar Chase Account from the AMI Account were dissipated within two weeks of their deposit. The withdrawals from the Vilar Chase Account during that two-week period include the following:

  a.    An electronic check in the amount of approximately $540,000.00, made payable to "Washington and Jefferson";

  b.    A check in the amount of approximately $177,000.00, made payable to "American Academy in Berlin";

  c.    An electronic check in the amount of approximately $17,000.00 made payable to Alberto Vilar;

  d.    A check in the amount of approximately $14,640.08, made payable to what appears to be a catering service, with a memo line that reads:  "AV Party 4/18");

  e.    A transfer in the amount of approximately $10,000.00 for the benefit of "Albert W. Vilar";

  f.    A check in the amount of approximately $7,000.00 made payable to an individual with the last name "Vilar," with a memo line that reads: "Allowance-May";

  g.    A check in the amount of approximately $255.56, payable to an appliance service for "Dishwasher Repair" for an address which Vilar is know to reside; and

  h.    Approximately $1,000.00 in ATM cash withdrawals.

37. According to the Fraterrigo Affidavit, the Amerindo Chase Account was a business checking account held in the name of Amerindo. Ms. Fraterrigo concludes that approximately the entire initial $650,000 that was wire transferred into the Amerindo Chase Account was spent within approximately one month on what appear to be business expenses incurred by Amerindo based on descriptions of outgoing wire transfers.

38. According to the Fraterrigo Affidavit, the Trust Account was an attorney's escrow account. I have learned that those records further show that at least approximately $400,000.00 of those funds were used to make an investment on behalf of L.C., which investment was unrelated to the SBIC, and which investment L.C. believed would be paid for by funds invested with Amerindo separate and apart from the $5,000,000 investment L.C. had made in the SBIC. According to the Fraterrigo Affidavit, on or about July 31, 2002, a check in the amount of approximately $100,000.00 was drawn on the Trust Account and was subsequently returned to L.C.

39. According to a July 31, 2003 article in the Pittsburgh Post-Gazette (www.pittsburghpost-gazette.com/ae/20030731vilarae3.asp), "[Vilar] initiated the Vilar Distinguished Artist Series [at Washington & Jefferson College] three years ago. He also is the largest contributor to the Vilar Technology Center, scheduled to open on campus this fall."

40. According to information posted on the internet at www.sourcewatch.org, the American Academy in Berlin was founded in 1998, and "Alberto W. Vilar" has contributed $1,000,000.00 or more to the Academy. The Academy's website, www.americanacademy.de, lists "Alberto Vilar" in the "President's Circle" of individuals who donated to the Academy during its first five years of operation, and lists "Alberto Vilar" as among the "Patrons" who had made donations between January 2004 and March 2005.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
June 1, 2005

Elzbieta Wraga

# Exhibit 1

220-99111
J

June 19, 2003

[redacted]

Dear [redacted]

Please accept this letter as authorization to wire $5,000,000.00 from my personal account number ([redacted] to the following:

Citibank NA
ABA# [redacted]
[redacted]
Acct # [redacted]
Further Credit to Account: M26
Account # [redacted]

Sincerely,

[redacted]

[redacted]

FOIA CONFIDENTIAL
TREATMENT REQUESTED
[redacted]0053


# Exhibit 2

03-13-2003 05:31pm From-J.GREENE 2124182888 T-081 P.001/003 F-735

TRANSMISSION VERIFICATION REPORT

TIME : 12/14/2002 17:54

| | |
|---|---|
| DATE,TIME | 12/14 17:53 |
| FAX NO./NAME | 12019918434 |
| DURATION | 00:00:24 |
| PAGE(S) | 01 |
| RESULT | OK |
| MODE | STANDARD ECM |

**AMERINDO**
INVESTMENT ADVISORS INC.

399 Park Avenue, 22nd Floor
New York, NY 10022
TEL (212) 371-6360
FAX (212) 371-6988

Alberto W. Vilar
President

March 13, 2003

[redacted]

*Via Facsimile* [redacted]

Dear [redacted]

I am glad we are having dinner this Sunday – at one of our favorite restaurants, Patsy's. Trust me when I tell you that I understand your frustration, and frankly shudder at the idea that our long-standing relationship has suffered. You are important to this firm and to me personally.

Unfortunately, it's just a fact of life that Gary and I, and in turn, Renata, tend to drag our feet when we don't have a specific answer to a query. However, not giving you the answers you request and are entitled to, is in no way intended to be discourteous to you. Neither should it be read as a sign that we are trying to hide from you. As I said, it's just the way we work.

I have two principal goals for dinner. First is to have you fully understand that there is a world of difference between a "cash squeeze", which has impacted us, and in turn you, and a capital loss that will never be recovered. My second goal is to bring you up-to-date on the extraordinary undertakings that the firm has embarked on since last September, that we think should prove very beneficial to the company, and in turn to you. (because of her %)

The unprecedented bear market of the last three years has been no laughing matter. In fact, it has exceeded the Great Depression by every conceivable yardstick. Somewhere between seven and ten trillion dollars has been lost. Companies that you and I grew up with and came to respect, such as Lucent, have declined 97%. What is important for you to appreciate is that the bulk of your funds have declined nowhere near what the market has declined. Rhodes held like a rock, while the monies put into escrow for the new SBIC fund remain at full value.

In the investment business, you take your luck any way you can get it; the truth is that some events fortunately played into our hands to our advantage, for whatever reasons. As you know, were originally going to distribute the proceeds of Rhodes several years ago. If we had, no matter what we would have invested the money in, it would have declined, and sharply. Even the S&P and the Dow have declined 50% from their highs. Moreover, we got very lucky on the SBA. We received initial

AMERINDO INVESTMENT ADVISORS INC.

approval in 2000. For a number of internal reasons, we decided not to start investing, which in retrospect, was absolutely the right thing to have done. Any private investment made during this horrific period would have declined significantly. Now, we're hoping to start investing when private investments are probably at their lowest levels of valuation in that last forty years. I think your investment in the SBA vehicle is going to be simply extraordinary. As I said, we will take luck any way we can get it, but we all have much to be thankful for in retrospect.

What has actually happened to us, and in turn to you, is quite different from the huge losses the financial markets have suffered across the board. We have sizable investments in private companies and other small capitalization technology stocks that have seen a dry-up of liquidity owing to market uncertainty. Unfortunately, the first casualty of a major bear market is always the closing of the IPO market, which is the market for Initial Public Offerings to the public stock market. Investors literally go on strike and lose interest in buying the shares of companies that are new to the public market, because the ones that they hold like Cisco, AOL, Orcale, Sun, etc. are all declining. (Cisco and AOL were two of the three best performing stocks in the decade of the 1990s, and yet both declined over 85% in the last two and a half years). What I am saying is that our inability in the last couple of months to make timely cash payments has been due to illiquidity, and not to capital loss. As a 35-year veteran of Wall Street and a pioneer of growth stock investing, I can also say with confidence that markets can turn on a dime, and liquidity can come back virtually overnight. To put this into perspective, the horrific bear market that started in March of 2000 looks to us as though it ended on October 9th, when NASDAQ hit a bottom of 1114. The fourth quarter saw a nice recovery bounce, but this was soon dissipated in January and February with the war overhang. It also dried up liquidity even more. Our best guess now is that the war will soon come and pass, and the markets will go on to breathe a sigh of relief and then start to recover. NASDAQ has outperformed the S&P and the Dow since the lows of 9/11. Amerindo's domestic fund is actually ranked number one this year, notwithstanding very modest results.

Let me go back to the positive side of the story, namely, what lies ahead and what will benefit you and us together. As you know, our dual expertise in private and public technology companies led us to apply several years ago to the U.S. Small Business Administration for a jointly managed SBA Fund for private equities. Ninety-nine plus percent of all money managers are turned down for SBA Funds. We were approved for this in early 2000, which we were very proud of securing. Fortuitously, in retrospect, as I pointed out, we did not proceed at that time with the investment because of the bear market. We are now awaiting permission to commence investing the funds we have placed into escrow, which we expect to happen fairly soon.

As I also mentioned above, emerging technology markets have been outperforming the S&P and the Dow for over a year. The only thing that hasn't happened so far, which is so critical to us and to our cash flow, is that the IPO market for technology stocks has yet to reopen. This key market force has been closed for literally three years, which has never happened before. This has been the principal source of our cash constraints because so much of our company and personal investing is initially routed through private investments. Like all venture capitalists, we are paper rich, but presently cash poor, but we believe that this too will fall into place later this year.

Notwithstanding the negative overhang on the stock market of the Middle East war, there are some very exciting developments taking place in our technology sector now. The consumer side of electronics is really on a "tear", with new devices designed to integrate seamlessly games, digital pictures, cell phones, PVRs, HDTV, etc., with broadband wireless access to the Internet.

To put all of this into the only perspective that counts, which is the historic record of actual stock market returns, the best single area of the stock market between 1975 and 2000 was electronic technology. Unfortunately, this was followed by a devastating bear market between March 2000 and October 2002, though your investments survived in very decent shape. I do not believe that we will see another bear market like this in our lifetime. As I have explained before, about five major factors came together in a very short period of time, which proved to be just too much for the market to handle in so short a period of time. These were a recession uniquely concentrated in capital spending for technology; rank speculation in IPOs; the euphoria surrounding the unfolding paradigm change that the Internet represented; the telecommunications burst; corporate and Wall Street scandals, and 9/11.

All of these unprecedented negatives are essentially behind us in terms of already being discounted in stock prices. The future is quite constructive for our technology sector, with the new Internet-Networking wave likely to get underway later this year. We do not think that the S&P or Dow will do well at all, as economic growth will be quite muted by historic standards in the next few years. With interest rates at 40-year lows, the bond market has no place to go but down. Even real estate is softening considerably. I would be hard pressed to think of a single area of investing that will do better than ours over the next five years.

I truly appreciate the extraordinary patience you have shown us, and myself personally. We think most of our problems are behind us and we ask for your indulgence just a tad longer. The best of all worlds would be that we can soon close the payments gap that has so uncharacteristically hampered us, and then we can all go on to make a killing in the SBA Fund and in Amerindo's own business – which you as a shareholder stand to benefit from.

Sincerely,

Alberto

Alberto Vilar

# Exhibit 3

AMERINDO
INVESTMENT ADVISORS INC.

399 Park Avenue, 22nd Floor
New York, NY 10022
TEL (212) 371-6360
FAX (212) 371-6988

Alberto W. Vilar
President

March 25, 2004

Maurice R. Kassimir, esq
Spielman & Kassimir, P.C.
111 West 40th Street
New York, NY 10018

Dear Maurice:

I was frankly taken aback by your letter regarding [redacted] for the reasons discussed below. Because you did not get all the pertinent facts, your letter is incorrect in some instances, and incomplete in others.

For starters, through both the good and bad times, [redacted] has done well by Amerindo. I have also personally done things for [redacted] that I, and for that matter, Gary and Amerindo, never did for any other client. Specifically, I gave one percent of Amerindo, one half from me and one half from Gary, to [redacted] for no consideration. Secondly, I offered to her and to her alone, participation as a general partner with Amerindo in an SBIC fund. This is an investment fund in which the US Government lends two dollars for every dollar put up without recourse.

It is well known that it is next to impossible to get an SBIC for a technology-oriented venture capital fund. Amerindo spent years applying for such a license at considerable expense, which was finally approved about three years ago. Unfortunately, largely due to personnel changes at the Small Business Administration pursuant to our approval, we were required to reapply about 18 months ago for the same license. While this has taken far longer than we ever anticipated, we nevertheless had to deposit the requisite key money for the SBA, which we did. I explained this on numerous occasions to [redacted]. Far more importantly, the prices of technology private-placements continued to decline throughout this waiting period. This means that we did not use a single penny of [redacted] investment during this declining period, and if and when, as expected, we start to make investments upon securing the renewal of our license later this year, we will be looking at the best prices probably ever seen in the four decade plus history of technology based, venture capital. I have told [redacted] that this could be the best investment of her lifetime. It is simply not the case that this investment was going to generate $250,000 per quarter at this time. This has obviously been confused with something I'm not familiar with.

AMERINDO INVESTMENT ADVISORS INC.

With respect to the transfer of the 1% equity ownership in Amerindo, it is simply not correct that it was done in exchange for the $5 million wire, since as I indicated above, this was done entirely for her benefit. I convinced Gary to go along with me principally because of my friendship with [redacted] and as you correctly put it, her loyalty through good and bad times, notwithstanding that [redacted] has done well at Amerindo. I also explained to [redacted] that while I had discussed making the change in the firm's ownership structure with Rick Cohen, I thought the issuance of the new capital structure should wait until the completion of an expected minority equity sale to a third party financial institution that has been under consideration since late last year. This in no way detracts from our word that the change in ownership has effectively taken place, and will be appropriately recognized in due course.

The New York office does not prepare [redacted]'s statements, which are done in London. If it is true that she hasn't received a statement since the middle of last year, I will look into that straight away and see that it is rectified with all due apologies. It probably makes sense to have her statements prepared here, notwithstanding regulatory issues. Unfortunately, James Stableford has been on a leave of absence for the past two months and is due back shortly.

