05 CV 5231

JUDGE SWAIN

Mark K. Schonfeld (MS-2798)
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, New York  10281
(212) 336-0077 (Gizzi)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION      :
                                        :
                        Plaintiff,      :
                                        :
            - against -                 :
                                        :
AMERINDO INVESTMENT ADVISERS INC.,      :
ALBERTO WILLIAM VILAR, and              :
GARY ALAN TANAKA,                       :
                                        :
                        Defendants.     :
                                        :
------------------------------------------------------------------x

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
EMERGENCY APPLICATION FOR A TEMPORARY
RESTRAINING ORDER, PRELIMINARY INJUNCTION,
ORDER TO SHOW CAUSE, AND OTHER RELIEF

The Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in support of its application for emergency relief to protect investors from an ongoing fraud concerning Amerindo Investment Advisors Inc., an investment adviser located in New York, New York ("Amerindo"), and its principals Alberto William Vilar ("Vilar") and Gary Alan Tanaka ("Tanaka") (collectively the "Defendants").

## PRELIMINARY STATEMENT

This case concerns Amerindo's misappropriation of at least one client's funds, and its principals' material misrepresentations, and failure to disclose, other material information to its clients. For example, Amerindo, Vilar and Tanaka have misappropriated funds of a long time elderly investor, L.C. Since the fall of 2004, L.C. has attempted to redeem her investments, currently valued at over $9 million, with Amerindo. L.C. has been unable to redeem her investments, in part, because Amerindo never invested her funds the way Vilar claimed it would. Specifically, Amerindo's latest account statement indicated that among other investments, L.C. had an investment identified as "Funds on Deposit with SBIC (value date 06.20.02)" that was valued at $5 million, and "Interest on SBIC Deposit" with a value of $225,000. These representations are simply false. In approximately June 2002, Vilar and Amerindo induced L.C. to invest $5 million in a fund that Amerindo was purportedly organizing to qualify and be operated as a Small Business Investment Company ("SBIC"). L.C. agreed to invest the $5 million and she transferred her funds to a brokerage account that Amerindo designated. As soon as L.C.'s funds were transferred to this account, however, Tanaka immediately instructed the broker-dealer to transfer L.C.'s funds out of the account, including to bank accounts that Vilar and Amerindo controlled. Vilar then used a portion of L.C.'s funds for his own personal purposes, including charitable donations. Amerindo used a portion of L.C.'s funds for business

purposes. Subsequently, when L.C. inquired about the status of her investment, Vilar misrepresented the status of her investment. Moreover, when L.C. sought to redeem all of her investments held with Amerindo, Amerindo, Vilar and Tanaka all refused to redeem her investments. The Commission fears that there are other clients who have similarly been defrauded.

Moreover, on May 26, 2005, the United States Attorney's Office for the Southern District of New York arrested the two principals of Amerindo, Vilar and Tanaka. Beyond the troubling allegations that are the basis for the USAO's complaints against both Vilar and Tanaka, their arrest has left a void at Amerindo. Vilar and Tanaka are the two principals of Amerindo, and are the primary decision-makers at Amerindo. In light of their arrests, Amerindo's clients, many of whom are institutional clients such as pension funds, will likely seek to terminate their relationship with Amerindo and transfer their funds and securities to other investment advisers. Based on representations by Amerindo's counsel, it is unclear whether any current employees at Amerindo have the ability to efficiently and properly transfer clients' holdings. Therefore, because of the lack of a decision maker to address client concerns, the Commission respectfully requests that the Court grant its request for expedited relief, including the appointment of a temporary receiver to review client account records, respond to client's directions concerning their accounts, and perform an accounting.

By this request for emergency relief, the Commission seeks to stop any ongoing fraud and preserve and recover any remaining assets for defrauded investors. The Commission seeks an order (1) appointing a temporary receiver over Amerindo; (2) authorizing expedited discovery and preventing the destruction of documents; and (3) requiring Amerindo to provide a verified accounting.

