Mark K. Schonfeld (MS-2798)
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, New York  10281
(212) 336-0077 (Gizzi)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION          :
                                            :
                    Plaintiff,              :
                                            : ECF Case
          - against -                       :
                                            :
AMERINDO INVESTMENT ADVISORS INC.,          : 05 Civ. 5231 (LTS)(DFE)
ALBERTO W. VILAR, and                       :
GARY ALAN TANAKA,                           :
                                            :
                    Defendants.             :
                                            :
------------------------------------------------------------------------x
```

DECLARATION OF MARK D. SALZBERG IN SUPPORT
OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MOTION FOR LEAVE TO AMEND THE COMPLAINT

I, Mark D. Salzberg, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over 18 years of age and I am an attorney on the staff of the plaintiff

Securities and Exchange Commission ("Commission").  I am employed as a Senior

Counsel with the Commission's Northeast Regional Office.  I make this Declaration in

support of the Commission's Motion For Leave to Amend the Complaint.

2.      The Defendants in the existing action are Amerindo Investment Advisors

Inc. ("Amerindo US"), Alberto W. Vilar and Gary Alan Tanaka.  The Commission has

properly served all three defendants with the Commission's Complaint dated June 1,

2005.

3.      Neither Defendant Vilar nor Defendant Tanaka has served a responsive pleading in this action.  Accordingly, pursuant to Fed. R. Civ. P. 15(a), the Commission may amend the Complaint as a matter of course with respect to Defendants Vilar and Tanaka.

4.      On August 19, 2005, Defendant Amerindo US filed an Answer to the Complaint.

5.      Counsel for Amerindo US has informed counsel for the Commission that Amerindo US does not object to the Commission filing an amended complaint.  (I have attached as Exhibit 1 to this Declaration a copy of an October 31, 2005 e-mail from Eugene Licker, Esq., counsel for Amerindo US, to Kay L. Lackey, Esq., counsel for the Commission, in which Mr. Licker states, in pertinent part, that Amerindo US "has no objection" to the Commission filing an amended complaint in this action.)

6.      To date, neither the Commission nor the Defendants have taken or scheduled depositions or engaged in any discovery in connection with this action.

7.      I have attached as Exhibit 2 to this Declaration a copy of the proposed amended complaint, which includes additional defendants and supplemental claims not included in the original Complaint.

8.      I have also submitted herewith a proposed Order granting the Commission leave to file and serve the amended complaint.

9.      The Commission respectfully contends that granting leave to amend the Complaint is in the interests of justice.  (Because Amerindo US' counsel has indicated that he does not object to the Commission filing an amended complaint, the Commission

does not believe that any briefing is required because of the nature of this motion.  If the

Court believes that the Commission should submit a memorandum of law in support of this

motion, the Commission respectfully asks for the opportunity to submit such a

memorandum.)

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       November 10, 2005

_____
Mark D. Salzberg

# EXHIBIT 1

## Lackey, Kay L.

| | |
|---|---|
| **From:** | Eugene Licker [elicker@loeb.com] |
| **Sent:** | Monday, October 31, 2005 8:58 AM |
| **To:** | Lackey, Kay L. |
| **Subject:** | SEC v. Amerindo |

My client, Amerindo Investment Advisors Inc. (U.S.), has no objection to the SEC filing an amended complaint as discussed in our October 6 conference with the Court.

-- Eugene Licker

Eugene R. Licker
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154-0037
Direct Dial: (212) 407-4157
Direct Fax: (646) 219-7454
Facsimile: (212) 407-4990

CONFIDENTIALITY NOTICE:  This e-mail transmission, and any
documents, files or previous e-mail messages attached to it may
contain confidential information that is legally privileged.  If
you are not the intended recipient, or a person responsible for
delivering it to the intended recipient, you are hereby notified
that any disclosure, copying, distribution or use of any of the
information contained in or attached to this transmission is
STRICTLY PROHIBITED.  If you have received this transmission in
error, please immediately notify the sender.  Please destroy the
original transmission and its attachments without reading or
saving in any manner.  Thank you, Loeb & Loeb LLP.

CONFIDENTIALITY NOTICE:  This e-mail transmission, and any
documents, files or previous e-mail messages attached to it may
contain confidential information that is legally privileged.  If
you are not the intended recipient, or a person responsible for
delivering it to the intended recipient, you are hereby notified
that any disclosure, copying, distribution or use of any of the
information contained in or attached to this transmission is
STRICTLY PROHIBITED.  If you have received this transmission in
error, please immediately notify the sender.  Please destroy the
original transmission and its attachments without reading or
saving in any manner.  Thank you, Loeb & Loeb LLP.

# EXHIBIT 2

Mark K. Schonfeld (MS-2798)
Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-0077 (Gizzi)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION          :
                                                                                    :          **ECF CASE**
                             Plaintiff,                                       :
                                                                                    :
                          - against -                                      :          **[PROPOSED]**
                                                                                    :          **AMENDED COMPLAINT**
AMERINDO INVESTMENT ADVISORS INC.,      :
AMERINDO INVESTMENT ADVISORS, INC.,     :          05 Civ. 5231 (LTS)(DFE)
AMERINDO ADVISORS UK LIMITED,               :
AMERINDO MANAGEMENT INC.,                     :
AMERINDO TECHNOLOGY GROWTH FUND, INC.,   :
AMERINDO TECHNOLOGY GROWTH FUND II, INC., :
TECHNO RAQUIA, S.A.,                                     :
ALBERTO W. VILAR, and                                 :
GARY ALAN TANAKA,                                     :
                                                                                    :
                             Defendants.                                   :
                                                                                    :
------------------------------------------------------------------------x

        The plaintiff Securities and Exchange Commission ("Commission") alleges the following

against defendants Amerindo Investment Advisors Inc. ("Amerindo US"), Amerindo Investment

Advisors, Inc. ("Amerindo Panama"), Amerindo Advisors UK Limited ("Amerindo UK")

(collectively "Amerindo"), Amerindo Management Inc. ("AMI"), Amerindo Technology Growth

Fund, Inc. ("ATGF"), Amerindo Technology Growth Fund II, Inc. ("ATGF II"), Techno Raquia,

S.A. ("Techno Raquia"), Alberto W. Vilar ("Vilar"), and Gary Alan Tanaka ("Tanaka")

(collectively the "Defendants"):

## SUMMARY

1.    The Commission brings this enforcement action against Amerindo (that is, Amerindo US, Amerindo Panama and Amerindo UK, which are all investment advisers), Amerindo's principals Vilar and Tanaka, and other affiliated entities that Vilar and Tanaka control. The Defendants, among other things, engaged in a scheme to defraud numerous investors, including an individual client, L.C., investors in Guaranteed Fixed Rate Deposit Accounts ("GFRDAs"), and investors in two offshore hedge funds, ATGF and ATGF II.

2.    Specifically, in approximately June 2002, Vilar solicited L.C., a wealthy investor and close personal friend, to invest $5 million in the Amerindo Venture Fund LP, a limited partnership that was purportedly being organized to qualify and be operated as a Small Business Investment Company ("SBIC"). After L.C. wired $5 million to a brokerage account in the name of AMI as Amerindo had instructed, Tanaka directed AMI to transfer a portion of her funds to other accounts Vilar and Amerindo controlled. For example, within several days of L.C.'s investment, Tanaka signed letters of authorization ("LOAs") directing AMI to transfer at least $1.65 million of L.C.'s funds from the AMI account to other accounts, including $1 million to a personal checking account held in Vilar's name, and $650,000 to a bank account Amerindo US controlled. Vilar then used the funds he received from L.C.'s investment to pay personal expenses, and Amerindo US used the funds to pay operating expenses. Subsequently, L.C. inquired about the status of her SBIC investment after Amerindo failed to make promised quarterly payments. Vilar then misrepresented the status of the SBIC investment, and failed to tell L.C. that Vilar, Tanaka, AMI and Amerindo had misappropriated her funds.

3.    Amerindo, Vilar, Tanaka and other affiliated entities, including Techno Raquia, also defrauded other individuals and entities who invested in another product Amerindo offered, GFRDAs. Vilar and Tanaka, as well as other Amerindo employees, solicited clients and others, including U.S. residents, to invest funds in GFRDAs, a product in which Amerindo guaranteed that investors would earn a fixed rate of return per year on their investment, and would receive their principal at maturity. Amerindo represented to investors that it would invest the majority of their funds in short-term debt instruments and invest the remaining portion of their funds in equities. For example, according to one version of the GFRDA offering circular that Amerindo provided to potential investors, Amerindo would invest approximately 75% of the investors' funds in short-term debt instruments and approximately 25% in technology and biotechnology stocks. Pursuant to instructions set forth in GFRDA subscription documents, investors generally transferred their funds to an account in the name of Techno Raquia at a broker-dealer located in New York, New York (the "Broker-Dealer"). After individuals and entities invested funds in the GFRDAs, however, Vilar, Tanaka and Amerindo failed to invest the funds in short-term debt instruments in accordance with the representations to investors. Rather, Vilar and Tanaka largely invested in equity securities, such as emerging technology and biotechnology stocks. Moreover, especially during the post-2000 bear market, these equity investments did not perform well and Amerindo was often unable to pay GFRDA investors their promised returns, or to return investors' principal at maturity. Consequently, when investors sought to redeem their GFRDAs, Amerindo generally either refused to honor redemption requests, or redeemed the GFRDAs with other investors' funds taken from unrelated brokerage accounts in, for example, the name of AMI, ATGF and/or ATGF II.

