```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X
                                        :
 4   SEC,                               :   05-CV-5231
                                        :
 5                      Plaintiff,      :   September 23, 2011
                                        :
 6               v.                     :   500 Pearl Street
                                        :   New York, New York
 7   AMERINDO INVESTMENT ADVISORS, INC., :
     et al.,                            :
 8                                      :
                        Defendants.     :
 9   ------------------------------------X

10
          TRANSCRIPT OF CIVIL CAUSE FOR PRETRIAL CONFERENCE
11            BEFORE THE HONORABLE LAURA TAYLOR SWAIN
                  UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14
     For Plaintiffs/SEC:        MARK DANIEL SALZBERG, ESQ.
15                              NEAL JACOBSON, ESQ.

16

17   For DOJ:                   SHARON LEVIN, ESQ.

18
     For Marcus:                JULIAN FRIEDMAN, ESQ.
19

20

21

22   Court Transcriber:         SHARI RIEMER
                                TypeWrite Word Processing Service
23                              211 N. Milton Road
                                Saratoga Springs, New York 12866
24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1          THE COURT: Good afternoon.  Please be seated.  This

2    is a pretrial conference in the matter of SEC v. Amerindo

3    Investment Advisors, et al., Number 05-CV-5231.

4          For the benefit of the digital audio record this is

5    Judge Swain speaking and counsel at the tables would you

6    please state your appearances for the record.  I would suggest

7    that the gentleman at the second table sit a little closer to

8    each other and have the microphone in the middle since there

9    is only one at that table.  Thank you so much.

10          MR. SALZBERG:  Good afternoon, Judge Swain.  Mark

11   Salzberg from the SEC.

12          THE COURT: Good afternoon, Mr. Salzberg.

13          MR. SALZBERG:  Good afternoon.  With me is Neal

14   Jacobson from the SEC.

15          THE COURT: Good afternoon, Mr. Jacobson.

16          MS. LEVIN:  And Sharon Levin from the U.S.

17   Attorney's Office.  Although the Government in this capacity

18   is not a party to the case I'm here to talk about the

19   forfeiture and restitution issues.

20          THE COURT: I appreciate that.  Good afternoon, Ms.

21   Levin.

22          MR. BURGER:  David Burger of Robinson Brog

23   representing Mr. Vilar.

24          THE COURT: Good afternoon, Mr. Burger.

25          MR. FRIEDMAN:  Good afternoon, Your Honor.  Julian

3

1 Friedman from Stillman & Friedman. I represent two of the
2 investors who are the victims here and Your Honor has
3 previously granted me permission to participate in these
4 conferences.
5          THE COURT: Good afternoon, Mr. Friedman.
6          And on the telephone we have Mr. Tanaka?
7          MR. TANAKA: Yes, Your Honor.
8          THE COURT: Good afternoon, Mr. Tanaka.
9 Unfortunately our telephone connection is not so good so we
10 don't hear you so well.  Are you able -- have you been able to
11 hear the speaking from this end well?
12          MR. TANAKA: Yes, I'm [inaudible].
13          THE COURT: That's good.  So when I call on you I may
14 ask you to really try to project but just then I heard you
15 fine.
16          MR. TANAKA: [inaudible]
17          THE COURT: Great.  Now, I've been kept abreast of
18 the general existence of settlement discussions in connection
19 with the restitution proceedings on the criminal case.  I have
20 received recently some correspondence from Mr. Tanaka
21 concerning concerns about the management of the funds, the
22 scope of the group or groups that would be the beneficiaries
23 of any distribution of the money that's been collected.  I
24 received yesterday a letter on behalf of the Mayor or Meyer
25 family M-A-Y-E-R who are apparently identified as victims with

4

1  respect to a large proportion of the restitution order in the

2  criminal case and that letter which I will post on the ECF

3  system if I haven't done already indicates that they are in

4  some distress and therefore even more concerned than they were

5  before about when and how disbursements will be made and from

6  Mr. Friedman and others I have received letters in the past

7  from victims and I have posted what I have received on the ECF

8  system.

9          So I would ask first for a status report and that

10  that status report include information about the criminal

11  forfeiture proceedings.  I'm glad Ms. Levin is here.  The

12  location of and responsibility for assets that have been

13  collected, the victim claim and identification process and

14  where the parties see that we're going from here particularly

15  in regard to realization of payouts of the money in an

16  appropriate way.

17          So, Mr. Salzberg, did you want to start?

18          MR. SALZBERG: Yes, please.  Thank you.  Good

19  afternoon.  Just by way of a very brief background, the SEC

20  amended complaint which was filed in 2005 covered allegations

21  that were covered both in a criminal complaint which was

22  involving Catz [Ph.] and the GFRDAs as well as additional

23  investors concerning ATGF, GFRDA and Rhodes Capital.  At the

24  end of the criminal action, and again this is meant to be very

25  brief, there was a $54 million order of forfeiture, a $34

1  million order of restitution which was $20 million of

2  principal and the remainder is interest.  And our basic

3  understanding in terms of where the composition of the assets

4  at this point, the victims in the -- that are identified in

5  the criminal action are owed approximately $20 million of

6  restitution exclusive of interest.  Additional Amerindo

7  investors have been identified approximately $20 million --

8  the numbers have changed a little bit over time, and as we

9  understand it the current available funds at least last check

10  was approximately $45 million of funds.

11         As we put in a couple of recent letters, this

12  potential $54 million forfeiture order would theoretically

13  cover all existing Amerindo related investment -- assets,

14  sorry, and this summer and I assume --

15         THE COURT: I'm sorry.  You said that the $34 million

16  -- the $54 million forfeiture order which in order of payment

17  would come behind the restitution, correct, on the criminal

18  side?  Doesn't restitution get paid before forfeiture?

19         MS. LEVIN: Not exactly, Your Honor.  Forfeiture --

20  they're parallel.  They're both obligations.  They're both

21  part of the defendant's criminal sentence but what typically

22  the Department of Justice does and what we would like to do in

23  this circumstance is any assets that we collect for forfeiture

24  there's a policy called a restoration policy where very

25  quickly we can take the money literally done with a letter

6

1    from me.  I write to the Department of Justice.  I say the

2    restitution order is complete, there are no other victims of

3    the fraud, and I ask that -- and the victims have all been

4    identified and the amounts are correct and I ask the

5    Department of Justice to take all the funds we forfeited to

6    date and the funds we're going to forfeit in the future and

7    transfer them to the clerk to be applied to the restitution

8    order and paid out by the clerk of the court to the victims.

9    That's what we do in most cases.

10        Here that is something that we'd like to do but

11   there's one little wrinkle in that -- in this case which is

12   that as you heard in the criminal prosecution there are I

13   believe it's five victims in the restitution order which also

14   includes prejudgment interest but there are other -- the fraud

15   is a little bit more extensive than what was prosecuted.

16   There was an additional -- as the SEC has alleged, there's an

17   additional related fraud that's pending before Your Honor and

18   in that case there's another $20 million a victim, $20 million

19   worth of claims by victim.  So because we have collected more

20   money -- the restitution order now is much greater with the

21   interest and instead of going through the restoration process

22   there's another process that DOJ filed -- follows in

23   situations like this and that's called a petition for omission

24   or mitigation process.  It's found in 28 CFR Part 9 and what

25   happens -- there is a victim can sue in a petition with the

1  Department of Justice with their loss, demonstrating what

2  their losses are and the Department of Justice will rule on

3  that petition and if it's granted some of the forfeited funds

4  will be transferred directly by the Department of Justice to

5  the victim to be comp -- to compensate them for loss and that

6  amount will be reduced from the restitution order.

