121avilc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    SECURITIES AND EXCHANGE
3   COMMISSION,
                  Plaintiff,
4              v.                        05 CV 5231

5   AMERINDO INVESTMENT ADVISORS,
    INC.,
6                 Defendant.
    ------------------------------x
7   UNITED STATES OF AMERICA,
                  Plaintiff,             05 CR  621
8              v.

9   ALBERTO VILAR AND GARY TANAKA,
                  Defendant
10  ------------------------------x

11                                       New York, N.Y.

12                                       January 10, 2012
                                         4:45 p.m.
13
    Before:
14
                      HON. LAURA TAYLOR SWAIN,
15
                                          District Judge
16
                           APPEARANCES
17
    US DEPARTMENT OF JUSTICE
18       Attorneys for Plaintiff
    BY:  SHARON COHEN LEVIN
19       BENJAMIN A. NAFTALIS (CR)

20
    SECURITIES AND EXCHANGE COMMISSION
21       Attorneys for Plaintiff Amerindo
    BY:  NEAL JACOBSON
22       MARK D. SALZBERG

23  GARY TANAKA, Pro Se Defendant

24  VIVIAN SHEVITZ
    JANE SIMKIN SMITH, of Counsel
25       Attorneys for Defendant Vilar (CR)

121avilc

DAVID C. BURGER
     Attorney for Vilar, (CV)


VICTORIA B. EIGER
     Attorney for Defendants, Tanaka (CR)


JULIAN W. FRIEDMAN
     Attorney for Investors Marcus, Heitkoenig, Salvitti


PATRICK W. BEGOS
     Attorney for Investor, Mayer


THOMAS J. HALL
     Attorney for Investor, Sayko

121avilc

1          (In open court; defendant Tanaka present via telephone

2     conference call)

3          JUDGE SWAIN:  Good afternoon, please be seated.

4          This is a combined hearing in the United States

5     against Vilar and Tanaka, and SEC v. Amerindo.

6          I'm Judge Swain, the judge presiding over the civil

7     case, and Judge Sullivan, who resides over the criminal case is

8     here as well.  And, first, I would like to take appearances

9     from the people who are at the table.

10         Actually, I think I'll start with Mr. Tanaka who is on

11    the phone so that we can confirm that we can hear him and he

12    hear us.  And Mr. Tanaka, we do have a court reporter here in

13    the courtroom, so we should be able to overcome inaudibility

14    issues.  If she can't hear you, we'll let you know and ask you

15    to repeat something.

16         So, Mr. Tanaka, would you introduce yourself first?

17         DEFENDANT TANAKA:  Gary Tanaka.

18         JUDGE SWAIN:  Good afternoon, Mr. Tanaka.

19         DEFENDANT TANAKA:  Good afternoon, your Honor.

20         JUDGE SWAIN:  So let's start with the front table.

21         Ms. Levin.

22         MS. LEVIN:  Yeah, good morning, your Honors.  I'm

23    Sharon Levin, I'm here for the government.  I am handling the

24    asset forfeiture matters.  Here with me is Ben Naftalis and he

25    is the prosecutor on the criminal case.

121avilc

1          MR. JACOBSON:  Neal Jacobson on behalf of The

2    Securities and Exchange Commission, and my colleague, Mark

3    Salzberg.

4          MS. SHEVITZ:  Vivian Shevitz.  And we represent

5    Alberto Vilar in the criminal matter and on the appeal.

6          MR. BURGER:  Good afternoon, David Burger,

7    representing Mr. Vilar in the SEC action, your Honor.

8          MS. EIGER:  Victoria Eiger.  We represent Mr. Tanaka

9    on the criminal appeal.

10         MR. FRIEDMAN:  Julian Friedman.  I represent three of

11   the investors in ATGF, Paul Marcus, Alfred Heitkoenig and, as

12   of this morning, Dr. Ronald Salvitti.  And I'm here by virtue

13   of having written a letter to the Court and the Court blessing

14   my participation in this conference.

15         JUDGE SWAIN:  Yes.  And there are other

16   representatives of investors or victims here as well.  And to

17   the extent we need people to speak, we'll ask you to identify

18   yourselves at that time.  I do have the cards on the appearance

19   sheet.

20         But at this point, I'm going to turn matters over in

21   the first instance to Judge Sullivan to talk about the status

22   of the forfeiture progressions.

23         JUDGE SULLIVAN:  Okay, thank you very much, Judge

24   Swain.

25         Good afternoon to all of you, many of whom I'm meeting

121avilc

 1   for the first time.

 2            Back at the sentencing -- Mr. Naftalis, you were

 3   there, I think you might be the only person at these tables

 4   that was there -- there was a discussion about forfeiture.  And

 5   Mr. Colton on behalf of Mr. Tanaka said that there was no

 6   objection by Mr. Tanaka to take all of the value that was in

 7   those accounts, different accounts that have been discussed,

 8   and have them forfeited to the government based on the

 9   government's representation that they would be used to repay

10   investors.  So there seemed to be a consensus at that point

11   that a preliminary order of forfeiture would be appropriate.

12   The parties would then huddle up, figure out where there was

13   consensus, and where there was disagreement with respect to the

14   value of the assets, and who the different investors in those

15   assets were, and what they thought they were entitled to, and

16   then we would be in a better position to know what was going on

17   in the future.  That seems to be the last time, really, that

18   was discussed in a way in which there was consensus.

19            So what if anything has happened since February of

20   2010 to identify the value of the assets, the universe of

21   investors, and the claims of the investors.  There have been

22   some investors who have made claims, and then those claims have

23   been petitioned, petitions made and then those were withdrawn

24   pursuant to some settlement with the government.  But I'm fuzzy

25   as to what is the universe of investors, how big it is, and how

121avilc

comfortable and confident are we that we have reached the whole

potential universe.

So I'm not sure who --

MS. LEVIN:  Sharon Levin from the U.S. Attorney's

Office.  I think I can answer part of that question, but I may

need to turn to my colleagues at the SEC to fill in some of the

gaps that I have.

In the forfeiture case there is a limited group of

victims who were investors, and we have those victims and we

know the amounts of their losses.

JUDGE SULLIVAN:  How many are there?

MS. LEVIN:  There are five.

JUDGE SULLIVAN:  Just five.

MS. LEVIN:  Five that are listed in the restitution

order.

JUDGE SULLIVAN:  Oh, the restitution order?

MS. LEVIN:  Yes.

JUDGE SULLIVAN:  All right.

MS. LEVIN:  In addition, to that, there is a larger

group that I believe are about maybe 20 to 30.  There is an

additional group of other investors that were investors in the

various different Amerindo funds that will also be considered

Amerindo investors for the purposes of any distribution.  And

to the extent that we have records from Amerindo, we have gone

through those records and we have a list.  And the SEC has

121avilc

1    provided us with a list of the investors with their last known

2    addresses.

3            JUDGE SULLIVAN:  All right, but that's 20 to 30.  I

4    assume you have the exact number someplace.

5            MS. LEVIN:  Yes, we do.

6            But there may be some question -- Mr. Tanaka raised

7    question in the conference that we had before Judge Swain on

8    September 23, that there might be other investors that we're

9    not aware of that are not included in that list.  And this is

10   meant to be, our distribution is meant to be full distribution,

11   that no one is excluded.  And so, accordingly, we intend to

12   provide some kind of publication on our office's website and

13   work with Mr. Tanaka or his counsel to come up with additional

14   names and addresses as there are then, and provide them with

15   notice and an opportunity to also put in a petition.

16           JUDGE SULLIVAN:  But that hasn't been done.

17           MS. LEVIN:  That has not been done, because we cannot

18   begin the petition for omission process until there is an entry

19   of final order of forfeiture.

20           JUDGE SWAIN:  Is there an impediment to your gathering

21   the information that would permit you, promptly to go, if you

22   will, on the remission procedure once the final order of

23   forfeiture.

24           MS. LEVIN:  There is no impediment.  What our plan is,

25   once we have agreement with the defendants, we would like to,

121avilc

1    you know, publish the list, or circulate the list, who we have

2    are the investors, and with their last known addresses and see

3    if there is any additions or corrections and then we're ready

4    to go forward and provide, once we have the order of

5    forfeiture, with a notice of the opportunity to fill a petition

6    for omission or mitigation and a sample petition.

7            JUDGE SWAIN:  I noticed on the list of assets that

8    there are a couple of assets that seemed to be identified with

9    employee benefit plans.  There is a requirement trust, I

10   believe, and a money purchased plan fund.  So has there been

11   any investigation or consideration as to whether there are

12   former employee claims to funds in those particular trusts

13   and/or any trust or ERISA type protections that need to be

14   taken into account?

15           MS. LEVIN:  No, those are all things that we're going

16   to turn to when we have control of the assets.

17           JUDGE SWAIN:  Again, I ask whether there is any

18   impediment to investigation before you have control of the

19   assets, and to the extent there isn't, do you have a timetable

20   for making these investigations.

21           MS. LEVIN:  To the extent that these assets are going

22   to be forfeited, then I can try and have an investigator in my

23   office, move forward on it, and we can go forward and start it

24   tomorrow morning.

25           JUDGE SWAIN:  You have a restraint on them already,

1    correct?

2              MS. LEVIN:  We have a restraint on the accounts.

3              JUDGE SWAIN:  And you specifically requested

4    forfeiture of them, and there has been no objection specific to

5    those assets or, indeed, any of the ones on the list, has

6    there?

7              MS. LEVIN:  Well, there has been an objection in

8    general to the forfeiture order, and to the entry of the final

9    order of forfeiture.  And so the marshal service is not capable

10   of taking possession of the assets and liquidating or managing

11   them at that time.  But can we call and investigate as to

12   exactly what there are, are there other parties associated with

13   them, or other parties that are entitled to get notice, there

14   is no impediment to us doing this.  We absolutely can provide

15   resources from the U.S. Attorney's Office to look into that.

16             JUDGE SWAIN:  Seems to me, given the amount of time

17   that has passed, and the fact that we're not sure of the

18   universe, that it would be appropriate to do as much in advance

19   of finalization of forfeiture as possible, and do that as

20   quickly as possible.

21             JUDGE SULLIVAN:  Yeah, I mean I guess I'm surprised

22   that pave work wasn't done right away.  Seems to me at the time

23   of sentencing, there was Mr. Marcus on behalf of Mr. Vilar had

24   made a suggestion that maybe we should put off sentencing until

25   after evaluation or liquidation of the assets had taken place.

121avilc

1    And then there was a consensus not to do that, not to wait, it

2    would take too long.  But it seemed that there was absolute

3    consensus between defendants and the government that investors

4    should be paid out of the moneys that had been frozen.  There

5    was a little bit of dispute as to how much those assets were

6    worth, whether it was 48 million, or 41 or 42 million.  But it

7    sounded like there was an awful lot of money to cover the

8    various claims that were anticipated.  And so I'm just sort of

9    surprised that we haven't advanced the ball really at all since

10   February of 2010.

11           MS. LEVIN:  Well, we can't, your Honor.  We can't --

12           JUDGE SULLIVAN:  We can't distribute.

13           MS. LEVIN:  We can't liquidate.  The marshal service

14   can't take possession of the assets.

15           JUDGE SULLIVAN:  I understand that.  I guess

16   identifying the universe of claims, and identifying or nailing

17   down the value of the assets with some precision, wouldn't seem

18   to be something that has to wait until the final forfeiture

19   orders.

20           MS. LEVIN:  There is expense associated.  In terms

21   of -- we have a valuation for what the assets are, in the joint

22   letter that we submitted to the Court, it provided the value

23   for the securities, as well as the value for the cash account.

24   What we don't have a value for are for their investments in

25   private companies.  And that will cost the marshal service

121avilc

1   between ten and $20,000 to make those valuations.  And,

2   generally, that money will come out of the money that's being

3   distributed.  And we have done the valuation once before, but

4   it didn't necessarily seem to be feasible, in advance of the

5   entry of the order of forfeiture, to find out what the value

6   is.  Because the dispute isn't as to what the value of one

7   asset is versus the other, it's whether or not we can move

8   forward and start to liquidate them now.

9           As to the claim as to the universe of investors, we

10  actually feel pretty confident that we have a list.  Because of

11  the concerns that were raised by Mr. Tanaka, we don't believe

12  we need to have any additional investigation.  The U.S.

13  Attorney's Office has a much smaller list because our case was

14  different than the SEC's case.  So our victims or our

15  investors, for the purpose of our case, were limited to those

16  victims that are included in the restitution order.  We have

17  been coordinating with the SEC, and we have their list, and

18  we're ready to go on it.  We don't believe that there really

19  are going to be many other additional people, but we don't want

20  to exclude anybody.

21          I just want to make clear that to the extent it

22  appears like we're not ready to go out and send notice, we

23  absolutely are ready and prepared to send notice out to now --

24  now, we believe we do have the full universe of the Amerindo

25  investors, based upon the SEC's reviews of the Amerindo

121avilc

1    records.  So it's not really a question that -- it just may be

2    that if one of them, we have forgotten somebody that Mr. Tanaka

3    knows about, that somehow it is not revealed in the records.

4    But we didn't view this as something that needed a detailed

5    investigation.

6          JUDGE SWAIN:  May I ask you this.  As to the valuation

7    of the illiquid assets or to the private investments, does your

8    identification of the universe of investors or potential

9    claimants also give you a solid enough sense of the amount of

10   money owed to investors so that you could perhaps determine

11   whether the liquid assets that are held would be sufficient for

12   the distribution, such that the illiquid assets might revert to

13   the defendants, if that's -- you know, if that's the right

14   outcome for excess.  I'm wondering whether it is essential to

15   value those assets now.

16         MS. LEVIN:  Well, first all, all of it is investor

17   money, so I'm not sure that any of it will actually -- or none

18   of it will actually go back to the defendants.  These are all

19   of the investor accounts.  There are a few assets that are

20   included in our substitute asset order such as personal

21   property of Mr. Vilar and Mr. Tanaka.  But those are not --

22   most of that doesn't have real value or there is not really

23   anything there.

24         In terms of the other investment accounts, my

25   understanding is regardless of whether there is enough to pay

121avilc

off all of these investors, the rest of that money doesn't

actually belong to Mr. Vilar and Mr. Tanaka.  But my

understanding, in answering your question, is that I don't

believe that the liquid assets will actually cover.  It should

cover pretty close to it, but we're not exactly --

JUDGE SULLIVAN:  What is the "it."

MS. LEVIN:  The amount that is owed each of the

individual Amerindo investors.

JUDGE SULLIVAN:  What does that add up to; do you know

what the individual investors are claiming?

MS. LEVIN:  We think it's around $44 million.

However -- and this information is in large part based upon

information that I had from Mr. Litt, when he was on the case,

is that there are some Amerindo investors that he has been

advised will not be submitting petitions.  Among other things,

what a common practice is, if there is a hedge fund, sometimes

that hedge fund, when it comes time for distribution, no longer

is in business under that name anymore and either chooses not

to or is unable to claim that money.  And that's the experience

the Department of Justice often has, is when it comes time for

omission or restoration, not all of the investors ultimately

will put in a claim.  So we think that the amount of money that

is available for distribution to the victims should be pretty

close to what the loss is that will be filed under the petition

for admission or identification process.

121avilc

1              JUDGE SWAIN:  And just to be clear, I misspoke when I

2      talked about reversion because, of course, you do have the

3      54 million-dollar forfeiture order.  And so any property that

4      would be necessary to satisfy that order, to the extent that

5      it's upheld, would of course go to the United States, as

6      opposed to reverting to defendants.

