UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

    v.                                      :        05 Cr. 621 (RJS)

ALBERTO WILLIAM VILAR and                   :
GARY ALAN TANAKA,
                                            :
           Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SECURITIES AND EXCHANGE                     :
COMMISSION,
                                            :        05 Civ. 5231 (LTS)
           Plaintiff,
                                            :
    v.                                      :

AMERINDO INVESTMENT ADVISORS,               :
INC, *et al.,*
                                            :
           Defendants.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

    This submission is made in response to the Court's January 13, 2012 Order proposing mechanisms to be employed in the civil SEC case for the valuation and distribution of assets that were ordered forfeited and restrained in the criminal case.  We appreciate the challenge facing the Court as it tries to craft an equitable solution to a thorny problem.

We also appreciate the Court's attempt to address concerns of Mr. Vilar that were expressed by his counsel in a letter dated December 31, 2011, and at the conference on January 10, 2012.   However, we do not agree with the basis or the structure of the proposed distribution.

With all due respect, the elephants in the room are the Court's orders decreeing: (1) the forfeiture of $54,351,150 (April 7, 2010) when (as the Court later recognized in its order of August 26, 2010) this figure was too high by (at least) $36,700,000; (2) the Court's stated lack of power to change the forfeiture order to state the correct amount (November 9, 2010); and (3) despite the Court's stated intention to allow for the forfeiture of "substitute" property *only* in the amount of $17,651,159 (August 26, 2010), the forfeiture of a long list of "substitute assets" (including the defendants' interests in the very companies identified by the Court in Attachment B, ¶ IV) conservatively valued by the government in excess of $42,000,000.   Meanwhile, the government has been sitting on this pile of money, and, though it clearly had the obligation and power to fully ascertain all legitimate claimants and take appropriate measures to protect and maintain the property including using accrued interest for this purpose, *see* 21 U.S.C. § 853 (g)-(j), Fed.

R. Crim. P. 32.2(b)(6), (c)-(e), all it seems to have done is put claimants off and delay their redemptions for a far longer time than the defendants were accused of doing, promising some payment after byzantine remission procedures are completed.    (We provide in an Appendix to this submission selected CFR provisions governing the process.).

We do not understand how the Court has the power now to carve out or "exempt" $17 million and/or the private securities from the $54 million/substitute asset forfeiture in order to distribute these assets to investors, when (it ruled) it did not have the power to carve out $36.7 million erroneously included in the forfeiture in the first place.  At this point, the $54 million forfeiture, substitute asset, and restraining orders are on appeal (as is the restitution order, which "rewards" testifying investors with 9% compounded interest that they would not have gotten in the free market or in state court, giving them a preference as compared to non-testifying investors and other creditors).  Unless that appeal is withdrawn, the Court does not have jurisdiction to tinker with the amounts or make "carve-outs." See *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58-59 (1982) (per curiam) (generally, the

filing of a notice of appeal divests a district court of authority over those aspects of the case on appeal).

If the parties' "consent" provides the Court with power to release or "exempt" funds and bypass the disposition and remission procedures set forth in 21 U.S.C. § 853, Fed. R. Cr. P. 32.2, and 28 C.F.R. Part 9 (reprinted in the Appendix hereto), then, at the very least, the Court ought to propose that the Government give its consent to the amendment of the forfeiture order and release to the defendants any and all substitute assets in excess of $17,651,159 that are currently under the Government's control and over which it has no legitimate claim by virtue of the fact that (as the Court said) the "real" forfeiture order was meant to be no more than that sum.

But we have a different proposal designed to better meet the pressing issue of getting investor moneys back in the hands of investors, and it could do so without any "carve out", "exemptions" or amendments of the forfeiture orders.  The proposal -- suggested in part by Ms. Levin at the conference on January 10 (T. 32) -- is, in essence, this:  First, with the parties' consent and the Court's approval, defendants will withdraw their appeals from the forfeiture and restraining orders and

restitution orders, and the Court will vacate *both* forfeiture orders (the initial order of April 7, 2010 as well as the Substitute Asset order of November 9, 2010) and the restraining and restitution orders; then, the assets held in seven particular accounts identified below (all of which are currently among the "substitute assets" and, together, are valued at $26,708,448 without counting "unpriced stocks"), can be put in trust and distributed to investors as part of "global" settlement (including individual and entity defendants) of the civil case (and the separate civil cases brought by the Mayers and Lily Cates.)

This proposal, we submit, is more effective than the Court's because it puts more money in the hands of the investors sooner at less cost and far more equitably, undoes the plainly erroneous forfeiture orders, saves appellate resources, and puts an end to lingering and costly litigation in the civil case(s).

Our proposal also alleviates another problem with the Court's proposed distribution scheme – the part that contemplates the defendants' receipt of service and then their consent ("as representatives of the entities") to the entry of a default judgment in the civil case against seven entities – "Amerindo US", "Panama", Amerindo

Advisors UK Limited, Amerindo Management Inc., Amerindo Technology Grown Fund, Inc., Amerindo Technology Grown Fund II, Inc., and Techno Raquia, S.A.. (Attachment B, ¶ IV.)

*Each one* of these entities is listed in the Post-Conviction Restraining Order (October 26, 2009) and the Order Of Forfeiture Of Substitute Assets (November 9, 2010). Since all of defendants' right, title and interest in these entities was restrained and ordered forfeited, the defendants can really play no role in, consenting to, or effectuating a default judgment against these entities in the civil case.

The defendants were put out of business by the government and the SEC, stripped of their abilities to run the companies and make orderly settlements with their clients, were barred from acting as Investment Advisors, and now it is suggested that service on *them* should be sufficient to confer a basis to impose civil liabilities. The circumstances do not permit it.

