UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
SECURITIES AND EXCHANGE                :
COMMISSION,
                                       :      05 Civ. 5231 (LTS)
                    Plaintiff,
                                       :
        v.
                                       :
AMERINDO INVESTMENT ADVISORS,
INC, *et al.,*                         :
                    Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Based on the allegations in the complaint, the evidence presented
by the government in the parallel criminal case, *United States v. Vilar
and Tanaka*, 05 Cr. 621  (RJS), and the submissions filed by the SEC
and the US Attorney in 2012 in both cases, Gary A. Tanaka moves to
dismiss and/or strike the complaint, in whole or at least in significant
part, on the grounds that (1) the alleged fraud involving GFRDA
investors (Complaint ¶¶ 73-157) is beyond the reach of U.S. Securities
Laws; (2) the alleged fraud involving ATGF and ATGF II investors is
insufficiently pleaded and did not exist; and (3) as matters of fact, law
and equity, there is no basis for additional penalties beyond those

imposed in the criminal matter in which the SEC fully participated as part of "the government"; the attempt to do extract additional penalties in this Court violates the 5th, 6th, and 8th amendments of the United States Constitution.

## I.   THE SECURITIES LAWS DO NOT REACH THE ALLEGED FRAUD IN CONNECTION WITH INVESTORS IN GFRDA

After this complaint was filed, the Supreme Court, applying the presumption against extraterritoriality, ruled that the securities fraud statute, Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.S. § 78j(b), "reaches the use of a manipulative or deceptive device or contrivance *only* in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2888 (2010) (emphasis added).  The holding has been extended to Section 17(a).  See *SEC v. Goldman Sachs & Co.,* 790 F. Supp.2d 147 (SDNY 2011).

On March 1, 2012, the Second Circuit interpreted *Morrison's* second prong: attempting to give content to the meaning of the phrase "purchase or sale of any other security in the United States," it

discussed the circumstances under which the purchase or sale of a security that is not listed on a domestic exchange should be considered "domestic" within the meaning of *Morrison*. It held that, in order to state a claim under § 10(b) involving securities not listed on a domestic exchange, a complaint "must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Limited, et. al v. Ficeto*, Docket No. 11-0221-cv (2d Cir. 2012).

The complaint here alleged no such facts as to offshore investors, and the evidence at the criminal trial confirms that no such facts could be alleged now (even if they could be deemed timely.)

GFRDA was not listed on an American stock exchange, and, as the government's evidence at the criminal trial showed, both the purchase and sale of it was deliberately and carefully structured to occur outside the United States. The seller – Amerindo Investment Advisors, Inc. – was a Panamanian entity (T. 4279) duly organized and domiciled in Panama, and recognized as such by the SEC (U-GX-3001; *SEC v. Amerindo Investment Advisors Inc.*, et al, 05 Civ. 5231 (LTS) (DFE) (Amended Complaint, ¶ 18 "Amerindo Panama is a Panamanian

corporation") (hereinafter "SEC Amended Complaint"); EX R to submission of A.U.S.A. Marc Litt, in connection with a *Franks* hearing– see Doc 145-18 SEC sched. 13G).[1]

As set forth below, the GFRDA investors – those who were identified at the criminal trial and those who are described in the SEC complaint -- did their purchasing through entities that were specifically designed and organized offshore in order to make the purchases.

Thus, even though the extra-territorial issue was not appreciated at the criminal trial, the documents introduced at trial showed that over **97%** of the nearly $70,000,000 in GFRDA purchases (as delineated in the Government's Sentencing Memorandum, at 92, and all of which it sought as "forfeitable proceeds") were purchase/sale transactions outside the United States between a Panamanian seller and purchaser-entities incorporated and/or domiciled offshore.  Government exhibits that were not introduced at the trial but were produced to the

---

[1] "T." refers to the transcript of the criminal trial; "GX" refers to Government exhibits admitted at trial; "DX" refers to defense exhibits admitted at trial; "U-GX" designates documents turned over to the defense by the government, and marked as exhibits but not introduced at trial.

defendants in discovery (labeled U-GX in the appellate briefs) bring the number to just about 100%:

- The Mayers purchased through private trust companies incorporated in the Bahamas (and received their interest payments and account statements through that and other off-shore companies that the family controlled) (T. 912, 1236, 4520; GX-8225; GX-8240; GX-3361-3; GX-3361-09; U-GX-3059; U-GX-6190-6195; U-GX-3359-11; U-GX-2101).

