UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SECURITIES AND EXCHANGE          :
COMMISSION,
                                 :       05 Civ. 5231 (LTS)
                 Plaintiff,
                                 :

     v.                                  DECLARATION IN
                                 :       SUPPORT OF
                                         MOTION
AMERINDO INVESTMENT ADVISORS,            TO DISMISS
INC, *et al.,*                   :

                 Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

     Vivian Shevitz, under penalty of perjury, hereby declares:

     1.    I am counsel for Gary Tanaka, a defendant in this case.  I

make this declaration in support of the defendants' motion to dismiss

this SEC case – or to dismiss it in significant part—because (1) the

alleged fraud involving GFRDA investors (Complaint ¶¶ 73-157) is

beyond the reach of U.S. Securities Laws; (2) the alleged defrauding of

ATGF and ATGF II investors (Complaint ¶¶ 158-172) is insufficiently

pleaded (and, to our knowledge, not one ATGF investor has ever

complained of being the victim of a fraud by any of the named

defendants; the only thing they are complaining about is the

1

government's role in tying up of their money for the last seven years); and (3) there is no basis for the imposition of additional penalties beyond those imposed in the criminal matter in which the SEC participated as part of "the government"; the attempt to extract additional penalties in this Court violates the 5th, 6th, and 8th amendments of the United States Constitution, and is not supported as a matter of fact, law or equity.

2.      The matters set forth in this declaration are based on my review of the record in this case and in the related criminal case, *United States v. Vilar* and *Tanaka,* 05-cr-00621 (RJS).

3.      The SEC initially filed its complaint in June 2005. (This was about a week after the filing of a criminal complaint and a week before the filing of an indictment in the criminal case.)  However, the civil case was largely dormant after December 2005, when AUSA Marc Litt intervened and the SEC obtained a stay of discovery while the related criminal case (which Litt was prosecuting) moved forward.

4.      The civil case received little notice for nearly six years. Attention was renewed in late 2011, however, when various investors began pressing the Court for assistance in facilitating the return to

them of monies that had been declared forfeited to the United States first as "proceeds" and then as "substitute assets" in the criminal action. Millions of dollars in cash and equities to which these investors have asserted claims has been sitting unattended and unmanaged in various investment accounts since 2005.

5.   While Judge Sullivan's forfeiture orders were not entered until April and November 2010, the accounts have been effectively frozen since the civil and criminal cases were initiated, when, according to evidence at the criminal trial, the banks --"working closely" with "the US Attorney's Office" and "the SEC" –"voluntarily" halted the movement of any funds from these accounts to the defendants. (*United States v. Vilar and Tanaka*, GX-3582-16, trial transcript (hereinafter "T.") 3486)

6.   The defendants in the criminal case (Vilar and Tanaka) never disputed that the investors should be able to redeem their investments (and, indeed, had worked out settlements with many GFRDA investors that the defendants were honoring right up to the moment they were arrested and before the accounts were frozen.) But now, payment to investors from the "forfeited" assets is not possible

3

because of defects in the forfeiture orders, and the forfeiture orders are on appeal.

7.     Among other things, Judge Sullivan signed orders directing the forfeiture of $54,351,159 and $54,351,159 in substitute assets when, by his own admission, this figure (set forth in proposed orders prepared by the government) overstated what he meant to order by $36.7 million! In other words, about $17 million was what he *meant* to rule forfeitable and forfeited.  The SEC, however, claims not only $54 million, but even more.  This is no small matter to the defendants, who worked hard and with great skill to amass wealth for their clients and for themselves.

8.     Beginning in the fall of 2011, the Court conducted conferences bridging the two cases, and issued a series of joint orders in the civil and the criminal cases aimed at creating a mechanism for getting funds back in the hands of investors.   The submissions of the SEC in response to these orders -- and recent decisions by the Supreme Court (*Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2888 (2010)), and the Second Circuit (*Absolute Activist Value Master Fund Limited, et. al v. Ficeto*, Docket No. 11-0221-cv. (2d Cir. March1, 2012))

limiting securities laws to domestic transactions -- lead us to this motion to dismiss.

