UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

v.

AMERINDO INVESTMENT ADVISORS INC.,
AMERINDO INVESTMENT ADVISORS, INC.,
AMERINDO ADVISORS UK LIMITED,
AMERINDO MANAGEMENT INC.,
AMERINDO TECHNOLOGY GROWTH FUND, INC.,
AMERINDO TECHNOLOGY GROWTH FUND II, INC.,
TECHNO RAQUIA, S.A.,
ALBERTO W. VILAR, and
GARY ALAN TANAKA,

                Defendants.

05 Civ. 5231 (RJS)

ECF CASE

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1 IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS ALBERTO W. VILAR AND GARY ALAN TANAKA**

Plaintiff Securities and Exchange Commission ("Commission") submits this statement of undisputed material facts as to which there is no genuine issue to be tried, in support of its motion for partial summary judgment against Alberto W. Vilar ("Vilar") and Gary Alan Tanaka ("Tanaka," and, together with Vilar, the "Individual Defendants"):[1]

---

[1] This statement of undisputed material facts is based on the August 3, 2012 Declaration of Neal Jacobson in Support of Motion by Securities and Exchange Commission for Partial Summary Judgment Under Fed. R. Civ. P. 56 ("Jacobson Decl.") and attached exhibits, the April 25, 2012 Declaration of James Meixner and attached exhibits, the record in the criminal case *United States v. Alberto William Vilar and Gary Alan Tanaka*, 05 CR 621 (RJS) (the "Criminal Case"), and the record on appeal to the United States Court of Appeals for the Second Circuit in *United States v. Alberto Vilar and Gary Alan Tanaka*, 10-521(L), 10-580 (CON), and 10-4639

1.      On May 25, 2012, the Commission filed the Second Amended Complaint in this action against the Individual Defendants and against Amerindo Investment Advisors Inc. ("Amerindo US"), Amerindo Investment Advisors, Inc. ("Amerindo Panama"), Amerindo Advisors UK Limited ("Amerindo UK," and, together with Amerindo US and Amerindo Panama, "Amerindo"), Amerindo Management Inc. ("AMI"), Amerindo Technology Growth Fund, Inc. ("ATGF"), Amerindo Technology Growth Fund II, Inc. ("ATGF II"), and Techno Raquia, S.A. ("Techno Raquia," and, together with AMI, ATGF and ATGFII, the "Amerindo Investment Vehicles").  (Ex. A)

2.      On August 15, 2006, the Government filed its Third Superseding Indictment in the Criminal Case.  (Ex. B)

3.      The Second Amended Complaint and the Third Superseding Indictment contain similar factual allegations regarding the Individual Defendants' fraud on their client, Lily Cates, and on investors in so-called Guaranteed Fixed Rate Deposit Accounts ("GFRDAs").  (Ex. A at ¶¶ 1-4; Ex. B at ¶ 6)

4.      The Second Amended Complaint and the Third Superseding Indictment charged the Individual Defendants with substantially similar violations of the federal securities laws. Both charged the Individual Defendants with violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  (Ex. A at ¶¶ 153-157; Ex. B at ¶¶ 43-44; 45-46)  The Second Amended Complaint charged the Individual Defendants with aiding and abetting violations of Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C.

---

(CON).  References to Exhibits in this statement of material facts are to the exhibits attached to the Jacobson Declaration unless otherwise noted.

§§ 80b-6(1), and 80b-6(2) and 80b-6(4)] and Rule 206(4)-2(a) thereunder, and the Third Superseding Indictment charged the Individual Defendants with direct violations of Section 206 of the Advisers Act. (Ex. A at ¶¶ 173-178; 183-186; Ex. B at ¶¶ 47-48) The Second Amended Complaint also charged the Individual Defendants with violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C.§ 77q(a)]. (Ex. A at ¶¶ 153- 157)

5. In addition to charging the Individual Defendants with securities fraud on Lily Cates and on the GFRDA investors and investment adviser fraud on Lily Cates, the Third Superseding Indictment also charged the Individual Defendants with one count of conspiracy to commit securities fraud, investment adviser fraud, mail fraud, wire fraud, and money laundering, as well as one count of mail fraud, two counts of wire fraud, four counts of money laundering and one count of making false statements to the Commission. (Ex. B at ¶¶ 35-41, 49-61)

