UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
SECURITIES AND EXCHANGE          :
COMMISSION,
                                 :         05 Civ. 5231 (LTS)
                    Plaintiff,
                                 :
        v.
                                 :
AMERINDO INVESTMENT ADVISORS,
INC, *et al.,*                   :
                    Defendants.

-  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Based on the allegations in the Second Amended Complaint (which the Court

wrongfully allowed to be filed as a foregone conclusion, without requiring

government to demonstrate need or propriety of the changes it sought to make and

hence without even attempting to exercise discretion), the evidence presented by the

government in the parallel criminal case, *United States v. Vilar and Tanaka*, 05 Cr.

621  (RJS), and the submissions filed by the SEC and the US Attorney in 2012 in

both cases, Gary Tanaka moves to dismiss and/or strike the complaint on the

grounds that (1) the alleged frauds are beyond the reach of U.S. Securities Laws; (2)

the alleged fraud involving ATGF and ATGF II investors and the alleged

"commingling" frauds are barred by the statute of limitations, are insufficiently

pleaded, did not exist, and represent a gross manipulation of evidence by the SEC;

indeed "the Government" made Paul Marcus and other satisfied investors into

"victims" by holding their money for seven years; (3) the allegations of "commingling"

as a basis for a remedy are barred by the statute of limitations and constitute an attempt to wrongfully impose liability for "violating" US advisers' requirements on an offshore corporation; (4) as matters of law and equity, there is no basis for penalties beyond those imposed in the criminal matter in which the SEC fully participated as part of "the government"; the attempt to extract additional penalties in this Court violates the 5th, 6th, and 8th amendments of the Constitution; and (5) allowing the filing of a Second Amended Complaint seven years into the litigation is an abuse of discretion, just as denying the originally-filed motion pending "pre-motion conferences" that did nothing useful was an abuse of this court's discretion.

I.  U.S. LAWS DO NOT REACH THE "FRAUDS" IN THIS CASE

In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2888 (2010), the Supreme Court applied the presumption against extraterritoriality, ruling that Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.S. § 78j(b), "reaches the use of a manipulative or deceptive device or contrivance *only* in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." The holding has been extended to Section 17(a).  See *SEC v. Goldman Sachs & Co.,* 790 F. Supp.2d 147 (SDNY 2011).  The Second Circuit later held that, to state a claim under § 10(b) involving securities not listed on a domestic exchange, a complaint "must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Limited, et. al v. Ficeto*, Docket No. 11-0221-cv (2d Cir. 2012).   The ruling also

applies to the Investment Adviser Fraud provisions of the Securities Laws, for the same reasons:    the conduct of investment advisers in foreign countries (here Amerindo Panama) (if defendants acted *qua* "advisers" despite the absence of specific compensation, as required), is not for the SEC to control.

The government filed a second amended complaint to fill the gap but there are no facts showing that offshore investors' transactions occurred here, much less facts that can be asserted timely.   GFRDA and ATGF were not listed on an American stock exchange; purchases and sales were deliberately and carefully structured to occur *outside* United States' laws.   The seller – Amerindo Investment Advisors, Inc. – was a Panamanian entity (T.4279) organized and domiciled in Panama, and recognized as such by the SEC (U-GX-3001; *SEC v. Amerindo Investment Advisors Inc.*, et al, 05 Civ. 5231 (LTS) (DFE) (Second Amended Complaint, ¶ 16 "Amerindo Panama is a Panamanian corporation") (hereinafter "SEC Second Amended Complaint"); EX R to submission of A.U.S.A. Marc Litt, in connection with a *Franks* hearing– see Doc 145-18 SEC sched. 13G).[1]   So, too, the "open-end investment companies", ATGF and ATGF II, named in ¶¶ 18 and 19, and AMI corporation which owns the prime brokerage accounts at former Bear Stearns, are Panamanian corporations.

GFRDA investors identified at the criminal trial and described in the SEC complaint purchased purposefully offshore or through entities designed and

---

[1] "T." refers to the transcript of the criminal trial; "GX" refers to Government exhibits admitted at trial; "DX" refers to defense exhibits admitted at trial; "U-GX" designates documents turned over to the defense by the government, and marked as exhibits but not introduced at trial.

organized offshore in order to make the purchases.  Documents showed that the nearly $70,000,000 in GFRDA purchases (as delineated in Gov. Sentencing Mem, at 92, and the gross sum of all of which it sought as "forfeitable proceeds") were purchase/sale transactions outside the United States between a Panamanian seller and purchaser-entities incorporated and/or domiciled offshore:

- The Mayers purchased through private trust companies incorporated in the Bahamas (and received interest payments and account statements through that and other off-shore companies that the family controlled) (T. 912, 1236, 4520; GX-8225; GX-8240; GX-3361-3; GX-3361-09; U-GX-3059; U-GX-6190-6195; U-GX-3359-11; U-GX-2101).

- Wayne Lewis purchased GFRDA through Graphic Enterprises Ltd, a Grand Cayman Islands company using Dextra Bank & Trust Co. Ltd., also in Grand Cayman Islands. (GX-3363-2)

- Beulah Birrd, a Stephen Gray client who, according to Gray, was "an Irish national resident but not domiciled in the U.K," made her GFRDA purchase through her 100% owned "Nevis registered share corporation, Lynx Ltd." that, according to Gray, was "formed solely to make a US$8 million investment into the Amerindo Guaranteed Fixed Rate Deposit Account". (GX 2096, USR-03312-4; T. 4113, 4129-36, 4142-9)

- Gary Wiener, another Gray client, purchased through Binna Holdings, also a Nevis corporation. (T. 4103, 4222-23, 4240, DX KC-5).

- Spartacus DeLia made his investment through a company he formed offshore called Worldwide Tops. (T. 4098-4100, 4207). (The printed subscription form signed by DeLia had a line for the entry of the "(Client's Name/Client's Offshore Corporation"). (DX JN-1).

