UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,

-against-

AMERINDO INVESTMENT ADVISORS INC.,
AMERINDO INVESTMENT ADVISORS, INC.,
AMERINDO ADVISORS UK LIMITED,
AMERINDO MANAGEMENT INC.,
AMERINDO TECHNOLOGY GROWTH FUND, INC.,
AMERINDO TECHNOLOGY GROWTH FUND II, INC.,
TECHNO RAQUIA, S.A.,
ALBERTO W. VILAR, and
GARY ALAN TANAKA,

                  Defendants.

_____

05cv5231(RJS)

Counterstatement
Pursuant to Rule
56.1

### Counter-Statement Pursuant to Rule 56.1

1.  Defendant Tanaka denies relevance of SEC Statement paragraph
    1, and asserts that though the Commission "filed" the Second
    Amended Complaint, it never received permission pursuant to a
    Motion; he also notes that there is no Order pursuant to any
    motion seeking permission.

2.  Defendant admits that the Government filed a Third Superseding Indictment.

3.  Defendant does not understand the meaning of "similar" in the description of "factual allegations" to describe the Second Amended Complaint and the Third Superseding Indictment.

4.  Defendant denies that the allegations in the Second Amended Complaint and the Third Superseding Indictment are "substantially similar"; and denies that the Second Amended Complaint is timely.

5.  Defendant admits the description of the allegations charged in the Third Superseding Indictment and denies the relevance on a Motion for Partial Summary Judgment.

6.  Defendant admits that trial commenced and ended on or about the dates stated.

7.  Defendant admits that Lily Cates testified at the trial.

8.  Defendant admits that "a number of GFRDA investors or their representatives testified at the trial."

9.  Although defendant admits that the Court charged the jury, the charge omitted "reliance" as an element of securities fraud, as is

argued on appeal in the criminal case.  (See appellant Vilar's brief,
10-521).    There are also errors in the Investment adviser fraud
and conspiracy charges, as also set forth in Appellant Vilar's brief
and reply brief also.  Further, there was a failure of defendants'
trial counsel to cross examine Lily Cates and any of the GFRDA
investors on issue of reliance, as set forth both in Vilar's appeal
brief and reply brief, and in further submissions to the appeals
court.   The issues are *sub judice.*  Because of this the defendant
did not have a full and fair opportunity to litigate the elements of
the case.

10.    Defendant admits that the jury found Vilar guilty of all 12
counts and Tanaka of Counts 1, 3, and 4 (but denies that count
four as alleged in the indictment or charged to the jury was
limited to "investor fraud on Lily Cates").

11.    This is a compound statement:  "In or about June 2002 Vilar
advised Lily Cates to invest in the SBIC Venture Fund LP and
Lily Cates relied on Vilar's false and fraudulent representations
regarding the investment when she agreed to invest …."    The
assertion is supported only by a reference to the Superseding

Indictment and to the Second Amended Complaint.  There is no PROOF that Lily Cates was "advised" to invest as opposed to being given an opportunity she sought - i.e., to invest in "privates", and there is neither PROOF nor a jury charge that Lily Cates "relied" on any false and fraudulent representations. Defendant Tanaka was acquitted of the Lily Cates charges, which is not surprising given Cates' admission on cross that she had told the government that she had not spoken to Tanaka about Rhodes or the SBIC fund and apologized for her possible "misrepresentation."  ("Q.  Can you think of any reason that you would tell the federal  investigators, who you knew you were under a legal obligation to tell the truth to, that you never spoke with Mr. Tanaka about SBIC and now you are certain you did?  8 A.  My intention was always to tell the truth, sir, all right? If I made a mistake or misjudgment on my part, or perhaps misrepresented it in some way, then it's my -- I take issue with that with myself and fault [myself]" (T.2261).)

