```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
SECURITIES AND EXCHANGE COMMISSION    :

                                       :    05 Civ. 5231 (RJS)
              Plaintiff,
                                       :    MEMORANDUM IN
    v.                                      REPLY, IN SUPPORT
                                       :    OF DISMISSAL

AMERINDO INVESTMENT ADVISORS INC, et al.,
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
```

The government (here the SEC) assures that its claims "relate back" and additions are but "detail".  It never shows us.  It never moved to file an amended complaint, never attached a proposed amended complaint or discussed "changes", and never explained why it needed the Second Amended complaint. Before accepting this Second Amended Complaint at all, much less SEC arguments, the Court should order the SEC to identify the specific changes it made between the Amended Complaint, and this Second Amended Complaint, state *why* it needed to amend to make those changes, and state how the amendments support its theories. Its selected responses here -- it gives us only a "For example" discussion in arguing that its amended complaint does not in fact add charges barred by the statute of limitations ("For example, …. (SEC Mem. in Opposition to Motion to Dismiss, p.4) – are insufficient.  It would be an abuse of discretion to allow the SEC to litigate the need for the amended complaint in the first place – and its propriety – without also requiring it to set forth all the changes.   If the Court does not dismiss the Second Amended Complaint on these papers, it should order the SEC to set forth its changes and discuss them.

1

In no way do the "new claims" involving so-called ATGF "victims", now identified as the claimants in the forfeiture proceeding (who for seven years (through Mr. Marcus) expressed an interest in having Mr. Tanaka manage their funds), or the newly minted "violation of custody rules" claims, "relate back" to the claims based on the indictment as to "victims" favored with restitution orders to which exorbitant interest was added.  The SEC, indeed, advances new theories – but conceals them in footnotes and afterthoughts, as if it should have a right to litigate without identifying its theories of liability.  The denouement appears for the most part in the final section of its opposition memorandum labels our arguments as "frivolous."  In fact its summary dismissal of our arguments masks deficiencies in the Second Amended Complaint.  It argues:

> In addition to the arguments addressed above, the Individual Defendants also contend that the Commission's allegation that Amerindo US violated custody rules is "completely false and is sanctionable." … However, as set forth in the Second Amended Complaint, Amerindo US, a registered investment adviser, managed Lily Cates' investment in the SBIC fund. (Jacobson Decl, Ex. A at ¶ 30)  As proved at the criminal trial, Lily Cates' $5 million SBIC investment was diverted almost immediately to benefit Vilar and Amerindo US, and to pay a GFRDA investor, clearly in violation of Rule 206(4)-2(a) under the Advisers Act.[7]

---

> Footnote 7 of the Commission's memorandum reads:
> 
> 7  The Second Amended Complaint also alleges that Vilar and Tanaka managed the Amerindo investment advisory entities interchangeably.  It is thus at least an issue of fact whether diversion of $250,000 from Lily Cates' managed account and diversion of GFRDA investor monies also violated Rule 206(4)-2(a) of the Advisers Act.

The Commission then says it has authority to regulate and prosecute Mr. Vilar and Mr. Tanaka even if the investments were made through Amerindo

Panama because it has a right to regulate *non registered advisers,* and it likens an individual acting *qua* offshore entity such an "unregistered adviser. It makes this astounding statement despite *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006), which held that a hedge fund's advisee is the fund, not its "partners". The SEC says, however, it can prosecute this case under the Investment Adviser Act (if not 10b) because *Goldstein* does not "affect[] the Commission's ability to prosecute" *unregulated* advisers under the U.S. Investment Advisers' Act. *Id., citing* its own decision in *SEC v. Gruss*, 2012 WL 1659142 at *10 (SDNY 2012) (a case we, who do not have a Westlaw subscription but only LEXIS, cannot even access!)

The SEC's position is extraordinary, and one heard for the first time here. It alleges authority over the transactions on a theory that defendants were *unregistered investment advisers* if they were operating in Panama or the UK. The SEC's comparison of the offshore operation with an "unregistered investment adviser" subject to the SEC's regulatory requirements ignores *Morrison*'s *principles*.

*Morrison* says that there is no extraterritorial application of the securities laws and no extraterritorial application of the rules. Defendants were not "investment advisers" when acting extraterritorially as investment managers in Amerindo Panama, and they were not subject to SEC rules.

The SEC's new position is that it can regulate (and therefore had a right to shut down Amerindo US) because Amerindo US was going to manage the SBIC funds is plain wrong. Amerindo US may have been named as *manager* of what would have been an "SBIC fund" if it had commenced investing, but (a) it did not, as

3

the investment was in Phase I, and (b) that circumstance did not make Amerindo US an "investment adviser" to Lily Cates nor turned Amerindo Panama into a US-regulatable investment adviser despite the fact that none of the offshore investors paid fees for the investment advice.  The SEC's reach is unjustified.  It has no authority over offshore sellers of offshore products, and had no business bringing this action against managers of offshore products sold to willing investors who gave them room to "do their thing."  (See "for example" ATGF II Offering Memorandum for ATGF II, from Lily Cates' files, Vilar Supplemental Appendix in 10-521, VSA 1, and VSA 24; these Circulars are relevant regardless of whether an offshore investor purchased this particular investment, or something else; it defines the defendants' business philosophies and methods and provides for a wide berth of management discretion, and their long-time offshore clients knew it and benefited).

