# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 05 Civ. 5231 (RJS)

U.S. SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

VERSUS

AMERINDO INVESTMENT ADVISORS, INC., *et al.*,

Defendants.

MEMORANDUM AND ORDER
March 11, 2013

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-11-13

RICHARD J. SULLIVAN, District Judge:

Plaintiff, the United States Securities and Exchange Commission ("SEC"), brings this action against Alberto W. Vilar ("Vilar"); Gary A. Tanaka ("Tanaka," and, together with Vilar, the "Individual Defendants"); Amerindo Investment Advisors Inc. ("Amerindo US"); Amerindo Investment Advisors, Inc. ("Amerindo Panama"); Amerindo Advisors UK Ltd. ("Amerindo UK"); Amerindo Management Inc.; Amerindo Technology Growth Fund, Inc.; Amerindo Technology Growth Fund II, Inc.; and Techno Raquia, S.A. (collectively, "Defendants") for violations of various anti-fraud provisions of the federal securities laws. Before the Court is the SEC's motion for partial summary judgment against the Individual Defendants based primarily on the preclusive effect of their convictions in

the parallel criminal case, *United States v. Vilar, et al.*, No. 05 Civ. 621 (RJS). The SEC seeks civil monetary penalties, disgorgement of profits, and a permanent injunction restraining the Individual Defendants from future violations of the securities provisions they are charged with violating. For the reasons set forth below, the Court (1) grants the SEC's motion in part; (2) denies it in part; (3) permanently enjoins the Individual Defendants from committing further violations of federal securities laws; and (4) appoints a receiver to investigate and report on the value of investor assets that have been restrained in the parallel criminal case for purposes of preventing the dissipation of those assets and of determining the amount of

disgorgement and civil penalties warranted in this action.

## I. BACKGROUND[1]

In 2005, the Individual Defendants were indicted on charges of violating federal securities laws in connection with two fraudulent investment schemes. The first scheme concerned a $5 million investment by a single investor, Lily Cates, in a venture called the Amerindo SBIC Venture Fund LP (the "SBIC Fund"). (Pl.'s 56.1 ¶ 11; Decl. of Neal Jacobson, dated Aug. 3, 2012, Doc. No. 248 ("Jacobson Decl."), Ex. B ("Indictment") ¶¶ 6, 9.) The second scheme concerned a different investment vehicle, known as the Amerindo Guaranteed Fixed Rate Deposit Accounts ("GFRDAs"), that the Individual Defendants represented as an investment in certain classes of securities but in fact misappropriated for other purposes. (Pl.'s 56.1 ¶¶ 16-19.; Indictment ¶ 31.)

Ultimately, the Third Superseding Indictment ("Indictment"), filed on August 15, 2006, charged each of the Individual Defendants with twelve counts, four of which are relevant to the instant case: (1) one count of conspiracy to commit securities fraud, investment adviser fraud, and a variety of other crimes ("Count One"); (2) one count of securities fraud in connection with the SBIC Fund, in violation of § 10(b) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Count Two"); (3) one count of securities fraud in connection with the GFRDAs, in violation of § 10(b) and Rule 10b-5 ("Count Three"); and (4) one count of investment adviser fraud in connection with the Cates investment[2] in violation of § 206 of the Investment Adviser Act of 1940 ("IAA"), 15 U.S.C. § 80b-6 ("Count Four"). (Indictment ¶¶ 35-50.) The Individual Defendants' criminal trial began on September 22, 2008.

---

[1] The following facts are drawn from the Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1"), Defendants' Rule 56.1 Statement ("Defs.' 56.1"), and the exhibits and declarations attached thereto. The facts are undisputed unless otherwise noted. Where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. *See* Local Rule 56.1(d) (requiring each statement in a 56.1 Statement to "be followed by citation to evidence which would be admissible"); *Holtz v. Rockefeller & Co, Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (noting that "where there are no[] citations or where the cited materials do not support the factual assertions in the [56.1] Statements, the Court is free to disregard the assertion" (internal quotation marks omitted)). The Court has also considered the parties' briefs in connection with this motion. The Court notes that what it refers to as the Individual Defendants' opposition brief is actually titled "Defendant Gary Tanaka's Memorandum in Opposition to SEC's Motion for Partial Summary Judgment." (Doc. No. 258.) Nevertheless, Vilar has "incorporat[ed] by reference . . . all the papers [Tanaka has] submitted in this action" (Doc. No. 254), and so the Court will treat Tanaka's submissions, and the arguments they raise, as having been jointly submitted and raised by both Individual Defendants.

[2] Although Count Four did not explicitly identify Cates as the victim of the charged conduct, at trial, Tanaka argued, and the Court and government agreed, that Count Four encompassed only the conduct related to Cates' investment in the SBIC Fund and not any conduct concerning the GFRDA investors. (*See* Trial Tr. 4871-72, Nov. 10, 2009; *id.* at 4803, 4849-51, Nov. 7, 2009.) Thus, Tanaka is now estopped from denying that Count Four implicated him in the fraud against Cates, as he attempts to do. (Defs.' Mem. 9); *see Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 147 (2d Cir. 2005) ("The equitable doctrine of judicial estoppel provides that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (internal quotation marks and brackets omitted)).

The testifying witnesses included two GFRDA investors, Lisa Mayer and Graciela Lecube-Chavez, and the representatives of two other GFRDA investors, Tara Colburn and Gary Cox (collectively, the "Testifying GFRDA Investors"). Cates testified as well. (*See* Pl.'s Mem. 3.) On November 19, 2008, a jury convicted Vilar on all twelve counts of the Indictment and Tanaka on Counts One, Three, and Four. (Pl.'s 56.1 ¶ 10.)

