UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

SEC                                                                    ECF Case

                                                                       **05 cv 5231 (RJS)**
             v.                                                        related to
                                                                       05 cr 621(RJS)
Amerindo Investment Advisors, Inc.,
Alberto Vilar, and Gary Tanaka

                               Defendants.
_____


MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
MOTION FOR RECONSIDERATION AND A STAY



                         Vivian Shevitz
                         Attorney for Defendants
                         VILAR and TANAKA
                         401 Cumberland Ave. – Apt. 609
                         Portland, Maine 04101
                         207-899-2502 /        Cell 914 762-2122
                         Vivian@shevitzlaw.com


Jane Simkin Smith
 Of Counsel.

TABLE OF CONTENTS

The Request For Reconsideration…………………………………………………………………………………1

Procedural History Leading To The Court's Ruling …………………………………………………… 5

    The Concurrently Filed Motions………………………………………………………………… 7

    Oral Argument On The Motions………………………………………………………….….. 10

The Court Finds "The Morrison Element" Undisputed As To Certain Investors ………………12

Argument……………………………………………………………………………………….. 14

The Court Should Grant A Stay While The Receiver Moves Forward…………………………24

TABLE OF AUTHORITIES

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60 (2d Cir. 2012) ................ passim

*Cleveland v. United States*, 531 U.S. 12 (2000) ........................................................... 23

*Cornwell v. Credit Suisse Group*, 729 F.Supp.2d 620 (S.D.N.Y.2010) ...................................... 20

*Fremay, Inc. v. Modern Plastic Mach. Corp.,* 222 N.Y.S.2d 694 (App. Div. 1961)................... 13

*SEC v. Gabelli*, 653 F.3d 49 (2011), *rev'd*, 113 S.Ct. 1216 (2013)........................................... 5, 8

*Morrison v. National Bank of Australia, Ltd.,* 130 S. Ct. 2869 (2010) ................................ passim

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 176

    (S.D.N.Y. 2010) .............................................................................................. 19

*United States v. Mahaffy*, 693 F.3d 113  (2d Cir. 2012) ............................................................ 18

**Statute**

U.C.C. § 2-106(1) ............................................................................................. 17

**Rule**

Fed. R. Civ. P. 12(d) ................................................................................................ 2

**Other Authority**

BLACK'S LAW DICTIONARY 1454 (9th ed. 2009); ............................................ 17

<u>MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION AND A STAY</u>

**The Request For Reconsideration**:   Defendants move for reconsideration of this Court's March 11, 2013 Order granting partial summary judgment to the SEC with respect to three "Testifying GFRDA Investors" (Lecube-Chavez, Colburn, and Cox) and Lily Cates.   As elaborated below, we believe the Court overlooked or failed to properly consider the following:

1.  Disputed or not, the materials cited by the SEC ( Pl's 56.1 ¶¶ 23-25, Ex. C at p. 309, Ex. D7-D8; Meixner Dec., Ex.A, B; Ex.D9-D11)) *do not* support the SEC's factual assertions that Lecube, Cox, and Colburn were in the United States when they took whatever action supposedly made them "irrevocably liable" to purchase (or Amerindo Panama "irrevocably liable" to sell any of them) a GFRDA (*i.e.,* an account at Amerindo Panama). Viewed in the light most favorable to the non-moving party, the SEC's Rule 56 showing is that a few investors domiciled in the U.S. bought *something*. As the Court agreed, a purchaser's residency does not affect where a transaction occurs. (Order  9-10).

    o   See, *N.Y. State Teamsters Conf. Pension Ret. Fund v.  Express Servs.*, 426 F.3d 640, 649 (2d Cir. 2005) ("Reliance on a party's statement of undisputed facts may not be warranted where those facts are unsupported by the record. *See, e.g Holtz [v. Rockefeller & Co.]*, 258 F.3d at 73-74 (refusing to rely solely on party's undisputed statement of facts where the cited materials"[1] did not support the factual assertions)."

2.  This Court, noting that, on the potentially dispositive *Morrison* issue, there was considerable overlap between defendants' proposed motion to dismiss and the SEC's

---

[1]        Lecube testified that, "subsequent" to having received a letter from Vilar in 1989, she sent money to "Amerindo". Lecube-Chavez could not recall where she sent the $74,000 and was not asked (and did not say) where she was when she sent it. (Jacobson Ex C at 309). Neither Cox nor Colburn testified at the trial, and, as with Lecube-Chavez, the SEC presented no evidence showing where they were physically when they contracted or elected to invest.

proposed motion for partial summary judgment, ordered simultaneous submissions and also heard oral argument on both motions at the same time.  Nevertheless, in finding the facts relating to the *Morrison* issue "undisputed" the Court overlooked the substantial materials identified in the defendants' nominally Rule 12(b) motion papers that disputed factual assertions in the SEC's *concurrent* Rule 56 motion (for example, evidence that Colburn went to London and executed documents abroad) and supported the defendants' contention that the securities transactions took place offshore.  (See, ecf # 253, Motion To Dismiss Second Amended Complaint, at 2-7).  The Court also overlooked evidence cited in the defendants' Memorandum in Opposition to the SEC's Motion for Summary Judgment *and* the Rule 56.1 counterstatement (ecf # 262, ¶ 20) indicating that no "transaction" was complete because there was no "security" in existence until these foreign securities issued in Panama or (physically) in London – and, therefore, there was neither transfer of title from Amerindo Panama *nor* "irrevocable liability" on the part of the investors, until the security was issued in Amerindo's London office.  Not only should this material have been considered but (particularly as to the Mayers and, as to Cates ("her investment also was in some sense `offshore'")) undisputed facts support *granting* summary judgment to defendants (*i.e.,* dismissing the complaint.)

o   See Fed. R. Civ. P. 12(d) ("**Result of Presenting Matters Outside the Pleadings.** If on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court [**as on this motion to dismiss**], *the motion must be treated as one for summary judgment under Rule 56.*  All parties must be given a reasonable opportunity to present all [pertinent] material ....") (Emphasis added.)

