Vivian Shevitz
Attorney at Law
401 Cumberland Ave. – Apt. 609
Portland, Maine 04101
(207) 899-2502
(914) 763-2122 (cell)
Vivian@shevitzlaw.com

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-18-13

May 29, 2013

Hon. Richard J. Sullivan (by email)
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

12 cv 5246

Re: *SEC v. Amerindo* – 05 cv 5231 (RJS): Response to Receiver Request For More Time And In Anticipation Of, And Objection To, Any Plan That Allows JP Morgan To Escape Accountability For Malfeasance In Its Custodian Duties As To Amerindo Panama Accounts, Including Theft Of Interest That Should Have Been Paid On The Amerindo Cash And Should Be Deemed Held In Constructive Trust For The Account Holders; Wrongfully Withholding Funds From The Account Holders; And "Abandoning" Accounts, All At Defendants'/ Amerindo Investors' Expense.

Dear Judge Sullivan:

I write in response to SEC Receiver Ian J. Gazes' request for more time to file a first report and in anticipation of, and objection to, Mr. Gazes' apparent plan to let JP Morgan escape accountability for malfeasance, to continue to "employ" JP Morgan, and allow it to set its own terms for sale of the securities it has held. We also want to:

(1) correct any misconception concerning the Receiver's statement that a "consensual resolution with all interested parties" was impossible, to insure that the Court does not have the misimpression that defendants Vilar and Tanaka did not cooperate with Mr. Gazes in good faith;

(2) advise the Court of ambiguities in the Receivership Orders, the determination of the Receiver to expand his role beyond the tasks explicitly assigned to him, and the unproductiveness and costliness of the Receiver to date; and

(3) suggest a change of course involving (a) the release of JP Morgan account 102-05012, a UK account held in the name of The Trustees of the Amerindo Advisors (UK) Ltd. Retirement Benefits Scheme, from the Order of Forfeiture of Substitute Assets and from the Restraining Order; (b) the release of other accounts and funds identified as "investor accounts" by Ian Gazes as set forth below and (c) the removal of a costly and ineffectual Receiver and the reappointment of Robert Knuts as Monitor to oversee defendants' sale of the public securities in the accounts and the distribution of the cash and stock sale proceeds to investors.

When the Court ordered Mr. Gazes to (1) value assets and claims, and (2) consider actions that should be taken to avoid dissipation of the assets and capped the task at $50,000, we – though still objecting to the Receivership and with a motion for reconsideration of the Order's premise in place – agreed with Mr. Gazes not to contest his fee. We did this in a good faith belief that, finally, there would be some kind of management of the millions upon millions worth of frozen assets, and that a process for paying investor claims could be formulated and begun.[1] Starting with a meeting with Mr. Gazes on April 4 and continuing over the next six weeks, Jane Simkin Smith and I, and the defendants personally, devoted considerable time and attention to working with Mr. Gazes.[2]

---

[1] We also wanted a long-sought forum to *demonstrate* that there are no "investor losses" "in the millions" and no "iceberg". The government has gone to great lengths to prevent defendants from getting to this point of truth, even inveigling defense counsel to forego valid positions in service to prosecutorial aims and its initial, flawed perception of the case when it obtained a Monitor and arrested defendants at the end of May and in June 2005.

[2] We worked to (1) identify all accounts either subject to the restraining order and/or the substitute asset forfeiture order; (2) identify accounts into which investor funds had been deposited (accounts that AUSA Levin had called "investor accounts") and track down funds from at least two such accounts where the Government had agreed to their liquidation or received payments on behalf of the accounts but had not advised the Receiver (or us) about these funds until we pressed for information; (3) identify investor claimants and their current addresses; (4) devise a claims process, including several drafts of a "proof of claims" form as well as discussions regarding notice to potential claimants and researching the costs of publicizing notice; (5) discuss recommendations (and voice objections) regarding institutions to be engaged to liquidate the publicly traded securities in the accounts and to evaluate the private securities held in the various accounts, where to maintain the funds, costs of liquidating, and paying both the Receiver and other professionals enlisted in the sales process; and (6) formulate a statement of the defendants' claims.

