Vivian Shevitz
Attorney at Law
46 Truesdale Drive
South Salem, New York 10590
(914) 763-2122
Vivian@shevitzlaw.com

September 30, 2013

Hon. Richard J. Sullivan
United States District Judge
Southern District of New York
40 Centre Street
New York, New York 10007

Re:  SEC v. Amerindo, Vilar and Tanaka, 05 cv 5231(RJS)
<u>Request for Stay, a Conference, and CJA Fees</u>

Dear Judge Sullivan:

     I respond to four or five submissions, requests, and/or threats of the SEC and the Receiver, all with the purpose of depriving Alberto Vilar and Gary Tanaka not only of their property but of their right to be heard about it (or about *their* clients' account claims) in the supposed "independent" "civil" SEC case (and seeking to do so immediately, while we have been moving and asked for a respite). [1] We need a

---

[1]    By motion dated September 5, 2013, the SEC seeks what it calls "reconsideration" of the Court's March 11, 2013 Order granting partial summary judgment in light of the Second Circuit's ruling about the Mayers, under Fed. R. Civ. P. 60 (a), and says in its memo that this does not change its request for injunctive relief (which was already granted) but affects other remedies.   I asked the SEC to consent to a Stay and it said it would not, but Mr. Jacobson would agree to more time for me to respond.

     The SEC made this motion without asking for a pre-motion conference (and without regard to the fact that defendants have a pending motion for reconsideration of summary judgment and without regard to the Court rules that the Court invoked previously to dismiss Mr. Tanaka's first motion for summary judgment, to be refiled after a court conference. ( DOC  221, 3/22/2012, dismissing Mr. Tanaka's motion for failure to move for pre-motion conference pursuant to the Court's Rule 2.A.)

     Then Mr. Jacobson sought a declaration of default against the Amerindo entities.  I objected on the ground that the SEC is responsible for incapacitating these corporations from responding and defending.  Mr. Jacobson had given me no notice except a last minute submission.  The Clerk entered what Mr. Jacobson asked for immediately without discussion.  Mr. Jacobson in emails questioned my clients' interest in the Amerindo entities and stated that if and when the SEC actually moves for a default judgment it would then be OK (with the SEC) for me to respond.

1

On September 27, 2013 "the Receiver", identifying himself as "the Court appointed receiver (the "Receiver") to Amerindo Investment Advisors Inc., Amerindo Investment Advisors, Inc., Amerindo Advisors UK Limited, Amerindo Management Inc., Amerindo Technology Growth Fund, Inc., Amerindo Technology Growth Fund II, Inc., Techno Raquia, S.A. (collectively "Amerindo")"-- **though there is no court order by which any such appointment was made** *and* the defendants' interests in the Amerindo entities are no longer "forfeited" if they ever were; Amerindo's owners disclaim any authority of Ian Gazes to act) -- applied for an Order "authorizing the Receiver to retain [a financial advisor] CBIZ effective [last] July 11, 2013 according to the terms and conditions set forth in [CBIZ's stunning] Engagement Letter, and such other and different relief".  The Receiver, states that the SEC signed off on that "Engagement letter", and refers to a disclosure of conflicts in that the Receiver has used this firm in seven of his matters *and* that the firm pays one of the witnesses against the defendants (Kassimir) who represented Lily Cates.  The Receiver states that *he (and apparently the SEC)* decided these conflicts should not disqualify his hand-picked advisors to do tasks that were in fact delegated *to the Receiver,* not meant for him to hand off to another "professional" for, in effect, compounded fees.  The Receiver seeks money presumably from the "forfeited" funds to pay these professionals for their "work."  There are no forfeited funds.  And there is a Stay entered in Mandamus action 13-2550 against any distribution of "substitute assets".  "Distribution" means use of these funds to pay people (and deplete the pot of funds), and that includes distributing moneys to the Receiver and his "professionals."  We object to any payment to these professionals and note the irony of the disenfranchisement of Mr. Vilar and Mr. Tanaka, who know their business and can achieve offshore distributions to their own clients without the use of expensive professionals who have to teach and assist Ian Gazes in what he should have known previously and accepted the assignment to complete himself .  Mr. Gazes was directly told by the SEC during the summer--unlike the bankruptcy proceedings he is accustomed to--he, or his appointees for assistance, could not assess an 'percentage' fee for his services.   Mr. Gazes appears to be determined to 'end run' the agreed $50,000 fee ceiling.   We ask for a hearing to examine and challenge Ian Gazes' time and expense records and object to the payment of *any* funds to Mr. Gazes or "his advisors."

