UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SEC v. Amerindo, et al.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

05 cv 5231 (RJS)
ECF Case
Declaration In Opposition To SEC's Motion
Pursuant to Rule 60 (b) (DOC 299) Seeking
Reconsideration Of
Partial Summary Judgment Ruling

Vivian Shevitz, under penalty of perjury, hereby declares:

1. I am counsel to Gary Tanaka and Alberto Vilar (with David Burger) in this case. I make this declaration in opposition to the SEC's Rule 60(b) motion for reconsideration asking the Court to find liability as to the Mayers based on the Court of Appeals' decision disagreeing with this Court concerning the Mayers claim.

2. Summary judgment is not appropriate here because there has been no final resolution of the issue of "domestic transaction" and the law is not settled. Although the Court of Appeals ruled that the Mayers' transaction occurred in Puerto Rico, there was no examination or cross examination on just *where* Lisa Mayer (or her father) "committed" to any transaction, and there was no jury determination on the issue. The Petition for Rehearing raises these points and this Court should await the appellate process before determining that judgment without a trial and without cross examination on this point should be granted. The Mayers may have been sitting in Puerto Rico (or may not have been) when they did or thought something but "committed" when they traveled to Geneva to transfer funds from Royal Bank of Canada to ATGF Panama.

3. Moreover no jury found specifically as to the Mayers that any alleged misstatement was "material" to any Mayer transaction, or that any "transaction" was within the limitation period for which the SEC may bring an enforcement action resulting in a penalty. The jury

found Counts One and Three proven, but not as to any particular investor. It never found (and neither did or could the Second Circuit) that there was a "material" misstatement in connection with any Aba/Daba (offshore corporations) purchase of any Panama product.

4. The Supreme Court held in *TSC v. Northway*, 426 U.S. 438, 450 (1976) that the issue of "materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts." The Court said that in considering summary judgment on the issue, the Court "must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a `reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." Fed R. Civ. P. 56(c) "permits summary judgment only when `there is no genuine issue as to any material fact.'" And "[i]n an analogous context, the jury's unique competence in applying the `reasonable man' standard is thought ordinarily to preclude summary judgment in negligence cases. See 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2729 (1973)." *Id.* In *TSC* there was nothing in any omission *so* compellingly "material", to warrant summary judgment. A trial was required.

5. A jury should also decide here. That fact has never been tried, and cannot be supplied without cross examination and adversarial testing.

6. Moreover the Second Circuit left open the question of just what the "offense conduct" *is* here. (Opinion p.54 paragraph (8) ("The District Court must, on remand, determine what acts constitute offense conduct for the purposes of calculating loss"). We think this must be determined before decisions of whether liability lies for that offense conduct.

7. *Gabelli*. Further the Supreme Court imposed a statute of limitations on the SEC in *Gabelli v. SEC*, 133 S. Ct. 1216 (2013). The SEC has not supported its right to any remedies here since it has not set forth "offense conduct" within the 5-year limitation period. Any statement about GFRDA occurred more than five years before the SEC commenced its action here. The SEC has not shown it is entitled to judgment as a matter of law.

8. *PUNITIVE* SANCTIONS WERE ALREADY OBTAINED BY THE SEC: In 2009, after the jury verdicts and before sentencing, Mr. Salzberg pursued (Administrative) sanctions against Mr. Vilar and Mr. Tanaka. He induced Mr. Tanaka, whose lawyers were departing because they could not be paid, to come *pro se* to his (Salzberg's) office where Mr. Tanaka signed off on what the SEC calls an "offer" to agree to the sanction of – essentially – lifetime disbarment, i.e., he could not "associate" with an investment adviser. (Mr. Tanaka says that he wanted to get this over with because he was being hounded and had no money to pay a lawyer.) Mr. Vilar's lawyer gave a *pro forma* response. Both were disbarred as investment advisors administratively for life, apparently, on the basis (as here) the criminal conviction. http://www.sec.gov/litigation/admin/2009/ia-2832-o.pdf (Order Instituting Proceedings against Messrs. Vilar and Tanaka); http://www.sec.gov/litigation/admin/2009/ia-2859a.pdf (Order as to Mr. Tanaka); http://www.sec.gov/litigation/aljdec/2009/id375bpm.pdf (Initial Decision with respect to Mr. Vilar); and http://www.sec.gov/litigation/aljdec/2009/ia-2882.pdf (Finality Order with respect to Mr. Vilar)

