```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 3    SECURITIES AND EXCHANGE
      COMMISSION,
 4
                    Plaintiff,
 5
                 v.                        05 CV 5231 (RJS)
 6
      AMERINDO INVESTMENT ADVISORS,
 7    et al.,
 8                  Defendants.
 9    ------------------------------x
                                          New York, N.Y.
10                                        October 25, 2013
                                          3:30 p.m.
11
      Before:
12
                        HON. RICHARD J. SULLIVAN,
13
                                          District Judge
14
                            APPEARANCES
15
      U.S. SECURITIES AND EXCHANGE COMMISSION
16         Attorneys for Plaintiff
      NEAL JACOBSON
17    MARK SALZBERG
18    ROBINSON BROG
           Attorney for Defendant Vilar
19    DAVID BURGER
20    LAW OFFICE OF VIVIAN SHEVITZ
           Attorney for Defendant Tanaka
21    VIVIAN SHEVITZ
22    FISHER BYRIALSEN & KREIZER
           Attorney for Defendant Vilar
23    JANE FISHER-BYRIALSEN
24    ALSO PRESENT:  IAN GAZES, Receiver
25
```

dapgamec                              Conference

1              (In open court)

2              MR. JACOBSON:  Good afternoon.  Neal Jacobson.  With

3     me is Mark Salzberg from the SEC.

4              THE COURT:  Good afternoon.

5              I'll do the defendants and then come back to the

6     receiver defendants.

7              MS. SHEVITZ:  Vivian Shevitz for Mr. Tanaka.

8              MR. BURGER:  David Burger from Robinson Brog.

9              THE COURT:  Mr. Burger, good afternoon.

10             For Mr. Vilar.

11             MS. FISHER-BYRIALSEN:  Jane Fisher-Byrialsen.  I'm

12    here to observe because I think it's helpful for whatever comes

13    in the future for our other case.

14             THE COURT:  That's fine.  You can stay where you are.

15             And we have the receiver here, as well.

16             MR. GAZES:  Ian Gazes, the receiver.

17             THE COURT:  Good afternoon to you.

18             We're here in connection with a number of different

19    requests before the Court.  I guess I'll take them up in no

20    particular order, but I have except motion for reconsideration

21    of my prior summary judgment ruling by the SEC and also by the

22    defendants.

23             I issued an order this week asking the defendants to

24    respond to the motion for reconsideration filed by the SEC and

25    set a date for that.  You saw that, Ms. Shevitz?

dapgamec                    Conference

1          MS. SHEVITZ:  No.  I was driving here this morning and

2     something bounced this morning, but I don't -- obviously, I

3     can't see it when it's bouncing on my phone.

4          THE DEPUTY CLERK:  November 4.

5          THE COURT:  November 4 is the date that I set for

6     responding to the motion for reconsideration.  It's a fairly

7     discrete issue.  The circuit has ruled.  In that ruling they

8     said that they agreed with the SEC's position concerning the

9     Mayer transactions which I found there was insufficient

10    evidence from which to grant summary judgment on the Morrison

11    issue.  The circuit said no, not at all, we think that there's

12    enough there.  And they found my reasoning unpersuasive.  So,

13    that was the basis for the SEC's motion for reconsideration.

14    It seems like the circuit agrees with them.  So, it sounds like

15    the summary judgment order that I issued would be enhanced

16    because now a third victim would be deemed to have been

17    victimized in the United States, so Morrison wouldn't apply.

18    So, I think that's a very discrete issue.  You're obviously, on

19    top of it.

20          MS. SHEVITZ:  I can't say I'm on top of it.  I have

21    not seen the rule.  I not seen this today.

22          THE COURT:  You've seen the SEC'S motion for

23    reconsideration.  They filed it a long time ago.  The time to

24    respond to it should have been a while ago, but I just issued

25    an order directing you to respond.  That's an issue that I

dapgamec                          Conference

1    think is resolved.

2            I also have from Ms. Shevitz' motion or request for a

3    stay of the summary judgment ruling and also renewed requests

4    for CJA funds in this case.  I issued a ruling today in the

5    Mayer case on the CJA funds denying that request, and for the

6    same reasoning that's set forth in that decision, I'm denying

7    it here in the SEC case.  I'm also denying the motion for a

8    stay.

9            We're going forward on the SEC case now.  There's no

10   reason to wait.  And there's a lot of people who, frankly, I

11   think are waiting for us to get this going.

12           My principal concern then is what do we need do for

13   discovery.  I think I granted summary judgment on liability,

14   but not for damages.

15           What sort of damages discovery is going to be

16   necessary?  Mr. Jacobson, I want to hear from you on that.

17           MR. JACOBSON:  The only issue is in fact the amount of

18   disgorgement amount.

19           MS. SHEVITZ:  I can't hear you.

20           MR. JACOBSON:  The only issues with respect to damages

21   is with respect to your Honor's ruling on liability, based on

22   collateral estoppel for the specific investors who are involved

23   in the criminal case is the amount of disgorgement and penalty

24   for them.  In our papers, we did rely on the record in the

25   criminal case with respect --

dapgamec                    Conference

1        MS. SHEVITZ:  I can't hear you, Mr. Jacobson.

2        MR. JACOBSON:  In our papers on summary judgment, we

3   did, in fact, make a calculation based on the record that was

4   presented in the criminal case.  I understand Ms. Shevitz is

5   disputing the calculation of forfeiture and whatnot with

6   respect to that case, however, in that case, there was a

7   determination of a base forfeiture amount.

