UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,

                                              05 cv 5231 (RJS)

      -against-

AMERINDO INVESTMENT ADVISORS INC.,

                   et al. ,

                Defendants.

_____X


MEMORANDUM OF ALBERTO VILAR and GARY TANAKA
IN OPPOSITION TO SEC's MOTION TO SET
DISGORGEMENT AND CIVIL PENALTIES

Vivian Shevitz
Attorney for Defendants
 VILAR and TANAKA
46 Truesdale Lake Drive
South Salem, New York 10590
914 763 2122
Vivian@shevitzlaw.com

## TABLE OF CONTENTS

Introduction .................................................................................................... 1

I. Equitable Disgorgement Is Not Supported ................................................. 4

  (a) The SEC Seeks Legal, Not Equitable, Disgorgement, But Legal Disgorgement Is Not An Available Remedy.......................................................................................... 4

  (b) The SEC Relies On Vacated Findings In The Criminal Case................................. 6

  (c ) The SEC Does Not Distinguish Legally- and Illegally-Derived Profits (if Any) ................. 7

  (d) The SEC's "Principal" and "Interest" Calculations Are Not Supported And  Inconsistent With The Position The Government Took In The Criminal Case .................................... 9

     The Inference That Defendants "Diverted" Cates' Money, Because They Withdrew Fungible Funds From the Linked Sub-Accounts Into Which Her Funds Were Initially Deposited, Is Misguided .............................................................................. 12

  II.  Additional Civil Penalties Should Not Be Granted Because Defendants Have Been Penalized Sufficiently........................................................................... 15

     The SEC Is Not Entitled To A "Third Tier" Penalty: It Has Failed To Show Pecuniary Gain "As A Result Of The Violation", Or That The Conviction Was Based On "Fraud, Deceit, Manipulation Or Deliberate Disregard" (As Opposed To A Failure To Redeem); Nor Does It Show That The Proven Offenses "Resulted in Substantial Losses Or Created A Significant Risk Of Substantial Losses" ...................................................................18

III. Given That The SEC Points To Only Three Enforceable Violations of US Securities Laws on the Part of Defendants, and Given The Vacatur Of the Forfeiture Orders By Which The Receivership RES Is Defined and Receivership Duties Created, The Receivership And The Asset-Freeze/Restraining Order-- Remedies Ancillary To Disgorgement and Penalties -- Must Be Terminated. There Is No Stand-Alone Res Over Which The Court Has Subject Matter Or Personal Jurisdiction; While The Court Has Jurisdiction and Authority To Authorize Full Control and Liquidation Of An Insolvent Entity involved in a Ponzi Scheme, It Cannot Hold Assets To Achieve A Remedy for Non-Defrauded Investors.    Assets Subject To the Restraining and Receivership Orders Are In Fact Assets of A Foreign Corporation Over Which There is No Personal Jurisdiction. .................................... 20

CONCLUSION ........................................................................................... 23

TABLE OF AUTHORITIES

**Cases**

*Capital Management Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012) .................. 14, 20

*Daimler AG v. Bauman,* 134 S. Ct. 746, 187 L.Ed. 2d 624 (2014) ............................................. 23

*Evans v. Michigan,* 133 S.Ct. 1069 (2013) ...................................................................................... 18

*Gabelli v. SEC*, 133 S.Ct 1216 ( 2013) ............................................................................................ 20

*Great-West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204 (2002) ........................... 4, 5

*Republic National Bank of Miami v. United States,* 506 U.S. 80 (1992) ...................................... 2

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) .......................................................................... 22

*SEC v. Byers,* 637 F. Supp. 2d 166 (SDNY 2009) ........................................................................ 22

*SEC v. Colonial Investment Management LLC*, 659 F. Supp. 2d 467 (S.D.N.Y 2009) .............. 15

*SEC v. Credit Bancorp*, 290 F.3d 80 (2d Cir. 2002) ...................................................................... 22

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1973) ........................................... 21

*SEC v. Razmilovic*, 728 F.3d 71 (2d Cir. 2013) ................................................................... 7, 11, 15

*SEC v. Razmilovic*, 822 F.Supp.2d 234 (E.D.N.Y 2011) ......................................................... 8, 15

*United States v. Peoples Benefit Life Insurance Co.*, 271 F.3d 41 (2d Cir. 2001) ........................ 5

*United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989) ................................................................. 7

**Statutes**

28 U.S.C. § 2465 ................................................................................................................................ 2

**Introduction**

This memorandum is respectfully submitted on behalf of Alberto Vilar and Gary Tanaka in opposition to the SEC's motion seeking a total of $41,803,884 in disgorgement and the maximum civil money penalty.

The SEC first seeks disgorgement of $21,303,451. There are two components:  First, the SEC argues that the defendants should disgorge "proceeds" in the amount of $14,805,985, representing the amounts the SEC claims the defendants raised from three investors (Lily Cates, the Mayers and Tara Colburn), less the amounts (the SEC figures) Amerindo paid back to these investors subsequent to their investment.  Second, the SEC seeks the "imposition of prejudgment interest" in the amount of $6,497,467 on the theory that, during certain periods after the time that they obtained the "proceeds," the defendants enjoyed in effect "interest free" loans, and, presumably, were unfairly enriched thereby.    The SEC concedes that any amount of disgorgement should be offset by any restitution payments made by the defendants in the criminal case. (Memo at 3-7)

In addition, the SEC seeks to practically double the amount of disgorgement with $20,500,353 in civil penalties.  The SEC acknowledges that, in its order granting partial summary judgment, the Court stressed that it could not determine the amount of either disgorgement or an appropriate penalty until the receiver completed his investigation and reported his findings to the Court.  (Memo and Order dated March 13, 2013, ecf 272 at 15 & n. 13)  Nevertheless, and even though the receiver has yet to submit findings, the SEC seeks civil money penalties in an amount that, it says, is equal to the "total ill-gotten gain with prejudgment interest …excluding the gain on the amounts raised from Tara Colburn outside the five-year statute of limitations applicable to civil money penalties." (Memo at 8)

1

While, as set forth below, defendants (who have repeatedly sought a way to pay back investors based on their last account statements before Amerindo was shuttered) accept some of the "numbers" pertaining to the three investors identified in the SEC's submissions, they object to others and submit that the SEC's theories are flawed in a variety of ways: the SEC is confusing "proceeds" and illegally obtained profits; the SEC seeks "legal" disgorgement, not equitable disgorgement; compound prejudgment interest in the manner calculated is unjustified; the SEC does not explain why it is entitled in any penalty much less a "third tier" penalty, and, indeed, additional penalties should not be imposed because, as a matter of equities, among other factors discussed below, the SEC already achieved *total disgorgement* of Amerindo US though that entity committed no securities law violations (the SEC's Monitor found it squeaky clean and in compliance with SEC rules applicable to a US Registered Advisory), and penalties were already awarded the SEC against defendants in Administrative Proceedings.

