Exhibits to Shevitz Declaration in Opposition to Disgorgement and Penalties

Exhibit A – 1992 letter to SEC

LAW OFFICES OF
# RICK COHEN
501 SANTA MONICA BOULEVARD, SUITE 501
SANTA MONICA, CALIFORNIA 90401

(310) 576-6868
(310) 576-6871 FAX

December 15, 1992

**BY FAX & U.S. MAIL**

FILE NO.

Richard A. Castro, Chief, Branch of Regulation
Vanessa Sherman, Securities Compliance Officer
United States Securities and Exchange Commission
San Francisco Branch Office
901 Market Street, Suite 470
San Francisco, CA 94103

RE: AMERINDO INVESTMENT ADVISORS INC ("REGISTRANT") - COMMISSION FILE NO. 801-24922

Dear Mr. Castro and Ms. Sherman:

The purpose of this letter is to respond to Ms. Sherman's letter to me dated December 8, 1992 and to summarize and confirm the matters related to you during the December 9, 1992 telephonic conference had among the two of you, Irv Einhorn and the undersigned.

Please be advised as follows:

1. The December 8 letter from Ms. Sherman requested a list of securities for which Registrant had filed a Form 13G during the past year. It is my understanding that this information has now been provided to you under cover of a December 10, 1992 letter to Ms. Sherman from Mr. Michael Sandifer, Registrant's Chief Compliance Officer.

2. Paragraph 2 at Page 1 of Ms. Sherman's December 8 letter requested documentation supporting performance data for the years prior to 1986. In response to that request, I think that it would be useful to reiterate and re-explore here the historical background which we shared with you on the telephone earlier this week. We believe that that historical background explains the historical evolution of Registrant and provides an indispensable framework for understanding the situation in which Registrant finds itself with respect to the requested information.

Richard A. Castro, Chief, Branch of Regulation
Vanessa Sherman, Securities Compliance Officer
December 15, 1992
Page 2

      As you know, there are two non U.S. advisory entities which, through their ownership by Messrs. Vilar and Tanaka, are affiliated with Registrant. One of those entities is registered in the U.K. ("Amerindo U.K."), and the other is registered in Panama ("Amerindo Panama").

      The operations of both Amerindo U.K. and Amerindo Panama commenced long before Registrant commenced its operations, and long before it was even conceived that Messrs. Vilar or Tanaka might bring their investment advisory business to the United States. Basically, from the time that Messrs. Vilar and Tanaka first began to practice investment management independently and outside of the employ of any large institutional organization, they had done so offshore and in a manner directed to non U.S. nationals. These non U.S. nationals tended, naturally, to be extremely wealthy individuals and other persons, fiercely jealous, as one might expect, of their privacy and anxious, for any variety of reasons personal to them, to keep their affairs offshore and outside the scope and reach of any authority other than those of the country in which they choose to make their investments. Simply put, they specifically sought discrete, professional and expert management of a specialized portfolio of U.S. securities in the technology and biotechnology sectors, without subjecting themselves to taxation or regulation in the United States.

      Well, over time, Amerindo U.K. and Amerindo Panama achieved considerable success for its clients, and it began to enjoy an enviable reputation. This development coincided with the growing awareness here and abroad that tremendous amounts of capital were then beginning to be concentrated in huge pension funds, many of which required and were seeking expert and experienced outside professional management. Thus it was that Messrs. Vilar and Tanaka began during late 1983 and early 1984 to explore the possibility of entering the investment management field in the United States.

