Vivian Shevitz
Attorney at Law
46 Truesdale Lake Drive
South Salem, New York 10590
914-763-2122
Fax:  888 859-0158
Vivian@shevitzlaw.com

February 13, 2014

Hon. Richard J. Sullivan (by email)
United States District Judge
40 Centre Street
New York, New York 10007

Re:  SEC v. Amerindo, Vilar and Tanaka  05 cv 5231 (RJS)
RESPOSE TO PATRICK BEGOS 2/11/2014 LETTER AND
HIS CLIENTS' HARDSHIP REQUEST

Dear Judge Sullivan:

I write on behalf of Gary Tanaka and Alberto Vilar in response to the Mayer "hardship" request, approved by the Receiver and the government in this case.  I also write in response to Patrick Begos' 2/11/2014 letter to the Court, attempting to argue his defense to our motion to vacate, filed in State court, in *this* court, instead of waiting for the State court to decide the pending motion.  Neither Mr. Begos nor his clients are parties in this case.  If he wants to litigate his clients should be required to formally intervene.  Suffice it for now to say that Mr. Tanaka and Mr. Vilar will be replying.[1]  Mr. Begos is an *advocate*; and he misreads the motion to vacate.

---

[1] Among other things we show that Mr. Begos avoided giving notice to Gary Tanaka, then pro se, about the summary judgment motion.  Mr. Tanaka wrote to the State court that he had wanted to argue pro se but had not known about the motion.  Mr. Begos impugns Mr. Tanaka by stating (in his opposing papers filed in State court) t, that he mailed a copy of the motion to Gary Tanaka at Terminal Island.  However, his affidavit of mailing shows he used the wrong address in the first place.  He sent the letter to Terminal Island in "San Francisco".  Terminal Island is not in San Francisco; it is in San Pedro.  The Bureau of Prisons probably did not receive the letter, and if someone did, the Bureau of Prisons is not in the business of forwarding mail.

The Mayers have had three 'poverty' requests of $150,000 (no specific reason, granted), $250,000 (purportedly to pay mortgage, lapsed), and $50,000 (pending), the only one of defendants' clients to so formally request special distributions to the government and the court. Defendants empathize with Herbert Mayer, a longstanding client who turned management of his family funds over to his daughters many years ago.  His daughters again ask for sympathy and a "special favor"-payout.  This is ironic because it is their grab for double their projected redemption profits and a compound interest rate added to their "restitution" account, that caused the Court of Appeals to reject the restitution award in this case.

---

Mr. Tanaka stands by his moving papers.  He does not say, contrary to Mr. Begos' misreading (be it intentional or by mistake) , that the February 4 2004 letter *is* the settlement document.  He said the settlement was reached along the payout terms embraced in that letter.  He says that along the way the Mayers accepted the fruits – the payments – and demonstrated their acceptance of those settlement terms.

He said that Lisa Mayer's testimony that she *had* accepted the settlement, speaks louder than Mr. Begos' legal defense.   Her admitted acceptance (before Mr. Begos came on the scene to assert legal defenses and before the government adopted Lisa Mayer as a witness) shows that she accepted a modification of the investment contract's payout terms, thus obviating the terms as they were portrayed by the Mayers to the State court.

Mr. Begos also argues that the fact that Mr. Tanaka's and Mr. Vilar's attorneys would have shown the civil settlement because it was 'relevant to that defense" in the criminal case:  "One would assume that his attorney would have considered a claimed settlement with the Mayers (if true) relevant to that defense." (Begos 2/11/14 letter  to Judge Sullivan in the SEC case).  This is one of the serious issues the defendants have with their trial lawyers.  The Court of Appeals expressly stated it was not dealing with Mr. Vilar's ineffectiveness claim.  The magnitude of it keeps growing as the *real* defenses in this case unfold (such as *Morrison*).   Mr. Tanaka also has an ineffectiveness claim, based on his trial /sentencing counsel's failure to appreciate "forfeiture," which resulted in failures to advocate from the beginning to the end of the case for his client's property interests, including Amerindo.

 We object to Mr. Begos' litigation of this issue in this case.  If he really wants to get his clients paid,  he should  get his clients to agree to the amount on their account statement (adjusted for the payments found by Neal Jacobson, in his Motion for Disgorgement), so that everyone can settle, and move on.    This is all that defendants have been requesting:   payment of the May 25 accounts.

In considering whether the Mayers are entitled to more than their rightful share as restitution recipients, because of their "elderly, sick and handicapped father", or because they had an aggressive lawyer who was able to litigate relentlessly in State court while defendants were incapacitated from defending, or otherwise, the Court and parties should appreciate:  the Mayers  1) live in what is described on an internet search as an 8-bedroom 5-bath home in Scarsdale, pleading poverty, while Amerindo has other silent clients who suffer genuine hardship without advocating for their own situations; 2) the Mayers could not make their ends meet on up to $100,000 per month (taxes not paid); and the Mayers 3) seek by force of legal means to win double their Amerindo redemption, thereby creating more litigation (the turnover case), endangering, delaying, and ultimately at the expense of the payouts of their fellow clients. [2]

Though defendants had and have no funds and have been drained with litigation in the SEC case, in the criminal case, and in the Court of Appeals, defendants and their counsel struggled to prepare a motion to vacate their unwarranted judgment.  We hope we showed the

