UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x
                                                          :
SECURITIES AND EXCHANGE COMMISSION,                       :        Case No. 05-cv-5231-RJS
                                                          :
                              Plaintiff,                  :
                                                          :
                       -  against -                       :
                                                          :
AMERINDO INVESTMENT ADVISORS, INC., *et al*,              :
                                                          :
                              Defendants.                 :
                                                          :
-----------------------------------------------------------------------x


**Response and Objections of Lisa and Debra Mayer to Receiver's Motion (Doc. No. 355) As Amended (Doc. No. 370)**


Begos Brown & Green LLP
Attorneys for the Mayers
2425 Post Road
Southport, CT 06890
203-254-1900
pbegos@bbgllp.com

## Table of Contents

Preliminary Statement ............................................................................................................. 1

Objections Regarding Claim Value ......................................................................................... 3

    1. The Receiver Must Value the Mayers' Claim As Calculated in Their Judgments ............. 3

    2. The Receiver's Amended Method of Calculating ATGF and GFRDA Claims Is Unfair to GFRDA Investors ................................................................................................................ 7

        A.  GFRDA and ATGF Investors are Not Similarly Situated ........................................ 7

        B.  The Difference in the Investments Makes the NCA Method Unfair ...................... 14

    3. The Receiver Miscalculated the Mayers' GFRDA Claim Under the NCA Method ......... 15

Objections Regarding Priority of Distribution ....................................................................... 16

    4. The Mayers' Judgments Have Priority ............................................................................. 16

        A.  The Receiver and the SEC Can Seek Out Additional Assets for Other Investors .. 20

    5. Victims of Vilar's and Tanaka's Fraud Should Receive Priority in Distribution ............. 22

    6. JP Morgan's Claim Should Be Subordinated .................................................................... 23

i

Lisa and Debra Mayer, by their attorneys, Begos Brown & Green LLP, hereby submit the following response and objections to the Receiver's Motion for an Order Fixing Investor Claims and Authorizing Interim Distribution (Doc. No. 355).

## Preliminary Statement

The Mayers' objections fall into two broad categories: objections regarding the calculation of the value of claims; and objections regarding priority of distribution of claims. Within each of those two categories are two distinct issues. One issue is unique to the Mayers: because of their judgments and judgment lien, they occupy a position that no other victim, investor or creditor occupies with respect to calculation and distribution of their claim.

The second issue is more general, and concerns the need to differentiate between victims of Vilar's and Tanaka's fraud (most notably GFRDA investors) on the one hand, and non-victims (primarily ATGF investors) on the other. There are vast differences between them that make it entirely unfair to treat them in the same manner. GFRDA investors were typically friends or family of the fraudsters who sought and were promised safety, with guarantees protecting the interest they were promised and the return of their principal. They did not want or expect speculation, and would receive no benefit from their money being improperly invested in speculative technology stocks. They are victims of fraud.

ATGF investors, on the other hand, sought  and obtained speculation. They wanted exposure to the turbulent technology and biotechnology sector, and got exactly what they wanted. They did not invest for interest or dividends (there is no evidence ATGF ever paid any), but growth. Their account statements from years preceding the Criminal Case show the dramatic ups and downs one would expect from a technology mutual fund. They had no guarantee against

loss, but a huge potential upside in a rising tech market. *No one has established that they were the victims of any fraud.*

Despite the differences between the two groups, the Receiver proposes to calculate their claims in a way that is unduly favorable to ATGF investors, and proposes to pay all claims *pro rata*. This is unfair, and should not be approved, as we will discuss.

### Objections Regarding Claim Value

The Receiver has improperly disregarded the Mayers' judgments against Vilar, Tanaka, and Amerindo Investment Advisors, Inc. (US and Panama) ("Amerindo"). Those judgments are entitled to full faith and credit, and the Receiver is precluded from disregarding them. The Mayers' claim must be valued in the amount of their judgments. *See* Objection 1.

In the event the Court does not sustain Objection 1, the Receiver's "modified NCA" method of calculating claims unfairly provides a boon to ATGF investors and penalizes GFRDA investors. The two groups are not remotely similarly situated in relationship to the fraud, in relationship to the losses, in relationship to the fraudsters, or in relationship to the nature of their investments. Their claims should be calculated by the IIT method the Receiver initially proposed. *See* Objection 2.

Even if the Court were to uphold the Receiver's modified NCA calculation, the calculation is incorrectly applied to the Mayers' claim. *See* Objection 3.

### Objections Regarding Priority of Distribution

The Receiver recommends, without explanation, that the Mayers receive no priority in distribution, despite the existence of their judgment lien. Yet, inconsistently, he recommends that JP Morgan Securities receive priority on account of its claimed security interest.  Just as the Receiv-

er cannot disregard the Mayers' judgment for purposes of valuing their claim, he cannot disregard it when determining priorities. *See* Objection 4.

Even if the Mayers' judgments did not given them a priority, the Court should not impose *pro rata* distribution on the fraud victims to the benefit of speculative ATGF investors. The law and facts discussed in Objection 2 applies equally to this objection. The Court should reject a *pro rata* distribution as unfair and inequitable, and, rule that the GFRDA investors and/or fraud victims be given priority of distribution. *See* Objection 5.