It is correct that there was a drop in the accumulated value of her account as you indicated. Part of this was due to an error that had unknowingly compounded for several years on the interest earned that was detected in an audit last year. It applied to all clients. There is not much we can do about this now other than apologize. The rest of the drop was the result of periodic realignments we make in private equities, which do not trade like public securities that have readily available prices. We tend to price our private securities twice yearly, largely based on company information received. However, this change in value would not be out of line with the fact that technology venture investments sustained the largest loss in their history over the last three years. It would not be far-fetched to say that two-thirds went out of business. Notwithstanding this drop, it is still a fact that [redacted] account performed satisfactorily during the worst bear market in the four-decade history of venture-backed and public technology. Incidentally, the last time [redacted] was in the office, I showed her some 87 boxes that had been sent here from our San Francisco office that related to our private investments. We have had to comb through all boxes to substantiate a) the error that I indicated above and b) the changes in value the bear market in technology caused in our private investments. My point in mentioning this is that it is not as though we were unresponsive to her valid query, but these things can take considerable time and effort.

Detail on Audited Statement

It is true that [redacted] wanted to receive $250,000 per quarter, which unfortunately has not been forthcoming. As I explained to her a number of times, the unprecedented bear market of 2000-2002, which wiped out $10 trillion in equity values with technology being the hardest hit sector of both the public and private markets, caused a liquidity squeeze for all organizations in our specialty sector of investing. We are hopeful that we will be in a position to resume payments later this year.

I really do take personal and professional exception if not umbrage with item number six in your letter. Your allegations are wrong. This letter may not be the place to do so, nor have I been so authorized by [redacted], but there have been very specific instances when I have gone out of my way to help [redacted]. For example, [redacted] wanted us to invest a fair amount of money for her in a small medical information company in New Jersey. I put the entire resources of my firm to analyze [redacted] potential investment. Our analysis recommended that [redacted] not invest in that company – which unfortunately she did anyway, and I understand lost money. I also stuck my neck out to help her with the not inconsiderable problems Joey Salerno created in her life – which I truly believe she does appreciate.

When it counts, I do believe [redacted] knows that I will be there for her without question. She can call me at any time. As indicated above, she has requested information on several items that are being worked on. In a relationship as long as ours, problems undoubtedly surface. In my own way, which has always been to put [redacted] first, I have always managed to sort them out – and fulfill [redacted] goal of seeing her wealth increase over time. The future for our sector has never looked better to us – which is described in my firm's latest investment review that I've taken the liberty to enclose.

Sincerely,

Alberto Vilar

AV:ms

cc: [redacted]

FROM : FAX NO. : 3108286138 Apr. 19 2005 06:51AM P6

# Exhibit 4

# AMERINDO INVESTMENT ADVISORS, INC.

AVENIDA SAMUEL LEWIS
EDIFICIO PLAZA OBARRIO
APARTADO 5215
PANAMA 5 PANAMA
TEL: (507) 264-9673
FAX: (507) 264-9667

## STATEMENT OF ACCOUNT

| Client Account Number | Reference |
|---|---|
| D487-D1C-166 | F |

| Statement Period | |
|---|---|
| Opening 07.01.04 | Closing 09.30.04 |
| Closing Account Balances | |
| Cash ---------- | Equities ---------- |
| Fixed Deposits ---------- | *External* $12,217,191.85 |
| Financial Account Summary $12,217,191.85 | |

| Type of Investment | Price | Amount |
|---|---|---|
| FIXED DEPOSIT ACCOUNTS | | |
| EQUITIES | | |
| FUNDS ON DEPOSIT WITH SBIC (value date 06.20.02) | | $5,000,000.00 |
| EXTERNAL CUSTODY ACCOUNTS | | |
| A/C #899-00236 | | $2,872,058.00 |
| MISCELLANEOUS / CASH | | |
| 2 SHARES IN RHODES CAPITAL GROUP | | $1,000,000.00 |
| ACCUMULATED DIVIDENDS + INTEREST EARNED ACCOUNT | | $3,120,133.85 |
| INTEREST ON SBIC DEPOSIT | | $225,000.00 |
| TOTAL | | $12,217,191.85 |

# Exhibit 5

Exhibit 9

# AMERINDO
INVESTMENT ADVISORS INC.

## MEMORANDUM

To: Ed Swanson

From: Alberto Vilar

Date: October 25, 2004

Re: [redacted] Statement of Account

---

You asked for an explanation of the entries on [redacted] Statement of Account. The statement is produced for clients at our London office, typically semi-annually, although for [redacted] we undertake to get it out quarterly in arrears. This is because most of her assets are in fixed deposits with the exception of equities in her [redacted] account, which she receives directly on a monthly basis. My comments on each entry follow.

1. Funds on deposit with SBIC, for $5 million. Technically this represents an escrow deposit for a technology-based SBIC. [redacted] has effectively coinvested with Gary and myself in a new fund that has been approved for investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war. This is an eight year fund which we remain extremely optimistic about, given our very positive view on wireless broadband convergence.

2. [redacted] account for $3,366,281.00. This is self- explanatory, as it represents public securities we have acquired for her in her account at [redacted]. A separate statement of account is produced by [redacted] for these securities.

3. Two shares in Rhodes Capital Group for $1 million. This was an investment partnership that Amerindo offered to a select number of clients some years ago at $500,000 per share. It is anticipated that these capital shares will be redeemed at face value in the intermediate-term future, as the bulk of the partnership's investments have been executed and realized.

4. Accumulated dividends and interest earned account for $3,071,661.68. This represents accumulated dividends that have been earned by Rhodes Capital, plus interest on the same when not withdrawn but reinvested. These funds were invested in Fixed Rate

Exhibit [illegible] (2)

Deposit accounts. The rate of return varies from year to year. Over the years, the returns on the account were very positive, of which a significant amount has already been paid out to [redacted] The dividends have been reinvested in a portfolio of private and debt securities. Funds in this account have occasionally been invested in different Amerindo investment vehicles, both short and long term, over the years. This multiple in-house account intermediation shows up in the account total, as noted above. Separate category entries are not necessarily created for separate investments.

5. Interest on SBIC deposit for $200,000. This is self-explanatory.

The attached Statement of Account has been used by Amerindo for at least the past decade. It is not dissimilar from hedge fund management company practices, in that we provide a summary statement, and not a detailed listing of all the securities in the portfolio with the exception of equities held in her [redacted] account, as noted previously. The majority of her funds are invested in various Amerindo products providing guaranteed fixed annual interest return. Amerindo issues a summarized statement largely because clients, as is the case with [redacted] are principally interested in the growth in the account, namely the return their invested capital has produced over measurable time periods.

I will be traveling to California this Saturday until next Wednesday and will not be back in the office until next Thursday, October 28. If you would like to discuss the statement in greater detail, please contact Michael Shattner at 212.418.2532.

Best regards,

[signature]

Alberto Vilar

AV:ms

Enclosures

cc: Gary Tanaka

# Exhibit 6

**EDWARD T. SWANSON**
Attorney At Law
1135 17th Street Suite E
Santa Monica, California 90403
Phone: (310) 586-0082 Fax: (310) 828-6138
Email: etswanson@att.net

December 7, 2004

Via Email

Amerindo Investment Advisors Inc.
399 Park Avenue, 22nd Floor
New York, NY 10022
Attention: Alberto Vilar

Re: [redacted]

Dear Alberto:

I have reviewed the SBIC documents you provided to me and discussed the proposed investment in the SBIC with [redacted]. [redacted] has decided that she does not wish to participate in the SBIC investment. Consequently, please wire transfer the $5 million and interest accrued to date to [redacted] personal account at [redacted]. This transfer should be effected as soon as practicable and in no event later than February 6, 2005, which is 60 days from today.

This transfer does not affect [redacted] prior request to you to transfer to her $250,000 from her Rhodes Capital investment in January 2005.

Separately, [redacted] advised me today that she still has not received the September 30, 2004 account statement from Amerindo. When [redacted] and I talked with you by telephone a month ago, you stated that it was on your desk and about to be mailed out. Why has she not received it?

Very truly yours,

Edward T. Swanson

# Exhibit 7

**AMERINDO**
**INVESTMENT ADVISORS INC.**

399 Park Avenue 22nd Floor
New York, NY 10022
Tel (212) 371-6360
Fax (212) 371-6988

Alberto W. Vilar
*President*

December 9, 2004

Edward T. Swanson
1135 17th Street, Suite E
Santa Monica, CA 90403

***Via email:*** etswanson@worldnet.att.net

Dear Ed:

I write in response to your email-letter of December 7 regarding [redacted] account.

If [redacted] does not wish to retain the SBIC investment she agreed to make, we will have to undertake on a best efforts basis the sale of her participation to another prospective investor. As could be expected, we are not at liberty to liquidate that investment on demand, as it constitutes part of the $10 million minimum the General Partner was required to come up with to initiate the fund. On one hand, technology-based venture capital investing has recently begun to see some rekindling of investor interest as an attractive long-term investment option going forward, especially relative to everything else in the lackluster environment expected to prevail for some time. On the other hand, it is nevertheless quite likely that prospective investors for [redacted]s investment will now require the commencement of government-matched funding. This unfortunately involves a political timetable completely beyond our immediate control. Any changeover in ownership will thus take time. At this stage, all we can do is keep you posted of our efforts on her behalf to pursue this very unusual request, which, as noted above, will remain constrained by the special funding program attached to it.

If [redacted] wants to liquidate her investment to invest in something else, she could liquidate the [redacted] account.

Incidentally, the London office has confirmed that the September 30 statement has been sent under separate cover to [redacted]. I regret to have to say that it is simply inconceivable

that when I talked to you a month ago, I would have told you that her statement was on my desk, as you indicate in your December 7 letter. These statements are generated and distributed directly from the London office. The main part of [redacted] account that tends to fluctuate on a quarterly basis is the [redacted] account, for which she receives statements directly. As she could confirm, her [redacted] monthly statements are not received in our London office until late in the following month.

Sincerely,

Alberto Vilar

AV:ms

# Exhibit 8

**EDWARD T. SWANSON**
Attorney At Law
1135 17th Street Suite E
Santa Monica, California 90403
Phone: (310) 283-1035 Fax: (310) 828-6138
Email: etswanson@att.net

February 17, 2005

Via Fax and Email

Amerindo Investment Advisors, Inc.
399 Park Avenue, 22nd Floor
New York, NY 10022
Attention: Alberto Vilar

Re: [redacted]

Dear Alberto:

As [redacted] indicated to you on the telephone on February 15, 2005, she has decided upon a "total divorce" with Amerindo due to her extreme dissatisfaction with Amerindo. This will confirm in writing that [redacted] desires to close her account with Amerindo. Her client account number is D487-D1C-166. According to the statement from Amerindo for the period ended September 30, 2004, the value of her account on that date was in excess of $12 million.

Please provide to me by Tuesday, February 22, 2005, a written confirmation that [redacted] account is being closed, and the date by which her funds and securities will be transferred to her. All funds and securities should be delivered to the following account maintained by [redacted] Please feel free to contact Mr. [redacted] of [redacted] should you need additional information with respect to such transfer.

On behalf of [redacted], I also hereby request an accounting with respect to her Amerindo account since January 1, 2001.

This letter does not alter [redacted] position that the $5 million SBIC investment made by Amerindo on her behalf was improper and should be rescinded.

[redacted] hereby rescinds any discretionary authority Amerindo believes it may have with respect to her account.

Very truly yours,

Edward T. Swanson

cc: [redacted]
Graham N. Arad

# Exhibit 9



February 21, 2005

Amerindo Investment Advisers, Inc.
399 Park Avenue, 22nd Floor
New York, NY 10022
Attention: Alberto Vilar

Dear Alberto:

      This will confirm that I want to close my account with Amerindo and revoke any discretionary authority Amerindo believes it has with respect to my account.  My attorney, Edward T. Swanson, has provided a more detailed notice.  Please direct all questions and correspondence to him.

                            Very truly yours,

# Exhibit 10

Alberto W. Vilar
860 United Nations Plaza
New York, NY 10017

February 23, 2004

Edward T. Swanson
1135 17th Street, Suite E
Santa Monica, CA 90403

***Via email:*** etswanson@worldnet.att.net

Dear Ed:

The Investment Management Agreement requires that the client notify the office where the account is lodged of its decision to terminate its service in writing. [redacted] should write a letter to the Amerindo office where she has been a client for the better part of 20 years, which is:

Amerindo Investment Advisors, Inc.
Calle Elvira Mendez
Vallarino Building
6th Floor
P.O. Box 4415
Panama 5
Republic of Panama

She can also send a signed copy of this notification to the London office, which coordinates administration.

Amerindo stands by what it has previously said to you regarding [redacted] full understanding and agreement with regards to the SBIC investment. There is no other investment that was discussed more extensively over the last three years with her and on which there exists a documented record at Amerindo of these numerous discussions.

[redacted] is in receipt of statements provided by the Panama company, which includes the accounting you requested.

Please note the net proceeds that will ultimately be sent to her will be net of fees, which have long been accrued but not charged for the duration of her account, plus applicable taxes payable.  As a valued client, this was done expressly to maximize her total returns pre fees and taxes.