## THE RELEVANT PARTIES

### A.    The Defendants

1.    **Vilar**, age 64, is a resident of New York, New York.  Vilar, together with Tanaka, is a co-founder and principal of Amerindo, Amerindo Investment Advisors, Inc. ("Amerindo Panama"), and various affiliated entities.  Vilar is the President of Amerindo.  Vilar has been involved in emerging technology investment strategies for over 25 years.

2.    **Tanaka**, age 61, is a resident of London, England.  Tanaka, together with Vilar, is a co-founder and principal of Amerindo, Amerindo Panama, and various affiliated entities. Tanaka is the President of Amerindo.  Like Vilar, Tanaka has been involved in emerging technology investment strategies for over 25 years.

3.    **Amerindo** is a California corporation with a principal place of business in San Francisco, California.  Amerindo also maintains offices in New York, New York and London, England.  Amerindo has been a registered investment adviser since 1985.  According to its most recent Form ADV, the adviser has approximately $1.2 billion under management in 25 client accounts.  In addition, Amerindo serves as an investment adviser to Amerindo Funds, Inc., a registered open-end investment company, which as of January 31, 2005, had an aggregate net asset value of approximately $122 million.  Amerindo is also an adviser to at least one hedge fund and a United Kingdom investment trust.  Finally, according to the Form ADV, Amerindo has a number of related advisers, including Amerindo Investment Advisors (Cayman) Limited, Amerindo Investment Advisors (UK) Limited, and Amerindo Panama.

3

**B.**     **Related Entity**

**Amerindo Funds, Inc**. is a registered open-end investment company with one series, the

Technology Fund. The fund's aggregate net asset value as of January 31, 2005 was

approximately $122 million. Amerindo is the investment adviser of this fund.

**FACTS**

L.C. is an investor who has maintained an investment advisory relationship with

Amerindo since 1987. (Declaration of Elzbieta Wraga, ¶ 2 (hereinafter "Wraga Decl.").)

Since 1987, Amerindo has advised L.C. concerning her investments, and periodically, Amerindo

sent L.C. account statements reflecting her various investments.

*Vilar Induced L.C. To Invest in a SBIC Fund*

In or about June 2002, Vilar recommended that L.C. invest $5 million in a fund that Vilar

and Tanaka were to manage as an SBIC, and which would seek a license from the SBA. (Wraga

Decl. ¶ 3.) Vilar told L.C. that he and Tanaka were starting an investment fund that would invest

in technology companies, and that the SBA would provide matching funds. Vilar recommended

that L.C. invest in the SBIC.

L.C. agreed to make the investment, and on June 20, 2002, she wired $5 million to an

account that Amerindo had designated (the "AMI Account") at a broker-dealer (the "Broker-

Dealer"). (Wraga Decl. ¶ 5.)

At the time of her investment, Amerindo, Vilar and Tanaka failed to provide L.C. with

any documentation concerning the investment, such as a private placement memorandum

("PPM"), subscription agreement, or other document reflecting the investment itself. (Wraga

Decl. ¶ 4.)   L.C. and her advisors subsequently questioned Vilar about the investment. On or

4

about March 25, 2004, Vilar sent a letter on Amerindo letterhead to L.C.'s accountant, which

contained the following:

> It is well known that it is next to impossible to get an SBIC for a
> technology-oriented venture capital fund. Amerindo spent years
> applying for such a license at considerable expense, which was
> finally approved about three years ago. Unfortunately, largely due
> to personnel changes at the [SBA] pursuant to our approval, we
> were required to reapply about 18 months ago for the same license.
> While this has taken far longer than we anticipated, we
> nevertheless had to deposit the requisite key money for the SBA,
> which we did. . . . Far more importantly, the prices of technology
> private-placements continued to decline throughout this waiting
> period. This means that we did not use a single penny of [L.C.'s]
> investment during this declining period, and if and when, as
> expected, we start to make investments upon securing the renewal
> of our license later this year, we will be looking at the best prices
> probably even seen in the four decade plus history of technology
> based, venture capital. (Wraga Decl. ¶ 11, Exh. 3.)