3

4.    Additionally, Vilar, Tanaka and Amerindo defrauded investors, including U.S.

residents, who invested in two offshore hedge funds that Vilar and Tanaka formed, ATGF and

ATGF II. According to offering circulars, ATGF and ATGF II planned to invest in emerging

growth companies. Rather than using investor funds solely to invest in such companies'

securities, however, Tanaka directed ATGF and ATGF II to transfer investor funds from the

funds' brokerage accounts to other accounts for Vilar's and Tanaka's own business and

personal benefit. For example, Tanaka directed ATGF and ATGF II to transfer funds to other

investors in order to repay investors, who, for instance, were attempting to redeem their

GFRDA investments. In addition, Tanaka authorized ATGF and ATGF II to transfer funds to

Amerindo US to, among other things, pay its operating expenses.

## VIOLATIONS OF FEDERAL SECURITIES LAWS

5.    By virtue of the conduct alleged herein:

  a.    Vilar, Tanaka, Amerindo US, Amerindo UK and Amerindo Panama,
        directly or indirectly, singly or in concert, have engaged and are engaging
        in acts, practices and courses of business, that constitute violations of
        Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §
        77q(a);

  b.    Vilar, Tanaka, Amerindo US, Amerindo UK and Amerindo Panama,
        directly or indirectly, singly or in concert, have engaged and are engaging
        in acts, practices and courses of business that constitute violations of
        Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"),
        15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5;

  c.    AMI, Techno Raquia, ATGF and ATGF II, directly or indirectly, singly

4

or in concert, have engaged and are engaging in acts, practices and courses

of business that constitute aiding and abetting violations of Section 10(b)

of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. §

240.10b-5;

d.     Amerindo US, Amerindo UK and Amerindo Panama, directly or

indirectly, singly or in concert, engaged and are engaging in acts, practices

and courses of business, that constitute violations of Sections 206(1) and

206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15

U.S.C. §§ 80b-6(1) and 80b-6(2);

e.     Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II, directly or

indirectly, singly or in concert, have engaged and are engaging in acts,

practices and courses of business that constitute aiding and abetting

violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§

80b-6(1) and 80b-6(2);

f.     Amerindo US, directly or indirectly, singly or in concert, engaged and is

engaging in acts, practices and courses of business, that constitute

violations of Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4);

and

g.     Vilar and Tanaka, directly or indirectly, singly or in concert, engaged and

are engaging in acts, practices and courses of business, that constitute

aiding and abetting violations of Section 206(4) of the Advisers Act, 15

U.S.C. § 80b-6(4).

6.     Unless Vilar, Tanaka, Amerindo US, Amerindo UK, Amerindo Panama, AMI,

Techno Raquia, ATGF and ATGF II are permanently restrained and enjoined, they will continue to engage in the transactions, acts, practices and courses of business set forth in this Amended Complaint and in transactions, acts, practices and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.   The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9, seeking to restrain and enjoin permanently Vilar, Tanaka, Amerindo US, Amerindo UK, Amerindo Panama, AMI, Techno Raquia, ATGF and ATGF II from engaging in the transactions, acts, practices and courses of business alleged herein.

8.   The Commission seeks a judgment ordering Vilar, Tanaka, Amerindo US, Amerindo UK, Amerindo Panama, AMI, Techno Raquia, ATGF and ATGF II to disgorge ill-gotten gains with prejudgment interest thereon.

9.   The Commission seeks a judgment ordering Vilar, Tanaka, Amerindo US, Amerindo UK, Amerindo Panama, AMI, Techno Raquia, ATGF and ATGF II to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9.

10.   Finally, the Commission seeks any and all other just and appropriate relief.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e) and 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

12. Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14. Certain of the transactions, acts, practices, and courses of business alleged herein occurred within the Southern District of New York. For instance, Amerindo US maintains a place of business in New York, New York. Vilar resides in New York, New York. Vilar, Tanaka, and Amerindo misappropriated investor funds for their own personal and business purposes from accounts at the Broker-Dealer, and other broker-dealers, all located in New York, New York. Finally, certain victims, including L.C., reside in New York, New York.

13. Defendants, directly or indirectly, have each made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and/or the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANTS

14. **Vilar**, age 65, is a resident of New York, New York. Vilar, together with Tanaka, is or was a co-founder, director and/or principal of Amerindo US, Amerindo UK and Amerindo Panama, and various affiliated entities including AMI, Techno Raquia, ATGF and ATGF II. Vilar is the Chief Executive Officer of Amerindo US. Vilar has been involved in emerging technology investment strategies for over 25 years.

7

15.  **Tanaka**, age 62, is a resident of London, England.  Tanaka, together with Vilar, is or was a co-founder, director and/or principal of Amerindo US, Amerindo UK, Amerindo Panama, and other affiliated entities, including AMI, Techno Raquia, ATGF and ATGF II. Tanaka is the Executive Vice-President of Amerindo US.  Tanaka has been involved in emerging technology investment strategies for over 25 years.

16.  **Amerindo US** is a California corporation with a principal place of business in San Francisco, California.  Amerindo US maintains offices in New York, New York and London, England.  Amerindo US has been a registered investment adviser since 1985, and has served as the investment adviser to numerous clients.  For example, Amerindo US was the investment adviser to Amerindo Funds, Inc., a registered open-end investment company, with one outstanding series, the Amerindo Technology Fund.  As of January 31, 2005, this fund's aggregate net asset value was approximately $122 million.  Amerindo US has described itself as a specialist in "emerging technology growth stocks."

17.  **Amerindo UK** is a United Kingdom corporation with a principal place of business in London, England.  Vilar and Tanaka are the sole shareholders, officers and directors of Amerindo UK.  At all relevant times, Amerindo UK acted as an investment adviser.  According to the United Kingdom's Financial Services Authority's website, the regulator recently changed Amerindo UK's status to "authorized – closed to regulated business."  Previously, Amerindo UK's status was limited to advising on investments, and it was not permitted to hold client funds.  In 1996, Amerindo UK assigned all of its clients to Amerindo US.  Amerindo UK purportedly provided "administrative services" to Amerindo Panama.  Tanaka's wife works in Amerindo UK's office in London.

18.  **Amerindo Panama** is a Panamanian corporation.  Amerindo Panama purportedly

8

maintains its principal office in Panama. At all relevant times, Amerindo Panama acted as an investment adviser. Vilar and Tanaka are Amerindo Panama's sole shareholders, officers and directors. Amerindo US' Form ADV (Part II) prepared in July 2003 represented that Vilar and Tanaka constitute "all of the shareholders, directors and officers" of Amerindo Panama. Additionally, a filing on Form 13G with the Commission concerning the securities of Homestore Inc., signed by Vilar and Tanaka, and filed on February 1, 2005, represents that Vilar and Tanaka are the "sole shareholders and directors" of Amerindo Panama.

19. **AMI** is a Panamanian corporation and is the owner of a brokerage account at the Broker-Dealer in New York, New York. Vilar is the President of AMI and Tanaka is the Secretary of AMI. Both Vilar and Tanaka serve as directors of AMI. Tanaka and Vilar have discretionary authority over AMI's account at the Broker-Dealer, which includes the ability to direct securities transactions in the account and transfer funds and securities into and out of the account. Additionally, according to account documents at the Broker-Dealer, Amerindo US' Chief Operating Officer and Chief Financial Officer, D.M., who works in New York City, is AMI's authorized agent to receive service of process on AMI's behalf in connection with any disputes between AMI and the Broker-Dealer arising from the brokerage arrangement.

20. **ATGF** is an open-end investment company incorporated in Panama. ATGF is the owner of accounts at the Broker-Dealer and another broker-dealer, both in New York, New York. Vilar is the President, and Tanaka is the Secretary, of ATGF, and both Vilar and Tanaka serve as directors of ATGF. Tanaka and Vilar have discretionary authority over ATGF's account at the Broker-Dealer, which includes the ability to direct securities transactions in the account and transfer funds and securities into and out of the account.

9

Additionally, according to account documents at the Broker-Dealer, D.M. is ATGF's authorized agent to receive service of process on ATGF's behalf in connection with any disputes between ATGF and the Broker-Dealer arising from the brokerage arrangement. Amerindo Panama is the "Investment Manager" of ATGF, and Vilar and Tanaka are the portfolio managers at Amerindo Panama. ATGF's principal objective is purportedly "growth of capital through concentrated investment, primarily in U.S. publicly traded emerging growth companies that are principally in the fields of electronics and healthcare." ATGF, through Amerindo, Vilar and Tanaka, solicited individuals and entities in the United States to invest in ATGF, and United States residents, including investors in Connecticut, New Jersey, and California, invested in ATGF.

21. **ATGF II** is an open-end investment company incorporated in Panama. ATGF II is the owner of accounts at the Broker-Dealer and two other broker-dealers, all in New York, New York. Vilar is the President, and Tanaka is the Secretary, of ATGF II, and both Vilar and Tanaka are directors of ATGF II. Tanaka and Vilar have discretionary authority over ATGF II's account at the Broker-Dealer, which includes the ability to direct securities transactions in the account and transfer funds and securities into and out of the account. Additionally, according to account documents at the Broker-Dealer, D.M. is ATGF II's authorized agent to receive service of process on ATGF II's behalf in connection with any disputes between ATGF II and the Broker-Dealer arising from the brokerage arrangement. According to an offering circular dated January 1985, "Amerindo Investment Advisors Inc., a portfolio management firm incorporated in Panama and maintaining offices in San Francisco and London" serves as the investment adviser of the fund. ATGF II has similar investment objectives as ATGF. ATGF II, through Amerindo, Vilar and Tanaka, solicited individuals

10

and entities in the United States to invest in ATGF II, and, for example, a resident of Pennsylvania invested in ATGF II.