7          Here, because of the additional victims we believe

8  that is the most appropriate mechanism to follow.

9          THE COURT: This would then be some sort of re-

10 proration of the restitution determination that was -- that's

11 part of the judgment in the criminal case?

12         MS. LEVIN: It's done somewhat separately from the

13 restitution order in the criminal case.  We would rely upon

14 the restitution amounts that were determined by Judge Sullivan

15 and then we would -- but we would ask that they not -- because

16 the prejudgment interest would take away most of the money

17 that's forfeited.  So we'd ask the Department of Justice

18 instead to take the restitution amounts that are listed in the

19 restitution order and then allow the other victims or

20 investors to similarly put in petitions with the Department of

21 Justice for the amount of money that they also lost and we

22 would recommend a pro rata distribution of that amount of

23 money and maybe it will actually --

24         THE COURT: A pro rata distribution of the --

25         MS. LEVIN: Forfeited funds but there may be -- it

8

1    may be everybody gets a hundred cents on their dollar.

2               THE COURT: Forgive me for trying to go through this

3    step by step but --

4               MS. LEVIN: I'm sorry.

5               THE COURT: You are way ahead of me.

6               MS. LEVIN: No, this is -- I know that's what I do.

7    So I know I jump around a little too quickly.  So I'm happy to

8    step back.

9               THE COURT: So in Judge Sullivan's proceeding, in the

10   criminal proceeding there was a $34 million restitution order.

11   Is that $34 million principal only or principal plus

12   prejudgment interest?

13              MS. LEVIN: Principal plus prejudgment interest.

14              THE COURT: And then there was a larger $54 million

15   forfeiture order?

16              MS. LEVIN: Yes.

17              THE COURT: And so when you are talking about this

18   amount to be reallocated, are you talking about reallocation

19   of the differential between 34 and 54 or the entire 54?

20              MS. LEVIN: The entire 54 is what's forfeited though

21   while the judgment is for $54 million the Government has not

22   seized or restrained $54 million.  The value of the assets,

23   many of them in securities.  The value of them fluctuate.  At

24   last count I think we had -- I think it was a little bit less

25   actually than -- it was about $43 million but the amount --

9

1    that amount can go up or could go down but it'sprobably8

2    between, right now probably between $40 and $45 million in

3    assets.   That's the pool at present that would be available

4    for remission to victims.

5         THE COURT: And you would have a process for seeking

6    modification of the judgment entered by Judge Sullivan insofar

7    as that judgment identified particular victims and restitution

8    amounts?  Wouldn't that be required?

9         MS. LEVIN: No, it's completely separate. When money

10   is forfeited it becomes property of the United States and

11   under the forfeiture statute which is 28 U.S.C. Section 853,

12   the Attorney General has a discretion to do certain things

13   with forfeited property, and one of the things that the

14   Attorney General has authority to do is he has the authority

15   to remit it or to restore it to crime victims.  So this is a

16   Department of Justice procedure independent of Judge

17   Sullivan's decisions on restitution or forfeiture though of

18   course guided by Judge Sullivan's determination on the amounts

19   of restitution for the victim and -- because we would rely

20   upon that information in crafting what the restitution order -

21   - what the remission amounts would be at least with respect to

22   those victims but it's an independent procedure where each

23   victim either on their own or through counsel would be able to

24   file a statement or a claim with the Department of Justice

25   laying out what their loss amount is and then someone at the

10

1  Department of Justice his job is to go through them and figure

2  out granted, not granted and how much they're going to get.

3  They put them all together and then the money is distributed

4  and my office has an opportunity to comment on it and they

5  will entertain -- it's a very, you know, somewhat open process

6  in terms of people can submit whatever documentation they

7  want.

8            We go -- my office takes on the task of noticing the

9  victims and we will notice -- we have from the SEC a list of

10 investors.  We will go off of that list.  Mr. Tanaka in a

11 previous conversation indicated that he thinks that we may not

12 have all the names of the investors and we're of course open

13 to receiving any other additional investor information and

14 we'll notice them as well.

15           THE COURT: Have you -- since Mr. Tanaka clearly is

16 not the custodian of the records of the entities at this point

17 given his physical location, have you and he talked about some

18 methodology for identifying the additional people?

19           MS. LEVIN: We have not but I believe my office has

20 most of the records because I believe there were search

21 warrants done.  So we have the records from the companies and

22 it's from that that we obtain the list so -- but we may be

23 because there's foreign investors -- it may not be complete.

24 So we're very comfortable with providing it to Mr. Tanaka if

25 he knows of additional people we've left off.  I believe we

1  did so already.  We definitely provided to counsel and yes,

2  and Mr. Tanaka was included in that through his sister.

3          THE COURT: And is the Department of Justice now

4  actually the manager or custodian -- well, are the funds

5  custodied under the supervision of the Department of Justice

6  now?

7          MS. LEVIN: Not yet, Your Honor.  What happened here

8  was that we obtained a substitute asset order.  The court --

9  Judge Sullivan issued a money judgment for $54 million and

10  additional assets that we've had restrained and we asked Judge

11  Sullivan -- we applied an application to get a substitute

12  asset order to order them forfeited.  Judge Sullivan entered

13  that forfeiture order forfeiting the defendant's interest in

14  the property but that left open the issue of third parties.

15  So third parties had an opportunity to file a petition and

16  that period has expired and we're prepared to go in and submit

17  a final order of forfeiture and when we get that final order

18  of forfeiture when Judge Sullivan issues it, the United States

19  will have title to the property, will take possession of the

20  property and will be, you know, have the authority to

21  liquidate it or to do what is appropriate with respect to

22  that.

23          But in light of -- we've been -- in ongoing

24  negotiations with counsel for several months now, I believe

25  from our last court conference, we've refrained from Mr.

1   Vilar's attorney in the criminal case held in opposition to

2   the forfeiture order and we were hoping to come to some

3   agreement before we went ahead and did it and it doesn't

4   appear right now that we're going to be able to reach an

5   agreement on this matter.  So what we had hoped to do was go

6   forward on Monday, file our application for our forfeiture

7   order which Mr. Hurlock [Ph.] has already opposed.  We have

8   our legal authority for it.  Judge Sullivan will rule on it

9   and the sooner he grants the forfeiture order we think that

10  it's in the best interest to begin the petition process.

11          The only wrinkle in that is that because Mr. Vilar

12  and Mr. Tanaka have both appealed their conviction the

13  Department of Justice doesn't traditionally distribute

14  remission until the appeals are final because in the event

15  that the conviction is reversed or the forfeiture is reversed

16  on appeal the defendants would get their money for property

17  back and they typically won't distribute money until the

18  appeal has been upheld -- I mean the forfeiture has been

19  upheld.

20          What our agreement was, what we were trying to reach

21  a compromise in is that Mr. Vilar and Mr. Tanaka would at

22  least agree to some subset of money that could be distributed

23  now and that they would -- the only think we asked for was a

24  waiver that in the event that their conviction is reversed on

25  appeal they won't seek this money that went back to their

13

investors, they won't seek it back.  That's where things just

have not worked out and I fear that -- it's a lengthy process

to go through the petitoin process just because of the

notification, giving people time to file a petition.  I'm very

conscious of as you know Mayer's financial situation.  So I

feel like we can't wait any longer.  We need to move this

process along as quickly as possible.