7              MS. LEVIN:  One other thing I want to add is that the

8      restitution order is actually for a larger amount, it includes

9      prejudgement interest.  And in our proposal, to come up with

10     some kind of proposal, typically the Department of Justice

11     doesn't seek an agreement from the defendants on distribution

12     of forfeitable assets.  We're asking for it here because we

13     would like to do it while the appeal is pending.  But in the

14     proposal that I made where we would begin the distribution, the

15     loss to the victims in the criminal case is the amount of

16     their, for the most part, the amount of their loss plus

17     prejudgement interests.  That prejudgement interest figure

18     would not be included in this proposed distribution.  Victims

19     in the criminal case, and the other Amerindo investors, would

20     be treated exactly the same.  They would both be entitled to

21     essentially the amount of money, without interest, that they

22     lost.

23             JUDGE SULLIVAN:  Have you shared the names of the

24     claimants that you have identified with the defendants or their

25     counsel at this point?

121avilc

1          MS. LEVIN:  I believe that we have -- I believe that

2     that information had previously been provided by Mr. Litt.  And

3     I believe that we had previously, the SEC had circulated their

4     list.  The information that I have is from the SEC's list.  And

5     I believe that they had previously provided the list of the

6     investors, their list of who the Amerindo investors are.

7          JUDGE SWAIN:  That was some time ago?

8          MS. LEVIN:  Yes.

9          JUDGE SWAIN:  And so will you -- are you willing and

10    able to provide the current list to Mr. Vilar's counsel and to

11    Mr. Tanaka promptly for their additions, corrections, or

12    whatever?

13         MS. LEVIN:  Absolutely.  But I think that our issue

14    that has been holding us up is not the actual list itself and

15    who they are, but whether or not they're willing to agree to

16    the condition for DOJ to distribute the money right now, or to

17    begin the remission process, which is that in the event that

18    the forfeiture is overturned on appeal, that they won't seek

19    the money back from the Department of Justice.

20         We've just been unable to get an agreement or even an

21    answer to that question.  If so, we can move forward on that

22    process.  So that's what our hold up has been.  I don't think

23    there is really an issue with that they don't think that we

24    have -- the defendants or their counsel don't believe that we

25    have a complete list because, as we said, we'll take whatever

121avilc

```
 1   names they give us and provide them.  And we plan to put
 2   something up on the U.S. Attorney's Office website, which will
 3   be a reference to the case, and a sample petition, and an
 4   opportunity for anybody else that knows about it to file a --
 5   file a petition, as well.  So the process should be very
 6   inclusive, that anybody that had money in Amerindo.
 7            JUDGE SWAIN:  So you would be going out to the last
 8   known address of the people identified, in addition to putting
 9   it up on the website?
10            MS. LEVIN:  Absolutely.
11            JUDGE SWAIN:  And this agreement that you are talking
12   about, not to go backwards again, but the government is as
13   to -- I think the figure is $17 million for the preliminary
14   distribution to be divided pari passu, or no?
15            MS. LEVIN:  Yes, your Honor.  But we would be
16   perfectly comfortable in having all of the money distributed
17   now, to have the final order of forfeiture entered, and the
18   marshals to come in and liquidate the assets, everything, and
19   distribute all of the money now.  The reason why we ultimately
20   came -- I made the proposal of $17 million, is there were
21   issues with counsel about the amount of a forfeiture and what
22   was the proper number, because that issue was on appeal.  And
23   because this is going through a forfeiture process, to avoid
24   that whole issue.  What I proposed was we just limit the money
25   right now to $17 million to enable at least some money to go
```

121avilc

1    back to investors.  And then with respect to the remaining

2    money, you know, that can wait until the resolution of the

3    appeal.

4            But the government's position is, with the entry of

5    the final order of forfeiture, we're ready, willing, and able

6    to begin the petition for omission or mitigation process.  I

7    called the Department of Justice this morning, the Asset

8    Forfeiture Money Laundering Section to confirm that if we had

9    this agreement from the defendants that they wouldn't seek the

10   recovery of the money, that we could go forward under the

11   petition for omission or mitigation process and distribute it.

12   And I also confirmed that the general proposal, last value --

13   you know, the most recent value on the last Amerindo statement

14   would be an appropriate mechanism.  And while they can't,

15   without seeing a proposal they can't agree to it, it sounded,

16   you know, generally acceptable to them.

17           JUDGE SWAIN:  So that was back in the fall.  And but

18   since then you haven't had a definitive answer?

19           MS. LEVIN:  No, no.  I spoke to them this morning.  I

20   had a conversation in the fall.  And then recognizing that

21   times change and things could happen, I called to make sure

22   this morning that I can accurately represent to the Court that

23   the Department of Justice would not have -- you know, has

24   indicated that they generally agree with this approach.

25           JUDGE SWAIN:  All right.  So, at this point, we'd like

121avilc

1    to --

2              Well, Judge Sullivan, do you want to call on?

3              JUDGE SULLIVAN:  Yeah, I was going to ask Ms. Shevitz,

4    or Mr. Tanaka, I mean just --

5              MR. JACOBSON:  May I say one thing?

6              JUDGE SWAIN:  Yes.

7              MR. JACOBSON:  With all of the talk about whether the

8    forfeiture order would be reversed later on and these assets

9    would either revert, or not revert, it's the SEC's position,

10   obviously --

11             DEFENDANT TANAKA:  I am having difficulty hearing.

12             JUDGE SWAIN:  Move the microphone over.

13             MR. JACOBSON:  As stated, many of the investors --

14             JUDGE SWAIN:  Mr. Jacobson speaking.

15             MR. JACOBSON:  Right.

16             Many of the investors are in the SEC case.  Our case

17   was stayed up until about a year ago.  We have been trying to

18   resolve our case with the defendants and, hopefully, resolve

19   all of the money issues as well before we move forward with

20   either summary judgment or other disposition of the case.  But

21   it's certainly the SEC's intention, in the event that a

22   forfeiture order is reversed and these assets become free, so

23   to speak, that be would be seeking relief in the district court

24   in the civil action, again, to restrain the assets, freeze the

25   assets, if necessary seek the appointment of a receiver to be

121avilc

1    able to then distribute those assets in the civil action.

2              So, in our view, under any circumstance, the moneys

3    that are in the accounts, investor accounts, should be going

4    back to those investors, regardless of the ultimate outcome of

5    whether the forfeiture order itself is vacated or reversed or

6    reduced.

7              JUDGE SWAIN:  Thank you.

8              JUDGE SULLIVAN:  All right.

9              Ms. Shevitz, that was my understanding that there

10   really was a consensus, at least at the time of sentencing,

11   that the investors were entitled to get their money back and

12   certainly the defendants were suggesting that the investors had

13   been sort of put in a bad spot because of the freeze happening

14   when it did.

15             MS. SHEVITZ:  Absolutely.

16             JUDGE SULLIVAN:  So it seemed like there was real

17   consensus that we would identify investors, investors would get

18   their money back, and if there was some little bit left over,

19   then that might be what was the fight.

20             MS. SHEVITZ:  I can tell you the problem.  First of

21   all, Mr. Vilar was not at Mr. Tanaka's sentence.  So whatever

22   you did at sentencing for Mr. Tanaka, Mr. Vilar was not there.

23             JUDGE SULLIVAN:  No, what I just read before.

24             MS. SHEVITZ:  Yes.

25             JUDGE SULLIVAN:  Mr. Vilar was there.  Because that

121avilc

1    was before Mr. Vis sentencing.  So what I just read was a quote

2    from Mr. Colton, and that's at page 7 of the sentencing

3    transcript.

4              MS. SHEVITZ:  Well that's my point.

5              JUDGE SULLIVAN:  And after that, we sentenced

6    Mr. Vilar.

7              But in any event, my point is not that somebody is

8    bound by something that was said there.  It seemed there was a

9    consensus that investors had to get their money back, they had

10   been waiting a long time.  And everyone, defendants and

11   government, agreed that that should happen and should happen

12   quickly.

13             MS. SHEVITZ:  Yes.  We would like the investors paid

14   what they are due.  We would like all of the claimants paid

15   what they are due.  However, we are not willing to give up

16   total control of all the assets and all the, quote, substitute

17   assets, so that the marshal service and the government can

18   start playing with it, now, that they didn't do it for the last

19   6 years.

20             JUDGE SULLIVAN:  Can I ask you to define what you mean

21   by "total control?"

22             MS. SHEVITZ:  Total control means that what Ms. Levin

23   wants to do is have a final order of forfeiture of

24   $54 million --

25             JUDGE SULLIVAN:  Right.

121avilc

1      MS. SHEVITZ:  Now, your Honor, if you recall, agreed,

2  that --

3      JUDGE SULLIVAN:  No, I get all that.  I'm just asking,

4  what she is proposing is that, short of an order of forfeiture,

5  that you folks agree and do not consent.

6      MS. SHEVITZ:  On consent -- we would consent if we

7  knew the universe of people, if we knew what the claims were --

8  which we have not been given this information.  And, even today

9  they say, oh, well maybe there is 20 or 30 people.  That isn't

10  good enough.  Our clients are people and they still have

11  continuing liability to all of the people who they have dealt

12  with.  And they do want to make them whole.  But we're not

13  getting the information.  And what we have been getting is it's

14  none of your business.  And the fact is, it is our business.

15  Right now, Ms. Levin says, well, we'll ask Mr. Tanaka and

16  that's fine, but Mr. Vilar is there, too.  He has a say.

17      JUDGE SULLIVAN:  I think the point is that you are

18  representing Mr. Vilar for those purposes, it is not clear if

19  Mr. Tanaka is representing himself for those purposes or

20  whether he is being represented.

21      MS. SHEVITZ:  Well, regardless, we have both asked, we

22  have all asked for backup, for documents, for something.  We

23  don't have input.  These defendants have not seen books and

24  records since 2005 since they were kicked out of the business

25  and the business was shut down.  How do we know?  We can say,

121avilc

          1      yes.  That's what they want us to do, they want us to say yes.

          2      And right now --

          3                JUDGE SULLIVAN:  I don't know what you want.  So you

          4      are saying you want -- you want the names of the claimants they

          5      have identified --

          6                MS. SHEVITZ:  We want releases, too.

          7                JUDGE SULLIVAN:  -- you want to know what the claims

          8      are of those persons.

          9                MS. SHEVITZ:  Yes.  Of everybody.  And who they

         10      contacted, how they contacted them.  Because there are people

         11      who are -- my client just told me that somebody contacted,

         12      through somebody else contacted them, and has a claim, and

         13      wanted to know who to talk to.  Now, that person isn't

         14      contacted.  So we don't have books and records.  According to

         15      the government, we can't do anything, because we're barred from

         16      acting as anything.  We can't anyway.  And they don't want to

         17      give us any information.  And they don't want to tell us the

         18      universe of people.  And, today, six years after they shut the

         19      business down, they say maybe 20 or 30 others.  That is not

         20      good enough.

         21                JUDGE SWAIN:  Well, Ms. Levin just agreed, earlier,

         22      that the government would provide you, Mr. Vilar's counsel, and

         23      also Mr. Tanaka, with their list of the universe of known

         24      claimants.

         25                And will you include in that list, also, the last

121avilc

1    account balance that you are proposing to work off -- and this

2    is a question I'm a asking Ms. Levin -- and the date to which

3    that last account balance is attributed?

4            MS. LEVIN:  Your Honor, we don't have that

5    information.  Let me explain.  There may be a misunderstanding

6    about what this petition for omission or mitigation process is.

7            This is a process the Department of Justice employs

8    when assets are forfeited.  And they're being used as

9    compensation to victims of crime.  And the way that the

10   procedure works is that the victim -- and we consider the other

11   Amerindo investors victims by virtue of the SEC action -- file

12   a petition setting forth their loss, how they're a victim and

13   they provide documentation as to what that loss is.  And then

14   the Department of Justice reviews it and accepts it or doesn't

15   accept it.  We do not have, right now -- we have not been

16   running -- certainly, the U.S. Attorney's Office and SEC can

17   speak for the SEC.  But there hasn't been a receiver appointed.

18   And we have not stepped in and been running the investment

19   advisory business.  We don't have the last statements for the

20   account holders.  Rather, we have a list of names and

21   addresses.  And under the petition for mitigation process,

22   those people were given notice, and they will have an

23   opportunity to submit the petition and provide their

24   documentation.  That information will be reviewed.  My office

25   will make a recommendation.  And the investigating agency will

121avilc

 1    make a recommendation.  And then the Department of Justice will

 2    decide.

 3          The individual claimant, or petitioner, or victim,

 4    does not have to trace their, you know, their property into any

 5    particular account.  They just need to show that they suffered

 6    a loss here.

 7          So the universe of claims we won't know until

 8    everybody submits a petition.  And that will be submitted to my

 9    office.  We typically -- in fact, I can never recall a

10    circumstance where defendants have been involved in that

11    process.  The defendants' interest in this property was

12    forfeited from them by virtue of the substitute asset order.

13    They have no legal right, title, or interest in the property.

14    And what Ms. Shevitz is complaining about is the entry -- the

15    final order of forfeiture we're seeking here is not for

16    $54 million.  The Court has already entered that order and that

17    order is on appeal.  The order is a final order of forfeiture

18    as to the specific assets listed in what was in the substitute

19    asset order, so that the United States can have title to that

20    property so it can control it and it can liquidate that

21    property.

22          So, you know, that is how we would go about executing

23    it.  But in terms of will the Department of Justice agree that

24    defendants, during the process we should provide all of the

25    claim petitions for them for them to agree or to disagree to

121avilc

the amount of the losses of their victims, I can't recall a

circumstance where that has ever been done -- of course, I can

check with them.  But that's not how the procedure typically

works.  This is not a bankruptcy proceeding.  This is one where

people who have suffered a loss can come in for relief from the

government out of forfeited funds.

JUDGE SULLIVAN:  But you said a moment ago you are not

going to pay out on that until after the appeal issues, right?

MS. LEVIN:  Yes, your Honor.

JUDGE SULLIVAN:  So the issue here is what we can get

done before the appeal is resolved.  None of us know when that

is going to be.  And you have hit upon the fact that you need

the consent or waiver from the defendants, right.  And the

defendants are saying we're willing to do that, maybe, if we

get certain other information that allows us to know that we're

not giving away or waiving something that might be significant.

What is the downside to doing it this way?  It's informal.

It's not a requirement.  It's an arrangement in order to get

people, who are hurting and who have been waiting, something

now when they might be able to use it actually.

MS. LEVIN:  Okay, your Honor, first of all, it's

twofold; there is two procedures here.

We can begin the process and we can -- DOJ can

liquidate the assets and they can start ruling on the petitions

without the consent of the defendants.  What needs to happen is

121avilc

1    the entry of the final order of forfeiture for the substitute

2    assets.  That has not been entered yet.

3          JUDGE SWAIN:  All right, but that just got proposed in

4    December, right?

5          MS. LEVIN:  Yes, we refrained from doing it because we

6    believed we can enter into, because there is an objection,

7    there was an objection in July filed to the order of forfeiture

8    when I advised counsel that I intended to get it.  And we have

9    been trying to work it out since then.  But it was just

10   submitted in December, the application for the final order of

11   forfeiture.  But that's one.  The DOJ, once we have the final

12   order of forfeiture, we can begin the petition process, sending

13   out notice, notifying third parties, and they can submit their

14   claims.

15         What we need the consent of the defendant for is to

16   agree to release the money the claimants, to agree that the

17   money be returned from them.  I find it -- I would have to

18   check with the Department of Justice, the Attorney General has

19   absolute discretion over the remission of forfeited funds.  So

20   I cannot imagine that as a policy matter the Department of

21   Justice is going to agree to work in conjunction with the

22   defendant reviewing them, particularly because our concern is

23   that defendants are going to submit objections to certain

24   claimants -- you know, certain petitioner's claims.  For

25   example, victims that testified against them at trial.  They

1   have an interest in -- you know or the victims that are listed

2   in the restitution order.  And this is not a Court proceeding.