Moreover, as discussed below, even if the Mr. Vilar had such power, he would not exercise it in the way proposed; we object to any partial entry of a money judgment in the SEC case. Instead, we suggest that, working together, Mr. Vilar, Mr. Tanaka and the SEC should be

able to arrange for the distribution of investor funds to the investors *and* settle the civil action as against *all* the defendants (individual or corporate) without the entry of any default or other judgment against any of them.

Before turning to more specific objections to the proposed architecture, we must take issue with an underlying premise of the Court's Order. The Order is inaccurate when it states at p. 2: "It appears that there is general agreement in principle that investors are entitled to the return of substantially all of the funds and other assets that have been restrained in the criminal proceeding in connection with the forfeiture process, and that it is appropriate for the distribution of such assets to commence as expeditiously as possible."

We do not agree with this statement at all.

We agree that funds in various commingled accounts that were used in connection with client investment activities should be used to satisfy investor claims. These accounts are: Bear Stearns Accounts ## 102-17995 (Techno Raquia, S.A.); 102-01484 (Amerindo Management Inc., sub-Account M26); 102-01490 (Amerindo Technology Growth Fund Inc.); and 102-01495 (Amerindo Technology Growth Fund II); as well as

SG Americas Securities, LLC Account # 64524357 (Amerindo Growth Fund), and Ventures Management (Amerindo Technology Growth Fund II, Inc.).

According to the government's December 30, 2011 submission, the value of these accounts (without including any illiquid private securities) is $26,708,448.  Our proposal is to make that pot of money in those seven accounts available for distribution to the investors – and to have the distribution process begin as expeditiously as possible.

Importantly, however, there is the issue of personal assets and business accounts that were not used for the benefit of Amerindo clients, but which also have been restrained as a result of the extravagant and unsupported Substitute Asset Order.   For example, according to the government's December 30, 2011 submission, it is holding over $14 million in cash and an unspecified number of shares of "unpriced stock" in a retirement account:  Bear Stearns Account # 102-05012 held in the name of The Trustees of the Amerindo Advisors Ltd. Ret. Benefits Scheme.  Under no circumstances do we agree that this fund is forfeitable *or* available for distribution to investors in the civil case.

But under our proposal for a global settlement, there is over $26 million of other "cash" available for distribution – not just the $17 million "fund" that would theoretically be "carved out" under the Court's proposal.

The attempt to carve out $17 million (an amount that is, supposedly, justifiable as a forfeiture) while, at the same time, leaving restrained most of the rest of the forfeited assets (which, by the Court's own reckoning, should not have been ordered forfeited in the first place) has superficial appeal (and is undoubtedly in the government's interest since it must be aware of the likelihood of the forfeiture being overturned and its consequent obligation to return the property to the defendants).   But we object:   under the structure proposed, the defendants bear all of the past and future costs of the improper restraint, the defendants have only minimal input into the process for the liquidation and distribution (even though, again, they are the ones who ultimately bear the costs), and the defendants receive no benefit from helping the government and the court clean up the mess the government created by proceeding the way it has done here.

From the start, the government overplayed its hand.  On May 26,

2005, the defendants were arrested and nineteen armed United States Postal Inspectors conducted a search of Amerindo's New York office – a search that the government tried to justify by alleging that the business(es) were "permeated with fraud". (After a suppression hearing, the district court rejected that characterization, and found the search unconstitutionally overbroad. By then, however, the defendants were out of business).

In the next few days, the SEC unsuccessfully sought an order appointing a Receiver to take over *all* of Amerindo. See *S.E.C. v. Amerindo*, 05-cv-05231 (LTS); ECF Doc. #8, 10 (the court ordered a monitor instead). Undeterred, the SEC and DOJ instructed Amerindo employees to fire the pension fund clients of the U.S. business – as to which there has never been an allegation of wrongdoing and which was some 98-99% of the defendants' business. Those who had not already been scared away by the massive wave of negative publicity were gone. (See 05-cr-621, Trial Transcript (hereinafter "TT.") 3075-76.) And Bear Stearns, working closely with the government, froze Amerindo's funds without a court order. (TT. 3483-86)

And after trial in the criminal case, the government made

extravagant forfeiture claims and then grabbed investor funds as part of a "substitute asset" order that, it knew, was well in excess of anything that could be justified

Instead of figuring out that there was plenty of money here to pay investors and it was a case of delayed redemptions and bad communications, and rather than go the SEC settlement route (employed in the now infamous Citigroup case, *Securities and Exchange Commission v. Citigroup Global Markets, Inc.*, 11 Civ. 7387 (JSR) where investor losses ($700 million) and bank profits ($160 million) absolutely dwarf the amounts ever charged in this case) -- the government charged in with an indictment and the SEC followed on the DOJ coattails.

Because of the decision to arrest, indict, and seize first and then work out details later, the government has been in *de facto* and *actual* control of the "substitute asset" business entities and accounts (holding an estimated $42 million in cash and securities), since 2005.  Yet it did not tell the Court *until the defendants' sentencing* that there is a big pool of money available probably sufficient to cover investors' claims, and has done nothing to manage the accounts or get moneys back in the

11

hands of the clients.

When, within a week of the defendants' arrests, the government initiated the civil action, it confirmed that, as a result of the arrests, the defendants were "unable to continue to run Amerindo" and that there did not appear to be anyone else with the needed decision-making authority "to address client concerns and account for all funds and investments held by Amerindo on behalf of its clients." (Complaint ¶ 9, 14, *SEC v. Amerindo Investment Advisors Inc.*, 05-cv-05231 (SDNY)) Nevertheless, with the exception of a 10-month period between June 2005 and April 2006 when a "Monitor" was in place, the government, the *de facto* managers of the funds, failed completely to even attempt to oversee or manage the businesses or accounts.  Except for the Amerindo U.S. clients, who received every dime they were owed, clients whose funds the government has held up, have received nothing.[1]

---

[1] Even during the 10-month period, virtually nothing was done.  While the Monitor had oversight powers over Amerindo Investment Advisors Inc. and its accounts, including "the power to review and monitor client requests to purchase, sell, transfer or redeem any securities or funds in accounts for which Amerindo serves as an investment adviser, or over which any Amerindo principals... exercise discretionary authority" (Order, June 3, 2005, 05-cv-05231, ¶IIIE.), he limited his attention to the business and clients of Amerindo U.S. (Monitor Report, December 5, 2005).