- Wayne Lewis purchased GFRDA through Graphic Enterprises Ltd, a Grand Cayman Islands company using Dextra Bank & Trust Co. Ltd., also in Grand Cayman Islands. (GX-3363-2)

- Beulah Birrd, a Stephen Gray client who, according to Gray, was "an Irish national resident but not domiciled in the U.K," made her GFRDA purchase through her 100% owned "Nevis registered share corporation, Lynx Ltd." that, according to Gray, was "formed solely to make a US$8 million investment into the Amerindo Guaranteed Fixed Rate Deposit Account". (GX 2096, USR-03312-4; T. 4113, 4129-36, 4142-9)

- Gary Wiener, another Gray client, purchased through Binna Holdings, also a Nevis corporation. (T. 4103, 4222-23, 4240, DX KC-5).

- Spartacus DeLia made his investment through a company he formed offshore called Worldwide Tops. (T. 4098-4100, 4207) (Indeed the printed subscription form signed by DeLia had a line for the entry of the "(Client's Name/Client's Offshore Corporation"). (DX JN-1).

- The Giannamores purchased through Just Capital Ltd. (T. 4104, 4164-71, DX JD-1) (In their case, the words "Client's Name" was crossed out on the printed subscription form and only the name of the "Client's Offshore Corporation" was entered.)

- Donald Kahn purchased through Paragon Ventures Ltd. in Jersey (T. 4102, 4176; U-GX 3330-06; U-GX-2104)

- Alec Cobbe purchased through Pelican Trust, whose Trustees, Guinness Flight, were in Guernsey, British Channel Islands. (T. 4105-6; DX JR) (Government March 1, 2010 Guernsey, British Channel Islands. (T. 4105; DX JR) (Government March 1, 2010 Letter, Exhibit X)

- Kent B. Crane made his GFRDA purchase through Nemo Holdings Ltd., which was incorporated in the Isle of Man. He also arranged to have his funds wired from Jersey and his returns wired to a Swiss bank account. (T. 4105-6, 4396; GX 2094-C, USR-04036, USR-04041; DX KI-3; U-GX-2098)

- U-GX-3388 shows that Tara Colburn (who had died prior to trial) made the purchase in London in January 2000, and that she did this "offshore" transaction for tax and secrecy reasons. As stated in that exhibit, "one comes to England to deposit funds with a Panamanian corporation to ensure that there is no US nexus and that the laws and rules of the US do not apply to the transaction."

- Likewise, the evidence indicates that Robert Cox and his partner John Hunter, the Urichs, and Graciela Lecube-Chavez were operating offshore. Their names are all listed on U-GX-3264, a document entitled "Offshore" with dates of statements in 1995. Another document, U-GX-3304-4, shows that, in 1995, Cox and Hunter requested that their interest payments be deposited in their London bank account.

- U-GX-3333-11, Marianne Kaye's GFRDA Application Form, shows that she has a London address. [2]

The SEC complaint nonetheless seeks to assert enforcement authority over these GFRDA investments. The complaint purports to describe five investors who purportedly purchased or received shares of GFRDA and were supposedly defrauded by alleged misstatements in offering circulars. Based on the descriptions, it is possible to match each one with an individual about whom the government's exhibits in the criminal case (whether introduced at trial or not) show ownership through an offshore entity: Investor # 2 is the Mayers (Bahamas); Investor # 3 is Kent Crane (Isle of Mann); Investor # 4 is Beulah Birrd (Nevis); Investor # 5 is Lecube-Chavez (London); and Investor # 7 is Ariadne Sanchez-Weir who operated through. A.R.I. Investors, Inc., a

---

[2] There is only one GFRDA investor on the government's post-trial sentencing list of GFRDA investors about whom we could find no evidence: "Hrytsyk/Pavlovskyy". The source assigned by the government to support this investment – GX-3490- is not on the government's exhibit list. We believe that, like all the others, it is another offshore investor.

company incorporated in the British Virgin Islands (GX-3346-14, U-GX-3346-17).

*All* are offshore clients.