9.     The SEC's submissions are long on bluster but short on anything that moves the return of any funds to the investors.  They reflect part of a larger pattern of over-reaching by the government, a failure to acknowledge the damage not only to the investors but also to the defendants that this over-reaching has wrought, and an unconstitutional effort by the SEC and the DOJ -- working *in tandem* -- to subject Mr. Tanaka and Mr. Vilar to successive prosecutions, and multiple and excessive punishments, for the same offense, in violation of the double jeopardy and due process clauses of the Fifth Amendment, the right to counsel to defend against criminal penalties and prosecutions, and the Excessive Fines clause of the Eighth Amendment.

10.     In short, the SEC professes in its submissions in response to the Joint Orders (seven years later) that it lacks a clear idea as to how much is even owed to investors, or how much the substitute assets are even worth. (See SEC submission, dated February 21, 2012.)

11.     Nevertheless, the SEC takes the position that, because of the substantial likelihood that the criminal forfeiture will be reversed on

appeal, this "civil" proceeding must serve as a backup for extracting from the defendants *all* of the same assets that were (improperly) ordered forfeited in the criminal case for return to the investors.[1] Additionally, the SEC (like a bully) is using the threat of an even greater penalty that it thinks it should get in this "civil" case to coerce the defendants into foregoing any claim they might have to any of the assets ordered forfeited in the criminal case (which includes, in essence, every known asset Vilar and Tanaka ever had, including all the companies they built up for decades.)[2]

---

[1] In the SEC's January 27, 2012 "Response to the Courts' January 13, 2012", it wrote:

> In the SEC staff's view, maintaining the ability to seek full disgorgement and penalties against the entity and individual defendants is also necessary to ensure that all of the Amerindo funds are returned to investors in the event that the convictions are sustained but the Final Forfeiture Order is reversed on appeal.

[2] By email June 21, 2011, counsel for the SEC wrote to Vivian Shevitz (in her capacity as counsel for Alberto Vilar in the criminal case):

> We represent the SEC in the civil action against your client. As we stated in prior calls, we agreed to recommend to the Commission not to seek any disgorgement or civil penalties against Messrs. Vilar and Tanaka provided they agree to injunctions in the civil case **and to forego any right to the identified substitute assets, all of which would be**

12.   This attempt by the SEC to grab all the assets that the government can find, its insistence that all known assets should be "disgorged" and handed over to investors without even knowing how

---

returned to investors pursuant to DOJ's forfeiture remission process. **In effect, we would recommend that the Commission accept a settlement whereby the monetary claims against the defendants would be deemed satisfied by their relinquishment of their interests, if any, in the substitute assets.** It was our belief that this process was being held up solely by certain investors who have asserted a property right in the substitute assets and that those challenges would be resolved in the near term.

Based on your email below to Sharon Levin, which I have pasted into this email, it appears that you might now be taking the position that your client will only agree to relinquish his rights to approximately $17-$18 million in assets (an amount commensurate to what you believe should be the appropriate forfeiture amount). If that is the case, then we agree with Sharon Levin that this is inconsistent with the position taken by your client before Judge Swain. As you may know, the SEC's claims in the civil action are much broader than those tried in the criminal case.

Why don't we try to get on a call next week to clarify the issues. If your client has changed his position and will no longer agree to relinquish any and all claim to the substitute assets, **we will have no choice but to take steps to obtain the maximum disgorgement and civil penalty against your client and, if necessary, to seek an asset freeze and possibly the appointment of a receiver over the substitute assets in the event they are released from judicial restraint in the criminal action.** (Emphasis added.)

7

much the investors are owed or "lost", and its threat to extract even greater penalties unless rights are waived, is emblematic of overreaching by the government that has gone on since the beginning.