**The Criminal Trial**

6. The criminal trial against Vilar and Tanaka commenced on September 29, 2008 and ended on November 19, 2008. (Ex. C)

7. Lily Cates testified at the trial. (Ex. C at 2022)

8. In addition, a number of GFRDA investors or their representatives testified at the trial. Among them were Gary Cox, the nephew of Robert Cox, a GFRDA investor (Ex. C at 74); Graciela Lecube-Chavez, a GFRDA investor (Ex. C. at 291); Nicholas Ciriello, the trustee of the estate of Tara Colburn, a GFRDA investor (Ex. C at 503); and Lisa Mayer, who along with other members of her family, was a GFRDA investor (Ex. C at 646) (collectively, the "Testifying GFRDA Investors").

9.   At the conclusion of the evidence, the Court charged the jury on the conspiracy, securities fraud, and investment adviser fraud counts in the Third Superseding Indictment, among others.  (Ex. C at pp. 5545-5588, 5611-15)

10.   On November 19, 2008, the jury found Vilar guilty on all twelve counts of the Third Superseding Indictment and found Tanaka guilty on count one (conspiracy to commit securities fraud, investment adviser fraud, mail fraud, wire fraud and money laundering); count three (securities fraud on the GFRDA investors); and count four (investment adviser fraud on Lily Cates).  (Ex. C at pp. 5728-5733)

**Summary of the Material Facts Regarding the Fraud on Lily Cates Proved at Trial**

11.   In or about June 2002, Vilar advised Lily Cates to invest in the SBIC Venture Fund LP and Lily Cates relied on Vilar's false and fraudulent representations regarding the investment when she agreed to invest approximately $5 million.  (Ex. B at ¶ 9; Ex. A at ¶¶ 30-32)

12.   Although Vilar, Tanaka and Amerindo never obtained a license from the Small Business Administration for the SBIC fund, Vilar advised Lily Cates that the venture had been approved by the Government, recommended that she invest $5 million, and advised her that she would be able to receive approximately $250,000 each quarter from her investments managed by Amerindo. (Ex. B at ¶¶ 10-17; Ex. A at ¶¶ 30-38; 45-54)

13.   Lily Cates' $5 million investment was deposited into an account at a New York City brokerage firm.  Shortly after she made the deposit, Tanaka directed the brokerage firm to transfer funds out of the account to and for the benefit of Amerindo affiliates, Vilar, and the payment of other investors.  None of Lily Cates' $5 million investment was invested in the SBIC fund.  (Ex. B at ¶¶ 18-25; 30-32; Ex. A at ¶¶ 45-54)

4

14.     After obtaining the $5 million investment, Vilar made the following false and misleading statements to Lily Cates regarding her investment.  In or about March 2003, Vilar advised Lily Cates that her funds were held in escrow and that Amerindo expected approval to invest the funds "soon."  In or about March 2004, Vilar advised Lily Cates that Amerindo was still awaiting the SBA license and that Lily Cates' money had not been invested yet.  In or about October 2004, Vilar advised Lily Cates that the investment had been approved but that the investment was delayed due to a delay in funding by the SBA.  (Ex. B at ¶ 26; Ex. A at ¶¶ 33-44, 59-63)

15.     In September 2003, Amerindo, Vilar and Tanaka also misappropriated another $250,000 of Lily Cates funds being managed by Amerindo by forging Lily Cates's signature on a letter of authorization and transferring Lily Cates' funds to an ATGF account.  Days later, $250,000 from the ATGF account was transferred to Vilar's personal account.  (Ex. B at ¶¶ 27-30; Ex. A at ¶¶ 55-58)

**Summary of the Material Facts Regarding the GFRDA Fraud Proved at Trial**

16.     Beginning in or about 1986, Vilar and Tanaka solicited victims to invest in the GFRDAs, a sham product offered to Amerindo clients.  Vilar and Tanaka promised investors that the majority of the funds would be invested in short-term debt instruments with little or no risk that would earn a fixed interest rate generally substantially above the prevailing rates available from banks and other institutions.  Vilar and Tanaka also promised investors that the remainder of the funds – generally no more than 25% of the account value – would be invested in publicly traded emerging growth stocks.  In truth, Vilar and Tanaka did not purchase short-term debt instruments as promised and failed to provide investors with the promised rate of return.  (Ex. B at ¶ 31; Ex. A at ¶¶ 64-71)