- The Giannamores purchased through Just Capital Ltd. (T. 4104, 4164-71, DX JD-1) (In their case, the words "Client's Name" was crossed out on the

printed subscription form and only the name of the "Client's Offshore Corporation" was entered.)

- Donald Kahn purchased through Paragon Ventures Ltd. in Jersey (T. 4102, 4176; U-GX 3330-06; U-GX-2104)

- Alec Cobbe purchased through Pelican Trust, whose Trustees, Guinness Flight, were in Guernsey, British Channel Islands. (T. 4105-6; DX JR) (Government March 1, 2010 Guernsey, British Channel Islands. (T. 4105; DX JR) (Government March 1, 2010 Letter, Exhibit X)

- Kent B. Crane purchased through Nemo Holdings Ltd., incorporated in the Isle of Man.  He also arranged to have his funds wired from Jersey and his returns wired to a Swiss bank account.  (T. 4105-6, 4396; GX 2094-C, USR-04036, USR-04041; DX KI-3; U-GX-2098)

- U-GX-3388 shows that Tara Colburn (who had died prior to trial) made the purchase in London in January 2000, and that she did this "offshore" transaction for tax and secrecy reasons.  As stated in that exhibit, "one comes to England to deposit funds with a Panamanian corporation to ensure that there is no US nexus and that the laws and rules of the US do not apply to the transaction."

- Likewise, Robert Cox and his partner John Hunter, the Urichs, and Graciela Lecube-Chavez were operating offshore.  Their names are all listed on U-GX-3264, a document entitled "Offshore" with dates of statements in 1995. Another document, U-GX-3304-4, shows that, in 1995, Cox and Hunter requested interest payments be deposited in their London bank account.

- U-GX-3333-11, Marianne Kaye's GFRDA Application Form, shows that she has a London address. [2]

---

[2] The only GFRDA investor in the government's post-trial sentencing list of GFRDA investors was "Hrytsyk/Pavlovskyy":  the source assigned by the government to support this investment – GX-3490- is not on the government's exhibit list.  This is in any event another offshore investor.

The SEC complaint nonetheless seeks to assert enforcement authority over these GFRDA investments *and* ATGF purchased through Panama (in that a number of long-time clients who learned of Amerindo's successful investment style wanted it that way.)

The Second Amended Complaint proceeds on the discredited theory that "conduct" or "effects" in the United States is sufficient to make the transaction "domestic, and posits its "new" evidence of such "conduct." *Morrison* rejected the theory. *Every single client* the SEC is trying to "protect" here were offshore clients.

Offshore was the name of the game (*see* http://treasureislands.org), to avoid domestic regulation, to insure secrecy, and to avoid domestic taxation. Presidential candidate Mitt Romney's extensive offshore holdings, his refusals to expose his finances to the world, and the acknowledgement that his Bain Capital *used* Panama in the same way that defendants operated (*see* LA Times, 7-19-12 ("Early Bain money tied to Panama firms, El Salvador") prove the point – even if the SEC stubbornly refused to appreciate (*inter alia*) testimony like that of attorney Stephen Gray, whose clients were GFRDA investors: "I would have known that it [Binna Holdings] was not an entity formed in the United States...No one would have formed a company in a place where you would pay tax unnecessarily.) (T. 4225)[3]

---

[3] "Offshore" permeated the criminal trial.  Offshore investments were offered to Lily Cates (GX 124, "these returns are able to remain underline offshore for tax purposes"); Rhodes Capital Group, Ltd. was incorporated in the British Virgin Islands (GX 128). See also, GX 4605, email subject "Offshore trades – coded"); (GX 4617, "Non-operational offshore assets and liabilities as at 31 May 02") (T. 3214-3223:  "No requirement that companies that incorporate in Panama have a substantial portion of their business in Panama...Quite common for foreign corporations to incorporate

What's "okay" for Mitt Romney should be no less "okay" for these defendants.  (*LA Times*, *supra*:  "Bain Capital was enmeshed in the largely opaque world of international high finance from its very inception.  The documents don't indicate any wrongdoing, and experts say that such financial vehicles are common for wealthy foreign investors.")

*Morrison* now recognizes what Mitt Romney knew long ago.  The U.S. securities laws are not designed to reach offshore transactions in private securities.  Like the criminal prosecution, the allegations in the SEC complaint relating to Amerindo Panama transactions should never have been brought.  If people (including U.S. citizens) want to escape regulation and escape taxation by doing their business offshore, they do so without protection of U.S. securities laws.  The U.S. government and courts are not there for these investors to recoup investments when they go sour (unless the courts are the forum for a contract action).

*Morrison* precludes any SEC enforcement action relating to alleged fraudulent conduct in connection with these extra-territorial securities transactions under §10(b) and §17(a).  As in *SEC v. Goldman Sachs & Co.,* 790 F. Supp.2d 147 (S.D.N.Y. 2011), where the Court – on *Morrison*/failure to state a claim grounds - dismissed the SEC's claims based on both Section 17(a), Section 10(b), here the Court should dismiss the 17(a), 10(b) *and* section 206 claims.

---

in Panama."); SEC Amended Complaint, ¶17 "Amerindo UK is a United Kingdom corporation." ¶ 19 "AMI is a Panamanian corporation"; ¶ 20 "ATGF is an open-end investment company incorporated in Panama"; ¶ 21 ""ATGF II is an open-end investment company incorporated in Panama."

## II. ATGF INVESTOR FRAUD IS INADEQUATELY PLED (AND THERE WAS NO FRAUD)

The SEC Second Amended complaint newly alleges that investors in ATGF and ATGF II were defrauded (¶¶ 130-152), but – aside from violating the statute of limitations in that this "fraud" was not charged specifically previously -- this "fraud" was not in connection with the offer, purchase or sale of ATGF securities; nor is there any allegation that a material misrepresentation was made to any ATGF or ATGF investor. If there had been, they wouldn't have waited seven years to be "victims". Accordingly, any Section 10(b) or 17(a) claim based on ATGF or ATGF II investors must also be dismissed.