12.     This is a compound statement, and suggests there are causal connections when there are none ("[a]lthough…."). The allegedly

undisputed statement reads:  Although Vilar, Tanaka, and
Amerindo never obtained a licenses from the Small Business
Administration for the SBIC fund, Vilar advised Lily Cates that
the venture had been approved by the Government, recommended
that she invest $ 5 million, and advised her that she would be able
to receive approximately $250,000 each quarter from her
investments managed by Amerindo."  The only support for these
facts are allegations in the Third Superseding Indictment
(Jacobson Dec. Ex. B) and the SEC's Second Amended Complaint
(Jacobson Dec. Ex. A).    There is no specific articulable basis to
identify any particular statement as having been stated, relied on,
proven, or sufficient to establish 10b-5 or other liability.  Tanaka
was acquitted of the Lily Cates charges.

13.  This is a compound statement:  "Lily Cates' $5 million was
deposited into an account at a New York City brokerage firm.
Shortly after she made the deposit Tanaka Directed the brokerage
firm to transfer funds out of the account to and for the benefit of
Amerindo affiliates, Vilar, and the payment of other investors.  None
of Lily Cates' $ 5 million investment was invested in the SBIC fund."

The only support for this is the Third Superseding Indictment, which does not constitute proof of any of these statements.   Further, moneys were deposited into an account among several controlled by a Panamanian corporation, pursuant to corporate resolutions, governed by the laws of Panama, required by "the brokerage firm" so that it could and would act only in accordance with that corporate resolution.  (GX 702, included at pages Governmental Supplemental Appendix SA 640-SA 647, in Appeal 10-521; GX 711 (SA-673-689); GX 720 (GX 690-694))  According to these resolutions, which must be interpreted by the laws of Panama, under which they were created, Bear Stearns could act only on the basis of the directives of the authorized signatories.  (SA-646 (e.g.)).   According to Cates' account statements issued by Amerindo Panama, Cates' $ 5 million was in fact invested in what the government called the "SBIC fund" but which was actually an agreement to invest in "privates."  (see GX 1252, SA 715)))  Even after receiving her Account Statement and invoking the powers of the US government to enforce her claims, Cates never individually or through a representative (Swanson, her attorney, or Ross, her bond broker, or anyone else), complained about

the nature of the investment or challenged its shorthand designation
"SBIC".  She merely urged the government to help her redeem.
There is agreement that Cates' account statement entitles her to the
amount for which her account was credited.   Neither the
government nor defense counsel cross examined Lily Cates about the
private terms of the investment represented by GX 265, the Private
Placement memorandum.

14.   This is a compound statement.   The citations are to the
indictment and the complaint.  Cates did not testify that any of these
statements were material to her investments.  Further, the Court
stated that an alleged false statement could be deemed material for a
10b-5 offense if it "induces someone not to act to either end their
investment or alter their investment" (T.4810-11).  But that is not a
correct statement of law.  For 10b-5 liability there must be a material
misrepresentation inducing reliance in the domestic purchase of a
security, not a contract breach in carrying out the investment.
*Capital Mgmt. Select Fund v. Bennett*, 670 F.3d 194 (2d Cir. 2011);
*Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000) (quoting *Mills
v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 2000)).

Further, Cates' counsel agreed in a statement to prosecutors in 2008 that an escrow meant merely holding money for a specific purpose. (UGX 3505-15, Swanson).

15.   There was never any finding much less a "necessary finding" that Vilar or Tanaka "misappropriated" $250,000.  There was no jury charge requiring a finding of "theft" or "misappropriation."  The SEC cites only allegations from an indictment and the SEC complaint. There was no evidence of how any transfer was treated on Amerindo's books and records as to Cates' account.

16.   This is a compound statement, supported only by the Third Superseding Indictment and the Second Amended Complaint.  There was no definition of "sham" proven or charged to the jury; there was no finding of a specific promise that funds invested in any Amerindo product would in fact be invested in a static way.  Nor was there proof regarding the entire universe of investments by Vilar and Tanaka and thus no basis for the statement that they did not "purchase short-term debt instruments as promised."  What was promised was a rate of return.

17.   This is a compound statement.  There was no proof of who
"prepared" or even "distributed" offering circulars, and no evidence of
"false and misleading statements of *material* facts." No jury passed
on these specific issues.  There was NO promise that funds would not
be commingled.  The offshore investors knew that high returns were
generated from defendants' investment in their field of expertise.
The only support for the allegation is the Third Superseding
indictment and the Second Amended Complaint.