There is no factual support, required as a matter of pleading under Fed. R. Civ. P. 8 or 9, for the SEC's allegations that the defendants operated the entities "interchangeably" (or most of the other alleged "facts").  The SEC argues that it is an "issue of fact" (Mem. p.8 n.7) but has no basis to have alleged it in the first place.  Intercompany transfers do not mean companies were used "interchangeably."  The government at the criminal trial showed *nothing* about the books and records of the Amerindo Entities.  David Maimzer, the Chief Operating Officer of Amerindo US, was interviewed after the arrests, and made clear that the operations are separate and there were governing contracts. (UGX 3523-1) .

4

The paucity of support for the SEC's claims is alarming, and does not satisfy the constraints reaffirmed by the Supreme Court in *Bell AtlanticCorp. v. Twombly*, 555 U.S. 544 (2007), made applicable to all civil complaints in *Ashcroft v. Iqbal*, 556 U.S. ___ (2009). The Second Amended Complaint should be dismissed.

<u>Disgorgement and Other Penalites</u>: The SEC engages in fuzzy thinking. It argues that it is entitled to "disgorgement" even if it does not and cannot prove that the individual defendants obtained "ill-gotten" gains. It mischaracterizes the argument in a footnote, and then tears it down by citation to a case that does not stand for the proposition it claims the case to support. At Mem. p.8 n.6 the SEC misstates our argument as being that it is improper for the Commission to seek to distribute any disgorgement it obtains to defrauded investors. The SEC trumpets: "Although the primary purpose of disgorgement is to deprive wrongdoers of ill-gotten gain, disgorgement serves a secondary goal of compensating victims." *Id.*, citing *Official Committee of Unsecured Creditors of World Com, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2005).

The Second Circuit did not hold in *Official Committee* that the SEC had authority to take a defendant's funds for distribution, by way of disgorgement, unless and until it shows that the defendant *obtained* such "ill-gotten" gains to "disgorge" in the first place. That it is an *alternate* "goal" to compensate investors may be true, but it does not supplant the basis for disgorgement, which must be proven. *Id.* (Although disgorged profits may be distributed to defrauded investors,

5

"[t]he primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains.").

The SEC takes no responsibility of the "disgorgement" it obtained already -- prematurely. *Thinking* that Lily Cates was a client of Amerindo US, the SEC already took ALL the value of Amerindo U.S. from the defendants. It did so on the theory that Amerindo operated a Ponzi scheme, a comparison it continues to make in these papers, trying to compare defendants' conduct to the Ponzi case it uses (Mem. p.5-6) to cite only a snippet of the holding, *SEC v. Smart,* 678 F.3d 850, 857 (10th Cir. 2012) untethered to the full facts (defendant had told investors their money would be placed in secure investments like mutual funds "but then pooled the money into one account and used it to engage in risky financial ventures, make partial payment so other investors, and covers his and his wife's personal expenses). Quoting the holding in *Smart* may give the SEC "cover" in its mind for its misjudgment at the beginning of the case, but Amerindo was not a Ponzi scheme; no new money was taken in by Amerindo Panama after 2002, and payments were being worked out and being paid. Further, as the David Ross reports submitted at sentencing show, there were sufficient assets to cover investors' claims in 2005. The Amerindo Panama funds have been reduced in value since then because of the SEC's failures of management. This is a fact that should render the SEC liable, not justify its continued besmirchment of the Amerindo businesses. The SEC got "disgorgement" prematurely in an amount (the value of Amerindo US) far beyond any "loss" or any gain, when it destroyed Amerindo US in 2005, as well as when it

reduced the value of the Panamanian accounts by doing nothing to manage the money since 2005, when its request for a Receiver was *denied*.