The SEC brought this parallel action on June 1, 2005 (Doc. No. 1) and filed its first amended complaint on November 17, 2005 (Doc. No. 44). The matter was initially assigned to the Honorable Laura Taylor Swain, United States District Judge, who stayed the matter pending resolution of the Individual Defendants' criminal proceedings. On March 21, 2012, this matter was reassigned to my docket due to its substantial overlap with the Individual Defendants' criminal trial, over which I presided. (Doc. Nos. 219, 220.) On May 25, 2012, the SEC filed its Second Amended Complaint ("SAC"). The SAC brings seven claims against Defendants, three of which are directed against the Individual Defendants. Specifically, the SAC charges the Individual Defendants with: (1) violations of § 17(a) of the Securities Act of 1933 ("Securities Act"), 17 U.S.C. § 77q(a), § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (2) aiding and abetting violations of IAA §§ 206(1) and 206(2), 15 U.S.C. § 80b-6(1)–(2); and (3) aiding and abetting violations of IAA § 206(4), *id.* § 80b-6(4), and Rule 206(4)-2(a) thereunder, 17 C.F.R. § 275.206(4)-2(a).

On August 9, 2012, the SEC filed the instant motion for partial summary judgment against the Individual Defendants based primarily on the preclusive effect of the Individual Defendants' criminal convictions

for their fraud on Lily Cates ("Cates") and the Testifying GFRDA Investors. (Doc. No. 245; Pl.'s Mem. 3.) The following day, the Individual Defendants each filed a motion to dismiss the SAC. (Doc. Nos. 252, 254.) The Court set parallel briefing schedules for the motions, which were fully submitted by October 12, 2012. (Doc. Nos. 264, 265.) Following several adjournment requests by Defendants, the Court held oral argument on all three motions on December 11, 2012, at which time it denied the Individual Defendants' motions to dismiss and reserved decision on the SEC's motion for partial summary judgment. (Tr. of Dec. 11, 2012 Oral Argument at 38-39.)

## II. LEGAL STANDARD

### A. Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of proving that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). As such, the court must resolve any ambiguity in favor of the nonmoving party. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Anderson*, 477 U.S. at 252.

Once a moving party has met its burden, the nonmoving party will defeat summary judgment only if it identifies "evidence in the record from any source from which a reasonable inference in [its] favor may be drawn." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted); *see also Anderson*, 477 U.S. at 252 ("[T]here must be evidence on which the jury could reasonably find for the [nonmoving party].").

## B. Collateral Estoppel

"The doctrine of offensive collateral estoppel permits a plaintiff to bar a defendant from relitigating an issue that was decided in a prior case against the defendant." *Roe v. City of Waterbury*, 542 F.3d 31, 41 (2d Cir. 2008). "It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978). In the context of securities cases, "[c]ourts in this district have consistently found that a defendant convicted of securities fraud in a criminal proceeding is collaterally estopped from relitigating the underlying facts in a subsequent civil proceeding." *SEC v. Contorinis*, No. 09 Civ. 1043 (RJS), 2012 WL 512626, at *3 (S.D.N.Y. Feb. 3, 2012); *see SEC v. Shehyn*, No. 04 Civ. 2003 (LAP), 2010 WL 3290977, at *3 (S.D.N.Y. Aug. 9, 2010); *SEC v. McCaskey*, No. 98 Civ. 6153 (SWK), 2001 WL 1029053, at *3 (S.D.N.Y. Sept. 6, 2001).

A criminal conviction has a preclusive effect in a subsequent civil action if four conditions are satisfied:

(1) the issues in both proceedings must be identical, (2) the issue in the

prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986); *see also SEC v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007) (applying the four-factor test). For collateral estoppel to apply, the civil claims need not arise under the same statutory provisions under which a party was convicted; it is enough if "the factual allegations underlying the . . . convictions are sufficient to establish that [the defendant] also violated the provisions [of law] at issue." *SEC v. Dimensional Entm't Corp.*, 493 F. Supp. 1270, 1277 (S.D.N.Y. 1980); *see, e.g.*, *Shehyn*, 2010 WL 3290977, at *3–5 (granting summary judgment on the SEC's § 10(b) and Rule 10b-5 claims based on the defendant's prior wire fraud conviction).

## III. DISCUSSION

The Court will consider each of the SEC's claims in turn and then address the appropriate remedies for the Individual Defendants' civil liability.

### A. Securities Fraud

The SEC seeks summary judgment on its claim that the Individual Defendants violated § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5 thereunder. To establish that the Individual Defendants violated § 10(b) and Rule 10b-5, the SEC must establish that each defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a

4

fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).[3]  In addition, as a result of the Supreme Court's recent decision in *Morrison v. National Bank of Australia, Ltd.*, the SEC also must establish that the sale or purchase at issue involved either "transactions in securities listed on domestic exchanges, [or] domestic transactions in other securities."[4]  130 S. Ct. 2869, 2884 (2010); *see Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012) (recognizing that a plaintiff must plead the domesticity of a transaction in order to state a § 10(b) claim). "The standard for establishing a violation of Section 17(a) is 'essentially the same'" as for establishing a violation of § 10(b) and Rule 10b-5. *Haligiannis*, 470 F. Supp. 2d at 381 (quoting *Monarch*, 192 F.3d at 308).

The SEC's summary judgment motion with respect to its securities fraud claim rests on two pillars. The SEC argues that (1) collateral estoppel precludes the Individual Defendants from relitigating the *Monarch* elements, and (2) there is no genuine dispute of material fact, and the SEC is entitled to judgment as a matter of law, on the *Morrison* element. The Court will discuss each pillar of the SEC's argument separately, and then address the Individual Defendants' argument that the securities fraud claim requires proof of an additional element – reliance.

---

[3] The Court will hereinafter refer to these three elements as the "*Monarch* elements."

[4] The Court will hereinafter refer to this element as the "*Morrison* element."