3.   In asserting that the facts were undisputed and concluding that the SEC was "entitled to

2

judgment as a matter of law, concerning what it called "the *domestic nature of the investments*" of Lecube-Chavez, Colburn, Cox, and Cates" (Order at 10, emphasis added), the Court did not consider facts (cited, *inter alia*, in defendants' Rule 56.1 counterstatement) showing the foreign nature of the security itself before determining that any factor constituted an act of irrevocable liability.   Rather, the Court expressly considered only facts cited by the SEC purportedly demonstrating that "liability" may have been incurred in the U.S.-- but its "irrevocability" was not established by the SEC's mere statement that it was so established, without even knowing the security's terms. This was error as a matter of law and fact.

o   In addition to the materials cited in their motion to dismiss, defendants specifically pointed to evidence in their Memorandum in Opposition to the SEC's Motion for Summary Judgment *and* their Rule 56.1 counterstatement (ecf # 262, ¶ 20) indicating that no "transaction" was complete until an entry in the books and records of Amerindo's London office.  This was undisputed by the SEC.  (Here the transaction is the issuance of a foreign security akin to a bank CD, that was not *issued* until *created* in Panama as a part of the foreign securities business of Amerindo Panama).

4.   In concluding that the SEC was "entitled to judgment as a matter of law, concerning **the domestic nature** [emphasis added] **of the investments** of Lecube-Chavez, Colburn, Cox, and Cates" (Order at 10), the Court mistook the term "domestic nature of the investment" as equivalent to Morrison's term "domestic transaction."  A transnational transaction may have had a "domestic nature" under the "conduct" and "effects" test; now, the court must consider the sale transaction to determine whether U.S. securities laws control.

o The Court's decision fails to appreciate that *Morrison* focuses on a securities transaction as a property transaction. The Circuit's *Absolute* decision was made on a motion to dismiss, not on the merits, and set forth a disjunctive only as sufficient to warrant further proceedings. Where (as here) title to the security passed in London or Panama, the holding that a "locus" of some conduct in support of what the Court identifies as a binding "contract" is a "trump card" and relieves the Court from *any* consideration of the location of title transfer contradicts *Morrison*. Here the parties invested through an offshore company, and purposefully did so to avoid restrictive trading rules (e.g., concerning permissible leverage) for "domestic" securities and to enjoy the secrecy of an offshore investment. That *was* part of "the deal." The Court should have allowed litigation of the applicability of *Morrison* to these circumstances. Developments in this new area should be informed by a deliberative factual and legal process, not a rushed decision based on a decision in a "pleading"-stage case allowing amendment of that complaint.

5. The Court overlooked the statute of limitations. As argued in the defendant's motion to dismiss (ecf # 253, 30), the SEC seeks relief based on transactions occurring more than five years prior to the filing of the complaint, but the relief is barred by the statute of limitations. Per the Second Amended Complaint, this applies to the purchase by Colburn in February 2000 (¶ 98):  the Mayers' purchases (¶ 112 first purchase in 1988; ¶ 115 last purchase "on or about January 4, 2000"); Lecube in 1989 (¶121); Cox in 1989 (¶ 126).

o The SEC relied on *SEC v. Gabelli*, 653 F.3d 49 (2d Cir. 2011), to argue that its claim for penalties does not accrue until the claim is discovered. (Ecf # 260, at 5 n.4))  On February 27, 2013, this case was reversed.  See, *Gabelli v. SEC*, 113 S.Ct. 1216

(2013). *Gabelli* requires the limitation analysis prior to any SEC penalties.

**Procedural History Leading To Court's Ruling**:  *Morrison v. National Bank of Australia, Ltd.,* 130 S. Ct. 2869 (2010) ("*Morrison*"), of course, was and is a central issue on appeal in the related criminal case. In the Circuit, the defendants supported arguments with record evidence showing that the purchase and sale transactions were specifically designed to occur outside the United States; they were between a Panamanian seller and (for the most part) purchaser-entities incorporated or domiciled off-shore, and concerned Panamanian *products* about which the government did not know details (and so called the investments a "sham"). (Brief, at 65-72; Reply Brief, at 10-13)

The Government recognized that most transactions about which it offered evidence  in the criminal case were executed overseas, and (accordingly) argued to the Circuit that *Morrison* does not apply in criminal cases.  Alternatively, it argued, even if *Morrison* does apply, the defendants' challenge did not withstand plain error review because "*not all* of the GFRDA transactions were executed overseas".  (GB at 104; emphasis added.)  It supported this with record evidence about only one investor (Lecube's 1989 purchase of $74,000, 17 years before the indictment), conceding by implication (a concession that means that the government should be judicially estopped from changing its position) that transactions with other investors were, in fact, executed abroad.

Mr. Tanaka reiterated legal and factual arguments made to the Second Circuit in this case in a motion to dismiss and/or strike the first amended complaint, first filed in March 2012.  (Ecf # 210) With citation to particular portions of the record in the criminal case, defendant showed that the purchases and sales of GFRDA were deliberately and carefully structured to occur outside the United States and each investor in the complaint operated offshore. (Id. at 3-10)

Based on criminal trial evidence and Government exhibits provided in discovery, Mr. Tanaka moved to dismiss and/or strike the first amended complaint on the ground that the alleged fraud involving GFRDA investors and Lily Cates' private venture is beyond the reach of the U.S. Securities laws.