We alerted Mr. Gazes to certain funds we thought were being held by the government (or pursuant to its secret negotiation) in an as-yet undisclosed amount as a result of the Amerindo Cayman Internet Growth Fund bankruptcy. We learned that the amount is some $4 million from Neal Jacobson only after repeated emails to the DOJ and SEC requesting the disclosure of this asset, which Sharon Levin and Mark Salzberg "negotiated" behind the scenes with the Cayman Liquidators, were ignored. Not only did no one "do anything" with this information, but information was hidden. As of the time Mr. Gazes ended our negotiations, he had penned a footnote that there was $4 million but he had taken no steps, as far as we knew, to identify it, or its components (Cayman stakeholders), or to "receive" it – or to "ask" the government to disclose the circumstances of its holding so proper claims can be made.

We now learn, as discussed in footnote 4, that there is an additional unaccounted-for $2.9 million in the "main" "seized" ATGF II account that JP Morgan calls "unpriced" because it has not converted the formerly private securities in the portfolio, and no one has demanded that JP

During the 6 ½ weeks, Mr. Gazes attempted to structure a "stipulation" in which various "interested parties" would agree to an investor claims- and interim distribution process and would agree to the release of certain accounts from the restraining and forfeiture orders, the sale of assets within the accounts, and the distribution of cash to approved claimants. We studied, commented upon, and in a number of phone calls discussed at least five different versions of a proposed stipulation prepared by Mr. Gazes. Mr. Gazes listened and incorporated many of our points and rejected others. When he rejected, he did so principally on the ground that, according to the Receiver, the defendants have no "rights" to control -- and should have no control over -- how any of the assets are managed and, accordingly, should not be heard to even complain about the costs associated with a claims and interim distribution process. Those "costs" had escalated as the "stipulation" process proceeded, and included objectionable provisions authorizing JP Morgan to in essence set its own fees and expense bill for selling the public securities, without even bids from others and with authorization in advance, and to hire unidentified accountants and professionals to accomplish a payout with costs and expenses as yet unidentified.

When we objected to his shutting down "negotiations" in favor of this "big-bank" expansion of duties and costs, Mr. Gazes took the position that, if defendants "want" a claims and distribution process, they have to pay for it, and pay for it his way.

Mr. Gazes expressed little interest in allowing, or for that matter understanding, that (unlike a bankruptcy context) defendants have property interests in the seized and restrained assets that have not been extinguished validly, or, for that matter, in coming to terms with the extraordinary procedural posture of this case: a virtual state of limbo where a concededly invalid substitute forfeiture order in the related criminal case that has tied up in excess of $50 million in assets (including the $25 million-plus *cash* in JP Morgan accounts, unmanaged and not earning interest, in amounts to which the government has no present claim) -- with the government taking the position (in both the criminal case and the civil case) that defendants "can have no role in managing" the restrained and seized assets but also, more bizarrely, that, until a "final" order of forfeiture is entered, neither can the Government. (Letter to Court from Sharon Levin, dated January 8, 2012).

The Government has now taken an even more extreme stance – one that put a halt to any progress with the Receiver. After six weeks and at least four detailed proposals concerning a claim and interim distribution process, on May 21 Mr. Gazes included for the first time a provision by which Mr. Vilar and Mr. Tanaka (for no consideration) must *release the SEC and DOJ (and the Receiver himself,* and, seemingly, the entire cast in the JP Morgan Interpleader case) for everything and anything – and if not, the government would not sign off on an "agreement" in this SEC case so that a consensual claim process could be started. (This demand for a complete release[3] goes even farther than the demand made by the DOJ in September 2011

---

Morgan do so or give up the funds for management. There is, in sum, at least $7 million additional payout funds no one has 'discovered' or taken steps to "receive."

[3] The first release language Mr. Gazes sent us contains this SEC requirement:

3

that "defendants agree not to seek the return of any forfeited funds restored to victims and/or Amerindo Investors under the Remission Process if the forfeiture is overturned on appeal." *See* Letter to Court from Sharon Levin, dated January 8, 2012).

We understand the government's desire to immunize itself from liability for destroying defendants and (*inter alia*) their US Advisory company when no Amerindo clients lost money, and for its holding money without legal right for eight years without managing it (except to give it to the Mayers and the Cayman liquidators and allow JP Morgan to run the show with accountability to no one (perhaps in exchange for its "agreement" with the SEC and DOJ to withhold funds from the defendants, as JP Morgan's Peterscak stated in a letter to an Amerindo investor in 2005 ( GX 3582-16)).