We expect that Mr. Jacobson or the Receiver, will next make a motion or informal request to bar us further from making claims (though we have done so repeatedly with the statement that defendants' claim is to *all* the seized funds) or apparently also from having any say in their contemplated distribution of the previously denominated "substitute assets.".  On Friday, September 27, 2013, after I asked Mr. Gazes for a list of Amerindo claimants who have submitted claims to date (after Gazes asked for extra time to compile and check claims), Mr. Jacobson sent this blistering rejection of our request and the challenge that he will "urge the Receiver to seek to modify the claims process (or [the SEC] will do so on our own motion if necessary) to bar [Mr. Vilar and Mr. Tanaka] from having any say in the claims resolution process and from participating in the distribution of funds held in clients accounts".  Mr. Jacobson wrote me this:

> While I cannot speak for the Receiver, I will note that nothing in the Court's June 20, 2013 Order establishing the claims process requires that he provide you with a claims register.  Moreover, in light of the Second

conference to discuss these – and to discuss defendants' motion for a stay pending rehearing in the criminal case, a renewed request for CJA counsel fees to conduct this defense as to my clients' property rights, -- and, to the extent the SEC seeks reconsideration, a cross motion for reconsideration of the Court's denial of defendants' motion to dismiss the SEC case (rejected without stated reasons at the hearing on December 11, 2012) which we renew because this prosecution and the SEC's insistence that defendants litigate without their funds, violates the Constitution, and specifically the Due Process Clause, and defendants' Sixth Amendment right to defend.

    We seek a conference and a stay in light of the facts that:

(1) The premise of the Receiver's holding the JP Morgan-held assets is a forfeiture order that the Second Circuit has now ruled is to be *vacated entirely* along with the sentencing subject to a *de novo sentencing* (when the mandate issues). There is *no* "pot" of funds subject to court/ government control. Any government "rights" to those funds is reversed and will be vacated. Title "reverts" to the "owners" in that the interests the government wanted forfeited, are not forfeited. (AMI is the owner and

---

Circuit's affirmance of Mr. Vilar and Mr. Tanaka's convictions for securities fraud and investment adviser fraud, we will urge the Receiver to seek to modify the claims process (or we will do so on our own motion, if necessary) to bar them from having any say in the claims resolution process and from participating in any distribution of funds held in client accounts. *See, e.g., SEC v. Byers*, 637 F. Supp. 2d 166, 184 (S.D.N.Y. 2009) ("The Receiver's proposal to treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by caselaw."), *aff'd*, 2010 U.S. App. LEXIS 22080 (2d Cir., Oct. 25, 2010).

    We also see no need to seek a conference at this time. [email of 9/27/2013 9:44 a.m. from Neal Jacobson].

*Byers,* cited by Jacobson and one of the cases he litigated, apparently, was a Ponzi scheme case and there were not enough funds for the investors there. In this case "cutting" defendants out of their claims (they are **owed** fees that have accumulated in the "pot") constitutes some additional penalty not authorized by law but which the SEC wants to impose to punish and shut the defendants up. This also runs counter to what the Court ordered. This Court had ordered on June 20, 2013 that defendants as parties would have the right and opportunity to review and address the Amerindo clients claims (as had been agreed several times previously by the Receiver and the defendants). Now the SEC wants to deprive the defendants of even this right, though it "arises" by virtue of their ownership of property and status as defendants in this case and should not depend on the "largesse" of the SEC or its "receiver".

3

signatory on the JP Morgan accounts and directs JP Morgan to put the funds in interest bearing accounts and to restore accounts deemed abandon to live status.)

(2) The Court of Appeals, in the two consolidated Mandamus cases, one specifically involving the, criminal case and one the SEC case (see 13-2527 and 13-2550), Ordered that there be *no distribution* from the "substitute assets" pending the appeal.[2] (In issuing this Order, the Circuit plainly anticipated the *vacatur* of the substitute asset forfeiture order).

(3) There is no final appeal decision: the Court granted a Stay of the Mandate and extended our time for a Petition for Rehearing until October 11, 2013 – which may have to be extended more when (unfamiliar) counsel is appointed there for Mr. Tanaka. (This situation is not Mr. Tanaka's or Mr. Vilar's doing. Mr. Tanaka and Mr. Vilar have asked for release of the assets, and at least the assets of the UK Pension Scheme, a UK Entity that never "contained" "client assets" or any "proceeds." Mr. Tanaka has repeatedly asserted his right to counsel and/or to be heard *pro se* when by chance he *has* been given some notice of what the Courts were being asked to, and intended, to do *to* him (to his liberty and property). Mr. Vilar has repeatedly stated that he has not paid his caretaker lawyer, and therefore he did not have the opportunity to defend, much less notice of the SEC's "moves.")