9. These penalties are deemed punitive sanctions. *Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996). They were imposed on top of the SEC's having exacted the ultimate penalty already on the Defendants and their showcase advisory company, Amerindo US, a $1.2 billion asset money management firm, destroyed on Day One 2005 and then left to be bled dry.

Amerindo was found *clean* by the SEC Monitor six months later and *no* client of Amerindo US lost anything.

10. Any further sanction would violate the successive sanction prohibition of the Double Jeopardy and the Eighth Amendment. *See Dept. of Revenue of Montana v. Kurth Ranch*, 511 US 767 (1994) ("tax" is not the type of remedial sanction that may follow the first punishment for a criminal offense; name of penalty is not determinative of whether it is punishment); *United States v. Andrews*, 146 F.3d 933 (D.C. Cir. 1998). *See also* an article about over-harsh punishment by the SEC, which does not have penal law power, but has seized and used it nonetheless. *http://www.bloomberg.com/news/2012-08-15/don-t-let-the-sec-punish-too-harshly.html* , and a piece suggesting that after *Southern Union v. United States*, 132 S.Ct 2344 (2012), there must be a jury determination of a punitive financial sanctions in any case. http://www.milbank.com/images/content/1/0/10281/Be-Careful-What-You-Wish-For.pdf.

11. The SEC also claims that the "equities" support its right to a Rule 60(b) ruling although it has never allowed fair litigation in this case.

12. On June 1, 2005 it commenced this case and sought a Receiver. It did not give Notice to Mr. Tanaka or Mr. Vilar, who were still awaiting detention hearings. It convened a hearing that went over to June 2, 2005. Only two SEC lawyers (Paul Gizzi and Kay Lackey) were present, along with a lawyer (Eugene Licker) whom the SEC "installed" as a stand-in attorney for Amerindo US. He never was appointed by Amerindo or its principals (the only decision makers); he never spoke to the defendants before, during, or after. He never told the defendants what happened. He never ordered the transcript. No one ordered that transcript (not even Gary Tanaka's SEC lawyer, Glenn Colton) until I did in July 2013, at my expense.

(I do not see the transcript docketed.  I will provide it if necessary but it should be filed).

13. Ms. Lackey read the criminal charges (not even an indictment; just criminal complaints) to Judge Swain.  No one with knowledge was there and no one defended.  Kay Lackey and Eugene Licker, whose sole proclaimed goal was to avoid indictment of Amerindo US, so he testified at the May 31, 2006 suppression hearing, had already "agreed" to just remove Gary Tanaka from the day-to-day decision making *and* trading at Amerindo US (and by extension all Amerindo entities);  Mr. Tanaka's lawyer did not challenge it later and at sentencing of Mr. Tanaka just accepted this as if it was a justified *fait accompli*.  (Eugene Licker didn't grasp the fact that "Amerindo" *was* wholly-owned by the individual defendants,  that Amerindo US had already been disenfranchised  by the publicized takedown and the outrageous public statements by the US Attorney that there would be client losses in the mega millions).

14. This "taking" that occurred on June 1, 2005-- of Amerindo US and of Gary Tanaka's and Alberto Vilar's rights to *manage* their own property, and of Amerindo Panama and UK's rights to control property – constituted a "remedy" far beyond any authorized penalty in the SEC's rightful arsenal, a decidedly punitive remedy, *and, further,* one imposed without Mr. Tanaka's or Mr. Vilar's knowledge, and without their input.