8        MS. SHEVITZ:  I can't hear you.

9        MR. JACOBSON:  There was a determination of a base

10  forfeiture amount which was the amount of money received by the

11  defendants, from specifically Lily Cates, the Mayers, Graciela

12  Chavez, Tara Coburn, and one other investor, Robert Cox.

13        So based on our papers, we believe that all we need to

14  show is a reasonable approximation of appropriate disgorgement.

15  In this case, as the defendants have acknowledged, all of the

16  money they receive has been commingled, all the investments,

17  from their hedge fund, ATGF, ATGF II, the Panamanian hedge

18  funds, that money has been commingled with the money that they

19  raised from the GFRA, as well.  My understanding is most of it

20  is in one account.

21        MS. SHEVITZ:  I can't hear.  And I really would like

22  to be able to hear what you're saying.

23        THE COURT:  Speak into the microphone.  I'm hearing

24  him okay.  If you want to move closer, that's fine, too.

25        MR. JACOBSON:  From based on the papers that we

1    presented, we believe that we have already shown the

2    appropriate amount of disgorgement with respect to those

3    investors, as well as the appropriate calculation for a

4    penalty.

5            As far as the discovery, to the extent we need to

6    establish new numbers, I believe that the process that

7    Mr. Gazes is involved in is probably the most accurate

8    process that could be used at this point in order to determine

9    the amount of disgorgement because of the commingling of the

10   funds and whatnot.

11           It's impossible for us to know independently how much

12   money was raised from each one of the investors and then the

13   appropriate calculation of the penalty in our view would be a

14   multiple of that number, as well.

15           I'm not aware of any discovery that we can take at

16   this point that would shed light on the amount of disgorgement,

17   other than what's already been presented in the criminal case

18   and the process that Mr. Gazes is going through right now.

19           THE COURT:  The short answer is you're not seeking any

20   discovery on that issue.

21           MR. JACOBSON:  No.  However, we would like to rely on

22   the report or the numbers and the amounts of claims that are

23   coming in through the receivership process.  Discovery, it's

24   only the amount of loss.  It's only the amount of money that

25   was received by defendants.  So, we have records that show

dapgamec                    Conference

1    amounts that were raised.  We could file another motion in the

2    context of the summary judgment to show money raised from the

3    defendants and present that and they can try to dispute it but

4    really the only issue here is the amount of money raised at

5    this point.

6          THE COURT:  So, you're saying you don't need any

7    discovery because you're going to be relying on what was in the

8    criminal record.  That's what you're saying?

9          MR. JACOBSON:  In our summary judgment papers, we did

10   rely on what was in the criminal -- we did rely on that.  We

11   also have our own records and we could supplement it with

12   affidavits and whatnot from our own examiners who have gone

13   through the various records and bank accounts to show money

14   coming in from various investors, but there's no other

15   discovery that we are aware of that would help in determining

16   that number.

17         THE COURT:  Remember, I didn't grant you summary

18   judgment with respect to damages or disgorgement, right?

19         MR. JACOBSON:  Correct.  My understanding, your Honor

20   did not grant it.  You did request that the receiver do some

21   due diligence and try to figure out the claims against the

22   amounts that are in the bank accounts.

23         My understanding was there was some connection,

24   perhaps.  Your Honor did not intend that there be any

25   connection between receivers' investigation and the amount that

dapgamec                     Conference

1    the defendants might owe; however, if we can supplement what's

2    in the criminal record with our own records and bank records

3    and work that was done by examiners to determine what came from

4    investors to the defendants' bank accounts and we could submit

5    that in another pleading, a supplemental pleading to establish

6    disgorgement specifically.

7            THE COURT:  Mr. Gazes, is your report getting into

8    what the gains or the profits of the defendants?

9            MR. GAZES:  No, my report does not get into that.  My

10   report only simply reflects what the proof of claims have been

11   and what the claimants are claiming.  It would be, I think, an

12   impossible task for us at this point to determine what profits

13   there would be since the money was commingled.  And in fact,

14   the bulk of the money is in an account that is unrelated to the

15   investment vehicles that were originally invested to begin

16   with.

17           THE COURT:  That's what I thought.  I just wanted to

18   make sure I wasn't missing something.

19           MR. JACOBSON:  Again, in the criminal case, the

20   amounts of forfeiture with respect to the specific investors

21   that are named in our summary judgment papers were determined

22   by the Court and those amounts were set forth by the Department

23   of Justice in their pleadings that indicated that that money

24   was money that was received from those specific investors, not

25   necessarily losses, but money that was received from them and

1    paid to the defendants.

2            The cases that we cite stand for the proposition that

3    our burden is to establish a reasonable approximation of

4    disgorgement; however, when the defendants have created a

5    situation such as these defendants have where all of the

6    records are mixed up and the money is commingled, it's

7    impossible for us to differentiate and figure out exactly how

8    much went to them individually or to their entities.  It's

9    their burden then to come back and explain and prove that, in

10   fact, this money should not be disgorgement.

11           So to the extent that those numbers are still valid

12   from the criminal case, we would rest on those numbers.

13           THE COURT:  Let me hear from defense counsel with

14   respect to this.