But before getting to these issues, we have a fundamental objection to what is going on here that must be stated at the outset:  Once the forfeiture orders in the criminal case were vacated by the Second Circuit, the floor fell out from under the "receivership estate," which consists of all the assets previously ordered forfeited. See 28 U.S.C. § 2465; *Republic National Bank of Miami v. United States,* 506 U.S. 80 (1992) (when a forfeiture order is overturned, the property subject to forfeiture must be returned.)  In place of the now vacated forfeiture orders, the SEC is trying to use the remedies of disgorgement and penalties to retain control over, and justify the receiver's continuing hold on, all these assets; and it has made clear that it wants to use this control in order to distribute the funds to *all* investors, not simply the ones found to have

been victims of securities violations.[1]

In other words, despite the limited enforceable "violations" as to which the SEC may be entitled to financial remedies, it appears to be seeking disgorgement and penalties as a vehicle for obtaining all restrained funds in order to provide restitution (in amounts not yet determined) to every investor claimant against Amerindo Panama -- whether defrauded or not, whether involved in a domestic transaction or not, whether having a claim that can be asserted within the statute of limitations or not.   This is not a Ponzi scheme-like case where a receiver is given control over an entity whose assets are, by definition, all fraud proceeds, and where distribution of the assets will go exclusively to victims of securities violations.  Here, the SEC is looking to create a fund for the benefit of all Amerindo Panama investors, whether victims or not.  While we have no quarrel with the desire to compensate investors whose investments have been tied up for almost a decade as a result of the morass of this criminal and civil litigation (indeed, we proposed a way to settle the case and refund moneys to investors more than 2 years ago), we do not accept the "right" or "power" of the SEC to act as the distributing agency as to all the Amerindo Panama investors or to use civil penalties as a convenient mop to clean up the mess.

A big fly in the ointment, of course, is the Mayers' state court judgment and their federal turnover case, 12 civ. 5240, in which they effectively insist on the right to a preference over other Amerindo investors.  We continue to believe that a settlement can be reached, and the defendants have taken steps (which we hope can be endorsed by the parties who would benefit

---

[1] See, for example, September 27, 2013 email written by Neal Jacobson after the Second Circuit issued its opinion in the criminal case (quoted in the accompanying Shevitz Declaration), in which, citing *SEC v. Byers,* 637 F. Supp. 2d 166, 184 (SDNY 2009), he reports a plan to modify the receiver's claims process so as to bar defendants from having any say in it and from participating in the distribution of the funds held in client accounts.  This plan has succeeded as of now despite the lack of any opportunity for adversary discussion about the applicability of *Byers* or any other factors justifying such remedy to the SEC.

by such settlement, including the SEC) to legally invalidate the Mayers' judgment  (Exhibits D and E, Shevitz Declaration). Short of a settlement, however, we challenge the SEC's motion for disgorgement and penalties on legal grounds.

### I. Equitable Disgorgement Is Not Supported

### (a) The SEC Seeks Legal, Not Equitable, Disgorgement, But Legal Disgorgement Is Not An Available Remedy

The SEC is entitled to equitable remedies after it is determined that there is a federal securities law violation.   See § 21(d)(5) of the Exchange Act.   Here, the SEC seeks "disgorgement" of the amounts involved in the sole "domestic transactions" in the case as to which it is entitled to "enforcement" (which turns out to be 3 investors).  Aside from the fact that there has been no showing of individual "enrichment" of Gary Tanaka or Alberto Vilar (funds went to a Panama *corporation*, not to defendants personally, and were immediately converted into account credits which remain on the books of the company to this day), what the SEC actually seeks is a legal remedy, not equitable disgorgement.

In the absence of tracing, which the SEC has not done here (and cannot), a "disgorgement" remedy would entail a legal judgment against defendants for the sum, as opposed to a remedy re-taking identified monies.   This would constitute "legal" disgorgement," not "equitable" disgorgement.   Legal disgorgement, however, is not an available remedy under section 21 of the Exchange Act or any other statute or authority.  *See Great-West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204 (2002), *discussed in* Russell G. Ryan, *The Equity Façade of SEC Disgorgement*, http://www.hblr.org/2013/11/the-equity-facade-of-sec-disgorgement/#_ftn21, Harvard Business Law Review (2013).  *See also* David Smyth, December 23, 2013, "Insight and Commentary On SEC Enforcement Actions, "Thinking About SEC

4

Disgorgement," *SEC Litigation*,  http://www.secmiscellany.com/2013/12/23/thinking-about-sec-disgorgement/.

The Supreme Court in *Great-West* distinguished between remedies that involve equitable relief from ones involving legal relief this way:

> In cases in which the plaintiff "could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff had a right to restitution at law through an action derived from the common law-writ of assumpsit. In such cases, the plaintiff's claim was considered <u>legal</u> because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money."
>
> In contrast, a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, <u>where money or property identified as belonging in good conscience to the plaintiff could clearly be traced</u> [emphasis added] to particular funds or property in the defendant's possession. A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. But where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff "cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

Here the SEC has not traced and cannot trace moneys invested by any of the "victims" as to whose investment it seeks disgorgement.  Indeed, this Court so determined in denying the application of investor Paul Marcus to intervene in the "interpleader" case.  (DOC 98, 2 cv 5240 (9/23/13), citing *United States v. Peoples Benefit Life Insurance Co.*, 271 F.3d 41 (2d Cir. 2001) (intervener in federal *in rem* forfeiture case did not have sufficient interest in company owner's property to justify intervention, as "the property allegedly subject to the constructive trust was `not readily identifiable as or traceable to the property' at issue in the case.")  Prosecutor Litt also

5

stated at Mr. Vilar's sentencing that he had not sought an asset freeze because "we did not have a basis to prove that there were fraud proceeds there." (2/5/10 Sentencing Tr. 13).