      It should be noted that Amerindo U.K. and Amerindo Panama had been operating in essentially unregulated jurisdictions, which was so both in Panama and even in the U.K., where regulation was virtually nonexistent and the extensive regulatory framework for and oversight of IMRO had not even then remotely begun to approach the kinds of levels which we see today. Accordingly, Amerindo U.K. and Amerindo Panama were operating in environments which did not require extensive, long term and exacting record keeping, and where, in the main, the principal restrictions placed upon Amerindo U.K. and Amerindo Panama were those specific requirements actually imposed upon them by their very sophisticated clients. Thus, performance would be calculated, but documentation similar to that required by Rule 204-2 would not be retained. Again, because it bears repeating, not only were Amerindo U.K. and Amerindo Panama then not subject to the record keeping requirements of Rule 204-2, but, in addition, neither Amerindo U.K. nor Amerindo Panama was subject to any kind of regulatory scheme or requirement remotely similar thereto.

      The inchoate U.S. entity, therefore, found itself in a unique dilemma, the solution to which, even after exhaustive research, remained unclear and inconclusive. The dilemma was that now that Registrant was about to become organized and U.S. registered so as to permit its principals entry into the U.S. management field, Registrant had to decide

Richard A. Castro, Chief, Branch of Regulation
Vanessa Sherman, Securities Compliance Officer
December 15, 1992
Page 3

what performance reporting it could do, what performance reporting it should do, and what performance reporting it was required to do. Registrant recognized this to be a difficult problem at the time, and consulted with counsel extensively over the issue back in 1984 and 1985. That counsel was I, so I find myself in the position of being able to report first hand on the deliberations which took place at that time.

Those deliberations led us to conclude that performance data prior to 1986 should be reported, notwithstanding that Rule 204-2 records and detail were not available. Essentially, it was our conclusion that it would be misleading to suggest that there was not performance history when, in fact, there was considerable performance history with respect to the two individuals who owned some 90% of Registrant's stock. We were convinced that the framework of the Investment Advisors Act would have required this performance reporting had the record of Amerindo U.K. been a poor one, so we were convinced that this performance was nonetheless required, notwithstanding that the record of Amerindo U.K. was a good one and not a poor one. We concluded that true and accurate performance reporting was required, and that Registrant's obligation was to make sure that the information provided was true and complete and not in any way misleading. Moreover, we felt especially comfortable with this conclusion given the fact that Registrant would be marketing its services to extremely sophisticated institutional clients, most, if not all, of whom would have experienced and sophisticated investment committees and consultants fully capable of asking all questions necessary to explore for themselves exhaustively any and all aspects of the performance reporting that would be provided.

That is the history and background of why it is that Registrant has been including pre-1986 performance information for Amerindo U.K., even though Rule 204-2 type records cannot be supplied to confirm the information reported. (Amerindo Panama information has not been reported to clients because, as I discuss below in more detail, Amerindo Panama manages assets somewhat differently from both a technical and strategic point of view). Note, however, that it turns out that the pre-1986 record for which backup data cannot be supplied is pretty much consistent with the ample post-1986 substantiated record which has now become available. Thus, Registrant would suggest that it made a careful and considered judgement, that the information which it supplied was in all respects true and correct, that its judgment was correct and in conformity with the regulatory framework as a whole, and that it would not be injurious to clients to permit Registrant to continue to provide this information in the future.

You suggested during our telephone conference the other day that historically the Staff has not approved this type of reporting, even given the situation which I have outlined above. It is important to stress during the course of your further consideration of this issue that Registrant has an extremely sophisticated actual and potential clientele, who are likely to request this information in the event that it is not provided to them in the first instance. Therefore, at the least, I would request that you give your consideration as to how this information might be provided to clients and prospective clients in the event that it is specifically requested by a sophisticated prospective client who makes that request.

Richard A. Castro, Chief, Branch of Regulation
Vanessa Sherman, Securities Compliance Officer
December 15, 1992
Page 4

    3.    At Paragraph 3 at Page 1 of Ms. Sherman's December 8 letter, you request that the trade blotter of transactions for advisory clients of Panama U.K. be provided. As we mentioned during our telephonic meeting, Registrant cannot provide these materials and, further, these materials should not be produced in any event. As this position is not newly conceived or arbitrary or capricious in any way and is, instead, reflective of careful and deliberate planning which went on years ago, we feel that here too a restatement of the historical background which we provided to you on the telephone would be useful.