---

[2] The Mayers' relentless pursuit of the defendants is ironic given that they fulfilled the Mayer family's basic desire, as Lisa Mayer said at sentencing:  to "protect our principal" as well as to "make money for us."  Mr Tanaka was not present at the Vilar sentence but this is what Lisa Mayer said there (p.50) :
> MS. LISA MAYER: Lisa, L-i-s-a, Mayer, M-a-y-e-r.
> Good afternoon, your Honor. As you know, I was a witness in the criminal trial, and I'm standing here today as a culmination of many years of a very hard-fought battle.
>    We gave our money to Alberto Vilar and Gary Tanaka for  them to make money for us and to protect our principal.
>    Unfortunately when we asked for our money back we didn't get it, and we still haven't gotten it. We have endured a terrible, stressful time in our lives without our funds and carrying for our elderly, sick and handicapped father.

It is ironic that defendants achieved this very objective through overcoming many personal crises of the Mayer family who were appreciative of the defendants' shepherding their investment for the purpose of protecting their principal for long term growth, but were always, for 20 years, "in crisis."  They could not make ends meet on $100,000 per month and invoked their father's poor health repeatedly as a reason to take all their funds, immediately.

State court that the Mayers judgment was achieved only though Begos making sure that the defendants would be unable to defend..[3]

---

[3] Just "finding" documents has been an enormous effort. On 2/11/14 counsel was searching through more of the 200-plus cartons full of single sheet papers obtained from Mr. Tanaka's prior lawyer's office. Counsel found – among a box of records apparently turned over *to* Mr. Colton, from the government's "privilege" team – a March 8, 2004 memo from Alberto to Renata indicating that the Intouch shares the Mayers have sought (and have been awarded) are without value, but that they are entitled to the share certificates nonetheless. Alberto reported that he learned that the company was hardly alive, and so probably would not reissue the shares, originally purchased by ATGF II for its pooled portfolio, to the Mayers. There is nothing Amerindo can do to get the bankrupt company to issue shares in the Mayers' name, as the Mayers were previously informed. The image is pasted below:

> Mayers' file
>
> **AMERINDO**
> INVESTMENT ADVISORS INC.
>
> MEMO
>
> March 8, 2004
>
> To: Renata
> From: Alberto
>
> This memo only covers the intouch shares for the Mayers.
>
> ATGF II purchased 113,636 shares of intouch Group, Inc. on February 15, 1994, at $11 each for a total value of $1,249,996. The Mayers' portion, and I don't have the exact figure this represents on their statement, is the percentage of the $1,249,996 that their investment represents.
>
> The company went into Chapter 11 bankruptcy subsequently. The preferred shares we had were converted through a reverse split at a rate of 21.06 to one in new common shares. This gave ATGF II a total of 5,395 common shares. Thus, the Mayers' allocation would be the same percentage of the 5,3095 that they had of the original 113,636 shares. This is the number you should use for computation.
>
> 16% = 863-2 Shares.
>
> David Mainzer says that he might be able to ask the company to issue a certificate for the new shares that pertains to the Mayers. This is rather "iffy" in that the company is out of bankruptcy, but hardly alive. In fact, we have kept the investment, after bankruptcy, valued at $0.00 on our balance sheet, but it seems that they are entitled to a stock certificate for something like 50 shares of a company that has no value.
>
> P 00683

As to a hardship distribution, **there should be no preference of clients**. We agree in principle to an interim payment to **all our clients, not just the Mayers.**

We are grateful that finally, there has been a "cap" on the accusation that there are a multitude of phantom ATGF or other clients who may be "out there" or other feared "missing" Amerindo investors. The universe as Mr. Gazes found them is largely consistent with the payout proposal we made last July 2012 in papers in the SEC case; it seems to be "the word", finally, as to claims in this case. (They look much more circumscribed than the prosecutor and SEC envisioned in May and June 2005 and again at sentencing in 2010).

Though clients' claims have been accepted by Mr. Gazes for purposes of the SEC receivership, we believe that some are unjustified, or contain inaccuracies, and will be preparing a response. It will include consent to an interim payment to most of the Amerindo Panama clients except two whose claims though accepted but should not have been.

In the meantime, to the extent the Receiver has not *looked* at those UK Files, he should do so. Though the Receiver claims a "paucity" of information, there is in fact, or should be, substantial information in the UK office's client files, seized and then custodied, last we knew, by the Postal Inspectors on Church Street. We were given (limited) "access" to those documents in the fall of 2005. The government maintains these records and should produce them. They are the best and most reliably accurate source of information about claims as exist; we are amazed that they were not given over to the receiver by the government or SEC. (At the same time, Mr. Jacobson attached "AUK" –labeled documents to his Declaration in support of disgorgement and penalties, to show *some* of the payments made previously; *all* the documents should be obtained from "storage" by the government (DOJ or SEC) and turned over to the Receiver, and provided to us as parties). As Mr. Begos has demonstrated in his response in the

Mayer State case, there are many undiscovered documents of pertinence – some which would, we believe, confirm the Mayer account restructuring agreement.

        Very truly yours,

         /s/

        Vivian Shevitz