The Receiver has proposed allowing JP Morgan Securities Claim for legal fees and expenses, apparently on a priority basis. JP Morgan has, however, had possession of tens of millions of dollars of cash and securities for almost ten years without paying any interest. Surely JP Morgan, as any bank, made use of the money and assets in its possession, which likely more than offsets any fees it has incurred. The Court should subordinate JP Morgan's claim to the claims of fraud victims and other investors. *See* Objection 6.

<div align="center">

**Objections Regarding Claim Value**

</div>

**1.    The Receiver Must Value the Mayers' Claim As Calculated in Their Judgments**

"It has long been the law that 'the judgment of a state court should have the same credit, validity, and effect, in every other court in the United States, which it had in the state where it was pronounced.' *Hampton v. McConnel*, 3 Wheat. 234, 235, 4 L.Ed. 378 (Marshall, C. J.)." *Thomas v. Washington Gas Light Co.*, 448 U.S. 261, 270, 100 S. Ct. 2647, 2655, 65 L. Ed. 2d 757 (1980). *See also*, 28 U.S.C. § 1738 ("judicial proceedings … shall have the same full faith and credit in every court within the United States").

"A final judgment in one State … qualifies for recognition throughout the land. For claim and issue preclusion (*res judicata*) purposes, in other words, the judgment of the rendering State

<div align="center">

3

</div>

gains nationwide force." *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 233, 118 S. Ct. 657, 663-64, 139 L. Ed. 2d 580 (1998) *See also*, *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 467, 102 S. Ct. 1883, 1890, 72 L. Ed. 2d 262 (1982) ("the federal courts consistently have applied *res judicata* and collateral estoppel to causes of action and issues decided by state courts").

Significantly, "[u]nder *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Kremer*, 456 U.S. at 467.

*Res judicata* clearly applies here. The Mayers' judgments are against Vilar, Tanaka, and Amerindo Investment Advisors, Inc. (US and Panama) (together, "Amerindo"), and concern their liability for, *inter alia*, their GFRDA, ATGF and Intouch investments. The judgments finally resolved the issues of liability and damages. It is beyond dispute that Vilar, Tanaka and Amerindo cannot challenge those judgments in this (or any) court.[1]

The Receiver stands in the shoes of Vilar and Tanaka. The SEC moved for summary judgment only against Vilar and Tanaka, and the Court granted summary judgment only against Vilar and Tanaka. *See* March 11, 2013 Memorandum and Order ("2013 Order"), pp. 1, 16. Based on a determination that Vilar and Tanaka had committed various acts of securities fraud, the Court gave the Receiver additional power over the assets he had originally been appointed to preserve, which were "the assets that have been seized by the government in the related criminal case" against Vilar and Tanaka. October 17, 2012 Order (Doc. No. 267).  The Court has already

---

[1] Vilar appealed two of the three judgments, and the New York Appellate Division upheld them. *Mayer v. Vilar*, -- N.Y.S.2d --, 2014 WL 113951 (1st Dept. Jan. 14, 2014). Vilar's and Tanaka's recently filed, and frivolous, motions to vacate one of the judgments do not affect the finality or enforceability of any of the judgments.

determined that those assets are assets of Vilar and Tanaka. *See* Order of Forfeiture of Substitute Assets, dated November 9, 2010 (Doc. No. 463 in Criminal Action).

The Receiver has no greater right to disregard the Mayers' judgments than Vilar and Tanaka have themselves: "the authority of a receiver is defined by the entity or entities in the receivership. The plaintiff in his capacity of receiver has no greater rights or powers than the corporation itself would have." *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) (citations, brackets and quotation marks omitted). Therefore, "[a]receiver … stands in the shoes of the corporation and can assert only those claims which the corporation could have asserted." *Id.* (quotation marks omitted).Thus, the Receiver is bound by the Mayers' judgments. *See, e.g.*, *In re Beck Indus., Inc.*, 725 F.2d 880, 885 (2d Cir. 1984) ("a judgment against Sloane in its California action would normally preclude the [bankruptcy] trustee from relitigating issues there determined in Rothberg's favor").

No matter how or where the Court circumscribes or extends the power of the Receiver, he cannot arrogate to himself, nor can the Court give him, the power to disregard or recalculate Vilar's, Tanaka's  and Amerindo's liabilities to the Mayers as fixed in their judgments.

It is not unfair for the Mayers' claim to be calculated differently than the claims of investors who have not bothered to pursue and obtain a judgment. It has been nine years since Vilar and Tanaka were arrested, so other investors can hardly complain that the Mayers won a "race to the Courthouse." Moreover, the litigation that resulted in the judgments was started by Vilar and Amerindo, who defrauded the Mayers and then sued them for defamation. Once the litigation began, the Mayers had two choices: discontinue it or abide by Justice Kornreich's orders to prosecute it to conclusion. The Mayers cannot be faulted for successfully concluding the litigation.

The reality is that the other investors have received a tremendous boon in having their claims considered, and valued, by the Receiver. ATGF investors, for example, have had their claims approved even though they do not have any direct claim against Vilar and Tanaka, and it has not been established that they were defrauded in any way (discussed further in Objections 2 and 5). They have not even been required to prove any default (*e.g.*, that they sought to redeem their ATGF stock but were rebuffed). They have not been required to file suit and submit admissible evidence to support their claimed damages. They have not been required to pay counsel to undertake a potentially lengthy and costly litigation against Vilar, Tanaka and/or their corporate entities.