Sincerely,

Alberto Vilar

AV:ms

# Exhibit 11

FROM : FAX NO. : 3108286138 Apr. 19 2005 06:55AM P6

2/28/05 10:38 PAUL

Exhibit 43

February 28, 2005

Via Fax

Amerindo Investment Advisers, Inc.
Panama, New York and London

To Whom It May Concern:

This will confirm the notice dated February 17, 2005 from my attorney, Edward T. Swanson, and confirmed by me in writing on February 22, 2005 and hand delivered by me to Amerindo at its New York City office, that I have instructed Amerindo to close my account with Amerindo, and that I have revoked any discretionary authority Amerindo believes it has with respect to my account. My client account number is D487-DIC-166.

I found the letter dated February 23, 2005 from Alberto Vilar to my attorney quite insulting, in requiring me to provide written notice to the Panama address of Amerindo before Amerindo would comply with my instructions. I have frequently dealt with Alberto and other Amerindo associates in New York, and also have talked by phone with Amerindo associates in London, without this "requirement" ever being raised. I also have never before heard that there were "fees" relating to my account of nearly 20 years that Amerindo has not charged and now will do so. I have instructed my attorney to contact the appropriate regulatory authorities regarding this and certain other concerns I have.

My attorney, Edward T. Swanson, may provide additional instructions or inquiries on my behalf. Please direct all questions and correspondence to him.

Very truly yours,



# Exhibit 12

**EDWARD T. SWANSON**
Attorney At Law
1135 17th Street Suite E
Santa Monica, California 90403
Phone: (310) 586-0082 Fax: (310) 828-6138
Email: etswanson@att.net

March 31, 2005

Via Fax

Daryl Hagel, Assistant Director
Judith Anderson, Senior Special Counsel
Securities and Exchange Commission
San Francisco District Office
44 Montgomery Street, Suite 1100
San Francisco, CA 94104

Re: Failure of Amerindo Investment Advisors, Inc. To Transfer Funds of [redacted]

Dear Daryl and Judith:

I am writing you at the suggestion of Ms. Rosalind Tyson of the Los Angeles Regional Office of the Securities and Exchange Commission. Amerindo Investment Advisors, Inc. has ignored written instructions from my client, [redacted] to transfer all securities and funds in her account with Amerindo to an account she maintains at [redacted] I first provided written notice to Amerindo of these instructions by [redacted]n a fax on February 17, 2005. On February 22, 2005, [redacted] personally delivered to Amerindo in New York a letter signed by her confirming my instructions. The next day, Mr. Alberto Vilar of Amerindo, who had dealt with [redacted] for approximately 18 years in New York where they both live, emailed a letter to me stating that (1) [redacted] needed to send a letter to the Amerindo office in Panama, and (2) Amerindo would first deduct unspecified fees he claimed had been accruing but not charged for the 18 year duration of her account with Amerindo.

On February 28, 2005, a letter signed by [redacted] again confirming her instructions to close her account and transfer her funds and securities was faxed by me personally to Amerindo in Panama as well as New York and London. Since then, there has been no transfer and not even a letter or phone call of acknowledgement.

Any assistance you are able to render with respect to the return of [redacted] funds and securities to her by Amerindo would be greatly appreciated. It is my understanding from Ms. Tyson that the San Francisco District Office oversees Amerindo due to its office there.

Daryl Hagel, Assistant Director
Judith Anderson, Senior Special Counsel
Securities and Exchange Commission
March 31, 2005
Page Two

Please do not hesitate to call me should you require any additional information. If you are unable to reach me at my office number, feel free to call me on my cell phone, 310-283-1035.

Very truly yours,

Edward T. Swanson

cc: [redacted]

# Exhibit 13

**AMERINDO**
**INVESTMENT ADVISORS INC.**

**399 Park Avenue 22nd Floor**
**New York, NY 10022**
**Tel (212) 371-6360**
**Fax (212) 317-9381**

Alberto W. Vilar
*President*

May 20, 2005

VIA FAX
(415) 705-2330

Ms. Cheryl M. Lawson
Investor Assistance Specialist
United States Securities and
Exchange Commission
San Francisco District Office
44 Montgomery Street, Suite 2600
San Francisco, California 94104

**Re:** [redacted]
**SF 1064027**

Dear Ms. Lawson:

I am responding to your letter, dated April 8, 2005, addressed to Amerindo Investment Advisors Inc. ("Amerindo") at its San Francisco office, to the attention of Ms. Dana Smith, Chief Compliance Officer. That letter requested that Amerindo respond to a complaint letter, dated March 31, 2005, sent to your office by [redacted], Esq., on behalf of [redacted]. This letter was received in Amerindo's New York office on May 2, 2005, by Ms. Smith who immediately contacted your office to acknowledge receipt.

Amerindo is a California corporation maintaining its principal place of business at One Embarcadero Center, Suite 2310, San Francisco, California 94111. [redacted] has never been a client of Amerindo, the California corporation. Rather, for approximately 18 years, [redacted]

was a valued client of a Panamanian corporation, also known as Amerindo Investment Advisors, Inc. ("Amerindo Panama"), which has, at all times, been a separate legal entity from Amerindo. At the present time, there is no common ownership with respect to Amerindo and Amerindo Panama, and no overlap between the directors, officers and employees thereof. The present owners of Amerindo formerly owned Amerindo Panama, but they sold it to its present owners in 2001. Pursuant to that transaction, the present owners of Amerindo Panama have the right to continue to use the "Amerindo" name through December 31, 2005, after which time the name of the company will be changed. Amerindo does not control or manage the present operations of Amerindo Panama.

During [redacted] tenure as a client of Amerindo Panama, she has enjoyed profits in excess of $10,000,000 on an initial investment of $1,700,00.00, and it is our understanding that she has received more than $6,000,000.00 in distributions from that firm.

In or about February, 2005, Amerindo received a request from [redacted] that her account be closed. In response, Amerindo informed [redacted], by letter to her attorney, [redacted] dated February 23, 2005, that she should submit her request, in writing, to Amerindo Panama, with a copy to Amerindo Advisors (UK) Limited, a U.K. based separate entity, which has provided administrative services to Amerindo Panama.

We are confident that Amerindo Panama would have no objection to [redacted] decision to close her account. **In fact, we believe that the liquid securities in her account, totaling close to $4,000,000.00, have already been turned back to her for her management and disposition.** The matter of closing [redacted] account and returning the remaining balance of her funds to her is, however, complex. This is because we understand that what remains to be liquidated are entirely private placement securities, for which there is no public market. Even if buyers can be found for such illiquid securities, industry practice is that they tend to be sold for typically 10% to 20% of their original costs. This has been explained in detail to [redacted] and her lawyer.

For example, [redacted] account includes two shares of Rhodes Capital Group Limited, which [redacted] acquired in or about 1989, pursuant to a private placement, with an initial investment of $1,000,000.00. Since making that investment, [redacted] has received considerable dividends. [redacted] and her attorney have been informed that it is anticipated that the remaining private investments will be liquidated, but that this could take up to two years. [redacted] account includes a second private investment for approximately $5,000,000.00, which was made with [redacted] express consent in 2002, and was expected from the outset, to be of approximately a 10 year duration, corresponding to comparable private equity vehicles. [redacted] has, at all times, been fully aware of the long term nature of these investments, including their short term illiquidity.

When [redacted] decided to terminate her investment relationship with Amerindo Panama, she and her lawyer were told that every effort would be undertaken to sell her illiquid investments to one or more other private investors, which could easily take two to three years,

and that the value to be received for the investments would be negotiated with the ultimate buyer(s), as there is no public market for the securities involved. [redacted] and her attorney are well aware of this, and of the fact that there can be no assurance as to the precise time frame in which a final liquidation of her investments with Amerindo Panama can be accomplished. We believe that Amerindo Panama will make every effort to do this as expeditiously and on as favorable terms as possible. Several efforts have been made to contact [redacted] lawyer to discuss this matter further, but there has been no response yet.

Amerindo stands ready to assist Amerindo Panama in this effort, and would do so without charge.

Very truly yours,

AMERINDO INVESTMENT ADVISORS INC.

[signature]

Alberto Vilar

cc: [redacted]

# Exhibit 14

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, Page 1**
**7/15/2004 11:32:27 AM**

**ADV Part 1A, Page 1**

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 3.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you.

A. Your full legal name (if you are a sole proprietor, your last, first, and middle names):
AMERINDO INVESTMENT ADVISORS INC

B. Name under which you primarily conduct your advisory business, if different from Item 1.A.
AMERINDO INVESTMENT ADVISORS INC
*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

C. If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.), enter the new name and specify whether the name change is of
☐ your legal name or ☐ your primary business name:

D. If you are registered with the SEC as an investment adviser, your SEC file number: 801-24922

E. If you have a number ("*CRD* Number") assigned by the *NASD's CRD* system or by the IARD system, your *CRD* number: 112610
*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, Page 2**
**7/15/2004 11:32:27 AM**

**Item 1 Identifying Information (Continued)**

F. *Principal Office and Place of Business*

(1) Address (do not use a P.O. Box):
Number and Street 1: Number and Street 2:

~~ONE EMBARCADERO CTR, STE 2300~~
ONE EMBARCADERO CTR, STE 2310

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| SAN FRANCISCO | CA | USA | 94111-3162 |

If this address is a private residence, check this box: ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for registration, or are registered only, with the SEC, list the largest five offices in terms of numbers of employees.*

(2) Days of week that you normally conduct business at your *principal office and place of business*:

◉ Monday-Friday ○ Other:

Normal business hours at this location:
6:00AM TO 3:00PM

(3) Telephone number at this location:
415-362-0292

(4) Facsimile number at this location:
415-362-0533

G. Mailing address, if different from your *principal office and place of business* address:

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| 399 PARK AVENUE | | 22ND FLOOR | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| NEW YORK | NY | USA | 10022 |

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| City: | State: | Country: | ZIP+4/Postal Code: |

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610**

**Rev. 05/2003**

**ADV - Annual Amendment, Page 3**
**7/15/2004 11:32:27 AM**

**Item 1 Identifying Information (Continued)**

**YES NO**

I. Do you have World Wide Web site addresses? ◉ ○

*If "yes," list these addresses on Section 1.I. of Schedule D. If a web address serves as a portal through which to access other information you have published on the World Wide Web, you may list the portal without listing addresses for all of the other information. Some advisers may need to list more than one portal address. Do not*

*provide individual electronic mail addresses in response to this Item.*

J. Contact *Employee*:

Name: DANA SMITH
Title: CHIEF COMPLIANCE OFFICER
Telephone Number: 212-371-6360
Facsimile Number: ~~212-980-5118~~ 212-371-7003

Number and Street 1: 399 PARK AVENUE, 22ND FLOOR
Number and Street 2:

City: NEW YORK
State: NY
Country: USA
ZIP+4/Postal Code: 10022

Electronic mail (e-mail) address, if contact *employee* has one: DSMITH@AMERINDO.COM

*The contact employee should be an employee whom you have authorized to receive information and respond to questions about this Form ADV.*

| | YES | NO |
|---|---|---|
| K. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*? *If "yes," complete Section 1.K. of Schedule D.* | ◉ | ○ |

| | YES | NO |
|---|---|---|
| L. Are you registered with a *foreign financial regulatory authority*? *Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes", complete Section 1.L. of Schedule D.* | ○ | ◉ |

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610**

**Rev. 05/2003**

**ADV - Annual Amendment, Page 4**
**7/15/2004 11:32:27 AM**

### Item 2 SEC Registration

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2 only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration.

A. To register (or remain registered) with the SEC, you must check at least one of the Items 2.A(1) through 2.A(11), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A (12). You:

☑ (1)have *assets under management* of $25 million (in U.S. dollars) or more;

*See Part 1A Instruction 2.a. to determine whether you should check this box.*

☐ (2)have your *principal office and place of business* in the U.S. Virgin Islands or Wyoming;

(3)have your *principal office and place of business* outside the United States;

☐

☑ (4)are an investment adviser (or sub-adviser) to an investment company registered under the Investment Company Act of 1940;

*See Part 1A Instruction 2.b. to determine whether you should check this box.*

☐ (5)have been designated as a nationally recognized statistical rating organization;

*See Part 1A Instruction 2.c. to determine whether you should check this box.*

☐ (6)are a pension consultant that qualifies for the exemption in rule 203A-2(b);

*See Part 1A Instruction 2.d. to determine whether you should check this box.*

☐ (7)are relying on rule 203A-2(c) because you are an investment adviser that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

*See Part 1A Instruction 2.e. to determine whether you should check this box. If you check this box, complete Section 2.A(7) of Schedule D.*

☐ (8)are a newly formed adviser relying on rule 203A-2(d) because you expect to be eligible for SEC registration within 120 days;

*See Part 1A Instruction 2.f. to determine whether you should check this box. If you check this box, complete Section 2.A(8) of Schedule D.*

## FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| **Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610** |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, Page 5**
**7/15/2004 11:32:27 AM**

**Item 2 SEC Registration (Continued)**

☐ (9) are a multi-state adviser relying on rule 203A-2(e);

*See Part 1A Instruction 2.g. to determine whether you should check this box. If you check this box, complete Section 2.A(9) of Schedule D.*

☐ (10)are an Internet investment adviser relying on rule 203A-2(f);

*See Part 1A Instructions 2.h. to determine whether you should check this box.*

☐ (11)have received an SEC *order* exempting you from the prohibition against registration with the SEC;

*If you checked this box, complete Section 2.A(11) of Schedule D.*

☐ (12)are no longer eligible to remain registered with the SEC.