Amerindo sent L.C. statements of her account. As of September 30, 2004, the statement

Amerindo sent to L.C. included an entry indicating "FUNDS ON DEPOSIT WITH SBIC (value

date 06.20.02)," which was valued at $5 million, and "INTEREST ON SBIC DEPOSIT," which

was valued at $225,000. (Wraga Decl. ¶ 12, Exh. 4.) On October 25, 2004, Vilar sent a

memorandum on Amerindo letterhead to L.C.'s attorney to explain the account statement, which

Vilar said was prepared "at our London office." Regarding the entry for "Funds on Deposit with

SBIC, for $5 million," Vilar wrote that "[t]echnically this represents an escrow deposit for a

technology-based SBIC. [L.C.] has effectively coinvested with Gary and myself in a new fund

that has been approved for Investment, but the actual funding leverage-supplement has been

delayed owing to budgetary problems in Washington, due to the increase in the deficit and the

Iraqi war. This is an eight year fund which we remain extremely optimistic about, given our

very positive view on wireless broadband convergence." (Wraga Decl. ¶ 13, Exh. 5.)

5

In the fall of 2004, after L.C. raised questions about the SBIC investment, Vilar finally supplied L.C. with the PPM for the SBIC fund. This PPM indicated that the fund was named the Amerindo Venture Fund, LP. (Wraga Decl. ¶ 14.) After reviewing the PPM, L.C. and her advisors determined that it was not an appropriate investment for L.C. and requested that her $5 million (plus interest) be returned. (Wraga Decl. ¶¶ 14-15.) Further, on December 9, 2004, Vilar sent L.C.'s attorney a letter on Amerindo letterhead that "[i]f [L.C.] does not wish to retain the SBIC investment she agreed to make, we will have to undertake on a best efforts basis the sale of her participation to another prospective investor. As could be expected, we are not at liberty to liquidate that investment on demand, as it constitutes part of the $10 million minimum the General Partner was required to come up with to initiate the fund." (Wraga Decl. ¶ 16, Exh. 7.) Vilar also wrote that "it is nevertheless quite likely that prospective investors for [L.C.'s] investment will now require the commencement of government-matched funding," and that "[t]his unfortunately involves a political timetable completely beyond our immediate control." Id. Finally, Vilar wrote that "all we can do is keep you posted of our efforts on her behalf to pursue this very unusual request, which, as noted above, will remain constrained by the special funding program attached to it." Id.

As is explained below, Vilar's statements were materially false and misleading. Although Amerindo began the application process to obtain a license, the SBA never approved an application to license the Amerindo Venture Fund, LP, or any other Amerindo affiliated fund. (Affidavit of Margaret T. Dennin dated June 1, 2005 (hereinafter "Dennin Aff.") ¶ 23.) The SBA also never held any funds in escrow on behalf of the Amerindo Venture Fund, LP, or any other Amerindo affiliated fund. (Dennin Aff. ¶ 24.) The SBA also never required the Amerindo Venture Fund, LP, or any other Amerindo affiliated fund to keep funds in escrow. (Dennin Aff.

6

¶ 24.) Moreover, by approximately March 2004, it was clear the Amerindo Venture Fund, LP and its adviser would not obtain matching funds. Specifically, in early 2004, the SBA posted a notice on its website to advise that financing for the Participating Securities SBIC program (for which the Amerindo Venture Fund, LP had applied) would terminate on September 30, 2004, and that to be eligible to receive such financing, a potential applicant would need to file an application by March 31, 2004, which Amerindo did not do. (Dennin Aff. ¶¶ 9, 21.)

### *Amerindo, Vilar and Tanaka Misappropriated L.C.'s Funds*

Furthermore, Vilar never invested L.C.'s funds in the Amerindo Venture Fund, LP or otherwise placed her $5 million investment in escrow pending the SBA's approval of a license. Rather, on June 20, 2002, L.C. transferred her $5 million into the AMI Account at the Broker-Dealer, as Amerindo directed. (Wraga Decl. ¶ 5.) The AMI Account was not a new account opened for the SBIC fund. Rather, the account was an existing Amerindo affiliated account, which had been opened years before. (Wraga Decl. ¶ 6.) Moreover, as of May 31, 2002, the account had a negative cash balance of $428,122 and held equities with a value of $758,847, for a net equity of $330,725. (Wraga Decl. ¶ 30.) Within days of L.C.'s $5 million transfer, Tanaka directed the Broker-Dealer to transfer a portion of L.C.'s funds out of the account. (Wraga Decl. ¶¶ 32-33, Ex. 16, 17, 18.) Indeed, in June 2002 and July 2002 alone, at least $5 million was transferred out of the account to various other parties and entities. (Wraga Decl. ¶¶ 32-34.)