22. **Techno Raquia** is the owner of an account at the Broker-Dealer in New York, New York. Amerindo, Vilar and/or Tanaka directed certain GFRDA investors, including numerous residents of the United States, to transfer their funds to Techno Raquia's account at the Broker-Dealer in New York. According to the account documents that Techno Raquia provided to the Broker-Dealer, Tanaka is the Secretary and a director of Techno Raquia, and Vilar and another Amerindo UK employee are officers and/or agents of Techno Raquia. Additionally, according to account documents at the Broker-Dealer, D.M. is Techno Raquia's authorized agent to receive service of process on Techno Raquia's behalf in connection with any disputes between Techno Raquia and the Broker-Dealer arising from the brokerage arrangement. Finally, Tanaka and Vilar have discretionary authority over Techno Raquia's account at the Broker-Dealer, which includes the ability to direct securities transactions in the account and transfer funds and securities into and out of the account.

## FACTS

### Vilar and Tanaka Managed Various Amerindo Entities as a Common Enterprise as Part of Their Scheme to Defraud Investors

23. As a preliminary matter and as will be described below, Vilar and Tanaka managed the various Amerindo investment advisory entities (e.g., Amerindo US, Amerindo UK, and Amerindo Panama) as a common enterprise.

24. Vilar and Tanaka created confusion among clients and other investors concerning the identity of the Amerindo investment advisory entity with whom they were dealing.

25. For example, the legal names for Amerindo US ("Amerindo Investment Advisors Inc.") and Amerindo Panama ("Amerindo Investment Advisors, Inc.") were nearly identical,

with the only difference being that Amerindo Panama's name had a comma between "Advisors" and "Inc."

26.   Additionally, as will be described below, Vilar and Tanaka intermingled the finances of the various Amerindo investment vehicles, affiliated entities and investment advisory entities, and then used at least a portion of these funds for their own personal and business purposes.

### Amerindo, Vilar, and Tanaka Defrauded Client L.C.

#### *L.C. Became A Client Of Amerindo*

27.   L.C., a resident of New York, New York, is an investor who has maintained an investment advisory relationship with Amerindo since 1987.

28.   L.C. believed she was a client of Amerindo US and often dealt with Vilar, primarily in Amerindo US' New York offices.

29.   Over time, L.C. and Vilar developed a close, almost familial, relationship, and L.C. placed her trust in Vilar to manage her investments.

30.   In 1987, Vilar sent L.C. a draft of an Investment Management Agreement pursuant to which "Amerindo U.S. Investment Advisors Inc.," Amerindo US' predecessor entity, was to provide investment management services for L.C.'s benefit.

31.   In addition, Vilar and Tanaka sent L.C. a letter dated March 14, 1988 on the stationary of "Amerindo Investment Advisors Inc." (e.g., Amerindo US), which referenced Amerindo's San Francisco and London offices as the return addresses.  The letter stated that "Amerindo Investment Advisors Inc." had agreed to serve as L.C.'s investment adviser.

32.   Over time, L.C. made a variety of investments with Amerindo.

33.   L.C. continued to receive correspondence from Amerindo US after 1987.  L.C.

received periodic account statements beginning in 1987. The first statements she received were prepared on the letterhead of "Amerindo Investment Advisors Inc." (e.g., Amerindo US) and referenced a London address. Beginning with the September 30, 1995 account statement, however, the account statements were prepared on the letterhead of "Amerindo Investment Advisors, Inc." (e.g., Amerindo Panama), and referenced an address in Panama.

34.   Amerindo personnel never explained the change in the account statement letterhead to L.C.

35.   During the late 1990s, L.C. received account statements from Amerindo Panama indicating that her account had increased significantly in value. At its peak, the account statements indicated that L.C.'s investments were valued at approximately $18 million.

### Vilar Induced L.C. to Invest in a SBIC Fund

36.   In or about June 2002, Vilar recommended that L.C. invest $5 million in a fund that Amerindo US was to manage as an SBIC, and which would seek a license from the Small Business Administration ("SBA").

37.   Vilar told L.C. that he and Tanaka were starting an investment fund that would invest in technology companies, and that the SBA would provide matching funds. Vilar explained to L.C. that it was quite unusual for the SBA to authorize an investment in technology companies, but that he nonetheless was confident that the application would be approved.

38.   L.C. agreed to make the investment in this security, and, on or about June 20, 2002, she caused $5 million to be wired, as directed, to an account AMI held at the Broker-Dealer ("AMI Account").

39.   At the time of her investment, Vilar, Tanaka and Amerindo failed to provide L.C.

with any documentation concerning the investment, such as a private placement

memorandum, subscription agreement, or other document reflecting the investment itself.

40. Subsequently, L.C. did not receive quarterly payments that Vilar had promised to

pay from her investments with Amerindo.

41. In the Fall of 2003, L.C. and her advisors questioned Vilar about the investment

in the SBIC. L.C. and her advisors told Vilar that she needed the promised payments to pay

her expenses.

42. On or about March 25, 2004, Vilar sent a letter on Amerindo US letterhead to

L.C.'s accountant, which contained the following:

> It is well known that it is next to impossible to get an SBIC for a
> technology-oriented venture capital fund. Amerindo spent years
> applying for such a license at considerable expense, which was
> finally approved about three years ago. Unfortunately, largely due
> to personnel changes at the [SBA] pursuant to our approval, we
> were required to reapply about 18 months ago for the same license.
> While this has taken far longer than we anticipated, we
> nevertheless had to deposit the requisite key money for the SBA,
> which we did. . . . Far more importantly, the prices of technology
> private-placements continued to decline throughout this waiting
> period. This means that we did not use a single penny of [L.C.'s]
> investment during this declining period, and if and when, as
> expected, we start to make investments upon securing the renewal
> of our license later this year, we will be looking at the best prices
> probably even seen in the four decade plus history of technology
> based, venture capital.

43. As of September 30, 2004, the statement Amerindo sent to L.C., on Amerindo

Panama letterhead, included an entry "FUNDS ON DEPOSIT WITH SBIC (value date

06.20.02)" that was valued at $5 million, and an entry "INTEREST ON SBIC DEPOSIT" that

was valued at $225,000.

44. On or about October 25, 2004, Vilar sent a memorandum on Amerindo US

letterhead to L.C.'s attorney to explain the account statement, which Vilar said was prepared

14

"at our London office."  Regarding the entry for "Funds on Deposit with SBIC, for $5 million," Vilar wrote that "[t]echnically this represents an escrow deposit for a technology-based SBIC.  [L.C.] has effectively coinvested with Gary and myself in a new fund that has been approved for Investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war.  This is an eight year fund which we remain extremely optimistic about, given our very positive view on wireless broadband convergence."

45.  In the Fall of 2004, after L.C. raised questions about the SBIC investment, Vilar finally supplied L.C. and her advisors with the private placement memorandum for the SBIC fund.  This private placement memorandum indicated that the fund was named the Amerindo Venture Fund, LP.  After reviewing the private placement memorandum, L.C. and her advisors determined that it was not an appropriate investment for L.C. and requested that her $5 million (plus interest) be returned.

46.  On or about December 9, 2004, Vilar sent L.C.'s attorney a letter on Amerindo US letterhead stating that "[i]f [L.C.] does not wish to retain the SBIC investment she agreed to make, we will have to undertake on a best efforts basis the sale of her participation to another prospective investor.  As could be expected, we are not at liberty to liquidate that investment on demand, as it constitutes part of the $10 million minimum the General Partner was required to come up with to initiate the fund."  Vilar also wrote that "it is nevertheless quite likely that prospective investors for [L.C.'s] investment will now require the commencement of government-matched funding," and that "[t]his unfortunately involves a political timetable completely beyond our immediate control."  Finally, Vilar wrote that "all we can do is keep you posted of our efforts on her behalf to pursue this very unusual request,

which, as noted above, will remain constrained by the special funding program attached to it."

47.   As is explained below, Vilar's statements reflected above were materially false and misleading.

48.   Although Amerindo US began the application process to obtain a license, the SBA never approved an application to license the Amerindo Venture Fund, LP, or any other Amerindo affiliated fund.

49.   The SBA also never held any funds in escrow on behalf of the Amerindo Venture Fund, LP, or any other Amerindo affiliated fund.

50.   In addition, the SBA never required the Amerindo Venture Fund, LP, or any other Amerindo affiliated fund, to keep funds in escrow.

51.   Moreover, by approximately March 2004, it was clear that the Amerindo Venture Fund, LP and its investment adviser would not obtain a license.  Specifically, in early 2004, the SBA posted a notice on its website to advise that financing for the Participating Securities SBIC program (from which the Amerindo Venture Fund, LP had planned to seek a license) would terminate on September 30, 2004, and that to be eligible to receive such financing, a potential applicant would need to file an application by March 31, 2004, which no Amerindo affiliated entity did.

### Amerindo, Vilar, Tanaka and AMI  Misappropriated L.C.'s Funds

52.   Vilar never invested L.C.'s funds in the Amerindo Venture Fund, LP or otherwise placed her $5 million investment in escrow pending the SBA's approval of a license.

53.   Rather, on June 20, 2002, L.C. transferred her $5 million into the AMI Account at the Broker-Dealer, as directed.

54.   The AMI Account was not a new brokerage account opened for the SBIC fund.

Rather, the account was an existing Amerindo affiliated account, which had been opened years before.

55. Amerindo had custody of L.C.'s funds, and Amerindo failed to segregate L.C.'s funds and properly maintain her funds in an account in the name of the adviser as agent or trustee for its clients.

56. Moreover, as of May 31, 2002, the AMI Account had a negative cash balance of $428,122 and held equities with a value of $758,847, for a net equity of $330,725.

57. Within days of L.C.'s $5 million transfer, AMI, at Tanaka's direction, transferred a portion of L.C.'s funds out of the AMI Account.

58. Indeed, eventually, AMI, at Tanaka's direction, transferred virtually all of L.C.'s funds out of the AMI Account to various other parties and entities.