I'm going to do everything in my power as the chief

of the forfeiture unit here to make sure that this is a number

one priority and that we get a decision, and at the same time

I'm very happy to continue to negotiate with Mr. Vilar's

counsel and Mr. Tanaka's counsel in the criminal case to see

if we can come up with some compromise but I think we need to

move forward on this.

THE COURT: I'm glad to hear you say that it is a

priority for your department. I also hear you saying that the

department is reluctant to make distributions before the

conclusion of an appeal without certain voluntary waivers and

that the process takes a long time.

So assuming that you're successful even before Judge

Sullivan in respect of the objections that have been raised by

Mr. VIlar and a forfeiture order is issued there, what can

victims or claimants expect in terms of the practical effect

of it being a high priority and what is within your power in

terms --

14

1          MS. LEVIN: What is the --

2          THE COURT: -- of them seeing actual dollars?

3          MS. LEVIN: I actually called Washington before I

4    came here because I knew that Your Honor would want to know

5    these things of course.  I talked to them and asked them to

6    push it up to the front of the pile but generally once we get

7    the order we will immediately send out letters to every single

8    investor that we know of and we have to give them a reasonable

9    time to put in petitions.  So assuming 30 days is a reasonable

10   period, and I guess we could extend it for some people if

11   possible, they have 30 days to figure -- a week to get out the

12   notice letters, give them a week for mailing then 30 days.  So

13   figure that's six weeks.  Then we have to gather them -- my

14   office has to gather them and review them and make a

15   recommendation as does the postal inspection service.  As I

16   said, they -- as soon as they come in and we're ready I'll sit

17   down with whoever I have to and we'll review them.  Depending

18   on the volume of them it may take a couple of days but I

19   assume -- let's assume we can do it within a week and then we

20   will submit our recommendation to the Department of Justice

21   and then I'll call them.  So I would say -- I don't know that

22   it's ever been done this quickly but we would try and do it

23   within three or four months.

24          THE COURT: And that's notwithstanding the pendency

25   of the appeal --

1          MS. LEVIN: No, it has nothing --

2          THE COURT: -- in the criminal case?

3          MS. LEVIN: -- to do with the appeal.  They will

4     rule at that point and then we'll grabble with the issue of

5     can they distribute the money, can they grant some kind of

6     extraordinary waiver in this circumstance.  I don't know that

7     they will but I am perfectly happy to raise it up as far as I

8     can in Washington.

9          THE COURT: So the three to four month time frame is

10    to what, to sign off by the Department of Justice on how the

11    money will be distributed when it's distributed --

12         MS. LEVIN: Yes.

13         THE COURT: -- or it's three to four months to the

14    Mayers actually having some help in paying their rent?

15         MS. LEVIN: The distribution of it should be

16    relatively quick or at least we could possibly start with

17    partial distributions because there's securities and there's a

18    question of are they going to be liquidated but there is a

19    bulk of cash that's there.

20         The procedure actually is relatively -- like the

21    restoration process that I told you where the marshals give

22    the clerk's office a check and the clerk's office has to write

23    checks, this is typically the Marshal Service either wire

24    transfers or cuts their own checks right away.  So it's an

25    internal process within the United States Marshal Service.  So

1  it doesn't -- it shouldn't take that long.  It will take a

2  couple of weeks in terms of calculating it out and all of that

3  and being prepared to distribute the checks but it shouldn't

4  be -- it shouldn't be more than I would say like two weeks for

5  them to be able to do it.

6          THE COURT: So this isn't something held up by the

7  pendency of the appeal?

8          MS. LEVIN: It will not --

9          THE COURT: Forgive me for asking you that same

10  question four times.

11          MS. LEVIN: It won't be held up during the pendency

12  of the appeal unless the -- Mr. Vilar and Mr. Tanaka move for

13  a stay of the entry of the forfeiture order in which case if

14  they move for a stay then we can't do anything.  We can't move

15  forward.

16          THE COURT: If the motion is granted.

17          MS. LEVIN: If the motion is granted, yes, if the

18  court grants the stay.

19          THE COURT: Now, who is managing this money?  Is it

20  invested somewhere?

21          MS. LEVIN: Yes.  There are accounts at JPMorgan.

22  They're the same amounts that Amerindo had in the first place.

23  They're just remaining exactly where they were.

24          THE COURT: But they're not business checking

25  accounts.  They're some sort of investment accounts?

1          MS. LEVIN: They're both.  They're both.

2          THE COURT: So there is some money that is not

3    earning any interest at all, not that --

4          MS. LEVIN: I don't think they're business checking

5    accounts.  I think they're all interest bearing accounts as

6    best as my recollection -- I'm not sure we know completely all

7    the details of it but I cannot imagine that they're checking

8    accounts, no.

9          THE COURT: That is something that I would hope and

10   expect the department is focusing on given that it is a lot of

11   money and we're in a very low interest rate environment.

12         MS. LEVIN: Your Honor, we don't have authority right

13   now until we have that final order of forfeiture.  We don't

14   have authority to take possession of those assets.  So we're

15   sort of in limbo right now but once the money -- once we do

16   take possession of them and they're put in the Marshal's

17   account they do earn interest in the Marshal's account.

18         THE COURT: Now, Mr. Tanaka in his letter raised a

19   couple of additional points that I wanted to ask you to

20   address directly.  One is his queries as to the status of the

21   pension -- he said there are separate pension related accounts

22   of the company and I think he used a figure of something like

23   $10 million in that regard and he also contended that there

24   are investors in the company who were not victims of any of

25   the alleged fraudulent activities and his assertion is that

1   the money shouldn't only go to the victims of the -- we'll say

2   alleged fraudulent activities just to cover this case which is

3   unresolved and the criminal case.

4           So is the $54 million figure representative of money

5   that the Government has been able to trace to and map to its

6   allegations that Messrs. Vilar and Tanaka took investor money

7   illegitimately and put it somewhere else or is that all of the

8   assets that can be found that are attributable to all of these

9   entities whether they were in a money market book kept to

10  particular individuals and the pension account and office

11  assets account or what?

12          MS. LEVIN: It's a little bit -- with respect to Mr.

13  Tanaka's first question, I don't have an answer.  I can go

14  back and try to find it.  I tried to get a quick answer on it

15  and I couldn't get one but we're absolutely going to look into

16  it and when the Marshals take possession of all the accounts

17  we'll make sure that we find out exactly what's there.

18          With respect to the second question, that's the

19  whole point of the remission process versus doing that earlier

20  process.  I talked about restoration where it would just go to

21  the victims in the criminal case.  If we want to make sure

22  what Mr. Tanaka is saying is investors, the people that are

23  investors that are considered -- that are the ones that are

24  part of the SEC case, the point of our going through the

25  remission process rather than the restoration is to recognize

1   them as well so that they can also share in the distribution.

2   So that's where we are.  We want to make it inclusive.

3           In terms of the $54 million I know I'm making

4   forfeiture loss to them unbelievably confusing but the $54

5   million is actually something else.  That's the property that

6   the defendants obtained as a result of their offense.  Without

7   respect to what they have that's a money judgment against them

8   because that's assets that they got and it was a gross -- it's

9   the gross proceeds of their offense without any subtraction

10  for money that -- for any of their costs of engaging in the

11  criminal activity.  So it's somewhat of a separate number.