3   This is not going to be resolved by the Court.  This is within

4   the Department of Justice at the discretion of the Attorney

5   General.  So we're essentially turning this into some kind of

6   adversarial claims proceeding where the defendants that have

7   been convicted of the crime and ordered to forfeit the funds

8   are having a role in deciding which of their victims get how

9   much money.

10          JUDGE SULLIVAN:  I think it seems to be an attempt to

11  get passed an adversarial process to allow for parties to reach

12  some agreement so that people can get paid sooner, rather than

13  later.

14          MS. SHEVITZ:  Yes.

15          JUDGE SULLIVAN:  Because I think what you have said is

16  that, unless there is agreement by then, you're not going to

17  pay out until you get affirmed on appeal.  Right?

18          MS. LEVIN:  Yes, your Honor.

19          JUDGE SULLIVAN:  Yes.  So the people who are waiting

20  for their money, are not going to get a nickel until after the

21  Court of Appeals decides, at the earliest.

22          MS. LEVIN:  I understand, your Honor.  And the only

23  thing I can suggest is, perhaps, an alternative proposal.  I do

24  not imagine that the Department of Justice is going to agree to

25  let defendants who have been convicted of the underlying

121avilc

offense to have a role in deciding which claims are going to be

paid.  The only thing I can suggest, otherwise, is that the

Court appoint a receiver, perhaps in the SEC action, and that

the defendants agree to allow the receiver to distribute the

money and maybe under that process the receiver has a say and I

mean the defendants can have a role in that process.  Because I

think, as a policy matter, the Department of Justice is not

going to agree to it.  I can talk to them and discuss it, but

it's their procedure, it's not the U.S. Attorney's office.

          JUDGE SULLIVAN:  I understand that.  But you're the

one who is saying you want a waiver from the defendants.  And

they are simply saying, before they sign a waiver, they want to

have a better understanding as to what exactly it is that you

intend to do.  It doesn't seem crazy.

          MS. LEVIN:  We told them exactly what we intend to do.

What we intend to do is we intend to accept the petition, send

notices to everybody that was an Amerindo investor, and to

aggressively seek out the name of anybody else that the SEC

doesn't have on their list and that while every Amerindo

investor is entitled to recover the balance on their last

statement, I believe the date was April of 2005.  Whatever the

April 2005 statement balance is, that's what they're entitled

to.

          JUDGE SWAIN:  And you're looking to the investors to

come forward with that statement balance, rather than saying

121avilc

```
 1   you have books and records that at this point reflect that
 2   statement balance?
 3              MS. LEVIN:  Yes, your Honor.
 4              The SEC may be able to --
 5              JUDGE SWAIN:  Mr. Salzberg.  And, then, after that,
 6   we'll hear from Ms. Eiger.
 7              JUDGE SULLIVAN:  But I had winked at Ms. Shevitz,
 8   because she was jumping up before.
 9              JUDGE SWAIN:  Ms.  Eiger also wanted to speak.
10              MS. LEVIN:  Your Honor, I'm a little bit baffled by,
11   we sort of don't understand what the point is of why the
12   defendant needs this information.  I understand if we're going
13   to give broad parameters as to what we're doing, last
14   statement, every Amerindo investor is included, why the
15   specific amount that is being paid to the Mayer family, versus
16   Robin Sayko, what difference does that make to the investors,
17   as long as we're stipulating that every Amerindo investor is
18   entitled to their balance as of April 2005.
19              JUDGE SULLIVAN:  They just want to make sure that you
20   have got it right.  I don't know --
21              MS. LEVIN:  We would --
22              JUDGE SULLIVAN:  Ms. Shevitz can speak for herself.
23   Mr. Tanaka can, too.
24              MS. LEVIN:  Yeah, the point is that that assumes they
25   have a right to contest that amount.
```

121avilc

1          JUDGE SULLIVAN:  No.  No, but you made their waiver a

2    condition on the early payment.  If that's the condition that

3    you have set, they don't have to waive.  And if they have set

4    some other conditions that they want met before they're going

5    to waive, seems to me that's a negotiation, it's not about an

6    adversarial process.

7          JUDGE SWAIN:  It also seems to me that this is a

8    somewhat -- I hope this is an unusual instance in which,

9    through a forfeiture process, the government is seeking to take

10   complete title to moneys that everybody agrees at some level

11   belongs to investors, rather than to the defendants.  And

12   because of the prior investment and fiduciary relationship, as

13   Ms. Shevitz says there is, in addition to whatever restitution

14   liability there may be in a criminal case, there is exposure of

15   these defendants to follow on litigation to the extent the

16   distribution of these funds is not consistent with the

17   investor's position as to real ownership of or entitlement to

18   the funds.  So I think it seems to me that the way you pursued

19   the forfeiture, you have walked into a situation that has wider

20   implications then you might have if you know truly only sought

21   the forfeiture of these defendants' specific personal right,

22   title, and interest in whatever doesn't belong to investors.

23   But that's where we are today.  And I think the effort needs to

24   be to make sure that there is a, you know, fair, rationale,

25   documentable, and rapid -- insofar as we can do -- distribution

1   of the money that everybody agrees doesn't belong to

2   Messrs. Vilar and Tanaka.  And as Judge Sullivan says, the

3   questions that are being asked here don't seem on their face

4   irrational, given the type of situation that we're in and what

5   you're proposing to do is negotiate an interim measure, and

6   negotiations kind of go two ways.

7         MS. LEVIN:  Your Honor, I just want to add one

8   comment, which is that -- or one clarification is, it is that

9   the condition that we're imposing is not our condition, it is

10  otherwise if the defendants do not agree, then in the event

11  that the forfeiture is overturned on appeal, the United States

12  government will be required to return that money to the

13  defendants.  And the United States government is not gonna be

14  in a position where it's going to be, if money has been

15  distributed to third parties, it is not going to be able to

16  return the money to the defendants.  So that's the reason

17  why --

18        JUDGE SULLIVAN:  No, I don't think it is saying that's

19  a silly reason, I think we are saying if everybody shares the

20  same goal, which is to get the folks who invested their money

21  back, and quickly, it doesn't seem to be an insurmountable

22  task, it doesn't, to me.  So, I guess I'm not sure why we can't

23  sort of work this out, and move towards that goal.

24        MS. LEVIN:  Then I propose what I have mentioned,

25  which is my alternative, which is that the Court appoint a

1   receiver and that the receiver go through that process.

2   Because I don't think that under the regulatory requirements of

3   the petition for omission or mitigation process, that the

4   Department of Justice is going to agree to this.  Of course I

5   can go back and ask them.  But I think there is gonna be a huge

6   obstacle to that, and I just want to raise the alternative that

7   the government agrees to vacate the substitute asset order, and

8   that the Court appoint a receiver and a notification to third

9   parties, to the victims, and then liquidation of assets is done

10  by a third party.  We do not want to, in any way, block the

11  victims and investors immediate access to their funds.  And to

12  the extent that the forfeiture order is getting in between

13  that, we want to do what we can.  But I don't think that under

14  the regulatory scheme for petitions for omission or mitigation,

15  this type of -- the proposal that I have recommended where it's

16  the Department of Justice has absolute authority is one that I

17  think they can do under the stipulated conditions.  But I don't

18  believe that it's going to one where they can do so in

19  consultation with defendant.  So just I want to raise the

20  alternative.

21        JUDGE SULLIVAN:  All right.  Ms. Shevitz, you wanted

22  to jump in a while ago.

23        MS. SHEVITZ:  I don't know much about the crossover

24  investment exactly that they did, but I'm told that this

25  firm -- and I'm told by some of the people in the well, too,

121avilc

1   that this firm had some very tricky kind of investment

2   crossover -- I don't know what it's called here.  But, in any

3   event, the private securities which seem to be dismissed as

4   not -- as irrelevant, are really relevant to the total pot, for

5   one.  And we agree that there should be somebody competent to

6   evaluate the privates and figure out what there is for

7   distribution.

8          I am told that that -- and I don't trust the marshals

9   office to do that, frankly.  And I don't know if anybody in

10  this room would.  But there is a firm, a specialist firm called

11  Mooreland partners, who undertook a similar assignment for

12  Amerindo UK trust in 2005.  There are other people who do that.

13  Nobody has wanted to consider this, because Mrs. Levin is stuck

14  on having a liquidation and a remission process.

15         Now, if there should be no forfeiture, there should be

16  no remission process.  We object to the remission process, as

17  well, on behalf of everybody because, A, we would like to know

18  our own liabilities here.  And, B, why should the Department of

19  Justice have discretion to decide who to pay valid claims.

20         The problem is, we are willing --

21         You look confused.

22         JUDGE SULLIVAN:  Well, I mean I think why should the

23  Department of Justice get to do this, they get to do this

24  because there is a forfeiture order.  I think the issue is what

25  can we do quickly.

121avilc

1          MS. SHEVITZ:  Right.  And what we could do quickly,

2     because I read the transcript of the last SEC appearance which

3     was sent yesterday by attachment.  And I see that they are

4     willing to move to withdraw the substitute forfeiture --

5     substitute asset forfeiture order and, then, nobody would have

6     to have go through this remission process.  And, then, as the

7     Court did with paying the amount to the Mayers back in 2008,

8     seven, I don't know when it was; 2008 or 2009.  We could agree

9     to make some payments and it wouldn't have to have this

10    remission process.

11         Now, I, on behalf of the investors I would want to

12    argue for them that why should they have to go through a

13    remission process and invoke the Department of Justice's

14    discretion when, really, it's their money, to a large extent.

15    And we're trying to figure out what it is.  We're on their

16    side, to an extent.  But we don't want to be on their side and

17    just have everything disappear.

18         Another problem with the substitute asset forfeiture

19    order, as your Honor said when you said that there was a

20    forfeiture that was $36 million too high, that you would remedy

21    that in the substitute asset forfeiture order, which you did

22    not, with all due respect.

23         JUDGE SULLIVAN:  Well, they --

24         MS. SHEVITZ:  In any event, there should only be a

25    substitute asset forfeiture order to the extent of $17 million.

121avilc

1          JUDGE SULLIVAN:  But they're proposing all of this,

2     now, as part of an agreement, right?

3          MS. SHEVITZ:  No, they are proposing --

4          JUDGE SULLIVAN:  Isn't that what you said, Ms. Levin?

5          MS. SHEVITZ:  No, they're proposing to take

6     everything, start the marshals liquidating it, which includes

7     the privates, or else they are going to forget the privates,

8     which they really shouldn't forget the privates, because people

9     here tell me that the privates are worth a lot of money.  And

10    probably because the funds were not managed, and the privates

11    were not managed, they are sitting in a drawer.  And somebody

12    didn't followup on warrants -- is that the words?

13         A VOICE:  That's the word.

14         MS. SHEVITZ:  Warrants that may have come due, or come

15    up?

16         A VOICE:  Expired.

17         MS. SHEVITZ:  Expired.

18         JUDGE SULLIVAN:  But Ms. Levin's point is that I

19    should sign the order, they have agreed they are going to start

20    distributing up to 17 million, and the rest will wait until the

21    Court of Appeals decides.

22         MS. SHEVITZ:  No, the rest will be in the marshals'

23    hands.

24         JUDGE SULLIVAN:  But if the Court of Appeals goes your

25    way on this, then the marshals hands give it back, right?

121avilc

1          MS. SHEVITZ:  Well, I don't know about that, but the

2     point is --

3          JUDGE SULLIVAN:  Why don't you know about that?

4     That's what you said, right, Ms. Levin?

5          MS. SHEVITZ:  Because they want it all.

6          MS. LEVIN:  Yes, your Honor.

7          JUDGE SULLIVAN:  No, she has just said --

8          MS. SHEVITZ:  But the SEC then says if they get it all

9     back, then they're gonna take it.  I don't know under what

10    theory, because if everybody is paid, everybody is paid.  They

11    want to extract blood, you know, if you don't agree, then we're

12    gonna to go for super duper penalties and get more out of you.

13    So we have an interest in retaining a little bit of control of

14    how things are distributed, how things are evaluated.  How

15    things are evaluated, especially the privates and distributed.

16    In all of this, we're willing to release money directly to the

17    investors without this remission process.

18         JUDGE SWAIN:  Well, let me come back in here and

19    perhaps I have misheard something.  But I'm going to first

20    start with -- I mean explain the structure of what I thought I

21    heard as two kind of different stages of proposal and ask

22    Ms. Levin if I have misheard her.  And to the extent I haven't,

23    I am going to ask Ms. Shevitz and Mr. Tanaka to respond to the

24    two levels.

25         What I thought I was hearing was that while the

 1    government's ultimate goal is to get the final order of

 2    forfeiture signed and go through the remission process, of

 3    which the Department of Justice and marshal service would have

 4    total control and which would require the liquidation of the

 5    private investments as an interim measure and in advance of the

 6    final signing of the final order of forfeiture, the government

 7    would be willing to have a pro rata distribution to all known

 8    and discoverable investors of $17 million, which I am hoping

 9    you will tell me could be able to be covered by assets that are

10    liquid now, and wouldn't require liquidation of the private

11    investments, and that interim distribution would be conditioned

12    on the defendant's agreement that essentially at least

13    $17 million of this, for sure, belongs to the investors.  And

14    so, whatever happens with the final order of forfeiture

15    process, the defendants would not seek to get the 17 million

16    back from the government, would not say that 17 million didn't

17    really belong to investors and was improperly distributed.  And

18    in aid of that, the government would provide to defense counsel

19    and to Mr. Tanaka the names of the people it believes with the

20    SEC are in the universe of investors entitled to share in that,

21    would vet that list with the defendants.  And, then, what I

22    think I'm also hearing, is also committed to doing, once the

23    people have responded, would cap the claims of the investors

24    for this distribution purpose at the amount of the last 2005

25    Amerindo statement, and would share out that $17 million on

121avilc

| | |
|---|---|
| 1 | that basis.  And that would not require the Court to make a |
| 2 | final decision on the proposed final order of forfeiture and |
| 3 | would not require resolution of those issues, is that correct, |
| 4 | Ms. Levin? |
| 5 | MS. LEVIN:  Almost.  Just a little -- there is one |
| 6 | issue that we disagree with.  Which is that in order for the |
| 7 | assets to be liquidated for the marshals to take control of |
| 8 | them and the Department of Justice to go through the petition |
| 9 | process, there needs to be a final order of forfeiture.  But |
| 10 | that final order of forfeiture has no consequence to the |
| 11 | defendants.  The order that they're objecting to is the |
| 12 | 54 million-dollar order that is already final and it's already |
| 13 | on appeal and it's going to heard by the Second Circuit. |
| 14 | Nothing that we're doing here today is gonna change that.  They |
| 15 | have the same arguments they are making.  This is just -- the |
| 16 | only issue here is, the substitute asset order forfeited the |
| 17 | defendant's interest in those accounts listed there.  No third |
| 18 | parties have filed claims or petitions for those accounts.  And |
| 19 | what's left is for the United States to take title to that |
| 20 | property.  In order for the money to be distributed or for DOJ |
| 21 | to go through the remission process, at least for the |
| 22 | $17 million, there needs to be a final order of forfeiture for |
| 23 | that amount. |
| 24 | JUDGE SWAIN:  So there is no way that we can put off |
| 25 | to another day the issues with the final order of forfeiture |

121avilc

1    and have an agreement to distribute the 17 million on the basis

2    that I described, with everybody reserving their rights as to

3    everything north of, and around, the 17 million so that we can

4    get the 17 million out with no commitment to try for clawback

5    against the government?

6            MS. LEVIN:  Well, there is two -- I mean there is sort

7    of two -- there is sort of two ways that can happen.