As appears from the valuations of substitute assets that the government provided in February 2010 and December 2011, even *after* the entry of the forfeiture orders in 2010, and despite the warning of David Ross in his report to the Court in January 2010 before sentencing (also included in the Addendum hereto) that the lack of management of the funds had already created losses, the government took *no* steps to manage the assets or derive any income from them:  most of the $26-27 million in cash in these accounts has not even been receiving interest. The banks have been the only ones to profit from the freezes put in place by the banks in 2005 at the government's "suggestion" and with the government's approval.   (05-cr-621, Sentencing Transcript 12-13; TT. 3483-86).

Nothing in the Court's Order acknowledges this state of affairs. (One can argue, indeed, that the failure to have managed the funds it *de facto* controlled is a crime under the 18 U.S.C. 1911[2].)  We think it is no

---

[2] 18 U.S.C. § 1911 provides:

> Whoever, being a receiver, trustee, or manager in possession of any property in any cause pending in any court of the United States, willfully fails to manage and operate such property according to the requirements of the valid laws of

13

less important to address the government's mismanagement here than for Judge Rakoff and others to question the SEC in other cases. Especially where the whole case is based on delayed redemptions by the defendants, the government's role in delaying payouts for *twice* as many years as did the defendants, warrants *some* sanction *or at least a statement* from the Court, or the government will continue to think this is OK to do!

It is unfair under the circumstances that all of the costs of moving forward fall on the defendants.

\* \* \* \*

We turn now to the specifically proposed distribution mechanisms, and note that the proposals we are making will also require a distribution mechanism.   To the extent applicable, our objections to the Court's proposals should be understood as counter-proposals for our plan.

As we understand the "Consensual Structure" proposed by the

---

the State in which such property shall be situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof, shall be fined under this title or imprisoned not more than one year, or both.

Court in Attachment A, the defendants can submit a recommendation, but the Court will appoint a Receiver and fund the Receiver's compensation and expenses with money in the $ 17 million fund to be carved out of the forfeited substitute assets.   No parameters on the compensation and expenses are fixed.   It is not clear whether any payments to the Receiver will be credited against the forfeiture judgment (or whether such "offsets" are limited to the amounts distributed to investors).   And defendants are precluded from making any claim against the government for any amount distributed from the Fund even if the criminal convictions and forfeiture orders are overturned.

This means the defendants may wind up having to pay for a high-priced Receiver whom they did not choose and over whom they have no control even if the convictions and forfeiture are overturned.   Moreover, under the proposal, the defendants' potential liability in the civil case (including the SEC's threats of penalties) (and the defendants' potential liability to investors and other creditors) is unchanged notwithstanding the defendants' part in paying for and facilitating the distributions to the investors through the civil case.   We object to this.

The costs incident to the sale, or other disposition of forfeited property, are normally deducted from the amount available for remission or mitigation. See 28 C.F.R. §9.9(a). Certainly any payments to any Receiver ought to offset any forfeiture. To the extent the Order anticipates a credit to the defendants' forfeiture order from any moneys "distributed" per Attachment B, ¶II, that is insufficient: the entire amount of any "Fund" and any payments from the "Fund" should be offset from any forfeiture, and from Restitution, and from any request for disgorgement in the civil case.

More of concern to Mr. Vilar, and to us, however, is the substantial probability that the forfeiture will *not* be upheld by the Second Circuit. When a forfeiture order is overturned, the property subject to forfeiture must be returned. See 28 U.S.C. § 2465; *Republic National Bank of Miami v. United States,* 506 U.S. 80 (1992). There is a strong probability that the forfeiture orders will be overturned in this case given the plethora of mistakes set forth in our brief at pp. 158-215. Defendants should not have to bear the costs of the government's illegitimate hold on the money and then, on top of that, bear the costs of distribution to the investors, and bear the costs without being able to

16

control the costs.

If defendants have continuing liability to investors, they have an interest in maximizing the funds available for distribution. We thus object to a Receivership as proposed to the extent that the Receiver may charge hefty fees and unnecessary work and expense. *See Eberhard v. Marcu,* 530 F.3d 122 (2d Cir. 2008) (Receiver there hired an expensive former-prosecutor lawyer who, with his law firm, billed plenty).

Given these factors, we like and urge adoption of Mr. Friedman's suggestion of using a Magistrate Judge and agreeing to a process for evaluating and recognizing claims.  Once we are allowed to participate in the valuation of claims (previously disallowed by the prosecutors) by seeing claimants' requests and backup, and the books and records we have not been allowed to see to date, we believe that an agreement can be reached – without the need for an expensive Receiver.

We also note that the universe of investor-claimants is far less than that provided by the government.  The absurdity of the lists provided by the government is apparent – and troubling, given the government's statement at the recent conference that there were "about maybe 20 to 30" investors.  (Transcript, p.6).  Despite that, they

provided a multi-page bunch of copies of lists from elsewhere, including unreadable fax transmissions among Amerindo documents, which are not explained nor analyzed, most of the names on which are not investors or are clients who were fully paid. (Some are contractors for Amerindo). This is hardly a good faith process on the part of the government to identify claimants or claims. The process should have been begun in 2005 when the government was denied a Receiver and let the Monitor be discharged without figuring out anything except that all the Amerindo U.S. clients were paid.

This process should not be allowed to go further with the government shepherding it as it has. There should be a cost-effective trustee and cost-effective valuator of the illiquid assets. David Ross, who already has familiarity with the "trust estate" and has the confidence of at least some of the investors, is the obvious choice. *Cf. United States v. Segal*, 432 F.3d 767, 777-8, & n.8 (Court recognizes defendant's interest in the terms of a Trustee's settlement in connection with the disposition of forfeiture assets since the parties had agreed that the defendant could attempt to reduce his liability by the settlement amount).