Offshore was the name of the GFRDA game (*see* http://treasureislands.org), to avoid domestic regulation, to insure secrecy, and to avoid domestic taxation. (See e.g., T. 4225, testimony of attorney Stephen Gray who counted many of the GFRDA investors as his clients:  "I would have known that it [Binna Holdings] was not an entity formed in the United States...No one would have formed a company in a place where you would pay tax unnecessarily.) [3]

---

[3] "Offshore" permeated the criminal trial.  Offshore investments were offered to Lily Cates (GX 124, "these returns are able to remain offshore for tax purposes"); Rhodes Capital Group, Ltd. was incorporated in the British Virgin Islands (GX 128).  See also, GX 4605, email subject "Offshore trades – coded"); (GX 4617, "Non-operational offshore assets and liabilities as at 31 May 02") (T. 3214-3223:  "No requirement that companies that incorporate in Panama have a substantial portion of their business in Panama...Quite common for foreign corporations to incorporate in Panama."); SEC Amended Complaint, ¶17 "Amerindo UK is a United Kingdom corporation."  ¶ 19 "AMI is a Panamanian corporation";  ¶ 20 "ATGF is an open-end investment company incorporated in Panama"; ¶ 21 ""ATGF II is an open-end investment company incorporated in Panama."

*Morrison* held that the securities laws are not designed to reach offshore transactions in private securities.   Like the criminal prosecution, the allegations in the SEC complaint relating to GFRDA should never have been brought.  In essence, if people (including U.S. citizens) want to escape regulation and escape taxation by doing their business offshore, they do so without the protection of U.S. securities laws.  The U.S. government and the U.S. courts are not available tools for these investors to recoup their investments when they go sour (unless the courts are the forum for a contract action).

*Morrison* precludes any SEC enforcement action relating to alleged fraudulent conduct in connection with these extra-territorial securities transactions under §10(b) and §17(a).  As in *SEC v. Goldman Sachs & Co.,* 790 F. Supp.2d 147 (S.D.N.Y. 2011), where the Court – on *Morrison*/failure to state a claim grounds - dismissed the SEC's claims based on both Section 17(a) and Section 10(b), the claims based on GFRDA transactions must be dismissed.

II. SECURITIES FRAUD IN CONNECTION WITH ATGF INVESTORS IS INADEQUATELY PLED (AND THERE WAS NO FRAUD)

The SEC complaint alleges that investors in ATGF and ATGF II were defrauded (¶¶ 158-172), but this "fraud" does not appear to be in connection with the offer, the purchase or sale of the ATGF securities; nor is there any allegation that a material misrepresentation was even made to any ATGF or ATGF investor.  Accordingly, any Section 10(b) or 17(a) claim based on ATGF or ATGF II investors must also be dismissed.

The complaint alleges that ATGF and ATGF II were "off shore hedge funds", managed by Amerindo Panama, a Panamanian corporation.  Purchasers of shares in the fund – sophisticated investors some of whom resided in the United States -- were allegedly defrauded because the defendants commingled funds provided by ATGF purchasers with funds provided by purchasers of other investments such as GFRDA, and because *in 2003*, Tanaka supposedly "misrepresented [to, apparently, a Broker-Dealer at Bear Stearns] that Amerindo US" had an equity interest in ATGF and ATGF II and did so

– according to the SEC and the DOJ, "in order to misappropriate investors' funds."

The complaint does not identify or describe any particular ATGF investor, the date or circumstances surrounding the purchase of any ATGF shares, or set forth any misrepresentation made by any defendant to any ATGF investor.  Nor does it allege with sufficient particularity a set of facts that would lead a reasonable person to infer that, at the time defendants sold the ATGF shares to the investors, they acted with the intent to misappropriate the proceeds for their own purposes, cf. *SEC v. Zandford*, 535 U.S. 813, 824 (2002) ("SEC claims respondent sold [investors] securities while secretly intending from the very beginning to keep the proceeds"), or otherwise to fail to honor investment contracts.

The paucity of evidence was revealed when, at the *Franks* hearing in 2006, former AUSA Marc Litt testified that the Magistrate Judge reviewing the "all records" search warrant and warrant affidavit for the arrest of Gary Tanaka for alleged "conversion", had asked how the government could draw an inference that any "appropriations" of moneys from Amerindo accounts were "appropriations" *of investors'*

*moneys* as opposed to use of moneys of Amerindo's own.  Litt said that he told the Magistrate Judge it was supported by a chain of inferences, in part from Lily Cates' statements that (years after the purchases were made) other investors "may" have had problems with redemptions. Though Litt drew an inference at this time that everything defendants did was "permeated with fraud," Judge Karas issued a 120-page ruling in 2007 holding that the government had not shown even probable cause to conclude that there was fraud against *anyone*, except possibly Cates and Mayer based on their own statements to the government.