13.   Amerindo U.S. managed over $1.2 billion in assets, and was regularly audited and examined by the SEC without findings of impropriety.   Based on redemption timing complaints from two investors -- who, together, had approximately $25 million invested offshore through a separate Amerindo company in Panama (a small amount compared to what Amerindo U.S. was managing, only about 2% of the total client asset base) – the government leapt to and continues to act on the mistaken conclusion that the defendants were engaged in some massive international securities fraud involving every separate company that had "Amerindo" in its name.

14.   Driven by this mistaken assumption, the SEC and the DOJ worked together from the very start – first to obtain and execute an overbroad search warrant that allowed, in essence, for the seizure of any record of any Amerindo company as long as it had writing on it (see Opinion and Order of Judge Kenneth Karas, April 5, 2007, 05-cr-621, finding the "all records" search warrant unconstitutionally overbroad

and granting motion to suppress, at p. 15, 37-8), and now, to deprive the defendants of everything they own.

15.   As Judge Karas found when (two years after the search and seizures) he ruled that the search warrant was unconstitutionally overbroad, the government knew that the vast majority of defendants' business was legitimate and had no basis for concluding that fraud was rampant: "[I]t appears that the Government does not contest that some portion of these assets, *if not a substantial majority of them*, were managed lawfully. Yet, the wrongdoing alleged in the Affidavit touches on but a fraction of those assets. Moreover, the Warrant application sufficiently identifies only two victims of Defendants' alleged conduct. This falls far short of the evidence presented in cases where the all-records exception has been applied, as those cases involved rampant misconduct and little, if any, legitimate business activities." (Opinion and Order at 39, emphasis added.)

16.   Nevertheless, drawing an uninvestigated and unsupported conclusion that the complaints of two investors was the tip of an "iceberg" worth of "fraud," and blurring the lines between the separate Amerindo entities, the government tore Amerindo U.S. offices apart,

then Amerindo U.K., and seized and held onto computers, including the computers needed to engage in trading activities.  It also made public statements to the press suggesting the defendants were the biggest thieves of all time,[3] causing *Morningstar* to tell investors to get out of Amerindo (U.S.). (See Market Watch, May 31, 2005, http://articles.marketwatch.com/2005-05-31/finance/30683963_1_vilar-and-tanaka-morningstar-annual-expense-ratio ("Vilar and Tanaka were removed as managers of the Amerindo Technology D Fund, according to a Securities and Exchange Commission filing Tuesday.  The fund board's action on Friday came one day after the two men were arrested

---

[3] *See, e.g.*, *MutualFundWire.com* - The insiders' edge for 40 Act industry executives, an InvestmentWires' Publication -  Tuesday, May 31, 2005:

Amerindo's Vilar Faces Fraud Charges

Another top leader of a fund firm is facing justice. This time the scandal is at New York-based Amerindo Funds. Alberto Vilar, Amerindo's founder, and Gary Tanaka were both arrested on Thursday by U.S. Postal inspectors, *Bloomberg* reported. The pair have been charged with fraud in two separate criminal complaints, according to the paper….

David Esseks, an assistant U.S. Attorney handling the case, told reporters that the charges are "very serious and very well-founded" and "we fear that they are just the tip of the iceberg."

on federal charges of defrauding investors and stealing $5 million from an unnamed client" .... "'Charges of fraud against Amerindo Technology's managers are just the most obvious reason to avoid it,' said analyst Dan Lefkovitz in a written report. "We're worried that impending redemptions will only exacerbate the fund's problems by forcing it to sell out of positions.")

17.   The unconstitutional search and seizures of 170 cartons of hard-copy materials and millions of pages worth of electronically stored materials, the precipitous arrests of Amerindo's two principals, and the announcements to the press and retention of trading computers, had the effect of precipitously shutting down Amerindo U.S. and every other Amerindo business; it made it impossible for Mr. Tanaka and Mr. Vilar to earn a living *or* earn money for the investors -- whose money is still tied up because of these actions by "the government."