17. Vilar and Tanaka prepared and distributed offering circulars for the GFRDA investments that contained false and misleading statements of material fact including, among others, statements concerning which Amerindo entity was offering and guaranteeing the investment; that the GFRDA program would have a high guaranteed income, price stability, liquidity, and immediate confirmation of purchases, redemption and quarterly interest payments when it did not; that the funds invested in the GFRDA program would be deposited in an account in the investor's name or an Amerindo sub-account when in fact the funds were commingled in Amerindo's brokerage accounts; and that the GFRDA investments were primarily in high grade money market instruments when they were not.  (Ex. B at ¶ 32; Ex. A at ¶¶ 66-68, 76-129)

18. Vilar and Tanaka failed to redeem certain investors' investments upon their request, discouraged investors from redeeming their investments and diverted funds from other Amerindo clients to repay Amerindo's obligations to certain GFRDA victims.  (Ex. B at ¶ 34; Ex. A at ¶¶ 66-68, 76-129)

19. As part of their scheme to defraud, Vilar and Tanaka opened brokerage accounts in the name of Panamanian entities controlled by Vilar and Tanaka; solicited funds by making false and misleading statements about the investments to investors, including false representations concerning the types of securities the funds would be invested in and the "guaranteed" rate of return that would be generated by the accounts; deposited monies received from investors as a result of their false and misleading representations into brokerage accounts opened by Vilar and Tanaka in the name of the Panamanian entities; misappropriated investor funds to be converted to the use of Vilar, Tanaka and others; and used investor funds to repay Amerindo's obligations to other investors, rather than in a manner promised to the investors. (Ex. B at ¶ 35-42; Ex. A at ¶¶ 66-68, 76-129)

**The Securities Transactions Were Domestic Transactions**

20.     The sworn testimony and documentary evidence introduced at the trial and set forth in the Meixner Declaration shows that each of the securities transactions for which Vilar and Tanaka were convicted were domestic securities transactions.

21.     Vilar solicited Lily Cates's investment in the SBIC fund in his apartment in New York City after his assistant had called her to tell her to meet him in his apartment. Lily Cates put Vilar on the telephone with her banker while in Vilar's apartment, and approximately one week to ten days later, she executed the documents to make the investment in her New York City apartment and handed them to a messenger. The $5 million investment was transferred from Lily Cates' account at Bear Stearns & Co., Inc. in New York City to an Amerindo affiliate account at Bear Stearns & Co., Inc. in New York City. (Ex. C at 2097-2104; 2456-2460)

22.     Lisa Mayer lived in Puerto Rico until 2002 or 2003. (Ex. C. at 650-51) On or about December 26, 2000, Renata Tanaka, Tanaka's wife, sent a letter to the Mayer family in Puerto Rico offering to renew the Mayers' $11,066,713.44 GFRDA security at an 11% interest rate for three years. (Ex. C. at pp. 920-21; Ex. D1) On January 4, 2001, the Mayers' signed instructions in Puerto Rico to renew the investment and faxed the instructions from Puerto Rico. (Ex. C at pp. 921-925; Ex. D2-D3) The signed instruction letter introduced at trial as Exhibit 2112 indicates that it was initially faxed from a Puerto Rico fax number on January 4, 2001. The top line on the fax confirmation also indicates that on that same day the instructions were sent to Amerindo's New York City office. (Ex. D2-D3)

23.     Graciela Lecube-Chavez, a New York City resident, was introduced to Vilar by Vilar's stepmother, who was Ms. Chavez's co-worker at Avon Products located in New York City. (Ex. C at p. 292) Mr. Vilar solicited Ms. Chavez's investment both orally and by letter

7

addressed to Ms. Chavez's work address in New York City and advised Ms. Chavez that he would put her in touch with a representative in California. (Ex. C at pp. 300-309; Ex. D4-D8) On or about June 27, 1989, Ms. Chavez invested $74,000 with Amerindo by sending the funds to Amerindo's New York or California office. (Ex. C at p. 309; Ex. D7-D8)