"Commingling" funds was not a representation of any kind. Further "commingling" of funds was not a crime under the Investment Advisor Fraud provision and commingling of *offshore* funds is not within the authority of the SEC to regulate. ATGF and ATGF II were "off shore hedge funds", managed by Amerindo Panama, a Panamanian corporation. Purchasers of shares in the fund – sophisticated investors some of whom resided in the United States -- were not defrauded because the defendants commingled hedge funds which are always pooled. In *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006) the Court told the SEC it did not have the authority to determine that individuals were "clients" of the pooled hedge fund adviser and wrote that the SEC was exceeding its authority in trying to regulate pooled hedge funds.[4]

---

[4] The Court wrote: "Here, even if the Advisers Act does not foreclose the Commission's interpretation, the interpretation falls outside the bounds of reasonableness. `An agency construction of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds

In 2007 the SEC adopted a new rule, *purporting* to extend Investment Adviser fraud provisions to pooled hedge funds through new Rule 206(4)-8.   The SEC Release, see 17 CFR Parts 275, Release No. IA-262, entitled "Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles" even states that this new rule responded to the *Goldstein* case.   The SEC's attempt to assert regulatory authority to prevent "commingling" of offshore hedge funds prior to that date, even if it could do so now despite *Morrison*'s focus on the fact of multi-national investment authorities, must fail.    It is *ex post facto* at the least.

The SEC has now purported to shamefully turn satisfied ATGF investors into "victims" by adding them to the SEC's Amended complaint, it does nothing to show any misrepresentation to them – much less with the type of particularity required for fraud allegations by Fed. R.Civ. P. 9.   There is no allegation of *any* set of facts that would lead a reasonable person to infer that, at the time defendants sold the ATGF shares to the investors, they acted with intent to defraud, *nor* any intent to misappropriate the proceeds for their own purposes, cf. *SEC v. Zandford*, 535 U.S. 813, 824 (2002) ("SEC claims respondent sold [investors] securities while secretly intending from the very beginning to keep the proceeds"), or otherwise to fail to honor …contracts")   -- nor even with "recklessness".   They acted under contract principles, as do businessmen in such situations.

---

the agency's authority.  It does not matter whether the unlawful action arises because the disputed regulation defies the plain language of a statute or because the agency's construction is utterly unreasonable and thus impermissible.' *Aid Ass'n for Lutherans v. United States Postal Serv.*, 321 F.3d 1166, 1174 (D.C.Cir. 2003); *see also id.* at 1177-78; *Am. Library Ass'n v. FCC*, 406 F.3d 689, 699 (D.C.Cir.2005)."

The SEC arrogantly confuses possible misstatements *to it*, as statements amounting to investor fraud – as if *it* were the investing public whose interests it is supposed to protect.  If, *arguendo*, anyone made misstatements to the SEC in 2003 (or at any other time) about ownership of accounts through Panama or in ATGF, and if, *arguendo,* such a misstatement *to the SEC* suggested a violation of some SEC Rule that, *arguendo*, is applicable to offshore companies, this *might* warrant some sanction.  However, a technical violation does not translate into a fraud aimed at investors in connection with purchases made years earlier.

"Section 10(b) and Section 17(a) have essentially similar requirements that the deceptive conduct occur in connection with the "purchase or sale" or "offer or sale," respectively, of any security."  *SEC v. Roanoke Tech. Corp.*, 2006 U.S. Dist. LEXIS 92995, *10 (M.D. Fla. 2006). While misrepresentations and omissions need not coincide precisely with a securities transaction, there must be some connection between a falsehood and the securities transactions.   No such connection is apparent here.  (Indeed, no ATGF investor claimed "fraud", even if they are claiming it in a belated complaint, until the SEC's and DOJ's strong-arming turned them into "victims" who turned against the men who made them money.)

The section 10(b) and section 17(a) claims for relief as they relate to ATGF investors must be dismissed.   They are untimely and there was no fraud.

The SEC also alleges no facts that allow the inference that any of the ATGF "purchase[s] or sale[s were] made in the United States." *Morrison*, 130 S.Ct. at 2886. For this reason as well, the claims involving ATGF must be dismissed.

III.  NO REMEDIES ARE APPROPRIATE IN THIS ACTION

- ▪ IT IS AN ABUSE OF DISCRETION TO HAVE ALLOWED THIS AMENDED COMPLAINT; FURTHER, THE "NEW" ALLEGATIONS (PERHAPS APART FROM MORRISON –RELATED "FACTS" CONCERNING U.S. "CONDUCT", THOUGH IT IS NOT CONTROLLING) DO NOT RELATE BACK AND ARE BARRED BY THE STATUTE OF LIMITATIONS

The law requires a party seeking to file a Second Amended Complaint to either get the opposing party's written consent, or obtain leave of the Court.  Fed. R. Civ. P. 15(a).  In November 2005, when Mark Salzberg sought to file an Amended Complaint, he filed a motion seeking such relief "in the interest of justice" (Doc. 41), and submitted the proposed Amended Complaint.  The Court granted the motion (Doc. 42) upon a finding that "a proper showing has been made."

Here, the Court did not even purport to exercise discretion based on a consideration of "proper" factors.  Among the factors a Court is required to consider in determining *whether* a party should be granted leave to amend a complaint after the first time, is timeliness, whether there has been "extensive discovery and litigation," and, generally, the impact of the proposed new claim on the parties who then must oppose the new complaint.   In *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.An.*, 626 F.3d 699, 726-727 (2d Cir. 2010), the Court referenced some of those factors and ruled that the fact that the filing of the new complaint would "undoubtedly have required to `expend significant additional resources' to defend and would have `significantly delay[ed] the resolution of the dispute'" made it plain that amendment of the complaint was properly denied.