18.   This is a compound statement.  Defendants agrees that they
"failed to redeem" at par in certain cases, and admits that funds from
commingled accounts were used for obligations.

19.   This is a compound statement.  There is no jury verdict
establishing any of the allegations in this paragraph, which is
supported only by the Third Superseding Indictment and the Second
Amended Complaint.  Since the government has made "failure to
redeem" part of the alleged "scheme to defraud" and defendants
admit that they failed at times to redeem at par, the only factual
assertion that is supported is the failure to redeem.  There was and
is no allegation that defendants agreed to fail to redeem when they

sold any security.  There was no finding that defendants "misappropriated investor funds."  The only support for these compound allegations are the Second Amended Complaint and the Third Superseding Indictment.

20.    Defendants deny that the testimony and documentary evidence "show[] that each of the securities transactions for which Vilar and Tanaka were convicted were domestic securities transactions."  This conclusory assertion is followed by NO citation to any part of the record to establish that this was a fact proved at the criminal trial (or found by the jury in the criminal case).   Indeed, though the focus was on "Panama", which is in fact where the accounts were domiciled, the "victims" – including Lily Cates -- believed they were conducting business "offshore", non-domestically, with "London," which is where account statements emanated from   (T.2052).   And, as argued by the government in rebuttal summation (T.5474-75), as to all the GFRDA clients who testified at trial, SEC Examiner Wraga did not put any amount involved in a transfer into her chart (GX 8202) until she had

matched a transfer with a "confirm" that emanated from Amerindo in London.

21.     This is a compound statement.  Tanaka was acquitted of the Lily Cates'- related counts, except Count One, which had a "failure to redeem" component.  That is not a "fraud."  The only references to the record are to testimony of Lily Cates.  (Ex. C to the Jacobson Affidavit, which Mr. Jacobson does not further identify in his declaration, except to say that they are "selected pages from the transcript of the trial in the Criminal Case, but in fact are statements of Lily Cates and Eugene Ross.)  The account into which Cates transferred funds, with her banker's concurrence and Ross's acknowledgment was an account controlled by an Amerindo Panamanian entity with the banking relationship controlled through a banking resolution authorized by the laws of Panama.  (GX 702, eg.)  (Ross:  "We received instructions to wire the funds to an account controlled by Amerindo." (T.2056).  At T.2052 prosecutor Litt explained that Cates did business with London.

22.     Defendant admits that Lisa Mayer lived in Puerto Rico for a time, but she bought securities using offshore corporations.

Further, GX 345 (Jacobson Exhibit D-1) is written to the Mayers from Amerindo by Renata Tanaka in December 2000, using a Panama letterhead; GX 2112, which is Exhibit D-2-3, referred to in this compound accusation, was apparently faxed to Renata Tanaka and James Stableford in London.  All of the clients knew they were getting good deals with offshore investments.

23.     Because Morrison was not an issue, Graciela LeCube Chavez was not cross examined on where she knew her transaction to have occurred or title to have passed, nor was their proof on that point.  The SEC's supposedly undisputed "facts" show conduct and/or effects in the United States, and no more.

24.     Because Morrison was not an issue, and because Ms. Colburn was dead, Colburn was not cross examined on where she knew her transaction to have occurred or title to have passed, nor was their proof on that point.  The SEC's supposedly undisputed "facts" show conduct and/or effects in the United States, and no more.  Colburn's estate sued Amerindo London.

25.     Because Morrison was not an issue, Cox was not cross examined on where his uncle's transaction occurred or title to

have passed, nor was their proof on that point.  The SEC's supposedly undisputed "facts" show conduct and/or effects in the United States, and no more.    Cox dealt with London.

26.     Defendant objects to "post-conviction events" to justify partial summary judgment.  The post-conviction restraining order in the criminal case is irrelevant. If it is relevant, so too is the SEC's conduct in de facto restraining assets by asking for Bear Stearns and JP Morgan's "voluntary" restraint of Amerindo funds. However, this attempt to "unify" the cases confirms – for purposes of the defendants' motions to dismiss – that this is "the same case" as the criminal case.