The SEC's tactic of closing down a business *as an incident of "disgorgement"* is disclosed in a scholarly article by Barbara Black (a Professor at the Corporate Law Center, University of Cincinnati College of Law): *Should the SEC Be A Collection Agency For Defrauded Investors?* (2008).  Professor Black reports that disgorgement was not used by the SEC as loosely as it is now, but arose in two categories of cases:  against insiders and issuers who made profits, *and* where "an entity made material misleading statements in connection with selling its securities", where "the entity directly benefited from the fraud, and the disgorgement remedy was viewed as comparable to the remedies of rescission and restitution because of … privity between the corporation [against which the disgorgement was sought] and the investor." *Id*. p.322.   The author wrote:  With respect to the "most egregious of these frauds [--]  Ponzi schemes [ -- ] the SEC routinely sought to shut down  the enterprise  and appoint a receiver in an attempt to recover any available funds for the defrauded investors." *Id*. p. 323, *citing SEC v. JT Wallenbrock & Assocs.,* 440 F.3d 1109, 1112 (9th Cir. 2006).   The SEC took such drastic action "[i]n…situations [where] disgorgement was appropriate  because  the entire  enterprise was fraudulent  … and the SEC  did not need to concern itself with preserving a legitimate business …." http://scholarship.law.uc.edu/fac_pubs/55.

Ponzi schemes have a definition.  A "Ponzi scheme is `[a] fraudulent investment scheme in which money contributed by later investors generates

7

artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, usually without any operation or revenue-producing activity other than the continual raising of new funds.' Black's Law Dictionary 1198 (8th ed. 2004).", *Mosier v. Callister, Nebeker & McCullough, P.C.*, 546 F.3d 1271 (10th Cir. 2008)).

"Amerindo" definitely was not THIS (as Judge Sullivan stated at the Vilar sentencing, Tr. 34).  The SEC Monitor recognized value in Amerindo that was important to the ongoing business.  The Monitor eschewed a needless SEC "investigation" into who was a client of the offshore company, telling the SEC and the Court directly that the limited funds remaining should be used to claims and then *return* moneys to the owners, the defendants.

The SEC's request for a Receiver in this case was denied; and the Monitor made it plain that Amerindo US was "clean."  Even after the Monitor's report in December 2005,  it took a year of litigation before defendants, against all odds, succeeded in a ruling that the government did not even have probable cause, much less that this was the "tip of an iceberg" or a fraudulent Ponzi scheme.

The government is still trying to litigate the ruling that there was not even probable cause to support the theory that "Amerindo" was a "fraudulent enterprise." They have raised the issue on the criminal appeal now, trying to justify its treatment of "Amerindo" in this way, relying on Lily Cates.  The SEC is doing the same thing here.  It acts as if it is doing work that justifies the huge expenditure of

time and resources in this case.  Though it "thought" it had to protect US investors in the Amerindo U.S. Advisory company, it found out that the clients involved in this "mess" were not clients of the U.S. company.  It should have dismissed the case.

Instead, disregarding its costly mistake as if of no moment, the SEC adds chaos, pushing penalties unsupported by facts, law, or its Second Amended Complaint.  Nor do *its* allegations prove "domestic transactions", and its justification for such a conclusion (that some purchasers were sitting in the United States and that's enough) is sophomoric.

As to the statute of limitations, the SEC drops a footnote (Memo p.5 n.4) pointing to *SEC v. Gabelli*, 653 F.3d 49, 59 (2d Cir. 2011) to support its assertion that there is no limitation period for SEC enforcement.  Last month the Supreme Court granted *certiorari* in *Gabelli v. United States*, Supreme Court Dkt. No. 11-1274 (*cert. granted* September 25, 2012).  The SEC should not be so sure of its unlimited powers.   In the end, the SEC spouts platitudes but skirts serious discussion.  With an inability to hide behind *Bowman, t*he SEC claims it set forth domestic transactions, when it does not, and claims the ability to "regulate" offshore investment managers of hedge funds because of some ability to regulate unregistered "investment advisers" though – as in this case – they did not act as investment advisers but had a separate business offshore.   This is extreme.  *Goldstein* and *Morrison* make clear that the SEC had no business intruding in Vilar's and Tanaka's offshore business.

This "prosecution" violates defendants' constitutional rights. The SEC says only there is no support for our position, but does not address its role in restraining the defendants' funds, taking down Amerindo U.S. on the uncorroborated word of a dyslexic, or switching theories just to effect "the forfeiture." Our support is the Constitution, the outlandish destruction of Amerindo US, the commingling of "civil" and "criminal" case captions to justify holding all the defendants' assets, and the fact that the SEC has caused these men's assets to be unavailable for their defense. With the wrongful destruction of Amerindo U.S, and the diminution of assets held by Amerindo Panama due to a failure to manage the funds or allow their management, the SEC has exacted penalties far beyond anything the Eighth Amendment or other Constitutional protections allow.

## CONCLUSION

The SEC seeks to litigate a Second Amended Complaint that it did not get proper permission to file. It urges that it added only "detail" but does not say what the detail is nor sets it out so we can litigate whether that detail is in fact merely dressing for a previously stated claim, or a new claim. We have a right to know what that "detail" is – to see it in black and white; a defendant is not supposed to have to guess. The case and the SEC's litigating position are **abusive.** The case should be dismissed.

Dated: October 12, 2012        _____/s/_____
                                Vivian Shevitz (for Vilar and Tanaka)

10