## 1. *Monarch* Elements

With respect to its securities claim, the SEC seeks to preclude relitigation of the *Monarch* elements based on both Individual Defendants' convictions on Count Three – securities fraud against the GFRDA investors – and on Vilar's conviction on Count Two – securities fraud against Cates. In reaching those verdicts, the jury, per the Court's instructions, found that the Individual Defendants: (1) in connection with the purchase or sale of securities, employed a device, scheme, or artifice to defraud, made a material misrepresentation or materially misleading omission, or engaged in an act, practice, or course of business that operated as a fraud or deceit upon the purchaser or seller; (2) acted knowingly, willfully, and with intent to defraud; and (3) used a means of interstate commerce in furtherance of the fraudulent conduct. (*See* Jacobson Decl., Ex. C at 5573–5581 (jury instructions on the elements necessary to convict on Counts Two and Three in the Individual Defendants' criminal trial).) These elements clearly overlap with the *Monarch* elements to establish civil liability for securities fraud. *See Monarch Funding*, 192 F.3d at 308. Thus, to the extent the conduct underlying the SEC's securities fraud claim overlaps the conduct underlying Counts Two and Three of the Indictment, the Individual Defendants' convictions preclude relitigating the *Monarch* elements.

Here, there can be no doubt of such overlap between the Indictment and the SAC. The SEC alleges that the Individual Defendants

> orchestrated a scheme to defraud Amerindo US, Amerindo UK and/or Amerindo Panama clients. For instance, Vilar and Tanaka converted clients' funds, including Cates'[s]

funds. Additionally, Vilar and Tanaka misrepresented, and failed to disclose, material information to clients to induce them to make investments, and to continue to maintain their investments, with Amerindo US, Amerindo UK and/or Amerindo Panama, including Cates [and/or] investors in the GFRDAs . . . .

(SAC ¶ 155.) The broad sweep of the SEC's claim demonstrates why Tanaka's acquittal on Count Two, securities fraud against Cates, does not preclude summary judgment. (*See* Defs.' Mem. 5.) The SEC's claim clearly encompasses both the Cates fraud, for which only Vilar was convicted, *and* the GFRDA fraud, for which both Individual Defendants were convicted. The latter fraud, which formed the basis for Tanaka's conviction on Count Three, is thus sufficient grounds for precluding both Individual Defendants from relitigating the *Monarch* elements here.[5]

### 2. *Morrison* Element

Unlike with the *Monarch* elements, the SEC does not seek to establish the *Morrison* element on the basis of collateral estoppel. The SEC acknowledges – as it must – that that element was not decided in the criminal case, which concluded nearly two years before the Supreme Court issued *Morrison*.

(Pl.'s Mem. 11.) Rather, the SEC attempts to establish the *Morrison* element in the traditional Rule 56 manner by demonstrating that there is no genuinely disputed issue of material fact and that it is entitled to judgment as a matter of law on that element. *See Anderson*, 477 U.S. at 250 ("[T]he trial judge shall . . . grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law.").[6] To do so, the SEC relies on the testimony and evidentiary record from the Individual Defendants' criminal trial and on declarations the SEC submitted with its summary judgment motion. Such use of materials from a prior proceeding is perfectly valid because "[s]worn testimony from another trial is admissible on a motion for summary judgment." *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, No. 98 Civ. 8168 (MBM), 2001 WL 521809, at *2 n.1 (S.D.N.Y. May 16, 2001); *see also Shulins v. New England Ins. Co.*, 360 F.2d 781, 785 (2d Cir. 1966) (stating that certified transcripts of testimony from another trial "ha[ve] the same evidentiary value and safeguards as affidavits provided for in Rule 56(e)"). Accordingly, for purposes of the *Morrison* element, the Court will conduct the familiar Rule 56 inquiry rather than determining whether collateral estoppel applies.

In *Morrison*, as noted above, the Supreme Court held that § 10(b) of the Exchange Act does not have extraterritorial

---

[5] For these reasons, the Court also rejects the Individual Defendants' argument that "in this case neither the SEC nor anyone else knows what 'facts' were necessary to the judgment of conviction, since the Indictment had thrown the 'kitchen sink' into each and every charge." (Defs.' Mem. 7.) Because the Indictment and SAC allege the same fraudulent conduct with respect to GFRDA investors, "it is evident that the allegations in the [SAC] were litigated and necessarily decided" against the Individual Defendants at their criminal trial. *Tzolov*, 2011 WL 308274, at *4.

[6] The Individual Defendants' argument that summary judgment is inappropriate because they "did not have a full and fair opportunity to litigate . . . the 'domestic transaction' issue underlying *Morrison*" (Defs.' Mem. 6) appears simply to misapprehend the SEC's position, incorrectly believing it to be that the Individual Defendants' convictions preclude litigation in the instant action over the domestic nature of the fraudulent transactions.

effect and applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Morrison*, 130 S. Ct. at 2884. The Second Circuit elaborated on *Morrison* in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, holding that "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." 677 F.3d at 67. The Second Circuit explained that irrevocable liability marks "the point at which the parties obligated themselves to perform what they had agreed to perform." *Id.* at 68. Thus, the question of where a party incurred irrevocable liability to purchase securities may be restated, in contractual terms, to ask where it was that the party acquired a legal obligation to purchase those securities. *See id.* at 67 ("[T]he act of purchasing or selling securities is the act of entering into a binding contract to purchase or sell securities."). If the party acquired such an obligation in the United States, § 10(b) will regulate that transaction.

Here, the SEC argues that the Individual Defendants are civilly liable under § 10(b) of the Exchange Act, Rule 10b-5 thereunder, and § 17(a) of the Securities Act because "each of the purchasers [of the Individual Defendants' securities] incurred irrevocable liability to take and pay for his or her securities in the United States."[7] (Pl.'s Reply 3.) The Court will first consider this argument with respect to the Testifying GFRDA Investors, whom both Individual Defendants were convicted of defrauding, and then address it with respect to Cates, whom only Vilar was convicted of defrauding. In both cases, however, the inquiry for purposes of summary judgment

is the same: whether the SEC has demonstrated that there is no genuine dispute that the locus of each investor's contract was in the United States. If it has, and if the Individual Defendants do not cite evidence in the record creating such a dispute, then the Court must grant the SEC summary judgment as to the transactions' domesticity.