The SEC made procedural objections to this motion and sought to amend the complaint a second time (to add allegations of domesticity to satisfy *Morrison*), and expressed its intention to move for summary judgment based on collateral estoppel. (March 14, 2012 Jacobson letter to Judge Swain, not docketed; March 8, 2012 Jacobson Letter to Judge Swain, ecf # 217).   These matters were discussed at a conference on May 4, 2012, with the *Morrison* issue front and center. (T.5-7) The question whether the criminal case record showed domestic transactions (as the Government argued in the Circuit and the SEC suggested it could allege in an amended complaint to support a motion for summary judgment), or foreign transactions (as defendants argued in the Circuit and in the motion to dismiss the first amended complaint) was critical.  As the Court noted, "[T]here is going to be ... overlap in some ways as to the motions, the opposition for summary judgment and the moving papers on the motion to dismiss. ...There will be a lot of the same legal issues, a lot of the same factual issues." (T. 11)  Accordingly, the Court, in the interest of efficiency, "ha[d] it all happening at the same time." (T. 11) The Court ordered the SEC to file its second amended complaint (by May 25) and scheduled the SEC and the defendants to file their motions (the SEC's summary judgment and defendants' motion to dismiss) and responses simultaneously.

**The Concurrently Filed Motions**:  As expected, the motions overlapped, with the SEC setting forth legal argument and record support for its contention that the transactions were domestic in its motion for summary judgment (Ecf #246, Memorandum In Support of Motion for

Partial Summary Judgment, 10-11; ecf #250, Rule 56.1 Statement, ¶¶ 20-25), and defendants setting forth arguments and record support for their contention that the transactions were offshore in the motion to dismiss (Ecf # 253, Motion To Dismiss Second Amended Complaint, 2-7).  Both parties pointed to *Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60 (2d Cir. 2012)*,* the first Second Circuit opinion elaborating on what a complaint must allege to state a claim under §10(b) in order to withstand a motion to dismiss: "facts suggesting that irrevocable liability was incurred or titled was transferred within the United States." *Id.* at 67.

In essence, the SEC contended that "irrevocable liability" was a simple matter when an investor made her "investment decision while in the United States and executed the documents necessary to consummate the investment in the United States." (Ecf # 246, at 11).  It set forth trial evidence that (it said) satisfied this "decision making" and "execution of documents" criteria as to each testifying investor. (As discussed in n.1 above, incorporated herein fully as if again set forth, the evidence it cited does not support the facts asserted.)

In the motion to dismiss, defendants posited that application of *Morrison's* "transactional test" was legally more complex than suggested by the SEC. (Ecf # 253, 3-7)   In essence, defendants argued that the essence of this transaction was "offshore" as far as Amerindo Panama and its investors were concerned *(i.e.,* the "benefits" of an offshore transaction were central to the deal), and this "offshore" nature of the security is a vital factor for consideration when determining the locus of the securities transactions to determine *whether* 10b-5 applies to the transaction.  Defendants showed (with extensive citations to the record) that the purchases and sales were of Panamanian products and were deliberately structured to occur outside the U.S.'s laws and regulations:  the seller was a Panamanian entity; purchasers purchased offshore (*e.g.,* Tara Colburn went to London to make her purchase, U-GX-3388) or through entities designed

and organized offshore (*e.g.,* Mayer purchased through private trust companies in the Bahamas (T. 912, 1236, 4520; GX-8225; GX-8240; GX-3361-3; GX-3361-09; U-GX-3059; U-GX-6190-5; U-GX-3359-11; U-GX-2101)), and arranged for interest payments to be deposited in off-shore accounts (*e.g.*, Mayers and Cox, U-GX-3304-4).

In addition, defendants argued in the motion to dismiss that, to the extent the SEC was seeking relief based on securities transactions that occurred five years prior to the filing of the complaint, the relief was barred by the statute of limitations.  (Ecf # 253, 30)  (According to the Second Amended Complaint, this would apply to the purchase by Tara Colburn in February 2000 (¶ 98):  the Mayers' purchases (¶ 112 first purchase in 1988; ¶ 115 last purchase "on or about January 4, 2000"); Lecube Chavez in 1989 (¶121); Robert Cox in 1989 (¶ 126).)  In its reply, the SEC argued, *inter alia*, that there is no statute of limitations for claims of disgorgement and injunctive relief; relying on the now-reversed *SEC v. Gabelli*, 653 F.3d 49 (2011), *rev'd,* 113 S.Ct. 1216 (2013) it also argued that the claim for penalties does not accrue until the claim is discovered. (Ecf # 260, at 5 n.4)) (Defendants pointed out in reply papers that the Supreme Court had granted *certiorari* in *Gabelli*.  Ecf# 264, at 9).