It is *not* understandable for the SEC to impose a condition that defendants grant the government immunity in exchange for allowing an investor claim process (to which we all consented) to begin. This tactic has no place in this Receivership under any of its formulations.[4]

---

"21.   Alberto William Vilar, Gary Tanaka, and the Amerindo entities identified in the caption (together with any present, former or future affiliate, predecessor, successor, assign, beneficiary, distribute, representative, officer, employee, director, shareholder, agent, attorney, accountant or delegate of them or of any of the foregoing, collectively, "Defendants") release the Receiver, the United States and the Securities and Exchange Commission (together, with any successor, assign, representative, employee representative, agent, attorney, accountant or delegate of said parties) from any and all past, present and future actual or potential, known or unknown, suspected or unsuspected, asserted or unasserted, claims directly or indirectly that may arise, have arisen or may have arisen under, out of, with respect to or in connection with parties performance under this Stipulation including without limitation the interim distribution contemplated therein.

When we told him this was a non-starter, he proposed even broader, more inclusive language.

[4]   We objected to using JP Morgan to sell the securities from the inception and pointed out to the Receiver that JP Morgan had repeatedly refused to put over $25 million in cash in an interest bearing account and refused to provide the Amerindo account holders with asset statements, not to mention deeming three accounts as "abandoned." For whatever his reasons, be it his personal relationship with JP Morgan (disclosed in part after his appointment) or any other reason he may not have disclosed, Mr. Gazes refused to respect our objection to JP Morgan. His plan favors this bank, at the expense of maximization of the assets.

Without any help from Mr. Gazes or anyone else in recovering assets, we see (on a February 29, 2012 statement that we had to fight for) that as to one account, 102-25590 (Amerindo Master Venture Fund LLC), JP Morgan stole (to say it uncharitably) or "confiscated" (through "abandonment") some $164,967 in a private security turned public ("3PARDATA Inc. Ser A-3 ... abandoned property") along with the $26,613 cash that had been lying fallow in the account. They did not reverse this when we (and investors) complained *in Court*. According to

4

We mentioned above the Mayer/JP Morgan Interpleader action (12 cv 5240 (RJS).[5] Throughout the weeks we engaged with Mr. Gazes, it was apparent that part of his agenda was to somehow appease JP Morgan and the Mayers, and, if possible, assure that that action did not impede an investor distribution process in the SEC case. To our knowledge, the Receiver was not tasked with resolving the Mayers' complaints. But this brings up our next point: a lack of clarity as to just what input the Receiver has "received," *see Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) (authority of receiver is defined by the entity in receivership), and what the Receiver has been appointed to do (for a fee capped at $50,000). Part of the problem is that there has been a moving target in the Court's orders, which are not specific or clear; they do not identify the "receivership estate."

The Court first announced its intention to appoint a receiver in an order in the civil case dated July 17, 2012: "The Court is prepared at this time appoint a receiver for the limited purpose of taking steps to value and preserve the *seized* assets and beginning the process of determining how much is owed to victims and investors. However, the Court is not prepared to authorize distributions at this time." (Emphasis added.) The use of the word "seized" indicated that the assets in question were the substitute assets ordered forfeited in the criminal case in November 2010. The phrase "taking steps to value and preserve" these assets indicated some degree of management.

The Court issued an order the same day (July 17, 2012) in the criminal case denying defendants' motion with respect to the management of the funds in one of the accounts identified in the forfeiture order, JP Morgan Chase Account 102-05012, held in the name of the Trustees of the Amerindo Advisors (UK) Ltd. Ret. Benefits Scheme (hereinafter "the Pension account"). In that order, the Court questioned its authority to appoint a manager of forfeited assets in the

---

this one account statement JP Morgan made that "determination" of abandonment seemingly first in February 2012, while we were litigating in the SEC/Forfeiture cases. Mr. Gazes should have done something about this, but because he did not want to value to private equities (or use David Ross to do so, with his supervision of course) and sought to use JP Morgan to sell securities, he did not evaluate the fact that per David Ross's report, 3-PARDATA was worth $25,800.32 in 2005 and $55,138.97 in 2009, nor saw that 3-PARDATA became public and was taken over in a 2010 merger and, based on our calculations, was worth an **additional** $164,967 ($33 / share), or almost $200,000 in total, when JP Morgan was allowed to deem it "abandoned."