(4) Mr. Tanaka's and Mr. Vilar's rights to be heard were cut off from the earliest days by arrangement of the SEC and purported "counsel" for Amerindo US at a hearing in the SEC case on June 1 and 2, 2005, of which Mr. Tanaka and Mr. Vilar never received Notice or an opportunity to be heard. At the time, they were incarcerated locally pending detention hearings and without counsel. No one told them about the SEC's TRO and civil case, and no one represented them at the TRO hearing on June 1 or 2, 2005. Their rights in their companies were effectively extinguished at that meeting, after which the SEC and DOJ got Bear Stearns and other banks to "voluntarily" freeze funds belonging to defendants' offshore companies. All without their knowledge. This is discussed further in DOC 591 in the criminal case, the response to the *Curcio* request.

---

[2] "It is further ORDERED that the motions in Case No. 13-2550 for a stay, and for reconsideration of the prior denial of a stay by the applications judge, are GRANTED in part, pending the disposition of the criminal appeal, Case Nos. 10-521-cr(L), 10-580-cv(CON), 10-4639-cr(CON). The motions for stay and for reconsideration are granted only to the extent that they request a stay of the distribution of the substitute assets." See DOC 25 in 13-2550 (specifically requesting a stay of the SEC's forging ahead with a Receiver using "substitute assets"); DOC 38 (disposition of the Mandamus petition).

4

(5) The SEC deprived, and continues to deprive, the defendants of their rights to due process. That they act in what they call a "civil" case does not insulate the duty of providing Notice and an Opportunity to be heard. As the Supreme Court stated in a *civil* case involving rights of trust beneficiaries to be heard, *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950), which seems perfectly intended to apply to an SEC Receivership over property of a defendant:

> Many controversies have raged about the cryptic and abstract words of the Due Process Clause, but there can be no doubt that, at a minimum, they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.
>
> In two ways, this proceeding [the proceeding before the Court to enforce or cut off beneficiary property rights] does or may deprive beneficiaries of property. It may cut off their rights to have the trustee answer for negligent or illegal impairments of their interests. Also, their interests are presumably subject to diminution in the proceeding by allowance of fees and expenses to one who, in their names but without their knowledge, may conduct a fruitless or uncompensatory contest. Certainly the proceeding is one in which they may be deprived of property rights and hence notice and hearing must measure up to the standards of due process.
>
> Personal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding. But the vital interest of the State in bringing any issues as to its fiduciaries to a final settlement can be served only if interests or claims of individuals who are outside of the State can somehow be determined. A construction of the Due Process Clause which would place impossible or impractical obstacles in the way could not be justified.
>
> Against this interest of the State, we must balance the individual interest ... . This is defined by our holding that **"[t]he fundamental requisite of due process of law is the opportunity to be heard."** *Grannis v. Ordean*, 234 U. S. 385, 234 U. S. 394. **This right to be heard has little reality or worth unless one is informed that the matter is pending**

> **and can choose for himself whether to appear or default, acquiesce or contest**.[3]

(6) Though on June 20, 2013, this Court approved the Receiver's plan to compile claims and submit them for review by parties including (not surprisingly) by the defendants, now SEC counsel Jacobson threatens that it will get the Receiver (though Mr. Jacobson assures he "cannot speak for [him]") to move to *modify* the plan to exclude the defendants entirely from any distribution process . Further, Mr. Jacobson writes, "I will note that nothing in the Court's June 20, 2013 Order establishing the claims process requires that he provide you with a claims register". Thus, Mr. Jacobson wants to deprive us of Notice and an opportunity to be heard about *our clients' claims*. (See Jacobson email 9/27/2013 9:44 a.m.). A court of law should not countenance this stunning "moving of the goal posts" for the SEC to achieve its ambitions after eight years of stagnation. Indeed, *laches* should be applied and their case dismissed. They have already achieved the ruin of Amerindo, and the lives of Gary Tanaka and Alberto Vilar.

(7) It has taken the SEC and DOJ eight-plus *years* to (try to) compile a list of Amerindo investors. By sentencing letter on February 3, 2010 Marc Litt said the government did not *know* who all the investors "out there" were.

---

[3] The Constitutional right to "Due Process of Law" extends to all government proceedings that can result in an individual's deprivation, whether civil or criminal in nature, from parole violation hearings to administrative hearings regarding government benefits and entitlements to full-blown criminal trials. The article "Some Kind of Hearing" written by Judge Henry J. Friendly, 123 U. PA. L. REV. 1267, 1275 (1975) (*citing Goss v. Lopez*, 419 U.S. 565, 579 (1975)) created a list of basic due process rights "that remains highly influential, as to both content and relative priority." These rights apply equally to civil due process and criminal due process and include:

> An unbiased tribunal.
> Notice of the proposed action and the grounds asserted for it.
> Opportunity to present reasons why the proposed action should not be taken.
> The right to present evidence, including the right to call witnesses.
> The right to know opposing evidence.
> The right to cross-examine adverse witnesses.
> A decision based exclusively on the evidence presented.
> Opportunity to be represented by counsel.
> Requirement that the tribunal prepare a record of the evidence presented.
> Requirement that the tribunal prepare written findings of fact and reasons for its decision.