15. The SEC has continued to take the position that Mr. Vilar and Mr. Tanaka are not entitled to Notice or an opportunity to be heard (or to manage their own investment accounts). We have tried to detail these situations in submission to this Court, but this Court has rejected these efforts of the defendants to be heard. As stated at the SEC conference on October 25, 2013, the SEC and the Receiver do not even want to provide information and backup concerning client claims that have formed the very basis of this action.  In fact today, as I write this, the

Receiver just filed a letter with this Court stating that he has "elected" to" turn over copies of the proofs of claim to potential claimants providing the potential claimant agrees to *not* "share" proofs of claim or anything contained therein with ... the Defendants" or *any* third party" including counsel (Letter Gazes to Judge Sullivan 11-4-13) . Is this Due Process?

16. We do not know why this Court would, and does allow its Receiver and the SEC -- just a litigant before this Court – to belittle and dismiss Defendants' "requests" for Constitutional Due Process and does not say: 'Give the defendants the documents relevant to this "remedy", and let's hear the comments.' We cannot fathom why this Court has not even ordered: 'Yes, JP Morgan should credit interest on withheld accounts, as the defendants and investors are entitled to.' Why has the SEC not itself required this?

17. We further cannot understand *why* this Court has continued to pile on more and more SEC-case "sanctions" and "benefits-to-Mr.- Gazes'-associates-for-work-that-should- have- been-done-by-the-SEC-since-2005", when the very Order on which the Receiver was appointed is subject to a pending motion for reconsideration that we filed long ago which this Court fails and refuses to decide. At the same time the Second Circuit has ruled (along with the rulings that the government likes) that there are NO substitute assets for the taking because the forfeiture orders will be reversed and vacated. Quite shockingly this Court in fact did not *know* that the Court of Appeals *stayed* distribution of any "substitute assets" in the Mandamus action controlling this SEC case. (Tr. October 25, 2013, 25-26). This Court ought to be fully aware of this circumstance before authorizing action in anticipation of a payout that cannot be made out of "substitute assets". The *only* rights to control the property reside in the defendants as Sharon Levin stated when the "joint" hearings occurred. Now there is no forfeiture. It was done wrongly and needed to be vacated. There are no

substitute assets to "receive." Another mandamus petition may be in order and/or an appeal as of right as to the *injunction* imposing a Receivership while sitting on defendants' rights to appeal a final Order by not deciding our timely motion for reconsideration, as well as the wrongful withholding documents from parties against whom the SEC has taken dramatic steps to confiscate property (without yet any disgorgement order, which it needs another six weeks to figure out). This is not Due Process. Nor is the holding of Defendants' offshore funds and preventing them from managing them for almost a decade by reason of the "conduct and effects" test, or by inventing a remedy that does not exist.

18. As further consideration of "the equities", we have also shown that the Mayers and their attorney obfuscated the real nature of their claims, by litigating without notice in the State "civil" case they commenced on the "flipping" of a caption, and when the SEC and US Attorney were making it impossible for the defendants to defend. We incorporate by reference DOC 618, a response to Patrick Begos' letter accusing counsel of misstating the fact that his client testified she had settled with Amerindo Panama, and DOC 614, showing that when "losses" are discussed again we will *show* Mayer documents (in the SEC's and DOJ's possession) proving that their purchases were offshore and their tax cheating pre-dated their relationship with Amerindo or Vilar. The Mayers themselves chose their offshore structures and failed to pay taxes, probably even until now. Just as the SIPA Trustee for Madoff was turned down on a remedy because of the "*pari delicto*" defense, http://dealbook.nytimes.com/2012/04/10/a-roadblock-to-recovering-money-for-madoffs-victims/?_r=0 the Mayers should not be supported by the SEC because both of the inequitable *in pari delicto* conduct on the part of the Mayers and their counsel.

19. Further, we now see that the only basis on which the SEC has purported to act against

Amerindo Panama is the discredited conduct and effects test. A 1993 letter from the SEC to Alberto Vilar justifying its request for Panama documents makes that clear:

NDO INVEST ID:3038458138 JAN 26'93 20:39 No.004

Alberto W. Vilar, President
Page 6

Absent evidence to the contrary, Registrant is in violation of Rule 206(4)-2(a)(4). Registrant should immediately begin to provide the limited partners with quarterly statements as required by the Rule.