15           MS. SHEVITZ:  First of all, he continues to talk about

16   commingled money as if there's something wrong with that.

17   There's nothing wrong with that in foreign countries.  The

18   Capital Management case under the Second Circuit dealt with

19   commingled monies, and I believe it was a Revco subsidiary.

20   They were commingled funds in offshore accounts.  It's not

21   dirty.

22           THE COURT:  I don't think that's the point

23   Mr. Jacobson was making.

24           His point was that for purposes of discovering the

25   gain or the disgorgement amount, there's not much point is what

dapgamec                        Conference

1    he's saying because the commingling will make that process

2    virtually possible.

3            Is that what you're saying?

4            MR. JACOBSON:  Yes.

5            MS. SHEVITZ:  I don't know if that makes it impossible

6    because you have two individual defendants to see if they

7    gained.  Nobody has done that analysis ever, nobody has done

8    that analysis.  The forfeiture and loss amounts are going to be

9    vacated.  Those don't apply.

10           The forfeiture also implicates the restraining order

11   and I'm going to be moving to vacate the restraining order

12   because it's premised on the forfeiture amounts which are going

13   to be vacated, your Honor.

14           THE COURT:  I've now found liability.  There's now a

15   summary judgment that has found liability and is likely only

16   going to get enhanced because of the circuit's ruling.

17           MS. SHEVITZ:  I'm sorry, but that sounds like

18   prejudging this based on not getting de novo sentencing, of not

19   allowing us to show what was taken in and what the value of the

20   securities there and the accounts that remain for these clients

21   and yes, it is a hundred cents on a dollar.

22           THE COURT:  First of all, the circuit's ruling with

23   respect to Morrison was that Dr. Mayer or the Mayers were, in

24   fact, defrauded in the United States.  That's what they found.

25   That's not what you argued in summary judgment here.  And I

dapgamec                          Conference

found that there disputed issues of fact on that, but the

circuit has indicated in a footnote that they were not

persuaded by that.

          MS. SHEVITZ:  It's hard to know why the circuit is

ruling in a footnote, but the fact is, one of our petitions for

rehearing is based on the fact that if we're going to find

liability based on where Lisa Mayer was sitting at time she

thought about committing to an investment, then we ought to be

able to cross examine her.  This is a ruling made on nothing

except some deduction from a document and nobody has been able

to cross examine Lisa Mayer.

          THE COURT:  Lisa Mayer was cross examined.

          MS. SHEVITZ:  Not on that issue.  That wasn't an issue

at the time, the issue of where she was sitting when she

committed to the transaction was not an issue in any case.

          THE COURT:  But the circuit has already indicated

their view on this, right?

          MS. SHEVITZ:  And one of the things that we raised is

the right to cross examine before a finding of fact is made on

that kind of analysis.

          You may think it's not entitled to rehearing.  I don't

know.  I think it's a fairly decent appellate issue that we

ought to be able to cross examine someone before a finding is

made on where they were at a specific time.  That finding has

never been made.

1      But I have more important things, too, and that is,

2 they rely now, they meaning Mr. Jacobson and the SEC, on what

3 Mr. Gazes is doing with his proofs of claim.  Mr. Gazes and the

4 SEC are taking the position that we, the defendants, are not

5 entitled to see the proofs of claim or to take notes on them or

6 to comment on them or to be heard on them at all.

7      Frankly, I don't understand how we can litigate a case

8 as parties to a case and be deprived of notice and an

9 opportunity to be heard and the right to receive documents on

10 what our investors claim are their losses and the amounts that

11 they're going to be charged with.

12      I will have to take that up to the circuit if this is

13 what's going to happen.  And this receiver, yes, he's not my

14 receiver, you made that clear, but he was appointed to do

15 certain tasks.  And we agreed to $50,000 if he was going to see

16 what was being held and how much the claims were and the value

17 of the private equities.  That hasn't happened.

18      Now, they want to say we're not even entitled to see

19 the proofs of claim.  And if I want to give Mr. Gazes three

20 potential times that we can walk into his office and look at

21 the proofs of claim but not take notes, then maybe he'll

22 consider that.

23      They don't want to give us the proofs of claim because

24 just as you were told at sentencing, they want to say that the

25 presence of these funds, we still don't know how much, is not

dapgamec                        Conference

1    relevant.  I think that's very highly relevant.  And this is

2    the same thing that's going through the entire case; let's not

3    tell the judge how much is really there.

4           THE COURT:  That's exactly what Mr. Gazes has been

5    charged with.

6           MS. SHEVITZ:  He's not doing that because we asked

7    where the money is.  There was a Cayman account.  I asked where

8    the money is from the Cayman account and how much.  I was told

9    go ask the liquidator.  Well, nobody talks to us, but these are

10   our funds, these are the Amerindo funds.

11          Now, there is a reversal.  There will be a reversal of

12   a forfeiture order so the right, title, and interest to

13   Amerindo and their entities returns to the defendants.  They do

14   have an interest in it.  It is their companies.  If they want

15   to take it away and they want to take everything away, can't we

16   do it with notice and an opportunity to be heard on all the

17   relevant factors and the data?  I don't know what the proofs of

18   claim are.

19          All I know is that Mr. Gazes submitted some really

20   incomprehensible claim registry which Mr. Jacobson told me I'm

21   not entitled to get that either.  They said Judge Sullivan

22   didn't say you're entitled to get the claims register.