As none of the Amerindo Panama investors (including the three as to whom the SEC seeks disgorgement) have any traceable interest in the commingled accounts used for Amerindo Panama trading (and the defendants have no other assets), the equitable remedy of disgorgement is not available to the SEC here. "Legal disgorgement" is not an available remedy (and if it were available, defendants would be entitled to a jury determination of any such remedy. *Eberhard v. Marcu*, 530 F.3d 122 (2d Cir. 2008)).

### (b) The SEC Relies On Vacated Findings In The Criminal Case

In its moving papers, the SEC states that the "appropriate measure of disgorgement against the Individual defendants here is $14,805,985." (Memo Doc 334 p. 3). The sole *evidentiary* basis appears in paragraph 29 of the SEC's Rule 56 statement, relying on collateral estoppel and referring to forfeiture/restitution findings made in the criminal case – which are now vacated. The Rule 56 statement (with emphasis added) says this:

> 29.  By letter dated March 1, 2010, the Government set forth its <u>theory of the appropriate forfeiture and restitution in the Criminal Case.</u>  In the letter, the Government set forth an analysis of the total proceeds received by the Individual Defendants from defrauded investors that should be forfeited.  The total proceeds from the Testifying GFRDA Investors received by Vilar and Tanaka equaled $6,936,500, broken down as follows:  $5,800,000 attributable to the Mayers; $1,000,000 attributable to Tara Colburn; $74,000 attributable to Graciela Lecube-Chavez; and $62,500 attributable to ... Cox.  (Ex. H6)  The total proceeds of the fraud on ... Cates received by Vilar and Tanaka equaled $5,425,000.  (Ex. H10)

The government's theory of forfeiture and restitution resulted in a ruling vacated by the Court of Appeals. There is no evidentiary support here by way of a "forfeiture" (or restitution) finding in the criminal case until the conclusion of the *de novo* resentencing and after a jury trial establishing the forfeitable "proceeds" (if any) obtained by the individual defendants.  Prior to

any *substitute* asset forfeiture order, there must be a jury finding as to "forfeitable proceeds." Defendants did not (knowingly) and do not waive their right to such a jury trial as to any "proceeds" forfeiture imposed on them in a *de novo* sentencing.[2]

### (c ) The SEC Does Not Distinguish Legally- and Illegally-Derived Profits (if Any)

In *SEC v. Razmilovic*, 728 F.3d 71, 86 (2d Cir. 2013), the Court of Appeals reiterated the rule that a distinction must be drawn between "legally" drawn versus "illegally" derived profits when "profits" are shown to have been obtained by a defendant – the same inquiry required in a criminal forfeiture inquiry.[3]

Because a determination of disgorgeable "proceeds" (like inquiries of whether there are "losses" by reason of "offense conduct") requires an inquiry of the value of assets (in the form of "accounts" of Amerindo Panama) representing the same proceeds -- hence a *chose in action* of the value of the investment made by Cates, or Mayer, or any Amerindo Panama client – a jury

---

[2] Forfeiture and restitution proceedings in the criminal case were marred by ineffective assistance of counsel, leading to unreliable results. As set forth in Vilar's brief to the Second Circuit, the government presented listings of figures that were pocked with errors both arithmetical and evidentiary. In addition, the record reflects counsel's professed ignorance of the right to a jury trial on forfeiture (Tr.5634). Counsel (and the Court) "accept[ed]" the "representation" of the prosecutor who stated his "belief" that the defendants did not have a right to a jury but did not offer legal support. The defendants were left with rulings on "forfeiture" (and *loss*) that had not focused on the pool of Amerindo assets that to this day has not been evaluated almost a decade down the line. Had counsel prepared for forfeiture, the preparation would necessarily have led to the need to evaluate "assets" and "claims" as that is the nature of the inquiry. The failure of counsel to appreciate forfeiture infected theories and litigation of "loss" as well as forfeiture claims.

[3] See *United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989) ("Porcelli's properties are forfeitable to the extent of the contribution from the offending companies, but not necessarily in their entirety. ... There is also evidence that Porcelli's business expanded and prospered as a result of his hard work and business acumen. In other words, these properties are not entirely the tainted fruits of Porcelli's fraud. The court ... erred in not determining the extent of ... interest in these properties that Porcelli would not have acquired or maintained but for his fraudulent scheme"; forfeiture limited by "rule of proportionality.")

must determine whether there is such *chose in action* of the value of the moneys invested with Amerindo Panama.  This is the very inquiry that the government (DOJ and SEC) have failed to undertake in the nine years in which they have prosecuted this case.

In the context of this case, assuming Cates or the Mayers ultimately obtain the full value of their last account statement adjusted for the date of the shutdown of Amerindo (which includes generous interest credited to their accounts), any determination regarding whether Amerindo Panama obtained "proceeds" *illegally* (as opposed to the extent to which Cates and Mayers invested for some reason other than alleged misstatements) requires an analysis of the extent Cates or Mayer relied on defendants' proven track record of making huge profits for them previously.[4]  There must be a causal connection.  While "reliance" may not be an element of a securities law offense (when prosecuted by the DOJ or SEC), a conclusion about amounts "disgorgeable" or classifiable as forfeitable "proceeds" requires analysis of the extent of **reliance** (if any) on alleged misstatements versus other factors as the "cause" of any purchase in the first place.  *SEC v. Razmilovic*, 822 F.Supp.2d 234 (E.D.N.Y 2011) *(*"Although the SEC is not required to prove the element of loss causation in order to establish liability [citations omitted], it is required to prove a causal connection between the fraud and Razmilovic's ill-gotten gains for the purposes of disgorgement. *See Patel*, 61 F.3d at 139 (holding that for the purposes of