    Back in 1984 and 1985, when the organization and licensing of Registrant were being considered, two principal concerns surfaced, concerns which went to the very issue of whether entry to the U.S. investment advisory market would be possible for Registrant at all.

    The first such concern was over whether entry into the U.S. market (or any other market, for that matter) would somehow compromise in any respect whatsoever the discretion and privacy which offshore clients so jealously guarded. This was terribly important. Amerindo Panama in particular had clients of long standing, with whom it had been the understanding from the beginning that their involvement with Amerindo Panama would not somehow subject them to regulatory involvement in any jurisdiction other than Panama. Thus, entry into the U.S. market would not have been pursued had it been concluded that this separation for offshore clients could not be maintained.

    The second such concern involved the fee structure employed by Amerindo U.K. and Amerindo Panama. As you know, Registrant employs a fee structure which is based on a base fee plus an incentive or performance fee. This is the same kind of structure used by Amerindo U.K. and Amerindo Panama. Amerindo U.K. and Amerindo Panama had always used this fee structure but, as you also know, this incentive or performance fee structure was not legal in the U.S. until November of 1985, at which time Rule 205-3 became effective. The concern here was not that Registrant would not be permitted to charge an incentive fee - Registrant was willing to enter the U.S. market and forego an incentive fee; the concern was that Section 208(d) of the Investment Advisors Act would operate to integrate the incentive fee charged by Amerindo U.K. and Amerindo Panama with the fees charged U.S. clients, thereby causing Registrant to be in violation of Section 205(1) notwithstanding that it actually did not itself charge prohibited fees to its U.S. advisory clients.

    Thus, there were serious concerns as to whether entry into the U.S. market was at all feasible, given the fact that the offshore entities were charging fees which were then prohibited under the U.S. regulatory scheme. The question to be answered was whether, under existing law, these preexisting offshore operations could be maintained separately and distinctly from registrant's onshore operations. The initial research conducted with regard to this issue turned up the <u>Richard Ellis, Inc.</u> letter (which deals, of course, with a parent/subsidiary relationship, not a sister corporation relationship). After reviewing this letter, contact was made with the Commissions's staff in Washington, D.C., to discuss this issue further. During these discussions, the staff suggested that counsel review the <u>Double D Management</u> letter and that a careful reading of that letter might suggest a resolution to our dilemma.

Richard A. Castro, Chief, Branch of Regulation
Vanessa Sherman, Securities Compliance Officer
December 15, 1992
Page 5

In fact, that letter and subsequent conversations with the Staff were quite helpful. As a result of that letter and as a result of a careful and deliberate review of all of the facts and circumstances, I felt comfortable advising the client that U.S. registration was possible without causing the operations or methods of the offshore entities to be integrated with those of Registrant.

I believed that to be the case then, and I believe that to be the case now. In that regard, I would like to point out to you that ever since its inception and until only very recently, there was not even a complete identity of ownership as between Registrant on the one hand and Amerindo U.K. and Amerindo Panama on the other. More specifically, it was not until this year, when Mr. Leo Guzman's 10% ownership in Registrant was repurchased, that Registrant first became wholly owned by Messrs. Vilar and Tanaka. Moreover, it is anticipated that the next 12 months will more than likely see Registrant once again being opened up to third party participation, as that has always been the way in which Registrant has operated. Additionally, it should also be pointed out that Registrant, unlike its U.K. and Panama relatives, has a portfolio manager who is not shared by Amerindo U.K. or Amerindo Panama and who practices in a specialty not shared by those entities (emerging growth), that Registrant has a Chief Financial Officer who is not shared by those entities, and that Registrant has a Chief Administrative Officer that is not shared by those entities. In point of fact, those other entities do not even have equivalent positions. Basically, Registrant is operated as a U.S. registered advisor and is structured to operate as such, while the other entities are operated and structured to exist in a regulatory environment quite different from the one in which Registrant finds itself.