In sum, the Receiver erred in valuing the Mayers' claim at $11,870,514.88, and must, instead, accept the value of their claim at $27,919,761.65 (as of March 14, 2014, plus additional interest at the rate of $5,712.61 per day until payment is made), as calculated below:

| Date of Entry | Principal | Interest per day | Days From Entry to 3/14/14 | Total interest | Total |
|---|---|---|---|---|---|
| 10/28/2011 | $ 19,133,299.78 | $ 4,717.80 | 868 | $ 4,095,050.35 | $ 23,228,350.13 |
| 4/18/2012 | $ 3,290,398.51 | $ 811.33 | 695 | $ 563,875.14 | $ 3,854,273.65 |
| 10/23/2012 | $ 744,113.49 | $ 183.48 | 507 | $ 93,024.38 | $ 837,137.87 |
| **Total** | $ 23,167,811.78 | $ 5,712.61 | | $ 4,751,949.87 | $ 27,919,761.65 |

Additionally, the Mayers' Supplemental Judgment directed Amerindo to "transfer and deliver to [the Mayers] 243,902.43 shares of Intouch, Inc. Series A Preferred stock, and [to] execute any and all documents required to effect any of the aforesaid conveyances[.]" Supplemental Judgment, p. 9. Instead, the Receiver disregarded that aspect of the judgment because he "has been unable to value the Intouch shares." But the value of the shares is not in issue; the Mayers are entitled to the shares, whatever their value.

6

2.     **The Receiver's Amended Method of Calculating ATGF and GFRDA Claims Is Un-fair to GFRDA Investors**

The Court need not address this Objection if it sustains Objection 1.

The Receiver initially determined that GFRDA investors should not be treated the same as ATGF investors. Specifically, he reasoned that the Individual Investment Type ("IIT") calculation was most fair, because it "does draw distinctions among investment types for the simple reason that doing so best matches investors' initial expectations as to risks and returns." Receiver's Motion, ¶ 15. Significantly, he observed that "treating all investment types the same would be inequitable and inconsistent with initial investor expectations." Receiver's Motion, ¶ 16.  In his Amended Motion, he correctly noted that, in using the IIT method, he "was guided by the differing anticipated returns and risk factors across the different investment types." Amended Motion, ¶ 13. But, nonetheless, he entirely abandons that method and concludes that all investors are "similarly situated," merely because they all lost money, and money was commingled. *Id.*

This analysis is incorrect and incomplete, and does not support use of a Net Contribution Amount ("NCA") method. The law and the facts compel the conclusion that GFRDA investors and ATGF investors are not similarly situated, making the IIT method is appropriate.

A.     **GFRDA and ATGF Investors are Not Similarly Situated**

Because receivers (like this one) are appointed in securities cases after fraud is proved, the central purpose of their distributions is to reimburse "defrauded investors[.]" *See*, *e.g., Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 81 (2d Cir. 2006). For example, "Sarbanes–Oxley's Fair Fund provision provides the SEC with flexibility by permitting it to distribute civil penalties among *defrauded investors*[.]" *Id.* at 82 (emphasis added).

Generally, a district court will review a distribution plan to ascertain whether it is "fair and reasonable" to victims of the fraud. *Id.* at 83-84. In conducting that review, two significant factors are whether "the funds *of the defrauded victims* were commingled" and  whether "*victims were similarly situated with respect to their relationship to the defrauders.*" *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88 (2d Cir. 2002) (emphasis added) ("*Credit Bancorp*"). *See also*, *Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 749 (2d Cir. 2013). The focus of the analysis is on *defrauded victims*, not investors who were not defrauded.

Here, there is no dispute about who was defrauded and who was not. Vilar and Tanaka have been convicted of defrauding a number of investors – the Mayers, Lily Cates, Los Angeles Opera, Robert Cox and Graciela Lecube-Chavez ("Victims"); these Victims qualified for mandatory restitution. 18 U.S.C. § 3663A. Relying on *res judicata* the SEC proved that Vilar and Tanaka defrauded a similar, but not identical, group of claimants – Lily Cates and the group the Court referred to as the "Testifying GFRDA Investors" (the Mayers, Graciela Lecube-Chavez, and representatives of Tara Colburn and Robert Cox). 2013 Order, pp. 2-3. The Court's summary judgment decision pertains only to Cates and the Testifying GFRDA Investors. *Id.*, *see also* February 3, 2014 Memorandum and Order (Doc. No. 348) (pertaining to fraud against the Mayers) ("2014 Order").[2]

In contrast, no one has established that a single ATGF investor was defrauded. The Court expressly noted that "claims … by investors who did not testify at trial … are beyond the scope of this Memorandum and Order." 2013 Decision, p. 15. Moreover, the Court otherwise expressly

---

[2]  To avoid confusion, we will focus the factual discussions on GFRDA investors, without attempting to distinguish between those GFRDA investors who are Victims and those who are not. For similar reasons, we will not discuss the details of the Cates investment, and leave to her any objections or arguments she cares to make regarding the calculation of claims.

differentiated between the interests of the Victims and other investors when, in explaining the need for a receiver, it referred to "the risk of harm to the SEC, the individual victims, and other investors[.]" 2013 Order, p. 16. Though the SEC, or one or more ATGF investors, might be able to prove at some time in the future that ATGF investors were defrauded in some way, the Court cannot now assume that they were.[3]

Proving investors were defrauded, is necessary, but not sufficient, to establish that they are similarly situated. *Walsh*, 712 F.3d at 750 ("the record does not support the 3M Group's characterization of the district court as adopting a principle that all investors are similarly situated 'merely' when all have been defrauded").