*See Part 1A Instructions 2.i. to determine whether you should check this box.*

B. Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. If this is an initial application, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings you submit to the SEC. If this is an amendment to direct your *notice filings* to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

| | | | |
|---|---|---|---|
| ☐ AL | ☐ ID | ☐ MO | ☐ PA |
| ☐ AK | ☐ IL | ☐ MT | ☐ PR |
| ☐ AZ | ☐ IN | ☐ NE | ☐ RI |
| ☐ AR | ☐ IA | ☐ NV | ☐ SC |
| ☑ CA | ☐ KS | ☐ NH | ☐ SD |
| ☐ CO | ☐ KY | ☐ NJ | ☐ TN |
| ☐ CT | ☐ LA | ☐ NM | ☑ TX |
| ☐ DE | ☐ ME | ☐ NY | ☐ UT |
| ☐ DC | ☐ MD | ☐ NC | ☐ VT |
| ☐ FL | ☐ MA | ☐ ND | ☐ VA |
| ☐ GA | ☐ MI | ☐ OH | ☐ WA |
| ☐ GU | ☐ MN | ☐ OK | ☐ WV |
| ☐ HI | ☐ MS | ☐ OR | ☐ WI |

*If you are amending your registration to stop your notice filings from going to a state that currently receives them and you do not want to pay that state's notice filing fee for the coming year, your amendment must filed before the end of the year (December 31).*

**Item 3 Form Of Organization**

A. How are you organized?

◉ Corporation ○ Sole Proprietorship ○ Limited Liability Partnership (LLP)
○ Partnership ○ Limited Liability Company (LLC) ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

**FORM ADV**

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION**

| **Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610** |
|---|---|

Rev. 05/2003

**ADV - Annual Amendment, Page 6**
**7/15/2004 11:32:27 AM**

**Item 3 Form Of Organization (Continued)**

B. In what month does your fiscal year end each year?
April

C. Under the laws of what state or country are you organized?
CALIFORNIA
*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

**Item 4 Successions**

| | YES | NO |
|---|---|---|
| A. Are you, at the time of this filing, succeeding to the business of a registered investment adviser? | ○ | ⦿ |

*If "yes," complete Item 4.B. and Section 4 of Schedule D.*

B. Date of Succession: (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

**Item 5 Information About Your Advisory Business**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly-formed advisers for completing this Item 5.

*Employees*

A. Approximately how many *employees* do you have? Include full and part-time *employees* but do not include any clerical workers.

○ 1- 5 ○ 6-10 ⦿ 11-50 ○ 51-250 ○ 251-500
○ 501-1,000 ○ More than 1,000 If more than 1,000, how many? (round to the nearest 1,000)

B.

(1) Approximately how many of these *employees* perform investment advisory functions (including research)?

○ 0 ○ 1-5 ⦿ 6-10 ○ 11-50 ○ 51-250
○ 251-500 ○ 501-1,000 ○ More than 1,000 If more than 1,000, how many? (round to the nearest 1,000)

(2) Approximately how many of these *employees* are registered representatives of a

broker-dealer?

○ 0 ◉ 1-5 ○ 6-10 ○ 11-50 ○ 51-250

○ 251-500 ○ 501-1,000 ○ More than 1,000 If more than 1,000, how many?

(round to the nearest 1,000)

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Items 5.A(1) and 5.B(2). If an employee performs more than one function, you should count that employee in each of your responses to Item 5.B(1) and 5.B(2).*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, Page 7**
**7/15/2004 11:32:27 AM**

**Item 5 Information About Your Advisory Business (Continued)**

(3) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

○ 0 ◉ 1-5 ○ 6-10 ○ 11-50 ○ 51-250

○ 251-500 ○ 501-1,000 ○ More than 1,000 If more than 1,000, how many? (round to the nearest 1,000)

*In your response to Item 5.B(3), do not count any of your employees and count a firm only once -- do not count each of the firm's employees that solicit on your behalf.*

*Clients*

C. To approximately how many *clients* did you provide investment advisory services during your most-recently completed fiscal year?

○ 0 ○ 1-10 ○ 11-25 ◉ 26-100 ○ 101-250

○ 251-500 ○ More than 500 If more than 500, how many? (round to the nearest 500)

| D. What types of *clients* do you have? Indicate the approximate percentage that each type of *client* comprises of your total number of *clients*. | None | Up to 10% | 11-25% | 26-50% | 51-75% | More Than 75% |
|---|---|---|---|---|---|---|
| (1) Individuals (other than *high net worth individuals*) | ◉ | ○ | ○ | ○ | ○ | ○ |
| (2) *High net worth individuals* | ◉ | ○ | ○ | ○ | ○ | ○ |
| (3) Banking or thrift institutions | ◉ | ○ | ○ | ○ | ○ | ○ |
| (4) Investment companies (including mutual funds) | ○ | ○ | ◉ | ○ | ○ | ○ |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (5) | Pension and profit sharing plans (other than plan participants) | ○ | ○ | ◉ | ◉ | ○ | ○ |
| (6) | Other pooled investment vehicles (e.g., hedge funds) | ○ | ◉ | ◉ | ○ | ○ | ○ |
| (7) | Charitable organizations | ○ | ◉ | ○ | ○ | ○ | ○ |
| (8) | Corporations or other businesses not listed above | ◉ | ○ | ○ | ○ | ○ | ○ |
| (9) | State or municipal *government entities* | ○ | ○ | ○ | ◉ | ○ | ○ |
| (10) | Other: TAXABLE | ○ | ◉ | ○ | ○ | ○ | ○ |

*The category "individuals" includes trusts, estates, 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*

*Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, check "None" in response to Item 5.D(4).*

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| **Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610** |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, Page 8**
**7/15/2004 11:32:27 AM**

**Item 5 Information About Your Advisory Business (Continued)**

Compensation Arrangements

E. You are compensated for your investment advisory services by (check all that apply):

- ☑ (1) A percentage of assets under your management
- ☐ (2) Hourly charges
- ☐ (3) Subscription fees (for a newsletter or periodical)
- ☐ (4) Fixed fees (other than subscription fees)
- ☐ (5) Commissions
- ☑ (6) *Performance-based fees*
- ☐ (7) Other (specify):

Assets Under Management

| | YES | NO |
|---|---|---|
| F. (1) Do you provide continuous and regular supervisory or management services to securities portfolios? | ◉ | ○ |

(2) If yes, what is the amount of your assets under management and total number of accounts?

| | U.S. Dollar Amount | Total Number of Accounts |
|---|---|---|
| Discretionary: | (a) $ ~~834550000~~ 1131770832.00 | (d) ~~32~~ 24 |
| Non-Discretionary: | (b) $ ~~62070000~~ | (e) 1 |

| | | |
|---|---|---|
| Total: | (c) $ ~~896620000~~ 87325053.00 1219095885.00 | (f) ~~33~~ 25 |

*Part 1A Instruction 5.b. explains how to calculate your assets under management. You must follow these instructions carefully when completing this Item.*

Advisory Activities

G. What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1) Financial planning services
- ☐ (2) Portfolio management for individuals and/or small businesses
- ☑ (3) Portfolio management for investment companies
- ☑ (4) Portfolio management for businesses or institutional *clients* (other than investment companies)
- ☐ (5) Pension consulting services
- ☐ (6) Selection of other advisers
- ☐ (7) Publication of periodicals or newsletters
- ☐ (8) Security ratings or pricing services
- ☐ (9) Market timing services
- ☑ (10) Other (specify): PORTFOLIO MANAGEMENT FOR COLLECTIVE INVESTMENT VEHICLES

*Do not check Item 5.G(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940.*

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| **Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610** |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, Page 9**
**7/15/2004 11:32:27 AM**

**Item 5 Information About Your Advisory Business (Continued)**

H. If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

○ 0 ○ 1-10 ○ 11-25 ○ 26-50 ○ 51-100
○ 101-250 ○ 251-500 ○ More than 500 If more than 500, how many? (round to the nearest 500)

I. If you participate in a *wrap fee program*, do you (check all that apply):

☐ (1) *sponsor* the *wrap fee program*?

☐ (2) act as a portfolio manager for the *wrap fee program*?

*If you are a portfolio manager for a wrap fee program, list the names of the programs and their sponsors in Section 5.I(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check either Item 5.I(1) or 5.I(2).*

**Item 6 Other Business Activities**

In this Item, we request information about your other business activities.

A. You are actively engaged in business as a (check all that apply):

☐ (1) Broker-dealer

☐ (2) Registered representative of a broker-dealer

☐ (3) Futures commission merchant, commodity pool operator, or commodity trading advisor

☐ (4) Real estate broker, dealer, or agent

☐ (5) Insurance broker or agent

☐ (6) Bank (including a separately identifiable department or division of a bank)

☐ (7) Other financial product salesperson (specify):

| | YES | NO |
|---|---|---|
| B. (1) Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ◉ |
| (2) If yes, is this other business your primary business? | ○ | ○ |
| *If "yes," describe this other business on Section 6.B. of Schedule D.* | | |

| | YES | NO |
|---|---|---|
| (3) Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ◉ |

## FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610**

**Rev. 05/2003**

**ADV - Annual Amendment, Page 10**
**7/15/2004 11:32:27 AM**

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

Item 7 requires you to provide information about you and your *related persons*. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

A. You have a *related person* that is a (check all that apply):

- ☑ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer
- ☑ (2) investment company (including mutual funds)
- ☑ (3) other investment adviser (including financial planners)
- ☐ (4) futures commission merchant, commodity pool operator, or commodity trading advisor
- ☐ (5) banking or thrift institution
- ☐ (6) accountant or accounting firm
- ☐ (7) lawyer or law firm
- ☐ (8) insurance company or agency
- ☐ (9) pension consultant
- ☐ (10) real estate broker or dealer
- ☐ (11) sponsor or syndicator of limited partnerships

*If you checked Item 7.A(3), you must list on Section 7.A. of Schedule D all your related persons that are investment advisers. If you checked Item 7.A(1), you may elect to list on Section 7.A. of Schedule D all your related persons that are broker-dealers. If you choose to list a related broker-dealer, the IARD will accept a single Form U-4 to register an investment adviser representative who also is a broker-dealer agent ("registered rep") of that related broker-dealer.*

| | YES | NO |
|---|---|---|
| B. Are you or any *related person* a general partner in an *investment-related* limited partnership or manager of an *investment-related* limited liability company? | ◉ | ○ |

*If "yes," for each limited partnership or limited liability company, complete Section 7.B. of Schedule D. If, however, you are an SEC-registered adviser and you have related persons that are SEC-registered advisers who are the general partners of limited partnerships or the managers of limited liability companies, you do not have to complete Section 7.B. of Schedule D with respect to those related advisers' limited partnerships or limited liability companies.*

*To use this alternative procedure, you must state in the Miscellaneous Section of Schedule D: (1) that you have related SEC-registered investment advisers that manage limited partnerships or limited liability companies that are not listed in Section 7.B. of your Schedule D; (2) that complete and accurate information about those limited partnerships or limited liability companies is available in Section 7.B. of Schedule D of the Form ADVs of your related SEC-registered advisers; and (3) whether your clients are solicited to invest in any of those limited partnerships or limited liability companies.*

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients'* transactions. Like Item 7, this information identifies areas in which conflicts of interest may occur between you and your *clients*.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*.

**FORM ADV**

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION**

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

| Rev. 05/2003 |
|---|
| **ADV - Annual Amendment, Page 11**<br>**7/15/2004 11:32:27 AM** |

**Item 8 Participation or Interest in *Client* Transactions (Continued)**

Proprietary Interest in *Client* Transactions

| A. Do you or any *related person*: | Yes | No |
|---|---|---|
| (1) buy securities for yourself from advisory *clients,* or sell securities you own to advisory *clients* (principal transactions)? | ○ | ◉ |
| (2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | ◉ | ○ |
| (3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A(1) or (2))? | ◉ | ○ |

Sales Interest in *Client* Transactions

| B. Do you or any *related person*: | Yes | No |
|---|---|---|
| (1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | ○ | ◉ |
| (2) recommend purchase of securities to advisory *clients* for which you or any *related person* serves as underwriter, general or managing partner, or purchaser representative? | ◉ | ○ |
| (3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | ○ | ◉ |

Investment or Brokerage Discretion

| C. Do you or any *related person* have *discretionary authority* to determine the: | Yes | No |
|---|---|---|
| (1) securities to be bought or sold for a *client's* account? | ◉ | ○ |
| (2) amount of securities to be bought or sold for a *client's* account? | ◉ | ○ |
| (3) broker or dealer to be used for a purchase or sale of securities for a *client's* account? | ◉ | ○ |
| (4) commission rates to be paid to a broker or dealer for a *client's* securities transactions? | ◉ | ○ |

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

| Rev. 05/2003 |
|---|
| **ADV - Annual Amendment, Page 12**<br>**7/15/2004 11:32:27 AM** |

**Item 8 Participation or Interest in *Client* Transactions (Continued)**

D. Do you or any *related person* recommend brokers or dealers to *clients*? ◉ ○

E. Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party in connection with *client* securities transactions? ◉ ○

F. Do you or any *related person*, directly or indirectly, compensate any *person* for *client* referrals? ◉ ○

*In responding to this Item 8.F., consider in your response all cash and non-cash compensation that you or a related person gave any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

**Item 9 *Custody***

In this Item, we ask you whether you or a *related person* has *custody* of *client* assets. If you are registering or registered with the SEC and you deduct your advisory fees directly from your *clients'* accounts but you do not otherwise have *custody* of your *clients'* funds or securities, you may answer "no" to Item 9A.(1) and 9A.(2).

| | Yes | No |
|---|---|---|
| A. Do you have *custody* of any advisory *clients'*: | | |
| (1) cash or bank accounts? | ◉ | ◉ |
| (2) securities? | ◉ | ◉ |
| B. Do any of your *related persons* have *custody* of any of your advisory *clients'*: | | |
| (1) cash or bank accounts? | ○ | ◉ |
| (2) securities? | ○ | ◉ |
| C. If you answered "yes" to either Item 9.B(1) or 9.B(2), is that *related person* a broker-dealer registered under Section 15 of the Securities Exchange Act of 1934? | ○ | ○ |

**Item 10 *Control Persons***

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you.