Specifically, on June 25, 2002, Tanaka directed the Broker-Dealer to transfer $1 million of L.C.'s funds to Vilar's personal checking account. (Wraga Decl. ¶ 32, Ex. 16.) According to bank records for the period from approximately June 9, 2002 through July 8, 2002, the Vilar personal checking account had a balance of approximately $87,564.45 immediately prior to the incoming wire transfer of $1 million dollars on or about June 25, 2002. No other funds were

then deposited in the account during the statement period, and the closing balance of the Vilar

checking account was approximately $132,677.72. Thus, all but approximately $45,0000 of the

funds wired into the Vilar checking account from L.C.'s SBIC investment were dissipated

within two weeks of their deposit. (Wraga Decl. ¶ 36.)

The withdrawals from the Vilar checking account during that two week period included:

- An electronic check in the amount of $540,000 made payable to "Washington and Jefferson" (Vilar has pledged millions of dollars to various programs at his alma mater Washington & Jefferson College);
- A check in the amount of approximately $177,000 made payable to "American Academy in Berlin" (according to the Academy's website, www.americanacademy.de, "Alberto Vilar" has made significant donations to this institution);
- An electronic check in the amount of approximately $17,000 made payable to Alberto Vilar;
- A check in the amount of approximately $14,640 made payable to what appears to be a catering service, with a memo line which reads: "AV Party 4/18");
- A transfer in the amount of approximately $10,000 for the benefit of "Albert W. Vilar";
- A check in the amount of approximately $7,000 made payable to an individual with the last name "Vilar", with a memo line which reads "Allowance-May";
- A check in the amount of approximately $255.56 payable to an appliance service for "Dishwasher Repair" for Vilar's home address; and
- Approximately $1,000 in ATM cash withdrawals.

Additionally, on June 26, 2002, Tanaka directed the Broker-Dealer to transfer $650,000

of L.C.'s funds to Amerindo's business checking account. Amerindo's bank records indicate

that within approximately one month, these funds were spent on what appear to be routine

business expenses Amerindo incurred. (Wraga Decl. ¶ 37.)

Finally, on July 9, 2002, Tanaka directed the Broker-Dealer to transfer over $3 million

from the AMI Account to a bank account in Luxemburg. (Wraga Decl. ¶34.)

8

*Amerindo, Vilar and Tanaka Refused to Redeem L.C.'s Investments*

L.C.'s attorney has made a number of written redemption requests with respect to the

SBIC investment as well as other investments with which Amerindo has failed to comply. For

instance, on February 17, 2005, L.C.'s attorney wrote to Vilar and indicated that L.C. wished to

close her Amerindo account, which a September 30, 2004 account statement indicated had a

value in excess of $12 million. (Wraga Decl. ¶ 17, Ex. 8.) (The September 30, 2004 account

statement indicated that L.C.'s investments were valued at $12,217,191.85. Because $2,872,058

of this amount was invested through an external account at the Broker-Dealer, L.C. was able to

revoke Amerindo's discretionary authority over the account and transfer this sum to another

personal brokerage account she maintained. Therefore, L.C.'s investment with Amerindo as of

September 30, 2004 was purportedly worth approximately $9,345,133,85.) (Wraga Decl. ¶ 12,

22.)

Vilar responded in a February, 23, 2005 letter that, pursuant to the terms of an investment

management agreement, L.C. needed to notify "the office where the account is lodged of its

decision to terminate its service in writing." Vilar further advised that L.C. should write to

Amerindo Panama, where her account was located. (Wraga Decl. ¶ 19, Ex. 10.)