59. Specifically, on or about June 25, 2002, Tanaka, while working at Amerindo UK's office in London, sent an LOA on Amerindo US letterhead directing AMI to transfer $1 million of L.C.'s funds from the AMI Account to Vilar's personal checking account.

60. According to bank records for the period from approximately June 9, 2002 through July 8, 2002, Vilar's personal checking account had a balance of approximately $87,564.45 immediately prior to the incoming wire transfer of $1 million on or about June 25, 2002. No other funds were then deposited in the account during the statement period, and the closing balance of Vilar's checking account was approximately $132,677.72. Thus, all but approximately $45,000 of the funds wired into Vilar's checking account from L.C.'s SBIC investment were dissipated within two weeks of their deposit.

61. The withdrawals from Vilar's checking account during that two week period included:

17

- An electronic check in the amount of $540,000 made payable to "Washington and Jefferson" (Vilar has pledged millions of dollars to various programs at his alma mater Washington & Jefferson College);
- A check in the amount of approximately $177,000 made payable to "American Academy in Berlin" (according to the Academy's website, www.americanacademy.de, "Alberto Vilar" has made significant donations to this institution);
- An electronic check in the amount of approximately $17,000 made payable to Alberto Vilar;
- A check in the amount of approximately $14,640 made payable to what appears to be a catering service, with a memo line which reads: "AV Party 4/18);
- A transfer in the amount of approximately $10,000 for the benefit of "Albert W. Vilar";
- A check in the amount of approximately $7,000 made payable to an individual with the last name "Vilar", with a memo line which reads "Allowance-May";
- A check in the amount of approximately $255.56 payable to an appliance service for "Dishwasher Repair" for Vilar's home address; and
- Approximately $1,000 in ATM cash withdrawals.

62. Additionally, on or about June 26, 2002, Tanaka, again working in Amerindo UK's office in London, sent an LOA on Amerindo US letterhead directing AMI to transfer $650,000 of L.C.'s funds from the AMI Account to Amerindo US' business checking account. Amerindo US' bank records indicated that within approximately one month, these funds were spent on what appear to be routine business expenses Amerindo US incurred.

63. Finally, Tanaka eventually directed AMI to transfer virtually all of the remaining portion of L.C.'s funds from the AMI Account to other third party bank accounts.

***Amerindo, Vilar and Tanaka Misappropriated L.C.'s Funds From Her Managed Account***

64. In addition to her investment in the SBIC, L.C. had other investments with Amerindo.

65. According to an account statement on Amerindo Panama letterhead, as of June 30, 2003, among other investments, L.C. held approximately $2 million in an account at the Broker-Dealer that "Amerindo Investment Advisors" managed (the "Managed Account").

66. On or about September 25, 2003, an LOA on Amerindo US letterhead was signed by Tanaka and, purportedly by L.C., authorizing that $250,000 be journaled from the Managed Account to an account in the name of ATGF at the Broker-Dealer. L.C. did not execute – or authorize to be executed – the September 25, 2003 LOA.

67. L.C.'s subsequent account statements from Amerindo did not reflect any investment in ATGF. For example, L.C.'s March 31, 2004 account statement did not reflect any investments in ATGF.

### Amerindo, Vilar and Tanaka Refused to Redeem L.C.'s Investments

68. L.C.'s attorney has made a number of written redemption requests with respect to the SBIC investment as well as L.C.'s other investments with which Amerindo has failed to comply. For instance, on February 17, 2005, L.C.'s attorney wrote to Vilar and indicated that L.C. wished to close her Amerindo account, which a September 30, 2004 account statement indicated had a value in excess of $12 million. (The September 30, 2004 account statement indicated that L.C.'s investments were valued at $12,217,191.85. Because $2,872,058 of this amount was invested in the Managed Account, L.C. was able to revoke Amerindo's discretionary authority over the account and transfer this sum to another personal brokerage account she maintained at the Broker-Dealer. Therefore, L.C.'s remaining investments with Amerindo as of September 30, 2004 were purportedly worth approximately $9,345,133.85.)

69. Vilar responded in a February, 23, 2005 letter on his personal letterhead with his New York apartment listed as the return address. In this letter, Vilar asserted that:

> The Investment Management Agreement requires that the client notify the office where the account is lodged of its decision to terminate its service in writing. [L.C.] should write a letter to the Amerindo office where she has been a client for the better part of 20 years, which is: Amerindo Investment Advisors, Inc., Calle Elvira Mendez, Vallarino Building, 6[th] Floor

P.O. Box 4415, Panama 5, Republic of Panama.  She can also send
a signed copy of this notification to the London office, which
coordinates administration.

70.  Despite the fact that L.C. primarily dealt with Vilar and Tanaka, and did not
believe her account was managed by Amerindo Panama, L.C.'s attorney then sent a request on
February 28, 2005 to Amerindo Panama, which was copied to Amerindo offices in New York
and London, confirming her intention to close her account.

71.  Neither Vilar nor any Amerindo investment advisory entity confirmed receipt of
the request, nor has Vilar, Tanaka or any Amerindo investment advisory entity transferred any
funds or securities to L.C.

72.  Interestingly, and despite repeated representations Vilar and Tanaka had made
that they were the sole shareholders and directors of Amerindo Panama (for example, in
Amerindo US's 2003 Form ADV (Part II), and the Form 13G filed in February 2005
regarding the Homestore investment), after the Commission staff inquired about the status of
L.C.'s investments, in a May 20, 2005 letter to the Commission staff, Vilar wrote:  "[a]t the
present time, there is no common ownership with respect to Amerindo [US] and Amerindo
Panama, and no overlap between the directors, officers and employees thereof.  The present
owners of Amerindo [US] formerly owned Amerindo Panama, but they sold it to its present
owners in 2001."

### Amerindo, Vilar and Tanaka Defrauded GFRDA Investors

### *Various Amerindo Investment Advisory Entities Participated in the Offering Of The GFRDA Product to Investors*

73.  Vilar, Tanaka and Amerindo offered to clients and other investors an investment
called the "Guaranteed Fixed Rate Deposit Account," or GFRDAs.  The GFRDAs are
securities.

74.  Vilar, Tanaka and/or Amerindo personnel prepared numerous versions of the GFRDA offering circular, including versions in 1986, 1998, and 2002.

75.  The GFRDA offering circulars indicate that various Amerindo investment advisory entities had a role in offering the GFRDA products to clients and other investors.

76.  For example, the offering circular for the GFRDA program dated June 2002 ("2002 Offering Circular") indicates that "investments . . . are managed by Amerindo Investment Advisors, Inc."

77.  The final page of the 2002 Offering Circular lists New York and San Francisco addresses for Amerindo US, and a London address for Amerindo UK, and provides a Panamanian address for Amerindo Panama (but the Offering Circular does not contain an explicit explanation elsewhere in the document that the investment manager of the GFRDAs was the Panamanian entity).

78.  The 2002 Offering Circular also includes the following explanation concerning the Amerindo advisory entities:

> [t]he Investment manager was organized on 6 May 1979.  The firm was founded by Messrs. Alberto W. Vilar and Gary A. Tanaka, who between them have a total of 54 years of investment experience.  They are also the controlling shareholders of Amerindo Investment Advisors Inc. ("Amerindo"), a portfolio management firm with offices in London, Minneapolis, New York and San Francisco.  Amerindo, whose predecessor was first organized in 1977, manages assets of several billion dollars for U.S. and U.K. pension plans, principally Fortune 1000 companies, public pension plans, endowments and large family trusts.

79.  The 2002 Offering Circular then indicates that "Amerindo" (e.g., Amerindo US) would, for example, employ a number of professional money management techniques to manage the GFRDAs, and guarantee the deposit and the fixed rate of interest.

*Vilar, Tanaka and Amerindo Misrepresented How Funds Would be Invested*

80.  Amerindo, Vilar and/or Tanaka solicited numerous clients, including U.S. residents, to invest in GFRDAs.

81.  According to GFRDA offering circulars, subscription documents, and correspondence, investors would deposit funds to a designated Amerindo account at the Broker-Dealer for a specific term (i.e., one, two or three years) that earned a fixed rate of interest, generally at a rate substantially above the prevailing rates available from banks and other institutions.

82.  Amerindo agreed to pay interest either periodically during the term of the investment or at the conclusion of the term, and was to return the initial deposit at the end of the term.  Alternatively, investors could roll over their investment into a new term (subject to renegotiation of the interest rate for the new term).

83.  The 2002 Offering Circular noted that Amerindo would guarantee "[b]oth the deposit and the interest rate" associated with each account and that Amerindo was backed by its "two founding partners" (Vilar and Tanaka).

84.  Certain versions of the GFRDA subscription document provided wire instructions to an account in the name of Techno Raquia at the Broker-Dealer in New York, New York.

85.  Vilar assured some investors that their GFRDA investments were safe because they were custodied in New York.  For example, in a November 7, 2002 letter on Amerindo US letterhead to an investor ("Investor One"), Vilar explained that "[m]onies are located in New York, mostly at [the Broker-Dealer]."

86.  Similarly, in a December 13, 2004 letter on Amerindo US letterhead to another GFRDA investor who lived in Puerto Rico and New York, Vilar wrote "[i]t is also a fact that

22

the instruments in which the deposits are made are custodied with US investment banks; it is not as though the funds were in some faraway place."

87.    The GFRDA offering circular dated July 1, 1986 ("1986 Offering Circular") indicated that "INVESTORS ARE BEING OFFERED:  High Guaranteed Income[,] Stability of Principal[,] Liquidity[,] Professional Management[,] Immediate Confirmation of Purchases, Redemption, and Quarterly Interest Payments[,] No Sales or Redemption Charges."  The GFRDA offering circular dated September 1998 ("1998 Offering Circular"), and the 2002 Offering Circular contained nearly identical language.