12          THE COURT: These were not -- well, I guess one thing

13  I'm trying to get at is -- two things I'm trying to get at.

14  Is that number predicated on assets and substitute assets

15  titled to the individual and/or entity defendants?  That's

16  sort of Part A of the question.  And Part B of the question is

17  were there any segregated accounts here?  Were there accounts

18  or assets that were identifiable to particular investments by

19  people who are not alleged to have been defrauded here and if

20  so, how is that being handled?

21          MS. LEVIN: There is one other account.  Well, in

22  terms of the $54 million, it's not tied to any particular

23  assets.  The $54 million is the money -- is essentially the

24  money, the gross money that the defendants got, the money that

25  they got as a result of the fraud.   But some of it may come

20

1   from some of the investors, not the victims.

2           In terms of are there others outside of it, the

3   group that is in the criminal case are a certain class of

4   victims.  The accounts that we have are -- we call them

5   substitute assets but the reality is there was so much

6   commingling of the money here that it's very, very hard for

7   the Government -- it was going to be an exhaustive task to

8   literally to trace the crime proceeds that were in those

9   accounts with money from things that were not charged as a

10  crime.  So we just call them substitute ,assets other assets

11  of Amerindo or Mr. Vilar or Mr. Tanaka that can be used to

12  satisfy the money judgment but there were other investors.

13  There was ATGF.  There were other funds that they had that are

14  not necessarily -- that were not a part of the criminal case

15  and there was one other account that is subject to a

16  liquidation proceeding in the Cayman Islands and we vacated

17  the forfeiture order with respect to that account because the

18  court in the -- it was a bankruptcy proceeding in Grand Cayman

19  Islands and the court in that case had appointed a liquidator.

20  He had the bankruptcy -- they have the bankruptcy order

21  entered in this court and so we released that property from

22  the restraining order and that property was distributed

23  pursuant to a bankruptcy court in the Grand Cayman Islands

24  reorganization plan and that process was ongoing right now.

25          MR. SALZBERG: Your Honor, if I may.  That actually

1  is one of the entities that Mr. Tanaka was asking about in his

2  letter.  That's the Amerindo internet fund which is the $10

3  million Cayman Island fund I believe.

4        MS. LEVIN: And that property is being distributed in

5  a separate proceeding that we have no part of.

6        THE COURT: Will the calculations, the distribution

7  principals, the ultimate recipients through the Department of

8  Justice process be revealed and sort of when in relation to a

9  final decision?  There's been concern expressed about

10  [inaudible], about fairness of treatment of fraud victims as

11  opposed to regular investors, all sorts of different angles on

12  these issues as raised by different parties in interest.

13        MS. LEVIN: It's solely in the discretion of the

14  Department of Justice because it's forfeited funds.  However,

15  that being said, there is a -- there's a federal regulation

16  which governs it which makes things pretty clear.  It's a

17  victim of the offense or a related offense and we would

18  consider the case before Your Honor to be at a minimum a

19  related offense.  There is no priority given for distribution

20  to victims of the offense over the related offense.  Generally

21  the Department of Justice follows principals that the victims

22  can recover the pecuniary loss that they suffered as a result

23  of the criminal conduct and there typically is not any

24  interest given on it and those are sort of the basic

25  principles and they favor the concept of it.  There's not

22

1    enough money for everybody to be made whole.  Pro rata

2    distribution based upon the amount of your loss.

3           That being said, each petition -- it's not a closed

4    process where you write something and there's no input.  If

5    you want to -- the Department of Justice for each individual

6    investor, they will get a letter from the Department of

7    Justice telling them what the determination is.  They

8    typically will tell me before and if there's -- we think that

9    there's issues or they need additional information the

10   individual investor or victim or their counsel can meet or

11   talk on the phone with people from the Department of Justice.

12   It's an informal process.  The whole basis for it is to

13   achieve justice, provide compensation.  If there's a limited

14   pot of money you always run into situations where -- and I'm

15   very cognizant of Mr. Vagos' letter on behalf of the Mayers

16   that the victims of the charged offense -- of the offense in

17   the criminal case feel like they want to make sure that

18   they're able to get all their money, that they should be the

19   ones that recover first and while I'm sympathetic to that

20   argument the general rules for remission are all victims are

21   treated equally.

22          But in the end it's a decision made by the

23   Department of Justice and can be reviewed of the chain there.

24          THE COURT: And by virtue of the forfeiture order

25   that you anticipate will be entered by Judge Sullivan via the

23

1   criminal proceeding these identified assets which are less in

2   total amount than the forfeiture judgment by virtue of the

3   forfeiture judgment all of these identified assets are

4   considered proceeds of the crime, they're forfeitable, and

5   they are put into this Department of Justice process that

6   you've described?

7           MS. LEVIN: Yes, Your Honor.

8           THE COURT: And that that process has, if you will,

9   first claim on the assets and by law that is what the

10  distribution process will be?

11          MS. LEVIN: Yes, Your Honor.

12          I also want to add one other thing about this

13  process which is somewhat beneficial is unlike situations

14  where a receiver is appointed by the court there are very

15  little expenses involved in that process.  So that the hours

16  spent reviewing the petitions or the job of liquidating the

17  assets, liquidation of the assets is done by the Marshal

18  Service.  The job of reviewing the petitions is me and I'm

19  paid my Government salary as well as people at the Department

20  of Justice.  So it's a pretty low cost process which will --

21  so there will be less money reduced from the money that the

22  victims are going to recover.

23          THE COURT: Thank you for that --

24          MS. LEVIN: Thank you.

25          THE COURT: -- very extensive explanation and for

24

1    engaging my questions and bringing me up to speed on it.

2           So at this point what is it that the SEC would

3    propose we do in this proceeding?

4           MR. JACOBSON: Your Honor, I'll try to answer that.

5    Neal Jacobson.  One of the issues we have here is that we

6    don't have an assets before Your Honor.  So --

7           THE COURT: And it sounds like we won't given the

8    effect of the forfeiture order.

9           MR. JACOBSON: At this point it appears that we

10   won't, correct.  It's possible if the forfeiture is reversed

11   and the money hasn't gone out there will be some assets that

12   would no longer be subject to the criminal jurisdiction in

13   which case there would be assets out there.

14          The question is then at some point, and I think we

15   stated this in one of the letters a month or two ago, I'm not

16   sure exactly when, at a minimum in our case we still have

17   defendants and I believe many haven't answered.  Is that

18   correct?  So the case has been stayed and nothing has happened

19   since the stay was lifted.

20          One avenue we considered was whether or not we

21   should move forward with a summary judgment motion of some

22   type against all of the defendants seeking disgorgement or

23   other type of equitable relief in order to make sure we have a

24   judgment against the defendants in the event the forfeiture

25   order is eventually -- if it's reversed or modified on appeal

1   in that case.  So there would be some mechanism at that point

2   for us to make a claim on the assets that are now subject or

3   will be subject to the Department of Justice's jurisdiction.