8            One, that 17 million -- that issue, the 17 million

9    versus 54 million, that issue is already presented to the

10   Circuit.  Nothing in the final order of forfeiture, whether it

11   is entered or not entered, nothing is gonna change that.  If

12   the Court enters a final order of forfeiture, the defendant

13   stands in the same position.

14           JUDGE SWAIN:  I understand that that is your position

15   and I also -- you know, I have got two defense counsel now

16   jumping up to argue with you about that.  And so what I'm

17   asking is, is there a way to avoid having that debate, and just

18   dealing with the $17 million in a way that is sufficiently

19   protective of the government's exposure to any potential

20   claimback and is also sufficiently protective of the investors'

21   rights and the process that is transparent as to the

22   17 million.

23           MS. LEVIN:  There is two possible ways I can see doing

24   that.

25           One, is to just have a final order of forfeiture for

121avilc

1    $17 million worth of cash.  The Court just enters a partial

2    final order of forfeiture for $17 million from one of the

3    various different accounts, and that is the money that is

4    subject to liquidation -- or it's already liquidated, it is in

5    cash anyway in the bank account.  And then the other money, the

6    other, you know, placements, whatever, remain in limbo.

7            The other alternative is, which the government would

8    be agreeable to either one is, to the extent that Ms. Shevitz

9    has concerns that the marshal service is not responsible and is

10   not going to be able to -- that they're untrustworthy, or the

11   Department of Justice, we strenuously disagree.  But we could

12   agree that we'll have a third party appointed to manage the

13   assets.  However, the costs of managing those assets are going

14   to have to come out of those assets themselves.  But the

15   government, for the purposes of -- if that's the issue, in

16   terms of the private placements, we could ask the Court to

17   appoint a third party to, you know, take over the management of

18   those assets if that's going to be the obstacle to, you know,

19   to this agreement.

20           I guess a third alternative, which is that

21   $17 million, we just agree to vacate the substitute asset order

22   for those, and those accounts are done outside the petition for

23   omission process, and a third party is appointed to do that.

24           Those are my three alternatives.

25           JUDGE SWAIN:  Okay.

121avilc

1          JUDGE SULLIVAN:  I don't remember who was up between

2     you first.

3          JUDGE SWAIN:  Ms. Eiger.

4          Mr. Friedman defers to Ms. Eiger.

5          MS. EIGER:  I think there is a fundamental issue that

6     we haven't addressed.  And I think that we need to address it.

7     And it explains why we need to know who the universe of

8     investors are, what their claims are, and what the size of the

9     pot is.  And the reason is that a distribution based upon the

10    last statement balance is fair to all investors, only if the

11    pot is sufficient to cover all claims.  Otherwise, it favors,

12    even if the pro rata distribution is made, it favors the

13    investors like the trial victim investors who have received

14    moneys back over time, over investors who may have invested

15    more recently and not received any moneys back.  And the

16    government, Ms. Levin, originally when we began talking about

17    resolving this, recognized that one way to do it would be to

18    determine what initial investments were, what investors got

19    back, and to make some kind of equitable distribution in

20    recognition of those factors.  And then she determined, well,

21    it was just too hard to do that.  And the government then

22    adopted, or then proposed, or pushed, or wants to use this last

23    statement balance.  But it creates a problem if the pot is not

24    big enough to satisfy all investor claims.  And since we don't

25    have a list of the investors, we don't have an idea, a firm

121avilc

```
 1    idea of their claims, and we don't have an idea how big the pot
 2    is, the proposal, I think that we're at an impasse here.  And
 3    that's, so far as Mr. Tanaka is concerned, Ms. Shevitz
 4    obviously has other issues, but that's the crux of our problem.
 5         JUDGE SULLIVAN:  So you're not going to sign a waiver,
 6    is what you mean without --
 7         MS. EIGER:  I don't think that we can reach an
 8    agreement without addressing that fundamental problem.
 9         MS. SHEVITZ:  Yes.  How much is there.  How much is in
10    the privates, too.  And who are all of the claimants.  If they
11    have not done it for now, but they have -- somebody has to do
12    that.
13         Now, in the interim, I guess the only way the
14    government would agree to do this, is if your Honor vacates the
15    substitute asset forfeiture order.  Because that would not --
16    that would I guess get rid of their need to do this, whatever
17    it is they do in Washington.
18         JUDGE SWAIN:  The remission proceeding.
19         MS. SHEVITZ:  The remission proceeding.
20         But so I guess the trigger for that was the substitute
21    asset forfeiture order, I don't know.  I don't know why it
22    seems form over substance.  But we are willing to do some
23    interim distributions, but we can't agree to waive things
24    without knowing what the facts are.
25         JUDGE SULLIVAN:  But the interim distributions, if we
```

121avilc

1    went that route, would still require consent essentially,

2    right?

3         MS. SHEVITZ:  We would consent -- I mean this started

4    with Mr. Begos' clients, the Mayers.  And they needed some

5    money.  And, okay, this happened before, and everybody agreed

6    to release some and they got some money.  And we would agree to

7    do that again and it would be a credit.

8         JUDGE SULLIVAN:  But presumably only if you had full

9    information that allowed you to know what --

10        MS. SHEVITZ:  Well, I think that we probably could

11   agree to some distribution now, of some small amount that would

12   help to tide them over, if that's what they need, while all of

13   this is going on.

14        JUDGE SWAIN:  As I hear it, the waiver that is being

15   requested is an agreement not to make a claim back against the

16   government as to whatever the amount is that's distributed,

17   claiming that the government shouldn't have given that money to

18   investors, or any particular investors, that whatever the

19   agreed interim distribution pool is, is gone, and has been

20   distributed to investors, would you be --

21        MS. SHEVITZ:  Yes, that's what happened before.

22        JUDGE SWAIN:  And you would be willing to do that.

23        MS. SHEVITZ:  If we know what the pot is.  If we know

24   what the claims are.  And if we know that -- yes.  Outside of

25   forfeiture, yes.  If it's outside of forfeiture, yes.

121avilc

1          JUDGE SWAIN:  If $17 million or $10 million, or

2     whatever the number is, is taken out of the forfeiture process

3     and distributed pro rata to claims that are submitted with a

4     cap of the amount of the last statement -- and I say that

5     specifically because of the point Ms. Eiger raised, would

6     defendants be willing to say that amount of money legitimately

7     went back to people who were owners.

8          MS. SHEVITZ:  I don't know about the last statement.

9     And I would have to talk to my client.  And Mr. Tanaka is on

10    the phone, but I don't think he should make an immediate

11    decision, either, you know.  But I think that the answer would

12    be, yes, we want to see people paid, but we want to do it in an

13    orderly way, and in a way in which we have some input because

14    we have continuing liability.  Not only here, but in life.

15         JUDGE SWAIN:  But if we can get a basis for a proposed

16    structure for further discussion and refinement and a deadline

17    by which you have to get back to Judge Sullivan and me, I don't

18    think that either Judge Sullivan or I would insist that

19    everybody sign something on a dotted line today, but we want to

20    see a time frame that everybody could understand and discussion

21    set.

22         MR. FRIEDMAN:  As I mentioned before, although I am

23    sitting at the table otherwise populated by defense counsel, I

24    do not represent any of the defendants, I represent the

25    investors in ATGF, Amerindo Technology Growth Fund.  Two of

121avilc

 1    those investors are in court today, Mr. Marcus and Mr.

 2    Heitkoenig, I also represent Dr. Salvitti.  And, together, my

 3    clients are the largest single group of investors in ATGF.  And

 4    I believe they hold well over 90 percent of the total ATGF

 5    shares.

 6          So while there may be 20 to 30 investors, most of the

 7    financial interest is my client's.  And I feel, and I'm sure my

 8    client would echo this, I'm sitting here listening to this, and

 9    we are caught in a cross fire.  Everybody in this room agrees,

10    including your Honors, that the goal of the exercise is to get

11    the money back to the investors as rapidly as possible.  And,

12    indeed, I sense that Judge Sullivan is concerned that very

13    little has happened since sentencing, leaving the investors

14    without any money.  And some clients, like Mr. Begos' has had

15    severe financial need.  Mr. Heitkoenig has relatives that have

16    that similar financial need.  And yet all we here is carping

17    back and forth between the government and defendants, and

18    nothing is ever gonna happen.  So I have an alternative

19    suggestion.  It somewhat mirrors what Ms. Levin said, but I

20    must say that I came up with this idea before hearing

21    Ms. Levin.

22          JUDGE SULLIVAN:  Do you have proof of that?

23          MR. FRIEDMAN:  I have contemporaneous notes.

24          What I think makes the most sense is for your Honors

25    to appoint a magistrate judge to supervise the distribution of

121avilc

1   this money.  And I do not see why any consent by defendants is

2   relevant, because everybody agrees that this is not their

3   money, that they held this money in trust.

4        In my letter to your Honors dated November 22nd, I

5   quote from the appellate briefs of Mr. Vilar and Mr. Tanaka in

6   which they acknowledged that they held this money in a

7   fiduciary capacity.  If their convictions are reversed, I don't

8   think that gives them any claim to money that was never theirs

9   in the first place.  I respectfully submit that the substitute

10  forfeiture order did not give them any claim to assets that

11  were never there in the first place.  All that could be

12  forfeited is whatever interest they had.  And they had no

13  interest in the ATGF funds, the ATGF 2 funds, or the JP Morgan

14  Chase bank accounts that held assets of those entities.  They

15  are not investors, they don't claim to be investors in the

16  funds.

17       If your Honors wanted to put that question to Ms.

18  Shevitz and Mr. Tanaka, right now, I assume they would confirm

19  what I am saying, because they already confirmed it in their

20  letters and in their motion papers.  So the way to break this

21  logjam and get the money to the investors and dispense with the

22  DOJ procedure and the fighting about consent, is to appoint a

23  magistrate judge, assign to that magistrate judge the task of

24  marshaling the assets and distributing the assets.  And most

25  respectfully, Judge Swain, I don't think there is any basis for

121avilc

1    that to be limited to $17 million.  That should be all assets

2    belonging to ATGF, ATGF 2 and GFRDA, which are the three, I'll

3    call them, for shorthand, investor vehicles, in which the

4    criminal defendants, Mr. Vilar and Mr. Tanaka, have admitted

5    that they have no interest, and all they had was title in a

6    fiduciary capacity.  I don't see why we are spending all of our

7    time and your Honors' time talking about whether they will or

8    will not give consent to the distribution of assets they never

9    owned in the first place.

10          JUDGE SULLIVAN:  I think the problem -- Ms. Levin can

11   speak for herself.  The problem is the government is not going

12   to distribute this until they have a final judgment from the

13   Court of Appeals.  Right?

14          MS. LEVIN:  Yes, your Honor.  But we are -- I mean I

15   don't -- some of the mechanics of Mr. Friedman's recommendation

16   I can't agree to.  One, I don't think a magistrate judge

17   necessarily has the authority to, like, liquidate assets and to

18   do -- obviously, they can decide on the various different

19   claims.

20          JUDGE SULLIVAN:  Not unless he's brokering a consent

21   or waiver among the parties, right?

22          MS. LEVIN:  But Mr. Friedman is actually right.  The

23   defendants don't have an interest.  These are not their assets.

24   They --

25          JUDGE SULLIVAN:  Well, that's your argument.  Your

121avilc

1    argument is I should sign the proposed order and then you can

2    do what you are doing, but you're not going to pay a nickel out

3    until you hear from the Court of appeals, right?

4              MS. LEVIN:  Yes --

5              JUDGE SULLIVAN:  Right?

6              MS. LEVIN:  Yes.

7              JUDGE SULLIVAN:  Yes.  So that's not making you happy,

8    right?

9              MR. FRIEDMAN:  No that's exactly what I object to.

10             MS. LEVIN:  It's not that I won't, I can't.

11             JUDGE SWAIN:  I'm not faulting you.  I'm just saying

12   that is the practical reality, as far as you are concerned.

13   That is a constraint on you.

14             If Mr. Friedman's goal, and Mr. Begos' goal is to get

15   their clients' money quickly, then there needs to be some sort

16   of broker process, it seems to me.

17             MS. LEVIN:  Your Honor, no matter what we recommend,

18   is that a receiver be appointed who can do all of what Mr.

19   Friedman is suggesting, and what I said at the beginning is my

20   alternative proposal --

21             JUDGE SULLIVAN:  Which is the withdrawal of the --

22             MS. LEVIN:  Substitute asset order.

23             To allow those who don't want to stand in the way of

24   the --

25             JUDGE SULLIVAN:  Because there is no other way to get

121avilc

1   this paid, absent a waiver or a consent of some kind from the

2   defendants, right?

3        MS. LEVIN:  Yes, absolutely.  This would be the only

4   other alternative.  And the government is willing to seek to

5   vacate the substitute asset order, and to allow the appointment

6   of a receiver, and the receiver could handle all of these

7   issues.

8        JUDGE SULLIVAN:  Just followup with that.  What does

9   that mean for the role of the defendants in that process?

10        MS. LEVIN:  I mean, I --

11        JUDGE SULLIVAN:  As far as you are concerned.

12        MS. LEVIN:  Probably be something that the SEC can

13   answer.  What typically happens in an SEC proceeding about what

14   the role is when a receiver is distributing assets.

15        MR. JACOBSON:  Typically, the procedure is similar --

16   not a remission process, but a receiver is appointed who has

17   authority over the assets, the receiver comes up with a plan of

18   distribution.  Here, limited number of investors, have to be

19   some type of claims process, which would be, again, similar

20   to -- maybe similar to remission process.  You have to come up

21   with a way to value each investor's claim.  We have heard from

22   defendants counsel that they may not agree exactly how to value

23   an investor's claim.  One says you could use the last

24   statement.  The other one says you have to look and see what

25   was paid out over time, what was invested in, and come up with

121avilc

         1    a net claim.  These are issues that come up a lot in SEC cases.

         2    And, typically, a receiver tries to look at whatever documents

         3    are available, claims that are available, and determine what is

         4    the most equitable way to distribute the assets.  They then

         5    seek Court approval of the plan of distribution.

         6         JUDGE SULLIVAN:  Right.  And that will entail,

         7    potentially at least, then, rounds of briefing from everyone as

         8    to why this is not the right way to go, right?

         9         MR. JACOBSON:  Well, someone has to make a decision.

        10         JUDGE SULLIVAN:  Not necessarily painless decision.

        11    It's going to more a fast decision process.  Is this receiver

        12    process going to be that much faster?

        13         MR. JACOBSON:  If people object to the way that the

        14    receiver determines how to distribute the money, then it won't

        15    be very fast, obviously.  Plus, we have to go through the

        16    process of getting someone appointed, figure out how to get the

        17    assets under the civil court's control, perhaps, and the

        18    release and everything else.  And we have to go back to the

        19    Commission to make sure we have authority to do that.  That

        20    could take some time, although it is not, wouldn't take a year.

        21         JUDGE SWAIN:  Do these specific funds that Mr.

        22    Friedman has been talking about, the growth technology, ATGF

        23    funds and other specific funds that he named, have the private

        24    illiquid investments in them, as well cash?

        25         MS. SHEVITZ:  Yes.

121avilc

1            MR. JACOBSON:  I don't know.

2            MR. FRIEDMAN:  They have basically three categories of

3       assets, as I understand it.  They have cash, significant

4       amounts of cash, including one particular account that has

5       $21 million in it on the basis of the letter that the

6       government wrote to the Court the other day.  They also have

7       publicly owned securities, publicly traded securities.  They

8       also have privately held securities.

9            Now if I can address the last issue for a moment.

10           There is a potential resource available to everybody

11      in this room that has not been mentioned yet, and that is a

12      person named David Ross.