Moreover, if, ultimately, there is going to be a Receiver or other appointed trustee, Mr. Vilar will not agree to forego the right to make a claim against a Receiver for excessive fees or compensation.   See 28 U.S.C. § 957(a) ("Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.  Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.")  We would also object to the appointment of anyone who is a former AUSA in the Southern District of New York or the Eastern District of New York.

      * * *

Turning to the claims process, there are three parts to the process: (1) identifying the investors with meritorious claims ("the qualifying investors"); (2) determining the amount of the claims; and (3) satisfying the claims in whole or in part on a pro rata basis.

We agree that, as set forth in Attachment A, ¶ b., to become a qualifying investor, an investor must come forward with a sworn

written claim and documentation, including account statements, transaction statements and receipts. We add, however, that defendants do not have, and have not had, access to all the records the government seized in 2005. Certainly the defendants should have access to books and records needed to verify any particular claim.

We disagree with necessarily focusing on "original investments" as the benchmark for distribution (Attachment A ¶II b, d.) because, among other things, this does not fairly reflect the nature of the investors' claims, and will make the process of distribution unduly cumbersome and ongoing litigation more protracted.

We also disagree with the apparent assumption by the Court that there is some specifically identifiable subset of investors who have an identifiable interest in particular assets such as the private (or public) securities held in the various accounts (Attachment C, ¶ II); there is not. All the ATGF investors had an equity interest in a fund, but none has a property interest in any particular Amerindo company asset, and, moreover, any claim they might have is subordinate to claims of unsecured creditors of the entities. Cf. *Krys v. Official Comm. of Unsecured Creditors (In re Refco Inc.)*, 505 F.3d 109, 117 (2d Cir. 2007)

("The record establishes that Sphinx is a single legal entity, and that the individual cells are not legally separate entities from Sphinx. By investing in Sphinx, Investors placed control of their funds entirely within the hands of the Sphinx directors (or managers acting on behalf of the directors). Only Sphinx, not individual Investors, or even Investors as a group, could assert a claim against the Refco estate, and only Sphinx was permitted to negotiate a settlement with the Committee. Investors maintain a financial "interest" in Sphinx, but they are not a "party in interest" within the meaning of the Bankruptcy Code. The party in interest in the bankruptcy sense, representing the Investors' financial interest, is Sphinx"); *In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002) (Under absolute priority rule in bankruptcy, "unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated.")

There were two different kinds of investors – those in GFRDA whose investment promised a fixed return; and those in ATGF with an equity interest in a managed fund, the value of which depended on fluctuations in the market. The principal investments of each group

21

were commingled and, given the government's inability to trace in connection with the forfeiture of substitute assets, tracing of invested funds into particular assets does not appear possible or feasible. However, in both cases, the value of the investors' interests in 2005 – and hence the amount of so-called "loss" suffered when the accounts were frozen and Amerindo was shut down -- can be equitably and fairly easily ascertained with reference to the account statements and latest net asset value on record: In the case of GFRDA investors, the total amount in the account is stated on the account statement.  In the case of ATGF investors, the statement showed the current number of shares and the last "net asset value" ("nav") of each share.

We thus submit that a more equitable, reasonable and cost-effective methodology for distribution than the one proposed by the Court would be to take the pool of assets in the commingled accounts, and make a distribution to all claimants based on the valuation of the qualifying investor's interest at (or as near as possible) to May 2005 when Amerindo stopped functioning (taking into account any distributions since that date, such as the distributions to the Mayers in 2009).

Particularly with respect to the GFRDA investors, searching records to determine movements in and out of the accounts over decades is cumbersome and, we submit, unnecessary in this case.[3]

We remind, this is not a Ponzi scheme where there is not likely to be enough money to compensate even for initial contributions. Here,

---

[3] We also note that, if the investors are limited to the original investment less distributions, the Mayers will get nothing. In 2005, after Lisa Mayer became a government witness (the Mayers had by then reached a civil settlement with Amerindo and were being paid on time), the Mayers had to file tax returns that they had failed to file for five years. In those returns, they took the position that all distributions to them from Amerindo over the years counted as return of their principal first, and that by 2004, all principal had been returned. See, *e.g.,* GX 9210, 9211, tax returns of Herbert and Debra for 2004 tax year. (These returns were filed in August 2005). The Mayers' tardy tax submissions (made after "cooperation" started") state this:

Beginning in the 1991 tax year, the taxpayer invested certain sums with Alberto Vilar and his Amerindo Companies. The taxpayer received and relied on the advice of Alberto Vilar and his group of professional attorneys, advisors and accountants in establishing the subject investment vehicle, administering the same, and for reporting the tax treatment of distributions, if any.

As a result of the massive fraud alleged to have been undertaken by Vilar with respect to the Amerindo Companies, of which the taxpayer is one of the victims, the distributions received by the taxpayer prior to the taxable year in issue have been reported as a return of capital.

The amount reflected on the subject return represents a distribution received in excess of the taxpayer's total investment amount and is being reported as ordinary income. To the extent any distributions are received in subsequent taxable years, they will similarly be reported as ordinary income.

the initial investments grew and, as we anticipate, the pool of assets we have identified ought to cover all the qualifying investors' account and nav amounts as of the time the government forced an end to operations. If the pool ultimately turns out not to be large enough to satisfy the statement amounts, then a pro rata distribution would be appropriate. See *SEC v. Sunwest Mgt*, 2009 U.S. Dist. LEXIS 93181 (D. Oregon 2009) ("A substantial body of case law concerning distributions through federal equity receiverships supports equitable pooling of the assets of receivership entities in order to enable pro rata distributions to investors in cases like this one.).