Moreover, the SEC confuses possible misstatements *to it*, as statements amounting to investor fraud.  If, *arguendo*, anyone made misstatements to the SEC in 2003 (or at any other time) about ownership of accounts through Panama or in ATGF, and if, *arguendo,* such a misstatement *to the SEC* suggested a violation of some SEC Rule that, *arguendo*, is applicable to offshore companies, this *might* warrant some sanction.   However, some such technical violation does not translate into a fraud aimed at investors and in connection with purchases by investors made years earlier.

"Section 10(b) and Section 17(a) have essentially similar requirements that the deceptive conduct occur in connection with the "purchase or sale" or "offer or sale," respectively, of any security." *SEC v. Roanoke Tech. Corp.*, 2006 U.S. Dist. LEXIS 92995, *10 (M.D. Fla. 2006). While misrepresentations and omissions need not coincide precisely with a securities transaction, there must be some connection between a falsehood and the securities transactions.

No such connection is apparent on the face of this complaint. (Indeed, no ATGF investor is claiming fraud.) Accordingly, the section 10(b) and section 17(a) claims for relief as they relate to ATGF investors must be dismissed.

The SEC also alleges no facts that allow the inference that any of the ATGF "purchase[s] or sale[s were] made in the United States." *Morrison*, 130 S. Ct. at 2886. And, for this reason as well, the claims involving ATGF must be dismissed.

### III.   NO PENALTIES OR OTHER REMEDIES ARE APPROPRIATE IN THIS ACTION

- **THE SEC IS VIOLATING DEFENDANTS' FIFTH AND EIGHTH AMENDMENT RIGHTS BY CARRYING ON THIS CASE**

The SEC and the DOJ engineered this case so that the government would have two shots at all of defendants' assets, and so that defendants would not have access to their money after they were arrested, making it impossible for them to fully defend themselves -- especially during the second round. The SEC's continuation of this effort violates the defendants' Fifth Amendment protection against Double Jeopardy and to Due Process, and their protection under the Eighth Amendment from the imposition of an Excessive Fine. Accordingly, the complaint should be dismissed and all prayers for relief should be dismissed.

In *Hudson v. United States*, 522 U.S. 93 (1997), the Supreme Court clarified the approach for determining whether a penalty sought in a civil proceeding was "criminal" for double jeopardy purposes, and in the same case noted that, even if Double Jeopardy protections did not bar a "civil" penalty (or any second penalty), other Constitutional provisions – the Eighth Amendment and Due Process – still gave

protection.

Thus, the Supreme Court wrote with respect to claims of irrational and excessive punishment:

> [S]ome of the ills at which *Halper* was directed are addressed by other constitutional provisions. The Due Process and Equal Protection Clauses already protect individuals from sanctions which are downright irrational. *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 ... (1955). The Eighth Amendment protects against excessive civil fines, including forfeitures. *Alexander v. United States,* 509 U.S. 544 (1993); *Austin v. United States*, 509 U.S. 602 (1993).

522 U.S. at 102-03.

There are due process and eighth amendment violations here.

The Excessive Fines Clause limits the government's ability to extract payments, whether in cash or in kind, as punishment for some offense. *Alexander v. United States*, 509 U.S. at 558. The Eighth Amendment is violated by imposition of an "Excessive Fine" regardless of the length or duration of any penalty of confinement, and, as in *Alexander*, may be violated when the government seeks and *in personam* criminal forfeiture that is disproportionate to the gravity of the offense.

The SEC has made plain that the disgorgement and civil

16

monetary penalties it is seeking are designed to serve first and foremost as a backup in case the criminal forfeiture is reversed, and secondly as a tool for extracting even greater monetary punishment.   The SEC insists that every asset belonging to the defendants must be returned to the investors, but this is, by definition, excessive since the SEC doesn't even know how to evaluate the investor claims or what it calls investor "losses" or the assets or any "ill-gotten" gains.

However venal the government tried to paint the defendants – in the press and in the criminal case and in this case -- they were not operating a Ponzi scheme, they did not abscond with the investors' money, and they did not cause the investors any irreparable harm: indeed, the government is still sitting on accounts that are available for their repayment and the defendants are actively seeking ways to make the repayments a reality.