18.   That the SEC and DOJ were working together as "the government" from the beginning to shut down the enterprise is beyond dispute:  Aside from the fact that SEC Counsel Mark Salzberg and AUSA Marc Litt together interviewed Lily Cates on the phone at what might have been the first interview she had with the government (UGX-

3512-002, Memorandum of Interview of Lily Cates, 5/1/2005 at 10:00 AM), remarkably, SEC Counsel Salzberg showed up *personally* at the premises of Amerindo U.S. while the search warrant was being executed, with 19 armed Postal Inspectors grabbing all the records they could find as well as the computers necessary to run the business. (Testimony of Eugene Licker, counsel to Amerindo U.S., at *Franks* hearing in 2006 about the search, pp. 22-23).

19.   After the search and seizure, the government jailed Amerindo's principals, instructed Amerindo employees to in essence get rid of the pension fund clients of the U.S. business (T. 3075-76), and the SEC and DOJ together made sure that any banker holding onto Amerindo's funds would do what the government "suggested" and not release funds to the defendants. (See GX 3582-1 described in the footnote below;[4] see also, October 7, 2010, Letter Of SEC Senior Counsel

---

[4] Witness David Petercsak testified at the criminal trial that he had worked at Bear Stearns, now JP Morgan, as a legal assistant. He was the person responsible for responding to the government's subpoenas concerning Amerindo documents. He said that productions began in May and June 2005, all the way through 2008, when the trial occurred. He also received at least one SEC subpoena and made simultaneous production for both. (T. 3460-68). Peterscsak stated in a signed letter (GX-3582-1) that he was working closely with the SEC, the US Attorneys, and the Amerindo Monitor, and that "no Amerindo funds

Mark Salzberg (with cc: to AUSA Marc Litt) requesting Morgan Stanley & Co., Inc.'s "voluntary" assistance and notification to the SEC of any attempt by Vilar or Tanaka to move funds or execute any transactions from brokerage accounts at Morgan Stanley while forfeiture orders were being litigated in the criminal case.)

20.    The SEC and DOJ thus all but mortally crippled the defendants' ability to defend:  Amerindo U.S. could no longer be worked and the income flow from that totally honest and aboveboard company was lost; Vilar could not even mount bail and has CJA counsel now; Tanaka had to count on his mother and had no lawyer at all for the SEC case (a condition that endured, until now).

21.    Meanwhile, while the government succeeded in putting the defendants out of business and putting all the business's assets beyond their reach, it did nothing to protect the value of the assets that, it claims (even though it doesn't know how much investors are actually owed or have a coherent theory for determining the amount of investor "loss"), should *all* go to investors.

---

would be transferred or withdrawn without first consulting the U.S. Attorney's office and the SEC." (T. 3483-86).

22.    And this inaction despite the fact that, within a week of the defendants' arrests, the SEC confirmed to this Court that, as a result of the arrests, the defendants were "unable to continue to run Amerindo" and that there did not appear to be anyone else with the needed decision-making authority "to address client concerns and account for all funds and investments held by Amerindo on behalf of its clients." (Complaint ¶ 9, 14, *SEC v. Amerindo Investment Advisors Inc.*, 05-cv-05231 (SDNY))   Nevertheless, with the exception of a 10-month period between June 2005 and April 2006 when a "Monitor" was in place, the government, the *de facto* managers of the funds, failed to oversee or manage the businesses or accounts in any way.[5]

23.   This lack of management persisted even after the government obtained actual control of all of the defendants' known

---

[5] Even during the 10-month period, virtually nothing was done.  While the Monitor had oversight powers over Amerindo Investment Advisors Inc. and its accounts, including "the power to review and monitor client requests to purchase, sell, transfer or redeem any securities or funds in accounts for which Amerindo serves as an investment adviser, or over which any Amerindo principals... exercise discretionary authority" (Order, June 3, 2005, 05-cv-05231, ¶IIIE.), he limited his attention to the business and clients of Amerindo U.S. (Monitor Report, December 5, 2005).

assets as a result its extravagant (and unjustifiable) forfeiture claims in the criminal case.