24. Tara Colburn was a resident of Los Angeles, California. (Ex. C at p. 509) Tara Colburn's GFRDA investment was funded by a company by the name of Ayr, Inc. in Northbrook, Illinois. Renata Tanaka sent Mr. James Meixner at Ayr, Inc. instructions to mail a $1 million payment on Ms. Colburn's behalf to the account of Techno Raquia at Bears Stearns & Co., Inc. in New York City. (Meixner Decl., Ex. A) James Meixner received the fax from Renata Tanaka. On or about February 7, 2000, James Meixner mailed a $1 million check from Ayr, Inc. in Northbrook, IL to Bear Stearns & Co., Inc. in New York City to fund Tara Colburn's investment. (Meixner Decl., Ex. B) The $1 million check was deposited into a Techno Raquia account on February 9, 2000. (Jacobson Decl., Ex. E)

25. Gary Cox was a resident of San Francisco, California. (Ex. C at pp 74-5) By letter dated December 27, 1989 and addressed to Gary Cox in San Francisco, Vilar solicited Gary Cox to invest the proceeds of a note that Gary Cox held on a property owned by Vilar in a GFRDA security. Mr. Cox invested with Amerindo while in California and received correspondence from Amerindo to his San Francisco address. (Ex. D9-D11)

**Post-Conviction Events**

26. On October 26, 2009, the Court entered a post-conviction restraining order restraining all of Vilar's and Tanaka's interests in a list of identifiable substitute assets, including in accounts held at J.P. Morgan Chase. (Ex. F1-F4)

27.     On February 5, 2010, the Court entered criminal judgments against Vilar and Tanaka.  Vilar was sentenced to 108 months imprisonment and ordered to pay a $25,000 fine and a $1,200 assessment.  (Ex. F5-F11)  Tanaka was sentenced to sixty months imprisonment and ordered to pay a $25,000 fine and a $300 assessment.  (Ex. F12-F17)

28.     On February 5, 2010, the Court held a sentencing hearing.  (Ex. G)  At the sentencing hearing, the Court stated that "it's interesting and troubling here that the people whose trust was abused were not generally sophisticated investors.  It wasn't pension funds, it wasn't others who never would have stood for the nonsense that went on.  It was people who were more vulnerable, it was people who didn't have the ability to push back, and who frankly might not have even had the stomach to question, and who were pushed around and taken advantage of so that [Vilar] could get through a difficult time by making use of their assets as though they were [Vilar's] own.  And I think that's very clear from the evidence that came out at this trial."  (Ex. G at p. 64)

29.     By letter dated March 1, 2010, the Government set forth its theory of the appropriate forfeiture and restitution in the Criminal Case.  In the letter, the Government set forth an analysis of the total proceeds received by the Individual Defendants from defrauded investors that should be forfeited.  The total proceeds from the Testifying GFRDA Investors received by Vilar and Tanaka equaled $6,936,500, broken down as follows:  $5,800,000 attributable to the Mayers; $1,000,000 attributable to Tara Colburn; $74,000 attributable to Graciela Lecube-Chavez; and $62,500 attributable to Robert Cox.  (Ex. H6)  The total proceeds of the fraud on Lily Cates received by Vilar and Tanaka equaled $5,425,000.  (Ex. H10)

30.     Pre-judgment interest on these amounts, calculated using the Internal Revenue Service rate of interest on tax underpayments and refunds from the dates the investments were

made through entry of the October 26, 2009 post-conviction restraining order, equals $8,094,174, broken down as follows:  prejudgment interest on (i) the $5,800,000 taken from the Mayers, calculated from the date of their last GFRDA investment on January 4, 2001 equals $4,010,095.99; (ii) the $1 million taken from Tara Colburn on February 9, 2000 equals $834,341.02; (iii) the $74,000 taken from Graciela Lecube-Chavez on or about June 27, 1989 equals $270,237.97; (iv) the $62,000 taken from Robert Cox on or about December 27, 1989 equals $210,395.61; (v) the $5 million taken from Lily Cates in connection with the SBIC fraud on or about June 20, 2002 equals $2,662,097.41; and (vi) the $250,000 taken from Lily Cates' managed account in or about September 2003 equals $107,006.  (Jacobson Decl. ¶ 16, Ex. O)

31. On April 7, 2010, the Court issued a Memorandum regarding the appropriate amount of restitution and forfeiture to be imposed on Vilar and Tanaka.  The Court found that "the 'essence of the crime' supports a substantial forfeiture award" in light of the fact that "the crimes at issue had actual, identifiable victims."  The Court also stated that the "Defendants were found guilty of plotting the entire scheme," and "[t]he conduct for which Defendants were convicted was exceedingly serious" as "Defendants violated the trust that was placed in them and cannot now argue that the offenses of which they were convicted were not serious."  (Ex. F18-F21)