11

Here the SEC did nothing and the Court required nothing by way of a showing that the filing of a Second Amended Complaint would not cause prejudice (and would not be futile because of the statute of limitations, among other things). In a case *consumed* with overbearing litigation for *years*, especially directed at defendants in a supposedly "separate" civil SEC case where they must litigate with their funds withheld from them, the failure to even *require* a showing of proposed *changes*, additions, and deletions in the Second Amended Complaint – and there are too many for a staff-less sole practitioner to discern in any cost-effective way – is, per se, an abuse of discretion. We did not consent to the filing of a Second Amended complaint seven years into this litigation, and do not consent. The failure to even *require* a proposed complaint, pointing out and discussing changes, or allowing defendants an opportunity to object and considering the objections, is an abuse of discretion. The Second Amended Complaint should be dismissed. . *See Ansam Associates, Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) ("Although generally leave to file an amended pleading 'shall be freely given,' Fed. R. Civ. P. 15(a), 'the trial court [is] required to take into account any prejudice' that might result to the party opposing the amendment. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31, … (1971). ")

We are not going into the many new words inserted in this new version of an Amended Complaint – words concerning facts known to the government since 2005. The government should have been required to point out and justify new claims. Because the claims are commingled beyond recognition, ALL the supposedly "new

claims" are untimely.  The Second Amended Complaint is permeated with untimely allegations and -- especially in light of *repeated statements* by Paul Marcus that he was fully satisfied with defendants' investment management – and is unjustified.  It should be dismissed.  It should also be dismissed because it is an abusive attempt to exact penalties seven years after it sat back to let "the Government" litigate, but let "the Government" run the litigation, even intervening to stop the proceedings so it could convict the defendants and strip them of assets before allowing this litigation.  Once the government saw here that its "iceberg" theory of criminal liability was completely unsustained and unsustainable, the government should have done the right thing, and dismissed.

COCKAMAMIE ALLEGATIONS ABOUT "COMMINGLING" AND ACTING AS AN "ENTERPRISE":  A TOO-LATE AND IMPROPER ATTEMPT TO GRAB POWER OVER OFFSHORE OPERATIONS

Among "new" claims wrongfully "added" (without due consideration) the SEC includes *numerous* allegations, not made as claims previously, concerning alleged commingling of funds.  In the Amended Complaint, granted on Mr. Salzberg's motion in November 2005, the SEC had one paragraph alleging "commingling".[5]  Now, in the second Amended Complaint, there are 12 "matches" of the word "commingling" – though no allegation anywhere as to whether that was a violation of the law of Panama, the corporation doing the "comingling".  These allegations should be dismissed.  They are another basis for relief known at the time of the

_____

[5] Paragraph 176 -178 of the November 2005 Amended Complaint talks of LOAs athorizing "the Broker-Dealer" to cover margin calls by transferring funds to different accounts.  Paragraph 177 specifically alleges:  "By authorizing such transfers, Vilar and Tanaka commingled the funds and securities of investors who were invested in different vehicles, such as Techno Raquia (where GFRDA investors generally deposited funds), ATGF and ATGF II."

First Amended Complaint and are time-barred. The SEC in attempting to raise questions about the Amerindo offshore operations have, no doubt, had their myopic sights distorted by the recent bankruptcies of MF Global and Peregrine Financial's onshore operations, in which domestic clients were exposed to massive losses brought about by real (and illegal) commingling of their onshore assets with those of the companies themselves for their operating capital requirements.   Here client assets were held by another custodian, Bear Stearns.

The SEC uses allegations such as these to support the RICO-type allegation (and it is not authorized to enforce RICO) that defendants – and all the Amerindo entities" "acted as a common enterprise," thus leading the SEC to the conclusion that because there were rules applicable to Amerindo US as US registered adviser, the defendants were required to adhere to the same rules when "acting" though a corporation, as to which there is no basis to pierce the corporate veil (and neither "the Government" nor the SEC ever tried), that a US Adviser must live by.

Just because the SEC takes a position, that doesn't mean it is right! *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006) (throwing out the SEC's interpretation of "customer" for hedge funds, which prompted the SEC's new – and ex post facto – rule, changing definitions of customers, and recognizing pooled funds. See SEC Release No. IA-2628.).   The defendants' conduct *in Panama,* and in connection with legitimate business in that country, has nothing to do with the SEC's Investment Adviser laws.   Under *Morrison*'s principles, the SEC cannot assert jurisdiction over conduct in Panama that is legal in that jurisdiction –

investments through which the investors in this case *chose*.   (The SEC may have gained authority over *some* foreign private fund advisers only after Dodd-Frank was enacted in 2011.  See <u>*http://www.sec.gov/news/press/2011/2011-133.htm*</u>.  It had none before then).

The only seeming support for the SEC's sophomoric assertions that Amerindo was some "enterprise" (as if this were a RICO case) as opposed to affiliated multi-national corporations, one of which did business in Panama, another through the U.K., and a third through a U.S. Advisory affiliate in the United States, is that Vilar or Tanaka or someone used U.S. letterhead and on occasion, and that, as many corporations owned by the same individuals do, some moneys from one operation (here Panama) were transferred to another (the US) to be used for operating expenses.   As to the latter, this is a matter of taxes and accounting.  It is not a matter for the SEC to use to jump in and assert multi-national jurisdiction. And there is absolutely *no* showing that there was anything wrong with the books and records of *any* of the Amerindo entities in any jurisdiction.   To the contrary, the Monitor's report in this case in 2005 demonstrated that *everything* about the U.S. operation was "right."