27.     Defendants admit that judgments were entered in the criminal case, that defendants were jailed and fined.  There was no "forfeiture" specified in any judgment.

28.     The judge's comments are not evidence establishing any relevant, material, much less undisputed fact.  All of these "vulnerable" people made money beyond their wildest dreams, and would have had the rest if the SEC had not tied it up for seven years. There is 50 million dollars in restrained accounts.

29.     This allegation is supported only by citation to "the
Government['s … ] theory of the appropriate forfeiture in the
Criminal Case."  The government has conceded in the Court of
Appeals that the forfeiture order (which defendants claim is
totally invalid, a claim that is *sub judice*) must be vacated.

30.     The illegality of pre-judgment interest was argued in the
Court of Appeals on August 21, 2012, and the Court expressed
skepticism of the propriety of such an award.   Mr. Jacobson's
calculations "using the Internal Revenue Service rate of interest
on tax underpayments and refunds" are beside the point and if
anything demonstrate the unreasonableness of the pre-judgment
interest awards in the criminal case.

31.     The "identifiable victims" were not properly examined on
"reliance" or on Morrison grounds.  The statements quoted from
the Court's "Memorandum" are characterizations, not evidence or
factual findings.  The restitution orders and forfeiture orders are
being considered on appeal.  Further, neither of defendants'
lawyers properly contested restitution or forfeiture prior to the
April 7, 2010 orders:  Tanaka's lawyer Colton had not officially

withdrawn but was no longer working, having turned the matter

over to appellate counsel, who did not appear in the criminal case;

Vilar's lawyer was quoted as "confessing" for his client and did not

object in any way to forfeiture or restitution.  There was never a

"full or fair opportunity" for the defendants to litigate.  Further,

the "essence of the crime" is no basis to impose forfeiture.

Forfeiture is to be determined by the nexus of property alleged to

be forfeitable, to an offense.  No one made findings on this issue.

Further, the right to a jury verdict on forfeiture was not waived

and is an issue on appeal.

32.      There is no restitution or forfeiture "judgment".  The April 7,

2010 orders were Orders, not judgments.  The Court refused to

enter new judgments.

33.      We agree that the Court entered an order stating its

judgment was wrong.

34.      While prosecutors may have "consented to remand" to

"determine the amount of forfeiture money judgments" there are

many more things "wrong" with the judgment that the Court of

Appeals is reviewing.  Defendants contend that NO judgment should be entered because the "forfeitures" are a *nullity*.

35.     Once again there is a commingling of the cases.  The SEC refers to "the SDNY advis[ing] the Court of the approximate value of the substitute assets."  The value has never been properly determined.  The SEC failed to get a Receiver in 2005 and has done nothing to deal properly with the property it ended up with, as "de facto" manager of the accounts it had caused to be unreachable by defendants.

36.     There were no findings regarding lack of remorse in the criminal case.  As to quoted statements allegedly showing lack of "remorse", Tanaka and Vilar DID run a "squeaky clean" program for Amerindo's 14,000 clients, and the investors in the Panama products would have been paid out had it not been for "the SDNY's" and SEC's joint action in holding moneys, so that defendants would have to consent to "forfeit" EVERYTHING, in order for any investor to get paid the amount due.  The SDNY and SEC did this without ever bothering to value the accounts or figure out the true debts.

37.     Tanaka's statements were right on the money.  The true "victims" are indeed Amerindo employees and Mr. Tanaka's family.  And tying up private clients' funds for now seven years has been THE worst "wrong" done to these investors.

38.     The SEC points to Vilar's denials in his answer to the First Amended Complaint as indicia of "lack of remorse", justifying severe sanctions.  "How dare them actually *litigate*?, is the meaning of the SEC's position.

39.     The SEC's unrelenting position forced Tanaka into a position – representing himself *pro* se -- where he voiced concern for clients, for the destruction of *his* business because of a search unsupported by probable cause, and for the fact that there have been no losses.

40.     Tanaka remains hopeful his clients will hold the government accountable for holding up and failing to manage the seized accounts, as opposed to the powerless defendants.