### a. GFRDA Investors

The SEC argues that each of the four Testifying GFRDA Investors incurred irrevocable liability in the United States to invest in GFRDAs. With respect to three of those four investors -- Lecube-Chavez, Colburn, and Cox -- the Individual Defendants do not raise factual disputes but argue that (1) the investors were not cross-examined regarding the loci of their transactions because *Morrison* was not an issue at the Individual Defendants' criminal trial, and (2) in any event, their testimony concerning the loci of their transactions does not establish where irrevocable liability was incurred. The Court will begin by discussing those three investors before turning to the fourth, Lisa Mayer, about whom the Individual Defendants claim to raise factual disputes.

As an initial matter, the Court finds the Individual Defendants' argument concerning the lack of cross-examination to be irrelevant. The SEC, as previously noted, is not relying on collateral estoppel to establish the domesticity of the Individual Defendants' fraudulent transactions. Thus, the admissibility of trial testimony does not depend on there having been a full opportunity to litigate that particular issue. Furthermore, the Individual Defendants are not limited to the testimony and evidentiary record from their trial for evidence establishing a genuine dispute of material fact concerning the transactions'

---

[7] The SEC does not address whether title passed within the United States.

domesticity. They may rely, for example, on declarations and affidavits from outside the trial – as, indeed, the SEC itself does. (*E.g.*, Decl. of James E. Meixner, dated Apr. 25, 2012, Doc. No. 249 ("Meixner Decl.").)

The Individual Defendants' second argument – that the record is unclear as to where the GFRDA investors incurred irrevocable liability – is equally unavailing. The SEC's factual assertions concerning Lecube-Chavez, Colburn, and Cox all demonstrate that those investors acquired irrevocable liability to purchase GFRDAs in the United States. For example, Lecube-Chavez, a New York City resident, testified that in June 1989, she invested $74,000 with Amerindo US by sending the funds to either Amerindo's New York or California office. (Pl.'s 56.1 ¶ 23; *see also* Jacobson Decl., Ex. D at 7 (letter from Vilar to Lecube-Chavez, dated June 9, 1989, instructing her to send funds to the San Francisco office of Amerindo US).) Similarly, Colburn, a California resident, made her investment by having an agent in Illinois send a $1 million payment to a Bear Stearns & Co. account in New York. (Pl.'s 56.1 ¶ 24; Meixner Decl., Ex. B.) Finally, Cox, also a California resident, elected to invest in a GFRDA while in California. (Pl.'s 56.1 ¶ 25.) While the moment of payment is not *necessarily* identical to the moment a party incurred irrevocable liability to purchase securities, *cf. Blau v. Ogsbury*, 210 F.2d 426, 427 (2d Cir. 1954) (holding that the appellee incurred "irrevocable liability" to take and pay for a stock when he mailed notice of election even though payment and delivery were to be delayed), it *may* mark such a moment, *see Ficeto*, 677 F.3d at 70 (describing "facts concerning . . . the placement of purchase orders . . . [and] the exchange of money" as suggestive of when parties became irrevocably bound). Here, these three investors all placed purchase orders and transferred payment within the

United States. Because the Individual Defendants fail to offer any specific facts that could lead a rational trier of fact to find that irrevocable liability was incurred at any other time or in any other place (*see* Pl.'s 56.1 ¶¶ 23-25), the SEC is entitled to summary judgment that the fraudulent transactions involving those investors were domestic within the meaning of *Morrison*.

The SEC also argues that Lisa Mayer incurred irrevocable liability to purchase GFRDAs in the United States. More specifically, the SEC asserts that Lisa Mayer, together with her father and sister, signed instructions from their home in Puerto Rico to renew their GFRDA investment and then faxed those instructions from Puerto Rico to Amerindo's New York office. (Pl.'s 56.1 ¶ 22.) The Individual Defendants, however, highlight two facts that create a genuine issue as to where the Mayers became bound. First, they note that the Mayers issued those instructions in response to an offer from Amerindo sent to them on the letterhead of Amerindo Panama. (Defs.' 56.1 ¶ 22; *see* Jacobson Decl., Ex. D at 1.) Second, they note that even though the Mayers' fax confirmation indicates that it was sent to a New York number, the actual addressee line, which Mayer filled in by hand, gives the names of two Amerindo UK employees and lists a London fax number. (Defs.' 56.1 ¶ 22; *see* Jacobson Decl., Ex. D at 2.) These facts create a genuine issue of material fact because Puerto Rican law -- unlike New York or California law – appears to presume a contract to have been executed at the place where the offer was made. *Compare* P.R. Laws Ann. tit. 31, § 3401 ("[Under Puerto Rican law, an] acceptance made by letter does not bind the person making the offer, but from the time it came to his knowledge. The contract in such case is presumed as executed at the place where the offer was made."), *with Buchbinder Tunick & Co. v.*

*Manhattan Nat'l Life Ins. Co.*, 631 N.Y.S.2d 148, 151 (App. Div. 1995) (stating that under New York law, "acceptance is effective upon dispatch," and "[t]he contract springs into existence at the time of such mailing" (internal quotation marks omitted)), *and Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*, 472 F. Supp. 2d 1183, 1197 (2007) (stating that under California law, "a contract is 'made' in the place of acceptance." (quoting *ABF Capital Corp. v. Grove Props. Co.*, 23 Cal. Rptr. 3d 803, 814–15 (Ct. App. 2005))).[8] Here, the fact that the offer appears on Amerindo Panama letterhead does not, of course, necessarily mean that the offer was made in Panama. Similarly, the discrepancy between the fax numbers does not establish that the offer was made in New York or London. These facts do, however, generate a genuine issue about where the offer was made and thus potentially about where the Mayers' contract to renew their GFRDA investment was formed. Accordingly, the Court cannot find, at the summary judgment stage, that the transaction involving the Mayers was domestic, and denies the SEC's motion with respect to the Mayers for the purpose of conducting limited discovery to determine where they incurred irrevocable liability to purchase GFRDAs.[9]