The parties' competing conceptions of *Morrison's* novel "transactional test"– with defendants' view that the test was factually more complicated than that presented by the SEC -- was reiterated in the next round of papers.   In opposing summary judgment, defendants stated that conclusions and evidence in the SEC's Rule 56.1 Statement (ecf # 250 ¶¶20-25) amounted to the rejected "conduct and effects" test.  Sticking to the view that intent to deal offshore was significant to the inquiry (as is the *fact* that the investment is an account in Amerindo Panama, as a decade of account statements shows, and was created and sold in Panama under its laws), and that the record cited in the motion to dismiss showed intentionally-structured offshore

**transactions**, defendants argued, "summary judgment should be granted to *defendants*." (Ecf # 258, at 11; emphasis in original)

Importantly, defendants disputed the SEC's **legal conclusion** that "each of the securities transactions for which Vilar and Tanaka were convicted were domestic securities transactions" (SEC Rule 56.1 statement, ¶ 20) by pointing to evidence (in both the Memorandum in Opposition *and* Rule 56.1 Counterstatement) that indicated no "transaction" was complete – *i.e., it didn't happen* yet, and therefore*,* there was **neither** "**irrevocable** liability" on the part of the investors nor transfer of title from Amerindo Panama -- until Amerindo's London office put the GFRDA (acceptance of "the contract") into the client's account, as the statements reflected.  As the prosecutor argued at trial (T. 5474-75), as to all GFRDA clients who testified at trial, SEC Examiner Wraga did not put any amount involved in a transfer into her chart (GX 8202) until she had a matched transfer with a "confirm" that emanated from Amerindo in London. (Ecf # 258, 12; ecf # 262, ¶ 20)

The SEC ignored this and instead focused *only* on where, it said, the purchasers incurred "irrevocable liability." In reply, it contended that it could and should do so because the Second Circuit's test (for *alleging* a domestic transaction in a civil complaint in a "private parties" case) as stated in *Absolute Activist* "is in the disjunctive".  (Ecf # 265, at 3-4).

To the SEC, it did not (and does not and would not) matter that there was evidence of title transfers in Panama and in London because (it wrote) "each of the purchasers incurred irrevocable liability to take and pay for his or her securities in the United States" (*Id.*)." The SEC's position rests on contract principles, but it nowhere pointed to evidence of the underlying

contracts.  Neither the facts relevant to the formation of "the contracts" (if separate from the purchase) nor law underlying the "contracts" has ever been litigated. [2]

In its summary judgment papers as well as in its opposition to the motion to dismiss, the SEC dismissed the significance of the investors' offshore activities.  With respect to the Mayers' purchasing through offshore entities, it argued, "the domicile of the purchaser is irrelevant to the determination of whether a transaction is a domestic transaction." (Ecf #265, at 4; ecf # 260, at 7, n.5)  While not disputing with any contrary evidence, the SEC also challenged reliance on GX's produced in discovery showing Cox and Colburn's behavior abroad on the ground that the exhibits had not been "authenticated nor admitted" at the criminal trial. (Ecf # 260, at 7 n.5)

**Oral Argument On The Motions**:  The Court heard argument on both sets of motions at the same time on December 11, 2012.  Again, the *Morrison* issue – and whether the criminal trial record showed that the transactions were domestic (as the SEC argued) or foreign (as defendants argued) -- was center stage.  (*See* T. 12/11/12, 8-12, 18-25)  The SEC repeated that the Second Circuit had made "the test" "disjunctive" and that the criminal record satisfied at least one arm ("irrevocable liability") of this test. (*Id*., at 10-12)  Defendants focused on the transfer of title, and (referring to the matters they had set forth in the Rule 56.1 counterstatement at ¶ 20) argued that "title didn't transfer in any of these securities until the money hit London and Mr. Tanaka's back office put that – and even then it may not have been irrevocable, but at that time when the security was put into her Panamanian, that is when it may have been, quote, irrevocable." (*Id*., at

---

[2] The SEC's "proof" that "irrevocable liability" was incurred in the U.S. amounted to no more than evidence that certain purchasers resided here.  To the extent that the notion of "irrevocable liability" rests on contract principles, *no one* has ever litigated or established what "the contract" is, or which law governs.  Moreover, to the extent that the Court chose certain state laws as governing, as shown above at n.1, the SEC's "evidence" does not even establish *where* purchasers Colburn and Cox might have been standing or sitting when directing a payment, much less whether any act established irrevocable (as opposed to revocable (or no) liability) for the ultimate purchase.  The SEC's mere statement that any act showed this is *ipse dixit*.

18-20) Counsel also argued that all the relevant facts necessary to resolve the issue of where the "transaction" occurred may not be fully developed because the issue was not litigated in the criminal case, and there was no discovery in this one. (*Id*. at 20, 25)

The Court again expressed its desire to be "economical" and acknowledged not only that "a lot of these arguments are made in both motions" (*id*. at 26) but also the importance of the trial and appellate records in the criminal case to the arguments of both sides.  The Court thus assured, "I presided over the trial so I know what the trial record is. … I have read the briefs." (*Id*. at 37)     The Court also acknowledged that the *Morrison* issue was before the Circuit and raised questions about the effect of a reversal in the criminal case on the entry of summary judgment or any remedies in favor of the SEC in the civil case. (*Id*. at 14-15, 18)

(Nevertheless, the Court said nothing when defendants brought up their pending request for a stay pending the outcome of appeal. (*Id*. at 6)  The defendants' motion for a stay was made in October 2012, in connection with the Court's Order dated October 16, 2012, directing the Government to set forth a proposal for a process to compensate Mr. Ian Gazes whom the Court said it was "prepared to appoint" as receiver.  (Ecf # 267)  The motion was submitted in both this case and the criminal case on October 24, 2012 (though it was docketed only in the criminal case, ecf # 533).  The SEC never responded and to date the court has not ruled.))