Looking further, we see that, in the "main" "seized" account, the "ATGFII" account number 102-01495, there are shares shown on the statements that convert to an additional 88,185 shares of 3-PARDATA. They are shown "unpriced" on the JP Morgan account statement, but are worth (or were) $2,910,105 since 2010. JP Morgan has since paid no interest; the DOJ, the SEC, and Mr. Gazes have not accounted for this additional sum available for investor payouts that JP Morgan has used for its own purposes.

[5] SDNY Local Rule 13 (for the Division of Business) does not permit "relationship" of a civil case to a criminal case. Yet the Mayer turnover case, 12 cv 5240 (RJS) was accepted as "related" to the criminal case (but not to this case).

criminal case: "It is not clear what the source of the Court's authority would be to ... appoint a manager of forfeited assets in a criminal case, and Defendants have cited to none." The Court pointed in a footnote to its Order that same day regarding a receiver in the civil case but did not explain the source of its authority in a civil case when it lacked the authority in a criminal case.

The Court did not explain its authority when it announced on October 17, 2012 again that it was "prepared to appoint Ian Gazes as a receiver in this [the civil] case, based on his experience in managing and liquidating large estates as a bankruptcy trustee." In delineating the Receiver's tasks – "to investigate and determine the value" of certain assets, "to consider what actions can and should be taken to avoid dissipation of those assets, and to submit a report to the Court regarding his findings and recommendation" -- the Court steered clear of "management", instead ordering: "Upon receiving his report, the Court will determine whether Mr. Gazes should be empowered to take broader action, such as managing the assets and beginning a claims process for investors." Here, the Court explicitly keyed the assets to the forfeiture order, but described the assets at issue as "*investor assets*": "At this time," the Court wrote, "*Mr. Gazes will be empowered only to investigate and determine the value of investor assets that have been seized or frozen pursuant to the forfeiture order in the criminal case.*" (Emphasis added.)

The term "investor assets" is ambiguous, and confusing, especially given the government's insistence in connection with the forfeiture that "investors of Amerindo do not have a legal 'interest' in the forfeited bank accounts, brokerage accounts and other assets of Amerindo." As Ms. Levin wrote: "The law on this point is clear. [citations omitted] ("A party's interest in property must be an interest in a particular, specific asset that has been ordered forfeited to the Government to warrant relief . . . .") (Email from Sharon Levin to Vivian Shevitz, et. al, December 12, 2010).

Mr. Gazes apparently assumed the term to mean bank accounts into which funds received from investors were deposited (since, to our knowledge, this is the only thing he has attempted to value in the almost two months he has acted as Receiver). Even so construed, there was additional ambiguity about assets he was tasked to value, perhaps because of a shift in the language used by the Court in its March 11, 2013 Order formally appointing Mr. Gazes to the Receiver and the failure of the Court to describe what Mr. Gazes was appointed Receiver *of*. In that order, the Court again referred to "investor assets", but moved from the forfeiture order to the restraining order: "IT IS FURTHER ORDERED THAT Ian Gazes, as Receiver [of what?], shall investigate and determine the value of investor assets and the value of the Individual Defendants' claims to monies that have been frozen pursuant to the restraining order in the criminal case; consider what actions can and should be taken to avoid dissipation of those assets; and submit a report regarding his findings and recommendations...."

Three days later, when the Court modified the restraining order in the criminal case in order to release funds to pay Mr. Gazes for his work in the civil case, it went back to defining the assets with reference to the forfeiture order, not the restraining order: "WHEREAS, the Court has appointed a Receiver in the related Securities and Exchange Commission action...to investigate and determine the value of investor assets that have been seized or frozen pursuant to the Forfeiture Order in the criminal case."