None of these incidents of Due Process were offered by the SEC in this case at any time, and it is still in the business of taking action without notice in this case.

> The Receiver asked *me* to give him our "lists" to make sure he has the investors. This was like a small family of an investment company and in fact only Mr. Vilar and Mr. Tanaka *know* all the investors, because business has been done on a handshake and most clients are long-time friends, business associates or relatives. How can the SEC know if, say a recent claimant a Vilar nephew John Burke is genuine? (He says he has some account or his mother did; Mr. Tanaka and Mr. Vilar know there is no account for him, as (a) there was never a John Burke account and (b) Mr. Vilar once managed a small amount for his own sister Patricia (Burke's mother) but it was dissipated in annuity-fashion some time ago to care for Ms. Burke and to educate and provide for John Burke.) On the other hand, does the SEC know about a claimant Frank Harris, who recently thanked the defendants for remembering his account? Also, who will assume responsibility for making *wrong* payments? The government? In any event, since there are no "substitute assets" to use to pay claims, so why does the SEC care to be involved in this process at all? (While at the same time refusing to direct JP Morgan to credit interest to these "investor accounts", as it calls them?)

(8) There is also no disgorgement Order, and no disgorgeable sums. The SEC sought disgorgement based on "the principal amount of the restitution ordered" and prejudgment interest "from the date of the first violation." Aside from the fact that the restitution awards are vacated, the restitution order did not indicate a "principal amount;" there were neither indictment allegations nor findings in the criminal case as to the "date of the first violation." In any event, keying disgorgement to criminal case restitution awards is improper. Disgorgement prevents unjust enrichment; it is properly keyed to at least a rough approximation of *profits*. Unlike restitution, it is not supposed to be used as a vehicle to compensate victims. *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). Accord, *SEC v. Razmilovic*, (2d Cir. 2013) (upholding a default judgment for a fugitive who refused to appear to defend and refused to appear for an "SEC case" deposition, but in which the Court made distinctions between profits the defendant would have obtained absent "the fraud" and those "caused" by "the fraud," ruling there could be disgorgement only of the latter [4]– an examination never made in this case). (The fugitive in that

---

[4] The *Razmilovic* Court wrote in July 2013 (p.34): "Because the [disgorgement] remedy is remedial rather than punitive, the court may not order disgorgement above this amount." *SEC v. Cavanagh*, 445 F.3d 15 105, 116 & n.25 (2d Cir. 2006). The very purpose of the trial in this case was to allow the court to distinguish Razmilovic's fraudulent gains from those that did not result from his frauds, and to order disgorgement of only the former." The Court also noted that (unlike this case) "Razmilovic's potential monetary liability in criminal fines and forfeiture in the criminal case far exceeds the value of his frozen assets."

case was given much more "process" than the defendants in this case, who were hauled into court in a case ignored and in which they were then prevented from speaking or defending.)

(9) It is also unlikely that the SEC is entitled to a penalty given the Supreme Court's reversal of *Gabelli*. In any event there should be notice and an opportunity to defend against any sum the SEC claims to be a disgorgeable sum or a proper penalty. The SEC should be required to set forth the basis for any sums it seeks to take for disgorgement or penalites.

In sum, Ian Gazes *is not and never was a receiver of Amerindo Panama or any Amerindo company*. There is no order so appointing him. Nor could there be. The defendants' interests in the Amerindo entities are no longer forfeited. And the SEC has not shown entitlement to *any* remedy. It sought "substitute assets". There are none. And there is a stay of distribution. (Second Circuit 13-2550, August 21, 2013).

We will have to appeal any order directing the Receiver to use or pay any of the substitute assets to his professionals, himself, or anyone. We also want to see all of Mr. Gazes' billing and other records, and those of "his advisors". WE are parties in this case, and owners of the funds he purports to act for, and are entitled to see and challenge the taking of funds to pay him. We apologize to the Amerindo clients whose payouts will be further delayed because of the government's high-handed and dictatorial treatment of defendant's interests but cannot sit idly while *their* property and liberty is Taken (in violation of the Taking clause) because of the SEC and DOJ's insistence that the government be the sole conduit to payment Amerindo Panama clients' redemptions.

We suggest the need for a conference and ask for a stay pending rehearing. If anyone wants to actually *talk* to us to try to achieve a payout and/or to resolve the SEC case otherwise, we welcome it. We object to the high-handed destruction of our rights to Due Process, Notice, and an Opportunity to be heard and to defend.

                Very truly yours,
                /s/
                Vivian Shevitz

Cc:    All counsel (SEC and Criminal case)
        Michael Humes
        Jane Fisher-Byrialsen
        Andrew Fisher
        Don Kravet
        The Press