V. Failure to Provide Requested Documents

During the examination of Registrant, the examiners requested the trading records for client accounts of off-shore investment advisory firms that are owned and managed by you and Mr. Tanaka. While Registrant provided the staff with the trading records of the affiliated advisory firm registered in the UK ("Amerindo UK"), Registrant declined to provide the staff with the trading records of the affiliated advisory firm registered in Panama ("Amerindo Panama").

The Commission's Division of Investment Management has taken the position that, generally, the Act is applied to regulate activity taking place outside the United States where that activity produces substantial and foreseeable effects in the United States or involves conduct occurring in the United States.[1] Abusive practices such as front running and unauthorized principal and agency cross transactions involving the accounts of foreign clients or foreign affiliates could harm United States investors. For example, an adviser might sell a security from a foreign client's account to the account of a United States client without receiving written authorization from the United States client in contravention of Section 206(3) of the Act, which addresses such agency cross-transactions, or place foreign client transactions ahead of a large transaction by a United States client. The Act should be applied to such activities because they involve United States clients.

Currently, Rule 204-2 of the Act requires, among other things, that registered advisers maintain records of not only their trades, but also of trades by any controlling persons or affiliates thereof who obtain information about investment advice.

The San Francisco office requested guidance from staff in the Division's Washington office. The Washington staff has advised us that the operations of off-shore investment affiliates must be separate from the operations of the registered domestic investment adviser, particularly with regard to the persons providing advisory services, before there is a rational basis for

[1] SEC Division of Investment Management, Protecting

20. Another newly found document shows that the SEC was told that an SBA license was *not required* for the SBIC venture. The SEC was so told and suppressed this information, though government witness Carlos Castellanos was the source of this information given the SEC. As in the *Mahaffey* case the SEC continues its campaign of suppression of relevant information that should have been known to the DOJ and the defense. (We will raise these issues in a 2255 if necessary but suggest that relief should be given here as well):



**From:** Carlos Castellanos
**Sent:** Tuesday, February 4, 2003 7:16 AM
**To:** Kristen Kipp
**Subject:** RE: SBIC info

Dear Kristen,
You are actually in one of my favorite cities, but I have only visited. I don't know what it would be like to live there full time. I am sold on any place that has access to both the ocean and the mountains, but New York is New York. There is no question that most Californians, even transplanted ones, are mellower than New Yorkers.

Concerning the SBIC:
1. There is an Offering Memorandum dated March 4, 2002 that includes Matthew Fitzmaurice and is entitled "Amerindo SBIC Venture Fund LP". We should not give them that one. There is an earlier version, dated October 1, 2001, entitled "Amerindo Venture Fund LP", which is the one they should have. We are not hiding anything. They are esentially the same, except that Fitzmaurice put himself in as lord and master of everything, and now he is no longer with the firm.

I have hard copies, but I am sure that either Rick Cohen or Patton Boggs in Washington have it in electronic form.

2. Description of the entity. This is a venture capital fund for investing in expansion and late stage companies in technology and biotechnology that is seeking licensing as a Small Business Investment Company (SBIC) from the United States Small Business Administration (SBA) in Washington. The business form of the fund is a Delaware Limited Partnership which will ultimately have a General Partner (a special purpose company owned by Alberto Vilar and Gary Tanaka), private limited partners (to be determined) and the SBA as a preferred limited partner. If licensed, the SBA would contribute in equity $2 for each $1 of private limited partner capital up to a total of $50 million in private limited partner capital. Thus, the maximum size of the assets in the fund would be $150 million.

3. Current status. The license application is nearing the final stages of review by the Investment Committee of the SBA. It is impossible to predict the outcome or timing of their decision, but I am optimistic, as are Patton Boggs, and we should have a better idea of the outcome within 3 months. The fund would not commence operations until the final decision from the the SBA is known. If the license should be denied, the fund would raise capital and begin operations anyway.