23          THE COURT:  I'm not sure what Mr. Jacobson --

24          MS. SHEVITZ:  With all due respect, there's no vehicle

25   for just talking about what's going on here.  Every time I try

dapgamec                        Conference

1  and say something it goes beyond my three-page limit or my

2  ten-page limit and I can't show you that there is enough money

3  there.  I can't show you the amounts.  And another reason I

4  can't show you the amounts is because they're not telling me.

5  They're not telling me.  They're saying that's all the SEC is

6  going to tell you now.

7          Do you know that on the very first day of this case

8  they brought a TRO while these two men were in jail awaiting

9  their first detention hearing and they were not served.  So,

10 they didn't know that the SEC was installing a receiver or

11 monitor.

12         THE COURT:  That's what a TRO is.  It's without

13 notice.  You're not familiar seriously?  You just said there

14 was a TRO and they weren't served.

15         MS. SHEVITZ:  No.  Then it became a preliminary

16 injunction matter and Judge Swain talked about it, but these

17 men and their views and their defenses were not before the

18 Court and never were, never were.

19         I brought that up again with Mr. Jacobson.  He said

20 it's a little late to complain now, but I'm complaining now

21 because nobody looked at the transcript before.  Mr. Tanaka,

22 yes --

23         THE COURT:  Again, my focus here is simply on what we

24 need to do --

25         MS. SHEVITZ:  Yes, what we need to do --

dapgamec                    Conference

1          THE COURT:  -- to establish disgorgement.

2          MS. SHEVITZ:  I don't know what the claims are because

3     I'd like to see all the proofs of claim and the backup because

4     I can't participate intelligently, or at all, without seeing

5     that.

6          I find it really amazing that the SEC is taking the

7     position that parties to the proceeding whose property they

8     want to confiscate and already have in forfeitures and in

9     restraints and in de facto restraints can't even see the basis

10    for it.

11         THE COURT:  You've made that point several times.

12         Mr. Gazes, your name has been taken in vain by the SEC

13    and by -- maybe not you, but your name has been referenced by

14    the SEC and by Ms. Shevitz.

15         Mr. Burger, actually, I jumped over you.  Is there

16    anything you want to add?

17         MR. BURGER:  No, your Honor.  Thank you.

18         THE COURT:  Sorry about that.

19         MR. GAZES:  I do want to address a few points that.

20         THE COURT:  Keep your voice up.  Move that mic a

21    little closer.  It's an acoustically challenging environment.

22         MR. GAZES:  Certainly, I'm surprised by Ms. Shevitz'

23    statements because at the beginning of my employment, I handed

24    over to her every JPMorgan statement that was in my possession

25    reflecting what was in the accounts before they were even

dapgamec                          Conference

1    turned over to my office.

2           To suggest that something different happened to the

3    amount of money that was in JPMorgan accounts to when they were

4    transferred in my name, I don't understand.  They are what they

5    are.  She has the statements and I give them to her.

6           I also invited the defendants to come to my office and

7    review the claims.  I think it's important that they review the

8    claims.  There may be information that they have that I'm not

9    aware of.  What I asked them to do is to not take the claims or

10   otherwise copy them.

11          Ms. Shevitz wanted to take the claims.  She actually

12   asked me to email and send them to her.  In light of the two

13   letters that the defendants sent to investors, which appear to

14   me to reflect that they were still in control or going to be in

15   control of these funds, I felt that I didn't want to reveal who

16   all the claimants were by giving them all the documentation.

17          But I gave them the invitation to come to my office

18   and review those proofs of claim and that invitation is still

19   open.  There was no reason for me not to give them that

20   invitation.  So I don't understand that.

21          Furthermore, to continue to argue that they're not

22   aware of what's out there is kind of ridiculous at this point.

23   The cash is what is cash is.  They have the bank statements.

24   None of those statements have changed since the transfer into

25   my name.  What the Cayman Island money is going to be, we don't

dapgamec                    Conference

know yet for a certainty because it hasn't been revealed to me

yet.  I'm still waiting for the receiver's report there.  And

the only other monies that may be out there may be some

escheated funds or some miscellaneous accounts or some accounts

that were held in other entities, which, by the way, would be

in the defendant's knowledge which they are not revealing to

us.  So they're forcing me to go out and spend time --

          MS. SHEVITZ:  Excuse me.  I didn't hear what we're not

revealing to him.  What is that?

          MR. GAZES:  All the money, all the accounts, where is

it all?  I've asked you to tell me that.  I even asked you to

give me the list of investors that your clients are sending

letters to and you refuse to do that.  You referred me to the

government again.

          I don't understand where you're coming from here.  I

tried to work out an agreement with them.  They keep on saying

they want all the investors to get their money, but they

wouldn't enter into an agreement with me either.

          I don't understand.  What's revealed on the docket is

all the claims that have been filed.  Ms. Shevitz has all the

statements.  What she doesn't know is what we all don't know,

what the value of the private securities will be.

          They will be the value that we can get in the open

market.  Nobody really knows, but she talks about Mr. Ross'

report as if it's a fait accompli that that's what the value is

dapgamec                    Conference

1    and if that's what she believes, then she knows what the value

2    of the private securities are, too.  So, frankly, she has

3    almost 90 percent of the picture of her own possession right

4    now.  I don't understand.