---

[4] For example, documents in the Government's possession showed that Rhodes had been *such* a lucrative investment for Lily Cates that it was the reason Cates chose to invest again in *whatever* venture Vilar and Tanaka prescribed. At the end of 2000, Cates' two shares of Rhodes Capital (purchased for $1 million and placed "in biotechnology or whatever Mr. Vilar and Gary deemed it should be in") had grown to $18,531,768.46. Cates understated: Rhodes "had done extremely well." (T.2078). (SEC "summary" witness Wraga testified that she had located documents showing disbursements on Cates' behalf that totaled over $7 million.) (T.4644-47) The documents show that on her Rhodes Capital investment, Cates made a 760% return.  The Mayers' prior profits also were their motivating factor.   Clearly the "tax factor" entered into these investors' decisions as well.

disgorgement, the calculation of profits need only be "a reasonable approximation of profits *causally connected* to the [securities law] violation." (emphasis added)); ... The determination of the extent to which the value of a security was inflated due to fraud is the same regardless of whether the plaintiff must demonstrate loss causation**, *i.e.,* that its loss was causally connected to the fraud,** or, in essence, gain causation, *i.e.*, that the defendant's **ill-gotten gain is causally connected to the fraud**.")

This analysis is especially required because here, the "offense" may not be misstatements at all, but rather, as AUSA Litt argued at Mr. Vilar's sentencing, merely the "failure to redeem." (Sentencing Tr. 45: " ... not giving it back, knowing that you have it, is a serious crime too"). As the jury's verdict did not distinguish between these grounds for conviction, and the SEC has not done so either, there would be no basis for disgorgement of the sums identified by the SEC as "disgorgeable" profits as to the three Amerindo Panama investors who had been satisfied clients for almost two decades. There is, in sum, no ground for disgorgement as the SEC seeks.

### (d) The SEC's "Principal" and "Interest" Calculations Are Not Supported And Inconsistent With The Position The Government Took In The Criminal Case

The SEC submits that the following (rounded to whole dollars) are the amounts by which the defendants were unjust enriched:

1. Mayers: Principal ($11,066,713) – Return ($1,460,728) + Interest ($2,759,611)= $12,515,596

2. Colburn: Principal ($1,000,000) – Return ($550,000) + Interest ($353,099) = $803,099

3. Cates: Principal ($5,250,000) – Return ($500,000) + Interest ($3,384,757)= $8,134,757

For Tara Colburn, the "principal" is the amount originally transmitted to Amerindo when the GFRDA was purchased. For the Mayers, the "principal" is the amount set forth as their balance in a letter from Amerindo to the Mayers in December 2000 before their investment

(made years earlier) was rolled over in January 2001.  For both, the "principal" is reduced by the purported total amount returned; the interest is then compounded using IRS rates and calculated on the "principal" (as reduced by any refunds) until May 2005 when the Amerindo accounts were frozen.

For Lily Cates, the "principal" is the amount of the SBIC investment plus an amount allegedly misappropriated from another account in her name (but there is no jury finding on any such alleged misappropriation).  The SEC calculates Cates' interest differently from the other investors.  For Cates, compound interest is calculated from the date of the investment and supposed misappropriation to the present, on the theory that, unlike the Mayers' and Colburn's investments, her funds were withdrawn from the Amerindo accounts and, accordingly, the defendants have had the benefit of those funds on which to draw interest since that time.

The SEC's numbers are not supported, and their unjust enrichments theories are flawed.

With respect to the Mayers, the SEC's position here is apparently based on a theory of restitution, not a determination of "proceeds."  This is evident from a comparison with the government's approach to forfeiture in the criminal case.  There, the government took the position that the "proceeds" attributable to the Mayers was $5,800,000, the amount the Mayers supposedly handed over to Amerindo when they initially invested in GFRDA. (Govt. Sentencing Memo at 92)   (We say "supposedly" because, as set forth in the footnote below, the evidence introduced at the criminal trial indicated that this number was off by more than $1.3 million.[5])  The SEC does not explain why it is using $11,0066,713 instead of the "proceeds" amount used

---

[5] The evidentiary "source" of the government's $5,800,000 figure in its sentencing memo was "GX 8202-B", a summary chart, entitled "GFRDA Investor Deposits into GFRDA Accounts," introduced into evidence by the government to show the receipt of investor funds by the defendants for the GFRDA product.  That exhibit reflected funds received from the Mayers between May 2, 1995, and July 6, 2000, totaling **$4,476,000, not $5,800,000**.

by the government at sentencing, or why its "proceeds" theory for the Mayers is so dramatically different from the one advanced by the government (and accepted by the court) in the criminal case. We respectfully request an opportunity to respond once the SEC explains this shift. (We also ask for the records underlying GX 8202-B so that we can correctly calculate interest.)

Second, the SEC started with a number on the Mayers' account in January 2001, and credited the Mayers with having received payments from Amerindo only between January 2004 and January 2005 ($1,310,729), plus a $150,000 payment they received in November 2009 by stipulation in the criminal case. However, the evidence at trial showed substantial payments to the Mayers in 2001, 2002, and 2003. Thus, when examined about the family's amended tax returns for the period 1999-2004, Lisa Mayer testified that, each year, the family received payments from Amerindo, and that while they failed to file returns in the years the payments were received, they ultimately filed amended returns where they treated these payments as returns of principal until such time as the total amount they received exceeded their initial capital investment. According to Mayer, that point was reached in 2004 (GX 9210), when a portion of the received payments was treated on the amended return as interest. The SEC has not accounted for the substantial repayments that the Mayers received in 2001, 2002, and 2003.

With respect to Lily Cates, we dispute that the SEC is entitled to interest from the date of the SBIC investment in 2002 and alleged transfer of funds from her account in 2003 to the present. If disgorgement of any "interest" purportedly obtained by the defendants is appropriate, the "interest" they enjoyed by virtue of Cates' investment should be treated the same as that obtained from the Mayers' and Colburn's investments. Imposition of prejudgment interest for the period after 2005 would be punitive, not remedial. *See SEC v. Razmilovic*, 728 F.3d 71 (2d Cir.