The point is, Registrant was careful at its inception and has been careful ever since to analyze its ability to maintain an existence and a profile separate and apart from its non U.S. relatives and to operate in a fashion that would not compromise in any way either the discrete operations of those offshore relatives or their offshore clients. This has not been an idle or haphazard exercise on Registrant's part; instead, it has been something which has always been at the center of Registrant's deliberative and planning processes (and, frankly, we had hoped that the Staff had reached the same conclusion as we had when your 1989 examination was concluded without a similar request). Thus, without addressing the issue of whether the Staff or the Commission has the jurisdiction or authority to do so, Registrant believes that the Staff should even seek production of the requested materials.

In addition to the foregoing, it should also be pointed out that Registrant has no authority in any event to deliver the requested materials. The materials which have been requested are the property of the clients of Amerindo Panama. It is our understanding that Amerindo Panama does not have the permission of these persons to hand over the materials sought and, quite likely (given the explanation set forth above), could not obtain their consent to do so. The Staff has inquired, however, as to whether Registrant might ask its Panamanian relative to request of its clients that the materials be produced. Following up on that, it is Registrant's understanding that Amerindo Panama believes that any such request would not only be turned down, but would also be viewed by its clients as being extremely insensitive,

Richard A. Castro, Chief, Branch of Regulation
Vanessa Sherman, Securities Compliance Officer
December 15, 1992
Page 6

indiscreet and embarrassing. Accordingly, it is Registrant's understanding that Amerindo Panama would not wish to make such a request of its clients.

Finally, you have also requested that we ask whether the requested material is in the U.K., and we have done so and been advised that Amerindo Panama's records are maintained in Panama, further evidence that a great deal of time, attention and effort has been devoted to allowing Amerindo Panama to maintain its discrete and separate existence. In that regard, you will note that information which has been requested by you for Amerindo U.K. has been turned over, owing to the fact that information concerning Amerindo U.K. has been included in the performance information which Registrant reports. Such performance information for the U.K. entity has been included in the material distributed by Registrant because of the fact that Amerindo U.K. manages accounts much like those managed by Registrant, but Amerindo Panama manages accounts on a very different basis, using, as it does, significant amounts of leverage in its management strategy, with the result that Amerindo Panama data is not reported, because doing so could be considered misleading. Thus, the profile of Amerindo Panama is different, the strategy of Amerindo Panama is different, the needs and expectations of clients of Amerindo Panama are different and there is not in the case of Amerindo Panama the nexus with Registrant that can be established for Amerindo U.K. (vis-a-vis performance reporting). Therefore, the requested information cannot be produced and should not be sought.

4.   It is my understanding that the custodial statements for Coors were provided under cover of Mr. Sandifer's December 10 letter.

5.   You indicated in our telephone conference that the number of limited partners of Ardent, as opposed to their names, would be required, and it is my understanding that this information was provided to you under cover of Mr. Sandifer's December 10 letter.

6.   I am providing to you herewith the information which you requested regarding the Rule 206(4)-3 materials relating to Tucker Anthony. Further, it is my understanding that the Chief Financial Officer of Registrant or Mr. Sandifer will be providing to you directly the Tucker Anthony calculations which you have requested. Finally, I am not aware of any other Rule 206(4)-3 type solicitation arrangements relating to ATP, but I am reconfirming that with Registrant. In that regard, I had, as you know, an opportunity to review the material which has heretofore been provided to you by Registrant, in order that I might become familiar with the items which you had seen. Going through that material, I noticed a memorandum in the file from me to Lori Bowers, wherein I inquired about whether some other solicitation arrangement might exist and whether, if so, the required Rule 206(4)-3 material had been or would be obtained. I will follow up on that with Lori, and report back to you. In the meantime, I would hope that you would be able to see from that memorandum and from the ATP file generally the care which take to conduct that offering properly.

7.   I believe that all of the requested Ardent materials were provided to you under cover of Mr. Sandifer's December 10 letter.