But even if ATGF investors could prove they were defrauded, the two investor groups are still not similarly situated. Though both *Credit Bancorp* and *Walsh* found the defrauded investor groups at issue to be similarly situated, the facts underlying those decisions, and their rationales, support the Mayers' objection.

In *Credit Bancorp*, there were two primary groups of investors defrauded by Credit Bancorp. Ltd ("CBL"). The Second Circuit held that the two groups were similarly situated because the group that transferred assets to CBL pursuant to a Credit Facility Agreement did not thereby

---

[3]  Vilar's and Tanaka's fraud was not a Ponzi scheme, in which an investor is typically either a victim or an accomplice. In a Ponzi scheme, "earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." *Credit Bancorp*, 290 F.3d at 89. Vilar and Tanaka defrauded GFRDA investors not by using their money to pay other investors, but by promising to invest their money conservatively and then investing it in risky technology ventures. *US v. Vilar*, 729 F.3d 62, 68 (2d Cir. 2013) ("Despite Vilar and Tanaka's description of the GFRDA program, they invested all of the funds in technology and biotechnology stocks[.] … The downside of this scheme, of course, was that the GFRDAs were volatile and not safe investments at all. And so, when the so-called dot-com bubble "burst" in the fall of 2000, the value of the investments held by the GFRDAs dropped precipitously."). ATGF investors, in contrast, got exactly what they were promised – investment in technology stocks. Therefore, it is far from clear that any ATGF investor could establish any fraud.

retain any greater rights in the transferred assets than the other group (who did not have such an agreement). All of the investors were defrauded, and all had the same relationship with CBL, so all were similarly situated.

In *Walsh*, the defendants admitted operating a Ponzi scheme that offered various investment vehicles for pursuing an index arbitrage strategy. The fraud victims typically invested in either an entity that was registered with the SEC as a broker-dealer (WGTC), or an entity that was not registered (WGTI). Aside from registration, there was no difference between the entities: "WGTI was to earn money when WGTC's trading strategies were successful, and investors in WGTI were told they would profit as WGTC did[, and] … 'the returns of investments in WGTI were computed exactly the same as that in WGTC.'" *Walsh*, 712 F.3d at 741. A group of victims who invested in WGTC argued they should receive a greater distribution because WGTC was registered with the SEC (allegedly making it a safer investment). *Walsh* found that the SEC registration had no bearing on the safety of their investment, and further held that the District Court had appropriately evaluated whether all of the victims were similarly situated:

> the court stated that victims may properly be considered similarly situated …
> when they were similarly situated in relationship to the fraud, in relationship to
> the losses, in relationship to the fraudsters, and in relationship to the nature of
> their investments, in what clearly was a uniform Ponzi scheme. This ruling was
> entirely consistent with the principles enunciated in *Credit Bancorp, see* 290 F.3d
> at 88–89.

*Walsh*, 712 F.3d at 750 (quotation marks and citations omitted). As we will discuss below, these elements all weigh against finding that GFRDA and ATGF investors are similarly situated.

*S.E.C. v. Enter. Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009) ("*Enterprise*"), also is relevant, because it found investors were *not* similarly situated. In *Enterprise*, the defendant was a broker who offered custodial services ("that is, to hold securities that the customers had pur-

10

chased"), and managed accounts (in which customers "relied on Enterprise to select securities"). 559 F.3d at 650. Enterprise's chief, Lohmeier, made risky trades in the managed accounts; if the trades paid off, the profits stayed in the managed accounts.  If money was lost, Lohmeier took assets from the custodial accounts to satisfy obligations. The court held that fraud victims with custodial accounts deserved a greater distribution than fraud victims with managed accounts, explaining: "if Lohmeier's strategy had succeeded, the investors in managed accounts (and Lohmeier himself) would have reaped the gains. Because they had been subjected to involuntary and uncompensated risk, the receiver concluded, the custodial investors deserved a larger cut[.]" *Enterprise*, 559 F.3d at 652.

Another pertinent decision is *Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 646 F.3d 401 (7th Cir. 2011), because it discussed the difference between lenders and investors in a receivership distribution. The court explained that lenders (like the GFRDA investors who are compensated only in interest) and shareholders (like ATGF investors, who are compensated by growth) typically occupy different positions: "[t]he priority that lenders enjoy in bankruptcy (and likewise in receiverships) over owners is a function of the difference in their relation to the enterprise." 646 F.3d at 408. More specifically, "[l]enders bear less risk because they have the first claim on the borrower's assets in the event of insolvency, and they pay for this by surrendering all upside risk to the borrower's owners (who in that way are compensated for bearing more downside risk than the creditors)." *Id.* Thus, the categorization of victims  must "mirror[] the contractual allocation of risk and reward between creditors and shareholders." *Id.*

Under this case law, it is clear that GFRDA and ATGF investors are not similarly situated.

First, they are not "similarly situated in relationship to the fraud." *Walsh*, 712 F.3d at 750. GFRDA investors were defrauded while ATGF investors were not.  Moreover, any fraud that

ATGF investors could prove would be of a different type; ATGF investors cannot establish that they were promised safe, guaranteed investments that would generate interest but had their money used for speculation. There certainly was no "unified scheme to defraud" all investors as was found in *S.E.C. v. Byers*, 637 F. Supp. 2d 166, 181 (S.D.N.Y. 2009), *aff'd sub nom. S.E.C. v. Orgel*, 407 F. App'x 504 (2d Cir. 2010), *and aff'd sub nom. S.E.C. v. Malek*, 397 F. App'x 711 (2d Cir. 2010).