If you are submitting an initial application, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application, you must complete Schedule C.

| | YES | NO |
|---|---|---|
| Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ◉ |

*If yes, complete Section 10 of Schedule D.*

## FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| **Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610** |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, Page 13**
**7/15/2004 11:32:27 AM**

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A(1), 11.A(2), 11.B(1), 11.B(2), 11.D(4), and 11.H(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

For "yes" answers to the following questions, complete a Criminal Action DRP:

| A. In the past ten years, have you or any *advisory affiliate*: | YES | NO |
|---|---|---|
| (1) been convicted of or plead guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ◉ |
| (2) been *charged* with any *felony*? | ○ | ◉ |

*If you are registered or registering with the SEC, you may limit your response to Item 11.A(2) to charges that are currently pending.*

| B. In the past ten years, have you or any *advisory affiliate*: | YES | NO |
|---|---|---|
| (1) been convicted of or plead guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ◉ |
| (2) been *charged* with a *misdemeanor* listed in 11.B(1)? | ○ | ◉ |

*If you are registered or registering with the SEC, you may limit your response to Item 11.B(2) to charges that are currently pending.*

## FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

| | Rev. 05/2003 |
|---|---|
| **ADV - Annual Amendment, Page 14**<br>**7/15/2004 11:32:27 AM** | |

**Item 11 Disclosure Information (Continued)**

For "yes" answers to the following questions, complete a Regulatory Action DRP:

| | YES | NO |
|---|---|---|
| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ◉ |
| (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ◉ |
| D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | | |
| (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ◉ |
| (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ◉ |
| (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ◉ |
| (5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ◉ |
| E. Has any *self-regulatory organization* or commodities exchange ever: | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a *"minor rule violation"* under a plan approved by the SEC)? | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? | ○ | ◉ |

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

| | Rev. 05/2003 |
|---|---|
| **ADV - Annual Amendment, Page 15**<br>**7/15/2004 11:32:27 AM** | |

**Item 11 Disclosure Information (Continued)**

| | YES | NO |
|---|---|---|
| F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? | ○ | ⦿ |
| G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? | ○ | ⦿ |

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

| | YES | NO |
|---|---|---|
| H. (1) Has any domestic or foreign court: | | |
| (a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? | ○ | ⦿ |
| (b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? | ○ | ⦿ |
| (c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*? | ○ | ⦿ |
| (2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H(1)? | ○ | ⦿ |

**Item 12 Small Businesses**

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC and you indicated in response to Item 5.F(2)(c) that you have assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

| | Rev. 05/2003 |
|---|---|
| **ADV - Annual Amendment, Page 16**<br>**7/15/2004 11:32:27 AM** | |

**Item 12 Small Businesses (Continued)**

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- Control means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to control the other *person.*

| | YES | NO |
|---|---|---|
| A. Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |
| *If "yes," you do not need to answer Items 12.B. and 12.C.* | | |
| B. Do you: | | |
| (1) *control* another investment adviser that had assets under management of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| C. Are you: | | |
| (1) *controlled* by or under common *control* with another investment adviser that had assets under management of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

| |
|---|
| **Rev. 05/2003** |
| **ADV - Annual Amendment, Part 1B, Page 1**<br>**7/15/2004 11:32:27 AM** |

**You must complete this Part 1B only if you are applying for registration, or are registered, as an investment adviser with any of the *state securities authorities.***

**Part 1B Item 1 - State Registration**

Complete this Item 1 if you are submitting an initial application for state registration or requesting additional state registration(s). Check the boxes next to the states to which you are submitting this application. If you are already registered with at least one state and are applying for registration with an additional state or states, check the boxes next to the states in which you are applying for registration. Do not check the boxes next to the states in which you are currently registered or where you have an application for registration pending.

| | | | |
|---|---|---|---|
| ☐ AL | ☐ ID | ☐ MO | ☐ PA |

| | | | |
|---|---|---|---|
| ☐ AK | ☐ IL | ☐ MT | ☐ PR |
| ☐ AZ | ☐ IN | ☐ NE | ☐ RI |
| ☐ AR | ☐ IA | ☐ NV | ☐ SC |
| ☐ CA | ☐ KS | ☐ NH | ☐ SD |
| ☐ CO | ☐ KY | ☐ NJ | ☐ TN |
| ☐ CT | ☐ LA | ☐ NM | ☐ TX |
| ☐ DE | ☐ ME | ☐ NY | ☐ UT |
| ☐ DC | ☐ MD | ☐ NC | ☐ VT |
| ☐ FL | ☐ MA | ☐ ND | ☐ VA |
| ☐ GA | ☐ MI | ☐ OH | ☐ WA |
| ☐ GU | ☐ MN | ☐ OK | ☐ WV |
| ☐ HI | ☐ MS | ☐ OR | ☐ WI |

**Part 1B Item 2 - Additional Information**

A. Person responsible for supervision and compliance:
Name:

Title:

Telephone: Fax:

Number and Street 1: Number and Street 2:

City: State: Country: ZIP+4/Postal Code:

Email address, if available:

If this address is a private residence, check this box: ☐

B. Bond/Capital Information, if required by your *home state*.

(1) Name of Issuing Insurance Company:

(2) Amount of Bond:
$ .00

(3) Bond Policy Number:

| | Yes | No |
|---|---|---|
| (4) If required by your home state, are you in compliance with your home state's minimum capital requirements? | ○ | ○ |

**FORM ADV**

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION**

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

Rev. 05/2003

**ADV - Annual Amendment, Part 1B, Page 2**
**7/15/2004 11:32:27 AM**

**Part 1B Item 2 - Additional Information (Continued)**

| | Yes | No |
|---|---|---|
| For "yes" answers to the following question, complete a Bond DRP. | | |
| C. Has a bonding company ever denied, paid out on, or revoked a bond for you? | ○ | ○ |
| For "yes" answers to the following question, complete a Judgment/Lien DRP: | | |
| D. Do you have any unsatisfied judgements or liens against you? | ○ | ○ |
| For "yes" answers to the following questions, complete an Arbitration DRP: | | |
| E. Are you, any *advisory affiliate*, or any *management person* currently the subject of, or have you , any *advisory affiliate*, or any *management person* been the subject of, an arbitration claim alleging damages in excess of $2,500, involving any of the following: | | |
| (1) any investment or an *investment-related* business of activity? | ○ | ○ |
| (2) fraud, false statement, or omission? | ○ | ○ |
| (3) theft, embezzlement, or other wrongful taking of property? | ○ | ○ |
| (4) bribery, forgery, counterfeiting, or extortion? | ○ | ○ |
| (5) dishonest, unfair, or unethical practices? | ○ | ○ |
| For "yes" answers to the following questions, complete a Civil Judicial Action DRP: | | |
| F. Are you, any *advisory affiliate*, or any *management person* currently subject to, or have you, any *advisory affiliate*, or any *management person* been *found* liable in, a civil, *self-regulatory organization*, or administrative *proceeding* involving any of the following: | | |
| (1) an investment or *investment-related* business or activity? | ○ | ○ |
| (2) fraud, false statement, or omission? | ○ | ○ |
| (3) theft, embezzlement, or other wrongful taking of property? | ○ | ○ |
| (4) bribery, forgery, counterfeiting, or extortion? | ○ | ○ |
| (5) dishonest, unfair, or unethical practices? | ○ | ○ |

G. Other Business Activities

(1) You are actively engaged in business as a(n) (check all that apply):

☐ Attorney

☐ Certified Public Accountant

☐ Tax Preparer

**FORM ADV**

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION**

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

Rev. 05/2003

**ADV - Annual Amendment, Part 1B, Page 3**
**7/15/2004 11:32:27 AM**

**Part 1B Item 2 - Additional Information (Continued)**

(2) If you are actively engaged in any business other than those listed in Item 6.A of Part 1A or Item 2.G(1) of Part 1B, describe the business and the approximate amount of time spent on that business:

H. If you provide financial planning services, the investments made based on those services at the end of your last fiscal year totaled:

| | Securities Investments | Non-Securities Investments |
|---|---|---|
| Under $100,000 | ○ | ○ |
| $100,001 to $500,000 | ○ | ○ |
| $500,001 to $1,000,000 | ○ | ○ |
| $1,000,001 to $2,500,000 | ○ | ○ |
| $2,500,001 to $5,000,000 | ○ | ○ |
| More than $5,000,000 | ○ | ○ |

If securities investments are over $5,000,000, how much? (round to the nearest $1,000,000)

If non-securities investments are over $5,000,000, how much? (round to the nearest $1,000,000)

| | Yes | No |
|---|---|---|
| I. *Custody* | | |
| (1) Do you withdraw advisory fees directly from your *clients'* accounts? If you answered "yes", respond to the following: | ○ | ○ |
| (a) Do you send a copy of your invoice to the custodian or trustee at the same time that you send a copy to the *client*? | ○ | ○ |
| (b) Does the custodian send quarterly statements to your *clients* showing all disbursements for the custodian account, including the amount of the advisory fees? | ○ | ○ |
| (c) Do your *clients* provide written authorization permitting you to be paid directly for their accounts held by the custodian or trustee? | ○ | ○ |
| (2) Do you act as a general partner for any partnership or trustee for any trust in which your advisory *clients* are either partners of the partnership or beneficiaries of the trust? If you answered "yes", respond to the following: | ○ | ○ |
| (a) As the general partner of a partnership, have you engaged an attorney or an independent certified public accountant to provide authority permitting each direct payment or any transfer of funds or securities from the partnership account? | ○ | ○ |
| (3) Do you require the prepayment of fees of more than $500 per *client* and for six months or more in advance? | ○ | ○ |

**FORM ADV**

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION**

**Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610**

Rev. 05/2003

**ADV - Annual Amendment, Part 1B, Page 4**
**7/15/2004 11:32:27 AM**

**Part 1B Item 2 - Additional Information (Continued)**

| | Yes | No |
|---|---|---|
| J. If you are organized as a sole proprietorship, please answer the following: | | |
| (1) (a) Have you passed, on or after January 1, 2000, the Series 65 examination? | ○ | ○ |
| (b) Have you passed, on or after January 1, 2000, the Series 66 examination and also passed, at any time, the Series 7 examination? | ○ | ○ |
| (2) (a) Do you have any investment advisory professional designations? *If "no", you do not need to answer Item 2.J(2)(b).* | ○ | ○ |

(b) I have earned and I am in good standing with the organization that issued the following credential:

- ☐ Certified Financial Planner ("CFP")
- ☐ Chartered Financial Analyst ("CFA")
- ☐ Chartered Financial Consultant ("ChFC")
- ☐ Chartered Investment Counselor ("CIC")
- ☐ Personal Financial Specialist ("PFS")
- ☐ None of the above

(3) Your Social Security Number:

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

Rev. 05/2003

**ADV - Annual Amendment, SCHEDULE A**
**7/15/2004 11:32:27 AM**

**Form ADV, Schedule A**

**Direct Owners and Executive Officers**

1. Complete Schedule A only if you are submitting an initial application. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a

company subject to Section 12 or 15(d) of the Exchange Act);

Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

(c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;

(d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

(e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

3. Do you have any indirect owners to be reported on Schedule B? ○ Yes ◉ No

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:

| NA - less than 5% | B - 10% but less than 25% | D - 50% but less than 75% |
|---|---|---|
| A - 5% but less than 10% | C - 25% but less than 50% | E - 75% or more |

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No., or Employer ID No. |
|---|---|---|---|---|---|---|---|
| VILAR, ALBERTO, WILLIAM | I | PRESIDENT, DIRECTOR, SHAREHOLDER | 06/1985 | D | Y | N | 1750037 |
| TANAKA, GARY, ALAN | I | EXECUTIVE VICE PRESIDENT, DIRECTOR, | 06/1985 | D | Y | N | 1750038 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | SHAREHOLDER | | | | | |
| SANDIFER, MICHAEL, JOHN | I | INVESTMENT COMMITTEE, CONSULTANT | 08/1996 | NA | N | N | 876539 |
| STABLEFORD, JAMES, PATRICK FRANCIS | I | INVESTMENT COMMITTEE | 06/2000 | NA | N | N | 4405802 |
| WEISS, MARC, JAY | I | INVESTMENT COMMITTEE, DIRECTOR OF RESEARCH | 11/2001 | NA | N | N | 4511170 |
| MAINZER, DAVID, ERIC | I | ~~CHIEF OPERATING OFFICER~~ CHIEF OPERATING OFFICER, CHIEF FINANCIAL OFFICER | ~~06/2003~~ 07/2004 | NA | N | N | 4511173 |
| SMITH, DANA, ELIZABETH | I | CHIEF COMPLIANCE OFFICER | 03/2003 | NA | N | N | 1798172 |
| MCDONALD, KATHERINE, FLYNN | I | INVESTMENT COMMITTEE, SENIOR HEALTHCARE ANALYST | 08/2002 | NA | N | N | 4687522 |

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| **Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610** |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, SCHEDULE B**
**7/15/2004 11:32:27 AM**

**Form ADV, Schedule B**

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.
2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by

his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

(b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

(c) in the case of an owner that is a trust, the trust and each trustee; and

(d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.
5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are:

| | | |
|---|---|---|
| | C - 25% but less than 50% | E - 75% or more |
| | D - 50% but less than 75% | F - Other (general partner, trustee, or elected manager) |

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

No Indirect Owner Information Filed

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, SCHEDULE C**
**7/15/2004 11:32:27 AM**

**Form ADV, Schedule C**

**Amendments to Schedules A and B**

1. Use Schedule C only to amend information requested on either Schedule A or Schedule B. Refer to Schedule A and Schedule B for specific instructions for completing this Schedule C. Complete each column.
2. In the Type of Amendment column, indicate "A" (addition), "D" (deletion), or "C" (change in

information about the same *person*).