Despite the fact that L.C. had always dealt with Vilar and Tanaka, and did not believe her

account was held at Amerindo Panama, L.C.'s attorney then sent a request on February 28, 2005

to Amerindo Panama, which was copied to Amerindo offices in New York and London,

confirming her intention to close her account. (Wraga Decl. ¶ 20-21. Ex. 11.)

To date, neither Vilar nor any Amerindo entity or employee has confirmed receipt of the

request, and no funds or securities have been transferred to L.C . (Wraga Decl. ¶ 22.)

## ARGUMENT

### I.   AMERINDO SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Because the Commission is "not … an ordinary litigant, but … a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  The Commission need not show irreparable injury or a balance of equities in its favor. *Id.*; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990).  Rather, the Commission is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *See* 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d); *see also SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998).[1]

Here, the Commission easily makes a "substantial showing" that (i) Amerindo has committed current violations of the antifraud and other provisions of the federal securities laws; and (ii) there is a present risk that Amerindo will repeat its conduct by continuing the fraud alleged in the Complaint and embarking on a new fraud.  Amerindo (and its principals Vilar and Tanaka) have committed an egregious act of misconduct, by abusing their fiduciary relationship with a client, and inducing her to make a substantial investment of $5 million, only then to misappropriate this investment for their own personal and business purposes.  Amerindo's violations of the federal securities laws are egregious and exhibit a high degree of scienter.

---

[1]      The Commission also is relieved of demonstrating the lack of an adequate remedy at law, as private litigants must, to obtain an injunction. *SEC v. Cavanagh*, 155 F.3d at 132.; *SEC v. Scott*, 565 F. Supp. 1513, 1536 (S.D.N.Y. 1983), *aff'd sub nom.*, *SEC v. Cayman Islands Reins. Corp.*, 734 F.2d 118 (2d Cir. 1984).

Given the nature of these violations, a temporary restraining order is warranted to preserve the status quo pending a preliminary injunction hearing.

**A.    Amerindo Has Committed Current Violations of The Anti-Fraud And Other Provisions of the Federal Securities Laws**

      **1.    Amerindo Has Violated Section 17(a) Of The Securities Act And Section 10(b) Of The Exchange Act And Rule 10b-5 Thereunder**

Amerindo has violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (the "antifraud provisions"). Under the antifraud provisions, the Commission must establish that, in the offer or sale of a security, or in connection with the purchase or sale of a security, a party has acted with scienter in making a material misrepresentation or omission. *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992) (citations omitted); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 235 n.13 (1988) (Section 10(b) of the Exchange Act and Rule 10b-5); *U.S. v. Naftalin*, 441 U.S. 768, 772, 778 (1979) (Section 17(a) of the Securities Act).

          **a.    Amerindo, through Vilar, Made Numerous Material Misrepresentations And Omissions In The Offer Or Sale Of A Security Or In Connection With The Purchase Or Sale Of A Security**

Amerindo, through its principal, Vilar, has made numerous material misrepresentations and omissions to Amerindo's clients. Among the misrepresentations and omissions that the Commission has uncovered so far are:

- Vilar induced L.C. to invest $5 million by falsely telling her that Amerindo would invest her funds in a fund that Amerindo was organizing to qualify and be operated as a SBIC venture;

- Amerindo, Vilar and Tanaka failed to disclose to L.C. that after she transferred her funds to the brokerage account they designated, and controlled, they used her funds for their own personal and business purposes;

11

- When L.C. then inquired about her investment, Amerindo and Vilar misrepresented that the SBA had approved Amerindo's application for a SBIC license (which was not true); that Amerindo could not return her money until another investor could be found (which was not true); that her $5 million investment was in escrow (which it was not); and that Amerindo had not used a single penny of her money (which it had).