88.    The GFRDA offering circulars also described specifically how Amerindo would invest funds received from GFRDA investors.  For example, the 1986 Offering Circular indicated that Amerindo offered clients fixed deposit accounts that Amerindo then "pooled" into "master accounts" and then invested as described below.

89.    The 1986 Offering Circular also contains the following description of the GFRDA investments:

> The fixed interest deposits are invested along the following lines. Approximately two-thirds is invested in a range of short-term investments such as Treasury bills, GNMA's, Government bonds, CD's, money market funds, etc.  Fixed interest deposits are arbitraged amongst these various short-term instruments with the objective of obtaining small, successive capital gains.  Amerindo maintains a joint venture management arrangement with a long established firm in New York that specializes in this field.
>
> The remainder of the funds in the deposit account are invested in publicly traded stocks that generally fall within Amerindo's principal field of expertise, which are emerging growth stocks in the applied science and technology sector. ...

90.    The 1998 Offering Circular indicated that the "majority" of funds in the GFRDA would be invested in short-term debt instruments, and that a portion of the account, "limited to

25%," would be invested in the stock of growth companies.

91.   The 2002 Offering Circular indicates that a relatively small portion of the account, "generally limited to 25%," would be invested in "public companies perceived to have the capacity to undergo exceptional growth of earnings."

92.   Contrary to representations made to GFRDA investors, Amerindo did not purchase short-term debt instruments as, for example, set forth in the GFRDA offering circulars.

93.   Additionally, Vilar, Tanaka and Amerindo either failed to make promised interest and/or principal payments to certain GFRDA investors, or used funds from other brokerage accounts, including accounts owned by AMI, ATGF, and ATGF II (which held other investors' funds), to pay certain GFRDA investors.

94.   Vilar, Tanaka, Amerindo, Techno Raquia, ATGF and ATGF II defrauded numerous investors, including the investors described below.

### *Investor One*

95.   Investor One, a personal friend of Vilar's and a resident of Los Angeles, California, invested $1 million in a GFRDA in February 2000.

96.   Amerindo provided Investor One with the 1998 Offering Circular.

97.   Investor One transferred funds to the Techno Raquia account at the Broker-Dealer on February 9, 2000.

98.   After making the investment, however, Investor One expressed misgivings to Vilar.  In a November 7, 2002 letter from Vilar to Investor One on Amerindo US letterhead, Vilar explained that Amerindo could not redeem Investor One's GFRDA investment prior to its February 2003 maturity date:

[O]ur unwillingness to accommodate your request is entirely different from Amerindo not being able to provide redemption of the fixed deposit contract at maturity.  By definition, our Fixed Deposits cannot be liquidated momentarily; this should be obvious to any investor.  If we could liquidate these investments on a moment's notice, it would only be because they were money market deposits, which would pay under 3% per annum.  This was disclosed up front in the paperwork you signed, which included the Offering Circular paperwork and Subscription Agreement, when you made your initial deposit.

Amerindo has been able to pay an above average money market rate to its offshore depositors, who concurrently receive the guarantee of the firm on both the interest rate and principle [sic], because of the special way in which we invest the deposit accounts.  We invest the money in a range of money market instruments, medium-term bonds, and selected sector equities, all of which are actively traded for small capital gains.

99.    In addition, Tanaka's wife, who worked at Amerindo UK's London office, sent Investor One a letter on Amerindo Panama letterhead on November 8, 2002 confirming that Investor One had a $1,000,000 GFRDA that would mature on February 9, 2003.  The letter further confirmed that her $1,000,000 principal and $271,240.25 worth of accumulated interest would be available to be wired to her personal bank account on February 10, 2003.

100.   Amerindo, however, did not wire funds to Investor One on February 10, 2003 as promised.

101.   Moreover, Amerindo never purchased short-term debt instruments for Investor One as Amerindo represented it would in the GFRDA offering circular and in other communications.

102.   In fact, when Investor One died on May 23, 2003, she still had not received her principal or interest payments.  Instead, following Investor One's death, a trust representing Investor One's estate (the "Trust") brought a civil action against Amerindo US seeking the return of her funds.

103.   In September 2004, the Trust, Amerindo US and Amerindo Panama entered into a "Mutual Settlement Agreement" whereby Amerindo US and Amerindo Panama promised to make a series of payments to the Trust in the aggregate amount of approximately $1.5 million.

104.   Although Amerindo US had denied that it owed any monies to Investor One, and instead claimed that Amerindo Panama owed the monies to Investor One, in settling the action, Vilar executed the "Mutual Settlement Agreement" and accompanying agreements on behalf of both Amerindo US and Amerindo Panama and agreed that both entities would be jointly and severally liable for the payments due to the Trust thereunder.

105.   In the Affidavit of Confession of Judgment by Amerindo Panama, which was executed on or about September 13, 2004, Vilar indicated he was an officer of Amerindo Panama.

106.   Vilar and Tanaka also each personally guaranteed the obligations of Amerindo US and Amerindo Panama under the terms of the Mutual Settlement Agreement.

107.   Amerindo made an initial $100,000 payment to the Trust on or about November 8, 2004.

108.   On or about January 21, 2005, ATGF II wired a second payment in the amount of $450,000 to the Trust from its account at the Broker-Dealer.

109.   Amerindo, Vilar and Tanaka have failed to make subsequent payments, as required by the terms of the Mutual Settlement Agreement.

### *Investor Two*

110.   Investor Two, a family whose members were residents of Puerto Rico and New York, were longtime friends of Vilar and investors with Amerindo.

111.   Investor Two invested in a series of GFRDAs beginning in 1988.  Vilar provided

Investor Two with the 1986 Offering Circular.  Additionally, in a November 24, 1987 letter

on Amerindo US letterhead, Vilar described the GFRDA program:

> The key features of this investment program, discussed at some
> length in the written material I left with you, are as follows:
>
> - Your funds are deposited in a fixed income Trust, which is
> custodied in New York with our various custody banks and
> brokers:  ([the Broker-Dealer and two additional broker-dealers]);
>
> - Between 75 to 85% of the funds in the Trust are invested in Bank
> CD's, government securities, etc., which are absolutely safe and
> liquid;
>
> - Deposits are usually made in fixed periods of 12 months; [and]
>
> - Interest, now running about 14%, can be paid out in accordance
> with your specific instructions, or recredited to your account …

112.  Investor Two subsequently made their first GFRDA investment in April 1988 in

an amount of $700,000.

113.  In 1998, Investor Two contemplated purchasing additional GFRDAs.  An issue

that needed to be resolved prior to consummating the investment, however, was the scope of

the guarantee behind the product.  In a May 18, 1998 letter on Amerindo US letterhead, Vilar

wrote as follows:

> I write to confirm that the Guarantee for the Fixed Rate Deposit
> Account includes myself, Gary and the various Amerindo
> companies separate as guarantors.  These include Amerindo
> Investment Advisors Inc., a California corporation[,] and
> Amerindo Investment Advisors, Inc., a Panama corporation.  These
> two companies comprise the bulk of the Amerindo group of
> companies and the $3 billion in assets it manages.

114.  In July 1998, Investor Two invested $1.35 million in a 14% GFRDA with a

maturity date of July 21, 1999.

115.  As of January 2001, Investor Two and Amerindo renewed all of Investor Two's

GFRDAs (then worth an aggregate of $11,066,713.44 according to the most recent account statement received by Investor Two from Amerindo) for a three year period ending December 31, 2003, with an interest rate of 11% per annum, and monthly payments of $96,667.74.

116.  On or about January 28, 2003, however, Tanaka's wife sent Investor Two a letter from the Amerindo UK London Office on Amerindo Panama letterhead noting that "as a temporary measure, a regular payment of $50,000 in lieu of your monthly interest payment [of $96,667.74]" would be sent and that Amerindo would "endeavour to send [Investor Two] additional sums of money whenever our cash flow situation allows for it."

117.  Furthermore, Tanaka's wife stated that Investor Two's interest rate would be retroactively lowered to 8% per annum, effective as of January 1, 2003 through the maturity date of the GFRDA.

118.  As a result, Investor Two subsequently sought to redeem their funds prior to the maturity date.  In an August 18, 2003 facsimile on Amerindo US letterhead with Tanaka's signature to Investor Two at their Scarsdale, New York home, the facsimile explained that the GFRDAs could not be redeemed early and noted:

> [i]t is extremely important for you to understand how difficult, if not literally impossible, it is to break a fixed deposit.  Fixed deposits are typically made for one-to-two year periods of time. This means that investments earn a specific yield precisely because they are on deposit for a fixed period of time.  Short-term deposits literally earn nothing, because nobody wants them.  It is almost never possible to break, i.e. terminate prematurely, a fixed-time deposit.  Once in a while, a fixed deposit has a callable option, which means that the issuer wants to redeem the investment prematurely.  This happens very, very rarely.  The bottom line is that we have taken a very close look at the list of deposits in our fixed portfolio and there is nothing we see that can be broken right now.

119.  Investor Two subsequently sent a facsimile on November 7, 2003 to Tanaka and

his wife at Amerindo's London office exercising their right to redeem the GFRDA at its

December 31, 2003 maturity date.

120.  Amerindo, however, failed to honor Investor Two's instructions, and failed to

redeem the GRFDA at maturity.

121.  Moreover, following Investor Two's November 7, 2003 request to redeem the

GFRDA, Tanaka's wife and Vilar sent a series of letters to Investor Two that discouraged

them from redeeming their investment.  For example, in a December 19, 2003 letter on

Amerindo Panama letterhead and sent by facsimile to Investor Two's Scarsdale, New York

home, Tanaka's wife indicated that "the financial markets have not fully recovered, which

makes redemption at par an impossibility."  Tanaka's wife further explained that "the

investments we have made in both equity and debt on behalf of your funds . . . cannot

immediately be redeemed at full face value."  Further, she offered to allow Investor Two to

"redeem your portfolio for the actual market value of the securities invested on  your behalf."