4           Given the fact that this could take a long time -- I

5   believe the appeal may take into next year or later, I'm not

6   sure if that's the best use of the resources of the court at

7   this point but at some point we will have to resolve the

8   issues with respect to the outstanding defendants whether it's

9   injunctions or default judgments or the like because the case

10  is still open with respect to those defendants who pled.  I

11  think at this point it might be -- we're still giving it an

12  additional few months or so to see how the process goes with

13  the Department of Justice and whether we can continue to speak

14  with the defendants to try to reach some type of mutual

15  consensual resolution to the matters that won't require

16  litigation.

17          So I think a few more months at the very least to

18  continue to speak to the defendants and for the process to

19  unfold might be beneficial.

20          THE COURT: So you'd suggest another control date in

21  say six months, another conference date?

22          MR. JACOBSON: I think six months is probably a good

23  amount of time, Your Honor.

24          THE COURT: Thank you.  Did anyone else wish to be

25  heard?  I see Mr. Burger is standing.

1          MR. BURGER: Yes, may I address the court, Your

2   Honor?

3          THE COURT: Yes, sir.

4          MR. BURGER: We've heard that what is requested is

5   that the money be forfeited so it becomes the property of the

6   United States and that the Department of Justice would then

7   have discretion as to what to do with those funds.  Now, with

8   the appeal pending we have absolutely no objection to invested

9   funds being returned to the investors directly.  Not becoming

10  property of the United States, not being forfeited, not being

11  spent at the Government's discretion.  That is what we've

12  opposed.

13         In the past we -- Mr. Vilar signed a stipulation

14  releasing $150,000.00 to the Mayers because of their

15  difficulties financially and we have no objection to doing

16  something similar though we're not willing to forfeit all the

17  money to the United States Government in their discretion

18  while the appeal is pending.

19         THE COURT: Ms. Levin, did you want to speak to that?

20  You're clearly -- the forfeiture proceeding is cued up before

21  Judge Sullivan and so to the extent there is an objection to

22  the grant of that relief that objection has to be directed to

23  Judge Sullivan because it's not in the proceeding before me

24  but I think I hear in your statement a statement of position

25  but also a statement in the theories of discussions I guess

27

1  that have been going on between the department and the

2  defendants here.

3      MR. BURGER: Which has some bearing on the comments

4  that have been made here today.

5      THE COURT: Yes.

6      MS. LEVIN: Your Honor, with respect to the first

7  statement about the Mayers, and I will certainly be in touch

8  with the Mayers counsel, Mr. Vagos, and see if there is some

9  money in light of their dire circumstances right now, if

10  there's some money that can be released to them.  We would

11  have to because there's a forfeiture order forfeiting the

12  defendants' interest in the property, we would have to amend

13  the forfeiture order to do so but I think for some small

14  amount of money we can potentially agree to that but like --

15  and particularly because they're one of the largest victim

16  investors but to the extent that releasing some people's money

17  and others is going to harm the greater group we would -- we

18  couldn't agree to it.

19      With respect --

20      THE COURT: Well, given the magnitude of the

21  calculation as to them so far it would just seem to me that

22  some amount that would relate to their immediate needs

23  wouldn't upset the apple cart.

24      MS. LEVIN: No, absolutely.  I think that's

25  fantastic.  This is the first I heard of it today.  I think

1  it's a fantastic idea and we will literally jump right on that

2  right away.

3          With respect to the rest of the money, we have -- we

4  forfeited the defendants' interest in the property to vacate

5  the forfeiture order and allowed -- there's really no

6  procedure to be followed to be returning the money.  I don't

7  think that it's appropriate for Mr. Vilar or Mr. Tanaka or

8  their counsel to be the ones to decide who gets what money.

9  Mr. Vilar and Mr. Tanaka are both incarcerated right now.  So

10  practically speaking it's not [inaudible] business entity

11  could do it.  Rather, we have to have some unusual procedure

12  like the -- Judge Sullivan would have to vacate the forfeiture

13  order and appoint an independent monitor or receiver to take

14  possession of all of the funds and to send out claims, to

15  liquidate the assets and to determine the distributions.  That

16  would all come out of the money that the victims are going to

17  recover and they would be -- since it's money -- I'm not even

18  sure who would be the one that would review this independent

19  monitor's determination of who gets what and in the case

20  before Judge Sullivan the investors aren't a party to that

21  case.  They're not victims and they're not recognized in the

22  restitution order.

23          So we have a very unusual circumstance where we

24  would essentially be asking Judge Sullivan to vacate the order

25  of forfeiture, the order of forfeiture for the substitute

1   assets that he's already entered to be -- to allow the money

2   to go to essentially non parties to the criminal proceeding as

3   well as the victim and I do not believe that the victims in

4   the criminal case are going to agree to that because they will

5   be concerned that their amount could be diluted plus the fact

6   that there is a Department of Justice procedure which will

7   cost them the -- to be a very small expense whereas the cost

8   of hiring an independent monitor wouldn't be one individual.

9   It would probably have to be some kind of firm that does these

10  type of claims processing and from my experience in forfeiture

11  cases they can be expensive.  We could be spending several

12  million dollars on the processing and I don't know that it --

13  that it would be appropriate to do under the circumstance

14  because there's no reason to believe -- I know I'm saying

15  trust the Government but I've explained what the principal is

16  which I think everybody agrees.  The Department of Justice

17  will essentially rely upon --

18          MR. TANAKA: [Inaudible] Ms. Levin [inaudible].

19          MS. LEVIN: I'm sorry, Mr. Tanaka.  Yes, I'll move it

20  over here.  Can you hear me better now?

21          MR. TANAKA: Yes, [inaudible].

22          MS. LEVIN: I'm sorry.  What I was essentially

23  saying -- let me just quickly review what I was saying to you

24  which is that there will be an expense -- I think the only way

25  to do what Mr. Vilar's counsel has suggested would be to bring

1   in some kind of -- this is an unusual procedure that I'm not

2   even sure that could be done.

3         THE COURT: May I just interrupt for one moment?

4   This is Judge Swain.  Your remarks of the last five minutes or

5   so, Ms. Levin, I heard as a summary of how you would

6   anticipate you would respond before Judge Sullivan --

7         MS. LEVIN: Yes.

8         THE COURT: -- to the argument that Mr. Vilar's

9   counsel has made.

10         MS. LEVIN: Well, actually my argument that I would

11   respond -- I'm sort of giving an equitable argument.  In terms

12   of the actual legal argument the court has -- the entry -- the

13   filing of an appeal does not divest the court of jurisdiction.

14   If Mr. Vilar or Mr. Tanaka does not want the forfeiture to be

15   implemented their remedy is to file a motion for a stay of the

16   forfeiture order which they're free to do under the forfeiture

17   law.  Whether Judge Sullivan will grant the stay, it's within

18   his discretion but just in terms of a fairness of how can we

19   get the money back to these two -- to the investors --

20         THE COURT: And also explaining why in your view it

21   wouldn't make sense to try to do it any other way.

22         MS. LEVIN: I think the simplest, the quickest and

23   the most practical way to get the money back to the investors

24   would be through the petition for omission process.  There's

25   no requirement that the defendants agree that the forfeiture

1  was proper, agree that the restitution is proper, and I've

2  made the representation that the victim and the investors, the

3  investors that sit under the regulation as a victim -- I know

4  that the regulation is what qualifies as a victim, that both

5  of those groups, which is essentially investors and the

6  various Amerindo funds, that they will recover equally on a

7  pro rata basis under the petition for omission process based

8  upon their providing appropriate documentation to show what

9  their losses are.