13           Judge Sullivan may remember, David Ross was, as I

14      understand it, and I was not there, but he was originally

15      engaged by Mr. Tanaka.  And he valued -- he is forensic

16      accountant examiner type person.  He valued the assets in the

17      ATGF assets, using that as a catch-all broad phrase.  He valued

18      those assets as of September 30, 2009.  He came to the

19      conclusion that there was $43 million plus in assets.  He

20      stated those conclusions in three letters addressed to Judge

21      Sullivan that were sent in January.

22           In April of 2011, he confirmed, to me, his view that

23      the assets were valued at September 30, 2009 as $43 million.

24      He has recently stated the view, to me, indirectly through Mr.

25      Marcus, that the asset value, now, is about $50 million.

121avilc

1          David Ross has done a very meticulous tracing of what

2     privately held securities -- or what companies whose privately

3     held securities were owned by ATGF were involved in mergers and

4     other corporate transactions such that those privately held

5     securities were replaced by publicly traded securities.

6          Now, apparently, because nobody has been managing the

7     ATGF assets, no one has ever made a claim for those publicly

8     owned securities which are available to ATGF as the record

9     owner, and which could be sold tomorrow.

10          There is work that has to be done.  But what I am

11     suggesting is a lot of it has been done by Mr. Ross.  And

12     Mr. Ross is available, at a modest fee, to be retained by a

13     receiver, or the Court, or a magistrate judge.  And if I could

14     just -- sounding like a broken record -- go back to the

15     magistrate judge.  Does not the Courts, and I guess I mean

16     Judge Sullivan primarily in the criminal case have -- and maybe

17     I mean both of your Honors -- have an inherent equitable power

18     to do justice here to assign to a magistrate the task of

19     distributing these assets.  It would seem to me that's in the

20     inherent equitable powers of the Court.  And what I would

21     suggest is, again, the consent of the defendants does not

22     matter, because they do not have any interest in the assets.

23     Their legitimate interest is to make sure that what's being

24     distributed are assets of ATGF, and not their apartments or

25     pension plans or resources, some of the other subjects covered

121avilc

 1   by the forfeiture order.  But they do not have an interest in

 2   ATGF assets.  And by way of response to Judge Sullivan's

 3   question, I think that may make the distribution process an

 4   awful lot faster.  If there aren't going to be any objections

 5   from the defendants because they don't have standing because

 6   they don't have an ownership interest, I don't think it's a

 7   very complicated process.

 8              And in other words --

 9              JUDGE SULLIVAN:  I would be curious to hear from Ms.

10   Levin whether she thinks the Court has the inherent power to

11   just start dividing up assets and ordering payments. I think I

12   know what you're going to say, but --

13              MS. LEVIN:  The one way that the Court could do it is

14   under the -- what initially happened when we filed a substitute

15   asset order, was that we sent notice to, you know, published

16   notice.  And a few claimants, a few Amerindo investors filed

17   petitions.  They ultimately withdrew them to allow the money to

18   be distributed under the petition process.  But the Court could

19   invite all Amerindo investors to submit petitions.  And then

20   the Court, and the Court could appoint a magistrate judge, to

21   just divide up among the Amerindo investors how much they were

22   entitled to get out of the substitute assets.

23              Typically, they wouldn't have standing, because you

24   have to have an interest in a specific asset.  But in light of

25   what's going on here, the government isn't going to make that

121avilc

```
 1    objection.  And the government will allow, if the Court
 2    chooses, to have -- you know, won't object to it.  And, you
 3    know, a magistrate judge could decide the issue of what the
 4    amount of each investor is entitled to.
 5            The issue of -- I don't think that a magistrate judge
 6    has the authority to sort of step out of the courtroom and
 7    actually liquidate the assets or manage the assets.  I think
 8    that a third party is gonna need to come in and ultimately be
 9    that distribution agent to do that.  I don't think the Court
10    can open up a bank account, and liquidate the assets, put the
11    money in there.  That's typically what a receiver does.
12            JUDGE SWAIN:  Seems to me it would require a receiver
13    or special master, or be done to some devolution to the civil
14    side.
15            THE COURT:  Did you want to be heard?
16            MR. BEGOS:  I do think I have an answer to how this
17    can be done.  But before I get there, I do just want to say
18    everything that we have been talking about today involves
19    months.  It involves taking significant amounts of money,
20    figuring out who gets what, deciding who is going to make the
21    determination, everybody gets to weigh in, and money gets
22    distributed.  My clients don't have months.  They don't have
23    medical insurance.  They have medical problems that they have
24    not been able to deal with.
25            Dr. Mayer is literally dying, and they don't have
```

121avilc

1    money to bury him, if and when he does die.  Their house is in

2    foreclosure.  They can't afford to heat it.  My clients are

3    literally almost out on the street.  And they don't have

4    months.  And so the number one priority I have today is to try

5    to get a documented agreement, today, that they get money to

6    survive the months that all of this other process, however it

7    ends up looking, will take.  And I do have an issue if it

8    doesn't happen today, because I have spent the last 2 years

9    begging the defendants' lawyers to do something.

10            After the last SEC hearing before Judge Swain in

11   September, I wrote to defendants because they had told Judge

12   Swain, as they said here today, they don't object to money

13   being distributed, they don't object to some special

14   distribution to people like the Mayers who are in desperate

15   situation.  I wrote to them in September and asked them for

16   money, and didn't hear one word back from them, other than a

17   cursory, we'll talk to our clients and get back to you.

18            So I have a very -- the only time they agreed to give

19   money was when there was something in it for them.  Before the

20   sentencing, they agreed to give $150,000 to the Mayers.  I have

21   a real concern that if we walk out of here today without

22   something on the record saying, however it's documented, the

23   Mayers can get some money to survive for the next two, three,

24   six months, whatever it may be, we're not going to get it.

25            JUDGE SULLIVAN:  Well, you're not going to get it

121avilc

1    unless there is a waiver from the defendants that the

2    government is prepared to consider a green light and to start

3    distributing money, right.

4             MR. BEGOS:  They did agree -- what Ms. Shevitz said

5    was they were agreeable, at least on Mr. Vilar's behalf to

6    doing something like was done back in 2009 where $150,000 was

7    distributed to the Mayers.  I would like more, because

8    $150,000, it's a lot of money, but it's not gonna do a lot for

9    them in the situation that they're in right now.  But there was

10   a -- there was just a simple stipulation that was signed by the

11   parties, it was signed by your Honor, that resulted in the

12   direct wiring of money from Bear Stearns to the Mayers.

13            JUDGE SULLIVAN:  Right.  No, I remember that.  But

14   that if we do that, if I we withdraw the prior order, then it

15   requires basically consent, right, Ms. Levin, that's your --

16            MS. LEVIN:  No, your Honor, we don't --

17            JUDGE SULLIVAN:  No?

18            MS. LEVIN:  We would need the defendant's consent to

19   release that amount of money.

20            JUDGE SULLIVAN:  Right.

21            MS. LEVIN:  But the government will agree --

22            JUDGE SULLIVAN:  But still requires some consent.

23            MS. LEVIN:  Yes.

24            JUDGE SULLIVAN:  The issue is are the defendants

25   prepared to consent for the really small, relatively small

121avilc

1    amounts, designed to help alleviate drastic situations for

2    people.

3              MS. SHEVITZ:  We have said that repeatedly, yes.  And

4    Mr. Begos says to me, I didn't give him any money?  How could I

5    do anything with this?

6              MR. BEGOS:  I wrote an e-mail to Ms. Shevitz.  She

7    said she would speak to her client, never got back to me.

8              JUDGE SWAIN:  Let's not go back --

9              MS. SHEVITZ:  There is nothing I can do.

10             JUDGE SWAIN:  Let's not go back there, I want to

11   ask --

12             MS. SHEVITZ:  But, yes, we would agree to a

13   distribution --

14             MS. EIGER:  I would --

15             THE REPORTER:  Hold on, I didn't get that.

16             JUDGE SWAIN:  So just for the record, Ms. Shevitz

17   said, yes, we would agree to a distribution to tied them over.

18   Ms. Eiger said as would we.

19             MS. EIGER:  Yes.

20             JUDGE SWAIN:  Mr. Begos, what are you looking for in

21   terms of an amount that would, say, take them through immediate

22   expenses in the next 6 months.

23             MR. BEGOS:  For the next six months, your Honor, what

24   I had asked for in my e-mail to Ms. Shevitz and to Ms. Eiger's

25   firm, I went through the mortgage arrears that they had.  And

121avilc

this is actually attached as -- it's part of the e-mail chain

that is attached to the final exhibit, Exhibit E of Ms. Levin's

January 8, 2012 letter.  It's really the last two pages of that

document.

          There are mortgage arrears, there are tax arrears,

utility arrears.

          JUDGE SULLIVAN:  What's the bottom line.

          MR. BEGOS:  The bottom line to get them on sound

footing and be able to get them through the next six to 12

months, was $2.8 million.

          MS. SHEVITZ:  No.

          MR. BEGOS:  The monthly expenses that they have, going

forward, approximately -- I mean they have a hundred thousand

dollars of repairs they need to do on their house they have not

done, leaking roofs.

          JUDGE SWAIN:  What is necessary to stop the

foreclosure proceedings, pay medical expenses and, you know,

that absolutely positively needs to be done within, say, the

next 6 months.  What's that number.

          MR. BEGOS:  To stop the foreclosure proceeding my

estimate is that it would require paying the mortgage arrears,

which is $800,000 approximately.

          JUDGE SWAIN:  And living expenses on top of that, and

provision for potential funereal expenses would add, what?

          MR. BEGOS:  Future mortgage payments, $17,000 a month.

121avilc

Insurance, utilities, food, real estate taxes, approximately

$28,000 per month.  The necessary repairs were approximately

$81,000.

JUDGE SULLIVAN:  That includes medical expenses,

according to your e-mail, right?

MR. BEGOS:  Correct, your Honor.

JUDGE SWAIN:  Would the repairs include medical

expenses?

MR. BEGOS:  Yes.  Necessary repairs and anticipated

medical expenses was $81,000.  I also had a couple of other

numbers in there, past due real estate taxes, utilities, and so

forth, as well as taxes that they would be paying on whatever

money is distributed to them.  Obviously they can make do with

less, but I did try to give as accurate a number as I could so

we were not in another situation in three months or six months

coming back and going through the process again.

JUDGE SWAIN:  And so these are figures, the future

expense figures are on a 24 month basis, so that 408,00, and

672,00, and 81,000 are on a 24 month basis?

MR. BEGOS:  The $28,000 is per month.  The 17 -- yes,

your Honor, that is correct, that's on a 24 month basis.

JUDGE SWAIN:  And the 1.2 million,

1.16 million-dollar number under past due amounts would be

amounts that are necessary to stop the mortgage foreclosure

proceedings and cure the arrears on real estate taxes and

1   things like that?

2          MR. BEGOS:  That's correct.  It's my assumption that

3   if and when the past due mortgage payments were paid, that the

4   bank would de accelerate the mortgage and stop the foreclosure

5   proceeding.  I actually have no guarantee about that, but.  You

6   know, I prefer to pay off the mortgage but, obviously, that is

7   not gonna be in the cards right now.

8          JUDGE SWAIN:  So the first -- that first group is 1.16

9   million dollars.  The second group, the 24 month figure, is a

10  little over -- looks like a little over million dollars.  I

11  didn't look at the income tax figure.  That is 500,000

12  estimated on a distribution.  There is no return of principle

13  argument there?  I mean you are assuming that this is all

14  taxable as long term capital gains at 15 percent on some much

15  larger number?

16         MR. BEGOS:  I believe that is the assumption, your

17  Honor, although I'm not a tax lawyer, I didn't calculate that

18  number.  But I believe that is the assumption.

19         JUDGE SWAIN:  Well, to the extent we're going to go

20  down that road, I think you need to revisit that assumption if

21  this is essentially besides the $150,000, the first amount

22  coming out.

23         But let me just sort of offer up a plug figure here

24  for arrears and say six months.  If what we're talking about

25  is, I'm going to call it $1.8 million.

121avilc

1              MS. SHEVITZ:  That's a lot of money.

2              JUDGE SWAIN:  I know that's a lot of money.  What is

3     the overall amount of the claim, I'm sure it is in here

4     somewhere, but I don't have it, of the Meyers' claim.

5              MR. BEGOS:  Principle is about $11 million dollars

6     that was invested, all cash in 2000.  It was by rollover from a

7     maturing investment, matured in 2003.  And there is

8     approximately $7 million in interest.  So the total number that

9     was in the restitution order is about $18 million.  Of that, 11

10    point something is principle, so we're talking --

11             JUDGE SWAIN:  The interest is prejudgement interest?

12             MR. BEGOS:  Prejudgement interest, yes, your Honor.

13             JUDGE SWAIN:  So we're talking original investment

14    amount of 11 million.  There is the plug figure of about 1.8 is

15    roughly 15 percent of that principle investment amount.

16             MR. BEGOS:  Correct, your Honor.

17             JUDGE SWAIN:  Before I higher from the shaking heads

18    at the defense table, I want to ask the government, do the

19    government and SEC believe that there will be sufficient, in

20    terms of the assets that are known, to pay all investors at

21    least 15 cents on the dollar?

22             MS. LEVIN:  Yes, your Honor.  We do believe that there

23    are sufficient funds to pay each investor 15 cents on the

24    dollar.

25             JUDGE SWAIN:  And so then my question would be if

121avilc

1    there were an agreement to carve out $1.8 million from the

2    substitute assets order, obviously to be credited against any,

3    you know, additional claim by the Mayers, against funds to be

4    distributed, would the defendants agree to permit the

5    distribution of that carved out 1.8 to the Mayers under an

6    agreement that the defendants would not seek to hold the

7    government liable for improper distribution of the 1.8.  And

8    then, of course, for the rest of the investors and for the

9    health and ultimate termination of this process, I would want

10   to walk away today with some sort of structure that people are

11   supposed to be discussing among themselves, whether that's

12   magistrate, special master, or some other -- or a receiver,

13   because there would have to be some sort of expert involved in

14   liquidation and valuation.  And our magistrate judges are

15   wonderful judicial officers, but they are not financial experts

16   or bankers or anything else.  But leaving that aside for a

17   minute, I would like to focus on the 1.8.  And I see Ms.

18   Shevitz and Ms. Eiger consulting with each other.  And I know

19   Mr. Tanaka has been very patient and quiet on the phone here,

20   but I would first like to hear from counsel in the courtroom.

21        MS. SHEVITZ:  We really don't have the figures to

22   really test it out.  And I mean what comes to mind, now, is if

23   this money is not gonna, for sure, stop the foreclosure, why

24   are they still living in this house, frankly.

25        MR. BEGOS:  They can't sell it.  It is in foreclosure,

121avilc

1   and it is not worth what the bank wants for it.

2            MS. SHEVITZ:  There is probably other ways to mitigate

3   this but, you know, I just don't want to come to a situation

4   where other people clambering for money, and these folks got

5   1.8.  I don't know.

6            MS. EIGER:  It's A larger number than I contemplated

7   as a hardship distribution.  I would at least like to have an

8   opportunity to confer with my client.

9            MS. SHEVITZ:  Yes.  I would have to speak with my

10  client, too.

11           JUDGE SULLIVAN:  The e-mail is a long time ago, right?

12  September 27th.

13           JUDGE SWAIN:  They asked for 2.8 million in September,

14  knocked it down by a million.

15           JUDGE SULLIVAN:  You haven't talked to your client

16  about this request from Mr. Begos?

17           MS. SHEVITZ:  No.  We had this major -- initial

18  problem that they were not gonna let us agree to anything

19  without a total forfeiture.  That was it.