In this regard, Mr. Friedman's clients erroneously assume that all "ATGF assets" must be distributed to ATGF investors. Mr. Friedman's clients' interests are measured by the value of the shares owned by them as of the time the business ceased operating.

Moreover, aside from the fact that the Court's use of "loss" in this case is just not accurate  (no one *lost* money; Amerindo was shut down holding money; the clients have claims, not losses), it is wrong to assume that "lost" appreciated value in the accounts after May 2005 (if any) is attributable to the defendants or the offenses they allegedly

committed, and, therefore, is owing by the defendants to the claimants. Any "losses" after May 2005 occurred by virtue of the government's conduct irresponsibly shutting the businesses down and failing to manage the funds properly.

Further, as to Mr. Friedman's submission that defendants acknowledged that they do not have a beneficial interest in the accounts, defendants' management companies may be owed fees by the hedge funds. Defendants do *not* waive their rights to any such fees.

Hopefully everyone can be satisfied by the global settlement we can reach. The point is, we should be working this out through the offices of a Magistrate Judge supervising a settlement instead of being resolved *before* the value of the entire pot of available client funds and the universe of claims is determined.

We believe in this regard that it is imperative to evaluate private and public securities in any of the accounts *now*, before any potential pro rata share is determined and paid out. We need to know if the "pot" is "big enough" to cover all claims, which is a predicate to assessing the reasonableness of any plan and the reasonableness of any anticipated costs of distribution.

As to 1(e) in the Proposed procedures, we also will not agree to any release unless the investor (*e.g.,* the Mayers and/or Lily Cates) withdraws the State civil case with prejudice. Under our scenario, the claimants will get the amounts on the last Amerindo statement. As to Releases and offsets, we believe that the SEC must also release the defendants to the extent of any distributions.

Again, all amounts paid out for expenses and distributions should be credited against all liabilities.

The Proposed Order also provides for a Steering Committee that could hire further professionals to manage the private funds. This, of course, would entail more expense. Mr. Marcus previously suggested that the manager best suited to do this work was Gary Tanaka. He, and Mr. Vilar, could quickly accomplish a plan for dealing with these assets, and since it would be subject to the approval of the investors and the Court, there should be no reason to oppose this suggestion.

The government's knee-jerk reaction has been to state that the Department of Justice does not usually allow this. That is a poor reason for not allowing this cheaper option of managing funds, subject

to Court control.   It is especially ironic since it is the *government* that has mismanaged the funds when under its control!

We have set forth objections and proposals that we think are fair. If these reasonable options are not accepted, we have a right to move forward with our appeal of forfeiture, and a right to a stay.  It is not the defendants' fault that this case is the mess that it is.

There is nothing in the Court's proposal providing for a stay.  The government is seemingly free to commence its "forfeiture" without a stay.

We are willing to consent to certain procedures to get some moneys released.  But we are not willing to risk the government moving forward with "forfeiture."   The Court should grant a stay *of forfeiture.* Objective factors favor such a stay.  See *United States  v. Riedl*, 214 F.Supp.2d 1079, 1082 (D.Hawaii 2001) (factors important in determining the appropriateness of staying forfeiture pending appeal include: (1) the likelihood of success on appeal, (2) whether the forfeited asset will likely depreciate over time, (3) the forfeited asset's intrinsic value to defendant, and (4) the expense of maintaining forfeited property.

In conclusion, the Court should grant a stay of forfeiture (and the restitution order, which favors testifying clients with an unjustified 9% interest should be withdrawn to allow for equitable settlement parameters), and should send this case to the Magistrate Judge, or to David Ross, and the evaluation and claim process should begin immediately.

Dated:  Portland Maine
       January 2012

              ____/s/_____
                Vivian Shevitz

              ____/s/_____
                Jane Simkin Smith

APPENDIX

28 C.F.R. part 9, concerning remission and mitigation of forfeitures.

§ 9.7 Terms and conditions of remission and mitigation.

(a) Owners. (1) An owner's interest in property that has been forfeited is represented by the property itself or by a monetary interest equivalent to that interest at the time of seizure. Whether the property or a monetary equivalent will be remitted to an owner shall be determined at the discretion of the Ruling Official.

9.8  Provisions applicable to victims.

The provisions of this section apply to victims of an offense underlying the forfeiture of property, or of a related offense, **who do not have a present ownership interest in the forfeited property** (or, in the case of multiple victims of an offense, who do not have a present ownership interest in the forfeited property that is clearly superior to that of other petitioner victims). **The provisions of this section apply only with respect to property forfeited pursuant to statutes that explicitly authorize restoration or remission of forfeited property to victims. ?** Victims who have a superior present legally cognizable ownership interest in forfeited property may file petitions, as other owners, subject to the regulations set forth in § 9.7(a). The claims of such owner victims, like those of any other owners, shall have priority over the claims of any non-owner victims whose claims are recognized pursuant to this section.

(a) Qualification to file. A victim, as defined in § 9.2(v), of an offense that was the underlying basis for the criminal, civil, or administrative forfeiture of specific property, or a victim of a related offense, may be granted remission of the forfeiture of that property, if in addition to complying with the other applicable provisions of § 9.8, the victim satisfactorily demonstrates that:

(1) A pecuniary loss of a specific amount has been directly caused by the criminal offense, or related offense, that was the underlying basis for

the forfeiture, and that the loss is supported by documentary evidence including invoices and receipts;

(2) **The pecuniary loss is the direct result of the illegal acts and is not the result of otherwise lawful acts that were committed in the course of a criminal offense;**

(b) Pecuniary loss. The amount of the pecuniary loss suffered by a victim for which remission may be granted is limited to the fair market value of the property of which the victim was deprived **as of the date of the occurrence of the loss**. No allowance shall be made for interest foregone or for collateral expenses incurred to recover lost property or to seek other recompense.

§ 9.9 Miscellaneous Provisions.