The only financial harm the defendants might have caused any investor resulted from stalling and not redeeming investments when they were strapped for cash and when they asked their long-time-friend investors to wait.   A $54.3 million forfeiture – whether it is called criminal forfeiture or disgorgement or civil monetary penalty – is a

monetary extraction that is "grossly disproportional to gravity of" this conduct. *United States v. Bajakajian*, 524 U.S. 321, 324 (1998). See *United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009) (In applying *Bajakajian*, Court applies four factors that the *Bajakajian* Court considered in determining whether the forfeiture was excessive -- namely, (1) "the essence of the crime" of the defendant and its relation to other criminal activity; (2) whether the defendant fit into the class of persons for whom the statute was principally designed;   (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct).

Something is terribly out of whack in this case.  After putting the defendants out of business, the prosecutors believed they could and should grab every conceivable asset of the defendants, and use these assets to satisfy any and all claims of every known Amerindo investor around the world. [4] Professing to keep sentencing "as simple as

---

[4] The prosecutors initially sought forfeiture of more than $80,000,000 -- even though, according to their own calculations, this was nearly twice as much as was needed to make whole every known Amerindo investor whether defrauded or not -- including those (like the Mayers who invested through a private trust company in the Bahamas (T. 912), and unidentified investors in ATGF, an "unaudited Panamanian hedge fund") who were secreting their activities and income from the U.S. and

possible", they presented the court with an order for a staggering, extravagant, and wholly unjustifiable personal money judgment, and then waltzed in with an order for substitute assets without showing that either order was appropriate.

And now the SEC wants to use this case to guarantee the extravagant forfeiture and even extract more. This is excessive and should not be allowed.

The SEC wants to take all the *residual* value in all the Amerindo companies, *regardless* of whether anyone "lost" anything. This is just crazy. The Constitutional word for it is "Excessive." The SEC's pursuit violates the Constitution. The case should be dismissed now, so that the rest of the players can come to a reasonable settlement.

- ▪ THE RELIEF REQUESTED VIOLATES DOUBLE JEOPARDY

The SEC's attempt at a successive proceeding in order to insure the government's claim to all the assets (and more) that were the subject of forfeiture in the criminal case also violates Double Jeopardy. In *Hudson*, the Court ruled, double jeopardy is "[i]nitially ...a matter of

---

their home countries by operating off shore through entities in tax haven jurisdictions. (Letter, February 3, 2010; ST. 44)

statutory construction:   did the legislature, in establishing the penalizing mechanism, indicate either expressly or impliedly its intention to establish a civil or a criminal penalty?"

But even where, on the face of a statute, it appears that the legislature indicated an intention to establish a civil penalty, the circumstances may be such that what was clearly intended as a civil remedy has been transformed into a criminal penalty.

The SEC has transformed this case into a criminal case, through disgorgement and civil money penalties the objective of which, in the SEC's view, is to insure that the assets (*all* assets of the defendants) ordered forfeited in the criminal case will be distributed to investors, and not returned to the defendants; then, if it can, it threatens to lay claim to even more.

This unjustly duplicates the criminal prosecution.

*Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-169  (1963), discussed in *Hudson*, sets forth a number of factors a court should consider in evaluating whether the attempt to impose civil and criminal sanctions is unconstitutionally duplicative.   Here, several factors plainly support the conclusion that this second grab at the same

overstated penalties is another claim for a criminal penalty.  One factor that is evidenced beyond dispute is that the two government agencies, the SEC and the US Attorney's office, acted in tandem, to pursue punitive sanctions, and to do it serially.

Congress may have created what on their face appear as two statutory schemes (one civil and one criminal), but, we suggest, Congress never envisioned that an SEC official would join in the execution of a criminal search warrant, that the DOJ would intervene in the civil case (where the SEC already has counsel on the US government payroll) to stop the civil case while the defendants are stripped of assets, and then the SEC would try to punish the defendants to the extent of the criminal forfeiture sum even if it is wrong, and even if it is reversed.

The government blurred the distinction between civil and criminal here.  Then it blurred its enforcement missions.   The SEC case *de facto* seeks criminal penalties that were already imposed, and it should be dismissed under the Double Jeopardy Clause of the Constitution.