24.    Years have gone by since the assets were formally restrained and the forfeiture orders were entered, and, yet, to this day, the government has done nothing to maximize, or maintain, or even *ascertain* the value of the assets.[6] (See, Letter of Sharon Levin, dated December 30, 2011, in response to Court's December 19, 2011 Order, at p.4, in which the government professes an *inability* to value among other things approximately 45 million shares of "unpriced stock" – i.e., private securities – in the forfeited accounts.[7])

25.    Not doing anything itself to manage or maintain the assets,

---

[6] Indeed, most of the $26-27 million in cash in these accounts has not even been receiving interest.

[7] The value of private securities is highly dependent on continued participation in various rounds of financing, which Vilar and Tanaka attended to well; effectively managing private securities requires not only sophistication and business acumen but also careful and time-consuming attention.

In connection with the sentencing in the criminal case, David Ross submitted a report dated January 27, 2010 (Doc. 408, 05 CR 621), in which he set forth numerous instances of actual and potential losses stemming from the lack of custodial oversight over the restrained accounts. Yet, even after the filing of this report, the government has done nothing except say that it is too expensive to even value the privates.

the government also has made certain that the defendants could play no part in managing them.    Immediately after the convictions were obtained in the criminal case, SEC counsel instituted Administrative proceedings before the Securities and Exchange Commission against Tanaka and Vilar that resulted in orders barring them from association with any investment advisor.  (*See In the Matter of Alberto W. Vilar and Gary Alan Tanaka*, Decisions dated March 17, 2009, Advisors Act Release No. 2859A, and April 17, 2009, Initial Decision Release No. 375).    (Tanaka did not have a lawyer for the SEC proceedings.)

26.    The investors are expressing their frustration at the years of delay in getting their money back and their concern that the accounts have been mismanaged.    Several investors have made pleas for assistance directly from the defendants, who – the investors knew- were really, really good at doing what they did.  By the second quarter of 2004, the Amerindo Tech D fund was named one of the three "Best" by                                                                    Morningstar. http://news.morningstar.com/QuarterEnd/Q22004BestWorstFunds.html , recovering to a 48.85 % return for the year.

27.    Indeed, at Tanaka's sentencing, investor Paul Marcus (who

stated he had always received from Amerindo what he had been promised) urged the Court not to send Tanaka to jail, but, rather to "put him on probation with the requirement that he work full time to locate and monetize the Amerindo investments that he was once very responsible for" (Sentencing Transcript, Feb. 5, 2010, 130)). Yet the SEC will not even consider the efficiencies of having the defendants (with all their years of experience and expertise) participate in a distribution process.

28.   Rather, it opposes as "unacceptable" the prospect that defendants would have any ability to control the assets if the forfeiture order in the criminal case is reversed. (See SEC submission to Court dated January 27, 2012).

29.   The SEC's positions have prompted us to take a close look at the SEC complaint.  The Complaint proves to be as vacuous as the SEC's current submissions and supports this motion to dismiss.

30.   Having succeeded in smashing the defendants' businesses, stripped them of their livelihoods and reputations, having done nothing in the last seven years to protect the interests of the investors, and with no appreciation for the costs that its lack of management has forced

upon the investors it purports to be protecting, the SEC views this "civil" proceeding not as a vehicle for protecting the public, but, rather as providing the government with a second shot at the criminal prosecution apple – the opportunity to cling to unsupported theories of liability and unsubstantiated theories of ill-gotten gains, and the opportunity to impose the same penalties as it obtained in the criminal case (or perhaps even more) in the event the forfeiture orders (and/or the convictions) are reversed on appeal.

31.   The government has already prosecuted and obtained punishment once.

32.   For all the reasons set forth here and in the accompanying memorandum of law, the government should not be allowed to do so again.

Dated:  Portland Maine
            March 7, 2012

__/s/_____
Vivian Shevitz