32. On April 7, 2010, the Court entered restitution judgments against Vilar and Tanaka, jointly and severally, in the amount of $34,899,102.53, (Ex. F22-F27), and forfeiture judgments against Vilar and Tanaka in the amount of $54,351,159.  (Ex. F28-F35)

33. On November 9, 2010, the Court entered an order in which it determined that it had erroneously imposed higher forfeiture judgments than it had intended to but that it could not amend the forfeiture judgments.  (Ex. F36-F37)

34. In its brief on appeal of the Vilar and Tanaka convictions before the United States Court of Appeals for the Second Circuit, the SDNY expressed its consent to remand of the forfeiture orders to the Court to determine the amount of forfeiture money judgments. (Ex. H14-H15)

35. By letter dated December 30, 2011, the SDNY advised the Court of the approximate value of the substitute assets subject to the Court's October 26, 2009 post-conviction restraining order. (Ex. H16-H20)

**The Individual Defendants Have Shown No Remorse for their Criminal Actions**

36. At his sentencing, Vilar denied criminal responsibility for his fraudulent conduct. Rather, Vilar blamed Mr. Tanaka "who ran the program" in London and the "major blow-up" in the equity market in 2000 and the resulting lack of liquidity for the investors' losses. (Ex. G at pp. 58-59) He then stated his deep "regret for any *inconvenience* that our 14,000 clients might have suffered." (Ex. G at p. 60, emphasis added)

37. Mr. Tanaka also denied criminal responsibility for his fraudulent conduct. Tanaka first apologized to unnamed "personal" victims – his family members and employees of Amerindo. (Ex. G at pp. 136-139) Mr. Tanaka characterized Amerindo's "private clients" as victims because their funds were "tied up" for five years pending the trial. (Ex. G at pp. 139-140) He then blamed the "laxness in our documentation" as the primary reason the firm got into trouble. (*Id.*)

38. Although convicted of all twelve counts in the Third Superseding Indictment, in his May 10, 2010 answer to the Commission's First Amended Complaint, Vilar denied or effectively denied all of the allegations in the Commission's First Amended Complaint. (Ex. I)

39. Recently, Tanaka reiterated his denial of criminal responsibility for his actions and is now deflecting blame onto the Government.  In a January 5, 2012 letter to the Court, filed on January 9, 2012, Tanaka stated that "[i]t is obvious that our former clients have been poorly served by the extensive five-year prosecution and trial results of the associated criminal case that summarily destroyed our investment management company . . . then achieved criminal convictions – currently under appeal – for myself, and my partner for 'fraudulent' actions contrary to the interests of our private clients who were shown in court to have suffered no losses at all (either those deemed 'victims' who testified in the proceedings or the remainder)."  (Ex. J1)

40. Tanaka went on to state in the letter as follows:

> I am regretful for the current sorry situation which has victimized the overwhelming majority of our private clients who did not even participate in the criminal proceedings.  I am confident that most of them, after reviewing the trial evidence attesting to our professional integrity in confronting the difficult tech environment of 2000-02, and then having been advised as to the backdrop of the delays in payment they have suffered since 2005-now six years later with uninvested, unremitted balances, they will not hold us accountable.  (Ex J2)

41. In another letter attached to the March 16, 2012 letter from Ms. Shevitz to Judge Laura Taylor Swain, Tanaka stated that he and Vilar "remain confident the courts will soon rule in our favour, to thus discredit any actions and motives deemed 'fraudulent' on our part."  (Ex. J8)

### Despite Having Admitted that the Client Assets Subject to Forfeiture Belong to Their Former Clients, The Individual Defendants Have Failed to Pay Their Victims

42. The Court apparently relied on Vilar's and Tanaka's counsel's statements at their sentencing hearings when it considered the appropriate amount of forfeiture to impose against them.  As discussed by the Court in footnote 4 of is August 26, 2010 Memorandum and Order filed in the Criminal Case regarding the appropriate forfeiture figure, the Court understood from

representations made by counsel to Vilar and Tanaka at their sentencing hearing that "[t]he parties' dispute as to the exact size of the forfeiture award may be at least somewhat academic, insofar as Defendants concede that the assets subject to the restraining order should eventually benefit investors who are not included in the restitution order." (Ex. F39)