As to use of wrong letterheads from time to time, this showed a commingling of letterheads picked up at the time perhaps with sufficient care, but it hardly shifts liability.   Courts have recognized that people use wrong letterheads by mistake. *See Air Sea Int'l Forwarding, Inc. v. Global Imps. & Trading, Inc.*, 2008 U.S. Dist. LEXIS 96318 (D.N.J. Nov. 14, 2008) ("The Court finds that the use of the wrong

letterhead and corporate position were merely mistakes by Tank. His intent was to bind SCI. As noted earlier, these were busy business persons who were not concerned  about the particulars."); *United States v. Goudge* [39 CMR 324 (ABR 1968)] (". . . we are of the opinion that the use of the wrong letterhead . . . is insignificant.)  The investors in this case all knew they were clients of the offshore fund.   That is exactly what they wanted.   Their account statements came from London until 1995, and then showed Amerindo Panama letterhead.   Offshore multinational firms are what the world of finance is about.  See Shaxson, *Treasure Islands*; see also *LA Times*, 7-19-2012 ("Early Bain money tied to Panama firms … When Mitt Romney launched Bain Capital in 1984, he struggled at first to raise enough money for the untested venture ….   [Bain] barred them from soliciting current clients or corporations that would have to publicly disclose the investment, according to an early Bain Capital employee.").

Further, "the government" continues to rely on "Amerindo's" use of ready cash to fund current expenses incurred by Amerindo US from time to time, as if it proves responsibility for "securities fraud.    This is how businesses operate.    Further, though the SEC alleges (para. 92) that research services provided by Amerindo US, paid for by Amerindo Panama, were not worth the money ("amounts …bore little or no relation to the amount of research Amerindo US in fact provided to Amerindo Panama and/or Amerindo UK"), the Second Circuit has told the government is should stay out of the business of valuing business services.  It is none of the SEC's business. *See United States v. D'Amato*, 39 F.3d 1249, 1255 (2d Cir. 1994) (valuing

of services to a law firm is not for the government to do, much less supports a charge of fraud).  The government *never* even looked at, much evaluated, the books and records of any of the affiliated companies.  COO David Maimzer told "the Government" (on June 6, 2005 – just days after the arrests and shutdown of Amerindo US (UGX 3523-1 – an interview at which both Marc Litt and Mark Salzberg were present), and as the Monitor reported (Doc. 138-21, filed in 05cr621 (RJS) on 8/30/06), there was *nothing* "untoward" about the Amerindo operations. Everything was properly accounted for.  Further, the SEC submitted Amerindo to three inspection audits, the last shortly before "the Government" took Amerindo down.  The SEC had all of the information at the time concerning the inter-company fees and agreements, and found nothing wrong.  Amerindo passed.  The SEC also does not have a problem with moneys that went *from* Amerindo US to Amerindo Panama to make a payment to Coburn.  The SEC "prosecutors'" arbitrary reliance on fully-accounted for intercompany loans and transfers now is just wrong.

Shockingly, the SEC *still* alleges that Amerindo US violated custody rules and that Vilar and Tanaka "aided and abetted" violation of custody rules.  (Sixth and Seventh Claims for Relief).  This allegation is completely false and is sanctionable.  Prosecutor Litt stated in summation just the contrary (Tr.5259, US v. Vilar):  "They couldn't steal from the institutional clients, their funds were locked up and were secure in custodial accounts …."  The SEC cannot condemn Vilar and Tanaka for pooling funds in Amerindo Panama when there is nothing in Panama that said it was improper, when *Morrison* counsels respect for extraterritorial

jurisdictions, and where the SEC had to amend its rule in 2006 to and Congress had to pass Dodd-Frank to bring hedge funds within the SEC's purview.  The entire SEC Second Amended Complaint is shockingly defective and irresponsible.

## I. THE SEC IS VIOLATING DEFENDANTS' FIFTH AND EIGHTH AMENDMENT RIGHTS BY CARRYING ON THIS CASE

The SEC and the DOJ engineered this case so that the government would have two shots at "all" defendants' assets, and so that defendants would have access to none of their money after they were arrested, making it impossible for them to fully defend themselves -- especially during the second round. The SEC's continuation of this effort violates the defendants' Fifth Amendment protection against Double Jeopardy and to Due Process, and their protection under the Eighth Amendment from the imposition of an Excessive Fine.

In *Hudson v. United States*, 522 U.S. 93 (1997), the Supreme Court clarified the approach for determining whether a penalty in a civil proceeding was "criminal" for double jeopardy purposes, and noted that, even if Double Jeopardy protections did not bar a "civil" penalty (or any second penalty), other Constitutional provisions – the Eighth Amendment and Due Process – still give protection.   The Supreme Court wrote of claims of irrational and excessive punishment (522 U.S. at 102-03):

> [S]ome of the ills at which *Halper* was directed are addressed by other constitutional provisions.   The Due Process and Equal Protection Clauses already protect individuals from sanctions which are downright irrational. *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 ... (1955). The Eighth Amendment protects against excessive civil fines, including forfeitures.  *Alexander v. United States,* 509 U.S. 544 (1993); *Austin v. United States*, 509 U.S. 602  (1993).

18

The Excessive Fines Clause limits the government's ability to extract payments, whether in cash or in kind, as punishment for some offense. *Alexander v. United States*, 509 U.S. at 558.   The Eighth Amendment is violated by imposition of an "Excessive Fine" regardless of the length or duration of any penalty of confinement, and, as in *Alexander*, may be violated when the government seeks and *in personam* criminal forfeiture that is disproportionate to the gravity of the offense.

The SEC has made plain that the disgorgement and civil monetary penalties it is seeking are designed to serve first and foremost as a backup in case the criminal forfeiture is reversed, and secondly as a tool for extracting even greater monetary punishment. Sharon Levin's and the SEC's recent submissions in the SEC case, and the Court's use of both captions to achieve its forfeiture purposes, proves the point.  (See Appellant Vilar's Motions to Supplement the Second Circuit record with evidence of the commingling of captions between the criminal and "civil" case, and with evidence that Ms. Levin stated that "the Government" is not a party to this SEC case, when in fact the DOJ's motion to intervene was granted in 2005, Documents 242, 365, 373, 385, 395, which motions were *granted*, Docs. 257,372, 388, 403).  (The Court of Appeals also allowed supplemental arguments that the government's failure to take any action concerning the apparent perjury of government witnesses constitutes misconduct and allowed the government a 5-page response by August 10, 2012.  Order, Doc. 388).