41.     It is astounding that the SEC faults Tanaka and Vilar for statements in litigation that they hope the Court of Appeals will

rule in their favor.  This has nothing to do with summary
judgment.

42.    There is no support for the assertion about what the Court
"apparently" relied on in connection with forfeiture.   Defendants
have repeatedly tried to correct the government's lack of
conciseness and accuracy in describing their positions.  The
defendants' position is:  the investors are due now the amounts
that were due when the Amerindo businesses were shut down and
the government took "control" of all Amerindo funds.  Not more.

43.    This is a false interpretation of Vilar's position on appeal.
This was an argument for why "substitute asset" forfeiture was
improper.  See the actual brief.  The victims "had" a constructive
trust, but no longer have such a remedy.

44.    Defendants contest the materiality of the assertion that
funds are commingled, and once again confirm that (as stated by
the SEC and the Justice Department ) investors do not have a
direct interest in any restrained account.

45.    This is a compound statement, and takes statements made
in the hope and anticipation of a reasonable settlement (whereby

finally investors can get to their money) as statements supporting summary judgment.  Faulting defendants for counsel's assertions violates Federal Rule of Evidence 408.

46.     These are further compound statements again reiterating counsel's litigating position.  What does this have to do with partial summary judgment?

47.     Though the SEC states that defendants' claim to fees from the restrained assets is "contradicted by Tanaka's April 24, 2002 sworn statement" in an arbitration *Cristov v. Amerindo Investment Advisors Inc.,*" the SEC has (again) misinterpreted and has its facts wrong.  Mr. Tanaka stated that ATGF has not charged "incentive" fees.  However, there were also *management* fees which *did* accrue, and the pot of funds may also contain residual fees accruing from other Amerindo investments, such as Rhodes Capital and perhaps other private deals which are none of the SEC's business because they are offshore and private.  As an example, see UGX 101, 102 (ATGFII brochures from Lily Cates, reprinted in Vilar Supplemental Appendix, VSA 1 et seq.).  At VSA 10:

The Fund has agreed to pay the Investment Manager an annual

investment management fee equal to 2% of total assets

under management. The investment management fee will be

calculated and paid quarterly in arrears on average total

assets, including borrowed funds and assets purchased

with such funds but excluding monies borrowed but uninvested

in equities for the entire previous quarter. In addition,

the Investment Manager will receive an annual incentive

fee equal to 15% of realized and unrealized portfolio

gains. The incentive fee will be calculated and paid semiannually,

or semiannually in arrears, at the discretion

of the Manager. Any decreases in portfolio value must

be earned back before the Investment Manager may again

receive an incentive fee, so that the incentive fee is

payable ( i) only when the portfolio value at the end of

a six-month period exceeds the highest preceding semi-annual

portfolio value, and (ii) only to the extent of such excess.

If, however, a decrease in portfolio value is not made

up within three years, then the portfolio value at the

end of the three-year period will be considered to be

the highest preceding portfolio value for the purpose

of computing future portfolio gains.

The Investment Management Agreement will be for

of 30 years from the date of the Agreement, but

terminated by either party at any time upon 90 days'

notice to the other party.

48. Tanaka's statement to his lawyer and to investor Marcus has nothing
to do with the SEC's right to summary judgment or partial summary
judgment.  It is outrageous that the SEC would condemn Tanaka for
expressing concern that the Mayers sought to jump the ship and
claim a right to the improperly-imposed 9% compounded interest,
when other investors have been waiting.  It is the SEC and the DOJ,
NOT Mr. Tanaka, who has "pit[ted] one set of investors against the
other", by withholding defendants' funds, making it impossible to pay
out anything, and then turning Marcus into an alleged "victim" by
just saying so in the Second Amended Complaint, and giving the
Mayers a pass on tax fraud so that they would testify against the
defendants and would have a free hand to litigate civilly.

Dated:  Portland Maine
        September 14, 2012        __/s/_____
                                  Vivian Shevitz

Attorney for Defendant Tanaka
401 Cumberland Ave. – Apt.609
Portland, Maine 04101
207-899-2502
Cell:  914-763-2122
Vivian@shevitzlaw.com