b. Cates

Vilar's conviction on Count Two for committing securities fraud against Lily

Cates creates an independent basis for holding him civilly liable for securities fraud in this action, provided that the fraudulent transaction involving Cates was domestic. The SEC asserts that it was based on the facts that Vilar solicited her $5 million investment in his New York City apartment and that, approximately seven to ten days later, in her own New York City apartment, Cates executed the documents obligating her to make the investment and handed them to a messenger. (Pl.'s 56.1 ¶ 21.) These facts, which the Individual Defendants do not dispute (*see* Defs.' 56.1 ¶ 21), suffice to establish as a matter of law that Cates became irrevocably bound in New York. *See McNamara v. Tourneau, Inc.*, 464 F. Supp. 2d 232, 237 (S.D.N.Y. 2007) ("In New York, a contract is valid if there is an offer and acceptance, consideration, mutual assent, and an intent to be bound." (citing *Register.com v. Verio*, 356 F.3d 393, 427 (2d Cir. 2004))); *Buchbinder Tunick & Co.*, 631 N.Y.S.2d at 151 ("[A]cceptance is effective upon dispatch."); *Fremay, Inc. v. Modern Plastic Mach. Corp.*, 222 N.Y.S.2d 694, 697 (App. Div. 1961) (explaining that under New York law, "the time and place of making of the contract is established when the last act necessary for its formulation is done, and at the place where that final act is done" (internal quotation marks omitted)).

Nevertheless, the Individual Defendants argue that the transaction was not domestic because "[t]he account into which Cates transferred funds . . . was an account controlled by an Amerindo Panamanian entity with the banking relationship controlled through a banking resolution authorized by the laws of Panama." (Defs.' 56.1 ¶ 21.) This argument, however, ignores the clear instruction from *Morrison* and *Ficeto* to focus on the locus of the transaction rather than the domicile of the parties thereto. *See Ficeto*, 677 F.3d at 69 (noting that a "purchaser's citizenship or

---

[8] Neither party has briefed the issue of contract formation under Puerto Rican law, so it may be that additional briefing and argument are warranted on this point.

[9] The Court emphasizes that this Memorandum and Order does not address, let alone decide, the disposition of the Mayers' separate action to enforce their New York State judgment against the Individual Defendants. *See Mayer v. JP Morgan Secs., LLC, et al.*, No. 12 Civ. 5240 (RJS).

residency does not affect where a transaction occurs" and rejecting a categorical rule "that the identity of the buyer or seller should be used to determine whether a transaction is domestic" (internal quotation marks omitted)). Thus, because the undisputed facts establish that Cates incurred irrevocable liability in the United States, the fact that her investment also was in some sense "offshore" (Defs.' Mem. 11) does not alter the Court's conclusion that § 10(b) applies to her investment.

### 3. Reliance

The Individual Defendants also maintain that summary judgment is inappropriate on the SEC's securities fraud claim because, at their criminal trial, they did not have a full and fair opportunity to litigate reliance. The Court, frankly, is puzzled by the emphasis the Individual Defendants place on this issue given the long line of cases affirming the principle that "[t]he SEC does not need to prove investor reliance . . . in an action under Section 10(b) of the Exchange Act, Rule 10b–5, or Section 17(a) of the Securities Act." *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002); *see id.* at 491 (collecting cases); *see also SEC v. Apuzzo*, 689 F.3d 204, 213 (2d Cir. 2012) ("[W]hile a plaintiff must prove reliance . . . in a private securities fraud suit, there is no such requirement in an SEC enforcement action." (citations omitted)). The Individual Defendants are, of course, free to urge the Second Circuit to hold otherwise – as they claim to have done (Defs.' Mem. 22) – but they cannot ask this Court to ignore the Second Circuit's guidance on this matter. In any event, "[t]he presence of appellate issues . . . will not defeat the application of collateral estoppel." *Tzolov*, 2011 WL 308274, at \*4; *see also United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-*

*CIO*, 905 F.2d 610, 621 (2d Cir. 1990) ("[T]he pendency of a criminal appeal generally does not deprive a judgment of its preclusive effect." (internal quotation marks omitted)).

\*     \*     \*

To summarize the Court's conclusions thus far: (1) collateral estoppel bars both Individual Defendants from relitigating their liability for the *Monarch* elements with respect to all the Testifying GFRDA Investors; (2) collateral estoppel also bars Vilar from relitigating his liability for the *Monarch* elements with respect to Cates; (3) the SEC has demonstrated that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law, concerning the domestic nature of the investments of Lecube-Chavez, Colburn, Cox, and Cates; and (4) there is a genuine issue of where the Mayers incurred irrevocable liability. Based on these conclusions, the Court grants the SEC's motion for summary judgment against both Individual Defendants for violations of § 10(b) of the Exchange Act, Rule 10b-5 thereunder, and § 17(a) of the Securities Act based on their fraud against Lecube-Chavez, Cox, and Colburn. The Court further grants summary judgment against Vilar with respect to the fraud on Cates. However, the Court denies the SEC summary judgment against the Individual Defendants for their fraud against the Mayers.

### B. Investment Adviser Fraud

In addition to its securities fraud claim, the SEC seeks summary judgment on its two claims against the Individual Defendants for aiding and abetting violations of the IAA. Specifically, the SEC seeks summary judgment that the Individual Defendants (1) aided and abetted violations of IAA §§ 206(1) and 206(2), and (2) aided and

abetted violations of IAA § 206(4) and Rule 206(4)-2(a) promulgated thereunder. The SEC argues that the Individual Defendants' convictions on Count Four of the Indictment, which alleged criminal violations of the IAA, bar them from relitigating their conduct here. The Court will consider the application of collateral estoppel to each claim separately.