At the conclusion of the hearing on December 11, the Court denied the defendants' motion to dismiss the complaint and reserved on the SEC's motion for summary judgment.  It indicated that it wanted to focus on "the issue as to whether or not the *Morrison* issue was fully and fairly litigated in the prior proceeding in light of the fact that there was intervening law."  (T. 12/11/12, at 38-39)

In denying defendants' motion, the Court mentioned only that part of it concerning the propriety of the SEC's filing a second amended complaint without a motion (and without setting forth specific changes and their relevance.)   The Court said nothing about the defendants' (criminal case record-supported) contention that the fraud claims in the second amended complaint should be dismissed because the alleged securities transactions were foreign and not domestic, *or* that the particular securities transactions involving the testifying GFRDA investors identified in the complaint predated the complaint by more than five years.   When counsel pointed out orally that the motion to dismiss raised issues besides whether the complaint could be filed, the court did not elaborate but said only:  "I understand that.  I am denying the motion in its totality." (Id. at 41)

**The Court Finds "The Morrison Element" Undisputed As To Certain Investors**: Relying on *Absolute,* the Court started with two propositions: (1) a securities transaction is domestic "if irrevocable liability" is incurred within the U.S.; and (2) the "moment of payment" *may* mark the "moment a party incurred irrevocable liability" depending on the law of the state where a paying investor resided.

Thus, the Court opined, "the question of where a party incurred irrevocable liability to purchase securities may be restated in contractual terms, to ask where it was that the party acquired a legal obligation to purchase those securities." (Order at 7).

Though legal issues relating to contracts and contract formation were not briefed by the parties (see Order at 9 n.8 ("Neither party has briefed the issue of contract formation under Puerto Rican law ...."), the Court *sua sponte* looked to the law of the various places where investors resided to determine whether, under that state's law, "a contract" is deemed executed at

the place of acceptance or the place where the offer was made. It assumed that where a person incurs a "legal obligation," the obligation is "irrevocable".

Contrasting law of New York and California (the home states of Lecube-Chavez, Colburn, Cox and Cates), with the law of Puerto Rico (the home of the Mayers), the Court viewed the former as "place-of-acceptance" states and the latter as a "place-of-offer" state. On this basis, it concluded that "the SEC's factual assertions concerning Lecube-Chavez, Colburn, and Cox all demonstrate that those investors acquired irrevocable liability to purchase GFRDA's in the United States." It ruled: "[b]ecause the Individual Defendants fail to offer any specific facts that could lead a rational trier of fact to find that irrevocable liability was incurred at any other time or in any other place (*see* Pl's 56.1 ¶¶ 23-25), the SEC is entitled to summary judgment that the fraudulent transactions involving those investors were domestic within the meaning of *Morrison*." (Order at 8)

With respect to Cates, the Court held that the undisputed facts that Vilar solicited the investment in New York and Cates "executed the documents obligating her to make the investment and handed them to a messenger…suffice to establish that Cates became irrevocably bound in New York." (Order at 9) (In so ruling, the Court apparently assumed that some "offer" of definite terms was made *to* her and that this was the place where the 'final act" necessary for formation of "the contract" was done (which showing is required under *Fremay, Inc. v. Modern Plastic Mach. Corp.,* 222 N.Y.S.2d 694, 697 (App. Div. 1961) (under New York law, "the time and place of making of the contract is established when the last act necessary for its formulation is done, and at the place where that final act is done" (internal quotation marks omitted))).

The Court wrote: "[T]he fact that her investment was in some sense `offshore' (Defs.' Mem.11) does not alter the Court's conclusion that § 10(b) applies to her investment." (Order at

13

10).  It did not say why, except to say that these other "undisputed facts" established "irrevocable liability" was incurred -- when she handed the messenger what the court called "documents obligating her to make the investment" -- in the United States.    It did not say how anyone established that this *was* the "final act" necessary for "the contract" to come into being.

The Court focused on where indicia of such "irrevocable liability" supposedly accrued under various states' contract laws, which varied from investor to investor.  It did so without reference to any specific contract or its terms.  Moreover, apparently because the SEC did "not address whether title passed in the United States" (Order, at 7 n.7) the Court did not address *where* title was transferred or consider evidence from the criminal case (discussed in various defense submissions and at oral argument) showing that, in fact, title to Amerindo Panama's securities products was transferred by it, as an issuer, and it was operating abroad.

## ARGUMENT

The Court's analysis is both factually unsupported and legally inadequate.  *Morrison* demands attention to the security at issue to satisfy its transaction-based test, and in this regard, the place where "title was transferred" is necessary to determine whether the "purchase and sale" of that security occurred domestically or abroad. Moreover, even if the Court's exclusive focus on "irrevocable liability" were appropriate, the finding with respect to GFRDA investors Lecube-Chavez, Cox, and Colburn is incorrect because it is not factually supported: the evidence identified in the SEC's Rule 56 Statement at ¶¶ 20, 23-25 *does not show* where Lecube-Chavez, Cox, and Colburn were located when making payments.

Thus, Lecube testified that, "subsequent" to having received a letter from Vilar in 1989, she sent money to "Amerindo". Lecube-Chavez could not recall where she sent the $74,000 and was not asked (and did not say) where she was when she sent it. (Jacobson Ex C at 309). Neither

Cox nor Colburn testified at the trial, and, as with Lecube-Chavez, there is no testimony about where they were physically when they contracted or elected to invest. Nor is it established by the exhibits relied upon by the SEC. (The Court wrote, incorrectly, "Lecube-Chavez, a New York City resident, testified that in June 1989, she invested $74,000 *with Amerindo US* by sending the funds to either Amerindo's New York or California office." (Order, at 8; emphasis added.) While she testified that Vilar's letter to her was written on stationery with Amerindo U.S.'s letterhead, but did not specify which Amerindo entity her check was made out to and *did not* say "Amerindo US." Notably, the confirmation she received (GX 3308-1A), while also on Amerindo U.S. letterhead *states that the $74,000 was accepted by Amerindo Panama*.)