6

Against this confusing backdrop as to both the Court's authority to empower a Receiver to manage assets seized and forfeited in a criminal – or a civil – case, as well as the identification of the pot of assets that the appointed Receiver is supposed to evaluate, several things are clear:

1. Because of the concededly excessive and invalid substitute asset forfeiture order, the government has held accounts worth far more than the amount for which it has any valid claim. Against a forfeiture that the government concedes should be $36.7 million less than the amount entered on the forfeiture order (which was – erroneously -- $54 million) – at most $17 million under the government's concession – restrained accounts previously managed by Amerindo contain far more than that $17 million sum. There is *at least $32 million* (almost twice as much as the conceded $17 million forfeitable sum the government posits) in accounts identified as "investor accounts" (or available for investor payments per defendants' agreement). (There is $25 million in the "included" JP Morgan accounts as identified by the Receiver, plus at least $ 7 million he did not account for (described in footnotes 2 and 4); on top of that, there are both priced and unpriced securities. But more:

    2. Included in the restraints is an account – the Pension Fund – that, as the government stated to UK Pension Fund Administrator Huw Davies (in a letter dated July 30, 2012, cc'd to this Court and others), is *not an "investor account"* or "investor asset". (Letter of Sharon Levin: "Furthermore, it is unclear from the Court's Order whether the Retirement Scheme account is to be included in the seized assets referenced in the Order [dated July 17, 2012] and whether it would be included in any future Order in the SEC action.... ... [T]he Retirement Scheme may not be subject to a receivership as it *is not an investor account."* (Emphasis added.) )[6]

According to a schedule prepared by Mr. Gazes, the Pension Fund account contains approximately $18.5 million, and it is not even an account *ever* titled to or owned by the defendants. The UK Pension Fund itself is a UK entity that exists under UK law and is governed by that law. There is no valid authority for the government to *ever* have restrained this account – other than its wrongful inclusion in the restraining order.

The amount in the account – some $18.5 million – is less than the $36.7 million figure that the government concedes was improperly seized and forfeited. Hence, at least this account should be released from the restraining order and the substitute forfeiture order now as a matter of the government's good faith and fair dealing, if not the Constitution and the law.

---

[6] By letter dated March 19, 2012 p.3 n.4 to Judge Swain (cc to everyone), the SEC still refused to release the asset, instead using it improperly as a bargaining chip to extract concessions, writing: "The Commission staff cannot confirm Mr. Tanaka's assertion that the Bear Steams account held in the name of the Trustees of the Amerindo Advisors (UK) Ltd. Retirement Benefits scheme is a 15-year segregated, stand-alone pension plan that does not contain any investor funds. However, if Mr. Tanaka's assertion is correct then the Commission staff could consider-continuing negotiations over the disposition of that account in the context of a global settlement."

Defendants have been struggling to litigate this very complex civil case and the related Interpleader (and its related state action) without any funds for counsel.[7] Freeing up the Pension account from the unjustified and unjustifiable restraints would help to allow them to defend these actions without having their hands tied behind their backs. (At least they could borrow against their right to a distribution). When *any* funds are released, as they should be, defendants will be able to go to state court (if necessary) to move to vacate the Mayers' judgment, premised on a failure of Due Process – including a failure to properly notice Mr. Tanaka (then *pro se*) and the fact that the Mayers and their counsel took advantage of their "special relationship" with the AUSA, who embraced their "hardship" and negotiated behind the scene in the State civil case to let them continue litigating while Mr. Vilar and Mr. Tanaka could not afford counsel. The Mayers would *not have* the claim on which they obtained judgment if they had been honest. Further, as the Court indicated in its partial summary judgment ruling, the Mayers' transactions are offshore. They are not subject to a US claim.[8]

### The Investor Accounts Should Be Released And, Subject to A Monitor, Should Be Managed For An Orderly Liquidation And Payout

Again, the most that the government should be allowed to "control" here, by its concession of "substantive error" on appeal, is about $17 million: $36.7 less than the $54 million amount the Court (twice) erroneously imposed (once in the forfeiture order, disclaimed as substantive error by Order dated August 25, 2010, and repeated in the substitute asset Order though the Court indicated it intended to impose only the $17 million figure.)