4. Type of clients. If you are referring to investors in the fund, they would consist of a mix of institutions and high net worth individuals. In order for individuals to be allowed to invest, they must be accredited and qualified as defined by the SEC and the SBA. If you are referring to the fund's investments, these would be mainly expansion and late stage companies strictly in Amerindo's universe, namely, electronic technology and biotechnology.

5. Manager and/or advisor. Amerindo Investment Advisers Inc. will the fund's sole discretionary manager.

6. Fee Structure. The manager will charge the fund a 2% p.a. asset management fee of the assets actually invested. The General Partner will receive a carried interest of 20% of new profits, to be paid after statutory distributions have been made to the SBA and to the limited partners in accordance with SBA regulations.

7. Type of investments. direct equity investments in expansion and late stage companies.

8. Any Reg D filings. None. The fund is not active. It is still a work-in-progress.

I am sending yout this information by email because I have to attend a meeting outside the office at 10:30 and will be back around 12pm. Feel free to call me at any time after that to discuss.

Hope this helps.

Best regards,
Carlos

-----Original Message-----
**From:** Kristen Kipp
**Sent:** Monday, February 03, 2003 7:49 PM
**To:** Carlos Castellanos
**Subject:** SBIC info
**Importance:** High

Hi Carlos,
How are things going in NY? I have to say it is nice to be away from the cold weather of NY but I do miss the city. I guess I'm an east coast girl at heart.

Anyway, the SEC has come back with a request on further information regarding the SBIC fund. Dana mentioned to me that you told her that there are 2 offering memorandums for the fund, can you let me know which one we should give them? They also need the following additional information:

(1) description of the entity
(2) current status
(3) type of clients
(4) manager and/or advisor
(5) fee structure
(6) type of investments
(7) any Reg D filings - it's not active so this doesn't pertain, correct?

Please give me a call so we can discuss. You can call at 415-362-0692.

Thanks!
Kristen

P 00879

21. Meanwhile, the SEC continues to stomp on defendants' rights to their own funds and will not agree to release even the UK Pension fund, which is a standalone account belonging to a UK entity. In a recent decision where the SEC is represented by the same Paul Gizzi who took defendants' management rights away on Day One 2005, *SEC v. Pentagon Capital Management PLC*, 2013 US DIST LEXIS 151298 (October 21, 2013) Judge Sweet ruled that the SEC was wrongly holding funds that were needed for counsel and modified a restraining order to release such funds. (I apologize: I do not have a Westlaw subscription and so provide the Lexis cite).

22. Something must be done to "watch" the watchdogs who are asserting too much power and creating their own inequitable remedies. Why, for instance, is there different treatment of SAC Capital, who was not dealt a deathblow, even though *its* offenses affected the entire marketplace? Why is it "worse" to have (at most) "lied" to Lily Cates, one offshore investor,

or perhaps a handful of offshore GFRDA investors who we believe did not care what Amerindo invested in after purchasing an offshore product because they relied on the superb track records and integrity of the defendants, who never lost client principal? Why is SAC allowed to plead guilty and stay in existence (and if necessary liquidate on an orderly basis), and its principal is allowed to remain free, when the SEC brings the full force of the law and beyond down on defendants, now almost ten years later, without allowing for a full valuation of the "frozen" assets and without allowing defendants (parties to this case) to even see the documents on which the SEC expects to distribute funds?

23. The SEC's motion for reconsideration should be denied, and its case should be dismissed. We do not *need* the SEC at exorbitant extra cost to distribute offshore moneys just because it wants it. This Court said at the December 11, 2012 hearing that it is "always done this way." With all due respect, that is not a good reason to continue to do it. *Morrison* followed 40 years of "doing it this way" and ruled that it was not justified by law. The SEC should have to justify the penalty of taking away defendants' rights to manage the funds -- a different interest than any "forfeiture" or "disgorgement" or any other remedy to which the SEC is "entitled" by law. It has already imposed its administrative penalties and destroyed the value of the businesses and two men spent a combined six years in jail. Anything further is another violation of the Constitution. Summary judgment should be granted to defendants dismissing the complaint and letting them manage and return Panama clients' funds in an orderly way.

Dated: November 4, 2013 __/s/______________________

Vivian Shevitz