5              MR. JACOBSON:  Just one more thing.

6              THE COURT:  Quickly.

7              MR. JACOBSON:  Going back to your initial question,

8    which is whether we need additional discovery, I believe that

9    in the context of the sentencing, at the very least, it will be

10   a recalculation or a resubmission of evidence regarding

11   forfeiture, which I think is directly related to our

12   disgorgement claim.

13             THE COURT:  You're asking the SEC case to follow the

14   criminal case?

15             MR. JACOBSON:  Just with respect to amount of money;

16   however, we don't have to do that.  We can go out ourselves

17   -- I don't think we need discovery because I think most people

18   would cooperate with us to just give us whatever we need.

19             However, we are willing to depose investors and go

20   through our files again and we can submit an affidavit from our

21   examiners who go through the files to see how much money was

22   actually raised from the specific investors and we can present

23   it to the Court that way.  However, we think it might be coming

24   up again anyway in criminal court.

25             THE COURT:  I don't know when the mandate is going to

1   come down with the criminal case, and that's why I wanted to

2   jump-start the SEC case.

3          MR. JACOBSON:  Then we are willing to on our own try

4   to come up with the exact numbers related to disgorgement with

5   respect to the specific investors that were part of the

6   criminal case and part of our summary judgment.  In that

7   context, though, I would expand that to include potential

8   disgorgement sums from the entities from the context of a

9   motion for default judgment as well with respect to the

10  Amerindo entities themselves.

11         THE COURT:  I'm not sure I understand what you're

12  saying when you say you're going to, on your own, get

13  information from various sources.

14         MR. JACOBSON:  We have records of the same bank

15  accounts that Mr. Gazes now has that shows money coming in from

16  various investors into Amerindo accounts.  That would be our

17  calculation of disgorgement with respect to specific investors.

18  That's to show how much, what money was received by the

19  defendants.

20         THE COURT:  It sounds to me you're just talking about

21  making a supplemental submission that relates to disgorgement

22  with affidavits or attachments from trial sources or --

23         MR. JACOBSON:  Or from investors, specific investors,

24  and from our own records that we have.  And there are

25  additional investors -- in our complaint, we mentioned several

1   investors who were not part of the criminal case they were ATGF

2   II investors.

3          THE COURT:  I get that Ms. Shevitz and Mr. Burger are

4   going to say I'm not going to take that on faith.  So, there

5   may be a request then to depose or get other documents.

6          MR. JACOBSON:  No, I understand that, but I don't

7   believe the SEC needs to engage in discovery specifically in

8   order to substantiate disgorgement; however, I understand if

9   they would like to respond.

10         THE COURT:  This is what I propose:  It seems to me

11  the SEC is indicating it has no desire for discovery and wants

12  to move for summary judgment on disgorgement and damages, for

13  lack of a better word, I would propose that we set a schedule

14  for them to do that.  And then the defendants get to respond to

15  that and get to say, well, we think we need additional

16  discovery before this is resolved and here's is the discovery

17  we would need, at least.  And then we would be addressing both

18  the need for discovery and other substantive points as part of

19  that briefing.

20         MS. SHEVITZ:  I am the practitioner really who got

21  into this case defending them on appeal.

22         THE COURT:  Right.

23         MS. SHEVITZ:  And I'm dragged into this case now

24  because it deals with a quote "substitute assets" which are not

25  substitute assets anymore.  I'm not in a position to undergo a

dapgamec                    Conference

lot of discovery, but I am in a position to ask for the proofs

of claim and other backup that Mr. Gazes said.

        Let me respond to what he said about he didn't say we

couldn't have them.  Email, October 4, and I would send it in,

October 4, 2013:  Ms. Shevitz, unless the Court orders

otherwise and as stated in the report, the receiver has no

intention of sharing the proofs of claim with your clients as

demand.  Should the defendants wish to examine the proofs of

claim at my office and agree in writing prior thereto not to

take notes and/or copy the papers, your clients are welcome to

do so.  Please forward three proposed dates and times and we

will respond.

        That's what I have to do to get the proofs of claim in

a case that they're dealing with our assets?  And there's a

forfeiture order that's reversed.  Really?  Is that what I have

to do to get them to not take notes and go take a look at them

in his office and then go through discovery?  I can't do that,

Judge.

        THE COURT:  I'll let Mr. Gazes respond on his own, but

my sense was this was after the defendants had basically made a

mass mailing to investors in an effort that Mr. Gazes --

        MS. SHEVITZ:  Excuse me.

        THE COURT:  No, I'm not going to excuse you.  You're

going to sit down.

        MS. SHEVITZ:  I'm sorry.

dapgamec                    Conference

1        THE COURT:  I think Mr. Gazes was concerned that you

2   were interfering with the task that he had been given by the

3   Court.

4        Is that what was going on, Mr. Gazes?

5        MR. GAZES:  Absolutely, that's exactly what was going

6   on.  And so I thought the best way to deal with that was to

7   offer for them to come in, they can review the proofs of claim,

8   they can provide me with what information they have by

9   reviewing the claims, and I can deal with it at that point.

10        But I was very concerned, based on the two letters

11   that had gone out and continue to hear in argument today before

12   you, that for some reason, they think it's their money.  And

13   that's very disturbing when you have people sitting here, 34

14   claimants, who are out money for ten years, some destitute and

15   in need of their money back.