2013) (reversing in part district court's imposition of interest on the ground that defendant's

funds had been frozen and unavailable for his use.)

### The Inference That Defendants "Diverted" *Cates'* Money, Because They Withdrew Fungible Funds From the Linked Sub-Accounts Into Which Her Funds Were Initially Deposited, Is Misguided

The SEC characterizes the withdrawals and transfers from the accounts into which

Cates's funds were placed as diversions of *her* investments for the defendants' continuing

personal and business use, and argues that, because the defendant "never returned" the amounts

diverted, prejudgment interest should run "to the present".   This characterization cannot be

squared with the business reality of Amerindo Panama's commingled accounts, as well as

evidence that, at the time of sentencing, the assets in the accounts exceeded liabilities to

investors by almost $2.5 million (see Letter of Mark Litt, 2/3/09, ecf 418; Appendix to Tanaka

Brief TA. 602), and the absence of any evidence that the total amount in the commingled

accounts was *ever* below the total amount reflected in the investor account statements.

The misconception that a withdrawal signified theft was developed before the case was

even commenced.  Since it bears on a consideration of both potential disgorgement and penalties,

we hope to clarify.

In the very first pre-arrest criminal complaint against Alberto Vilar (DOC 138-4 filed

8/30/06 as a Franks motion Exhibit), the government theorized that defendants had "stolen"

Cates' money because of the nearly contemporaneous withdrawals from the account into which

her SBIC funds were placed initially.  Three years later, however, Bear Stearns' Nierva (and his

3500 material) dispelled the basis for the conclusion:  though not fully developed at trial, where

Nierva testified, he explained that Bear offered "interchangeable" accounts as a "family" of

accounts "rolled up together for margin purposes" with one tax ID.  The use as a "family"

effectuated *more favorable* margin trading.[6]   Nierva's statement (3500-3, page 3) indeed reports Nierva's conclusion that even after withdrawals from the particular sub-account into which Cates' $5 million investment was moved after it initially was deposited, "the $5 million is still working in the acct., here allowing them not to be on call; cash used to make margin purchases."

There was never a determination of theft by a jury[7]; though the government believed that withdrawals from the account represented "theft" initially, its belief was formulated in connection with the 2005 arrest and search and long before the government learned from Nierva about the linked margin accounts.   The inference of misappropriation is belied by the evidence.

Some of these linked accounts contained commingled funds (and payouts for Amerindo Panama clients were made using some of them variously (as shown by documents evidencing payments to the Mayers' foreign entities, attached to Neal Jacobson's moving Declaration as Exhibit F).   But this fact of commingling of Amerindo Panama client accounts (into a unitary fund) (though constantly portrayed as inculpatory) is not a basis for finding that money was stolen or that anything nefarious or illegal was going on.   Commingling itself is not a crime and is not only part of the mutual fund industry, but is a common practice in brokerage arrangements as well as offshore brokers seeking to reduce capital reserve requirements and maximize margin

---

[6] Nierva's interview on July 31, 2008 (GX 3529-3) describes the "Family Concept" of accounts offered by Bear Stearns' "Global Clearing Services":  "in Global Clearing Svcs. can have multiple accts rolled-up together for margin purposes (one tax ID #) must have same beneficial owner + same entity."  (GX 3529-3 p.3).   All of the "102" accounts, Nierva stated, were "prime brokerage accounts" belonging  to AMI.  Nierva identified other "private client service" accounts as including "107" accounts, which were investment advisor accounts, and 105 accounts as "courtesy" – individual accounts that were managed by the Bear Stearns client.    As to the 102 "family" of accounts, Nierva said, "If there is enough collateral in the acct, could wire out more cash than is in an account."  This was "similar to line of credit (daily)."

[7] To the contrary, in upholding the mail fraud conviction, the Second Circuit held that the jury did *not* have to find that Cates' account statement (which reflected the total amount she invested and did not reflect any "withdrawals") was false in order to convict.

buying.  *E.g. Capital Management Select Fund Ltd. v. Bennett*, 680 F.3d 214, 220 (2d Cir. 2012)

(securities and property deposited in accounts of RCM, an "unregulated offshore broker", were

commingled in a fungible pool and were "part of the general cash reserves of the broker", "a

practice ...common in the brokerage industry ...").   (As to commingling, however, there may be

another misconception:  While Amerindo Panama commingled funds for trading purposes in one

asset pool (using a number of accounts described at trial by Bear Stearns witness Nierva), there

was *never* commingling of assets between Amerindo US and any other Amerindo entity.  Rather,

defendants properly employed intercompany transfers between Amerindo US and Amerindo

Panama and/or Amerindo UK for business purposes --  including for payment of claims of

investors that were due (see Jacobson Dec. Exhibit H , documenting a use of Amerindo US funds

for one of the Tara Colburn payments) -- and amounts were booked pursuant to intercompany

agreements.   These transfers were vetted by the SEC Monitor who attached a schedule of

transfers to or from Amerindo US/ Amerindo Panama, or to Amerindo UK to his original report.

(DOC 48, Monitor report, SEC v. Amerindo).  The SEC also had vetted intercompany matters

between Amerindo US and its known affiliate Amerindo Panama, and indeed, as shown by

correspondence between Amerindo US (the regulated entity) and the SEC, in audits conducted in

1992-93 and 2003-05, the SEC at all times knew that (a) there was no regulation in Panama but

for what investors required of their investment manager (1992 letter R.Cohen to SEC) – after

which the SEC "passed" Amerindo US's on its examination; (b) Amerindo Panama was

structuring its investors so that there would be one investor (a pool) about which Amerindo

Panama would provide limited trading information sought expressly under the "conduct and

effects" test (1993 letters SEC to Amerindo and Amerindo-Panama to SEC); and (c) the US

Advisory and the offshore companies had intercompany transactions  and would give limited

14

information about Panama operations. (The SEC passed Amerindo US's registration again in January 2005 after subpoenaing information about Panama, voluntarily disclosed in part.)) (Correspondence between the SEC and Amerindo's regulated entity are attached as Exhibits A, B and C to the Shevitz Declaration.).