Second, they are not similarly situated "in relationship to the fraudsters." *Id.*  The fraud against the GFRDA investors was very personal, because it was  directed against "a select group of individual clients, who were generally close friends or family members of Vilar or Tanaka." *U.S. v. Vilar*, 729 F.3d at 68. And GFRDA investors had a direct contractual relationship with Vilar and Tanaka, because those two personally guaranteed the payment of principal and interest. In contrast, ATGF investors had no guarantee or personal contract with Vilar or Tanaka; they merely were shareholders in a mutual fund owned by an entity owned by Vilar and Tanaka. Unlike the Credit Facility Agreement in *Credit Bancorp*, the personal guarantees gives GFRDA investors additional rights that ATGF investors did not have (as evidenced by the fact that the Mayers obtained a money judgment against Vilar and Tanaka, personally, for their breach of the GFRDA). *S.E.C. v. Byers*, 637 F. Supp.2d at 180, explained that one of the reasons it found investors were similarly situated was that "many of the securities offerings were backed by guarantees[.]" Here, the *only* investments backed by guarantees were the GFRDAs.

Third, the Victims and ATGF investors are not similarly situated "in relationship to the nature of their investments." *Walsh*, *supra*. In *S.E.C. v. Byers*, 637 F. Supp.2d at 180-81, one reason for treating investors alike was that "the offering materials all explicitly stated that the investments entailed a high degree of risk[,]" and all were "part of a 'unified scheme to de-

fraud[.]'" But that is certainly not the case here. ATGF investors intended to invest in speculative technology stocks, and that is how ATGF funds actually were invested. ATGF investors stood to gain, along with Vilar and Tanaka, if the risky investments paid off, like the managed-account investors in *Enterprise*, 559 F.3d at 652 ("if Lohmeier's strategy had succeeded, the investors in managed accounts (and Lohmeier himself) would have reaped the gains"). GFRDA investors, in contrast, were sold a substantially risk-free investment, which would pay a guaranteed and fixed interest rate, and which was supposed to be invested primarily in bonds. *See US v. Vilar*, 729 F.3d at 68 ("Vilar and Tanaka promised investors in the GFRDA program that … the over-whelming majority of the GFRDA funds would be invested in high-quality, short-term deposits, including U.S. Treasury bills"). GFRDA did not seek to speculate in technology stocks, and they would not participate in the potential upside of soaring technology stocks; they were entitled on-ly to their contracted-for interest rate, no matter how much profit the fraudulent investment strat-egy generated for Vilar, Tanaka and the ATGF investors.

On the flip side, ATGF investors understood and volunteered to undertake the risks of an investment in technology stocks: that they could lose their principal if the technology sector de-clined or if particular companies failed. Looking at the ATGF statements included in the Heitkoenig claim, for example, shows ATGF share prices declining from $114 a share in June 2000, to $51 a share in June 2001, to $14 a share in December 2002. This is almost a 90% loss in value in eighteen months, long before there was any claim of fraud. In contrast, as discussed, GFRDA investors expected safe investments, and had guarantees to prevent any loss of principal and interest. In January 2001, when the Mayers' GFRDA matured at a time when ATGF shares were in the midst of their collapse, Vilar and Tanaka offered the Mayers a new GFRDA with no loss of principal.

But the safety GFRDA investors were promised was a lie. Like the custodial-account investors in *Enterprise*, GFRDA investors were "subjected to involuntary and uncompensated risk[.]" *Enterprise*, 559 F.3d at 652. Because ATGF investors, in contrast, voluntarily undertook that risk, and were compensated for it, the two groups are not similarly situated. To put it differently, GFRDA investors deserve being treated in a manner to "mirror[] the contractual allocation of risk and reward between creditors and shareholders." 646 F.3d at 408.

Even the issue of commingling of assets does not impact these groups similarly. The commingling resulted in the funds of GFRDA investors, which were supposed to be invested in a particular, safe manner, being combined and invested indiscriminately with the money that Vilar and Tanaka were using to make high-risk technology investments. In contrast, there is no evidence that the commingling resulted in any losses, or even increased risk, for ATGF investors. Those investors got what they paid for.[4]

### B.    The Difference in the Investments Makes the NCA Method Unfair

The Receiver does not advance any persuasive justification for abandoning the IIT method and adopting the NCA method. Though he claims GFRDA and ATGF investors are similarly situated, as we have just discussed, they most certainly are not.  Rather, he got it right in the first place when he was "guided by the differing anticipated returns and risk factors across the different investment types." The Receiver does not have a legitimate basis to calculate their claims using the same method, especially when that method benefits the ATGF investors at the expense of the GFRDA victims.

---

[4] The Receiver finds some significance in the fact that there was no separate account(s) for GFRDAs. But the offering terms never specified discrete accounts, any more than the cash used to buy a CD at a bank is physically segregated into a custodial account. As long as Vilar and Tanaka invested the money as promised, honored their commitments, the absence of segregated accounts would not have been an issue.

The Mayers, for example, saw their proposed GFRDA claim decline from $11,564,333.89 to $7,317,029.23, while Ronald Salvatti saw his proposed ATGF claim increase from $1,905,192.22 to $6,000,000. In the aggregate, the new proposed claim valuation results in a decrease in GFRDA claims by more than $4,500,000, and an increase in ATGF claims by more than $6,000,000.