3. Ownership codes are: NA - less than 5%; A - 5% but less than 10%; B - 10% but less than 25%; C - 25% but less than 50%; D - 50% but less than 75%; E - 75% or more; G - Other (general partner, trustee, or elected member)

4. List below all changes to Schedule A (Direct Owners and Executive Officers):

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Type of Amendment | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| MAINZER, DAVID, ERIC | I | C | CHIEF OPERATING OFFICER, CHIEF FINANCIAL OFFICER | 07/2004 | NA | N | N | 4511173 |

5. List below all changes to Schedule B (Indirect Owners):

No Changes to Indirect Owner Information Filed

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610**

**Rev. 05/2003**

**ADV - Annual Amendment, SCHEDULE D Page 1**
**7/15/2004 11:32:27 AM**

**Form ADV, Schedule D Page 1**

Certain items in Part 1A of Form ADV require additional information on Schedule D. Use this Schedule D Page 1 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

**Section 1.B. Other Business Names**

List your other business names and the jurisdictions in which you use them. You must complete a separate Schedule D for each business name.

No Information Filed

**Section 1.F. Other Offices**

Complete the following information for each office, other than your *principal office and place of business*, at which you conduct investment advisory business. You must complete a separate Schedule D Page 1 for each location. If you are applying for registration, or are registered, only

with the SEC, list only the largest five (in terms of numbers of *employees*).

Number and Street 1:
399 PARK AVENUE, 22ND FLOOR
Number and Street 2:

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| NEW YORK | NY | USA | 10022 |

If this address is a private residence, check this box: ☐

Telephone Number at this location:
212-371-6360

Facsimile number at this location:
~~212-371-6988~~
212-371-7003

Number and Street 1:
43 UPPER GROSVENOR STREET
Number and Street 2:

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| LONDON | | ENGLAND | W1X 9PG |

If this address is a private residence, check this box: ☐

Telephone Number at this location:
011-44207-629-2349

Facsimile number at this location:
011-44207-493-5158

**Section 1.I. World Wide Web Site Addresses**

List your World Wide Web site addresses. You must complete a separate Schedule D for each World Wide Web site address.

World Wide Web Site Address: WWW.AMERINDO.COM

**Section 1.K. Locations of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D Page 1 for each location.

Name of entity where books and records are kept:
AMERINDO INVESTMENT ADVISORS INC.

Number and Street 1:
399 PARK AVENUE, 22ND FLOOR
Number and Street 2:

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| NEW YORK | NY | USA | 10022 |

If this address is a private residence, check this box: ☐

Telephone Number:
212-371-6360

Facsimile number:
~~212-371-6988~~
212-371-7003

This is (check one):

◉ one of your branch offices or affiliates.

○ a third-party unaffiliated recordkeeper.

○ other.

Briefly describe the books and records kept at this location.
~~FINANCE AND ADMINISTRATION~~
FINANCE, ADMINISTRATION AND CLIENT RECORDS

**FORM ADV**

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION**

| **Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610** |
|---|---|

Rev. 05/2003

**ADV - Annual Amendment, SCHEDULE D, Page 2**
**7/15/2004 11:32:27 AM**

**Form ADV, Schedule D Page 2**

Use this Schedule D Page 2 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

**Section 1.L. Registration with *Foreign Financial Regulatory Authorities***

List the name, in English, of each *foreign financial regulatory authority* and country with which you are registered. You must complete a separate Schedule D Page 2 for each *foreign financial regulatory authority* with whom you are registered.

No Information Filed

**Section 2.A(7) Affiliated Adviser**

No Information Filed

**Section 2.A(8) Newly Formed Adviser**

If you are relying on rule 203A-2(d), the newly formed adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

- ☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.
- ☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

**Section 2.A(9) Multi-State Adviser**

If you are relying on rule 203A-2(e), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

- ☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 30 or more states to register as an investment adviser with the securities authorities in those states.
- ☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 25 states to register as an investment adviser with the securities authorities of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

- ☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 25 states to register as an investment adviser with the securities authorities in those states.

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, SCHEDULE D, Page 3**
**7/15/2004 11:32:27 AM**

**Form ADV, Schedule D Page 3**

Use this Schedule D Page 3 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

**Section 2.A(11) SEC Exemptive *Order***

No Information Filed

**Section 4 Successions**

Complete the following information if you are succeeding to the business of a currently-registered investment adviser. If you acquired more than one firm in the succession you are reporting on this Form ADV, you must complete a separate Schedule D Page 3 for each acquired firm. See Part 1A Instruction 4.

No Information Filed

**Section 5.I(2) *Wrap Fee Programs***

If you are a portfolio manager for one or more *wrap fee programs*, list the name of each program and its *sponsor*. You must complete a separate Schedule D Page 3 for each *wrap fee program* for which you are a portfolio manager.

No Information Filed

**Section 6.B. Description of Primary Business**

No Information Filed

**Section 7.A. Affiliated Investment Advisers and Broker-Dealers**

You MUST complete the following information for each investment adviser with whom you are affiliated. You MAY complete the following information for each broker-dealer with whom you are affiliated. You must complete a separate Schedule D Page 3 for each listed affiliate.

Legal Name of Affiliate:
AMERINDO INVESTMENT ADVISORS (CAYMAN) LIMITED

Primary Business Name of Affiliate:
AMERINDO INVESTMENT ADVISORS (CAYMAN) LIMITED

Affiliate is (check only one box):

- (●) Investment Adviser
- ( ) Broker - Dealer
- ( ) Dual (Investment Adviser and Broker-Dealer)

Affiliated Investment Adviser's SEC File Number (if any)

Affiliate's CRD Number (if any):

Legal Name of Affiliate:
AMERINDO ADVISORS (U.K.) LIMITED

Primary Business Name of Affiliate:
AMERINDO ADVISORS (U.K.) LIMITED

Affiliate is (check only one box):

- (●) Investment Adviser
- ( ) Broker - Dealer
- ( ) Dual (Investment Adviser and Broker-Dealer)

Affiliated Investment Adviser's SEC File Number (if any)

Affiliate's CRD Number (if any):

Legal Name of Affiliate:
AMERINDO INVESTMENT ADVISORS, INC. (PANAMA)

Primary Business Name of Affiliate:
AMERINDO INVESTMENT ADVISORS, INC. (PANAMA)

Affiliate is (check only one box):

- (●) Investment Adviser
- ( ) Broker - Dealer
- ( ) Dual (Investment Adviser and Broker-Dealer)

Affiliated Investment Adviser's SEC File Number (if any)
801- 10424

Affiliate's CRD Number (if any):

## FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| **Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610** |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, SCHEDULE D, Page 4**
**7/15/2004 11:32:27 AM**

**Form ADV, Schedule D Page 4**

Use this Schedule D Page 4 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

**Section 7.B. Limited Partnership Participation**

You must complete a separate Schedule D Page 4 for each limited partnership in which you or a *related person* is a general partner and each limited liability company for which you or a *related person* is a manager.

Name of Limited Partnership or Limited Liability Company:
AMERINDO MASTER VENTURE FUND LLC

Are your *clients* solicited to invest in the limited partnership or limited liability company?
○ Yes ◉ No

Approximately what percentage of your *clients* have invested in this limited partnership or limited liability company?
0 %

Minimum investment commitment required of a limited partner or member:
$ 0

Current value of the total assets of the limited partnership or limited liability company:
$ ~~1041759~~
1086952

Name of Limited Partnership or Limited Liability Company:
~~AMERINDO INTERNET GROWTH FUND LTD.~~

Are your *clients* solicited to invest in the limited partnership or limited liability company?
◉ Yes ○ No

Approximately what percentage of your *clients* have invested in this limited partnership or limited liability company?
~~1~~%

Minimum investment commitment required of a limited partner or member:
$ ~~1000000~~

Current value of the total assets of the limited partnership or limited liability company:
$ ~~11085449~~

Name of Limited Partnership or Limited Liability Company:
~~SANDS BROTHERS/AMERINDO TECHNOLOGY ASSOCIATES LLC~~

Are your *clients* solicited to invest in the limited partnership or limited liability company?
○ Yes ◉ No

Approximately what percentage of your *clients* have invested in this limited partnership or limited liability company?
~~0~~%

Minimum investment commitment required of a limited partner or member:
$ ~~250000~~

Current value of the total assets of the limited partnership or limited liability company:
$ ~~304100~~

Name of Limited Partnership or Limited Liability Company:
~~SANDS BROTHERS/AMERINDO TECHNOLOGY ASSOCIATES INSTITUTION LLC~~

Are your *clients* solicited to invest in the limited partnership or limited liability company?
○ Yes ● No

Approximately what percentage of your *clients* have invested in this limited partnership or limited liability company?
~~0~~%

Minimum investment commitment required of a limited partner or member:
$ ~~250000~~

Current value of the total assets of the limited partnership or limited liability company:
$ ~~2905246~~

Name of Limited Partnership or Limited Liability Company:
~~SANDS BROTHERS/AMERINDO TECHNOLOGY OFFSHORE ASSOCIATES LLC~~

Are your *clients* solicited to invest in the limited partnership or limited liability company?
○ Yes ● No

Approximately what percentage of your *clients* have invested in this limited partnership or limited liability company?
~~0~~%

Minimum investment commitment required of a limited partner or member:
$ ~~250000~~

Current value of the total assets of the limited partnership or limited liability company:
$ ~~394440~~

**Section 10 *Control Persons***

You must complete a separate Schedule D Page 4 for each *control person* not named in Item 1.A. or Schedules A, B, or C that directly or indirectly *controls* your management or policies.

No Information Filed

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| **Primary Business Name: AMERINDO INVESTMENT ADVISORS INC** | **CRD Number: 112610** |
|---|---|

**Rev. 05/2003**

**ADV - Annual Amendment, SCHEDULE D, Page 5**
**7/15/2004 11:32:27 AM**

**Form ADV, Schedule D Page 5**

Use this Schedule D Page 5 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

| Miscellaneous |
|---|
| You may use the space below to explain a response to an Item or to provide any other information. |
| No Information Filed |

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

| Rev. 05/2003 |
|---|
| **ADV - Annual Amendment, DRP Pages**<br>**7/15/2004 11:32:27 AM** |

| CRIMINAL DISCLOSURE REPORTING PAGE (ADV) |
|---|
| No Information Filed |

| REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV) |
|---|
| No Information Filed |

| CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV) |
|---|
| No Information Filed |

| Bond DRPs |
|---|
| No Information Filed |

| Judgment/Lien DRPs |
|---|
| No Information Filed |

| Arbitration DRPs |
|---|
| No Information Filed |

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: AMERINDO INVESTMENT ADVISORS INC | CRD Number: 112610 |
|---|---|

| Rev. 05/2003 |
|---|
| **ADV - Annual Amendment, Execution Pages**<br>**7/15/2004 11:32:27 AM** |

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for SEC registration and all amendments to registration.

### Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the

Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having custody or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature:<br>ALBERTO W. VILAR | Date: MM/DD/YYYY<br>~~07/16/2003~~<br>07/15/2004 |
| Printed Name:<br>ALBERTO W. VILAR | Title:<br>PRESIDENT |
| Adviser *CRD* Number:<br>112610 | |

**_NON-RESIDENT_ INVESTMENT ADVISER EXECUTION**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for SEC registration and all amendments to registration.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule

or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

## 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

## 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having custody or possession of these books and records to make them available to federal and state regulatory representatives.

| Signature: | Date: MM/DD/YYYY |
|---|---|
| Printed Name: | Title: |
| Adviser *CRD* Number: 112610 | |

**State Registered Investment Adviser Execution Page**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for state registration and all amendments to registration.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the legally designated officers and their successors, of the state in which you maintain your *principal office and place of business* and any other state in which you are applying for registration or amending your registration, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may

be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are applying for registration or amending your registration.