All of the misrepresentations and omissions above are material. Information is considered material if there is a substantial likelihood that a reasonable investor would consider such information important in making an investment decision or if the information would significantly alter the total mix of available information. *Basic*, 485 U.S. at 231-32. Reasonable investors would consider who has discretion over their investments, the use of the assets raised, and the risks associated with the investments. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978) (misleading statements and omissions concerning the use of money raised from investors were material as matter of law); *see also United States v. Siegel*, 717 F.2d 9, 14-15 (2d Cir. 1983) (holding that failure to disclose the misappropriation of more than $100,000 was a fact which would be important to a stockholder in his decision making). Additionally, an investor would consider the fact that a manager of the investor's money is engaging in self-dealing to be material.

### b.   The Defendants Acted With Scienter

Amerindo acted with scienter, which is a mental state embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder, et al.*, 425 U.S. 185, 193 (1976).[2] The Second Circuit has held that reckless conduct generally satisfies the scienter requirement. *See, e.g., SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (holding that scienter required for a

---

[2]    A violation of Section 17(a)(1) of the Securities Act also requires a showing of scienter. However, the U.S. Supreme Court has held that scienter need not be shown in order to establish violations of Sections 17(a)(2) and (3) of the Securities Act. *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980).

12

Section 10(b) or Rule 10b-5 claim "may be established through a showing of a reckless disregard

for the truth"), *citing Rolf v. Blyth, Eastman, Dillon & Co.*, 570 F.2d 38, 46 (2d Cir. 1978);

*Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir.), *cert. denied*, 459 U.S. 838 (1982).

Here, the consistent material misrepresentations and omissions listed above — which are

only what the Commission staff have discovered to date — are indicative of intent to defraud by

Amerindo.  Further, Amerindo's, Vilar's and Tanaka's egregious and undisclosed self-dealing –

taking L.C.'s funds and using the funds for their own personal purposes -- is egregious and

reflects their willingness to use client accounts as their own piggy banks.

**c.    The Commission Satisfies The "In Connection With"
Requirement Of The Anti-Fraud Provisions Of The Federal
Securities Laws**

The Commission also satisfies the "in connection with" requirement of a securities fraud

violation.  The Defendants' misappropriated L.C.'s funds, which were purportedly to be invested

in a SBIC, and then used the funds for personal purposes. *See SEC v. Zandford*, 535 U.S. 813,

825 (2002) (holding that the "in connection with" element is satisfied by "a fraudulent scheme in

which the securities transactions and breaches of fiduciary duty coincide").

**2.    Amerindo Violated Sections 206(1), 206(2), and 206(4) Of
The Advisers Act**

Sections 206(1) and 206(2) of the Advisers Act make it unlawful for an investment

adviser to employ any device, scheme, or artifice to defraud clients or to engage in any

transaction, practice, or course of business that defrauds clients or prospective clients.  Sections

206(1) and 206(2) also impose upon investment advisers an affirmative fiduciary duty of utmost

good faith to make full and fair disclosure of all material facts to advisory clients.  As with

Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act, the

Commission must prove materiality.  And, like Section 10(b) of the Exchange Act, Rule 10b-5,

13

and Section 17(a)(1) of the Securities Act, Section 206(1) of the Advisers Act requires that a defendant acted with scienter. *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981). To establish a violation of Section 206(2) of the Advisers Act, like Sections 17(a)(2) and 17(a)(3) of the Securities Act, scienter is not required. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963).

Additionally, Section 206(4) of the Advisers Act prohibits an investment adviser from engaging in any act, practice or course of business that is fraudulent, deceptive or manipulative in contravention of Commission rules. Rule 206(4)-2(a) provides strict guidelines for investment advisers who accept custody of client funds or securities. Rule 206(4)-2 specifically states that investment advisers who do not comply with those guidelines are deemed to have engaged in fraudulent conduct in violation of Section 206(4) of the Advisers Act. Specifically, the Rule states that any investment adviser who has custody of client funds must 1) segregate client funds; 2) maintain the funds in a bank account that contains only client funds and is maintained in the name of the adviser as agent or trustee for such clients; 3) notify the client of where and how such funds are maintained; 4) send the client an itemized statement at least quarterly showing the funds and transactions in the period; and 5) have the funds verified by an independent public accountant at least once a year.