As Mrs. Tanaka explained, the value of Investor Two's "investments would be in line with

NASDAQ's decline from its peak, which was still off 45%."

122.  Amerindo never purchased short-term debt instruments for Investor Two as

Amerindo represented it would in the GFRDA offering circular and in other communications.

123.  To date, Amerindo has not fully redeemed Investor Two's GFRDA investment.

### *Investor Three*

124.  Investor Three, an Isle of Man corporation, invested $2,000,000 in a GFRDA in

approximately January 2000.

125.  In a December 7, 1999 letter on Amerindo Panama letterhead to a representative

of Investor Three, Mrs. Tanaka confirmed that the interest for such investment would be 11%

per annum and would be paid at maturity.

126. Investor Three wired $2,000,000 to the Techno Raquia account at the Broker-Dealer on or about January 6, 2000.

127. Following this transfer, the Techno Raquia account at the Broker-Dealer did not hold, purchase or sell any short-term debt instrument. Rather, Techno Raquia purchased and sold equity securities, primarily in the technology and biotechnology sectors.

128. In a January 3, 2003 letter to Investor Three's representative on Amerindo Panama letterhead, shortly before the maturity of Investor Three's GFRDA, Mrs. Tanaka wrote:

> This is to inform you that yesterday we were notified that we will not be able to effect a timely redemption to [Investor Three] upon the maturity of their three-year Fixed Rate Deposit Account next week on January 7, 2003.
>
> Our disbursement agent has informed us that the transactional funds that we had expected for the redemption have been delayed. Unfortunately, they are unable to specify today precisely when we would be receiving the proceeds. The transaction was a buyout of a company from our private venture portfolio.
>
> In order to continue to maintain the high interest rates that we offer to our clients, we have adopted a different approach to raising cash in the current market environment. Unfortunately, rarely on occasion, we are unable to co-ordinate the sale proceeds with the redemption. Hence the hold up in this case.

129. Mrs. Tanaka then requested that Investor Three's representative speak to his client in order to extend the GFRDA for an additional quarter at the same interest rate.

130. The representative responded, in a January 9, 2003 letter that the offer was unacceptable. Investor Three's representative pointed out that Mrs. Tanaka's explanation concerning the funds was inconsistent with the investment restrictions set forth in the GFRDA offering circular.

131.  The representative also noted the following:

This investment, for the record, was made with Amerindo as an entity
incorporated in the U.S.  The existence of a Panamanian "Amerindo" company
(as opposed to a Panamanian office of a U.S. corporation) is unknown to [Investor
Three] and your use of this stationary is of no relevance.

132.  Investor Three subsequently received the return of its GFRDA investment with
Amerindo.

133.  Amerindo and Tanaka satisfied this redemption, in part, by directing ATGF and
ATGF II to transfer funds to Investor Three.

134.  For example, from May 2003 through August 6, 2003, Tanaka signed three
LOAs on Amerindo US letterhead that directed ATGF and ATGF II to transfer $1,250,000 to
Investor Three from accounts at the Broker-Dealer.

135.  Specifically, on or about May 8, 2003, ATGF II, at Tanaka's direction,
transferred $500,000 from its account at the Broker-Dealer to Investor Three.

136.  On or about May 13, 2003, ATGF II, at Tanaka's direction, transferred $500,000
from its account at the Broker-Dealer to Investor Three.

137.  On or about August 6, 2003, ATGF, at Tanaka's direction, transferred $250,000
from its account at the Broker-Dealer to Investor Three.

### *Investor Four*

138.  Similarly, on or about December 21, 2000, Investor Four, a Nevis-registered
share corporation, invested approximately $6 million in a GFRDA.

139.  Investor Four wired the funds to the Techno Raquia account at the Broker-
Dealer in New York, New York, as directed.

140.  In a December 28, 2000 letter to Investor Four's representative on Amerindo
Panama letterhead, Mrs. Tanaka confirmed receipt of the funds and wrote that Investor Four

31

would have a two year GFRDA, accruing interest at 10% per annum in the first year and 11% per annum in the second year, with biannual payments of interest.

141.  Amerindo did not invest Investor Four's funds in short-term debt instruments, as Amerindo represented it would.

142.  Following a dispute concerning the scope of the guaranty, Amerindo agreed to allow Investor Four to redeem early.  None of Investor Four's redeemed funds came from the Techno Raquia account.  Vilar and/or Tanaka authorized, among others, the following wire transfers to Investor Four:

- $1,300,000 from the ATGF II account on or about July 2, 2002;
- $175,000 from an account for the benefit of ATGF II at a broker-dealer in New York, New York on or about July 3, 2002;
- $575,000 from the ATGF II account on or about July 5, 2002;
- $74,952.15 from the ATGF account on or about July 5, 2002;
- $3,102,958.85 from the AMI Account on or about July 9, 2002;
- $600,000 from the ATGF account on or about July 9, 2002; and
- $4,579.59 from the AMI Account on or about July 10, 2002.

### *Investor Five*

143.  Investor Five is a resident of New York, New York, and is an 80 year old diabetic woman.  Investor Five initially invested approximately $74,000 of her retirement funds in a GFRDA in approximately July 1989.

144.  Investor Five continued to maintain this investment and Amerindo UK's London office sent her an account statement on Amerindo Panama letterhead for the period ending January 2002 that showed an account value of $88,434.12.

145.  In an October 30, 2003 letter, Investor Five wrote to Mrs. Tanaka at Amerindo's London and Panama addresses and demanded that her account be closed as of November 15, 2003.

146.  Amerindo, which never invested Investor Five's funds in short-term debt instruments, has not fully redeemed her investment.

### *Investor Six*

147.  Investor Six, a resident of Connecticut, was also defrauded through a version of the GFRDA scheme.

148.  In approximately 1989, Investor Six initially invested $25,000 in Rhodes Capital Group, which, according to the relevant offering documents, was an investment vehicle that Vilar and Tanaka managed.

149.  In 2004, Investor Six attempted to contact Vilar, Tanaka and Amerindo because she had not received any information about the investment in many years.

150.  Investor Six received an August 6, 2004 e-mail from an employee in Amerindo US' New York office, on behalf of Vilar, in which Vilar advised her that Rhodes Capital had been "effectively wound down as an investment vehicle.  The proceeds were invested elsewhere, within the Amerindo universe, but certainly not in short-term investments."  Vilar further advised Investor Six to contact Amerindo following year-end valuations.

151.  In 2005, Investor Six spoke by telephone with Mrs. Tanaka who was in Amerindo's London office.  Mrs. Tanaka advised Investor Six that Rhodes Capital had been liquidated a number of years ago and that the proceeds of her investment had been invested into a "fixed rate" instrument.

152.  Mrs. Tanaka told Investor Six that she should "rest assured" that Amerindo had her money, but that Investor Six would need to develop a "plan" to liquidate her investment because of "what the markets had inflicted" on Amerindo's overall assets.

153.  Investor Six did not authorize the "fixed rate" investment.

154.  To date, despite repeated requests, Amerindo has not redeemed Investor Six's investment.

### *Investor Seven*

155.  Investor Seven, a resident of California, initially met Vilar in Puerto Rico in approximately 1981.  (Investor Seven was living in Puerto Rico at the time.)  At Vilar's urging, Investor Seven invested approximately $100,000, which constituted her pension money, in Rhodes Capital.

156.  Amerindo's London office then sent account statements to Investor Seven. According to Investor Seven's most recent account statement, sent on Amerindo Panama letterhead to her California home, as of December 31, 2002, she was invested in GFRDAs worth approximately $2 million.

157.  Amerindo did not, however, invest Investor Seven's funds in short-term debt instruments.

### Vilar, Tanaka, Amerindo, ATGF and ATGF II Defrauded Investors

158.  Vilar and Tanaka directed the formation of ATGF and ATGF II as offshore hedge funds.

159.  Shares of ATGF and ATGF II are securities.

160.  According to the offering materials for both ATGF and ATGF II, Amerindo Panama was the investment manager of the funds, and Vilar and Tanaka were the portfolio managers for Amerindo Panama.

161.  Investors in ATGF included Vilar's friends and family members, as well as a number of institutions and offshore entities.

162.  During a Commission examination in 2003, Amerindo US represented that the

investors in ATGF II were a combination of institutions and high net worth, sophisticated individual investors.

163.   Vilar, Tanaka and/or other Amerindo personnel solicited United States residents to purchase shares of ATGF and ATGF II funds.

164.   United States residents, including residents of New Jersey, Pennsylvania, and California invested in ATGF or ATGF II.

165.   On February 28, 2003, Tanaka and Vilar signed a letter addressed to the Commission staff in which they indicated that neither had:

> any direct or indirect record or beneficial interest in any client account managed by Amerindo or any affiliate of Amerindo, other than their respective interests in fees payable to Amerindo and of Amerindo and its affiliates and their respective director [sic] and/or indirect interest in the registered mutual fund managed by Amerindo, and the same is true of their spouses and any and all of their offspring or other dependents and, to the best of their knowledge, any other employee of Amerindo.

166.   Vilar and Tanaka therefore had no direct or indirect record ownership (either in their own names of through entities they owned, such as Amerindo US), or beneficial interest in ATGF or ATGF II, which were purportedly clients of Amerindo Panama.

167.   Tanaka subsequently misrepresented that Amerindo US did have an equity interest in ATGF and ATGF II in order to misappropriate investors' funds.