10        THE COURT: Thank you.  Mr. --

11        MR. TANAKA: [Inaudible] we know that [inaudible]

12  challenging forfeiture [inaudible] we know that [inaudible]

13  money through [inaudible].  So again is there any objection

14  [inaudible] that process because otherwise we're going to be

15  hung up legally [inaudible] money [inaudible].

16        MS. LEVIN: The difference is that for an agreed upon

17  amount to the Mayers is just simply -- it's a small

18  distribution.  The decision of multiple different investors

19  victims, there's a large group and someone needs to decide who

20  gets what and what the amount is, and that's something that an

21  outside third party has to do. That's not something that

22  can -- we can agree by stipulation this is the amount that

23  everybody's going to get and we're going to release it.  It's

24  a process that has to be gone through and as you yourself

25  recognize there's numerous different investors that would have

32

1   a right to submit their papers.

2          But in terms of the issue on appeal, this has no --

3   this distribution has no impact on that whatsoever and the

4   proposal that I had made most recently was that we just carve

5   out a set amount, $17 million, and we agree this amount be

6   distributed by the Department of Justice under the remission

7   process with an agreed upon criteria.  Amount and restitution

8   orders for victims, amount in last statement for investors,

9   and that that money -- of that $17 million it would be

10  distributed pro rata.  That's the quickest, that's the

11  fastest, that could be by stipulation.  All the Government

12  asks for in return -- and I spoke about this with the

13  officials at the Department of Justice in Washington who have

14  not seen the stipulation yet because we didn't have one but

15  they agreed in principal. So I imagine this is something that

16  we could get to happen and the only requirement for Mr. Vilar

17  and Mr. Tanaka -- and for me, Mr. Tanaka, is that you agree

18  that in the event that your forfeiture is reversed on appeal

19  that you will not seek to recover this $17 million from the

20  United States.  The remaining money will be there waiting the

21  decision of the Court of Appeals on the forfeiture.

22          THE COURT: So to the extent Mr. Tanaka is amenable

23  to continuing a discussion of the possibility of that

24  structure with you, what is your -- the mode of communication

25  he should use?  Because obviously we can't spend the afternoon

33

1 having a settlement discussion here.

2          MS. LEVIN: Yes, of course.  We'll just talk on the

3 phone.

4          He can -- through email, don't you think?

5          MR. SALZBERG: Your Honor, it's Mark Salzberg.  I've

6 been communicating with Mr. Tanaka via email through his

7 sister.  Mr. Tanaka is also represented in the criminal action

8 and to the extent that there have been discussions it's

9 largely been obviously the staff and the U.S. Attorney's

10 Office and counsel in the criminal matter for both Mr. Vilar

11 and Mr. Tanaka.  So he has been represented in the

12 conversations.  To the extent that he wants to become more

13 involved in the conversations I think it would probably make

14 sense for him to have a conversation with his criminal --

15 counsel in the criminal matter.

16          MS. LEVIN: Your Honor, there's a little bit of a

17 disconnect here because Mr. Vilar and Mr. Tanaka have separate

18 counsel in the criminal case who are not here today.

19          THE COURT: Yes.  I thought that some criminal

20 counsel were supposed to appear today and that's why we had

21 adjourned this.

22          MS. LEVIN: Yes, that was my understanding as well,

23 Your Honor, because I think it would have been very helpful if

24 we had everybody in the same place.

25          THE COURT: Yes.

1          MS. LEVIN: The problem is we had these discussions,

2    we think we're in agreement and then we go back and we talk to

3    the criminal counsel and they disagree.  So I think that

4    ultimately Mr. Tanaka should talk to his counsel and he can

5    call me and we can try and work through this.

6          THE COURT: Now, Mr. Friedman had stood up.  Before

7    Mr. Friedman speaks I would just like to try to summarize my

8    understanding of the broad contours of the proposal as I heard

9    them.

10         So the proposal that the department has made is for

11   $17 million of the identified funds to be distributed among

12   investors including the victims identified in the criminal

13   case as a one time final no clawback distribution to these

14   people and even in the event that there is a reversal of the

15   convictions or of the forfeiture order Messrs. Tanaka and

16   Vilar would be asked as part of this arrangement to get the

17   $17 million out to the investors to agree and waive

18   permanently any claim that any of that money should get back

19   to them or go anywhere other than the investors to whom it had

20   been distributed.  Is that a simple summary?

21         MS. LEVIN: Yes, exactly, Your Honor.

22         MR. BURGER:  Your Honor --

23         THE COURT: First -- I'm sorry.  Let me hear Mr.

24   Burger and then Mr. Friedman.

25         MR. BURGER: We have no, as I think I said before, no

35

 1   principal objection to the return of invested funds

 2   established to be owed to investors and if initially there

 3   were a distribution of $17 million in that regard we could

 4   cooperate with that and agree to that but I do not understand

 5   why that cannot be done outside of the forfeiture order unless

 6   I've misunderstood, and I'm not as familiar with all the

 7   details here as the other counsel here today.

 8             THE COURT: Let me just ask.  Ms. Levin, to do this

 9   you would have to get the forfeiture order reduced by the $17

10   million or something to carve it out of that process, is

11   that --

12             MS. LEVIN: We would apply any money returned to the

13   victims and investors.  We would apply that $17 million

14   against the forfeiture order and we would reduce it.  We don't

15   have to ask the court to do it.  I'm the one that credits

16   forfeiture orders.  I would credit that.

17             THE COURT: So that would count against anything

18   under the forfeiture order if the forfeiture order later went

19   away but everybody had made these waivers it would be kind of

20   no harm no foul, the money would stay with the -- return to

21   the investors?

22             MS. LEVIN: Exactly.

23             THE COURT: For me that helps in clarification.  I

24   don't know if that goes to the point that, Mr. Burger, you

25   were trying to raise.

1          MR. BURGER: Well, we aren't agreeing to forfeiture

2    order as applied to these funds.  My understanding is as of

3    the moment the forfeiture order does not apply to the funds

4    that we're talking about.  That would require further

5    application. Is that correct?

6          MS. LEVIN: The defendants' interest in the funds

7    have been forfeited.  For the United States it's a two part

8    process but the second part has nothing to do with the

9    defendants.  The first part is the initial preliminary order

10   of forfeiture forfeits the defendants' interest in the

11   property.

12         THE COURT: And that has already been entered?

13         MS. LEVIN: That has already been entered.  The

14   second one is notice sent to third parties that could

15   potentially have an interest in the property and here notice

16   was sent out and published on the internet and there were

17   actually a couple of claims filed by investors.  I spoke to

18   them, explained the process to them and also legal they

19   don't -- because there weren't investor accounts with certain

20   investor's names on it, they don't have an interest in the

21   specific property.  Explained the process.  They withdrew

22   their claims so money could be distributed under the

23   Department of Justice's petition for omission or mitigation

24   process, and there actually are I believe three or four

25   withdrawals of claims that specifically state that on the

1    record in the criminal case.

2           But the second part is an order for the United

3    States to get formal legal title to the money.  Then we need

4    to get that final order of forfeiture.  It's essential --

5           THE COURT: So let me just try to cut through this a

6    little bit because the hour is getting a little bit late in

7    relation to some other things.