20           JUDGE SWAIN:  Okay, well, we --

21           MS. SHEVITZ:  There was no negotiation or agreement to

22  do anything like this.  We said we would be willing to.  And,

23  no, after that, there was no reason to talk to the clients of

24  that specific amount of a carveout, because Ms. Levin has

25  repeatedly taken the position that we're not going to do that

121avilc

 1    at all, she's going to do the remission proceeding and that's

 2    it.  And we had no interest in saying anything.  So, that's

 3    why.

 4              JUDGE SULLIVAN:  How long do you think it would take

 5    you to confer with your clients and get back to the Court with

 6    respect to that specific request, 1.8 million.

 7              MS. SHEVITZ:  Well, we could do that.  I guess I could

 8    do a phone conference at Fort Dix.  Although the Court might

 9    have to expedite that, because I hear that there is a

10    problem --

11              JUDGE SULLIVAN:  That's fine, but you think end of the

12    week?

13              MS. SHEVITZ:  Let's say next week.

14              JUDGE SWAIN:  Next Monday?

15              JUDGE SULLIVAN:  Monday is Martin Luther King.

16              JUDGE SWAIN:  Next Wednesday, the 18th.

17              MS. SHEVITZ:  Yes, I could definitely talk to them by

18    then.

19              JUDGE SWAIN:  Ms. Eiger, would you talk to Mr. Tanaka

20    by the 18th?

21              MS. EIGER:  I can.

22              MS. SHEVITZ:  I kind of would like to hear all of the

23    other people.

24              JUDGE SULLIVAN:  I was going to ask Mr. Friedman, on

25    behalf of your client, you said some of your folks are

121avilc

```
 1    destitute.  Are they as destitute as that.  I feel like George
 2    Bailey at the end of the story, what do you need States to tide
 3    you over.
 4              MR. FRIEDMAN:  I do not want to get into a contest of
 5    sob stories.  And I don't want to minimize the mayors'
 6    position.
 7              JUDGE SULLIVAN:  Right.
 8              MR. FRIEDMAN:  I can tell you that Mr. Heitkoenig who,
 9    if the Court would agree, can address the Court directly, has
10    an uncle -- cousin in Haiti who has already been foreclosed on
11    and is destitute.  And Mr. Heitkoenig's investment is on behalf
12    of that cousin.
13              JUDGE SULLIVAN:  How much?
14              MR. FRIEDMAN:  I don't know the numbers.  Would it be
15    okay for Mr. Heitkoenig to address --
16              JUDGE SWAIN:  Talk to Mr. Heitkoenig.
17              MR. FRIEDMAN:  Okay.
18              MR. BEGOS:  Would it be possible to have some amount
19    of money cleared today while defense counsel are talking with
20    their client.  Presumably there is an amount of money that they
21    would agree to.  And then they can discuss with their client
22    the $1.8 million, get back to all of us in the court.  But they
23    should be able to agree to some amount of money today.
24              JUDGE SULLIVAN:  I'm not sure that Ms. Shevitz can,
25    without conferring with her client.  Do you think so,
```

121avilc

1   Mr. Begos?

2           MR. BEGOS:  Well, she did tell me back in September

3   she was conferring with her client.

4           JUDGE SULLIVAN:  With respect to a particular number?

5   I don't know, if she has had this conversation, and her client

6   has authorized her to consent to some number, then I guess she

7   might be in a position to do this.  But absent that kind of

8   communication, I think she might have trouble pulling the

9   trigger on something today, don't you think.

10          I understand your concern, but I'm just not sure how

11  she can responsibly agree to something without running it by

12  her client.

13          MR. BEGOS:  I understand.  And I have a feeling that

14  next week we're going to hear no.  And, then, I'm not sure

15  where we're gonna be, and I'm not sure where my clients are

16  going to --

17          JUDGE SWAIN:  Well, the response, next week, needs to

18  be a response to the 1.8.  And if there is an issue with the

19  1.8, since there has been an agreement for some time in

20  principle that some tide-over amount is appropriate, there

21  needs to be a specific other number with a justification for

22  the other number.  And that number would need to be in at least

23  six figures.

24          MS. SHEVITZ:  Well, Judge, we can't really do a total

25  justification for some other figure, again, without --

121avilc

1          JUDGE SWAIN:  I understand that.

2          MS. SHEVITZ:  So, last time, the defendants agreed to

3    $150,000.  So, in my mind, I was thinking in terms of something

4    like that.  So this is a huge difference.  And if the

5    government is agreeing to this, too -- I would like to know

6    what the government is agreeing to, and what their basis is --

7          JUDGE SULLIVAN:  I think they are inclined to agree to

8    anything you are willing to agree to; right, Ms. Levin?

9          MS. LEVIN:  We want the money to go back to the

10   victim, and we're willing to, in any way that we can possibly

11   do, to facilitate that process.  We want to do it.  And,

12   unfortunately, we're hampered by what we can do under the

13   petition process and what we can do under the forfeiture law.

14   But as long as it's legally permissible, we're in favor of

15   doing it.

16         JUDGE SULLIVAN:  Ms. Shevitz, you're not suggesting

17   that the Mayers are not entitled to, you know, more than a

18   couple of hundred thousand dollars, right.  There is no dispute

19   that they invested a lot of money, that they are entitled to

20   get that money back, and it's in the millions, right?

21         MS. SHEVITZ:  To what extent in the millions is an

22   issue, but, yes.

23         JUDGE SULLIVAN:  But north of 1.8.

24         MS. SHEVITZ:  I would say that's probably true.

25         JUDGE SULLIVAN:  So, again, I just don't think that is

121avilc

 1    that much --

 2              MS. SHEVITZ:  I defer to Mr. Tanaka on that issue.

 3              JUDGE SULLIVAN:  Okay.  Well, if Mr. Tanaka wants to

 4    speak, I guess he can, but he may want to confer with counsel,

 5    first.

 6              JUDGE SWAIN:  Mr. Tanaka, are you still there?

 7              DEFENDANT TANAKA:  Yes.

 8              JUDGE SWAIN:  I think Mrs. Eiger is going to be in

 9    touch with you very promptly, so I won't put you on the spot.

10              DEFENDANT TANAKA:  Maybe if it is --

11              JUDGE SWAIN:  Mr. Tanaka, Mr. Tanaka.  The court

12    reporter is still having trouble hearing you clearly, so please

13    speak as slowly and as loudly as you can.

14              Thank you.

15              DEFENDANT TANAKA:  Thank you.  I'm saying that the

16    Mayers have been our clients for 20 years.  And in the

17    interests of equality for all our clients, and knowing what I

18    know about the Mayers, I'm not as sympathetic as is the Court

19    is, because for the simple reason that, for example,

20    Mr. Friedman's client, Paul Marcus is 84 years of age, has not

21    received a penny, hasn't been saying anything.  I am sure he

22    would like to see a penny or two in next year or two.

23              What I know about the Mayers is their personal

24    spending habits have given them troubles for 20 years.  And at

25    one time, as I point out to the New York State Court, they

121avilc

received a hundred thousand dollars, tax free, which still didn't tide them over.  So they have been having problems for all of 20 years that I have known them.

On top of that, in this particular case, they've had a civil suit in New York State court and, basically, what I think they're doing is trying to jump the queue on other investors, and I'm not very sympathetic about that.  They wanted to have, what I said was a grab and run, where they get a judgment in New York State Court ahead of other investors.  So, therefore, I am not particularly sympathetic of the Mayer situation ahead of anyone else.

JUDGE SULLIVAN:  Well, I mean I don't know that it requires sympathy, necessarily, it require agreement to have that money --

DEFENDANT TANAKA:  Don't forget, they have a payment to them which no one else has gotten.

JUDGE SULLIVAN:  But, again, I think the issue is can you and Mr. Vilar agree that some amount of money would go sooner, rather than later, to the investors, including the Mayers.

DEFENDANT TANAKA:  Well, looking at their letter, the figure was somewhat north of $2 million, I said to myself, this is really injustice, looking at other investors.  Why should they have such a huge lump sum ahead of time, especially since they already had a prior payment.

121avilc

 1           JUDGE SULLIVAN:  All right.  Mr. Friedman, did you

 2    want to --

 3           MR. FRIEDMAN:  I did.  I have an answer to your

 4    Honor's question and a comment.

 5           With regard to Mr. Heitkoenig's cousin in Haiti, he

 6    informs me that $50,000 would tide that person over.  $50,000

 7    goes a lot further in Haiti than it does in the United States

 8    as we all could recognize.

 9           The other point I want to make is with regard to Mr.

10    Marcus, who is the person I am pointing to.  He doesn't look

11    it, but he is in his eighties.  He and his family are the, as I

12    understand it, the largest single investor in ATGF, with four

13    to $5 million -- I think that's right, close to $5 million

14    worth of investments.  As Mr. Tanaka just said -- Mr. Tanaka

15    actually said it as well or better than I could say it.  Mr.

16    Marcus has never gotten a penny.  Now, I cannot in good

17    conscience claim that Mr. Marcus is destitute, because he is

18    not.  So I'm obviously not going to stand up here and talk

19    about his need for money.  But what I can stand up and talk

20    about is fairness.

21           If the Mayers are going to get 500,000, a million,

22    2 million, Mr. Marcus owns a much greater interest than the

23    Mayers do in ATGF.  And we're talking about ATGF funds.  So

24    there has to be some basic equity if there is going to be an

25    interim -- on the interim distribution; in other words, a

121avilc

1   distribution today, or tomorrow, or next week.  I don't think

2   it is appropriate for only the Mayers to be considered.  And I

3   don't even think it's appropriate for only the Mayers and Mr.

4   Heitkoenig's cousin in Haiti to be considered.  Other investors

5   have to be considered as well.

6           JUDGE SWAIN:  Are the ATGF funds the only source of

7   liquidity here?  I'm asking the government.

8           MR. NAFTALIS:  They are all lumped together.  The

9   ATGF, plus the private clients' GFRDA funds are all in the same

10  basket, all of the different kind of private accounts are in

11  the same bank accounts.  So, yes.

12          MR. FRIEDMAN:  And I would just add that there are two

13  accounts which account for 24 million, plus.  And I guess Mr.

14  Naftalis' comment goes primarily to those two accounts, because

15  that's where most of the money is.  And I was reading from the

16  government's letter of December 30 to your Honors.

17          JUDGE SWAIN:  Well, I hear the equity point.  I hear

18  the delay points, which are compelling all of the way across

19  the board.  But the specific requests that are being made now

20  are requests are being made on the representation that it's

21  keeping somebody within their threshold while we work out the

22  larger interim distribution issue.  And it gets more

23  complicated and more delayed to the extent that we try to work

24  out some sort of proportional thing for a very small amount of

25  money and then have to revisit that sort of mechanism in what I

121avilc

1   hope, intend, and anticipate will be a short period of time in

2   dealing with something that is like $17 million.  And so my --

3   one second, let me just consult with Judge Sullivan.

4           (Pause)

5           Before we are specific about what has got to be in

6   this universe of desperation situations, I see there are a

7   couple of other counsel standing, are there other investors

8   whose representatives today want to inform the Court of what

9   they would contend are desperation situations on the order of

10  the ones that have been identified on behalf of the Mayers and

11  Mr. Heitkoenig's cousin?

12          MR. HALL:  Thomas Hall.  I represent one of the

13  investors, Robin Sayko.

14          Frankly, I didn't come here prepared to delineate the

15  extent to which her financial hardship may or may not exist.

16  But I can state that I know my client's recently gone through a

17  divorce.  And I would welcome the opportunity that if we're

18  gonna address these things on a sort of ad hoc basis to put

19  forth what, you know, her financial situation is, because I

20  believe she does have significant needs, as well.  But I can't

21  stand here and represent to your Honors this afternoon as to

22  what her mortgage arrears are or anything like that.  But I

23  would welcome the opportunity to do that if we could.

24          Secondly, and I don't know whether your Honors want me

25  to be heard on the other issues, the process issues.  But as I

121avilc

1    sat here and listened to all of this, in my mind it sounds like

2    the type of thing that is done in bankruptcy court all of the

3    time, where you have a universe of creditors or claimants, you

4    set a bar date, people come in, they set put forth their

5    claims, and you have a receiver or magistrate or somebody who

6    is gonna make a determination on those claims, and you have a

7    process where people can object.  Whether that is Vilar or

8    Tanaka.  And I recognize the argument that maybe they don't

9    have standing to object because it never was their money to

10   begin with.  But I, frankly, don't understand and, you know,

11   taking the lawyer hat off the client certainly doesn't

12   understand why, after 6 years, six and a half years, there is

13   still this logjam and this money is going nowhere.  So I would

14   greatly urge this Court, both of your Honors, to put some sort

15   of process in place.  And it sounds to me like this remission

16   process is not going to work.  And I think some sort of --

17   again, something similar to what is done in bankruptcy court

18   all of the time.  But let there be a bar date, let's finalize

19   the universe of claimants.  We're now 6 years since the

20   accounts have been shut down.  I would think everybody has come

21   forward who is gonna come forward, and let's have somebody make

22   a determination on the claims.

23           Thank you.

24           JUDGE SWAIN:  Thank you.

25           Sir.

121avilc

1          MR. WRIGHT:  Yes, good afternoon, I'm Timothy Wright,

2     I'm counsel for Peter Lusk, who is sitting right there.

3          And I would like to make just a few points to the

4     Court, if I could.

5          First, there are certain assets that are comprised of

6     the pension assets, for example, that are out of the universe

7     of Amerindo investors.  Or that is my understanding.

8          In the case of my client, Mr. Lusk, he was part of

9     three people who lent Alberto Vilar sufficient moneys to make

10    his bail.  Mr. Vilar then asked Mr. Lusk if he would convert

11    those funds to enable him to hire defense counsel in his

12    criminal case.  He subsequently lent additional money to

13    Mr. Vilar.  Mr. Lusk has a claim against Mr. Vilar in his

14    individual capacity.  We are contemplating bringing an action

15    to seek a judgment.  And if the broad scope of the substitute

16    asset order puts in jeopardy, in our view, assets that should

17    be available to satisfy the individual claims of Mr. Vilar,

18    which are separate and distinct from claims of investors in the

19    Amerindo funds.

20          JUDGE SWAIN:  You said the individual claims of

21    Mr. Vilar, you mean -- did you mean the say the individual

22    claims of Mr. Lusk?

23          MR. WRIGHT:  I'm sorry, yes, of Mr. Lusk.

24          JUDGE SULLIVAN:  He is an investor, or he is not an

25    investor?

121avilc

1              MR. WRIGHT:  He is not an investor.  He individually

2    and separate and distinct to the Amerindo funds, lent money to

3    Mr. Vilar to assist him in his defense in the criminal action

4    and now he has a claim against Mr. Vilar, personally, for the

5    return of the funds that were lent to him, to Mr. Vilar.

6              JUDGE SWAIN:  So these are funds that were lent after

7    the commencement of the prosecution, and not funds that are

8    contended represent moneys held in a fiduciary capacity.  It's

9    a general unsecured claim as against Mr. Vilar's personal

10   right, title, and interest in whatever he has a right, title,

11   and interest in?

12             MR. WRIGHT:  Yes, that is correct.  And the reason I

13   am here today is, as I understand it, the very broad scope of

14   the substitute asset order, means that all of Mr. Vilar's funds

15   are basically subject to forfeiture.  And we have an interest

16   in seeing this Court administer the fund properly, pay back the

17   investors.  We would hope that there will be an excess left

18   over that will be subject to a claim by Mr. Lusk against Mr.

19   Vilar.  So we have an interest in seeing that the private

20   securities are, the value of those private securities are

21   maximized to the extent possible.  And we have no concern or

22   claim about investor funds being paid back to investors, but we

23   are concerned that investor funds and personal funds are not

24   commingled to the detriment of there being no possibility for

25   an excess reverting back to the defendants.