(a) Priority of payment. Except where otherwise provided in this part, costs incurred by the United States Marshals Service and other agencies participating in the forfeiture that were incident to the forfeiture, sale, or other disposition of the property shall be deducted from the amount available for remission or mitigation. Such costs include, but are not limited to, court costs, storage costs, brokerage and other sales-related costs, the amount of any liens and associated costs paid by the government on the property, costs incurred in paying the ordinary and necessary expenses of a business seized for forfeiture, awards for information as authorized by statute, expenses of trustees or other assistants pursuant to paragraph (c) of this section, investigative or prosecutive costs specially incurred incident to the particular forfeiture, and costs incurred incident to the processing of the petition(s) for remission or mitigation. The remaining balance shall be available for remission or mitigation. The Ruling Official shall direct the distribution of the remaining balance in the following order or priority, except that the Ruling Official may exercise discretion in determining the priority between petitioners belonging to classes described in paragraphs (a)(3) and (4) of this section in exceptional circumstances:

(1) Owners;
(2) Lienholders;

30

(3) Federal financial institution regulatory agencies (pursuant to paragraph (e) of this section), not constituting owners or lienholders; and

(4) Victims not constituting owners or lienholders (pursuant to § 9.8).

(b) Sale or disposition of property prior to ruling. If forfeited property has been sold or otherwise disposed of prior to a ruling, the Ruling Official may grant relief in the form of a monetary amount. The amount realized by the sale of the property is presumed to be the value of the property. Monetary relief shall not be greater than the appraised value of the property at the time of seizure and shall not exceed the amount realized from the sale or other disposition. The proceeds of the sale shall be distributed as follows:

(1) Payment of the government's expenses incurred incident to the forfeiture and sale, including court costs and storage charges, if any;

(2) Payment to the petitioner of an amount up to his or her interest in the property;

(3) Payment to the Assets Forfeiture Fund of all other costs and expenses incident to the forfeiture;

(4) In the case of victims, payment of any amount up to the amount of his or her loss; and

(5) Payment of the balance remaining, if any, to the Assets Forfeiture Fund.

(c) Trustees and other assistants. In the exercise of his or her discretion, the Ruling Official, with the approval of the Asset Forfeiture and Money Laundering Section, may use the services of a trustee, other government official, or appointed contractors to notify potential petitioners, process petitions, and make recommendations to the Ruling Official on the distribution of property to petitioners. The expense for such assistance shall be paid out of the forfeited funds.

31

APPENDIX II

ROSS Reports to the Court, January 2010

# DM Ross Associates Inc.

315 East 72 Street
Suite 19B
New York, NY  10021
(917) 251-8456
DM.Ross.Associates@earthlink.net

27-January-2010

The Honorable Richard J. Sullivan
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY  10007-1312

Re: Amerindo 2005 Holdings Exceed $45 Million

Dear Judge Sullivan,

Ten months ago, Mr. Gary Tanaka engaged the services of my firm to review the Amerindo
Investment Advisors' private equity holdings of his firm's clients.  He asked us to inventory the
private holdings, obtain pertinent information about them, and make an initial estimate of the
value of these holdings for informational purposes.  Please consider this as an interim analysis as
this is an ongoing process.

I have enclosed a brief description of my firm for you information.  Please be aware that I had not
previously worked professionally with Mr. Tanaka nor had he previously been a client of my firm.
We had met socially four times before this assignment.

Using various private equity valuation methods including those summarized in the Private Equity
Industry Guidelines Group's Updated U.S. Private Equity Valuation Guidelines of March 2007
and based on documents provided by these companies, I have reviewed the holdings that several
Amerindo funds and investment vehicles had in 91 private companies in 2005.  As a result of
these efforts, I have reached an initial indicative value of $17,354,008 for the Amerindo
Technology Growth Fund II 2005 private equity investments.

Combined with the cash and public securities reported in available custodian statements and
distributions for this fund and other selected client vehicles, I have reached an initial indicative
value of $45,081,231 for 2005 Amerindo Investment Advisor client holdings.  Please note that we
have not yet been able to obtain primary documentation for a cash account, estimated value of
$2,000,000 in 2005, which was worth $3,147,560 in September 2009.

The indications of value are provided to you for informational purposes only. These valuations are
indicative, not actionable, and are not an offer to purchase or sell any instrument or enter into,
transfer or assign, or terminate any transaction.  These valuations may differ substantially from an
actionable value, particularly in volatile market conditions.  Whilst the information provided has
been obtained from sources believed to be reliable, DM Ross Associates does not attest to its
accuracy or completeness. DM Ross Associates does not accept any liability (whether in contract,
tort or otherwise howsoever and whether or not they have been negligent) for any loss or damage
(including, without limitation, loss of profit), which may arise directly or indirectly from use of or
reliance on such information.

# DM Ross Associates Inc.

315 East 72 Street
Suite 19B
New York, NY 10021
(917) 251-8456
DM.Ross.Associates@earthlink.net

Sincerely,

David Ross
President

Enclosure

# DM Ross Associates Inc.

315 East 72 Street
Suite 19B
New York, NY 10021
(917) 251-8456
DM.Ross.Associates@earthlink.net

## DM Ross Associates Inc.

Since 2006, DM Ross Associates Inc. has provided financial, marketing, and technology services to financial services companies. These clients have included Citigroup Smith Barney and the Bank of New York Mellon.

The president and principal of DM Ross Associates Inc. is David Ross. Mr. Ross has worked with and for financial services companies since 1984. He has held executive and/or professional positions, consecutively, with the Federal Reserve Bank of New York, Bankers Trust Company (now part of Deutsche Bank), and Citigroup. At those firms, Mr. Ross worked at various times in their marketing, finance, accounting, and technology areas. Over these 25 years, Mr. Ross has been responsible for valuing and reporting on private and public securities, both client-owned and bank-owned holdings.

Mr. Ross holds a Masters in Business Administration in Finance and Accounting from Columbia University and a Bachelor of Arts degree from Duke University.