> ▪ **NO SEC PENALTIES OR OTHER EQUITABLE FORMS OF RELIEF ARE APPROPRIATE IN THIS ACTION**

All of the requested relief including prayers for injunctions, disgorgement, and civil monetary penalties are matters of equity. No further penalties are appropriate here where, seven years after the government and the SEC instituted their actions, the defendants' business is in ruins, they have had every known asset taken from them, they have been sentenced to long prison terms, and, for years, the government has sat on millions upon millions of investor money (and defendants' funds) letting it sit idle without doing anything to either protect its value or get it back in the hands of the investors.

The SEC has acted *inequitably.* Along with the prosecutors in the criminal case, the SEC overplayed its hand: It used an overbroad warrant to ransack Amerindo's offices and put the company out of business. Then, instead of filing a civil forfeiture case to restrain assets it thought "involved" in any fraud (which would have triggered procedural and substantive rights, including the right to counsel pursuant to 18 U.S.C. § 983), the SEC winked at the banks and got them to restrain all of the defendants' funds in contravention of the prohibition against pretrial restraint of assets in a criminal case. See,

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332 (1999) (pretrial restraint of debtor's assets in civil proceeding is a severe remedy independent of a right to damages or property following a finding of liability, and such restraints are a `"nuclear weapon' of the law."`).  This purposeful skirting of process was not only unfair and inequitable, but also violated the defendants' Sixth Amendment and Due Process rights.

After obtaining convictions in the criminal case, the government immediately obtained judicial sanction for the previously unofficial restraint of all known assets of the defendants, and then put together an unjustified and unsubstantiated proposed order for the forfeiture of "substitute assets" that, it knew, exceeded the amount Judge Sullivan intended to approve by $36.7 million!  And after it obtained the judge's signature, the SEC jumped back in and began a campaign of coercion.

Under these inequitable circumstances, it cannot be right to impose further penalties on the defendant.

Proclaiming this case a massive international fraud, the SEC together with the DOJ made a mountain out of molehill, and, instead of protecting investors, its actions wound up hurting them more than

anything it showed the defendants to have done.  Indeed, it seems that the government can't seem to dig its way out of the mess it made. Piling more sanctions on the defendants only serves to cover up what went wrong here.   The claims for equitable relief should all be dismissed.

- THE SEC'S CLAIM FOR DISGORGEMENT SHOULD BE DISMISSED: THE SEC HAS FAILED TO ALLEGE THAT DEFENDANTS WERE UNJUSTLY ENRICHED; AND, TO THE EXTENT THAT THE SEC SEEKS DUPLICATION OF ANY AMOUNT AWARDED AS RESTITUTION IN THE CRIMINAL CASE, THE REQUEST VIOLATES DOUBLE JEOPARDY

Disgorgement is an equitable remedy designed to ensure that the defendant not profit from his illegal acts by divesting him of unfair profits.  Disgorgement is unavailable here as a matter of law because the complaint contains no allegation that defendant obtained any unfair profits or was unjustly enriched as a result of any alleged securities law violation.   Cf. *SEC v. Gabelli*, 2010 U.S. Dist. LEXIS 27613 (SDNY 2010) ("The SEC adequately alleges that the remedy of disgorgement is necessary to prevent Defendants from enriching themselves through their `ill-gotten gains from their illegal conduct . . .'").

There were no "ill gotten gains" from these transactions.  There were "gains", if at all to defendants, from their investment prowess and

the fees that came with their management skills and services.  Indeed, the government's theory of restitution at trial – and its theory of investor "losses" as set forth in Exhibit B of its February 21, 2012 submission -- presuppose that initial investments kept working for the investors and, as reflected on the regular account statements, were appreciating; any suggestion that the defendants were "unjustly enriched" by an amount measurable by either the amounts that investors deposited, or the amounts on the account statements, is inconsistent with these criminal case theories, and wholly unsupported in the complaint and in fact.  The SEC should not be able to use disgorgement to extract any purported ill-gotten gain or unjust enrichment when there was none.

The SEC has maintained that it is seeking "disgorgement and *prejudgment interest*" "against all of the defendants for the benefit of the Amerindo investors." (Submission, January 27, 2012)   "In a securities enforcement action, as in other contexts, disgorgement is not available primarily to compensate victims" but "[i]nstead . . . to prevent wrongdoers from unjustly enriching themselves through violations, which has the effect of deterring subsequent fraud." *SEC v. Cavanagh*,

445 F.3d 105, 117 (2d Cir. 2006).  In the absence of any allegation that the defendants themselves obtained prejudgment interest on any "ill-gotten gains", no relief by way of a money remedy labeled "disgorgement" can be available to the SEC.  The request for disgorgement relief should be stricken.