43. In his brief on appeal of his criminal conviction to the United States Court of Appeals for the Second Circuit, Vilar also apparently disclaimed any property interest in accounts subject to forfeiture holding investor funds. In opposing the forfeiture order, Vilar represented that he held the funds in a constructive trust and "[s]ince the investors, as the beneficiaries of a constructive trust, have an interest in the forfeitable property that is superior to defendant's, the forfeiture is invalid." (Ex. K at 205)

44. Arguing on behalf of Mr. Vilar, Ms. Shevitz represented to the Court in a December 31, 2011 letter that the accounts subject to the forfeiture order "are commingled accounts that contain investments not only from the criminal case claimants but also others (such as investors in ATGF)." (Ex. J12)

45. Notwithstanding their criminal convictions on serious fraud charges, the admission that GFRDA and ATGF funds were commingled, and their prior representations that they apparently have no personal interest in the corporate accounts subject to the forfeiture orders, Vilar and Tanaka are now seeking to limit GFRDA and ATGF investors' claims so that they can retain some inchoate "residual value" in the assets. In a January 27, 2012 submission to the Court, Ms. Shevitz offered to release the approximately $27 million in cash held in the various Amerindo accounts to investors, but no more, subject to a global resolution of the claims of the Commission and investors against her clients and the apparent extinguishment of the $34.9 million restitution orders. (Ex. L at pp. 4-5) In a July 27, 2012 letter to the Court, Vilar and

Tanaka, through Ms. Shevitz, continued to insist on global releases from personal pecuniary liability for their fraudulent conduct. In response to the Court's order regarding the appointment of a receiver in this case, Vilar and Tanaka offered to release the funds and securities held in specified client accounts in exchange for global releases from liability and the transfer of all other funds and properties subject to the post-conviction restraining order to them. In the letter, Ms. Shevitz stated that failure to accept her clients' terms would result in further delay because the defendants would appeal the order appointing the receiver. Ms. Shevitz further stated that "[i]nvestors have not received payment since 2005, and it threatens to be a much longer time if we do not resolve things now." (Ex. J19-J28)

46.     In a March 20, 2012 letter to the Court, Ms. Shevitz articulated Mr. Tanaka's position that the Government is to blame for the investors' inability to be paid and the theory under which Tanaka now claims an interest in the Amerindo accounts. In the letter, Ms. Shevitz stated that "[w]e agree to pay to clients the amounts due at the time the SEC closed Amerindo down and made it impossible for defendants to make a living. . . . The residual value that remains in the accounts after those amounts are paid – and the 'substitute assets' consisting of the Amerindo entities themselves, which have claims against the funds for management fees and for performance fees (some of which were left invested in the funds) – belong to the defendants. We will not agree to the 'substitute asset forfeiture' because it purports to strip the defendants of their hard earned property rights to that residual value." (Ex. J16)

47.     Ms. Shevitz's letter stating that Vilar and Tanaka are entitled to "performance fees" is directly contradicted by Tanaka's April 24, 2002 sworn statement provided to an arbitration panel of the American Arbitration Association and filed in a case pending in the Supreme Court of New York *Cristov v. Amerindo Investment Advisors Inc., Index No.*

*100530/2003*, in which Tanaka affirmed that "Since at least 1990, ATGF has not charged its shareholders an 'incentive' or 'performance' fee." (Ex. M)

48.     Finally, at the end of 2011, when the Court and District Court Judge Laura Taylor Swain were attempting to facilitate hardship distributions to victims of Vilar's and Tanaka's fraud, Tanaka, in an apparent attempt to pit one set of investors against the other, revealed his disdain towards the largest GFRDA investor in an October 26, 2011 email, which was shared with Walter Pfaeffle, a journalist, and with Mr. Paul Marcus, an ATGF investor.  In the email Tanaka disparages the largest GFRDA investor without regard to his role in causing their loss.  (Ex. N)

Dated: New York, New York
       August 3, 2012

                                        Respectfully submitted,


                                        /s/ Neal Jacobson
                                        By:  Neal Jacobson
                                             Mark D. Salzberg
                                        Securities and Exchange Commission
                                        New York Regional Office
                                        3 World Financial Center, Suite 400
                                        New York, New York  10281
                                        Telephone: (212) 336-0095
                                        Facsimile:  (212) 336-1324
                                        Email: Jacobsonn@sec.gov

Of Counsel:
Alistaire Bambach

15