The SEC insists that every asset belonging to the defendants must be

returned to the investors, but this is, by definition, excessive since the SEC doesn't even know how to evaluate the investor claims or what it calls investor "losses" or the assets or any "ill-gotten" gains.

However venal the government tried to paint the defendants – in the press and in the criminal case and in this case -- they were not operating a Ponzi scheme, they did not abscond with the investors' money, and they did not cause the investors any irreparable harm: indeed, the government is still sitting on accounts that are available for their repayment and the defendants are actively seeking ways to make the repayments a reality.

The only financial harm the defendants might have caused any investor resulted from stalling and not redeeming investments when they were strapped for cash and when they asked their long-time-friend investors to wait.  A $54.3 million forfeiture – whether it is called criminal forfeiture or disgorgement or civil monetary penalty – is a monetary extraction "grossly disproportional to gravity of" this conduct.  *United States v. Bajakajian*, 524 U.S. 321, 324 (1998).  See *United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009) (In applying *Bajakajian*, Court applies four factors that the *Bajakajian* Court considered in determining whether the forfeiture was excessive  -- namely, (1) "the essence of the crime" of the defendant and its relation to other criminal activity; (2) whether the defendant fit into the class of persons for whom the statute was principally designed;  (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct).

Something is terribly out of whack in this case.  After putting the defendants out of business, the prosecutors believed they could and should grab every conceivable asset of the defendants, and use these assets to satisfy any and all claims of every known Amerindo investor around the world.[6] Professing to keep sentencing "as simple as possible", they presented the court with an order for a staggering, extravagant, and wholly unjustifiable personal money judgment, and then waltzed in with an order for substitute assets without showing that either order was appropriate.

And now the SEC wants to use this case to guarantee the extravagant forfeiture and even extract more.  This is excessive and should not be allowed.

The SEC wants to take all the *residual* value in all the Amerindo companies, *regardless* of whether anyone "lost" anything. This is just crazy.  The Constitutional word for it is "Excessive."  The SEC's pursuit violates the Constitution.  The case should be dismissed now, so that the rest of the players can come to a reasonable settlement.

<u>Double Jeopardy</u>

The  SEC's  attempt  at  a  successive  proceeding  in  order  to  insure  the

---

[6] The prosecutors initially sought forfeiture of more than $80,000,000 -- even though, according to their own calculations, this was nearly twice as much as was needed to make whole every known Amerindo investor whether defrauded or not -- including those (like the Mayers who invested through a private trust company in the Bahamas (T. 912), and unidentified investors in ATGF, an "unaudited Panamanian hedge fund") who were secreting their activities and income from the U.S. and their home countries by operating off shore through entities in tax haven jurisdictions. (Letter, February 3, 2010; ST. 44)

government's claim to all the assets (and more) that were the subject of forfeiture in the criminal case also violates Double Jeopardy.  In *Hudson*, the Court ruled, double jeopardy is "[i]nitially ...a matter of statutory construction:  did the legislature, in establishing the penalizing mechanism, indicate either expressly or impliedly its intention to establish a civil or a criminal penalty?"

But even where, on the face of a statute, it appears that the legislature indicated an intention to establish a civil penalty, the circumstances may be such that what was clearly intended as a civil remedy has been transformed into a criminal penalty.

The SEC has transformed this case into a criminal case, through disgorgement and civil money penalties the objective of which, in the SEC's view, is to insure that the assets (*all* assets of the defendants) ordered forfeited in the criminal case will be distributed to investors, and not returned to the defendants; then, if it can, it threatens to lay claim to even more.

This unjustly duplicates the criminal prosecution – and is conduct of two government agencies acting together as one and blurring lines.

*Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-169 (1963), discussed in *Hudson*, sets forth a number of factors a court should consider in evaluating whether the attempt to impose civil and criminal sanctions is unconstitutionally duplicative.  Here, several factors plainly support the conclusion that this second grab at the same overstated penalties is another claim for a criminal penalty.  One factor that is evidenced beyond dispute is that the two government agencies, the

SEC and the US Attorney's office, acted in tandem, to pursue punitive sanctions, and to do it serially, and that the Court, commingling captions, has assisted the prosecutorial effort.

Congress may have created what on their face appear as two statutory schemes (one civil and one criminal), but Congress never envisioned that an SEC official would join in the execution of a criminal search warrant, that the DOJ would intervene in the civil case (where the SEC already has counsel on the US government payroll) to stop the civil case while the defendants are stripped of assets, and then the SEC would try to punish the defendants to the extent of the criminal forfeiture sum even if it is wrong, and even if it is reversed.

The government blurred the distinction between civil and criminal here. Then it blurred its enforcement missions.     The SEC case *de facto* seeks criminal penalties that were already imposed, and it should be dismissed under the Double Jeopardy Clause of the Constitution.

- **NO SEC PENALTIES OR OTHER EQUITABLE FORMS OF RELIEF ARE APPROPRIATE IN THIS ACTION**

All of the requested relief including prayers for injunctions, disgorgement, and civil monetary penalties are matters of equity.   No further penalties are appropriate here where, seven years after the government and the SEC instituted their actions, the defendants' business is in ruins, they have had every known asset taken from them, they have been sentenced to long prison terms, and, for years, the

government has sat on millions upon millions of investor money (and defendants'
funds) letting it sit idle without doing anything to either protect its value or get it
back in the hands of the investors.