### 1. Sections 206(1) and 206(2)

At their criminal trial, both Individual Defendants were convicted of violating IAA § 206 by engaging in fraudulent practices "with respect to investors and potential investors in [Amerindo US]." (Indictment ¶ 48.) In reaching that verdict, per the Court's instructions, the jury found that the Individual Defendants: (1) were investment advisers; (2) engaged in fraudulent conduct vis-à-vis clients or prospective clients; (3) acted knowingly, willfully, and with the intent to defraud; and (4) used the mails or another instrumentality of interstate commerce. (*See* Jacobson Decl. Ex. C at 5581–83 (jury instructions).) These elements, which established the Individual Defendants' criminal liability, also establish their civil liability for aiding and abetting violations of §§ 206(1) and 206(2). *See, e.g.*, *Fund of Funds, Ltd. v. Vesco*, No. 74 Civ. 1980, 1976 WL 800, at *11 (S.D.N.Y. July 12, 1976) (holding that if "plaintiffs could show that [the defendant] was an investment adviser . . . or that [the defendant] aided and abetted investment advisers, and that a fraud occurred in connection with such activities, liability could be premised upon the [IAA]" (footnotes omitted)); *cf. Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("[A] defendant must actually make a false or misleading statement in order to be held liable under [§] 10(b). Anything short of such conduct is merely aiding and abetting . . . ." (internal quotation marks

omitted)). The fact that both Individual Defendants also were convicted of violating § 10(b) of the Exchange Act reinforces this conclusion because "[f]acts showing a violation of [§] 17(a) or 10(b) by an investment adviser will also support a showing of a [§] 206 violation." *See Haligiannis*, 470 F. Supp. 2d at 383. Accordingly, the Court grants the SEC's motion for summary judgment on its claim that the Individual Defendants aided and abetted violations of IAA §§ 206(1) and 206(2).[10]

### 2. Section 206(4) and Rule 206(4)-2(a)

IAA § 206(4) provides that it shall be unlawful for any investment adviser "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4). It also grants the SEC rulemaking authority to define such unlawful acts, practices, and courses of business. *Id.* Rule 206(4)-2(a), promulgated pursuant to that authority, prohibits an investment adviser from having custody of client funds or securities unless the adviser maintains those assets either

---

[10] Neither the Supreme Court nor the Second Circuit has extended *Morrison* to the IAA, and the Court declines to do so here. In *Morrison*, the Supreme Court based its interpretation of § 10(b) on the fact that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Morrison*, 130 S. Ct. at 2884. By contrast, "[a]s demonstrated by its text and regulatory structure, the focus of the [IAA] is clearly on the investment adviser and its actions." *SEC v. Gruss*, 859 F. Supp. 2d 653, 662 (S.D.N.Y. 2012). *See generally id.* at 660–665 (explaining why *Morrison* does not limit the IAA's protections to domestic clients). Accordingly, this Court joins the widely-held position that *Morrison* neither altered nor added to the requirements for liability under the IAA. *See SEC v. ICP Asset Mgmt., LLC*, No. 10 Civ. 4791 (LAK), 2012 WL 2359830, at *2–3 (S.D.N.Y. June 21, 2012) (collecting cases).

11

"[i]n a separate account for each client under that client's name" or "[i]n accounts that contain only [his] clients' funds and securities, under [his] name as agent or trustee for the clients."    17 C.F.R. § 275.206(4)-2(a).  In addition, Rule 206(4)-2(a) prescribes a variety of other requirements pertaining to such matters as bookkeeping, provision of notice to clients, and auditing, which are meant to ensure effective safekeeping of clients' funds and securities. *See id.*

As is evident from this description, Rule 206(4)-2(a) prohibits a far more specific type of conduct – namely, maintaining custody of client funds or securities without adhering to the required safeguards – than do IAA §§ 206(1) and 206(2), which prohibit investment advisers from "employ[ing] any device, scheme or artifice to defraud any client or prospective client" and from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. §§ 80b-6(1)–(2).    Thus, a conviction under the broad provisions of the IAA does not necessarily mean a defendant is guilty of conduct proscribed by the narrow rule.

The Indictment charged the Individual Defendants with violating IAA § 206, and both were convicted on that count.    The Indictment, however, did not identify any particular conduct as the basis for that charge, and it contained a variety of allegations, not limited to commingling client funds, that could have supported the jury's verdict. (*Compare* Indictment ¶¶ 19-20 (alleging commingling and improper safekeeping of Cates' funds), *with id.* ¶¶ 23-26 (alleging other types of fraudulent conduct directed against Cates).) Thus, two of the elements necessary to give the Individual Defendants' conviction preclusive effect as to the SEC's Rule

206(4)-2(a) claim are missing: the Court cannot say that the issue of whether the Individuals Defendants' commingled Cates' funds was "actually decided" by the jury, and even if it *were* decided, the Court cannot say that that issue was "necessary to support a valid and final judgment on the merits." *Gelb*, 798 F.2d at 44.    Accordingly, the Individual Defendants are not barred from relitigating the conduct underlying the SEC's Rule 206(4)-2(a) claim, and the Court must deny the SEC's motion for summary judgment as to that cause of action.[11]

## C. Remedies

As relief for the Individual Defendants' violations of the securities laws, the SEC seeks (1) a permanent injunction barring the Individual Defendants from committing further violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and §§ 206(1) and 206(2) of the IAA; (2) disgorgement and prejudgment interest; and (3) civil penalties.  For the reasons set forth below, the Court grants the SEC's motion for injunctive relief but defers decision on the other forms of requested relief pending the investigation of certain factual issues by a receiver.

### 1.  Permanent Injunction

The SEC may seek permanent injunctive relief for violations of the Securities Act, Exchange Act, and IAA.  *See* 15 U.S.C. § 77t(b) (Securities Act); *id.* § 78u(d)

---

[11] The Court does not address whether the SEC is entitled to summary judgment under a traditional Rule 56 analysis – based, for example, on the undisputed testimony from trial – because the SEC relies entirely on collateral estoppel to establish the Individual Defendants' liability for violating IAA § 206(4) and Rule 206(4)-2(a), as is evident from the fact that the SEC's 56.1 Statement cites exclusively to the Indictment and SAC in reference to the fraud against Cates. (*See* Pl.'s 56.1 ¶¶ 11-15.)