As for Cox, Ex. D9-D-11 is a letter from Vilar addressed to Cox and John Hunter in San Francisco dated December 27, 1989, in which Vilar simply mentioned a note that was about to mature and offered his "deserving anglophile neighbors and friends" Amerindo's services if Cox chose to "reinvest". Vilar described a fixed rate deposit account and added "you could even take part of your interest payments in London on your annual visits and reduce the tax burden even further." This letter from Vilar does not support the SEC's assertion that "Mr. Cox invested with Amerindo while in California" (Pl.'s 56.1 ¶25) (or the Court's finding that Cox "elected to invest in a GFRDA while in California" (Mem. and Order, at 8)). He may have made the decision to invest or communicated that decision to Amerindo or executed documents while he was on one of his annual trips to London, and we argued that cross examination was needed. Similarly, the Meixner Declaration sets forth that Colburn contacted Meixner "and requested that Ayr send $1 million to Amerindo." (Decl. ¶ 3) Neither the declaration nor attached exhibits indicate where Colburn was located when *she* elected to invest, contacted Meixner, or executed any documents

or agreements relating to this investment.  Again, we opposed summary judgment with a need to cross examine.

Further, defendants pointed to U-GX-3388, a document produced by the Government and on its Exhibit List (not introduced at trial) showing that Colburn was in London when she contracted to make the GFRDA purchase or "decided" to make the purchase.   Thus, factually and legally the conclusion of "irrevocable liability" is unsupported.

More importantly, the Court's legal analysis leads to precisely the kind of unpredictable and inconsistent application that *Morrison* rejected when it abolished the "conduct" and "effects" test.  If nothing else, the Court should have considered the facts relating to title transfer (set forth in defendants' papers including their Rule 56.1 counterstatement) because these facts *must* bear on where one's liability in fact becomes "**irrevocable**".

Indeed, here the offshore security itself did not exist until payment was received and a certificate (or credit) is issued by the issuer, Amerindo Panama.  A GFRDA was an invention of Amerindo Panama and was but *an account* it created.

*Morrison* overturned decades of what it essentially called a wrong-minded "conduct and effects" test under which the SEC sought power to investigate foreign conduct (such as this) if it had a "significant effect" in the United States.   The Supreme Court eschewed the Second Circuit's conduct and effects test in favor of a "transactional test:" It held that § 10(b) only applies to "transactions in securities listed on domestic exchanges[] and domestic transactions in other securities." 130 S.Ct. at 2884, 2886. "With regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales . . . ." *Id.* at 2885.

*Absolute* is, thus far, the only Circuit case elaborating on *Morrison.*  Significantly, its holding that "transactions involving securities that are not traded on a domestic exchange are

16

domestic if irrevocable liability was incurred or title was transferred within the United States," 677 F.3d at 67, was made in the context of a motion to dismiss, not on the merits.  It thus set forth a "disjunctive" only for deciding what is sufficient to warrant further proceedings.

The Court should have allowed (indeed invited) further litigation before determining the applicability of *Morrison* to the particular facts and circumstances of this case; developments in this new area should be informed by a deliberative factual and legal process, not a rushed decision based on a decision in a "pleading"-stage case that did not reflect an analysis of ultimate 10b-5 liability.

Here, the securities were creations of a Panamanian securities business, and the accounts did not even exist until payment was received, and accepted in London, at which time the security was created and was issued.  There could be no transaction in the security before its creation.  The holding – in essence, that the "location" of "a contract" step preparatory to the "purchase" of this unique foreign security is the be all and end all -- contradicts *Morrison*.

*Absolute* set forth two circumstances as constituting sufficient to support a complaint, but that cannot mean that a court ought to find domesticity if either one is satisfied without even evaluating the rest of the evidence.  As *Absolute* itself noted: "After all, a `sale' is ordinarily defined as `[t]he transfer of property or title for a price.' BLACK'S LAW DICTIONARY 1454 (9th ed. 2009); see also U.C.C. § 2-106(1) (`A "sale" consists in the passing of title from the seller to the buyer for a price".)"  677 F.3d at 68.  When "the sale" is shown to be offshore -- even though there is evidence that at a pretrial stage can be read as suggesting that liability might be onshore (such as here, where at the beginning of the case the SEC and DOJ believed that Lily Cates' invested through Amerindo US but found out differently) -- judgment should not be

granted to the SEC.   A purchaser's conduct cannot turn a foreign market transaction so easily into a domestic one after *Morrison*.

Indeed, one of the factors that convinced the *Morrison* Court that § 10b-5 did not have extraterritorial application was an express exclusion in the Exchange Act for an offshore securities business that existed for purposes other than "evading" US securities laws.  Here, as was known to the SEC's San Francisco office, Amerindo Panama and Amerindo UK predated even the registration of the Amerindo US Advisory company.   While the fact of offshore investment may allow an investor to avoid taxes and regulation, a purpose of avoidance is not a purpose of "evasion".   These offshore companies were not created to evade anything; they existed as independent sister-affiliates. [3]

The court overlooked this aspect of *Morrison* (quoted in the footnote),[4] but these *express* exclusions in the Exchange Act surely seem relevant to the inquiry whether as a matter of *law*

---

[3]     The SEC knows about these affiliates and indeed, its file should have been produced because of the "knowledge" it shows.  (See San Francisco SEC "Commission File No. 801-24922 for Amerindo Investment Advisors Inc ("Registrant"), which should be judicially noticeable, should be produced by the SEC, and should have been turned over at the criminal trial under *Brady* principles in accordance with the "squawk box case," *United States v. Mahaffy*, 693 F.3d 113   (2d Cir. 2012) (reversing convictions where prosecutors withheld and failed to disclose deposition transcripts taken by the SEC, some of which would have supported the defense).)