Before he adopted the government's view of the pay-to-play "release" required for a "consensual" claim and distribution process, Mr. Gazes identified seven JP Morgan accounts that fit the "investor account" theme – and which we *agreed* should be used for investor payouts, subject to defendants' claim for their fees that have remained in these accounts in part since 1984, when their management activities began in this offshore corporation (which *pre*-dated the US Advisory Company).[9] We had proposed use of these same accounts in our submission

---

[7]  I also have an unopposed (except by the Mayers' attorney) motion for CJA fees, made in

Defendants have been struggling to litigate this very complex civil case and the related Interpleader (and its related state action) without any funds for counsel.[7] Freeing up the Pension account from the unjustified and unjustifiable restraints would help to allow them to defend these actions without having their hands tied behind their backs. (At least they could borrow against their right to a distribution). When *any* funds are released, as they should be, defendants will be able to go to state court (if necessary) to move to vacate the Mayers' judgment, premised on a failure of Due Process – including a failure to properly notice Mr. Tanaka (then *pro se*) and the fact that the Mayers and their counsel took advantage of their "special relationship" with the AUSA, who embraced their "hardship" and negotiated behind the scene in the State civil case to let them continue litigating while Mr. Vilar and Mr. Tanaka could not afford counsel. The Mayers would *not have* the claim on which they obtained judgment if they had been honest. Further, as the Court indicated in its partial summary judgment ruling, the Mayers' transactions are offshore. They are not subject to a US claim.[8]

<u>The Investor Accounts Should Be Released And, Subject to A Monitor, Should Be Managed For An Orderly Liquidation And Payout</u>

Again, the most that the government should be allowed to "control" here, by its concession of "substantive error" on appeal, is about $17 million: $36.7 less than the $54 million amount the Court (twice) erroneously imposed (once in the forfeiture order, disclaimed as substantive error by Order dated August 25, 2010, and repeated in the substitute asset Order though the Court indicated it intended to impose only the $17 million figure.)

Before he adopted the government's view of the pay-to-play "release" required for a "consensual" claim and distribution process, Mr. Gazes identified seven JP Morgan accounts that fit the "investor account" theme – and which we *agreed* should be used for investor payouts, subject to defendants' claim for their fees that have remained in these accounts in part since 1984, when their management activities began in this offshore corporation (which *pre*-dated the US Advisory Company).[9] We had proposed use of these same accounts in our submission

---

[7] I also have an unopposed (except by the Mayers' attorney) motion for CJA fees, made in the criminal case, for my representation of these indigent defendants in the Interpleader case.

[8] All GFRDAs and ATGF shares were foreign securities. No "security" ever issued *before* it was "invented" and issued in Panama, or the UK. These were untraded foreign private securities and there was no "irrevocable liability" before Amerindo Panama chose to issue them. No one proved where any "contract" resided, which is the basis of our motion for reconsideration of the partial summary judgment order. At least it should be litigated, openly, and choice of law issues should be briefed, especially as *Morrison* supports deference to foreign securities laws.

[9] We repeatedly told Mr. Gazes that defendants' claim for fees *depends* on an evaluation of all assets, including the private equities that Mr. Gazes (despite the Court order) thinks need not be valued now. That is because defendants' claim is to any surplus over accounts due investors as of the date they were disabled from managing the accounts or effectuating bank transactions – May 25, 2005. Because defendants through an offshore corporation are the account holders, the

8

dated July 27, 2012 (also, but with fewer specifics, in January 2012, in the "joint case" hearings).[10]

Now, however, the Government and Mr. Gazes would impose more conditions on the use of the money for purposes we proposed long ago. As long as these moneys are held pursuant to the Restraining Order (or the government's secret holds) they cannot be used for payouts. But as can be seen, nothing can be done to manage or liquidate the assets for payouts to investors without the SEC's requirements of unconscionable "release" provisions. Further, Mr. Gazes has exhibited no interest in maximizing the assets by even considering "inducing" JP Morgan to reimburse interest on the withheld cash for the years the bank has been holding the funds. To the contrary, he wants to let JP Morgan run the show even longer.

We personally like Mr. Gazes, but suggest that the Court should remove him because he is a costly and ineffectual Receiver and is getting us nowhere, and his allegiance to JP Morgan bizarre and inappropriate here.[11] We make the bold suggestion that the funds should be managed on a day to day basis, with a purpose of liquidation, by Mr. Tanaka, with strategic input from Mr. Vilar – and, to appease the SEC's concerns, subject to a Monitorship. For this purpose, we suggest that the Court should reappoint Robert Knuts, if he will accept the appointment, to oversee defendants' sale of the public securities in the accounts, the evaluation of the privates by David Ross (if he will take the job), and the distribution of the cash and stock sale proceeds to investors (in accordance with amounts they would get in restitution if they were US accounts – the amount at the "date of loss", and only those amounts for which defendants are responsible and not additional interest or other additional sums.)