16        So, I offered for them to come in and give me their

17   thoughts with regard to the filed proofs of claim.  I have not

18   permitted anybody who is coming into my office to look at the

19   proofs of claim to copy them.  In some circumstances, I have

20   sent them out.

21        But with regard to the defendants, since those two

22   letters went out and it appeared to me that they seemed to be

23   making the representation that they were going to be in control

24   of these funds and otherwise the disbursements of them, I was

25   worried that they were going to contact and find out more

1    people to, again, send out a third letter, and that was my

2    premise for it.

3         THE COURT:  But going forward now, with respect to the

4    proofs of claims that have been submitted which you've

5    tallied, the books are closed on that at this point; is that

6    right?

7         MR. GAZES:  That's correct.

8         THE COURT:  What are you seeking now Ms. Shevitz?

9         MS. SHEVITZ:  I'm seeking all the backup and all the

10   proofs of claims and all the documents that were submit so I

11   know what the claims are.

12        I'm seeking the information about where the assets

13   are, what has been gathered.  I'm seeking information about why

14   nobody has told JPMorgan to credit interest.  If there's a

15   receiver of assets -- nobody's even asked JPMorgan which has

16   been sitting on accounts without crediting interest for ten

17   years now why is a receiver who is supposed to be maximizing

18   the value not doing that?  I'm also asking why, if when the

19   receiver was first appointed to evaluate the private equities

20   and all of the assets, why wasn't that done?  We still don't

21   know what they are.

22        I'm asking a lot of questions, but right now I would

23   like to get copies of the documents and information about what

24   assets are being held, where are they, under what circumstances

25   because we do have an interest in the assets.

dapgamec                         Conference

1          Now that the Court of Appeals has reversed or said it

2     will reverse when the mandate issues the forfeiture and the

3     restitution especially and we will ask for a jury trial on

4     forfeiture on our resentencing under the rule, if there's going

5     to be any forfeiture, we want to know what the evidence is.

6          Mr. Gazes refuses to give it to us.  He says he

7     invited us into the office; yes.  He invited us in and then he

8     wanted us to settle with a release, a general release of

9     everybody or else you can forget it.

10          And I said forget it, we're not releasing anyone yet.

11     We'd like to have the information.  We'd like to have

12     knowledge.  We would like to have notice and an opportunity to

13     be heard about what the facts are.

14          THE COURT:  I understand, but what is the interest

15     that you believe your clients have?  Mr. Vilar and Mr. Tanaka

16     have made a claim?

17          MS. SHEVITZ:  Yes.

18          THE COURT:  For how much?

19          MR. GAZES:  There's been no claim filed by Mr. Tanaka

20     or Mr. Vilar with me.

21          MS. SHEVITZ:  We have explained to Mr. Gazes that the

22     interest of the defendants is the remainder after the client

23     claims of May 25, 2005, are paid in full on the accounts.

24     That's our interest.  It's the remainder.  It's not a claim

25     based on a certain amount now.  We have said that.  He refuses

dapgamec                     Conference

1    to put it in because this is more prepunishment.  I don't know

2    why; I don't get it.

3           But also there are issues of Gabelli now.  Are there

4    going to be sanctions, financial sanctions, based on conduct

5    five years earlier?  We would like to be able to argue about

6    that.  I don't know when it was.

7           THE COURT:  This is where we're going to go with this

8    then.  I'm going to allow the SEC to make their motion with

9    respect to summary judgment on disgorgement and penalties.

10          I'll then give the defendants an opportunity to

11   respond in which they can articulate the need for additional

12   discovery, and they can also make the legal arguments, some of

13   which have been referenced today.

14          MS. SHEVITZ:  Thank you.

15          THE COURT:  Then the SEC will get a chance to reply.

16   In the meantime, the receiver will continue in compliance with

17   the orders that I have issued because I do think it's important

18   that we get these assets valued and that we start making

19   distributions as quickly as we can because it seems to me that

20   there is no dispute that there are investors who are out money

21   who need to be repaid as quickly as possible.

22          MS. SHEVITZ:  In the mandamus proceeding, the Court of

23   Appeals said there was to be no distributions pending Court of

24   Appeals decision.

25          THE COURT:  In the criminal case.

dapgamec                    Conference

1          MS. SHEVITZ:  No, in the SEC case, in the SEC case.

2     One of the mandamus actions was as to the SEC case.  It was in

3     that action, I don't know whether it's 1325 -- 27 or 132550,

4     it's one of them, but it's the SEC case that the Court of

5     Appeals said there is a stay of any distribution of the

6     substitute assets or those assets pending the criminal case.

7          THE COURT:  Right, I understand that.

8          MS. SHEVITZ:  That stay is in effect.

9          THE COURT:  I'm saying I want to get to the point

10    where we can make distributions.  Things have to happen before

11    we do that, but I'm not waiting until the criminal case is

12    resolved before we start valuing and preparing to make the

13    distributions.  We're not going to make them until we can.

14         MS. SHEVITZ:  Okay.

15         THE COURT:  But I'm not going to sit down and do

16    nothing because years will go by potentially.

17         MS. SHEVITZ:  We said we agreed to distributions but

18    nobody wants to talk to us.