Further, as to the SEC's supposition about defendants' "use" of Lily Cates' funds, there is no evidence that defendants have or used *any* assets, or that there *are* assets other than frozen assets, by which they could have (or did) gain interest on Lily Cates' money.  The SEC's position is a fiction to avoid the need to trace.

A grant of prejudgment interest for the period after 2005 in these circumstances would penalize, not remedy.  It would not only violate the rule appreciated in *Razmilicov,* but also would constitute an Eighth Amendment violation as an excessive punishment.  It would constitute a double jeopardy violation as civil penalties were also meted out in SEC administrative proceedings imposing a bar on defendants acting as or associating with investment advisors.  The SEC's request for interest should be denied.

## II.  Additional Civil Penalties Should Not Be Granted Because Defendants Have Been Penalized Sufficiently

Civil penalties are authorized to punish a securities law violator for past violations as well as to deter.  *SEC v. Razmilovic*, 822 F.Supp.2d 234 (E.D.N.Y 2011), citing  (*inter alia*) *SEC v. Colonial Investment Management LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y 2009).  It is not only whether defendants' conduct was "egregious" or whether they acted with scienter: the SEC and the court must consider whether a "penalty should be reduced due to the defendant's demonstrated current and future financial condition" and *all* the facts and circumstances of the case.  *Id*.  The SEC asks for the maximum civil penalties that can be imposed in this case without any serious discussion of why they are warranted.   Rather, it seems to rely on the Court's ruling

last March that various factors considered by courts as relevant to determining whether to impose penalties were present in this case and "weigh heavily in favor on imposing civil penalties." (Memorandum and Order, March 11, 2013, at 15)

With all due respect, the Court issued that order prior to the issuance of the Second Circuit's opinion (*i.e.,* at a time when this Court held the erroneous view that *Morrison* did not apply to criminal cases, a view that undoubtedly colored its perception that the criminal case reflected "egregious" misconduct involving "substantial losses"), and without consideration of all the facts and circumstances of the case.

Most importantly, in seeking maximum penalties, the SEC does not acknowledge the fact that penalties (in the form of punitive bans on the defendants' acting as or associating with investment advisors, their life work, *and* the total loss of Amerindo US though it was not found to have committed *any* securities law violation, losses to defendants of their hard-earned stellar professional reputations and a long-established company name were trashed, and ten years of home-detention or incarceration) have been meted out already.

At bottom, the case has come down to interactions between defendants and two longest-term offshore clients with significant personal relationships (disrupted by the market crash and efforts to slow redemptions), who were deemed by the Court of Appeals to have been involved in a "domestic transaction" because (though they purchased on a foreign market as to which Rule 10b and other securities laws do not apply) they were physically present in the United States and consequently defendants were to be governed by the US rules of disclosure and remedies.  In seeking penalties merely on the basis of these "domestic" involvements, the SEC has failed to mention of the fact that, on an *ex parte* basis and an invalid warrant, the DOJ and SEC achieved total disgorgement of Amerindo US, 98% of defendants' business – though it later found out

(from its own SEC Monitor) that Amerindo US had not committed federal securities law violations and that all of its clients had been re-paid.  (Monitor Report DOC 48, 05 cv 5231).

The loss to the defendants of this tremendous asset that was 100% legitimate – which also served as the basis of the guarantee to Amerindo Panama's individual investors – is not remedial.  It is a penalty, and one of far greater value than any amounts sought by the SEC as penalties in this case.[8]  The lifetime bans are also punitive. (See Exhibit H, Shevitz Dec.) *Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996) (censure and 6-month suspension were punitive; thus subject to § 2462 and Eighth Amendment consideration).  Defendants, first time offenders now over age 70 and not in the best of health, have been prosecuted for nine years; they spent three years pretrial and jailed for 2 ½ and 4 years and counting, and the year they were released on bail, they were under 24 hour monitoring surveillance with restrictions on their liberty. With money sitting frozen in accounts not gaining interest and losses not determined in any reliable way, any further penalties (for this non-Ponzi scheme case) would be totally disproportionate, and constitutes punishment in violation of the Eighth Amendment implicating Double Jeopardy.[9]

There Should Be No Punitive Remedy As To The Mayers in any Event:  As to the Mayers, while this Court recently adopted the ruling of the Second Circuit that, because Lisa

---

[8] AIA US had $1.2 billion under management, all satisfied institutional clients who were told to leave when the Monitor took over.  It was a high-profile cash-cow which generated $9 million in annual fees in 2004 (projected to increase to $12 million for 2005).  Its value was estimated at $50 million in the Bear Stearns merger terms.

[9] We have written in many documents we have tried to submit in this case about the value of Amerindo US to the defendants (and as a source of security to the Panama investors who were well aware of Amerindo US's successes, its integrity, and its solvency).  In the interest of brevity we do not repeat these discussions here.  We incorporate by reference documents filed in connection with this case previously, and refer to the backup for the Report of the SEC Monitor.

If there is any doubt we ask for a hearing.

17

Mayer was physically present in the United States, the Mayer transaction was "domestic", earlier this Court stated specifically that evidence as to a domestic transaction was "insufficient" (SEC Memo for disgorgement, p.2).  We submit that under these circumstances where Your Honor sat as factfinder in both the criminal case and the "parallel" SEC case and made a ruling as to insufficiency of the trial record, this ruling constituted a substantive acquittal barring further penalties as against or concerning the Mayer transactions, as a matter of Due Process and Double Jeopardy for reasons stated in *Evans v. Michigan,* 133 S.Ct. 1069, 1076 (2013).

**The SEC Is Not Entitled To A "Third Tier" Penalty: It Has Failed To Show Pecuniary Gain "As A Result Of The Violation", Or That The Conviction Was Based On "Fraud, Deceit, Manipulation Or Deliberate Disregard" (As Opposed To A Failure To Redeem); Nor Does It Show That The Proven Offenses "Resulted in Substantial Losses Or Created A Significant Risk Of Substantial Losses"**

The SEC asks for third tier penalties based on conclusory statements that such penalties are justified by the circumstances the Court is required to consider.  This case is hardly the "worst of the worst" calling for the maximum allowable penalty.  At most, there were less than a handful of investors who can be deemed victims of federal securities fraud.  The defendants are not fugitives and did not abscond with the "victim's money."  To the contrary, some $42 million has been sitting in frozen accounts for almost a decade.