The NCA method proposed by the Receiver absolves ATGF investors of all of the risk and market upheaval that occurred prior to 2005. For example, the Receiver proposes that Ronald Salvatti, who purchased $6,000,000 of ATGF in 1999, should have his investment valued at $6,000,000 in 2005, notwithstanding the intervening technology crash. ATGF investors cannot have their claims calculated as if they intended to invest in T-bills or something similarly safe.

It is also unreasonable and unfair to deduct from the claims of GFRDA investors like the Mayers interest payments that were made prior to 2005. Interest was the only compensation GFRDA investors stood to receive, as opposed to the growth that ATGF investors sought. Instead of treating paid interest as a return of principal, the Receiver should treat unpaid interest as an increase in the claim.

The Court therefore should adopt the IIT method initially used by the Receiver.

**3.     The Receiver Miscalculated the Mayers' GFRDA Claim Under the NCA Method**

The Court need not address this objection if it sustains the Mayers' Objection 1 or 2.

The Receiver states that "Under the Receiver's Revised NCA Method, the allowed amount of a GFRDA based Investor Claim would consider the account balance as of the last available account statement but with no interest component subsequent to the statement date." Amended Motion, ¶ 5.

As the Receiver conceded in his initial motion, the "last available account statement" for the Mayers' GFRDA shows a balance of $11,564,334 as of June 30, 2004. Receiver's Motion, ¶ 24. But in the Amended motion, he uses a "Last Known GFRDA Account Balance" of $11,066,713, which was the amount the Mayers initially invested in January 2000. *See* Mayers' Proof of Claim. Then, the Receiver deducts $3,749,683.77 in alleged "Distributions Subsequent to Last Known Balance." But the only distribution made to the Mayers after June 2004 – the last account balance – was the $150,000 distributed prior to sentencing (the $50,000 that the Court just authorized will be deducted from the actual distribution made to the Mayers). Thus, under the NCA method, the Mayers' GFRDA claim should be $11,564,334-$150,000, or $11,414,334.

## Objections Regarding Priority of Distribution

### 4. The Mayers' Judgments Have Priority

As is set forth in detail in the Turnover Petition and Supplemental Turnover Petition in the special proceeding entitled *Matter of Mayer against JP Morgan Securities, LLC*, 12 Civ. 5240 (RJS) ("Turnover Proceeding"), which the Mayers incorporate by reference, the Mayers claim a senior, perfected judgment lien against certain funds (in the ATGF II and AMI accounts) that are now under the Receiver's control.

Specifically, on June 6, 2012, the Mayers delivered to the Sheriff of New York County a property execution directed to JP Morgan Securities. Turnover Petition, ¶ 33, Ex. Q. CPLR 5202(a) provides that, upon delivery of such an execution, the Mayers' rights in the property or debt in question "are superior to the extent of the amount of the execution to the rights of any transferee of the debt or property[.]" Application of CPLR 5202 results in a judgment lien. *Knapp v. McFarland*, 462 F.2d 935, 938 (2d Cir. 1972) ("To enforce the judgment as a lien against the debtor's personalty, however, the judgment creditor must, after docketing of the

judgment, deliver a writ of execution to the sheriff for levy");[5] *In re Cosmopolitan Aviation Corp.*, 34 B.R. 592, 595 (Bankr. E.D.N.Y. 1983) (" It is clear that an execution creditor in New York possesses certain interests … by virtue of sections 5202 and 5234 of the N.Y.C.P.L.R. and thus obtains a lien under [Bankruptcy Code] § 101(28)").

The Mayers' judgment lien is senior to any rights that the SEC and/or the Receiver can claim. The Court appointed the Receiver on October 17, 2012 (Doc. No. 267), and entered summary judgment for the SEC on March 11, 2013. 2013 Order, pp. 16-17.  Thus, they are patently "transferees" of the property whose rights are inferior to the Mayers' rights.

Just as the Receiver cannot disregard the Mayers' judgments in calculating their claim, he cannot disregard the Mayers' lien against the assets in his care when proposing a distribution. 28 U.S.C. § 959(b) (receiver must "manage … the property in his possession … in the same manner that the owner or possessor thereof would be bound to do if in possession thereof").

We note further that the Receiver's disregard of the Mayers' judgment lien is inconsistent with his position that JP Morgan Securities is entitled to a priority for its fees and expenses because it has a security interest in the accounts. There does not appear to be any principled basis for recommending that a security interest be enforced, while a judgment lien be disregarded. The Receiver certainly has not advanced any justification for that distinction.

The SEC has contended that the Court's post-conviction restraining order in the Criminal Action (Doc. No. 364) makes the Mayers' execution ineffective to establish a judgment lien.  We disagree.  In general, a federal court does not have the authority to enjoin non-parties from pursu-

---

[5] *Dictum* in *Knapp* concerning the procedure for docketing in New York a federal judgment issued in a District Court outside of New York was abrogated by *Keeton v. Hustler Magazine, Inc.*, 815 F.2d 857 (2d Cir. 1987). That *dictum* and its abrogation has no bearing on the enforcement of a New York judgment.

ing their rights and remedies. *Doctor's Associates, Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302 (2d Cir. 1999) ("Subject to exceptions, a court's in personam order can bind only persons who have placed themselves or been brought within the court's power"); *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 13, 65 S. Ct. 478, 481, 89 L. Ed. 661 (1945) ("The courts, nevertheless, may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law"). In *Doctor's Associates*, the district court had issued an order purporting to enjoin non-parties from pursing litigation against Doctors' Associates in state court. The Second Circuit found the order improper. 191 F.3d at 302.