## 2. State-Registered Investment Adviser Affidavit

If you are subject to state regulation, by signing this Form ADV, you represent that, you are in compliance with the registration requirements of the state in which you maintain your principal place of business and are in compliance with the bonding, capital, and recordkeeping requirements of that state.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| Signature | Date MM/DD/YYYY |
|---|---|
| CRD Number<br>112610 | |
| Printed Name | Title |

# Exhibit 15

COPY

Approved: [signature]
MARC LITT
Assistant United States Attorney

05 MAG 937

Before: HONORABLE FRANK MAAS
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

-v-

ALBERTO WILLIAM VILAR,
a/k/a ALBERT VILAR,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SEALED
COMPLAINT

Violations of
15 U.S.C. §§ 80b-6 and 80b-17
18 U.S.C. §§ 1341, 1343, and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

CYNTHIA M. FRATERRIGO, being duly sworn, deposes and says that she is a Postal Inspector with the U.S. Postal Inspection Service and charges:

COUNT ONE

From in or about 1987, up to and including the present, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, acting as an investment adviser to investors and prospective investors, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative; to wit, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, by use of means and instrumentalities of interstate commerce, including interstate wires, U.S. mails, and interstate mailings via private commercial carriers, induced one and more individuals to entrust him with millions of dollars for

investments by his firm, Amerindo Investment Advisors Inc. and its affiliated and formerly affiliated entities, which funds VILAR converted to his own use, and the use of others, without the permission and authorization of the investors.

(Title 15, United States Code, Sections 80b-6 and 80b-17; and Title 18, United States Code, Section 2).

COUNT TWO

On or about December 10, 2004, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did cause to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, and took and received therefrom, any such matter and thing; to wit, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, sent and caused to be sent and delivered by Federal Express a false and fradulent account statement to one and more investors.

(Title 18, United States Code, Sections 1341 and 2.)

COUNT THREE

On or about September 26, 2003, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, unlawfully willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice; to wit, on or about September 26, 2003, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, caused approximately $250,000.00 of investor funds to be sent by wire from within New York State, to a bank in Delaware, which funds were subsequently converted to the defendant's own use without the knowledge, authorization, or permission of the investor.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

1. I have participated in the investigation and I am familiar with the facts and circumstances of the charged offenses. Because this affidavit is being submitted for a limited purpose, I have not included details about every aspect of this investigation. Where conversations or statements of others are related herein, they are related in substance and in part.

2. In the course of my investigation, I have interviewed witnesses, reviewed documents, and spoken with colleagues who have spoken with witnesses and reviewed documents.

Background on the Defendant and the Amerindo Entities

3. According to Amerindo's website (www.amerindo.com), and a document filed with the Securities and Exchange Commission in or about May 2003, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, is, along with his Partner (the "Partner") one of the original founders of Amerindo Investment Advisors Inc. ("Amerindo U.S."), a California corporation, and is a shareholder, officer and director of Amerindo U.S. According to an SEC filing dated on or about September 4, 2002, VILAR and his Partner were also all of the shareholders, directors and officers of Amerindo Investment Advisors (Cayman) Limited ("Amerindo Cayman"), Amerindo Investment Advisors (U.K.) Limited ("Amerindo U.K."), and Amerindo Investment Advisors (Panama), Inc. ("Amerindo Panama"). (Amerindo U.S., Amerindo Cayman, Amerindo U.K. and Amerindo Panama are hereinafter referred to collectively as "Amerindo.") One or more of the Amerindo entities serves as the investment advisor to Amerindo Technology D -- a mutual fund which, according to Morningstar.com, currently has approximately $99 million in assets.

4. According to documents issued by Amerindo, and ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, and a Brokerage Firm used by Amerindo, VILAR and his Partner in connection with their investment advisory services business, Amerindo also historically has offered investment services for institutional clients and high net worth individuals through hedge funds, "guaranteed fixed rate deposit accounts," and other investment vehicles. According to an Amerindo website (www.amerindo.com), as of May 24, 2005, inquiries concerning private equity investments were directed to Amerindo U.S., located at 399 Park Avenue, 22nd Floor, New York, NY 10022, and One Embarcadero Center, Suite 2300, San Francisco, CA 94111-3162. The Amerindo website provides a list of three private equity professionals including VILAR ("Co-Founder, President and Portfolio Manager; Investment Committee Member").

5. According to documents obtained from the Securities and Exchange Commission, Amerindo U.S. has been a registered investment adviser since approximately August 1985.

6. According to a document filed by Amerindo with the SEC on or about July 15, 2004, Amerindo then had approximately $1.2 billion of assets under management.

7. As of approximately December, 2004, ALBERTO WILLIAM VILAR, the defendant, had a reported personal net worth of approximately $950 million. According to numerous published reports, VILAR has made charitable contributions of more than approximately $200 million to a variety of entities, including various opera organizations around

the world, medical institutions, and his college alma mater, Washington and Jefferson College, among others.

8. During the course of my investigation, for the reasons set forth in more detail below, I have probable cause to believe that ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, while acting as an investment advisor, induced an individual to invest $5 million with VILAR and Amerindo in a Participating Securities Small Business Investment Company ("SBIC") to be licensed by the Small Business Administration ("SBA"), converted the investor's $5 million to his own personal use and that of others, and subsequently made numerous misrepresentations to the investor about the status of the investment and Amerindo's efforts to obtain the necessary SBIC license from the SBA.

The Victim's Investment In An Amerindo SBIC

9. I, and other U.S. Postal Inspectors, have spoken to an individual (the "Victim") who invested millions of dollars with ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, and Amerindo, over approximately the past two decades. According to the Victim, in approximately June, 2002, VILAR advised the Victim to invest in an Amerindo venture designed to take advantage of a government program to promote venture capital investment in small businesses involving the U.S. government and small business (the "Amerindo SBIC"). The Victim agreed to invest approximately $5 million in the Amerindo SBIC based solely on VILAR's oral description of the investment opportunity, including VILAR's representation that the Victim would earn approximately $250,000 per quarter through the venture, thereby replacing the Victim's approximate otherwise expected income from the invested principal. The Victim's investment of approximately $5 million in an Amerindo SBIC on or about June 20, 2002, is reflected in records received from a brokerage firm at which Amerindo and the Victim have accounts (the "Brokerage Firm") and documents sent by VILAR and Amerindo to the Victim.

The SBA's SBIC Program

10. According to documents received from the SBA, and interviews conducted with representatives of the SBA, during a period between in or about 2000 and on or about September 30, 2004, the SBA provided funding for the Participating Securities SBIC Program (the "SBIC Program"). Under the SBIC Program, a qualified private venture capital firm that had received an SBIC license from the SBA was eligible to receive matching funds through SBA guarantees. Those matching funds allowed the SBICs to gain the benefits of "leverage" of up to twice the invested private capital.

11. I have also learned from representatives of the SBA that:

a. An SBIC must be licensed by the SBA.

b. The first step in the SBIC licensure process is to complete a Management Assessment Questionnaire ("MAQ"), which must be completed and certified as being accurate by the principals and control persons of the applicant. The MAQ form includes a warning that an individual who knowingly makes false statements in the MAQ is subject to criminal prosecution under various statutes, including 18 U.S.C. § 1001. As part of the MAQ, the applicant must identify, among other things, the principals of the applicant, and the private funds raised from, and committed by the applicant's principals, institutional investors and individual investors.

c. If a MAQ satisfies the SBA's criteria, an applicant may receive a "go forth" letter, inviting the applicant to apply for an SBIC license within the following 18 months. If an applicant does not receive a "go forth" letter, it may not apply for an SBIC license.

d. If an applicant is invited to apply for an SBIC license, the applicant must submit with the application commitment letters from institutions and individuals that have agreed to invest a minimum of $10 million in the SBIC if it is licensed, of which no more than 30% may come from the principals or affiliated or associated individuals or entities.

e. After an applicant applies for an SBIC license, but prior to that application being approved, the applicant must demonstrate that it has $2.5 million of the $10 million minimum deposited in a separate bank account set up for the SBIC.

Amerindo's Application for an SBIC License

12. According to documents received from the SBA, and interviews conducted with representatives of the SBA:

a. Amerindo first submitted a MAQ to the SBA in or about January, 2000. Although Amerindo received a "go forth" letter in or about April 2000, based on a presentation made by VILAR to the SBA Investment Committee on or about April 18, 2000, its license application was rejected.

b. Amerindo submitted a second MAQ in or about May 2002.

c. Amerindo submitted a third MAQ in or about September 2002. The third MAQ listed ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant as one of the the four principals of the proposed Amerindo SBIC, and did not include Victim on that list. In response to a question about its then current fund-raising commitments to date, the form reflected only that one principal had committed an amount "up to $7 million" to the venture, and the MAQ did not reflect the $5 million investment by Victim which had been received by Amerindo on or about June 20, 2002.

d. On or about December 27, 2002, the Chief Administrative Officer of the SBA's Investment Division sent a letter to VILAR in which she stated, among other

things, "Review of the third MAQ by the Investment Committee produced numerous areas of concern." Those concerns included, among other things, the facts that the principals were located in three different geographic areas (New York, London, and Virginia), and the fact that VILAR would be spending a small fraction of his time on the Amerindo SBIC compared to his interest in the SBIC. That letter concluded, "I am sorry to have to write this letter to you, but we feel that if we proceeded, after receiving three submissions to date, that it would be at considerable time and expense to your team (as well as ourselves), and that ultimately, the Agency Licensing Committee would reject your application."

    e. Amerindo did not receive a "go forth" letter as a result of its submission of the third MAQ.

    f. In or about January, 2004, VILAR and Amerindo filed a fourth MAQ with the SBA. Each of the MAQs submitted by VILAR and Amerindo, including the fourth MAQ, noted that they were represented by counsel experienced with the SBIC licensing process.

    g. In or about February, 2004, the SBA posted on its website a notice indicating that, due to a lack of funding by Congress of the SBIC Program, there was no guarantee that applications submitted after approximately the end of March, 2004, would be eligible to receive leverage funding. This fact was well known within the SBIC community, and was something which Amerindo's counsel should have known.

    h. In or about April, 2004, following the receipt of an e-mail indicating that one of the principals of the Amerindo SBIC Venture Fund was resigning, an SBA representative conveyed to VILAR by telephone that the MAQ did not meet the criteria to be presented for consideration by the Investment Committee.

    i. On or about May 28, 2004, an Amerindo employee sent an e-mail message to an SBA employee. The subject line of the e-mail read: "From Alberto Vilar - Amerindo Investment Advisors." The text of the e-mail stated, in part, that "Amerindo remains keenly interested in learning about the status of the MAQ that was filed during the winter," and asked that the SBA take a telephone call from a former senior policy adviser in the SBA's investment division, who was assisting Amerindo with the licensing process.

    j. The SBA received no further written or oral communication from VILAR or any other representative of Amerindo after the May 28, 2004 e-mail described above.

    k. Neither VILAR, Amerindo, nor any of the Amerindo entities that had sought to obtain permission to apply for an SBIC Program license ever received the license required to apply for leverage funds under the SBIC Program.

The Use Of The Victim's $5 Million SBIC Investment

13. I have examined records from the Brokerage Firm which reveal that the Victim's $5 million investment in the Amerindo SBIC was deposited into a brokerage account used by ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, as a personal piggy bank to pay personal expenses and make charitable contributions, without the knowledge, consent, or authorization of the Victim. Specifically, the Brokerage Firm records demonstrate that:

a. The Brokerage Firm's account into which Victim's SBIC investment was deposited on or about June 20, 2002, was opened by VILAR in or about the Fall of 1987, in the name of a Panamanian entity called "Amerindo Management Inc." (the "AMI Account").

b. On or about June 20, 2002, the AMI Account held numerous equity positions in technology stocks, and had a negative cash balance of approximately $428,122, prior to the incoming transfer of the Victim's $5 million SBIC investment.

c. On or about June 25 and June 26, 2002, the Brokerage Firm received letters of authorization ("LOAs") directing the Brokerage Firm to transfer by wire approximately:

i. $1 million to an account at Chase Manhattan Bank held in the name of "A.W. Vilar";

ii. $650,000 to an account at Chase Manhattan Bank held in the name of Amerindo Investment Advisors Inc.; and

iii. $500,000 to a trust account at Bank of New York;

d. Each of the June 25, 2002, and June 26, 2002, LOAs stated that, "This wire transfer represents redemption by the above referenced equity partner," apparently referring to the owner of the account designated to receive the requested transfer.

e. According to other documents produced by the Brokerage Firm, a letter authorizing an additional wire transfer was received by the Brokerage Firm on or about July 9, 2002, directing the Brokerage Firm to transfer a sum of approximately $3,102,958.85 million to an overseas account located in Luxemburg. That LOA contained the same language described in subparagraph (d), above. The AMI Account received an incoming wire deposit of approximately $500,000.00 on or about July 10, 2002, and ended the July 2002 statement period with a cash balance of approximately $555,222.63.