Amerindo violated Sections 206(1), 206(2), and 206(4) of the Advisers Act. Amerindo is a registered investment adviser. Additionally, for compensation, Amerindo engaged in advising clients, including L.C., as to the value of securities or as to the advisability of investing in, purchasing or selling securities. Amerindo has violated Sections 206(1) and 206(2) of the Advisers Act, by among other things, fraudulently representing that Amerindo would invest L.C.'s $5 million in a SBIC fund; misappropriating her funds as soon as she transferred them to a

14

brokerage account under Amerindo's control; and then making numerous material

misrepresentations and omissions to L.C. when she inquired about the status of her SBIC

investment, and when she attempted to redeem all of her investments. Moreover, Vilar directed

L.C to transfer her funds to the AMI account, which was not a segregated client account. In

addition, Amerindo failed properly to segregate L.C.'s funds, and failed to maintain her funds in

a bank account that contained only client funds and was maintained in Amerindo's name as

agent or trustee for L.C.

**B.     The Defendants Are Likely To Continue Their Illegal Conduct**

In determining whether to grant emergency relief, courts consider the likelihood that,

unless enjoined, a defendant will violate the securities laws again. *SEC v. Cavanagh*, 155 F.3d at

135. As the Second Circuit instructed in *Management Dynamics, Inc.*:

> Certainly, the commission of past illegal conduct is highly suggestive of the
> likelihood of future violations. . . . [F]actors suggesting that the infraction might not
> have been an isolated occurrence are always relevant. . . . Moreover, appellate courts
> have repeatedly cautioned that cessation of illegal activity does not ipso facto justify
> the denial of an injunction.

515 F.2d at 807. In assessing likelihood of repetition, courts also look to such factors as the

character of the violation, the degree of scienter involved, and the degree to which a defendant's

occupation or activities may present future opportunities to violate the law. *E.g.*, *Cavanagh*, 155

F.3d at 135; *SEC v. Commonwealth Chem. Secs., Inc.,* 574 F.2d 90, 100-01 (2d Cir. 1978); *SEC v.

Musella,* 578 F. Supp. 425, 444 (S.D.N.Y. 1984).

As demonstrated above, Amerindo's violations of the federal securities laws were

egregious and exhibited a high degree of scienter. Most significantly, Amerindo's conduct

continues. Amerindo has refused to provide information as to L.C.'s funds and securities, and as

recently as May 20, 2005, Vilar told the Commission staff that L.C. had been a client of

Amerindo Panama, which was sold to independent owners in 2001. (In fact, L.C. never believed

15

she was a client of Amerindo Panama, and Vilar's representation that Amerindo Panama was sold to independent owners in 2001 conflicts with statements that Amerindo has made in its Form ADV in approximately 2003 (which advisers are required to file with the Commission), and other statements Amerindo has made.  Given the nature of Amerindo's (and its principals') violations, and their persistence in pursuing their frauds and refusing to redeem L.C.'s investments, a temporary restraining order is warranted to prevent Amerindo from soliciting new investors and preserve the status quo pending a preliminary injunction hearing.

## II.    THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION OF INVESTOR ASSETS AND THE PROSECUTION OF THIS CASE

The Court should order an accounting to preserve and identify investor assets, and appointment of a temporary receiver.  The Court also should order expedited discovery and prohibit the destruction of documents and witness tampering to allow for the efficient and just prosecution of this action.

### A.    The Court Should Order The Appointment Of A Receiver

The Court should appoint a receiver for Amerindo.[3]  Courts will appoint a receiver where necessary (1) to preserve the status quo while various transactions are being unraveled in order to determine an accurate picture of the fraudulent conduct, *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d at 1105; (2) to protect "those who have already been injured by a violator's actions from further despoliation of their property or rights," *Esbitt v. Dutch-American Mercantile*

---

[3]    The Securities Act, the Exchange Act and the Advisers Act do not specifically vest the court with the power to appoint a temporary receiver in a civil injunction action brought by the Commission.  Courts have consistently held, however, that such a power exists in order to effectuate the purpose of the federal securities laws.  *SEC v. American Board of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987); *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984), *cert. denied*, 471 U.S. 1053 (1985).