168.   For example, on January 10, 2003, Tanaka directed ATGF to transfer $25,000 to Amerindo US, and the LOA Tanaka signed directing this transfer indicated that this withdrawal represented a redemption by Amerindo US, as an "equity partner."

169.   Additionally, on January 27, 2003, Tanaka directed ATGF II to transfer $180,000 to Amerindo US, and the LOA Tanaka signed directing this transfer indicated that this withdrawal represented a redemption by Amerindo US, as an "equity partner."

35

170.  Similarly, on March 11, 2003, Tanaka directed ATGF II to transfer $170,000 to Amerindo US, and the LOA Tanaka signed directing this transfer indicated that this withdrawal represented a redemption by Amerindo US, as an "equity partner."

171.  From January 10, 2003 to December 16, 2003, Tanaka directed ATGF II to transfer no less than $2,147,250 from its account at the Broker-Dealer to Amerindo US' bank accounts.  Each of the LOAs that Tanaka signed directing ATGF II to transfer funds to Amerindo US' bank accounts indicated that the withdrawals reflected redemptions by Amerindo US, as an "equity partner."

172.  Further, as discussed above, on various occasions, Tanaka directed ATGF and ATGF II to transfer funds to investors in the GFRDAs, including Investor Three and Investor Four, in order to redeem their GFRDA investment or otherwise make promised payments.

### Vilar and Tanaka Intermingled the Finances of the Amerindo Investment Vehicles and Advisory Entities

173.  Vilar and Tanaka have treated the various Amerindo investment vehicles' funds interchangeably.

174.  As more fully described above, Tanaka directed ATGF, ATGF II, and AMI to transfer funds in order to pay GFRDA investors.

175.  Tanaka authorized ATGF, ATGF II, AMI and Techno Raquia to transfer securities and funds among their various brokerage accounts.  For example, in a May 12, 2005 LOA on Amerindo US letterhead, Tanaka directed ATGF II to transfer options on Google stock from its brokerage account at the Broker-Dealer to the AMI Account.  In the LOA, Tanaka noted the following:

> [i]t is my understanding that these accounts held at [the Broker-Dealer] are indeed a type of omnibus account, (indeed [the AMI Account] is even called "sub account").  Items should be able to be

36

journaled freely from one account to the other as has always been
the case.

176.   In addition, Amerindo employees signed LOAs authorizing AMI, Techno

Raquia, ATGF and ATGF II to transfer funds and/or securities between these respective

accounts at the Broker-Dealer in order to cover margin calls in the recipient accounts.  For

example, an Amerindo UK employee directed the ATGF account to transfer $2,808 to the

Techno Raquia account on August 13, 2003 to cover a margin call.  Additionally, to cover a

margin call, Tanaka directed a transfer of 15,000 shares of OSI Pharmaceuticals from the AMI

Account to the ATGF II Account on July 21, 2004, and a transfer of 34,100 shares of XM

Satellite Radio stock from ATGF II to the AMI Account on the same date.

177.   By authorizing such transfers, Vilar and Tanaka commingled the funds and

securities of investors who were invested in different vehicles, such as Techno Raquia (where

GFRDA investors generally deposited funds), ATGF and ATGF II.

178.   Vilar and/or Tanaka also transferred funds from investment vehicles, such as the

Techno Raquia, ATGF and ATGF II accounts, for the benefit of Amerindo US.

179.   From 1999 to 2004, Amerindo US' liabilities often exceeded its assets.

180.   When Amerindo US found itself in a cash shortfall, Amerindo US's Chief

Financial Officer, D.M., would contact Tanaka in Amerindo UK's London office and advise

him of the shortfall.

181.   Shortly thereafter, Amerindo US would often receive the necessary funds from

bank and brokerage accounts purportedly affiliated with Amerindo Panama's investment

vehicles, such as Techno Raquia, ATGF and ATGF II.

182.   During this period, Amerindo US received funds including:  $4,342,311 from the

ATGF account; $12,249,065 from the ATGF II account; $2,870,500 from the Techno Raquia

37

account, and $2,706,770 from the AMI Account.

183.   Amerindo US often received these funds at irregular intervals (at times on multiple occasions in the same month and on other occasions skipping months) and in varying amounts.

184.   To account for these transfers, the Amerindo investment advisory entities purportedly entered into agreements, such as a series of "Research Supply Agreements." Pursuant to these agreements, Amerindo Panama and Amerindo UK were jointly and severally liable to pay Amerindo US for research that it purportedly provided during the course of the year.

185.   The agreements were renewed at the beginning of each fiscal year.  The amounts to be paid were left blank, however, and were filled in at the end of the fiscal year to reflect the amounts Amerindo US had already received.

186.   These amounts bore little or no relation to the amount of research Amerindo US in fact provided to Amerindo Panama and/or Amerindo UK.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5

(Vilar and Tanaka Defrauded Investors)

187.   The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 186.

188.   Vilar and Tanaka directly and indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, in the offer and sale, and in connection with the purchase or sale, of securities, knowingly or recklessly: (a) employed

38

devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

189.   As part and in furtherance of the violative conduct, Vilar and Tanaka orchestrated a scheme to defraud Amerindo US, Amerindo UK and/or Amerindo Panama clients.  For instance, Vilar and Tanaka converted clients' funds, including L.C.'s funds. Additionally, Vilar and Tanaka misrepresented, and failed to disclose, material information to clients to induce them to make investments, and to continue to maintain their investments, with Amerindo US, Amerindo UK and/or Amerindo Panama, including L.C., investors in the GFRDAs, and/or investors in ATGF and ATGF II.

190.   Vilar and Tanaka acted knowingly and/or recklessly.

191.   By reason of the foregoing, Vilar and Tanaka, singly or in concert, directly or indirectly, violated and, unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5

(Amerindo US, Amerindo UK and Amerindo Panama, Acting as a Common Enterprise, Defrauded Investors)

192.   The Commission realleges and incorporates by reference herein each and every

39

allegation contained in paragraphs 1- 191.

193. Amerindo (e.g., Amerindo US, Amerindo UK and Amerindo Panama) directly and indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, in the offer and sale, and in connection with the purchase or sale, of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

194. As part and in furtherance of the violative conduct, Amerindo participated in a scheme to defraud clients. For instance, Amerindo converted clients' funds, including L.C.'s funds. Amerindo also misrepresented, and failed to disclose, material information to clients to induce them to make investments, and to continue to maintain their investments, with Amerindo, including L.C., investors in the GFRDAs, and/or investors in ATGF and ATGF II.

195. Amerindo acted knowingly and/or recklessly.

196. By reason of the foregoing, Amerindo, singly or in concert, directly or indirectly, violated and, unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

**THIRD CLAIM FOR RELIEF**

Violations of Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act, and Rule 10b-5

(In the Alternative, Amerindo US, Acting Independently, Defrauded Investors)

197.  The Commission realleges and incorporates by reference herein each and every
allegation contained in paragraphs 1- 196.

198.  Amerindo US, directly and indirectly, singly or in concert, by use of the means
or instrumentalities of interstate commerce, or of the mails, in the offer and sale, and in
connection with the purchase or sale, of securities, knowingly or recklessly: (a) employed
devices, schemes or artifices to defraud; (b) obtained money or property by means of, or
otherwise made, untrue statements of material fact, or omitted to state material facts necessary
in order to make statements made, in light of the circumstances under which they were made,
not misleading; and/or (c) engaged in transactions, acts, practices and courses of business
which operated or would have operated as a fraud or deceit upon purchasers of securities and
upon other persons.

199.  As part and in furtherance of the violative conduct, Amerindo US participated in
a scheme to defraud clients.  For instance, Amerindo US converted clients' funds, including
L.C.'s funds.  Amerindo US also misrepresented, and failed to disclose, material information
to clients to induce them to make investments, and to continue to maintain their investments,
including L.C., investors in the GFRDAs and/or investors in ATGF and ATGF II.

200.  Amerindo US acted knowingly and/or recklessly.

201.  By reason of the foregoing, Amerindo US, singly or in concert, directly or
indirectly, violated and, unless enjoined will again violate, Section 17(a) of the Securities Act,

41

15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5,

17 C.F.R. § 240.10b-5.

## FOURTH CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act,
### Section 10(b) of the Exchange Act, and Rule 10b-5

(In the Alternative, Amerindo UK, Acting Independently, Defrauded Investors)

202.   The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1- 201.

203.   Amerindo UK, directly and indirectly, singly or in concert, by use of the means

or instrumentalities of interstate commerce, or of the mails, in the offer and sale, and in

connection with the purchase or sale, of securities, knowingly or recklessly: (a) employed

devices, schemes or artifices to defraud; (b) obtained money or property by means of, or

otherwise made, untrue statements of material fact, or omitted to state material facts necessary

in order to make statements made, in light of the circumstances under which they were made,

not misleading; and/or (c) engaged in transactions, acts, practices and courses of business

which operated or would have operated as a fraud or deceit upon purchasers of securities and

upon other persons.

204.   As part and in furtherance of the violative conduct, Amerindo UK participated in

a scheme to defraud Amerindo clients.  For instance, Amerindo UK converted Amerindo

clients' funds.  Amerindo UK also misrepresented, and failed to disclose, material information

to Amerindo clients to induce them to make investments, and to continue to maintain their

investments, including L.C., investors in GFRDAs and/or investors in ATGF and ATGF II.