8           For this settlement proposal, if you will, as to the

9    $17 million, you're not asking Mr. Vilar and Mr. Tanaka to

10   withdraw any objection that they have to the forfeiture orders

11   or withdraw anything on appeal as to the forfeiture order

12   that's been entered as to their assets?  You're not asking

13   them to consent or agree to the propriety of a Department of

14   Justice administered forfeiture proceeding.  What you're

15   proposing is that there be a contractual agreement under which

16   the $17 million would be distributed to specified investors in

17   specified amounts that part of that contractual agreement

18   would be that that particular distribution would be final as

19   to Messrs. Tanaka and Vilar and no matter what happens in the

20   forfeiture later, whatever happens in the criminal case they

21   wouldn't try to claim any of that money back and say well,

22   those people weren't really victims and so now the Government

23   should pay me back the $17 million; it has to be an agreement

24   that lets that $17 million stay with those people no matter

25   what but you don't intend for this to operate in any way that

38

1   would prejudice the positions that they're taking regarding

2   the forfeiture proceedings, the forfeiture order that's

3   already been entered or the criminal convictions.  Is that

4   correct?

5          MS. LEVIN: Yes, exactly, Your Honor.  I just want to

6   have one clarification.  When you were describing it I think

7   you were just being descriptive but it raised another issue

8   which is an objection that Mr. Vilar's counsel has had.

9   They've also asked before they consider this aside from not

10  wanting the property to be forfeited, which is just impossible

11  for DOJ to do anything without being forfeited, would be that

12  they'd be able to review the distribution before they agree to

13  it and the Department of Justice without an order of

14  forfeiture is not going to agree to -- they're not going to

15  begin the petition process and they're not -- they're not

16  going to give the defendant of the criminal case an

17  opportunity to review the amount of money that they're going

18  to be distributing to the particular victims.

19         THE COURT: Would that apply to the $17 million as

20  well?

21         MS. LEVIN: Yes, that would apply to the -- the $17

22  million.  The agreement that I drafted provides this criteria

23  which is that the victims in the criminal case get the amount

24  in the restitution order without interest and all other

25  qualified investors get the amount in their last statement.

39

1  So the exact -- who exactly applies for a petition and the

2  amount in their last statement is not something that we know

3  right now but we just simply want them to agree to the

4  principal of it.  We don't want to be in a position where the

5  Department of Justice is making a presentation after doing all

6  of this, makes a presentation to Mr. Vilar and Tanaka and they

7  say we don't agree, we're not agreeing to distribute the

8  money.

9          THE COURT: Thank you.  Mr. --

10          MR. TANAKA: I mean we want [inaudible].  We're

11  looking [inaudible] we're looking to distribute about $40

12  million.  We're [inaudible] we're just saying that [inaudible]

13  distribute $17 million in the same way we distributed

14  $175,000.00 to the Mayers.  What's the [inaudible].

15          MS. LEVIN: The reason --

16          THE COURT: I think that Ms. Levin has explained that

17  in a couple of different ways and sufficiently for this

18  proceeding.  I think additional conversations need to go on

19  off line directly between the parties and their

20  representatives to see whether this $17 million piece can be

21  done and what if any differences there are between the earlier

22  process and this but I think that we have identified the fact

23  that there is this proposal on the table, there's this

24  potential on the table and obviously it needs more work --

25  more communications and more input all around.

40

1        Mr. Burger, are you done?  Can we say that you're

2   done for this point?

3        MR. BURGER: Yes, I mean the basic concept of

4   agreeing to the distribution of $17 million, there's no

5   dispute as to that.  It's how it's done and what the effect is

6   of how it's done and we're happy to talk about that.

7        THE COURT: Thank you.  Mr. Friedman.

8        MR. FRIEDMAN: Your Honor, I would just like to

9   address the subject of the $17 million.  I think there is no

10  basis for limiting the distribution to $17 million.  It gives

11  Mr. Vilar and Mr. Tanaka leverage that they should not have.

12  I think Ms. Levin is being generous in trying to make an

13  accommodation with defense counsel but I think defense counsel

14  has no right and no right to participate in this process and

15  the -- originally I was going to argue to Your Honor that they

16  never had any interest in the assets belonging to Amerindo,

17  that neither Mr. Vilar nor Mr. Tanaka never had any such

18  interest because they were simply paid managers of those funds

19  and the fact that in his forfeiture order Justice Sull --

20  Judge Sullivan referred to their interest in Amerindo and what

21  he was forfeiting was their interest in ATGF.  That did not

22  mean they had an interest.

23        But my argument was made much easier this week

24  because the defendants filed their Second Circuit briefs and

25  in their Second Circuit briefs, their criminal appeal

41

1  briefs -- and I'm reading from Mr. Vilar's criminal appeal

2  brief, he specifically says I have no interest in the ATGF

3  assets.  When I say ATGF assets I am referring to the same

4  assets now in possession of JPMorgan Chase that Ms. Levin

5  referred to a minute ago and that people have said are worth

6  $40 to $42 to $45 million.

7        In his brief Mr. Vilar says "The defendants held the

8  capital as fiduciaries in constructive trust for the

9  investors."  The defendants are Mr. Vilar and Mr. Tanaka.  The

10  investors are the non criminal victim participants in the

11  remission process that Ms. Levin has described to Your Honor.

12  The defendants -- and I think this is a judicial admission

13  that's binding on the defendants.  They were constructive

14  trustees.  It says it was -- and now I'm reading -- that first

15  quote was from Page 203.  At Page 204 of Mr. Vilar's brief it

16  says "It was never truly the defendant's property and is not

17  subject -- " well, they say it's not subject to forfeiture but

18  the important --

19        THE COURT: But there's been a determination by Judge

20  Sullivan that it is subject to forfeiture and they're

21  attacking that.

22        MR. FRIEDMAN: Right.

23        THE COURT: There is -- right now there's an order

24  that covers it; correct?

25        MR. FRIEDMAN: Yes, and they can attack it however

42

1   they want but I think when they attack it I would assume --

2   I'm not a party to the proceeding before Judge Sullivan but I

3   would assume that somebody is going to point out to them that

4   they have admitted that it was not their property.  So they

5   have no standing to object to forfeiture.

6       At 205 of Mr. Vilar's brief it says the investors --

7   the investors again, the ATGF investors which include Mr.

8   Marcus and Mr. HIKONIG [Ph.] who are my clients and who are

9   sitting behind me.  "The investors as the beneficiaries of the

10  constructive trust have an interest in the forfeitable

11  property that is superior to the defendants."  So I do not see

12  for the life of me other than Ms. Shevitz who was Mr. Vilar's

13  criminal counsel, her leverage as a negotiator which I suggest

14  to Your Honor is augmented by her purposely absenting herself

15  from today's proceedings but I don't see what leverage she has

16  to say, or Mr. Burger for that matter has to say this should

17  be limited to $17 million.

18      I submit, and again I know that we're all in

19  opposition because a lot of the discussion today has been

20  about matters that relate more to Judge Sullivan than to Your

21  Honor and I recognize that.  But just in the interest of

22  completeness, everything that we've talked about today and

23  that Ms. Levin has talked about today should relate to the $40

24  to $45 million that's now in the possession of JPMorgan Chase,

25  not to some agreed on negotiated figure of $17 million.

43

1          THE COURT: Thank you.  I trust that to the extent

2   the Crime Victims Act would give you a right to be heard in

3   the proceeding before Judge Sullivan or Judge Sullivan is

4   amenable to hearing you in any event you would make those

5   assertions in Judge Sullivan's proceeding because that is the

6   one in which the forfeiture application is being made and the

7   forfeiture orders have been entered.