121avilc

1          JUDGE SWAIN:  Well, it seems to me that the claims

2     process should have the opportunity for people to make whatever

3     kind of claim it is, explaining the type of claim it is, and

4     also the opportunity for, for instance, the government to

5     object that its forfeiture claim -- to talk about priority of

6     claims, the government might take the position that a

7     forfeiture claim comes ahead of a post prosecution claim, but I

8     don't think it is necessary to deal with the resolution of that

9     up front in connection with the question of how to get investor

10    money back to the investors.

11         So as long as you have an opportunity to make that

12    claim as against the amount targeted for ultimate forfeiture

13    and, you know, whether that's in a remission process or

14    whatever, does that satisfy your concerns, that you are not

15    shut out of that process of claimsmaking?

16         MR. WRIGHT:  Yes, that would satisfy our concerns,

17    your Honor thank you.

18         JUDGE SULLIVAN:  Is the government aware of Mr. Lusk's

19    claim?

20         MS. LEVIN:  Yes, your Honor.  That's a separate issue

21    in terms of the substitute asset order that really doesn't go

22    to the heart of this.  But in the petition for omission or

23    mitigation process, anybody -- if we were to go through with

24    that procedure, anybody that feels they have a claim to this

25    money is entitled to submit a petition.  And DOJ follows, I

121avilc

1    have provided in the letter that I sent, a copy of the federal

2    regulations which governs who is entitled to, you know, assert

3    a claim to that money.  So that would be covered.  And of

4    course if the Court chooses the other option, which is to have

5    a receiver or special master appointed to do that, then the

6    Court can set, you know, a mechanism for anybody that had a

7    claim to the money to submit a claim.

8              JUDGE SULLIVAN:  All right, thank you.

9              Can I ask you a question, if the Court of Appeals

10   ruled tomorrow in your favor, Ms. Levin, how long would it take

11   to get money paid out to the investors?

12             MS. LEVIN:  Well, if the Court entered the final order

13   of forfeiture as to the substitute assets -- and, again, just

14   to be clear, it's only a final order of forfeiture for those

15   assets.

16             MR. FRIEDMAN:  I get that.  You're not going to pay

17   out anything until you hear from the Court of Appeals.

18             MS. LEVIN:  We can't pay out anything--

19             JUDGE SULLIVAN:  Right.  Let's say I signed the order

20   today, you get the Court of Appeals ruling tomorrow, how long

21   could it take for anybody to get paid?

22             MS. LEVIN:  We are going to start the process of

23   evaluating the petitions right way so that presumably the day

24   that the Court of Appeals decision comes out, that next day we

25   can start distributing the money.  It would take a while to

121avilc

1   review the claims, usually takes about 6 months.  Notice.

2   People submitting claims.

3           MR. FRIEDMAN:  That six-month clock is not gonna start

4   ticking until the final order is signed, as far as you are

5   concerned.

6           MS. LEVIN:  Yes.  The final order of forfeiture can be

7   signed prior without any waiver from the defendants.  The final

8   order of forfeiture can be signed now.  What can't be done is

9   the distribution of money.

10          JUDGE SULLIVAN:  I understand.  I'm just asking for an

11  assessment of how time consuming it is to do what you have

12  proposed doing, with the marshal service and Department of

13  Justice.

14          MS. LEVIN:  It is about, I would say, 6 months to a

15  year.  We would obviously ask them the expedite it as quickly

16  as possible.

17          JUDGE SULLIVAN:  That's if the Court of Appeals ruled

18  tomorrow.

19          MS. LEVIN:  For the money, yes.

20          JUDGE SULLIVAN:  Okay.

21          MS. LEVIN:  No, your Honor, it's whatever period of

22  time it is.  If the Court of Appeals rules -- yes, if the Court

23  of Appeals rules tomorrow, but while the Court of Appeals is

24  deciding the issues being briefed, we'll be working all this

25  time.

121avilc

1          JUDGE SULLIVAN:  I see.  And the receiver would be

2     faster or slower, in your view.

3          MS. LEVIN:  The only difference in the receiver, two

4     reasons why we have not pursued this receiver option before

5     was, one, because of the expense associated with it.  And that

6     was the main reason.  The benefit to the receiver is that I

7     believe that if the Court appoints the receiver and the

8     claimants agree, that they can -- the receiver can distribute

9     the money immediately.  But I'm not really clear.  I mean I

10    guess it would be done through the SEC proceeding, whether or

11    not the defendants -- there is any issue with defendants

12    needing the defendants consent, I think the SEC could

13    probably --

14         JUDGE SULLIVAN:  They could make claims, like anybody

15    else.

16         MR. JACOBSON:  Usually when we have a receiver, we

17    have -- it's a situation where we go in, seize assets, get a

18    freeze, the receiver takes control.  And then they propose a

19    plan.  People can object.  The defendant might be able to

20    object.  But usually when we have a judgment in place, it sets

21    the amount of disgorgement.  So we can take the assets, satisfy

22    the judgment, and then distribute the money.  In this situation

23    where it would be consensual, I think, you know, assuming we

24    could have a receiver put in place, we would obviously need the

25    same type of consent from the defendants that they would

121avilc

1    relinquish any claim to the assets before they can become

2    subject to the Court's jurisdiction.  And once it is clear that

3    the receiver has the jurisdiction over those assets, the

4    process can take a very short time, or a longer, depending on

5    the number of people who object and the nature of the

6    objections.  So it could be very short.  I don't know, I don't

7    think the claims process, 30 creditors, and maybe a few more,

8    that should not take more than a few months, I mean, normally.

9         JUDGE SWAIN:  Well, you're proceeding is name the

10   corporate entities for the business entities in addition to the

11   defendants.

12        MR. JACOBSON:  Correct.

13        JUDGE SWAIN:  Does it name these -- the growth

14   technology fund and the RDA fund?

15        MR. JACOBSON:  I think it names any potential

16   defendant that could have been -- that might have their name on

17   the account or any funds that might be available to investors

18   would be the names that are on the --

19        JUDGE SWAIN:  If we were to go down this road and

20   focus on the, you know, for some number in the eight digits on

21   the accounts that have funds attributed to those funds in them,

22   and if the representation of Mr. Friedman that neither

23   Mr. Vilar nor Mr. Tanaka had any personal interest in those

24   particular funds, would it be feasible then to put in receiver

25   as to those funds which are not being managed, and make the

121avilc

1    process move faster than it would if we're looking at amounts

2    that are potentially titled to the individual defendants who

3    are active.

4            MR. JACOBSON:  With respect to the -- my understanding

5    is that most of the funds are in the names of account for the

6    funds, and not the individuals.  I think most of that's what

7    we're talking about.  The private -- all of it, as far as the

8    government knows, all of the assets that actually have, or all

9    of the accounts that actually haves assets in them, belong to

10   the funds and not the individual.

11           JUDGE SWAIN:  And did you serve at the beginning of

12   this proceeding, these funds in some way -- I think where I'm

13   going is, is there a position that there is, you know, default

14   as to the claim of entitlement of the investors.

15           MR. JACOBSON:  The complaint was served and the

16   amended complaint was served on defendants and the entities

17   through the defendants because they were the representatives of

18   all of the entities at the time.  So everyone, as far as we

19   know, has been served properly with the complaint.

20           JUDGE SWAIN:  And there was an appearance on behalf of

21   Amerindo, Mr. Licker was turning up for a while then ultimately

22   withdrew.

23           MR. JACOBSON:  We know we have several defaults.  I

24   don't know if we have an official default through the clerk's

25   office, have a certificate and moved for default, we have not

121avilc

1    done that.  But there have been a number of defaults with

2    respect to answering the complaint.  So certainly one thing we

3    could do is just start the procedure whereby we would make a

4    move for default judgment or summary judgment, if necessary.

5    But that could take some time.  Get judgments, which we would

6    contemplate doing in any event at some point in the case.  And

7    once a judgment is entered, and money judgments are entered,

8    there would have to be some type of accommodation or agreement

9    with the government, because all the assets are still subject.

10            JUDGE SWAIN:  Assets would need to be released into

11    something.  I am trying to figure out whether there is a

12    structure that assets could be released into that would permit

13    the most expeditious approach that is consistent with Article

14    III powers to getting money to investors.

15            MR. JACOBSON:  Subject to what the criminal authority

16    is going to -- what the government will do, I believe it is

17    possible, if the defendants consented, or as part of a final

18    judgment in our case, there were some other issues with respect

19    to a final judgment --

20            MS. SHEVITZ:  I can't hear you, I'm sorry.

21            MR. JACOBSON:  -- such as injunctions that we

22    typically seek --

23            If the defendants would consent as part of a final

24    judgment in our case to relinquish any of their objections of

25    the distribution of the money, and to allow the money to be

121avilc

1    subject to the district court to the civil action jurisdiction,

2    and appoint a receiver, that is something that could happen.

3    That is possible.  That could be done in the case without us

4    litigating, if we could reach some type of civil order with the

5    defendants, and subject to the government's ability to

6    relinquish the restraints on the assets.

7              JUDGE SWAIN:  Again, I think that it would be

8    expedient to think about and structure this mechanism in terms

9    of $17 million or some sum south of that so that we don't have

10   to deal with the implications of the, right away with the

11   implications of the forfeiture proceedings and contentions as

12   to the whole universe of moneys.  And if we can come up with a

13   mechanism that people are comfortable with for the 17 million,

14   maybe that ultimately turns into a mechanism for everything,

15   but it seems to me a much larger, more complicated, and

16   time-consuming job to say what can we do to take everything

17   that is in the substitute assets order out into some other

18   mechanism.

19             Let's see, so Ms. Shevitz was standing, and then

20   Mr. Friedman stood, and then perhaps Mr. Jacobson can respond

21   again once we have heard from them.

22             Ms. Shevitz.

23             MS. SHEVITZ:  I would like to -- I'm reading from

24   Mr. Tanas personal letter sent to your Honor.  He says that he

25   thinks Ross, David Ross, could bring the expert asset analysis

121avilc

1    up to date for a cost of $25,000.  And probably could do it

2    quickly.  That's what we have suggested.  And it seemed to be

3    agreeable to the investors, as well, because then we'll know

4    what is in the pot.

5         I also suggest -- Mr. Tanaka said that he has not

6    received month-end statements of the principal Amerindo

7    accounts for over three years from the custodian broker, ever

8    since the changeover to JP Morgan Chase and it would be prudent

9    to request back missing copies, and for him to be able to get

10   copies, and everybody could help move this forward.  The

11   problem is that we have been excluded from the

12   helping-moving-this-forward task, and we do want to move this

13   forward.  All of this litigate here, and litigate here, we

14   don't want to do that either.  We want to resolve this, but

15   we're not going to resolve it on the back of a forfeiture we

16   think is illegal.

17        JUDGE SWAIN:  And that's why --

18        DEFENDANT TANAKA:  May I be heard?

19        JUDGE SWAIN:  Mr. Tanaka?

20        DEFENDANT TANAKA:  First of all, can I have a copy of

21   the transcript again?

22        JUDGE SWAIN:  Yes, we'll arrange that.

23        DEFENDANT TANAKA:  Yes, thank you.

24        And then to what Ms. Shevitz said, if David Ross has

25   done additional work and given it to Mr. Friedman, can Mr.

121avilc

Friedman submit that to court to see if we have up to date

numbers, what have you?

MR. FRIEDMAN:  I can, but I should say that all

Mr. Ross did was confirm to me the valuations as of

September 30, 2009, which were in the letters he sent to Judge

Sullivan.  The comment that the assets are now worth 50 million

is a comment Mr. Ross has made, but I don't have any supporting

documentation, because I have not talked to him in detail about

it.

So my narrow answer to Mr. Tanaka's question is I

don't know the basis on which Mr. Ross made that statement and

whether there are any supporting work papers.

DEFENDANT TANAKA:  So they're going to have to be used

as a basis for further work for him, then, as long as he is

half way there anyway.

MR. FRIEDMAN:  I think that's correct.

MS. SHEVITZ:  And, further, my suggestion would be

then to ask these people who have been working on the case for

6 years to get the final list together of people who they think

are the investors, and let's do that process while we're doing

all of the rest.

In the appeal, the brief is due in two months, in

March.  Theoretically, the case could be on the calendar for

argument 6 to 12 weeks after, that's the current schedule.

This is not going to be forever.  In the interim, we are still

121avilc

1  willing to do hardship things, if there is hardships.  But why

2  can't we just move this forward without all of these vehicles

3  getting in the way of turf wars and CFR provisions and things

4  like that.

5       JUDGE SWAIN:  What is the "this" that you are

6  proposing to move forward.

7       JUDGE SULLIVAN:  Yes.

8       MS. SHEVITZ:  We can agree to a lot of things if we

9  know the pot, and the investors, and the claimants.  We don't

10  know them.  We don't know them.  The government says they know

11  now, 20 or 30 people, or what the claims are.  Why can't we

12  just -- why can't -- with all due respect, your Honor, order

13  those to be produced now so we can see who it is and we can see

14  what we're talking about.  Then we could agree to more.  If we

15  know that we're not going to be liable at the end for claims,

16  then we can agree to a lot of different things.  But we just

17  don't know what the facts are now.

18       JUDGE SWAIN:  Well, at least an hour and a half ago,

19  Ms. Levin agreed that you would be given the government's and

20  SEC's list of known investors claims.

21       MS. SHEVITZ:  Okay.

22       JUDGE SWAIN:  That's been taken care of for a while.

23       MS. SHEVITZ:  Okay, we have not gotten that yet,

24  though.

25       JUDGE SWAIN:  Because she is still in the courtroom.

121avilc

 1    And so are all of us, and it's almost 7:00.

 2              MS. SHEVITZ:  I know, I know, I -- I know.  But that's

 3    my suggestion of moving it forward with Mr. Ross.

 4              JUDGE SWAIN:  Are you saying that evaluation by Mr.

 5    Ross of the illiquid assets is a condition to Mr. Vilar's

 6    willingness to consent not to make a claim back against the

 7    government as to an interim distribution.

 8              MS. SHEVITZ:  It depends how much the interim

 9    distribution is.

10              JUDGE SWAIN:  We have been talking about $17 million

11    as an interim distribution, covering all investors and

12    something around $2 million at this point as a hardship

13    distribution, which would be a subset of the 17 million.

14              MS. SHEVITZ:  Subset of it.  Again, I have to talk to

15    Mr. Vilar about this.  A couple of issues come up.  Will we

16    need to reduce the forfeiture amount by whatever we agreed to

17    distribute now, for one.

18              JUDGE SWAIN:  I think that would -- well, the

19    forfeiture amount or the substitute assets order?

20              MS. SHEVITZ:  Well, the substitute assets go to the

21    forfeiture amount.  So that would be one of our conditions,

22    that any payments that are made now reduce the forfeiture

23    amount.

24              JUDGE SWAIN:  Ms. Levin.

25              MS. LEVIN:  The forfeiture amount -- the substitute

121avilc

1      assets, the value of the substitute assets is applied against

2      the money judgment that has been entered against the defendant,

3      so that would reduce it.  If it's not going to be a forfeiture,

4      if we're doing this outside of the forfeiture process, that it

5      doesn't necessarily reduce the forfeiture amount.  It would --

6                  JUDGE SWAIN:  Would you agree to credit this against

7      the forfeiture amount, let me put it that way.  Obviously, it

8      wouldn't happen --

9                  MS. LEVIN:  I would agree to credit this against the

10     forfeiture amount.