# DM Ross Associates Inc.

315 East 72 Street
Suite 19B
New York, NY 10021
(917) 251-8456
DM.Ross.Associates@earthlink.net

27-January-2010

The Honorable Richard J. Sullivan
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: Amerindo 2009 Holdings Exceed $43 Million; Department of Justice Report Incomplete and
Unreliable

Dear Judge Sullivan,

Ten months ago, Mr. Gary Tanaka engaged the services of my firm to review the Amerindo
Investment Advisors' private equity holdings of his firm's clients. He asked us to inventory the
private holdings, obtain pertinent information about them, and make an initial estimate of the
value of these holdings for informational purposes. Please consider this as an interim analysis as
this is an ongoing process. While we will continue to update our estimates as further information
becomes available, we have reached several conclusions based upon our work in the last ten
months.

## Amerindo Client Holdings Exceed $43 Million as of 30-September-2009

Please note that we have reviewed the holdings that several Amerindo funds and investment
vehicles had in 91 private companies in 2009. This review was based upon documents provided
by the private companies and used various private equity valuation methods including those
summarized in the Private Equity Industry Guidelines Group's Updated U.S. Private Equity
Valuation Guidelines of March 2007. As a result of these efforts, I have reached an initial
indicative value of $15,541,074 for the Amerindo Technology Growth Fund II 2009 private equity
investments.

Combined with the cash and public securities reported in available custodian statements and
distributions for this fund and other selected client vehicles, I have reached an initial indicative
value of $43,608,384 for Amerindo Investment Advisor client holdings as of 30-September-2009.
Please note that we have not yet been able to obtain primary documentation for cash distributions
received from sales of certain private company holdings, which may reduce this value by up to
$2,000,000.

We have attached several reports in support of these conclusions.

The indications of value are provided to you for informational purposes only. These valuations are
indicative, not actionable, and are not an offer to purchase or sell any instrument or enter into,
transfer or assign, or terminate any transaction. These valuations may differ substantially from an

1 of 3

# DM Ross Associates Inc.

315 East 72 Street
Suite 19B
New York, NY  10021
(917) 251-8456
DM.Ross.Associates@earthlink.net

actionable value, particularly in volatile market conditions.  Whilst the information provided has been obtained from sources believed to be reliable, DM Ross Associates does not attest to its accuracy or completeness.  DM Ross Associates does not accept any liability (whether in contract, tort or otherwise howsoever and whether or not they have been negligent) for any loss or damage (including, without limitation, loss of profit), which may arise directly or indirectly from use of or reliance on such information.

## Department of Justice Report Incomplete and Unreliable

At the request of Mr. Tanaka, we have also reviewed the Department of Justice's report on the private holdings in the Amerindo Technology Growth Fund II's JP Morgan account #102-01495 M26.  Please also note that the Department of Justice report omitted any analysis of holdings in 10 other accounts held by the Amerindo Technology Growth Fund II and other Amerindo Funds.

It is my conclusion that the Department of Justice's report cannot be depended upon to adequately reflect the value of the Amerindo Technology Growth Fund II's private holdings.  The report reflects inadequate staff training, inadequate access to documentation, and inadequate time assigned.  We have provided examples of these shortcomings below.

eBags is a good example of inadequate staff training.  The Department of Justice had access to Amerindo's records through May 2005.  In addition, they were in contact with eBags financial staff.  From their available documentation, and documentation that eBags would have provided, they could have placed a simple value on Amerindo's holdings using the liquidation preference price available in all eBags financials since 2003.  Given the 528,814 Series B Preferred Shares that Amerindo has at a liquidation preference price of $6.04 per Series B Preferred Share, they could have readily calculated a value of $3,194,036.56.  With sufficient training, they could also have calculated a valuation following U.S. valuation standards using financials from comparable online retailers, as we did.  Given eBags steady growth in revenues and gross profit, they would also have concluded that eBags could readily achieve the liquidation value either through a public offering or a sale of the company.

OnFiber Communications is a good example of inadequate access to documentation.  We respect that obtaining access to full documentation on a private holding can be challenging, especially in the case of active private companies that may not wish to share volatile financial statement information.  In this case, however, the lack of access to documentation is puzzling.  OnFiber Communications was sold to Qwest Communications International in May 2006.  The pending distribution for the Amerindo Technology Growth Fund II of $1,620,917.79 was placed with U.S. Bank.  In the Government Sentencing Memorandum on page 95, the government specifically references these funds.  The Department of Justice should have been able to place this value on the Amerindo position in OnFiber Communications.

2 of 3

# DM Ross Associates Inc.

315 East 72 Street
Suite 19B
New York, NY 10021
(917) 251-8456
DM.Ross.Associates@earthlink.net

Tellme Networks is a good example of inadequate time assigned. A review of the Department of Justice report reveals a striking lack of notes on the final page. On the first three pages, the Department of Justice made insightful comments on many, although not all of Amerindo's private positions. This is not the case on the fourth and final page. Unfortunately, one of the positions that may not have been reviewed is that of Tellme Networks (which is also improperly transcribed as Tellne Networks). An examination of Tellme Networks final disposition, similar to that performed by the Department of Justice on the first three pages, would have revealed that Tellme Networks was sold to Microsoft in April 2007. The pending proceeds of this sale to Amerindo are $1,672,892.60.

We have documented other examples of this inadequate staff training, inadequate access to documentation, and inadequate time assigned, although the above are some of the more conspicuous

Given that the Department of Justice report placed a value of only $766,780.30 on eBags and no value on both OnFiber Communications and Tellme Networks in contrast to a more appropriate combined value of $6,487,846.95, we respectfully submit that this report cannot be depended upon to adequately or accurately depict the value of Amerindo's private holdings.