Further, it should not be able to seek or obtain either "ill-gotten gains" or "prejudgment interest" twice – once in the criminal case and again in the civil case.  Doing so violates double jeopardy.

We recognize that in *SEC v. Palmisano*, 135 F.2d 860 (2d Cir. 1998), the Circuit rejected the arguments that imposition of a disgorgement obligation and a civil money penalty violated double jeopardy in light of the punishment imposed in Palmisano's criminal case.  However, and significantly, the *Palmisano* Court cautioned that, in order not to violate double jeopardy, any disgorgement must take into account the payment of restitution ordered in the criminal case.  If it did not, the total amount Palmisano would be ordered to pay could exceed his unlawful gains. This, it opined, would not be acceptable, and, therefore, it ordered any judgment in the civil case provide that restitution payments in the criminal case offset any disgorgement

obligation.  See also, *SEC v. Monarch Funding Corp.*, 1996 U.S. Dist. LEXIS 8756 (SDNY 1996) ("it is axiomatic that disgorgement should be fashioned on the amount of ill-gotten gain currently realized by the defendant and not yet already repaid.")

- ▪ THE SEC HAS NOT ADEQUATELY PLED A BASIS FOR INJUNCTIVE RELIEF

Section 20(b) of the Securities Act provides for injunctive relief when a person "is engaged or about to engage" in any securities-law violation. 15 U.S.C. § 77t(b*).  The "critical question" in determining whether such conditions are present is "whether there is a reasonable likelihood that the wrong will be repeated." *SEC. v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972)*.

In determining the likelihood of future violations, and whether injunctive relief is available in an action under the Exchange Act, "[t]he focus of this inquiry is on the defendant's past conduct." *SEC v. Colonial Investment Management*, LLC, 2008 U.S. Dist. LEXIS 41442, 2008 WL 2191764, *3 (S.D.N.Y. 2008) (quoting *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978)). "Other factors courts should consider in determining whether there is a reasonable likelihood of future violations include: (1) the egregiousness of the past violations; (2)

the degree of scienter; (3) the isolated or repeated nature of the violations; (4) whether defendant has accepted blame for his conduct; and (5) whether the nature of the defendant's occupation makes it likely he will have opportunities to commit future violations." Id. (citing *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998)).

Although the SEC has pled that "unless enjoined" defendants "will again violate" Sections 10(b), and 17(a) of the Securities Act, and Sections 206(1) and (2) of the Advisers Act, (Compl. ¶¶ 191, 242), these conclusory allegations are not supported by the allegations in the complaint, the evidence presented at the criminal trial, or the actions undertaken by the SEC since the complaint was filed.

The SEC's request for injunctive relief here should be dismissed because it has not adequately pled, and the government has never demonstrated, any realistic likelihood of recurrence. To the contrary, all the evidence – including, in particular, the relief the SEC has already obtained by way of 2009 Administrative Orders barring defendants Vilar and Tanaka from association with any investment adviser pursuant to Section 203(f) of the Investment Advisers Act of 1940 – point in the opposite direction.

There is no allegation that either Vilar or Tanaka has ever engaged in a breach of fiduciary duty or other fraudulent activity either prior or subsequent to the specific claims brought here.

Further, while the government made all kinds of proclamations suggesting that the fraud it uncovered was just the "tip of the iceberg", it failed to show this.  Nothing alleged in the complaint or demonstrated at the criminal trial allows for the characterization of the conduct as egregious.  Investors – until the tech bubble burst – had been receiving magnificent returns on their investments (indeed, many were beneficiaries of an unprecedented **249%** return during some years preceding the market bust), and many were fully repaid when they sought to get out.  The government made extravagant proclamations before trial that this was just the "tip of the iceberg" and at the criminal trial that the entire GFRD program was a "sham" – and that regardless of whether a "victim" was able to redeem moneys or not, they were still victims of a "sham investment program" (T. 3584) – but none of these claims materialized.   Judge Sullivan recognized that this was not a Ponzi scheme and, to this day, enormous sums of money and equities are still sitting in Amerindo accounts.  (Sentencing Transcript 37)