The SEC has acted *inequitably*.  Along with the prosecutors in the criminal
case, the SEC overplayed its hand:  It used an overbroad warrant to ransack
Amerindo's offices and put the company out of business.  Then, instead of filing a
civil forfeiture case to restrain assets it thought "involved" in any fraud (which
would have triggered procedural and substantive rights, including the right to
counsel pursuant to 18 U.S.C. § 983), the SEC winked at the banks and got them to
restrain all of the defendants' funds in contravention of the prohibition against
pretrial restraint of assets in a criminal case.  See, *Grupo Mexicano de Desarrollo,
S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332 (1999) (pretrial restraint of
debtor's assets in civil proceeding is a severe remedy independent of a right to
damages or property following a finding of liability, and such restraints are a
`"nuclear weapon' of the law."`).  This purposeful skirting of process was not only
unfair and inequitable, but also violated the defendants' Sixth Amendment and Due
Process rights.

After obtaining convictions in the criminal case, the government immediately
obtained judicial sanction for the previously unofficial restraint of all known assets
of the defendants, and then put together an unjustified and unsubstantiated
proposed order for the forfeiture of "substitute assets" that, it knew, exceeded the

amount Judge Sullivan intended to approve by $36.7 million!  And after it obtained the judge's signature, the SEC jumped back in and began a campaign of coercion.

Under these inequitable circumstances, it cannot be right to impose further penalties on the defendant.

Proclaiming this case a massive international fraud, the SEC together with the DOJ made a mountain out of molehill, and, instead of protecting investors, its actions wound up hurting them more than anything it showed the defendants to have done.  Indeed, it seems that the government can't seem to dig its way out of the mess it made.  Piling more sanctions on the defendants only serves to cover up what went wrong here.  The claims for equitable relief should all be dismissed.

- ▪ THE SEC'S CLAIM FOR DISGORGEMENT SHOULD BE DISMISSED: THE SEC HAS FAILED TO ALLEGE THAT DEFENDANTS WERE UNJUSTLY ENRICHED; AND, TO THE EXTENT THAT THE SEC SEEKS DUPLICATION OF ANY AMOUNT AWARDED AS RESTITUTION IN THE CRIMINAL CASE, THE REQUEST VIOLATES DOUBLE JEOPARDY

Disgorgement is an equitable remedy designed to ensure that the defendant not profit from his illegal acts by divesting him of unfair profits.  Disgorgement is unavailable here as a matter of law because the complaint contains no allegation that defendant obtained any unfair profits or was unjustly enriched as a result of any alleged securities law violation.

There were no "ill gotten gains" from these transactions.  There were "gains", if at all to defendants, from their investment prowess and the fees that came with their management skills and services.  Indeed, the government's theory of restitution at trial – and its theory of investor "losses" as set forth in Exhibit B of its

February 21, 2012 submission -- presuppose that initial investments kept working for the investors and, as reflected on the regular account statements, were appreciating; any suggestion that the defendants were "unjustly enriched" by an amount measurable by either the amounts that investors deposited, or the amounts on the account statements, is inconsistent with these criminal case theories, and wholly unsupported in the complaint and in fact.  The SEC should not be able to use disgorgement to extract any purported ill-gotten gain or unjust enrichment when there was none.

The SEC has maintained that it is seeking "disgorgement and prejudgment interest" "against all of the defendants for the benefit of the Amerindo investors." (Submission, January 27, 2012)  "In a securities enforcement action, as in other contexts, disgorgement is not available primarily to compensate victims" but "[i]nstead . . . to prevent wrongdoers from unjustly enriching themselves through violations, which has the effect of deterring subsequent fraud." *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006).  In the absence of any allegation that the defendants themselves obtained prejudgment interest on any "ill-gotten gains", no relief by way of a money remedy labeled "disgorgement" can be available to the SEC.

Disgorgement is not a proper remedy in this case.  The request for disgorgement relief should be stricken.

Further, it should not be able to seek either "ill-gotten gains" or "prejudgment interest" twice – once in the criminal case and again in the civil case.  Doing so violates double jeopardy.

26

We recognize that in *SEC v. Palmisano*, 135 F.2d 860 (2d Cir. 1998), the Circuit rejected the arguments that imposition of a disgorgement obligation and a civil money penalty violated double jeopardy in light of the punishment imposed in Palmisano's criminal case.   However, and significantly, the *Palmisano* Court cautioned that, in order not to violate double jeopardy, any disgorgement must take into account the payment of restitution ordered in the criminal case.  If it did not, the total amount Palmisano would be ordered to pay could exceed his unlawful gains. This, it opined, would not be acceptable, and, therefore, it ordered any judgment in the civil case provide that restitution payments in the criminal case offset any disgorgement obligation.  See also, *SEC v. Monarch Funding Corp.*, 1996 U.S. Dist. LEXIS 8756 (SDNY 1996) ("it is axiomatic that disgorgement should be fashioned on the amount of ill-gotten gain currently realized by the defendant and not yet already repaid.")

THE SEC HAS NOT ADEQUATELY PLED A BASIS FOR INJUNCTIVE RELIEF

*Section 20(b)* of the Securities Act provides for injunctive relief when a person "is engaged or about to engage" in any securities-law violation. 15 U.S.C. ß 77t(b*)*. The "critical question" in determining whether such conditions are present is "whether there is a reasonable likelihood that the wrong will be repeated." *SEC. v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972).  "The focus of this inquiry is on the defendant's past conduct." *SEC v. Colonial Investment Management*, LLC, 2008 U.S. Dist. LEXIS 41442, 2008 WL 2191764, *3 (S.D.N.Y. 2008) (quoting *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 99 (2d Cir.

1978)). "Other factors courts should consider in determining whether there is a reasonable likelihood of future violations include: (1) the egregiousness of the past violations; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; (4) whether defendant has accepted blame for his conduct; and (5) whether the nature of the defendant's occupation makes it likely he will have opportunities to commit future violations." Id. (citing *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998)). Although the SEC has pled that "unless enjoined" Defendants "will again violate" Sections 10(b), and 17(a) of the Securities Act, and Sections 206(1) and (2) of the Advisers Act, these conclusory allegations are not supported by the allegations in *any* complaint, the evidence presented at trial, or actions undertaken by the SEC since the complaint was filed.