(Exchange Act); *id.* § 80b-9 (IAA). A court must grant such relief upon a showing that a defendant has violated the securities laws and that there is a "reasonable likelihood that the wrong will be repeated." *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011) (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972)), *rev'd on other grounds*, No. 11-1274, 2013 WL 691002 (U.S. Feb. 27, 2013). To determine whether there is a reasonable likelihood that a defendant will commit future violations, courts look to (1) the fact that a defendant has been found liable for illegal conduct; (2) the degree of scienter involved; (3) whether the infraction is an isolated occurrence; (4) whether the defendant continues to maintain that his past conduct was blameless; and (5) whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated. *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998).

Here, the Individual Defendants have been held criminally and civilly liable for multiple violations of the securities laws that they committed knowingly and willfully. Their frauds spanned nearly two decades, and at no point during that time or since have the Individual Defendants accepted blame. Instead, they have engaged in a pattern of shifting responsibility and downplaying the enormity of their misconduct. (*See* Pl.'s 56.1 ¶¶ 36-41.) Thus, each of the first four factors strongly supports permanently enjoining the Individual Defendants from committing further violations of the securities laws.

The Individual Defendants, who oppose the SEC's request for injunctive relief in general (*see* Defs.' Mem. 13), argue with particular vehemence that the SEC is engaged in "an unacceptable attempt to silence [them] and prevent them from litigating" by using their protestations of innocence to support its request for a permanent injunction (*see id.* at 14). The SEC, however, has done no such thing – nor, for that matter, has the Court. The Individual Defendants are of course free both to litigate this action and to appeal their criminal convictions, and they have exercised that freedom in both instances. Nevertheless, unless and until the Second Circuit reverses the Individual Defendants' convictions, the Court will consider their guilt to be an established fact. *See Int'l Bhd.*, 905 F.2d at 621 ("[T]he pendency of a criminal appeal generally does not deprive a judgment of its preclusive effect." (internal quotation marks omitted)). If insistence on one's blamelessness following a civil bench trial supports an award of injunctive relief, *see Manor Nursing*, 458 F.2d at 1101, then, *a fortiori*, such insistence following a criminal jury trial justifies injunctive relief as well.

Accordingly, the Court grants the SEC's request for injunctive relief and permanently enjoins the Individual Defendants from committing further violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and §§ 206(1) and 206(2) of the IAA.[12]

2. Disgorgement, Prejudgment Interest, and Civil Penalties

In addition to a permanent injunction, the SEC seeks three forms of relief –

---

[12] One might question the need to enjoin conduct that federal criminal laws already prohibit. *See generally* David M. Weiss, Reexamining the SEC's Use of Obey-the-Law Injunctions, 7 U.C. Davis Bus. L.J. 6 (2006) (discussing the history of the SEC's use of injunctions against violating federal securities laws and proposing modifications to that practice). Nevertheless, courts commonly issue such injunctions in SEC enforcement actions, *see id.*, and to the extent such injunctions are ever necessary, they clearly are warranted here.

disgorgement, prejudgment interest, and civil penalties – tied to the Individual Defendants' pecuniary gain from their frauds. Disgorgement is an equitable remedy that a court may impose "to prevent wrongdoers from unjustly enriching themselves through violations." *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). An order of disgorgement "forces a defendant to account for all profits reaped through his securities law violations and to transfer all such money to the court." *Id.* In calculating disgorgement, a court need not quantify the defendant's profits exactly, but must make "only 'a reasonable approximation of profits causally connected to the violation.'" *Haligiannis*, 470 F. Supp. 2d at 384 (quoting *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995)). A court may also impose prejudgment interest on disgorged funds to "prevent[] a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996); *see SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (recognizing district courts' discretion to impose prejudgment interest).

In arguing against the imposition of disgorgement and prejudgment interest, the Individual Defendants principally contend that "there was no showing that 'proceeds' to Amerindo were 'profits' to either of the defendants individually." (Defs.' Mem. 20.) That argument, however, misstates the SEC's burden. The Second Circuit has stated that defendants may be held liable for more than the profits they personally received when they were "intimately involved" in the frauds at issue, as the Individual Defendants were here. *First Jersey*, 101 F.3d at 1475. The Individual Defendants also quibble with the SEC's proposed method of calculating disgorgement, arguing that "proceeds raised" is the incorrect yardstick. Second

Circuit precedent speaks of "ill-gotten gains," *id.* at 1474, and "profits," *Patel*, 61 F.3d at 139, so to the extent that "proceeds raised" fails to "subtract[] total distributions from total contributions," *see Haligiannis*, 470 F. Supp. 2d at 384-85, it may be the incorrect measure. At the same time, the Individual Defendants cannot insist on absolute precision in calculating disgorgement. "[A]ny risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty," *Patel*, 61 F.3d at 140 (internal quotation marks and brackets omitted), and where a

> defendant's own recalcitrance and system of recordkeeping have so obscured matters that the lawful gains cannot be distinguished from the unlawful without incurring inordinate expense, it is well within the discretion of the court to rule that the measure of disgorgement will be the more readily measurable amount of losses incurred by the defendants' customers in the unlawful transactions.

*Commodity Futures Trading Comm'n v. Am. Bd. of Trade, Inc.*, 803 F.3d 1242, 1252 (2d Cir. 1986).

Civil penalties, unlike disgorgement, are statutory remedies, but they too depend on the defendant's pecuniary gain. Specifically, for violations of the securities laws involving "fraud, deceit, [or] manipulation" that "directly or indirectly result[] in substantial losses or create[] a risk of substantial losses to other persons," a court may order penalties equal to the greater of $100,000 per violation or the gross pecuniary gain to the defendant from the fraud. 15 U.S.C. § 77t(d)(2) (Securities Act); *id.* § 78u(d)(3)(b) (Exchange Act); *id.* § 80b-9(e)(2) (IAA).