[4]     *Morrison,* 130 S. Ct. 2869, 2882-2883, pointed to § 30(b) of the Exchange Act, 15 U.S.C. § 78dd(b), "which does mention the Act's extraterritorial application"; that provision says that the Exchange Act and any rule or regulation thereunder "'shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States' unless he does so in violation of regulations promulgated by the Securities and Exchange Commission `to prevent . . . evasion of [the Act].'"   It imposes "a condition precedent to its application abroad." This condition precedent was not litigated here.  As *Morrison* said:   "At most, the Solicitor General's proposed inference is possible; but possible interpretations of statutory language do not override the presumption against extraterritoriality. See *Aramco*, supra, at 253, 111 S. Ct. 1227, 113 L. Ed. 2d 274."

section 10b applies to this transaction when all is said and done (not just at the pleading stage).

The Court should have invited further litigation instead of awarding judgment on an assumed

contract location when the alleged "contract" (if any) was entered into (if at all) in reliance on

section 30's exclusion.

Here, the fact that Amerindo US, an Advisory company, had an offshore investment

company  affiliate, may have roiled the SEC; but the foreign securities issuer does not become a

"seller" in a United States transaction merely because a purchaser decides to purchase the

Amerindo Panama investment in the United States.   Observations of Judge Koeltl in *Plumbers'*

*Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 176 (S.D.N.Y.

2010) (a case cited with approval by the Circuit in *Absolute*, 677 F.3d at 69), are apt:

> The plaintiffs have conceded that Plumbers purchased its shares on a
> foreign exchange. (Hr'g Tr. 14, July 14, 2010.) [Here, in a foreign market.] The
> plaintiffs argue that Plumbers' purchase is a domestic one because (a) Plumbers
> "is a U.S. resident"; (b) Plumbers "made the decision to invest in the U.S."; (c)
> Plumbers "suffered harm in the U.S."; (d) Plumbers' "orders for Swiss Re stock
> were placed from Chicago"; and (e) the "traders who executed the purchase orders
> for Swiss Re stock were located in Chicago." (Pl. Supp. Mem. 8-9.) These
> allegations do not suffice to establish a domestic purchase.
>
> The first three alleged facts are plainly irrelevant to the Supreme Court's
> transactional test. A purchaser's citizenship or residency does not affect where a

---

*Morrison* also noted that the government had "fail[ed] to account for § 30(a), which reads
in relevant part as follows:  "It shall be unlawful for any broker or dealer . . . to make use of the
mails ... for the purpose of effecting on an exchange not within or subject to the jurisdiction of
the United States, any transaction in any security the issuer of which is a resident of, or is
organized under the laws of, or has its principal place of business in,  a place within or subject to
the jurisdiction of the United States, in contravention of such rules and regulations as the
Commission may prescribe . . . ." 15 U.S.C. § 78dd(a)."

Under the CFR provisions Amerindo Panama, as an "issuer," is not included in the
Exchange Act's proscriptions because it fits the description of 17 CFR § 230.405  "Foreign
Private Issuer" referred to in 17 CFR 230.902 ("Domestic issuer/ Foreign issuer") in that not
more than 50 % of its shares are owned by a US resident (as Mr.Tanaka resided in the UK) and
the business of the issuer was not administered in the US, but rather in the UK.

transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States. Nothing in *Morrison* or the text of the Exchange Act allows for any identity-based inquiry in determining the location of a transaction. *See Cornwell v. Credit Suisse Group*, 729 F.Supp.2d 620, 624 (S.D.N.Y.2010) ("Cornwell I") ("Plaintiffs would exclude from operation of the new test transactions in securities traded only on exchanges abroad if the purchase or sale involves American parties.... But insofar as this proposition superimposes an exclusion based strictly on the American connection of the purchaser or seller, it simply amounts to a restoration of the core element of the effect test.")

For the same reasons, the fact that an investor may have decided to purchase a stock in the United States has no bearing on where the stock was ultimately purchased. *See id*. at 622 (rejecting argument that an investor who "made an investment decision and initiated a purchase of [a foreign stock] from the U.S." and "took the ... stock into its own account in the U.S. and incurred an economic risk in the U.S." could sue under section 10(b)).

*Accord, Cornwell v. Credit Suisse Group*, 729 F.Supp.2d 620, 624 (S.D.N.Y.2010) (emphasis added):

Plaintiffs would exclude from operation of the new [*Morrison*] test transactions in securities traded only on exchanges abroad [or here in a foreign market -- which this Court recognized in its Lily Cates analysis is to an extent "offshore"] if the purchase or sale involves American parties, or if some aspects or contacts of such foreign transactions occur in the United States. But **insofar as this proposition superimposes an exclusion based strictly on the American connection of the purchaser or seller, it simply amounts to a restoration of the core element of the effect test**. Similarly, **to carve out of the new rule a purchase or sale ... because some acts that ultimately result in the execution of the transaction abroad take place in the United States amounts to nothing more than the reinstatement of the conduct test**.

Rehearing should be granted because *Absolute*'s "disjunctive" pleading rule should not be read as the determinant for establishing final 10b-5 liability.  Discussion of the ramifications should be welcomed, not discouraged.