Mr. Knuts' billings and report reflect that he was a man of integrity, who conducted himself straight down the middle and did not cumulate expenses needlessly. As reflected in his

---

only logical way of valuing their claims is to value the assets and the investor claims – the job that no one, not the DOJ or the SEC *or*, now, Mr. Gazes – has wanted to accomplish.

[10]  We proposed a workable plan of distribution based on 2005 accounts, the most to which a 10b-5 "victim" is entitled in a restitution context or through forfeiture remission, and asked the claims process to go forward so defendants could pay investors what they are owed out of those investor accounts. There has never been a substantive objection, except from Mr. Begos and a couple of investors who want more than the amount due on May 25, 2005, and with the help of the SEC have demanded it in these SEC proceedings though they are *not parties*.

[11]  See, e.g., http://www.businessweek.com/articles/2013-03-21/the-senate-drafts-the-secs-case-against-jpmorgan (" Senate probe of JPMorgan Chase (JPM) did more than conclude that the bank hid the full damage of last year's trading losses from investors and regulators. It delivered 900 pages of evidence that could help the Securities and Exchange Commission make the case that bank executives broke the law."); http://www.reuters.com/article/2013/05/18/us-jpmorgan-vote-idUSBRE94G0TL20130518, May 17, 2013 (" Pension and endowment managers on Friday called on U.S. regulators to review the rules for shareholder voting after a firm collecting ballots for JPMorgan Chase & Co cut off the bank's opponents from polling information.")

Interim billing request of November 2005 for work as SEC Monitor starting in June 2005 (Doc. 37, Knuts' billings), he sought $66,634.68 for documented tasks in furtherance of the court's orders, and did not waste the assets subject to his Monitorship. With Mr. Knuts watching, Mr. Tanaka should be permitted to "manage out" the assets in what they call "investor accounts" along the lines of the payment proposals we outlined in January and July 2012.

The only substantive concerns ever raised by the SEC or DOJ to defendants' managing accounts is that they are convicted felons and their rights have been forfeited. This unthinking reaction has disserved investors and the defendants. Mr. Marcus expressed the view three times, as late as Mr. Tanaka's sentencing, that the Court should allow (and require) Mr. Tanaka to manage the funds. The suggestion should have been embraced by defense counsel, the prosecutor, and the Court.

Kneejerk reactions against it were in all events baseless in fact. While their convictions disable them from serving as Investment Advisers (or "associating" with one – a provision of extreme and dubious meaning), nothing about their convictions *or underlying circumstances* should caution against their *managing* funds, much less disable them from doing so – especially in that they are offshore funds and they do not charge private clients advisory fees. They have a track record of stellar results, and were tops at recovering from the tech bubble burst when they were precipitously shuttered.

Even if properly convicted, Mr. Tanaka and Mr. Vilar have served 2 ½ and 4 years in jail, respectively and have been disabled from working their business starting on their ninth year now. There should be an appellate decision soon; the panel hearing *United States v. Mandell*, 12-1967 on May 2, 2013 indicated that the *Vilar* panel will be deciding the *Morrison* issue for the Court. Defendants have no incentive to compromise their position by imprudently managing the assets; they want this case behind them and have been asking repeatedly for valuation of the claims and assets – and for management of the assets.

No one else has a better and cost-effective way to liquidate these accounts and maximize profits, than Mr. Tanaka and Mr. Vilar. No one has a solid logical reason – except vindictive prosecutorial zeal – to oppose this. And further, the use of JP Morgan instead of defendants themselves is offensive. Mr. Knuts was appointed and accepted by the SEC once. He should be appointed and relied on again to end this case. We suggest that the majority of investors (other than Mr. Begos) may think it is a good idea. Enough is enough.

                                        Very truly yours,
                                        /s/
                                        Vivian Shevitz

Cc:    Neal Jacobson / Mark Salzberg
        David Burger
        Benjamin Naftalis/ Justin Anderson
        Ian Gazes
        Huw Davies
        Investors
        The Press