19         THE COURT:  I think that's disingenuous.

20         MS. SHEVITZ:  It's not disingenuous.  We can't do it.

21    We can't do it.

22         THE COURT:  You can't do what?

23         MS. SHEVITZ:  We can't make a distribution because

24    their thumbs are on the scales here.  How can we make a

25    distribution?

|  |  |
|--|--|
| 1 | THE COURT:  If the parties came to an agreement about |
| 2 | distributions, we can easily make those distributions.  We've |
| 3 | had conversations on this subject.  And you and your clients |
| 4 | declined to do this.  Sharon Levin was in the room.  I recall |
| 5 | this distinctly Judge Swain and I were there together. |

THE COURT:  If the parties came to an agreement about
distributions, we can easily make those distributions.  We've
had conversations on this subject.  And you and your clients
declined to do this.  Sharon Levin was in the room.  I recall
this distinctly Judge Swain and I were there together.

MS. SHEVITZ:  Yes, because we don't have a full value
of all the assets, Judge.  We asked for valuation of these
private equities.  It hasn't been done.  That was in your
Honor's first order.

THE COURT:  These private equities are hard to value.

MS. SHEVITZ:  I understand that.  In fact, our first
hearing --

THE COURT:  Mr. Gazes, that's in the cards?  That's
what you plan to do.

MR. GAZES:  Yes, it is, but once again, let's discuss
the disingenuousness of the argument.

My settlement discussions with Ms. Shevitz and the
defendants was part and parcel of setting aside the valuation
of the private equities and not pursue them at this point,
including the dissolution of the pension plan, pending a 50
percent distribution on initial claims only because Mr. Tanaka
and Mr. Vilar assert a claim to all money that was earned
post-2005.  That was part of the agreement.  I have nine drafts
of it to show you if I had to.  So, I don't understand how that
argument is being made now.  But we will and we are and I have

1    contacted a company to undertake the review of the private

2    securities and make a determination as to what value they can

3    fetch for us.

4            But all other assets have been fully disclosed.  There

5    is nothing of mystery here.

6            THE COURT:  Why are we not making a distribution on

7    the cash?  I don't understand.  What is the reason for not

8    doing that?

9            MS. SHEVITZ:  I don't know all the claims, Judge.  He

10   won't give me the claims that he has.  He won't let me dispute

11   them or say, hey, this guy who they're relying on, Burke, he

12   doesn't have a claim.  Who else is there?  I don't know.

13           There's a list of claims now that have people that are

14   not claimants.  Mr. Gaze's, as recently as October something,

15   asked me for our list because he doesn't know who the claimants

16   are.

17           THE COURT:  He's interested in getting information

18   from all sources.  There may be disputes.  That's the process

19   that has to be gone through.

20           MS. SHEVITZ:  I heard you, but it's not happening.

21   Sharon Levin, in the beginning of the case, from something I

22   quoted said, she just realized, gee, there's long-term family

23   investors in this business, a lot of them don't have backup.

24   We know that.  The real repository for who has claims is these

25   men's account, these men's minds, and nobody wants to talk to

1    them.  They just want to demand things from us.

2         THE COURT:  Mr. Gazes, do you not want to talk to the

3    defendants?

4         MR. GAZES:  I absolutely do.  And I have been, I met

5    them in my office when I was first appointed.  I invited them

6    to come back to my office and sit with me to go through their

7    claims and give me their thoughts.  I don't understand why this

8    argument is being made before you.

9         THE COURT:  I'm not sure either.

10        MS. SHEVITZ:  Because I haven't been able to explain

11   it well, I guess.

12        THE COURT:  Not from lack of having time, so we're

13   going to cut this short.

14        MS. SHEVITZ:  Can I get the backup to be able to

15   respond to whatever the SEC says?  I can't do it without

16   knowing what the facts are now.

17        THE COURT:  I don't know what the SEC is relying on in

18   their papers.  When you see the SEC's papers and you believe

19   you need additional discovery to respond to the summary

20   judgment motion, then you get to make that argument.  That's

21   not unusual.

22        MS. SHEVITZ:  I want to say something about these

23   client letters that were written.

24        Yes, Mr. Tanaka and Mr. Vilar, who have been out of

25   communication with their clients and it's a family group for

dapgamec                    Conference

1   all these years, wrote a nice letter to their clients.

2              THE COURT:  A nice letter.

3              MS. SHEVITZ:  Have you seen it?

4              THE COURT:  I have seen it.

5              MS. SHEVITZ:  You have seen it?

6              THE COURT:  I have.

7              MS. SHEVITZ:  Is there something wrong with it?

8              THE COURT:  I think it's inappropriate at this stage

9   of the game.

10             MS. SHEVITZ:  For them to communicate with their

11  clients?

12             THE COURT:  Yes, when I appointed a receiver whose job

13  is tasked to do this.

14             I didn't issue a gag order or an order preventing it.

15  So, I haven't held anybody in contempt.  I'm not going to do

16  that, but I do think it was a little cute, and it did suggest

17  to me that there's a real intention here to mess with the

18  receiver in the tasks he's been given.

19             MS. SHEVITZ:  We're not messing with the receiver.

20             THE COURT:  I hope not, because that would be a

21  3553(a) factor, too.

22             MS. SHEVITZ:  I hear you.  In fact, the letter told

23  the clients to cooperate with the receiver.  I don't know if

24  that's before the Court.  But instead of maligning the

25  defendants without a chance to respond, can we put the letters

dapgamec                        Conference

 1  in evidence and look at those?