As discussed, the SEC did not show "pecuniary gain" "as a result of the [only proven] violation[s]", as the investment monies remain in accounts and were not shown to have been "obtained" by either defendant.   There is also no basis for finding (based on collateral estoppel) that the conviction was based on "fraud, deceit, manipulation, or deliberate … disregard" of any regulation given the option of "offenses" on which the jury could have premised any finding of guilt, and AUSA Litt's statement at sentencing that "not giving it back, knowing that you have it, is a serious crime too", on which he was urging the substantial sentence. The basis of the verdict

18

could have been (and likely was) the failure to redeem, which was a business decision of Amerindo Panama at the time (to allow it to recover in the market), pursuant to which Amerindo was negotiating redemptions with its long-term clients.

Nor is there a collateral estoppel (or any other basis) to support a finding that the proven offenses "created a substantial risk of substantial losses" to other investors.   To the contrary, there is *no* finding of "loss", even to the *named* investors.

The government believes that it *will* identify such losses at the *de novo* sentencing.  But while the government may argue the same theory as was raised at the vacated sentencing hearing, the defendants will be pursuing the *correct* theory: that even if there were failures to redeem (and even if the court does not accept that there was a settlement agreement between the Mayers and Amerindo Panama, a matter raised in the pending Motion to Vacate the Mayer state court judgment based on documents we discovered only when they were attached to Neal Jacobson's moving Declaration in support of disgorgement, Exhibit E to Shevitz Dec.), such failures to redeem *did not* cause or threaten "substantial losses" to other investors, but, instead, were the tool for keeping money in the pooled vehicle to *obviate* the risk of market losses.

In any event there has never been a finding of "loss" nor a finding that the offense conduct created a threat of substantial loss.  To the contrary, Ian Gazes' first report (DOC 283 n.1) stated that there were enough funds (upon liquidation) to have covered *all* clients' May 2005 accounts.   Not *all* client accounts were *due* at the time of that shutdown:  the "run on the bank" was advanced because of the shutdown of Amerindo on May 25, 2005.  Thus even were there a present inability to cover all client accounts as of that date, the "loss" would not be "caused" by offense conduct, but rather the inability to gather assets to liquidate, or to continue using

defendants' own resources of Amerindo US (or otherwise call in debts) to cover the artificially

caused "run on the bank".[10]

> **III. Given That The SEC Points To Only Three Enforceable Violations of US Securities Laws on the Part of Defendants, and Given The Vacatur Of the Forfeiture Orders By Which The Receivership RES Is Defined and Receivership Duties Created, The Receivership And The Asset-Freeze/Restraining Order-- Remedies Ancillary To Disgorgement and Penalties -- Must Be Terminated. There Is No Stand-Alone Res Over Which The Court Has Subject Matter Or Personal Jurisdiction; While The Court Has Jurisdiction and Authority To Authorize Full Control and Liquidation Of An Insolvent Entity involved in a Ponzi Scheme, It Cannot Hold Assets To Achieve A Remedy for Non-Defrauded Investors.   Assets Subject To the Restraining and Receivership Orders Are In Fact Assets of A Foreign Corporation Over Which There is No Personal Jurisdiction.**

The Court appointed a receiver in this case to deal with substitute assets forfeited

pursuant to *in personam* forfeiture orders over the individual defendants.  Their interests were

ordered forfeited but the forfeiture has been vacated.

The Court ordered the frozen assets to be administered (and now liquidated) by a

receiver. There is no legal basis on which a Receiver can hold these assets as a Receivership is

ancillary to available remedies.  As to any Amerindo Panama investor not identified in the

request for disgorgement, there is no basis to hold assets pending disgorgement because there

can be no remedy in favor of the SEC.  As to any Amerindo Panama investors other than those

identified in the SEC disgorgement request, not only is enforcement (other than by injunction)

barred by *Gabelli v. SEC*, 133 S.Ct 1216 ( 2013),[11] but investors whose transactions were *not*

---

[10]   See *Capital Management*, *supra* (upholding dismissal of complaint for lack of deception): "Following Refco's disclosure of its $430 million uncollectible receivable, customers holding accounts with RCM, including appellants, attempted to withdraw their assets from RCM. This began the proverbial "run on the bank," and, on October 13, 2005, Refco announced a unilateral 15-day moratorium on ...trading activities."

[11]   At the May 4, 2012 pre-motion conference preceding the motion to dismiss and the SEC's motion for partial summary judgment, SEC counsel Jacobson agreed that the SEC was adding

proven "domestic" are not (by reason of *Morrison* ) "victims" of federal securities law violations; SEC rules and regulations do not apply to these defendants to the extent of their Panama operation, pursuant to Section 30(b) of the Exchange Act, discussed in *Morrison.* [12] The SEC is trying to hold (and obtain) assets for restitution to *non*-victims of domestic securities violations, but that is not a remedy available to the SEC.

A receivership is a remedy *ancillary* to disgorgement and penalties, and is properly used only to prevent assets subject to disgorgement or penalty *for a securities violation* from dissipating.   *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1973) (on a proper showing of a securities violation, court can fashion remedies.)   The initial assessment of the SEC and DOJ in 2005 was that they would find losses in the millions suffered by many investors and that what they knew about was the "tip of the iceberg" (the assessment that led to

---

claims concerning the "ATGF" investments (never proven "fraudulent") for the first time more than 5 years after the fact and that there was no evidence in the record supporting liability as against any of these investors. (Tr.6-8) ("MR. JACOBSON:   The amendment would allege additional facts with respect to the ATGF fraud, the advisor fraud on the ATGF fund, however, there has been no discovery in this case.   THE COURT:   **What you are saying, there is nothing from the trial record that would support those claims? MR. JACOBSON:   Correct**. ..."