Fed R. Civ. P. 65(d) permits the Court to extend an injunction to parties and "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order." This Rule "is designed to codify the common-law doctrine that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Doctor's Associates*, 191 F.3d at 302–303 (quotation marks and citations omitted). There is no contention that the Mayers, victims of Vilar's and Tanaka's crimes, are in "active concert" with them. To the contrary, the Mayers have been entirely adverse to Vilar and Tanaka at all times relevant to these proceedings.

Additionally, the "Anti–Injunction Act … bars a federal court from enjoining parties from proceeding with state court litigation, except 'as expressly authorized by Act of Congress, or where necessary in aid of [the court's] jurisdiction, or to protect or effectuate its judgments.' 28 U.S.C. § 2283." *Doctor's Associates*, 191 F.3d at 305 (brackets by the court).

18

The Court's restraining order states that it is pursuant to, *inter alia*, 21 U.S.C. § 853(g). That section authorizes an injunction "to protect the interest of the United States in the property ordered forfeited." *Id.* It is not clear that the Court has the authority under section 853(g) to enjoin persons or conduct that it cannot reach under Fed. R. Civ. P. 65 or 28 U.S.C. § 2283. We are not aware of any decision by the Second Circuit addressing that issue. Certainly, however, section 853(g) does not "expressly authorize" a court to enjoin non-parties from pursuing their rights under state law.

Even if the Court did have the authority under 21 U.S.C. § 853(g) to enjoin the Mayers from obtaining judgments or executing on them, the facts of this case strongly suggest that the restraint was unnecessary to protect any interest of the United States in the property ordered forfeited, long before the Mayers executed on their judgment. First, before the Mayers' execution was served, this Court had already indicated that its forfeiture orders were erroneous, *see* August 26, 2010 Order (Criminal Action Doc. No. 462), and the government had told the Second Circuit that it agreed the forfeiture orders "should … be vacated in light of Judge Sullivan's acknowledgment of error in calculating the forfeiture amount." Brief for United States of America, dated March 26, 2012 (Appeal Doc. No. 215).  If there is enough value in the accounts at JP Morgan to satisfy both the Mayers' judgments and the forfeiture order that the government ultimately obtains, then no interest of the government is harmed. In any event, it cannot be appropriate to restrain property valued far in excess of the expected forfeiture amount.

Second, the US Attorney's Office expressly notified the Court after the Turnover Proceeding was commenced that it did not object to the Mayers' execution or the Turnover Proceeding. *See* November 5, 2012 letter from Sharon Cohen Levin to Judge Sullivan ("the Government has no opposition to a modification of the Restraining Order … to allow for the turn over of funds or

19

a hardship distribution to the Mayers"). Accordingly, the government made clear that, whatever interest it had to protect at that time, it did not take precedence over the rights of victims of Tanaka's and Vilar's crimes to recover their losses.

Third, this Court modified the restraining order to allow the Receiver to take possession of the assets pursuant to the SEC's civil judgment against Vilar and Tanaka. To the extend the United States still had a protectable interest in the property at issue, turning that property over to the SEC's control pursuant to a civil judgment is not protecting those interests. To the contrary, it places the property beyond the reach of the United States, as it will be distributed by the Receiver, not through the Justice Department's internal procedures. It would be inequitable for the Court to modify the restraining order for the benefit of one party with a civil judgment (the SEC), but refuse to modify the restraining order for the benefit of the Mayers, who have a prior judgment.

If the Court finds that the restraining order made the execution ineffective, the Court can, and should, modify the restraining order, *nun pro tunc*, to give the Mayers the same consideration that it gave to the SEC. *See, e.g.*, *E. Refractories Co. Inc. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) ("we conclude that the bankruptcy court's order represented a modification *nunc pro tunc* of the automatic stay, retroactively lifting the stay to allow Eastern's action (filed in 1986) in the Southern District to proceed").

**A.     The Receiver and the SEC Can Seek Out Additional Assets for Other Investors**

The notion, evidently guiding the Receiver's recommendations, that most every claimant should receive some part of the money on hand, is not a valid basis to disregard the Mayers' judgment lien.

To date, to our knowledge, the Receiver has focused his efforts on the assets on hand that are either cash or publicly traded securities. *See* Receiver's Initial Report and Recommendations, ¶ 8-11.  Though there are substantial amounts of securities that JP Morgan has listed as private, the Receiver has not published any sort of valuation on the "private securities" in those accounts (though it is our understanding that a preliminary evaluation of private securities shows potentially tens of millions of dollars of additional value).

There are substantial additional assets within the Receiver's reach:

- The Receiver's Initial Report notes that the assets placed under his control include Vilar's and Tanaka's interests in real property in the United States and England, and Tanaka's interest in thirty-two race horses. *See, e.g.*, Government Sentencing Memorandum  (Doc. No. 354), p. 163 ("Tanaka's 6-year-old horse Pressing … won the second consecutive running of the Topkapi Trophy (Turk-II in Istanbul, Turkey, Sept. 3 [2009]. The son of Soviet Star is a group I winner in Italy and Germany and a seven-time stakes winner who has earned $1,891,212.") The Receiver has not provided any information on those assets.