14. According to records received from JP Morgan Chase, the account into which $1 million of the Victim's purported $5 million investment in an Amerindo SBIC was transferred was a personal checking account held in the name of "Alberto W. Vilar" (the "Vilar

Chase Account"). According to records covering the period between on or about June 9, 2002, through July 8, 2002, the Vilar Chase Account had a balance of approximately $87,564.46 immediately prior to the incoming wire transfer of one million dollars from the AMI Account on or about June 25, 2002. No other funds were deposited in the Account during the statement period, and the closing balance of the Vilar Chase Account was approximately $132,677.72. Thus, all but approximately $45,000 of the funds wired into the Vilar Chase Account from Victim's SBIC investment were dissipated within two weeks of their deposit. The withdrawals from the Vilar Chase Account during that two-week period included:

a. An electronic check in the amount of approximately $540,000.00, made payable to "Washington and Jefferson";

b. A check in the amount of approximately $177,000.00, made payable to "American Academy in Berlin";

c. An electronic check in the amount of approximately $17,000.00, made payable to Alberto Vilar;

d. A check in the amount of approximately $14,640.08, made payable ~~to what appears to be a catering service, with a memo line which reads: "AV Party 4/18");~~

e. A transfer in the amount of approximately $10,000.00 for the benefit of "Albert W. Vilar";

f. A check in the amount of approximately $7,000.00, made payable to an individual with the last name "Vilar," with a memo line which reads: "Allowance-May";

g. A check in the amount of approximately $255.56, payable to an appliance service for "Dishwasher Repair" for an address where VILAR, the defendant, is known to reside; and

h. Approximately $1,000 in ATM cash withdrawals.

15. According to records received from JP Morgan Chase, the account into which approximately $650,000 of the Victim's purported investment in an Amerindo SBIC was transferred on or about June 26, 2002, was a business checking account held in the name of Amerindo Investment Advisors Inc. (the "Amerindo Chase Account"). Those records further reflect that the approximately $650,000 that was wire transferred into the Amerindo Chase Account on or about June 26, 2002, was spent within approximately one month on what appear to be business expenses incurred by Amerindo based on the descriptions of outgoing wire transfers.

16. According to records received from the Bank of New York, the account into which approximately $500,000 of the Victim's purported investment in an Amerindo SBIC

was wire transferred on or about June 25, 2002 (the "Bank of New York Account"), ~~the Bank of New York Account~~ was a lawyer's escrow account. Those records further show that at least approximately $400,000 of those funds were used to make an investment on behalf of the Victim which investment was unrelated to the Amerindo SBIC, and which investment the Victim believed would be paid for by funds invested with Amerindo separate and apart from the $5 million investment the Victim had made in the Amerindo SBIC. The Bank of New York records furtheShow that on or about July 23, 2002, a check in the amount of approximately $100,000 was drawn on the Bank of New York Account and was subsequently deposited into the Victim's Brokerage Firm account from which the Victim's $5 million investment was originally transferred.

17. The Victim has informed me that:

a. The Victim did not authorize the transfer of one million dollars of the Victim's investment in the Amerindo SBIC to the personal account of the defendant, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant;

b. The Victim has never given a gift or loan of any money to VILAR; and,

c. The Victim has never authorized VILAR to make any charitable contributions on Victim's behalf.

18. According to a July 31, 2003 article in the Pittsburgh Post-Gazette (www.pittsburgpost-gazette.com/ae/20030731 vilarae4.asp), "[Alberto Vilar] initiated the Vilar Distinguished Artist Series [at Washington & Jefferson College] three years ago. He also is the largest contributor to the Vilar Technology Center, scheduled to open on campus this fall." According to an undated document posted on the internet at www.washjeff.edu, VILAR has pledged $18.1 million toward the construction of the Vilar Technology Center.

19. According to information posted on internet at www.sourcewatch.org, the American Academy in Berlin was founded in 1998, and "Alberto W. Vilar" has contributed $1 million or more to is the Academy. The Academy's website, www.americanacademy.de, lists "Alberto Vilar" in the "Presidents Circle" of individuals who donated to the Academy during its first five years of opertion, and lists "Alberto Vilar" as among the "Patrons" who had made donations between January 2004 and March 2005.

Vilar's False and Misleading Statements
Concerning Victim's $5 Million SBIC Investment

20. Several Amerindo account statements, including a statement received by the Victim in New York City on or about December 10, 2004, via a Federal Express delivery sent from London, described Victim's $5 million investment as "FUNDS ON DEPOSIT WITH SBIC."

21. On or about March 13, 2003, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, wrote a letter to the Victim in which he stated that although there had been an "unprecedented bear market [for] the last three years . . . the monies put into escrow for the new SBIC fund remain at full value." Later in the same letter he stated that, "We are now awaiting permission to commence investing the funds we have placed into escrow, which we expect to happen fairly soon." In fact, as described above, Amerindo and VILAR had been repeatedly rebuffed in their efforts to obtain an SBIC license, the Victim's funds were not placed in escrow, and VILAR had long since spent nearly all of the Victim's entire $5 million investment on personal expenses, business expenses, and purported equity redemptions by other investors.

22. On or about March 25, 2004, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, signed a letter to the accountant of the Victim in which he stated in part that had been required "to deposit the requisite key money" in connection with Amerindo's efforts to obtain an SBIC license. In that letter, VILAR also stated that while waiting for the license, "the prices of technology private-placements continued to decline . . . . This means that we did not use a single penny of [Victim's] investment during this declining period, and if and when, as expected, we start to make investments upon securing the renewal of our license later this year, we will be looking at the best prices probably ever seen in the four decade plus history of technology based, venture capital." At the time VILAR signed this letter, and as described above: (a) an applicant at the MAQ stage of the SBIC licensing process need not have capital on deposit until it is invited to apply for a license, which Amerindo was never invited to do during the period following the Victim's $5 million investment; (b) Amerindo's third and fourth MAQs did not report the investment of $5 million by the Victim in the Amerindo SBIC; and (c) VILAR had long since spent nearly all of the Victim's entire $5 million investment on personal expenses, business expenses, and purported equity redemptions by other investors.

21. On or about October 25, 2004, ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, signed a memo written to Victim's lawyer, in which he wrote in part: "Funds on deposit with SBIC, for $5 million. Technically this represents an escrow deposit for a technology-based SBIC. [Victim] has effectively coinvested with [me] in a new fund that has been approved for investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war." In fact, as described above, the Victim's $5 million investment in the Amerindo SBIC had been converted to the use of VILAR and others, and was not being held in escrow; (b) Amerindo had not received an SBIC license and was not likely to receive such a license in the near future; (c) SBA funding for the SBIC Program was not "delayed," but rather had been canceled -- a fact of which VILAR and his representatives should have been well aware.

## The Defendant's Conversion of Additional Funds Invested by Victim

22. I have examined records from the Brokerage Firm which further show that:

a. On or about September 25, 2003, the Brokerage Firm received a wire transfer instruction from Amerindo, and purportedly signed by the Victim, which requested the transfer of approximately $250,000.00 from an account held by the Victim at the Brokerage Firm (and managed on Victim's behalf by Amerindo) to an account held at the Brokerage Firm in the name of "Amerindo Technology Growth Fund I" ("ATGF I").

b. Prior to the transfer of $250,000.00 from the Victim's account to ATGF I, ATGF I had a cash balance of approximately $382,514.71.

c. On or about September 26, 2003, the Brokerage Firm received another wire transfer instruction from Amerindo requesting that approximately $250,000.00 be transferred immediately from ATGF I to a personal account held at Wilmington Trust Company, in Wilmington, Delaware (the "Wilmington Trust Account") by ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant.

d. On or about September 26, 2003, following instructions on an LOA received from Amerindo, the Brokerage Firm wired approximately $300,000.00 to an offshore account apparently held by a private trust corporation in the Bahamas, leaving ATGF I with a cash balance of approximately $82,514.71.

23. I have reviewed certain documents concerning the Wilmington Trust Account related to the months of September and October of 2003. Those documents show that:

a. $250,000.00 was wire transferred into the Account on or about September 26, 2003;

b. The Account received another wire transfer in the amount of $53,042.83 on or about September 29, 2003, which was immediately wired out of the Account on the same day that it was received;

c. Four wire transfers totaling approximately $138,491.15 were sent out of the Account on or about September 29 and 30, 2003;

d. Checks and other debits totaling approximately $112,709.24 were drawn on the Account through October 31, 2003, leaving the Account with a period ending balance of approximately $253.49.

24. The Victim informed me that the purported signature of the Victim which appears on the wire transfer instruction described in paragraph 25(a), above, is not genuine and was not authorized by the Victim. The Victim also informed me that the transfer of approximately $250,000 on or about September 26, 2003, from the Victim's account at the Brokerage Firm to a personal account held by ALBERTO WILLIAM VILAR, a/k/a ALBERT VILAR, the defendant, was not authorized by Victim. The Victim also informed me that the Victim did not authorize the use of any of the Victim's funds to pay for the personal expenses of

VILAR and his associates, and was unaware of any funds being transferred to an off-shore bank account.

WHEREFORE, deponent prays that a warrant be issued for the arrest of the above-named individual and that he be arrested and imprisoned, or bailed, as the case may be.

CYNTHIA FRATERRIGO
UNITED STATES POSTAL INSPECTOR
U.S. POSTAL INSPECTION SERVICE

Sworn to before me this 25th day of May, 2005

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# Exhibit 16

# AMERINDO INVESTMENT ADVISORS INC.

One Embarcadero Center, Suite 2300
San Francisco, CA 94111-3162
Tel: (415) 362-0292
Fax: (415) 362-0533

43 Upper Grosvenor Street
London W1X 9PG
Tel: (0171) 629-2349
Fax: (0171) 493-5158

25th June 2002

2002 JUN 25 AM 11:01

**BY FACSIMILE**

Specialist Clearance

70M

**Re: Sub Account M26- A/C #**

Dear Jean,

Please immediately send the following wire transfer:

| | |
|---|---|
| Bank: | Chase Manhattan Bank<br>New York, NY |
| ABA: | |
| A/C #: | |
| A/C Name: | Mr. A.W. Vilar |
| Amount: | $1,000,000.00 |

This wire transfer represents redemption by the above referenced equity partner.

Please call me immediately in London on +44-171-629-2349 in case of any problems.

Sincerely yours

Gary Tanaka
MANAGER

OK with Joan M.

TOTAL P.01

# Exhibit 17

# AMERINDO INVESTMENT ADVISORS INC.

One Embarcadero Center, Suite 2300
San Francisco, CA 94111-3162
Tel: (415) 362-0292
Fax: (415) 362-0533

43 Upper Grosvenor Street
London W1X 9PG
Tel: (0171) 629-2349
Fax: (0171) 493-5158

25th June, 2002

'02 JUN 25 PM 4:47

Specialist Clearance

BY FACSIMILE

Dear Jean

**Re: M26– A/C No**

Please immediately send the following wire transfer:

To: Bank of New York
Fairfield
New Jersey

ABA:

A/C:

A/C Name: Lawrence Appet Trust Account

**Amount:** **$500,000.00**

The wire transer represents a redemption by the above referenced equity partner.

Please call me immediately in London on 011-44-629-2349 in case of any problems.

Sincerely yours,

GARY TANAKA
Manager

TOTAL P.01

FOIA COFIDENTIAL
TREATMENT REQUESTED
0140

# Exhibit 18

# AMERINDO INVESTMENT ADVISORS INC.

One Embarcadero Center, Suite 2300
San Francisco, CA 94111-3162
Tel: (415) 362-0292
Fax: (415) 362-0533

43 Upper Grosvenor Street
London W1X 9PG
Tel: (0171) 629-2349
Fax: (0171) 493-5158

26th June 2002

**BY FACSIMILE**



Specialist Clearance

**Re: Sub Account M26- A/C**

Dear Jean,

Please immediately send the following wire transfer:

| | |
|---|---|
| Bank: | Chase Manhattan Bank<br>New York, NY |
| For credit to: | Amerindo Investment Advisors Inc. |
| Account number: | |
| CHIPS ABA#: | |
| Reference: | London |
| Amount: | $650,000.00 |



This wire transfer represents redemption by the above referenced equity partner.

Please call me immediately in London on +44-171-629-2349 in case of any problems.

Sincerely yours

Gary Tanaka
MANAGER

JUN 26 PM12:53

TOTAL P.01

FOIA COFIDENTIAL
TREATMENT REQUESTED
0142

# Exhibit 19

# AMERINDO INVESTMENT ADVISORS INC.

One Embarcadero Center, Suite 2300
San Francisco, CA 94111-3162
Tel: (415) 362-0292
Fax: (415) 362-0533

43 Upper Grosvenor Street
London W1X 9PG
Tel: 020 7629-2349
Fax: 020 7493-5158

9th July 2002

BY FACSIMILE

[redacted]
Specialist Clearance
[redacted]

Re: Sub Account M26- A/C# [redacted]

Dear Jean,

Please immediately send the following wire transfer:

| | |
|---|---|
| Bank: | Bank One International Corp.<br>153 West 51st Street<br>New York, NY 10019 |
| ABA Number: | [redacted] |
| Swift Number: | FNBCUS33XXX |
| For credit to: | Lloyd's TSB Bank (Luxemburg) |
| Account number: | [redacted] |
| Further credit to: | Lynx Account Number 5150305 |
| Amount: | $3,102,958.85 |

This wire transfer represents redemption by the above referenced equity partner.

Please call me immediately in London on +44-171-629-2349 in case of any problems.

Sincerely yours

Gary Tanaka
MANAGER

TOTAL P.03

FOIA COFIDENTIAL
TREATMENT REQUESTED
[redacted]0144