*Corp.*, 335 F.2d 131, 143 (2d Cir. 1964); (3) to prevent the dissipation of the defendant's assets

pending further action by the court, *SEC v. American Board of Trade, Inc.*, 830 F.2d at 436; (4)

to install a responsible officer of the court who could bring the companies into compliance with

the law, *id.* at 437; or (5) to place hopelessly insolvent entities in bankruptcy to effect their

liquidation, *id.* at 436.

A temporary receiver for Amerindo is necessary.  As a primary matter, Amerindo has

committed an egregious fraud, and a temporary receiver will secure any remaining assets of

Amerindo and prepare an accounting.  Moreover, in light of the arrests of Vilar and Tanaka,

there is simply a void at Amerindo.  As a primary matter, clients will be urgently attempting to

transfer there securities and funds from Amerindo in light of the arrests of Vilar and Tanaka.

According to Amerindo's counsel, other than Vilar and Tanaka, there does not appear to be an

employee who has full decision making abilities.  Therefore, a receiver is necessary to make

these decisions and to address clients' concerns and requests.

The receiver will also unravel current securities positions and liquidate positions to

attempt to maximize the amount of assets available to investors.

The Commission is ready and willing to assist the Court in identifying and appointing an

appropriate receiver if the Court wishes the Commission's assistance.

**B.      The Court Should Order An Accounting To
         Facilitate The Return Of Investor Funds**

The Commission also requests that Amerindo provide a verified accounting.  The

equitable remedy of a sworn accounting is frequently imposed to provide an accurate measure of

unjust enrichment and a defendant's current financial resources. *See, e.g., Manor Nursing Ctrs.*,

458 F.2d at 1105; *SEC v. Oxford Capital Securities, Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y.

1992); *SEC v. Bloom*, 1988 U.S. Dist LEXIS 2487 (S.D.N.Y. Jan. 12, 1988).

17

The Commission requests that the Court order, as part of its emergency relief, that Amerindo prepare an accounting of all investor funds received. Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of all funds obtained as a result of fraudulent activity, as well as a measure of unjust enrichment and defendants' current financial resources. *See, e.g., Manor Nursing Centers*, 458 F.2d at 1105; *SEC v. Oxford Capital Securities, Inc.*, 794 F. Supp. 104, 105-106 (S.D.N.Y. 1992). Moreover, Amerindo should provide a full and complete explanation of the status of clients' funds and securities. As explained above, Amerindo has not provided satisfactory explanations of the whereabouts and availability of L.C.'s funds and securities. As a result, the Commission does not know at this time where the L.C.'s assets are located or whether they exist at all. A prompt and complete accounting will assist in determining the status of clients' accounts. Thus, an accounting remedy is needed here to determine: (1) the disposition of Amerindo's assets; (2) the disposition of clients' accounts; (3) the amount of Amerindo's unjust enrichment; and (4) the assets available for disgorgement.

## C.    The Court Should Enter An Order Permitting Expedited Discovery And Prohibiting The Destruction Of Documents

The Court should grant the Commission's requested for expedited discovery in order to allow the Commission to act quickly to obtain bank and other records necessary to identify and preserve investor assets and determine whether Amerindo is engaged in other ongoing frauds. Likewise, the Court should enter an order prohibiting Amerindo from destroying and altering documents in order to preserve as much of the evidence as possible given Amerindo's misconduct.

## CONCLUSION

For all the foregoing reasons, and those set forth in the accompanying declarations and

exhibits thereto, the Commission respectfully requests that its application be granted.

Dated:  June 1, 2005.

                                        Mark K. Schonfeld (MS-2798)
                                        Attorney for Plaintiff


                                        By:  Paul G. Gizzi (PG-1836)

                                        Securities and Exchange Commission
                                        3 World Financial Center
                                        New York, New York  10281
                                        Telephone (212) 336-0077 (Gizzi)


Of Counsel:
Helene T. Glotzer
Kay L. Lackey
Paul G. Gizzi
Mark D. Salzberg

19