205.   Amerindo UK acted knowingly and/or recklessly.

206.  By reason of the foregoing, Amerindo UK, singly or in concert, directly or indirectly, violated and, unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## FIFTH CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5

(In the Alternative, Amerindo Panama, Acting Independently, Defrauded Investors)

207.  The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 206.

208.  Amerindo Panama, directly and indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, in the offer and sale, and in connection with the purchase or sale, of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise, made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

209.  As part and in furtherance of the violative conduct, Amerindo Panama participated in a scheme to defraud clients.  For instance, Amerindo Panama converted clients' funds, including L.C.'s funds.  Amerindo Panama also misrepresented, and failed to disclose, material information to clients to induce them to make investments, and to continue

to maintain their investments, including L.C., investors in GFRDAs, and/or investors in ATGF and ATGF II.

210. Amerindo Panama acted knowingly and/or recklessly.

211. By reason of the foregoing, Amerindo Panama, singly or in concert, directly or indirectly, violated and, unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5

(AMI, Techno Raquia, ATGF and ATGF II Aided and Abetted Violations of the Antifraud Provisions)

212. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 211.

213. Vilar, Tanaka, Amerindo US, Amerindo UK, and/or Amerindo Panama, directly or indirectly, singly or in concert, by the use of any means or instrumentality of interstate commerce, or of the mails, in connection with the purchase or sale of any security, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they are made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

214. AMI, Techno Raquia, ATGF and ATGF II knew that Vilar, Tanaka, Amerindo US, Amerindo UK and/or Amerindo Panama were engaged in a fraudulent scheme and/or that they made material misrepresentations and omissions to investors.

215. AMI, Techno Raquia, ATGF and ATGF II substantially assisted the fraudulent activity described above.

216. Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason of the foregoing, AMI, Techno Raquia, ATGF and ATGF II, singly or in concert, directly or indirectly, aided and abetted and unless enjoined will again violate, or aid and abet violations of, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SEVENTH CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

(Amerindo US, Amerindo UK and Amerindo Panama, Acting As a Common Enterprise, Violated the Antifraud Provisions of the Advisory Act)

217. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 216.

218. Amerindo (e.g., Amerindo US, Amerindo UK and Amerindo Panama) directly and indirectly engaged in the business of advising clients as to the advisability of investing in, purchasing or selling securities.

219. Amerindo, an investment adviser, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, employed and is employing devices, schemes and artifices to defraud clients, and has engaged and is engaging in transactions, practices and courses of

business which operate as fraud and deceit upon these clients.

220.   Amerindo knowingly or recklessly participated in a scheme to defraud clients, and it knew or was reckless in not knowing that the material representations and omissions set forth herein were false and misleading.

221.   By reason of the foregoing, Amerindo, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## EIGHTH CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

(In the Alternative, Amerindo US, Acting Independently, Violated the Antifraud Provisions of the Advisers Act)

222.   The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 221.

223.   Amerindo US directly and indirectly engaged in the business of advising clients as to the advisability of investing in, purchasing or selling securities.

224.   Amerindo US, an investment adviser, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, employed and is employing devices, schemes and artifices to defraud investors, and has engaged and is engaging in transactions, practices and courses of business which operate as fraud and deceit upon these investors.

225.   Amerindo US knowingly or recklessly participated in a scheme to defraud clients, and it knew or was reckless in not knowing that the representations and omissions set forth herein were false and misleading.

226.  By reason of the foregoing, Amerindo US, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## NINTH CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

(In the Alternative, Amerindo UK, Acting Independently, Violated the Antifraud Provisions of the Advisers Act)

227.  The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 226.

228.  Amerindo UK directly and indirectly engaged in the business of advising clients as to the advisability of investing in, purchasing or selling securities.

229.  Amerindo UK, an investment adviser, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, employed and is employing devices, schemes and artifices to defraud investors, and has engaged and is engaging in transactions, practices and courses of business which operate as fraud and deceit upon these investors.

230.  Amerindo UK knowingly or recklessly participated in a scheme to defraud Amerindo clients, and it knew or was reckless in not knowing that the representations and omissions set forth herein were false and misleading.

231.  By reason of the foregoing, Amerindo UK, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## TENTH CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

(In the Alternative, Amerindo Panama, Acting Independently, Violated the Antifraud Provisions
of the Advisers Act)

232.  The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 231.

233.  Amerindo Panama directly and indirectly engaged in the business of advising clients as to the advisability of investing in, purchasing or selling securities.

234.  Amerindo Panama, an investment adviser, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, employed and is employing devices, schemes and artifices to defraud investors, and has engaged and is engaging in transactions, practices and courses of business which operate as fraud and deceit upon these investors.

235.  Amerindo Panama knowingly or recklessly participated in a scheme to defraud clients, and it knew or was reckless in not knowing that the representations and omissions set forth herein were false and misleading.

236.  By reason of the foregoing, Amerindo Panama, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## ELEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act

(Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II Aided and Abetted Violations
of the Antifraud Provisions of the Adviser Act )

237.  The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1- 236.

238.   Amerindo US, Amerindo UK and/or Amerindo Panama, investment advisers, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, employed and are employing devices, schemes and artifices to defraud clients, and has engaged and are engaging in transactions, practices and courses of business which operate as fraud and deceit upon these clients, in violation of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

239.   Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II, directly or indirectly, singly or in concert, aided and abetted Amerindo US's, Amerindo UK's and/or Amerindo Panama's violations of Sections 206(1) and 206(2) of the Advisers Act.

240.   Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II knowing or recklessly participated in the scheme to defraud Amerindo clients, and they knew or were reckless in not knowing that the representations and omissions set forth herein were false and misleading.

241.   Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II provided substantial assistance to Amerindo US, Amerindo UK and/or Amerindo Panama.

242.   By reason of the foregoing, Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II, singly or in concert, directly or indirectly, aided and abetted and unless enjoined will again violate, or aid and abet violations of, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

**TWELTH CLAIM FOR RELIEF**

**Violations of Section 206(4) and Rule 206(4)-2(a) of the Advisers Act**

(Amerindo US Violated the Custody Rules)

243.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 242.

244.    Amerindo US, directly or indirectly, singly or in concert, violated Section 206(4) of the Advisers Act and Rule 206(4)-2(a).  Specifically, Amerindo US engaged in an act, practice or course of business which is fraudulent, deceptive or manipulative, in that Amerindo had custody of a client's account and it failed to properly maintain the account, by, among other things, failing to segregate the client's securities and funds, and failing to maintain the funds in an account in the name of the adviser as agent or trustee for the client.

245.    Amerindo US knowing or recklessly engaged in this act, practice or course of business which is fraudulent, deceptive or manipulative.

246.    By reason of the foregoing, Amerindo US, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2(a), 17 C.F.R. § 275.206(4)-2(a).

**THIRTEENTH CLAIM FOR RELIEF**

**Aiding and Abetting Violations of Section 206(4) and Rule 206(4)-2(a) of the Advisers Act**

(Vilar and Tanaka Aided and Abetted Violations of the Custody Rules)

247.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 246.

248.    Vilar and Tanaka, directly or indirectly, singly or in concert, aided and abetted

50

Amerindo US's violations of Section 206(4) of the Advisers Act and Rule 206(4)-2(a).

Specifically, Vilar and Tanaka knowingly provided substantial assistance to Amerindo US in

engaging in an act, practice or course of business which is fraudulent, deceptive or manipulative,

in that Amerindo US had custody of a client's account and it failed to properly maintain the

account, by, among other things, failing to segregate the client's securities and funds, and failing

to maintain the funds in an account in the name of the adviser as agent or trustee for the client.

249.    Amerindo US, Vilar, and Tanaka knowing or recklessly engaged in this act,

practice or course of business which is fraudulent, deceptive or manipulative.

250.    By reason of the foregoing, Vilar and Tanaka, singly or in concert, directly or

indirectly, aided and abetted and unless enjoined will again violate, or aid and abet violations of,

Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2(a), 17 C.F.R. §

275.206(4)-2(a).


## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following

relief:

### I.

An Order temporarily and preliminarily, and a Final Judgment permanently, restraining

and enjoining Amerindo US, its agents, servants, employees and attorneys and all persons in

active concert or participation with it who receive actual notice of the injunction by personal

service or otherwise, and each of them, from direct or indirect future violations of Section 17(a)

of the Securities Act, 15 U.S.C. §§ 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b)

and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1), 206(2) and 206(4) of the Advisers

Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4), and Rule 206(4)-2(a), 17 C.F.R. §

51

275.206(4)-2(a).

## II.

A Final Judgment permanently restraining and enjoining Amerindo UK and Amerindo Panama, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from direct or indirect future violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## III.

A Final Judgment permanently restraining and enjoining Vilar and Tanaka, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from direct or indirect future violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1), 206(2), and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4), and Rule 206(4)-2(a), 17 C.F.R. § 275.206(4)-2(a).

## IV.

A Final Judgment permanently restraining and enjoining AMI, Techno Raquia, ATGF and ATGF II, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from direct or indirect future violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1)

and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## V.

A Final Judgment ordering Amerindo US, Amerindo UK, Amerindo Panama, Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II to disgorge all ill-gotten gains, plus prejudgment interest that they obtained from their fraudulent conduct.

## VI.

A Final Judgment ordering Amerindo US, Amerindo UK, Amerindo Panama, Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9.

## VII.

Such other and further relief as the Court may deem just and proper.


Dated: New York, New York
           November __, 2005



                                                    _____
                                                    Mark K. Schonfeld (MS-2798)

                                                    Attorney for the Plaintiff
                                                    Securities and Exchange Commission
                                                    3 World Financial Center
                                                    New York, New York  10281
                                                    Telephone (212) 336-0077 (Gizzi)

Of Counsel:

Helene T. Glotzer
Kay L. Lackey
Paul G. Gizzi
Mark D. Salzberg
Amelia A. Cottrell