8          So let's pick a date for the next conference in this

9   matter which is six months out.  Ms. Ing, do you have a date?

10          THE CLERK: Yes. Friday, March 30, 2012 at two p.m.

11          THE COURT: So March 30, 2012 at two.  And will the

12   SEC again arrange for Mr. Tanaka's telephonic participation?

13          MR. SALZBERG: We will, Your Honor.

14          THE COURT: Thank you.  And will the SEC also begin

15   copying the Mayer's counsel on papers filed in this case?

16          MR. SALZBERG: We will, Your Honor.

17          THE COURT: I appreciate that.  Will it be acceptable

18   to the SEC if I write an endorsed order on the Mayer's letter

19   to the effect that SEC has agreed to copy the documents to

20   them and that the SEC and the Department of Justice expect to

21   be in touch concerning any potential for some limited

22   distributions since they're not here today or --

23          MR. SALZBERG: Yes, Your Honor, of course.

24          THE COURT: Okay.  Very good.  Now, Mr. Tanaka, I

25   have a couple of housekeeping issues with you.  There was a

1    letter sometime ago that indicated that you had sent some sort

2    of formal answer in this proceeding and it's -- I never

3    received anything in the court and Mr. Salzberg is indicating

4    that he hasn't seen it either.

5                MR. SALZBERG: To the best of my reco --

6                MR. TANAKA: [Inaudible]

7                THE COURT: Yes, Mr. Tanaka.

8                MR. TANAKA: Yes. [Inaudible]

9                THE COURT: I am trying to look now at the docket

10   here because I had written something about it at some point.

11   Just give me a moment.

12               MR. TANAKA: [Inaudible]

13               THE COURT: I'm sorry.  Would you repeat that?

14               MR. TANAKA: Yes. [Inaudible] or so.

15               THE COURT: This is a -- this being a civil

16   proceeding I am not certain of the rules regarding the

17   provision to pro se parties at court expense of a transcript.

18   Mr. Salzberg --

19               MR. SALZBERG: Last time I recalled it he had made a

20   similar request and we went ahead and ordered it and sent a --

21               MR. TANAKA: Yes, that's [inaudible].

22               MR. SALZBERG:  -- complimentary --

23               THE COURT: If the SEC would take care of that I'd be

24   grateful.

25               MR. SALZBERG: Of course.

1          THE COURT: Thank you.  Now, I'm having a little

2    trouble finding -- okay, let's see.  In September of 2010 I

3    entered an order saying that we received an August 2010 letter

4    from Mr. Tanaka indicating that he was preparing to assume

5    self representation and requesting appointment of counsel

6    which is the request that I have and continue to hold in

7    abeyance.  Then that order continued saying that the court has

8    also received a letter dated August 31, 2010 from Fox

9    Rothchild LLP, Mr. Tanaka's former counsel which refers to a

10   response to the SEC's amended complaint "sent to the court"

11   unbeknownst to them by Mr. Tanaka.

12          The court has not received nor does the docket

13   reflect the filing of a response by Mr. Tanaka.  Mr. Tanaka is

14   hereby directed to promptly file with the court via the pro se

15   office and serve on the SEC and counsel for Mr. Vilar his

16   response to the SEC's amended complaint.

17          Mr. Salzberg.

18          MR. SALZBERG: I do not recall having received

19   anything along those lines.

20          THE COURT: And the court has no record of having

21   received anything.  Mr. Tanaka, did you ever actually send a

22   document called an answer to the amended complaint to the

23   court or to the SEC?

24          MR. TANAKA: No, I don't think I did.

25          THE COURT: And sitting there now do you have such a

46

1  document that you intended to file?

2         MR. TANAKA: This is an official document order.

3         THE COURT: It would be something that you prepared.

4         MR. TANAKA: I [inaudible] because I sent [inaudible]

5  various parties.  So I think [inaudible].

6         THE COURT: So I've gotten letters from you.  You've

7  only sent the letters?

8         MR. TANAKA: Yes, yes, [inaudible] so.  I think

9  [inaudible].

10        THE COURT: All right then.  One other thing I need

11 you to do is to officially file your notice of appearance pro

12 se in this matter and what my chambers will do is send you a

13 copy of the form that the court uses for pro se people that

14 you will need to fill out and send back to our pro se office.

15 So you'll get that in a few days.

16        MR. TANAKA: Okay.  Your Honor, could I again

17 [inaudible] Ms. Levin [inaudible] details behind [inaudible]

18 questions but I was hoping [inaudible] documentation by

19 [inaudible].

20        THE COURT: Mr. Salzberg.

21        MR. SALZBERG: Mr. Tanaka, we are of course happy to

22 continue the negotiations at some point.  Maybe the easiest

23 thing to do would be to communicate through email and we can

24 set a time that we can all get on the phone and continue with

25 that work for you.

47

1          MR. TANAKA: That would be great, yes.

2          MR. SALZBERG: Okay.

3          MR. TANAKA: I have [inaudible] of the [inaudible]

4     that she was [inaudible] that would be fine.

5          MS. LEVIN: Mr. Tanaka, since you're represented by

6     counsel in the criminal case my communications should be with

7     your counsel.

8          MR. TANAKA: [inaudible]

9          THE COURT: So with this email exchange you'll set up

10    a call that everybody who should be on will be on?

11         MR. SALZBERG: We will, Your Honor.

12         THE COURT: All right.  Thank you all very much.  I'm

13    sorry, sir, did you wish to be recognized?

14         MR. MARCUS: I'd like to with my attorney's

15    permission and my name is Paul Marcus.

16         THE COURT: I think, Mr. Friedman, just so that Mr.

17    Tanaka can hear, can you pull that microphone.

18         MR. FRIEDMAN: Yes, if I don't pull the cord out.

19         THE COURT: Yes, be careful -- I was going to say be

20    slow and careful.  I don't know how far it will go but --

21    actually, would you just tell Mr. Friedman what you want to

22    say because it is -- we're an hour and a half into this

23    proceeding and you do have counsel here.  So would you tell

24    him what you want to communicate, please?  Thank you.

25                    [Pause in proceedings.]

48

1          MR. FRIEDMAN: The point that Mr. Marcus would like

2    to make to the court as well as to counsel at the front table

3    is that the money which is at JPMorgan Chase has not been

4    managed since 2005 is apparently just sitting there.  I don't

5    know if JPMorgan since they're not a charitable institution, I

6    am assuming they are deducting custodian fees of some kind but

7    the problem is it's now six years and nobody has been managing

8    the money.

9          THE COURT: And that is one of the questions that I

10   was raising with Ms. Levin and Ms. Levin's indication was that

11   as and when the forfeiture order is entered and the Government

12   actually is in a position to exercise direction and control

13   over that money it will be put in an interest bearing vehicle.

14         MS. LEVIN: Exactly, Your Honor.  Thank you very

15   much.

16         THE COURT: All right.

17         MR. SALZBERG: Thank you, Your Honor.

18         THE COURT: Thank you all very much.  We're

19   adjourned.

20         THE CLERK: All rise.

21                    * * * * *

22

23

24

25

49

1        I certify that the foregoing is a court transcript from

2    an electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5                        _____

6                                    Shari Riemer

7    Dated:   October 13, 2011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25