11                 But the other caveat, with respect to retaining an

12     expert to value the private placements and private stock.  We

13     do not have authority to pay for that.  The question is who is

14     going to pay for it.  If the assets are not being forfeited,

15     then the marshal service who typically pays for those things

16     out of the forfeited funds, they don't have authority to do so.

17     So it's being done through a special masters process.  I don't

18     want to belabor the mechanics of it, but I want to make clear

19     the government can't fund these expenses, so that would have to

20     be through a special master or a receiver.

21                 MR. NAFTALIS:  The only thing I would add to that,

22     your Honor, it may be premature to value the assets, because

23     what we are talking about here is an interim distribution less

24     than the amount of cash in the accounts, so we could value the

25     assets now, but we're going to have to do it again later when

121avilc

1    they are liquidated.  And the accounts, right now, it's 20 plus

2    million.  And we are talking about 17 million.  So we

3    could fund this distribution with just cash, the privates will

4    always be there and they can be valued when they are actually

5    liquidated.  So we can do it much more easily than involves

6    lots and lots of --

7              DEFENDANT TANAKA:  Judge Swain --

8              JUDGE SWAIN:  I need you to go back about 50 words,

9    slow it down, and be as clear as you can, because we're not

10   hearing you.

11             DEFENDANT TANAKA:  Thank you.

12             I find that there are a lot of e-mails and documents,

13   judging by the government e-mail, its letter recently,

14   suggesting more of the process of all of these e-mails, and

15   bits, and memos that are going back and forth.

16             JUDGE SWAIN:  So you're saying that in connection with

17   this proceeding, you have seen that there have been a lot of

18   e-mails and other --

19             DEFENDANT TANAKA:  Yes, and --

20             JUDGE SWAIN:  Mr. Tanaka -- Mr. Tanaka, hold on.  Only

21   one of us can speak at a time.  I'm trying to restate my

22   understanding of what you said, so that we can have an accurate

23   record, so listen to me for just one second and we'll go stage

24   by stage.

25             I believe I heard you saying, because the court

121avilc

1    reporter didn't get this down exactly, that you have seen that

2    there are a lot of communications by e-mail and otherwise that

3    have not been copied to you, so that you have not fully been in

4    the loop.  Would that be fair?

5              DEFENDANT TANAKA:  Judging by the letter, I have seen

6    today from the government --

7              JUDGE SWAIN:  And you're asking, then, that you be

8    copied on the communications between the government and

9    Mr. Vilar's counsel, and counsel for the claimant?

10             DEFENDANT TANAKA:  Here's the question.  If I'm

11   representing myself, pro se, Judge Swain, should I be a direct

12   recipient of these communications?

13             JUDGE SULLIVAN:  Well, I think what happened last

14   night is the government submitted, electronically, a letter

15   with attachments that includes some of the things we talked

16   about today.  It was clear that you were not gonna see those in

17   time, so I don't think you saw that letter, right?

18             DEFENDANT TANAKA:  No, I didn't see that.  But they

19   referred to plenty of memos and communications during the

20   summertime.

21             JUDGE SULLIVAN:  Well, I think --

22             DEFENDANT TANAKA:  That I was not privy to that, that

23   I'm completely in the dark about.

24             JUDGE SULLIVAN:  The e-mails that were referenced were

25   attachments to a letter from yesterday.  And you'll get that

121avilc

letter by hard copy.  It was unfortunate you couldn't get it
before today, but we'll send that to you.  It's probably been
mailed to you already.

        I'm not sure, if there are other things that -- that
you think everyone referenced that you have not received, I
think maybe once you look at the transcript, it might be more
apparent as to what was being referred to.

        JUDGE SWAIN:  Well, let me say, things that are filed
with the Court in the SEC action in which Mr. Tanaka is
officially appearing pro se, absolutely have to be served on
Mr. Tanaka, and served in the most rapid fashion.  Given the
questions that are in the air about proposals for more, you
know, informal consensual arrangements and questions about
verification of the universe of investors, and questions about
how one goes about getting a handle on the universe of assets,
it seems to me expedient that the assumption be that Mr. Tanaka
be copied on correspondence among the parents in interest here
so that we can move things along in the most efficient way.
And I see nods from both the front and the back tables of
lawyers here in the courtroom so, Mr. Tanaka, I think you'll
probably be getting a little bit more mail.  And Miss Eiger is
here, as well, and she obviously has some things she needs to
talk to you about, directly.

        DEFENDANT TANAKA:  Thank you.  I'm going to buzz off
now, if that's okay with you.

121avilc

1          JUDGE SWAIN:  All right.  Thank you, Mr. Tanaka.

2          DEFENDANT TANAKA:  Thank you very much.

3          (Mr. Tanaka no longer present)

4          JUDGE SWAIN:  Mr. Friedman.

5          MR. FRIEDMAN:  Yes, I will be very brief.

6          My only concern is I took it from the colloquy between

7   Mr. Jacobson and your Honor, and then between Ms. Shevitz and

8   your Honor, that we are still dealing with the issue of do the

9   defendants, or will the defendants consent to some

10  distributions.  And I just want to reiterate as clearly as I

11  can, they have admitted -- it is not me talking, it is the

12  defendants' admission that these were custodial funds.  They

13  don't have any right to consent, or withdraw, or withhold

14  consent and, therefore, I think that to let them withhold that

15  consent or condition that consent and stop the distribution

16  process is giving them a veto power over something over which

17  they should not have a veto power.

18          JUDGE SULLIVAN:  Ms. Levin is not cutting any checks

19  until she has got an appellate judgment in her favor.

20          MR. FRIEDMAN:  True, Judge, but I suggest that if your

21  Honors decide to go the receiver, or what I would argue

22  magistrate judge, but clearly that is not gonna fly.  If you

23  would go the receiver route, it may be that checks will be cut

24  prior to the decision on the appeal.

25          JUDGE SWAIN:  Let me say this before Mr. Jacobson

121avilc

speaks.

I think the issue here, and it is both a procedural issue and a substantive issue, is jurisdiction to deal with these assets.  Right now, there is jurisdiction by virtue of the substitute assets order in the criminal case, that I know people have issues with, but it's there, it's entered, those have been declared substitute assets that are potentially subject to forfeiture in the criminal case.

Mr. Jacobson's point is that in the civil case which is an in personam, not an in rem proceeding, at least at this stage, the Court has to have some authority for dealing with assets and distributing assets that's procedurally consistent with the type of case.  And short of going through a determination that results in a judgment that provides that, for legal reasons that are good and sufficient and consistent with due process, the Court can force a particular mode of distribution of a particular pool of assets as a practical matter and to get this done quickly, there needs to be something that the appropriate interested parties can agree to and sign off on as an expedient measure.  And that's where we are.  Because I can't give advisory opinions, I don't you know get to grab assets out of the air.

So what I would like to propose is this, that we talked about and set January 18th as the deadline for Messrs. Vilar and Tanaka to respond specifically to the

121avilc

```
1   carveout for hardship request that, at this point, is the
2   request on behalf of the Mayers for 1.8, and Mr. Heitkoenig's
3   cousin for 50,000.  And the counsel for Ms. Sayko wanted an
4   opportunity to identify a short-term hardship request on her
5   behalf.  Mr. Hall, you can submit and copy a letter that really
6   has to be a letter that, in your capacity as an officer of the
7   court, represents what Ms. Sayko would say would be necessary
8   to keep her from being, you know, put out of her apartment and
9   reduced to eating things that people shouldn't have to eat.
10            MR. HALL:  I understand.
11            JUDGE SWAIN:  Over the next 6 months.  Whatever that
12   number is.  Communicate that by letter by, today's Tuesday, end
13   of business Thursday of this week?
14            JUDGE SULLIVAN:  Yes.
15            JUDGE SWAIN:  And defense counsel to respond to the
16   Court and counsel by next Wednesday as to the individual
17   defendants' position on allowing that amount of funding, or
18   some subset thereof, to be distributed very quickly to the
19   hardship cases.
20            And it seems to me that the mechanism for distributing
21   that would need to be the government agreeing to release that
22   carveout.  It would have to be a stipulation that has the
23   government releasing that carveout from the substitute assets
24   order, and the defendant's agreeing that they will not make a
25   claim at the end of the day against the government for that
```

121avilc

1    amount as improperly distributed, period.

2              And, then, as to the structure for an approach to the

3    remainder of the 17 million, what I propose is that Judge

4    Sullivan and I consider everything that has been said today and

5    within the next, you know, 24 to 72 hours, we'd aim by the end

6    of the week to issue an order that would outline a structure

7    and provide an opportunity for parties in interest to respond

8    to, or object to, that structure and try to move on from there.

9    Because I think there have been enough different concepts

10   floating around this room that asking you all to talk and

11   propose something to the Court would not really be productive.

12             Judge Sullivan, would you be willing to --

13             JUDGE SULLIVAN:  Yeah, I think that makes the most

14   sense.

15             MR. FRIEDMAN:  How if at all would the order that you

16   contemplate issuing deal with amounts above 17 million; in

17   other words, the remainder of the liquid assets and the public

18   securities.

19             JUDGE SWAIN:  Frankly, my conception is not to deal

20   directly with that, if at all, in this order.  It is possible

21   that we may think that some approach to valuation or putting

22   out the concept of the feasibility of an in-kind distribution

23   of the private securities, you know, interests in the private

24   securities.  Maybe want to ask you that question in connection

25   with this order.  But I think what we would want to work on

121avilc

 1    would be a mechanism for distribution of liquid assets in a

 2    claim process that would be appropriate to those liquid assets.

 3            MR. FRIEDMAN:  Quickly, I would suggest to your Honor

 4    that the liquid assets are not limited to 17 million.

 5    Remember, the 17 million, it was a compromise proposal.

 6            JUDGE SWAIN:  Yes.

 7            MR. FRIEDMAN:  The liquid asset number, I think, is

 8    significantly higher than the 17 million.

 9            JUDGE SWAIN:  I understand that.  And that's one

10    reason I'm trying to focus on the most significant, least

11    controversial amount of money.

12            MR. FRIEDMAN:  I will be quiet.

13            JUDGE SWAIN:  Mr. Begos has been standing for a while.

14            MR. BEGOS:  Two quick points.  Could I ask that the

15    responses by defense counsel be also served on all of the

16    nonparties like the prior letters have in the last couple of

17    weeks.

18            JUDGE SWAIN:  That's why I said copy to the court,

19    counsel, and all parties in interest.

20            MR. BEGOS:  Okay, very well.

21            And the other point I just wanted to make, I did

22    mention before I started talking about the mayor's needs when

23    the discussion was as to the Court's authority to enter some

24    sort of order, this is sort of a counter point to Mr.

25    Friedman's position that the defendants don't have an interest

121avilc

1   in the money that is in the accounts.

2          To the extent that the defendants do claim some

3   interest and do claim that they need to be consulted or approve

4   distributions, 18 U.S.C. 36130 A(a)(1) gives Judge Sullivan the

5   authority upon a finding that the defendant is in default on a

6   payment of a fine or restitution, the Court may take any action

7   necessary to obtain compliance with the order or fine or

8   restitution.

9          Obviously, Judge Sullivan, you are the only one who

10  can determine whether there is a default in the order of

11  restitution.  It was not a payment over time, it was a payment

12  immediately.  And to the extent your Honor is convinced that

13  there is a default, then my reading of this section is that

14  your Honor has fairly broad discretion to fashion any kind of

15  relief that would be appropriate to have the restitution paid.

16  And that deals with the five criminal victims and not everybody

17  else.  But I do believe that is one other piece of ammunition

18  that -- or power that the Court has here that may prove

19  relevant.

20          JUDGE SWAIN:  We'll take that under advisement.

21          MR. BEGOS:  Thank you.

22          JUDGE SWAIN:  Ms. Shevitz.

23          MS. SHEVITZ:  Two things.

24          Mr. Lusk has said this, and I think I need to say,

25  that the private securities must be managed.  It is criminal to

121avilc

1    not manage them now.  I don't understand all of it, what goes

2    on.  But, apparently, there could be Facebook stock that needs

3    to be claimed, or should have been claimed in some of these

4    private securities that are sitting in a drawer that nobody has

5    looked at and nobody has managed.  And if nobody starts

6    managing them now, it's going to be worse.  It's going to --

7    perhaps he could say something.

8              JUDGE SULLIVAN:  I think the point's been made.  I

9    think that's understood.

10             MR. LUSK:  I'll be happy to write the Court.

11             MS. SHEVITZ:  Because I don't totally understand how

12   this works.

13             JUDGE SWAIN:  We understand it conceptually, if not --

14             MS. SHEVITZ:  The last thing I want to say is I did

15   move for stay of forfeiture.  And to the extent that the Court

16   is considering moving forward with that, I need an order so

17   that I can exercise my appellate right, because that is

18   immediately appealable.

19             JUDGE SULLIVAN:  I'm not sure I --

20             JUDGE SWAIN:  We are talking about a structure for

21   carving money out of the forfeiture process.

22             MS. SHEVITZ:  Yes.

23             And to that extent, if this forfeiture just sits

24   there, I'll be glad to wait, too, but to the extent anybody

25   enters an order of forfeiture or does anything else under a

121avilc

forfeiture mantel, I need to have my appellate rights, by

having your Honor --

JUDGE SULLIVAN:  No, obviously, we're not there yet.

The request is to hear from your client with respect to the

hardship money which would be on consent, and then we'll issue

an order later this week that directs the parties to do some

follow up with respect to interim distributions that will be

faster than waiting for the appeals process to exhaust itself.

MS. SHEVITZ:  Okay.  And my point is that, as long as

it is not within the forfeiture, I don't have a problem.  If it

is -- or if we don't get a credit to the forfeiture.  We need

the credit to the forfeiture.  But if there is any ordered

concerning the forfeiture aspect of this, within forfeiture, I

have moved for a stay, and that motion is pending.

JUDGE SWAIN:  We hear you.

MS. SHEVITZ:  Thank you.

JUDGE SWAIN:  And Judge Sullivan hears you.

MS. SHEVITZ:  Yes.

JUDGE SWAIN:  Which is the important thing.

MS. EIGER:  I have a single brief point, just because

that $17 million has come up again and I don't want that single

point I have made today to be lost, that a fair distribution of

anything depends upon ascertaining what the total pot is and

what the total claims are.  Because you cannot -- because

fairness requires that and, otherwise, we may be favoring some

121avilc

1  of the claimants over others.

2  　　　　MR. FRIEDMAN:  I said I would shut up, but Mr. Marcus

3  just handed me a note back on the hardship issue.

4  　　　　Mr. Marcus informs me that there are two members of

5  his family, both of whom are ATGF investors, that do have

6  family financial needs.  And I would ask for the same

7  opportunity -- I'm not in a position now to articulate the

8  reasons with any detail, because I have just gotten this

9  note -- but I ask for the same deadline that you gave Mr. Hall,

10  just to put in a letter that describes what is in the note that

11  Mr. Marcus just gave me.

12  　　　　JUDGE SWAIN:  Close of business Thursday?

13  　　　　MR. FRIEDMAN:  Thank you.

14  　　　　JUDGE SWAIN:  All right.  Did the government or the

15  SEC just send Mr. Tanaka a copy of the transcript last time?

16  I'm hoping the answer to that will be yes.

17  　　　　MR. SALZBERG:  Yes.

18  　　　　MS. SHEVITZ:  We are CJA, I would like a copy.

19  　　　　JUDGE SWAIN:  Do the form and Judge Sullivan will sign

20  off on that.

21  　　　　All right, thank you all very much.  I think we have

22  made a great deal of progress at least in communicating with

23  each other today.  And Judge Sullivan and I will come out with

24  this order, and I hope that we will make progress on the

25  distributions quickly, as well.  Good evening.  Keep well,

121avilc

1   everyone.

2           THE DEPUTY CLERK:  All rise.

3           (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25