Sincerely,

David Ross
President

# DM Ross Associates Inc.

315 East 72 Street
Suite 19B
New York, NY  10021
(917) 251-8456
DM.Ross.Associates@earthlink.net

27-January-2010

The Honorable Richard J. Sullivan
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY  10007-1312

Re:  Review of Amerindo Client Funds Actual and Possible Loss of Value

Dear Judge Sullivan,

Ten months ago, Mr. Gary Tanaka engaged the services of my firm to review overall asset
valuations as of 2005 and 2009 for funds managed by Amerindo Investment Advisors.  In the
course of our review, we came upon situations where lack of investment management and
investment administration oversight during the period beginning July 2005 to the present has led
to actual and/or possible loss of value for Amerindo private clients.  At Mr. Tanaka's request, we
are providing you with a summary of our findings.

1.  Actual Loss of Value:  Lack of Fund Custodian Administration Oversight

The first situation involves lack of oversight of the Amerindo funds' custodian accounts.  Many of
the Amerindo funds have accounts formerly with Bear Stearns, now with JP Morgan.
- Tax Status.  In January 2008, Bear Stearns incorrectly changed the status of one or more of
these accounts from 'U.S. owned' to 'Non-Resident Alien owned' and began to withhold taxes
on interest received.  These same accounts had not been subject to withholding prior to
January 2008.  By our estimate, this change has cost the Amerindo Technology Growth Fund
II more than $105,000 alone in one account, # 102-01495 M26.
- Inactive Cash.  Later in 2008, JP Morgan changed the handling of the cash in one or more of
these accounts, no longer investing it in a daily sweep fund and therefore no longer paying
interest on the cash in the accounts.  By our estimate, this change has cost the Amerindo
Technology Growth Fund II more than $80,000 alone in one account, # 102-01495 M26.
As a result, inattentive administration of the Amerindo custodian accounts has cost its clients more
than $185,000 to date.

2.  Actual Loss of Value:  Lack of Defensive Investment in Private Holdings

A second situation relates to the lack of selective participation by Amerindo in certain refinancings
by private companies in which the Amerindo funds held positions.  Since May 2005, a number of
the private companies in which Amerindo Investment Advisors invested have completed new
rounds of financings.  In most of these new financings, the companies have given existing
investors the opportunity to provide further capital to the private company involved.  If the
existing investor did not participate, their existing investment was substantially diluted, often
leading to a significant decrease in the value of their investment.  A good example of this is:

1 of 3

# DM Ross Associates Inc.

315 East 72 Street
Suite 19B
New York, NY 10021
(917) 251-8456
DM.Ross.Associates@earthlink.net

- Axsun Technologies Inc. In October 2006, Axsun Technologies completed a new round of financing to enable further growth. Existing investors were given an opportunity to invest a moderate amount of cash to retain their preferred investor status. Existing investors, including Amerindo, who did not participate lost their preferred status and were severely diluted. When Volcano Corporation acquired Axsun Technologies in December 2008, preferred investors received cash in return for their positions. All other investors received nothing. Had Amerindo invested approximately $85,000 in 2006 to hold its preferred status, it would have received more than $200,000 in 2008.

It is reasonable to note that Amerindo may not have chosen to invest further with a failing private company. Since most of the companies seeking a refinancing had growing revenues and improving profit profiles, it is likely that Amerindo would have decided to invest further with these companies, both to protect the value of their investment and to participate in further growth.

3. Potential Loss of Value: Uncollected Pending Cash Distributions

This third situation involves cash distributions due to the Amerindo funds as the result of sales of all or parts of private companies in which the Amerindo client funds had an investment. From May 2005 through August 2008, these cash distributions exceeded $5 million and less than $2 million of these funds were received in the Amerindo client fund accounts. Several examples of distributions still not yet collected include:

- OnFiber Communications – Acquired May 2006: $1,620,917.79
- Commergent Technologies – Acquired January 2007: $817,250.56
- TellMe Networks – Acquired April 2007: $1,672,892.60
- Homestead Technologies – Acquired December 2007: $239,208.34

While some of these distributions may be held in escrow in interest bearing cash accounts, others may not be, leading to the loss of potential interest income. A further risk with some of these distributions is that they may be declared as abandoned property by state regulations if not obtained soon, as some were set aside more than three years ago.

4. Potential Loss of Value: Lack of Active Management

This last situation examines the potential loss of value due to the lack of active management of the more than $16 million in cash in the Amerindo client funds from July 2005 through December 2009. We have calculated the likely interest that the Amerindo Technology Growth Fund II would have earned in 2008 and 2009 had JP Morgan continued investing the available cash at the three month Treasury bill rate. When combined with the actual interest that this fund earned in 2005 through 2008, we have estimated the likely total interest income at $2.3 million from July 2005 through December 2009. This income would produce an annualized return of 2.994% given the initial $16.3 million in cash available on 30-June-2005.

The Amerindo client funds were venture capital/hedge funds that invested heavily in technology, telecommunications, and biotechnology companies. According to Hedge Fund Research Inc,

2 of 3

# DM Ross Associates Inc.

315 East 72 Street
Suite 19B
New York, NY  10021
(917) 251-8456
DM.Ross.Associates@earthlink.net

hedge fund managers using all equity based strategies had an average annualized return of 4.58% for the period 2005 through 2009.  Given a return of 4.58%, the $16.3 million in available cash would have produced proceeds of $3.6 million, an additional $1.3 million, in this period.  Hedge Fund Research Inc. has also found that hedge fund managers who focused their equity investments in the Technology and Healthcare sectors, as Amerindo did, had an average annualized return of 7.81% over the same period.  Given a return of 7.81%, this available cash would have generated proceeds of $7.5 million, an additional $4.2 million, from July 2005 through December 2009.  It is reasonable to expect that active investment management of this cash would have produced a minimum 7.81% annualized return given the investment focus and superior long-term investment performance of Amerindo Investment Advisors.

In light of these four findings, we would encourage the immediate resumption of active administration of the Amerindo client funds, at a minimum.  We would also recommend resumption of active investment management of these funds.

Sincerely,

David Ross
President

3 of 3