As in *SEC v. Gabelli*, 2010 U.S. Dist. LEXIS 27613 (SDNY 2010), where the Court granted the defendants' motion for dismissal of the SEC's request for injunctive relief on the ground that it "has not plausibly alleged that Defendants are reasonably likely to engage in future violations", the facts alleged here "are quite different from those where other Courts have denied motions to dismiss injunctive relief under the securities laws. See, e.g., *SEC v. Colonial Investment Management LLC*, 2008 U.S. Dist. LEXIS 41442, 2008 WL 2191764, *3 (S.D.N.Y. May 23, 2008) (denying Motion to Dismiss where it was alleged that "defendants repeatedly [on eighteen separate occasions] and knowingly engaged in conduct that violated [securities laws] over a period of several years, and engaged in sham transactions to conceal the violative conduct.); *SEC v. Power*, 525 F.Supp.2d 415, (S.D.N.Y. 2007) (denying Motion to Dismiss where it was alleged that defendant "engaged in repeated fraudulent conduct . . . and knowing misconduct over a period of several years" including the creation of sham transactions, improperly writing off assets, improperly valuing inventory, falsely increasing a company's performance through the

improper consolidation of revenues, and improperly directing the establishment of reserves on a worst-case basis)."

Since there is no reasonable likelihood that the defendants will engage in future violations, the request for injunctive relief should be dismissed.

- THE REQUEST FOR CIVIL MONEY PENALTIES BASED ON ALLEGED VIOLATIONS OF SECTIONS 10(b) and 17(a) THAT OCCURRED FIVE YEARS PRIOR TO THE FILING OF THE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS

In several recent cases, the SEC has agreed that, at least with respect to a request by the SEC for civil monetary penalties, the five-year limitations period in 28 U.S.C. § 2462 applies.  See, e.g., *SEC v. Wyly,* 788 Supp. 2d 92, n.67 (S.D.N.Y. 2011); *SEC v. Kearns*, 691 F. Supp. 2d 601, 609 (D. N.J. 2010); *SEC v. Quinlan*, 373 Fed. Appx. 581, 2010 U.S. App. LEXIS 8205 (6th Cir. 2010).

In its prayer for relief here (section VI), the SEC has sought civil money penalties pursuant to several remedial sections, each of which is a penalty provision "keyed" to a "violation."  The complaint charges violations in the abstract without specifying any particular violation.

To the extent that any requested monetary relief rests on allegations of fraud in connection with the purchase and sale of GFRDA or ATGF securities more than five years before the filing of complaint, the relief is barred.

- ▪ NO CIVIL PENALTIES MAY BE IMPOSED FOR AIDING AND ABETTING A VIOLATION OF THE INVESTMENT ADVISERS ACT

The SEC cannot seek civil monetary penalties from aiders and abettors under the Investment Advisers Act. *SEC v. Bolla*, 550 F. Supp.2d 54, (D.D.C. 2008); *SEC v. Gabelli*, 2010 U.S. Dist. LEXIS 27613 (SDNY 2010).

Defendants Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II are charged *only* as aiders and abettors in the Eleventh Claim for Relief: ("Aiding and Abetting violations of Section 206(1) and 206(2) of the Advisers Act") and defendants Vilar and Tanaka are charged *only* as aiders and abettors in the Thirteenth Claim for Relief ("Aiding and Abetting Violations of Section 206(4) and Rule 206(4)-2(a) of the Advisers Act").   Accordingly, the claim for civil monetary penalties

against them in Prayers for Relief ¶ VI. pursuant to Section 209 of the Advisers Act must be dismissed.

## CONCLUSION

To the extent the SEC is doing anything here, it is barking orders trying to bully and coerce the defendants into accepting the huge and erroneously entered "forfeiture", to use all that money to "compensate" "victims" – most of whom have been deprived access to their investments not because of the actions of the defendants but, rather, because of the unprecedented and extravagant actions of the government in ruining Amerindo's business and freezing its accounts. It castigates the defendants while, at the same time, it has done *nothing* to find out to any degree of certainty what any "victim" actually "lost" and drags its feet without putting into place a mechanism for getting these investors paid.

The case should be dismissed, so we can go about the business of arranging to get investors paid, and to get the defendants what is rightfully theirs, without the bullying position of the SEC that makes it impossible to come to a fair resolution.

Dated:  Portland, Maine
        March 7, 2012

Vivian Shevitz
Attorney for Gary A. Tanaka
401 Cumberland Ave. – Apt. 609
Portland, Maine 04101
914 – 763 – 2122
FAX:  888 859-0158
Vivian@shevitzlaw.com