The SEC's request for injunctive relief here should be dismissed; it has not adequately pled, and the government has never demonstrated, any realistic likelihood of recurrence. The evidence – including, in particular, the relief the SEC has already obtained by way of 2009 Administrative Orders barring defendants Vilar and Tanaka from association with any investment adviser pursuant to Section 203(f) of the Investment Advisers Act of 1940 – point in the opposite direction.

There is no allegation that Vilar or Tanaka has ever engaged in a breach of fiduciary duty or other fraudulent activity either prior or subsequent to the specific claims brought here. While the government made all kinds of proclamations suggesting that the fraud it uncovered was just the "tip of the iceberg", it failed to show this. Nothing alleged in the complaint or demonstrated at the criminal trial

allows for the characterization of the conduct as egregious.  Investors – until the tech bubble burst – had been receiving magnificent returns on their investments (indeed, many were beneficiaries of an unprecedented **249%** return during some years preceding the market bust), and many were fully repaid when they sought to get out.  The government made extravagant proclamations before trial that this was just the "tip of the iceberg" and at the criminal trial that the entire GFRD program was a "sham" – and that regardless of whether a "victim" was able to redeem moneys or not, they were still victims of a "sham investment program" (T. 3584) – but none of these claims materialized.   This was not a Ponzi scheme and, to this day, enormous sums of money and equities are still sitting in Amerindo accounts.

The facts alleged here "are quite different from those where other Courts have denied motions to dismiss injunctive relief under the securities laws. See, e.g., *SEC v. Colonial Investment Management LLC,* 2008 U.S. Dist. LEXIS 41442, 2008 WL 2191764, *3 (S.D.N.Y. May 23, 2008) (denying Motion to Dismiss where it was alleged that "defendants repeatedly [on eighteen separate occasions] and knowingly engaged in conduct that violated [securities laws] over a period of several years, and engaged in sham transactions to conceal the violative conduct.); *SEC v. Power*, 525 F.Supp.2d 415, (S.D.N.Y. 2007) (denying Motion to Dismiss where it defendant allegedly "engaged in repeated fraudulent ...and knowing misconduct over a period of several years" including the creation of sham transactions, improperly writing off assets, improperly valuing inventory, falsely increasing a company's performance through the improper consolidation of revenues, and improperly directing the

establishment of reserves on a worst-case basis)."  There is no reasonable likelihood that defendants will engage in future violations; an injunction request should be dismissed.

## THE REQUEST FOR PENALTIES BASED ON ALLEGED VIOLATIONS OF SECURITIES LAWS OCCURRING FIVE YEARS PRIOR TO THE FILING OF THE COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS

In several recent cases, the SEC has agreed that, at least with respect to a request by the SEC for civil monetary penalties, the five-year limitations period in 28 U.S.C. § 2462 applies.  See, e.g., *SEC v. Wyly*, 788 Supp. 2d 92, n.67 (S.D.N.Y. 2011); *SEC v. Kearns*, 691 F. Supp. 2d 601, 609 (D. N.J. 2010); *SEC v. Quinlan*, 373 Fed. Appx. 581, 2010 U.S. App. LEXIS 8205 (6th Cir. 2010).   In its prayer for relief here (section VI), the SEC has sought civil money penalties pursuant to several remedial sections, each of which is a penalty provision "keyed" to a "violation."  The complaint charges violations in the abstract without specifying any particular violation.  To the extent that any requested monetary relief rests on allegations of fraud in connection with the purchase and sale of GFRDA or ATGF securities more than five years before the filing of complaint, the relief is barred.

## - THE SECOND AMENDED COMPLAINT ALSO VIOLATES F.R.C.P. 8

Rule 8 of the Federal Rules of Civil Procedure provide that a complaint "shall contain . . .  a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for

trial. See, e.g., Geisler v. Petrocelli, 616 F.2d 636, 640 (2d Cir. 1980); 2A Moore's Federal Practice para. 8.13, at 8-61 (2d ed. 1987). The statement should be short because "unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." 5 C. Wright & A. Miller, Federal  [**5] Practice and Procedure § 1281, at 365 (1969).

This Complaint hardly gives "notice" of what – exactly – "the Government" thinks the defendants did "wrong."  The allegations are a "take one from column A, and one from Column B":  The defendants are alleged to have acted "singly," or as an enterprise," or directly, or indirectly – or all of the above.  Supposed "misrepresentations" are not identified.  The Complaint reads like a hodge-podge of accusations that defendants did *nothing* "right."

Plainly the Complaint – indeed the Government's manner of litigating in both these cases – has not given the defendants "notice" of what they must defend against, under the "mass of verbiage."  The Government seeks to vindicate its own misjudgment in taking Amerindo US down, by alleging actions as some "enterprise" without the slightest notion of how the statutes' elements are satisfied by reference to such an expansive theory.

It does not identify misstatements, nor explains why the defendants *are* *"investment advisers"* when acting in and for a Panama corporation.  The "enterprise" theory is a "substitute" for meeting statutory definitions, and an end-run around *Morrison.*

31

## CONCLUSION

To the extent the SEC is doing anything here, it is barking orders trying to bully and coerce the defendants into accepting the huge and erroneously entered "forfeiture", to use all that money to "compensate" "victims" – most of whom have been deprived access to their investments not because of the actions of the defendants but, rather, because of the unprecedented and extravagant actions of the government in ruining Amerindo's business and freezing its accounts. It castigates the defendants while, at the same time, it has done *nothing* to find out to any degree of certainty what any "victim" actually "lost" and drags its feet without putting into place a mechanism for getting these investors paid.

The case is **abusive** and should be dismissed.

Dated:  Portland, Maine
        August 10, 2012

Vivian Shevitz
Attorney for Gary A. Tanaka
401 Cumberland Ave. – Apt. 609
Portland, Maine 04101
914 – 763 – 2122
FAX:  888 859-0158
Vivian@shevitzlaw.com