There is substantial overlap between the factors relevant to determining whether to impose injunctive relief and the factors relevant to determining whether to impose civil penalties.   In making the latter determination, as well as in setting the amount of any fines, courts look to such factors as: (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) the defendant's current and future financial condition. *See Haligiannis*, 470 F. Supp. 2d at 386; *SEC v. Coates*, 137 F. Supp. 2d 413, 429 (S.D.N.Y. 2001).   In this case, the Court has already found that the first four of these factors are present, and they weigh heavily in favor of imposing civil penalties.   *See supra* Section III.C.1. The fifth factor turns, in part, on any claims the Individual Defendants have to the assets that the Court restrained in their criminal case to make available to pay any restitution and forfeiture judgments; thus, for reasons discussed below, the Court cannot resolve the fifth factor at present.[13]   (*See United States v. Vilar, et al.*, No. 05 Cr. 621 (RJS), Doc. No. 364.)   Nevertheless, that final factor goes more to the size of the penalty than whether to impose one at all, *see Haligiannis*, 470 F. Supp. 2d at 386 (defining the fifth factor as "whether the penalty should be *reduced* due to the defendant's demonstrated current and future financial condition" (emphasis added)), and does not alter the Court's conclusion that civil penalties are warranted here.

---

[13]  The fifth factor turns, as well, on the ultimate resolution of the substantial claims to the restrained assets asserted by investors who did not testify at the Individual Defendants' criminal trial. Those claims, however, are beyond the scope of this Memorandum and Order.

Thus, the Court finds, in principle, that disgorgement and civil penalties are appropriate forms of relief for the Individual Defendants' violations.   The Court, however, is not prepared to determine the size of the disgorgement order and penalties at this time.   Setting the penalties depends on determining the value of any assets that will ultimately become available to the Individual Defendants, which in turn involves evaluating the claims of other investors who have asserted interests in the restrained assets.   Those determinations require untangling a web of transactions in Amerindo accounts – a task made only more challenging by the fact that the accounts of the various Amerindo entities, which contain both the victims' funds and any monies to which the Individual Defendants have claims, have been sitting dormant subject to a restraining order since 2009.

In *Deckert v. Independence Shares Corp.*, the Supreme Court recognized that "the power to make the right of recovery [under the securities laws] effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case."   311 U.S. 282, 288 (1940).   In keeping with that ruling, "'[a]lthough neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 explicitly vests district courts with the power to appoint trustees or receivers, courts have consistently held that such power exists.'" *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) (quoting *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987)).   Appointment of a receiver, however, is a "drastic remedy usually imposed only where no lesser relief will be effective."   *Ferguson v. Tabah*, 288 F.2d 665, 674 (2d Cir. 1961).   In general, factors supporting appointment of a receiver include:

'[f]raudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.'

*U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 859 F. Supp. 2d 602, 610 (S.D.N.Y. 2012) (quoting *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000)). In the securities context, courts have appointed receivers for several valid purposes, including "marshal[ing] the assets of the defendant[s]," "prevent[ing] the dissipation of [the defendants'] assets pending further action by the court," and "investigat[ing] the defendant[s'] transactions." *Eberhard*, 530 F.3d at 131. (internal quotation marks omitted).

Based on the Individual Defendants' extensive fraudulent conduct, the risk that the value of restrained assets will irreversibly dissipate, and the risk of harm to the SEC, the individual victims, and other investors, the Court finds that appointment of a receiver is warranted in the instant case. Accordingly, the Court reaffirms its October 17, 2012 Order (Doc. No. 267) appointing Ian Grazes as receiver and defers calculation of disgorgement and civil penalties in this action until after Mr. Grazes has had an opportunity to conduct his investigation and report findings to the Court.

IV. CONCLUSION

For the foregoing reasons, the SEC's motion for partial summary judgment is granted in part and denied in part. The Court grants the SEC summary judgment on its claims that (1) the Individual Defendants violated § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5 thereunder with respect to Lecube-Chavez, Colburn, and Cox, and, in Vilar's case only, with respect to Cates as well; and (2) the Individual Defendants aided and abetted violations of IAA §§ 206(1) and 206(2). The Court denies the SEC summary judgment on its claims that the Individual Defendants (1) violated § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5 thereunder with respect to the Mayers, and (2) aided and abetted violations of IAA § 206(4) and Rule 206(4)-2(a) thereunder.

Accordingly, IT IS HEREBY ORDERED THAT the Individual Defendants are permanently enjoined from committing any future violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and §§ 206(1) and 206(2) of the IAA.

IT IS FURTHER ORDERED THAT Ian Grazes, as Receiver, shall investigate and determine the value of investor assets and the value of the Individual Defendants' claims to monies that have been frozen pursuant to the restraining order in the criminal case; consider what actions can and should be taken to avoid dissipation of those assets; and submit a report to the Court regarding his findings and recommendations by April 22, 2013. IT IS FURTHER ORDERED THAT Mr. Grazes shall be compensated at the rate of $250 per hour. IT IS FURTHER ORDRED THAT, to make compensation for Mr. Grazes available, the Post-Conviction Restraining Order entered

16

in *United States v. Vilar, et al.*, No. 05 Cr. 621 (RJS) (Doc. No. 364) is modified as set forth in the accompanying Order so as to permit $50,000 to be withdrawn from the restrained assets and forwarded to a Court Registry Investment System in this action.

IT IS FURTHER ORDERED THAT, by March 22, 2013, the parties shall submit a joint letter setting forth (1) a proposed schedule for conducting limited discovery as to whether the Mayers incurred irrevocable liability in the United States, and (2) proposed steps for proceeding on the SEC's remaining claims, including those against the Individual Defendants related to the alleged fraud against investors who did not testify at the criminal trial.

The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 245. In addition, as the Court orally denied the Individual Defendants' motions to dismiss the SAC at oral argument, the Clerk of the Court is also respectfully directed to terminate the motions pending at Doc. Nos. 252 and 254.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 11, 2013
    New York, New York

The SEC is represented by Neal Jacobson and Mark D. Salzberg of the Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, New York 10281.

Defendant Alberto W. Vilar is represented by David Clifford Burger of Robinson Brog Leinwand Greene Genovese & Gluck PC, 875 Third Ave., Ninth Floor, New York, New York 10022.

Defendant Gary A. Tanaka is represented by Vivian Shevitz, 401 Cumberland Avenue Apartment 609, Portland, Maine 11375.