20

All the circumstances here have not even yet been litigated either in this summary judgment motion or previously.  Notions of the "irrevocability" of any commitment were *never* litigated, much less "suggested," in anything other than a conclusory fashion in the SEC's papers.  In fact, a "contract" of sale, if there was one, was unclear in its nature and terms.  While the Court referred to an "offer" by Amerindo Panama for the purchase of securities, it referred to what might be a Panamanian offer that may, or may not, have been contained all contract terms.  It is not clear what "the contract" was, or whether it *arose* in New York, or what law governs, or whether "the payment" constituted "the acceptance" of the relevant contract, or was the last step in its formation.  ATGF, for example, was governed by a Panama document introduced at sentencing by Mr. Litt (Doc. 418-2, filed 2/4/10 criminal case) in which "The Fund and its authorized agents reserve the right to reject any application in whole or in part."  (ATGF Inc. Circular, Docs 418-2, and 514-5, p.6).  It treats the application and payment as an offer to *it* to issue the security, and retains full discretion to reject it.  Presumably the same thing is true of GFRDA.

In such circumstances of a foreign issuer transferring its own security, the Court erred in focusing on the "locus" of each investor's "contract" leading up to the purchase (Doc. 272, p.7), and choosing that place's contract law to determine whether the transaction was foreign or domestic.  Any such "contract" was never the subject of any description or of proof such as to warrant a finding by collateral estoppel.

While under the securities laws a "sale" may "include" a "contract" of sale and a "purchase" may include a "contract", that does not mean that "the location" of *any* *contract* controls the location of the transaction after *Morrison.*  The relevant "location" is that of the purchase or sale transaction itself.   And under *Morrison*, which deals with

conflicting international regulation, that jurisdiction's laws apply to the securities transaction and so "the contract" may also be another jurisdiction's (Panamanian) contract. *Morrison* suggests that that is so.

The Court *presumed* here that "the contract" was a New York contract or a California contract, based on the fact that there was conduct in those states. Under the SEC's "conduct" and "effects" tests in the past, this might have sufficed even if the security existed only abroad, but here "the contracts" were not proved in the first place such that collateral estoppel would apply or such that a conclusion of liability (much less "irrevocable" liability) would flow from the facts.

Nor did the SEC's evidence independently prove the location of any contract, nor proved any contract's full terms. The Court assumed, for example, that New York law applied because Vilar "solicited" Cates in New York and she executed documents here, which, the Court stated, "suffice to establish as a matter of law that Cates became irrevocably bound in New York." (Opinion p. 9 citing *McNamara v. Tourneau*, 464 F. Supp.2d 232, 237 (S.D.N.Y. 2007). *If* what Cates was bound to buy were a matter as to which New York law applied, then evidence "might" have been sufficient to suggest that Cates was bound *at the time*, but maybe not. No one ever discussed choice of law or proved that New York contract law applied, or that the contract was a New York contract, so the Court's citation of *McNamara* (in which there was no issue of where the contract arose) is inapposite.

Though the Court wrote that defendants did not contradict the SEC's facts about where conduct occurred, the SEC did not contradict the showing that the securities are foreign and are born and transferred in Panama or in the UK (much like the "license"

which was the "property" in the mail fraud case, *Cleveland v. United States*, 531 U.S. 12 (2000)).

If anything, *Morrison*'s transactional rule compels summary judgment in defendants' favor on all the "pieces" of the SEC's claims (having to do with foreign investors buying securities in Amerindo Panama), and especially in connection with the Mayer claim.  With regard to the Mayers, the Court ruled judgment for the SEC insufficiently supported even under the "purchaser liability on contract"-theory.

The Mayers purchased Amerindo products through offshore entities (though they underplay it now) the successors of which are Aba and Daba, Bahamian corporations.  In *Absolute* the Court noted that where the purchaser and the seller are foreign, absent other factors "the transactions ... would not be domestic."  (677 F.3d at 69 ("Under this test, the second type of transaction at issue in this case – the transactions between and among the Funds themselves – would not be domestic.")).

There should be no further litigation over the Mayers *or* the ATGF investors, who purchased products of Panama in an offshore transaction where the offshore *nature* of the deal was an essential element of the securities transactions.  Tax and regulatory avoidance is of core concern to buyer and seller.  Such benefits would not flow if the securities were domestic.

As to Colburn, Cox, and Lecube-Chavez, the "facts" shown by the SEC do not even establish even that these investors *were* in the United States or in any particular state when ordering a purchase or making a payment.

As to Cates, whatever she purchased was not in existence until she purchased offshore, and the Court noted the transaction was in some sense offshore.

The Court should reconsider and grant judgment to defendants *or* at least order discovery and a trial on "the contract" and whether section 30 of the Exchange Act provides an express exception to applicability of the Act to this conduct.

### The Court Should Grant A Stay While The Receiver Moves Forward

We sought a stay of further litigation in this and the related cases.  The Court has not ruled on a stay.   As we have stated, defendants *could* take an immediate appeal from the Order of March 11, 2013, in that the Court Ordered a Receiver and imposed an injunction.

However, as we have discussed with Mr. Gazes, we have decided to forebear an immediate appeal should a stay be granted so that counsel (working without pay) can devote time to working with the Receiver to achieve a fair distribution instead of having to move forward (or move to be relieved) on other fronts.  For reasons stated in the motion for fees filed in the criminal case, it is difficult to litigate without funds or take action on defendants' behalf without a source of payment.  We believe that during this process, there should be a stay.   I am told by Mr. Gazes that he would support such a stay.

We don't know if the Court wants us to proceed by pre-motion conference seeking a stay. If so we will make such a request for a conference (though we did so previously and there was no ruling).  We wanted to make our positions known here.

Dated:  March 25, 2013                    _____/s/_____
                                                        Vivian Shevitz