 2          THE COURT:  In evidence for what?

 3          MS. SHEVITZ:  On, this record, when they're talking

 4  about --

 5          THE COURT:  All I'm trying to do now is set a schedule

 6  and you keep injecting new issues.

 7          MS. SHEVITZ:  I'm talking about an appeal record, as

 8  well.  And before people are talking about letters, innocuous

 9  letters, saying, hello, we're still here, if this is

10  overturned, we intend to pay you, there's something wrong with

11  that, to write to their own investors in Panama?

12          I'd like to put this letter before the Court of

13  Appeals.

14          THE COURT:  You can do what you want.  I have to

15  establish this usually for most lawyers, but I have to convey

16  that you don't have unfettered discretion to my time.  You

17  don't.  You're not entitled to it.  You don't get to just say

18  whatever pops into your head in whatever order it comes in, the

19  same with your letters and your submissions, okay?

20          You have to get to point.  You have to cite authority.

21  And you have to start recognizing that you are not the only

22  lawyer in the courtroom, and you're not the only case on the

23  docket.

24          When does the SEC want to make its motion for summary

25  judgment motion with respect to disgorgement and penalties?

dapgamec                    Conference

1          MR. JACOBSON:  If we could have six weeks to file.

2          THE COURT:  Six weeks.

3          THE DEPUTY CLERK:  December 6.

4          THE COURT:  I'll give the defendant six weeks to

5    respond.  That's right by the holidays.  I'll give you seven

6    weeks.

7          MS. SHEVITZ:  We would also like to see the JPMorgan

8    statements going forward, too.  We have not gotten them except

9    once or twice.  They're being withheld from us.  We'd like to

10   be able to see these things to participate knowingly in this

11   and intelligently.

12         Also, since your Honor directed a response in the

13   motion for reconsideration of summary judgment that's pending,

14   can we just put this all together, so I can respond to that, as

15   well as this disgorgement?

16         THE COURT:  The motion for reconsideration has been

17   pending for how long?  When did you make it?

18         MR. JACOBSON:  I believe within ten days or so after

19   the Second Circuit.

20         THE COURT:  You were supposed to respond it to and

21   just didn't do it.  I have given you two weeks to just rule

22   without anything from you, but you have two weeks to respond to

23   that.  I gave you until November 4.  So whatever that is, ten

24   days, but you've had months to do that.  They responded to

25   yours.

dapgamec                      Conference

1          MS. SHEVITZ:  Yes.  I asked them for an agreement to

2     put it off because I was moving.  I know you didn't think it

3     was that much of a deal but it was deal.

4          THE COURT:  I accommodated every request you made

5     during that time.

6          MS. SHEVITZ:  I'm saying if we're having summary

7     judgment submissions, can't we put it all together with their

8     next summary judgment submission?

9          THE COURT:  No.  One is a motion for reconsideration

10    on a summary judgment ruling I have already issued on liability

11    and that relates only to a discrete issue that's in the Second

12    Circuit's decision in the criminal case.  That's very discrete.

13    That's that motion.

14          The motion now we're talking about is with respect to

15    disgorgement, and that I'm giving you more time for, the SEC is

16    going to file by December 6.  And then I will give you until

17    January 24.  I'll give you to the 24th.  And if there's going

18    to be a reply at that point, February 3.

19          In the meantime, the receiver will continue complying

20    with my prior orders.  The receiver has requested that I extend

21    the claims objection date to February 8.  I will grant that

22    request with the understanding that that time will be used to

23    try to resolve disputed claims and try to reach a consensus

24    with respect to most of the claims.

25          This is not going to be an easy process, but it seems

dapgamec                    Conference

1    to me that most people should all be on the same page as trying

2    to nail this down with the most accurate information possible.

3    So I'm going to grant that request, as well.  In the meantime,

4    I don't know when the criminal case will come down, when the

5    mandate will come down, but if and when it does, then that

6    might alter some of this schedule, but I'm not waiting for

7    that.  I want the SEC case moving forward.

8              MR. GAZES:  Yes.

9              THE COURT:  Is there anything else we need to cover

10   from your perspective?

11             MR. GAZES:  No.

12             THE COURT:  Mr. Jacobson?

13             MR. JACOBSON:  No.  Thank you, your Honor.

14             THE COURT:  Mr. Burger?

15             MR. BURGER:  No.

16             THE COURT:  Ms. Shevitz?

17             MS. SHEVITZ:  No.

18             THE COURT:  Thank you all.  We thank the court

19   reporter for her time.  She has been working the entire time.

20   Thank you.

21             If anyone needs a copy of the transcript you can take

22   that up with her now or through the website.

23             MS. FISHER-BYRIALSEN:  We don't have a date in other

24   case in the criminal case to come back for a decision on the

25   bail.

dapgamec                    Conference

1          THE COURT:  No, because I don't have a mandate.

2          MS. FISHER-BYRIALSEN:  But you're not going to make a

3     decision on whether or not you're going to set bail.

4          THE COURT:  I'm going to decide that shortly.

5          MS. FISHER-BYRIALSEN:  We're not coming back to court

6     for that.

7          THE COURT:  No.  If you want to make an additional

8     submission on which standard I'm applying, you can do that by

9     Monday.  You don't have to, you're welcome to, but then I will

10    rule after Monday.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25