[12] Section 30(a) of the Exchange Act, 15 U.S. 78dd, entitled "unlawful transactions on foreign securities exchanges" regulates transactions involving US issuers, by providing (a) that brokers and dealers resident in the United States violate the Act when they effect a transaction in a security of an issuer resident or with a principal place of business in the United States, even if on a foreign exchange.   Subsection (b), however, quoted in *Morrison* as controlling text, specifically exempts "Business without the jurisdiction of the United States," specifying:   "The provisions of this chapter or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter."   *Morrison* noted there are no such regulations.  The SEC Monitor found Amerindo US compliant in its domestic operation.

the "all records" search found unconstitutional and the installation of a Monitor whose report dispelled any such notion).   Maintaining that "all asset" premise, the SEC and the Receiver sought and have been granted the broadest of remedies – a receivership that can engage in liquidation for the benefit of *all investors.*

The SEC has authority to remedy only *violations* of the federal securities laws; it is not a collection agency for "all investors".   The only cases in which this type of receivership is authorized are those dealing with Ponzi schemes, where the entity in receivership is and must be deemed insolvent.   *No* case has authorized a liquidating receivership over claims of *non-victims* or where the entity in receivership is solvent.

The SEC points to *SEC v. Byers*, 609 F.3d 87 (2d Cir. 2010).   But that case involved a Ponzi scheme as did the cases on which it is premised.   The SEC's brief to the Second Circuit in *Byers*   (09-3583-cv) (Shevitz Dec. Exhibit G), the first case in which such a broad liquidation was authorized, relies on *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (Posner, J.), which dealt with a Ponzi scheme and which held that the claims of all the investors   (*all* victims of fraud) "made a Ponzi scheme insolvent from inception".   Accord, *SEC v. Credit Bancorp*, 290 F.3d 80 (2d Cir. 2002) (approving equitable authority to hold *all the fraud victims* alike" where funds of *defrauded victims"* were commingled.)   Neither *Byers*, nor any other case, approves remedies for non-defrauded investors, nor approves a broad receivership where an entity (*i.e.,* defendants' businesses) is *not* insolvent.

At bottom this receivership imposes controls over assets of a foreign corporation, AMI, and also the UK and Panamanian entities and foreign investment companies – and there is no personal jurisdiction over these entities.   As stated in the SEC's declaration for a certificate of default (DOC 301, 9/10/13), a prelude (so Mr. Jacobson states) to the SEC's attempt to assert

remedial authority over Panamanian assets, the SEC states that it purported to serve Amerindo UK by sending documents to London to serve on Amerindo UK.  It purported to serve Amerindo Panama, AMI, and the other Panamanian corporations or entities, by providing documents to Gary Tanaka or Alberto Vilar as of June 1 and 2, 2005 – the inception of this SEC case – they were effectively decommissioned from acting as officers or in any way on behalf of those corporations.  When purported to be served in November 2005 as alleged service on the foreign Amerindo entities, defendants could do nothing to defend.  Though Mr. Jacobson states in his Declaration in support of a certificate of default that the entity defendants are not "incompetent," they were *de facto* incompetent.  It would violate Due Process to deem this service valid under the Due Process Clause.

Nor is there personal jurisdiction over these foreign entities in any event.  These entities did not do business in the United States and they were administered at all times in London, not the U.S.  See *Daimler AG v. Bauman,* 134 S. Ct. 746, 187 L.Ed. 2d 624, 639-40 (2014) ("only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there… [T]he place of incorporation and principle place of business are `paradig[m] … bases for general jurisdiction.")

## CONCLUSION

For many legal reasons, Defendants object to disgorgement, interest, or further penalties. As a matter of equity, the Court should consider the indisputable fact that defendants were already divested of their 100% clean business, Amerindo US, 98% of their business, when it was destroyed by the joint action of the SEC and DOJ as if it had been totally a massive fraud without ever hearing from the defendants in response.  Amerindo US did not commit (and the defendants did not commit through it) *any* securities law violation.

We are sure that the SEC and Court will not be satisfied with a ruling that there are no valid equitable remedies available to the SEC, because the SEC has consistently taken the position that defendants should not have control over funds for distribution to their own investors.  There is no legitimate justification for such unbending opposition.

Defendants' "violations" extend to a handful of investors as to whom the offense could have been a failure to redeem.  As to their Amerindo US investors and the majority of Amerindo Panama investors who were satisfied with Amerindo Panama's handling of their accounts, there was no violation in the first place.   Paul Marcus repeatedly asked for a "remedy" of allowing Mr. Tanaka to manage his funds.   His wishes should have been and still should be respected.

Defendants sought a resolution of the case involving David Ross overseeing *their* management for liquidation of their Panama investors' accounts.   Defendants still propose that remedy, which could be carried out while the re-sentencing proceeds.

In this case, the federal equity receivership which contemplates liquidation is improper and unjustified, as there is no basis for the SEC to remedy non-violations of the federal securities laws.  The Court should take heed of the observations of the Court in *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc*., 999 F.2d 314, 316 (8th Cir. 1993), that recognizes that even where there is fraudulent conduct affecting investors, a receivership may cause more harm to investors than it remedies. (Court rules that a court should consider *inter alia* "the probability that fraudulent conduct has occurred or will occur to frustrate that claim," (3) the "imminent danger that property will be concealed, lost, or diminished in value," (4) the inadequacy of other available legal remedies, (5) the "lack of a less drastic **equitable** remedy," and (6) and the "likelihood that appointing the receiver will do more good than harm).

Here the receivership has done more harm than good.  To our knowledge the receiver has spent more than a year but has not completed an evaluation of client claims, has not marshalled assets or maximized them, has not even required JP Morgan to credit interest and has incurred significant expense.  These are extraordinary failures if the purpose of an SEC receiver is to make sure that assets are not dissipated.  The restrained funds should be released.  Defendants should be given the opportunity to manage their accounts for liquidation.  *Accord*, *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105-1106 (2d Cir. 1972) ("Freezing assets under certain circumstances, however, might thwart the goal of compensating investors if the freeze were to cause such disruption of defendants' business affairs that they would be financially destroyed. Thus, the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.)

The Court is rightly concerned that assets have not been distributed.  Defendants share that concern, but have had their hands tied.


Dated:  February 7, 2014                    _____/s_____

                                                            Vivian Shevitz

25