- Public filings suggest that Vilar and Tanaka owned, and might still own, personal stock-holdings that were not part of any of the accounts currently under the Receiver's control. For example, a search of the S.E.C.'s EDGAR database reveals that Vilar and Tanaka (under a number of variants of their names) reported substantial personal stakes in a number of companies. A number of those companies underwent mergers or acquisitions after Vilar and Tanaka were arrested. Examples include Opsware, Inc. (which was acquired by Hewlet Packard in 2007 for $1,6 billion); and OSI Pharmaceuticals, Inc., which was acquired by Astellas Pharma in 2010 for $4 billion). It is not always clear from EDGAR filings whether or when Vilar and Tanaka liquidated their personal holdings.

- Vilar reportedly is or was a majority shareholder in Figaro Systems, Inc. a private company that provides seatback sub-titling systems to opera houses around the world.

- Renata Tanaka, Tanaka's wife and an unindicted co-conspirator, remains in England with an unknown amount of assets that might very well be attributable to Tanaka's securities fraud. Such assets would include personal stakes in companies like Siebel Systems, Inc. and Hyperion Solutions Corp., both of which were acquired by Oracle for more than $9 billion.

- Vilar and Tanaka gave homes to family, friends and former employees. As Vilar's attorney admitted: "Vilar has built or purchased houses and apartments for many of his friends, family and staff. He bought an apartment for Pilar Perez, his housekeeper, an apartment for his assistant, Diane Cooper, a house for his friends, Mario and Jacqueline Gaztambide, and

houses and apartments for others[.]"  Criminal Action Doc. No. 352, p. 12. The Gaztam-bides co-signed Vilar's bail bond. Criminal Action Docket  No. 7

- Vilar and Tanaka donated millions of dollars in what is now known to be fraudulently ob-tained money to various institutions, both in the United States and abroad. Tanaka report-edly donated £ 27,000,000 to the Imperial College Business School, which was renamed the Tanaka Business School in or around 2003.

To our knowledge, no attempt has been made to recover any of these assets. Thus, there is no basis to conclude that giving the Mayers the priority they qualify for would result in other inves-tors not being paid in full.

### 5. Victims of Vilar's and Tanaka's Fraud Should Receive Priority in Distribution

The Court need not address this objection if the Court sustains Objection 4.

The analysis in this Objection is based on the same law and analysis as Objection 2, be-cause the fairness of a *pro rata* distribution is also judged by considering whether different groups of defrauded investors are similarly situated. *Walsh*, 712 F.3d at 750. Treating GFRDA and ATGF investors the same for purposes of distributions is as unfair and unreasonable as cal-culating their claims in the same manner. In particular, for the reasons discussed in Objection 2, GFRDA investors and ATGF investors are not similarly situated in relationship to the fraud, in relationship to the losses, in relationship to the fraudsters, or in relationship to the nature of their investments.

While there is a tacit presumption in favor of *pro rata* distributions in unwinding Ponzi schemes, *Credit Bancorp*, 290 F.3d at 89, Vilar and Tanaka did not operate a Ponzi scheme.  In any event, that tacit presumption is limited to *fraud victims*, which does not include ATGF inves-tors. *Id.* "the use of a pro rata distribution has been deemed especially appropriate for fraud vic-tims of a 'Ponzi scheme'").

Additionally, it should be noted that some Amerindo investors already have been treated differently. For example, shortly after Vilar and Tanaka were arrested and the SEC commenced this action, shareholders in Amerindo Technology Fund redeemed more than $35,000,000 in invested money. *See* http://goo.gl/6MOAG6 (*Investors.com*).  Subsequently, the entire fund was transferred to Munder Capital Management. *Id.* In order for the Receiver to justify his request for a *pro rata* distribution to GFRDA and ATGF investors, he should be required to explain why these other investors, who were able to redeem their entire investment, merit special treatment.

While cases approving *pro rata* distributions have *some* elements of dissimilarity between groups, we are not aware of a case imposing a *pro rata* distribution in which there was such a disparity as exists here. Virtually *every* element that the Second Circuit has deemed important in evaluating the fairness of a distribution plan weighs against a *pro rata* distribution. If the Court determines that *pro rata* distribution is fair and reasonable here, one wonders when a *pro rata* distribution ever would be inappropriate. And if that were the case, would not the Second Circuit's statement of the rule (which provides that *pro rata* distribution is appropriate only in certain circumstances) be inaccurate?

Because of GFRDA investors and ATGF investors are not similarly situated, the Court should distribute available funds to Victims and/or GFRDA investors first until they are paid in full, and then distribute any excess funds to ATGF investors.

**6.    JP Morgan's Claim Should Be Subordinated**

It is undisputed that JP Morgan has held tens of millions of dollars in cash for almost ten years. To the Mayers' knowledge, no interest has been credited. There can be no question that JP Morgan was able to use that cash to its own benefit. Accordingly, the Court should subordinate

JP Morgan's claim for additional fees, and pay it only if there are funds remaining after all investors have been paid in full.

Dated:      February 27, 2014

<div style="margin-left: 50%">

BEGOS BROWN & GREEN LLP

By:_____
       Patrick W. Begos (PB4372)
Attorneys for Lisa and Debra Mayer
2425 Post Road, Suite 205
Southport, CT 06890
(203) 254-1900
pbegos@bbgllp.com

</div>