

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X
                                         :

SECURITIES AND EXCHANGE COMMISSION,   :
                                         :

               Plaintiff,          :

                                         :       **05 Civ. 5231 (RJS)**

       v.                    :

                                         :       **ECF CASE**

AMERINDO INVESTMENT ADVISORS, INC., *et al.*,  :

                                         :

             Defendants.       :

-------------------------------------------------------------------------------X

**RESPONSE AND OBJECTIONS OF CLAIMANTS PAUL MARCUS,
THE DEANE J. MARCUS TRUST, THE STEVEN E. MARCUS TRUST,
THE CHERYL MARCUS-PODHAIZER TRUST AND
THE EVE S. MARCUS CHILDREN'S TRUST
TO RECEIVER'S MOTION FOR AN ORDER (A) FIXING
INVESTOR CLAIMS AND (B) AUTHORIZING INTERIM DISTRIBUTION**

        Claimants Paul Marcus, The Deane J. Marcus Trust, The Steven E. Marcus Trust, The Cheryl Marcus-Podhaizer Trust and The Eve S. Marcus Children's Trust ("Claimants"), by their counsel Ballard Spahr Stillman & Friedman, LLP, hereby file the following Response and Objections to: the Receiver's Motion for an Order (A) Fixing Investor Claims and (B) Authorizing Interim Distribution (the "Motion"), filed on February 8, 2014 (Docket Entry No. 355); and the Receiver's Amended Motion (the "Amended Motion") filed on February 25, 2014 (Docket Entry No. 370).

**I.       PRELIMINARY STATEMENT AND SUMMARY OF RECOMMENDATION**

        1.      The Receiver's Motion and Amended Motion contain recommendations to the Court regarding two subjects: valuing the Investor Claims; and an interim distribution.  We respond separately below with regard to each subject, and set forth our own recommendations as

to how we believe Investor Claims should be valued for purposes of both the first interim distribution and the distributions that follow.

2.      With regard to the valuation of Investor Claims, the Receiver's original Motion stated a preference for a Valuation Method based upon the "Separation by Individual Investment Type ('IIT')" rather than the "Pooling Method of Net Contribution Amounts" ('NCA')."   (Motion, ¶¶ 13-16.)   Now the Receiver has changed his recommendation and advocates what he calls the "Revised NCA Method." (Amended Motion, ¶¶ 5-7.)

3.      We respectfully submit that the Receiver's proposal that Investor Claims be valued based on his proposed "Revised NCA Method" should be rejected for the following two reasons (as fully explained in Point II below).   First, it fails to take account of the fundamental difference in the nature of the investments made by the two different categories of Investor Claimants before the Court in this proceeding -- those who invested in Guaranteed Fixed Rate Deposit Account ("GFRDA") and those who invested in Amerindo Technology Growth Fund ("ATGF").  The distinction between them is as basic as that between the bond and the equity markets.  Second, within the category of ATGF Investors, it discriminates between two different sub-groups with no rational basis for doing so.

4.      The way we believe these defects should be cured is addressed in Point III below.  As discussed in paragraphs 31-32, we respectfully submit that instead of the Receiver's "Revised NCA Method," the Court should adopt a procedure for valuing claims that:

(a)      recognizes the fundamental difference between the two separate investments at issue here;

(b)    values each of those two investments on the basis of the different terms applicable to each and the different expectations of the Investors as to risks and returns;[1]

(c)    divides the total assets to be distributed into two "buckets" -- an amount equal to the claims by GFRDA Investors for return of their principal plus accrued interest, and an ATGF bucket consisting of the total assets available for distribution less those allocated to the GFRDA bucket;

(d)    allocates the aggregate GFRDA distribution among the GFRDA Investors based on the amounts which the principal and interest claims of each such Investor bears to the total principal and interest claims of all GFRDA Investors; and

(e)    allocates the aggregate ATGF distribution among the ATGF Investors based on the proportion which the number of shares owned by each such Investor bears to the total number of ATGF shares owned by all ATGF Investors.

5.    Turning from the valuation of claims to the interim distribution, paragraph 56 of the Receiver's Motion states as follows: "The proposed interim distribution is predicated upon a court finding that the Mayers do not have a lien on the assets and therefore does not prime the investors' claims." The issue of the Mayers' claimed priority is addressed in Point IV below. These issues were previously addressed in the motion filed by Claimant Paul Marcus to intervene in the action entitled *Lisa Mayer, et al. v. J.P. Morgan Securities, LLC, et al.*, 12 Civ. 5240 (RJS). On September 23, 2013, this Court entered an Order denying the motion to intervene. In that Order (page 6), the Court stated that "If the receiver determines that there are

---

[1]    In the Motion, the Receiver stated that the "investors' initial expectations as to risks and returns" was a basis for separating the Claimants "by Individual Investment Type. (Motion, ¶ 15.)  Now that he has switched to the "Revised NCA Method," he apparently no longer considers these factors to be important.  We believe the Receiver was correct the first time.

sufficient funds for all investors, Marcus's intervention will serve no purpose.  Accordingly, the Court denies Marcus's motion for permissive intervention, with leave to renew once the receiver's accounting is complete."  However, we respectfully submit that as the Receiver recognized in paragraph 56 of the Motion, the Court cannot determine the amount that each Investor will receive as an interim distribution unless it first resolves the Mayers' claim that they have a lien on all of the assets.

6.      Point V below applies our proposed methodology to the Investor Claims filed in this proceeding.  We respectfully request that the Court do the same.

7.      Finally, in Point VI below, we discuss the important additional work that we believe the Court should empower the Receiver to do so as to maximize the recovery to be made on behalf of the Investors.[2]

## II.      THE GENERAL METHODOLOGY THAT CLAIMANTS BELIEVE SHOULD BE FOLLOWED TO DETERMINE INVESTOR CLAIMS

### A.      Claimants' Proposed Modifications to the Receiver's Recommendation As to How Investor Claims Should Be Valued

8.      As noted above, the Receiver is now proposing that Investor Claims based on GFRDA investments and ATGF investments should both be valued based on the "Pooling Method of Net Contribution Amounts."[3]  Pursuant to this NCA approach, the Receiver starts

---

[2]      We are aware from conversations with the Receiver that he is already working on the matters suggested for further action in Point VI of this Report.  However, we believe that an Order from the Court explicitly empowering the Receiver with regard to such matters will ease his task and address the issue of further compensation.

[3]      The Receiver calls his recommendation a "Revised NCA Method" -- rather than a pure "Pooling ... of Net Contributions" -- because he cannot always determine the amount invested by ATGF shareholders.  Where he does not have such information, he recommends that "the ATGF statement balance reflected on the last available statement less any subsequent redemptions/distributions."  (Amended Motion, ¶ 7.)  However, as discussed in ¶¶ 23-24 below, we believe there is no basis for such discrimination between one group of ATGF shareholders and another.

4

with the sums invested, nets out any distributions, and recommends that the resulting figures be used to make an interim distribution to all Investors -- regardless of whether they invested in GFRDA or ATGF -- on a pro rata basis. (Amended Motion, ¶¶ 5, 7.)

9.    In support of his recommendation that the "Pooling Method of Net Contribution Amounts" should be followed here, the Receiver urges that "all Investor Claimants are for the most part similarly situated in that all have been deprived of their investment as a result of Amerindo's mismanagement of those funds" and that "there is substantive evidence that Amerindo commingled investor funds regardless of the underlying investment." (Amended Motion, ¶ 13.) We respectfully submit that the Receiver's recommendation is fatally flawed because it ignores the fundamental difference in nature between the GFRDA and ATGF investments. This difference is far more important than -- and unaffected by -- the commingling of the funds invested in each vehicle.

10.    While we recognize that the Receiver has qualified his proposal for a pro rata distribution by stating that it is being made "for purposes of an interim distribution" (Motion, ¶ 2) -- and that he may adopt a different methodology for subsequent distributions (Amended Motion, ¶ 14) -- we believe that the problems raised by his pro rata distribution proposal should be addressed at this time. First, we are concerned that if it is approved by this Court, the Receiver's proposed methodology for the interim distribution may establish a "presumption" about the manner in which any subsequent distribution should be divided between GFRDA Investors and ATGF Investors.[4] Second, and more importantly, we believe that the

---

[4]    The Receiver has informed counsel for the Claimants that he is in the process of collecting approximately $4 million from an account beneficially owned by the investors and held in the Cayman Islands, and that he is in the process of seeking to have restrictions lifted on publicly-traded securities beneficially owned by the investors which could have an aggregate value in excess of $45 million. As discussed in Point VI below,

Receiver's proposal for a pro rata distribution to Investors regardless of category is based upon a failure to take account of the fundamental differences between the GFRDA and ATGF investments.

**B.       The GFRDA and ATGF Investments Should Be Treated Separately**

**1.       The Nature of the Investment**

11.     GFRDA was a fixed income security that entitled those who invested to the return of their capital at a specific future time with a specified interest rate.[5]  The investment was similar in nature to the purchase of a Certificate of Deposit issued by a bank.  If the money that the Amerindo managers received from the GFRDA Investors was used to invest in a stock that shot up in value, the GFRDA Investors would not be entitled to any of this increase because the stock was not purchased for their benefit.  The GFRDA shareholders would still only be entitled to the return of their principal plus agreed-on interest.  Even if the stock purchased in this hypothetical was purchased by the managers to provide a gain out of which that interest was to be paid, any portion of the gain beyond the interest due would not benefit the GFRDA Investors.

12.     By contrast, ATGF was an equity mutual fund that entitled each share owner to a proportionate interest in whatever the Fund's assets were worth at any given time.  That value obviously fluctuated widely, especially since most of the securities owned by ATGF were concentrated in the speculative high technology market sector which went through a boom,

---

we are requesting that the Court enter an Order that will help the Receiver in pursuing these assets on the investors' behalf.  The fact that these additional assets exceed the money now held in the JPMorgan Chase accounts which are the subject of the Motion (Motion, ¶ 56), illustrates the importance of maintaining the distinction between the ATGF and the GFRDA investments at every stage of this proceeding.

[5]     Our proposed modifications to the manner in which the Receiver calculated the interest which he credits to the GFRDA Investors are discussed in detail in paragraphs 31-32 below.

a bust, and another boom between the late 90s and the present time.  Annexed to this Response as Exhibit A is a chart showing the NASDAQ Composite Index prices between December 1996 and January 2014.  As the Court will see, the Index was above 4,000 at the end of 1999, fell below 1,400 by early 2003, rose only to 2,000 by May 2005 (the date the Receiver is using to value Investor Claims for purposes of the interim distribution (Motion, ¶ 2)), and then began a sharp rise to over 4,300, where it is today.

13.     One of the best indicators of the difference between the GFRDA and the ATGF investments is that the ATGF Investors received monthly statements of Net Asset Value, and also received quarterly reports describing the performance of the ATGF investments and listing the largest equity positions held.  The GFRDA Investors received no such equity reports because they had no beneficial ownership interest in the securities owned by ATGF, and no stake in the fluctuations in value of those holdings.  Instead, the reports they received showed only their principal and accrued interest.

14.     The Net Asset Value ("NAV") of the ATGF shares reported by Amerindo to the ATGF Investors from 1997 to 2005 moved in the same direction as the NASDAQ Index, but showed even greater volatility.  Annexed to this Response as Exhibit B is a chart showing the NAV reported by Amerindo from the end of 1996 through April 2005 (shortly before Messrs. Vilar and Tanaka were arrested).  As a comparison of Exhibits A and B demonstrates: the NASDAQ Index increased by 53% in 1998 (1,500 to 2,000); increased by 74% in 1999 (2,300 to 4,000); fell by 40% in 2000 (4,000 to 2,400); and fell by an additional 16% in 2001 (2,400 to 2,000).  By contrast, the ATGF NAV: increased by 61% in 1998 (31 to 50); increased by 150% in 1999 (50 to 125); fell by 41% in 2000 (125 to 73); and fell by an additional 53% in 2001 (73 to 34).  Thus, in each of these years except 2000, the NAV was significantly more volatile than

the NASDAQ Index because of the concentration of technology stocks.  In May 2005, when Messrs. Vilar and Tanaka were arrested, the NASDAQ Index was at 1,900.  Today, it is almost 4,300, having increased by approximately 125%.  Based on the historical relationship between the two indexes -- showing the NAV increasing even more rapidly than the NASDAQ Index -- there is every reason to think that the May 2005 Net Asset Value figure of $20.77 (which the Receiver is using as a benchmark) would have increased by substantially more than 125% to date.

15.    Exhibit B only goes through April 2005 because ATGF stopped reporting NAV to its Investors when Messrs. Vilar and Tanaka were arrested.  Because the NAV statements stopped in 2005, Claimants have no direct knowledge of how the value of the securities owned by ATGF -- and thus the value of the ATGF shares themselves -- changed from that time to the present.  However, we know that no sales or purchases were made by ATGF after this time.  We believe that the value of the ATGF shares would have fluctuated during this time period by a margin even greater than the NASDAQ Index.  And since the NASDAQ Index has more than doubled since 2005, it is reasonable to assume that the value of ATGF's holdings increased by an even greater amount since then because the greater volatility of the ATGF holdings.

16.    Such an increase in value should inure to the benefit of the ATGF Investors.  The GFRDA Investors should not participate, since they were entitled only to the return of their principal plus interest.  However, by treating all Investor Claims on a pro rata basis, the Receiver would be giving the GFRDA Investors a windfall by letting them participate in this increase in value at the expense of the ATGF Investors, who assumed a greater risk because their position was not "Guaranteed."

17.    To illustrate the point with simple numbers, if we assume that the GFRDA Investors were entitled to the return of their principal and interest in the amount of $30 as of May 31, 2005, and that the aggregate value of the commingled funds as of that date was $100, the $70 difference would be the sole property of the ATGF Investors.  If the aggregate value of the commingled funds then increased to $200 as of a specified later date and the Receiver allocates that fund between the two categories in the same 30/70 ratio determined as of May 2005, the GFRDA Investors would then get $60 (30% of $200) and the ATGF Investors would then get $140 (70% of $200).  But there is no basis for allocating that additional $30 -- derived entirely from an appreciation of the equity assets owned by ATGF -- to the GFRDA Investors.  Rather, the full balance of the $100 appreciation in the equities owned by ATGF -- and thus in the "commingled" assets -- should go to the ATGF Investors.

18.    By contrast, if the value of the commingled funds dropped from $100 to $50, the GFRDA Investors would not participate in that loss.  They would still be entitled to the return of their net investment of $30, and therefore only $20 would be left for the ATGF Investors.  The full decline of $50 would be borne by the ATGF Investors -- whose allocated portion of the new total would drop from $70 to $20.  And this is as it should be because the key word in GFRDA is "Guaranteed" -- these Investors were entitled to the return of their investments with interest regardless of how the equity markets moved.  By contrast, ATGF was a "Fund" -- a group of securities held on behalf of the purchasers of ATGF shares -- and the value of those securities could go up or down (or become completely worthless).

19.    It is this distinction between the nature of the GFRDA and ATGF investments -- in both the risks assumed and potential benefits that could be realized -- that

makes it wrong for the Receiver to recommend pro rata treatment for the two categories of Investors.

20.     The Receiver supports his recommendation by citing two cases (Amended Motion, ¶ 13), but neither really applies here.  In both *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002) and *SEC v. Malek*, 397 Fed. Appx. 711 (2d Cir. 2010), the Second Circuit found that pro rata distributions were appropriate, but those decisions were not based solely on the commingling of the funds of different investors.  Rather, they were based on the fact that the investors in question were "similarly situated" (290 F.3d at 89; 397 Fed. Appx. at 715) because they had invested in the same investment vehicles that were marketed in the same manner.  (290 F.3d at 87-88; 397 Fed. Appx. at 716.)  Moreover, as Judge Chin has stated in a related context, another important factor to consider in determining whether investors are "similarly situated," so as to justify pro rata distributions, is whether they relied on the same offering materials.  *SEC v. Byers*, 637 F. Supp.2d 166, 180 (S.D.N.Y. 2009).

21.     Here, the marketing materials relied on by the GFRDA Investors and the ATGF Investors were different, and led them to believe that they were investing in completely different vehicles with different risks and rewards.  For those reasons, it is respectfully submitted that the Receiver's recommendation that all Investors be treated pro rata should not be adopted by this Court.[6]

## 2.     The Receiver's Improper Distinction in ATGF Investments

22.     In addition to his failure to recognize the fundamental distinction between the GFRDA fixed income and the ATGF equity investments, we respectfully submit that the Receiver's revised proposal also treats the ATGF Investors incorrectly by establishing two

---

[6]     Our proposed methodology for allocating between the GFRDA and ATGF Investors is summarized in ¶ 4 above and set forth in detail in ¶¶ 31-32 below.

different sub-groups within that category.  The distortion in the allocation process introduced by this error can be avoided if the Court accepts the approach we recommend, and values the claims of the ATGF Investors on the basis of the proportional number of shares owned by each. However, in the event that the Court accepts the Receiver's new position and values the ATGF claims according to the amounts invested, we respectfully submit that this error by the Receiver must be addressed at this point.

23.     In his Amended Motion (¶ 7), the Receiver proposes that ATGF Investors' claims be valued "by either (a) the amount of an investor's contributions to the ATGF fund less any subsequent redemptions/distributions or (b) if the amount of an investor's initial contribution could not be verified, the ATGF statement balance reflected on the last available statement less any subsequent redemptions/distributions."  But any such "statement balance" would be the product of multiplying the number of ATGF shares held by the reported Net Asset Value as of the date of the statement.  However, the NAV was completely variable, so the date used to make any such calculation can result in a wide variation of the valuation assigned to a particular Investor's claim.

24.     As shown in Exhibit B, the reported Net Asset Value for the ATGF shares ranged from a high of over $144 in early 2000 to approximately $20 in April 2005.  An ATGF shareholder who owned 1,000 shares that submitted a claim based on a February 2000 statement would be assigned a value of $144,000 by the Receiver's method, whereas an ATGF shareholder who submitted a claim based on a May 2005 statement would be assigned a value of $20,000. The possibility for abuse -- based on an Investor selecting the most advantageous statement for use in his claim -- is obvious if the Receiver's proposed methodology creating two sub-

categories of ATGF Investors is adopted.  But if the ATGF claims are valued on the basis of the number of shares held -- as we urge -- the risk of such abuse can be avoided.

**C.**    **The Values of the Claims of the ATGF Investors Should Be Calculated Based on the Number of Shares Held by Each, Rather Than the Amount Invested**

25.    As noted at the outset, the Receiver originally recommended that the claims of the ATGF Investors be valued according to the number of ATGF shares they owned. Now, he has changed his position and recommends allocation based on the net investment made by each ATGF shareholder.

26.    We respectfully submit that allocation among ATGF Investors based on the number of shares owned by each is the only approach that would be consistent with the nature of ATGF itself.  It was a mutual fund which owned various securities.  Like any mutual fund, the value of its shares fluctuated as the prices of the underlying securities rose and fell over time.   And as in any mutual fund, the value of each shareholder's interest was his/her/its proportional share -- based on the number of shares owned -- of total fund assets.  If there were 100 ATGF shares outstanding and a particular Investor owned 10 of those shares, his ATGF holdings would be worth 10% of the value of the fund's overall holding.  If the price of the securities owned by the fund rose, 10% of any such increase would go to the benefit of the Investor in question.  And if the value of the fund's assets dropped, that Investor would bear 10% of any such loss.

27.    The Receiver's recommendation that the ATGF valuations be made according to the net amount invested by each shareholder ignores the fact that ATGF Investors -- like the shareholders of any mutual fund -- purchased their shares at different prices because they invested at different times.  In fact, it distorts the allocation process by focusing on the value of the shares on arbitrary and variable dates -- the date on which each Claimant purchased ATGF

shares.  What is far more important is the value of those shares at the time the distribution is being made.  And at any given time, the value of each ATGF share was the same -- even though some Investors may have paid more or less than that value depending on when they acquired the ATGF shares.

28.     It is respectfully submitted that allocation according to any metric other than the number of shares held would ignore the very nature of what kind of investment ATGF was.  Exhibit A to both the Motion and the Amended Motion disclose that the total number of ATGF shares outstanding in May 2005 was approximately 680,500.  Therefore, the portion of the aggregate amount of assets attributable to the ATGF Investors -- the total amount of assets located by the Receiver less the principal and accrued interest that goes into the GFRDA bucket -- should be allocated among those individuals by multiplying the total by a fraction the numerator of which is each ATGF Investor's own shares and the denominator of which is 680,500 (or such lower figure that may result from the Court's elimination of any ATGF claims listed in the Receiver's Exhibit A).

**D.     The Values Used by the Receiver to Calculate GFRDA Investor Claims Should Be Revised to Exclude Interest**

29.     The Receiver's proposed revised methodology credits the GFRDA Investors with "accrued interest through the date of their last statement."  (Amended Motion, ¶ 5.)  We respectfully submit that this is another example of giving an improper benefit to the GFRDA Investors that is not given to the ATGF Investors.

30.     As discussed above, the Receiver's general recommended approach for ATGF Investors is to value their claims based on their net investments.  (Amended Motion, ¶ 7.)  If this approach is adopted by the Court, the result would be that no allowance would be made for any appreciation in the ATGF investments -- which, as discussed above, should now be

worth more than twice their value at the end of 2005 based on the doubling of the NASDAQ Index since that time and the great volatility of ATGF.  We respectfully submit that there is no valid basis to allow for appreciation in the value of the GFRDA Investments (*i.e.*, accrued interest) and at the same time deny such treatment to the ATGF Investors.

### III.   CLAIMANTS' RECOMMENDATIONS REGARDING THE VALUATION OF THE INVESTOR CLAIMS

31.    Paragraphs 8-21 above describe the unfairness that we think results from the Receiver's proposal that Investors in both GFRDA and ATGF should be treated on a pro rata basis.  As explained in those paragraphs, we believe that the Receiver's proposal is flawed because it does not recognize the distinction between the GFRDA and the ATGF investments.

32.    While we acknowledge that it is difficult to make a final allocation without knowing the total value of the assets that will be available, we respectfully submit that there is a fairer methodology than that proposed by the Receiver -- a methodology which would take account of the difference in the nature of the two kinds of investments.  That methodology -- which we respectfully recommend to the Court -- consists of the following steps:

(a)    A calculation should be made of the net principal invested by the GFRDA Investors (*i.e.*, the amount invested less any amounts previously paid to the GFRDA Investors on account of those investments) plus accrued interest.[7]

---

[7]    Interest on the GFRDA Investments should be computed at the contractual rate for the time period covered by each investment and computed at prevailing interest rates for any subsequent period.  According to the ATGF Offering Circular (a copy of which is annexed as Exhibit C), all of the GFRDA investments were for one or two year periods at the agreed-on rate, and any GFRDA renewals were "subject to renegotiation of the interest rate at maturity."  Annexed as Exhibit D to this Response is a chart showing the interests paid on ATGF investments made at various relevant time periods between the beginning of 2001 and April 2005.  It is respectfully submitted that these rates should be used in calculating the interest to which any GFRDA Investor is entitled for any period subsequent to the maturity of his/her/its contractual investment.

(b)     An estimate should then be made of the total value of the assets that will be distributed -- not just on an interim basis, but in this Receivership proceeding as a whole.  We believe that the Receiver is in a position to make at least a preliminary estimate now because the amount contained in the JPMorgan accounts is known, and the Receiver has already informed us of his expectation that an additional $4 million will be recovered from the Cayman Islands account, and that the sale of the restricted securities owned by ATGF (once those restrictions are lifted) will yield an additional amount of approximately $45 million.  Thus, it can be estimated at this point that the aggregate recovery will be in excess of $72 million.[8]

(c)     The amount calculated under subparagraph (a) above should be subtracted from the amount estimated under subparagraph (b) above to arrive at an aggregate estimated figure attributable to the ATGF Investors (*i.e.*, the balance over and above the amount due to the aggregate GFRDA claims).

(d)     All interim distributions should be allocated to the two different Investor groups in the proportions which the amounts calculated under subparagraphs (a) and (c) above bear to each other.  Taking the simple example used above, if the funds available for distribution consist of $200 and the amount owed to the GFRDA Investors, computed pursuant to subparagraph (a) above is $40, then 20% of all distributions ($40/$200) should go to the

---

[8]     In addition to the assets described in subparagraph (b) above, Claimants respectfully submit that there may well be additional assets capable of recovery by the Receiver.  For example, the Cayman Islands account was previously described by the SEC as containing $10 million, rather than the $4 million to which the Receiver made reference.  Hopefully, further efforts by the Receiver will be able to explain this difference.  Similarly, papers submitted to this Court by the SEC and the United States have referred to an account in the approximate amount of $3 million held at SG Cowan (or SG Securities).  Again, further efforts by the Receiver may realize on the asset.  Finally, the JPMorgan Chase statements show that there are certain securities held in the accounts that are not publicly traded.  Nevertheless, it may be possible to sell these securities and realize additional funds.

GFRDA Investors as a group and 80% of all distributions should go to the ATGF Investors as a group. It is respectfully submitted that using such allocation percentages is the best way to recognize the different characteristics of the GFRDA and ATGF Investors.[9]

        (e)     The allocation percentages described above should be applied to the interim distribution in order to determine the amounts that will go into the GFRDA and the ATGF buckets. The Receiver recommends that the interim distribution be in the amount of 75% of the total cash held in the Distribution Fund. (Motion, ¶ 56.) We do not object to this percentage. However, the figure which should be multiplied by 75% is the current total figure shown in the bank statements most contemporaneous to the actual date of distribution.[10]

        (f)     To the degree that the actual funds available for distribution by the end of this proceeding are greater or less than the estimates made pursuant to subparagraph (b) above, appropriate adjustments be made in the allocation percentages computed for the GFRDA and the ATGF groups of Investors pursuant to the methodology set forth in subparagraph (c) above.

        (g)     Such proportional distributions should continue until the GFRDA Investors recover the aggregate amount calculated pursuant to subparagraph (a) above. Any further distributions after that point should go to the ATGF Investors.

---

[9]     Even if the Court adopts the Receiver's recommended pro rata allocation methodology for the interim distribution, we respectfully request that it nevertheless adopt the methodology set forth above for this proceeding as a whole, that our allocation proposal should be used to determine the final aggregate amount distributed to each category of Investors, and that the results of any interim distributions credited against those aggregate amounts.

[10]    The Receiver stated that figure as $23,158.299.00 as of February 7. (Motion, ¶ 22.) However, the figure that should be used is the total shown on the February bank statements (which will be issued in March and therefore will be received before the interim distribution is actually made).

(h)     With respect to any interim or subsequent distribution, the aggregate amount distributed to each of the two separate Investor groups should be allocated among the individuals within those groups as follows:

(i)     within the GFRDA group of claims, each GFRDA Investor should receive a portion of the aggregate GFRDA figure which equals the percentage that the amount he invested, less any funds distributed to him/her/it, plus accrued interest, bears to the total of the principal and interest due to all GFRDA Investors; and

(ii)     the distribution to any member of the ATGF group of claims should be a portion of the aggregate ATGF figure which equals the proportion that the number of ATGF shares held by each Investor bears to the total of 680,500 ATGF shares outstanding.[11]

## IV.     THE MAYERS' STATE COURT JUDGMENTS DO NOT GIVE THEM A PRIORITY CLAIM ON THE ASSETS THAT ARE THE SUBJECT OF THIS RECEIVERSHIP

33.     The Mayers' claim for priority treatment is based upon judgments they recovered in state court in an action entitled *Lisa Mayer, Debra Mayer, Daba, Inc. and Aba, Inc. v. Alberto Vilar, Gary Tanaka, Amerindo Investments Advisors, Inc. (U.S.) and Amerindo Investment Advisors, Inc. (Panama)*, Index No. 603234/2004 (the "Mayer Action"). The four defendants in that action, against whom the Mayers recovered their judgments, were Mr. Vilar, Mr. Tanaka and the two named Amerindo Investment Advisors, Inc. entities. None of those defendants is a record owner of any of the JPMorgan Chase accounts which are the subject of the

---

[11]     The 680,500 total of ATGF shares included in Exhibit A to both the Motion and Amended Motion does not include any shares ever issued to Mr. Vilar or Mr. Tanaka -- or any ATGF stockholder who received their shares from either of those individuals. This is proper because Messrs. Vilar and Tanaka have acknowledged repeatedly that they had no beneficial ownership of the ATGF assets. (See ¶¶ 40-41 below).

Receiver's Motion, or of any other assets that the Receiver is seeking to recover on behalf of the Investors (and that therefore may be the subject of subsequent distributions).

34.    The JPMorgan Chase accounts which are the subject of this proceeding are in the names of the following entities:

- Amerindo Technology Growth Fund Inc.;

- Amerindo Technology Growth Fund II Inc.;

- Amerindo Management Inc.;

- Amerindo Master Venture Fund LLC;

- Techno Raquia S.A.;

- Olafson Inc.;

- Amerindo Investment Advisors Inc. Money Purchase Plan and Trust; and

- The Trustees of the Amerindo Adv (UK) Ltd. Retirement Benefits Scheme.

None of those entities was a defendant in the Mayers' state court action.

35.    However, despite the fact that the judgments are not against the owners of the accounts at issue here, the Mayers claim that they have a lien on the accounts. The basis on which they make this claim does not withstand analysis.

36.    The Mayers simply ignore the fact that the JPMorgan Chase accounts are not in the names of any persons or entity against which they have obtained a judgment. Instead, they claim that this Court's entry of an Order of Forfeiture of Substitute Assets in the criminal case against Mr. Vilar and Mr. Tanaka "identified the ATGF II Account and the AMI Account as 'property of the defendants' (*i.e.*, Vilar and Tanaka) …," and that the entry of that Order "confirmed that the money and securities in ATGF II and AMI Accounts had been property of Vilar and Tanaka, that was properly reachable by their creditors." (*Mayer, et ano. V. JPMorgan Securities LLC, et al.*, Petition for Payment to Judgment Creditors dated June 25, 2010, ¶¶ 19-

20.)[12]  On that basis, the Mayers claim that any assets that ever were in the name of ATGF or AMI "are owned by Amerindo and/or Vilar and Tanaka" -- conveniently, the persons and entities against whom the Mayers have judgments.

37.     This attempt by the Mayers to read this Court's Order of Forfeiture of Substitute Assets as establishing that Messrs. Vilar and Tanaka were the owners of certain of the JPMorgan Chase accounts now under control of the Receiver is completely unsupportable.  First, as discussed above, it directly contradicts the titles of the accounts themselves.  The fact that the assets here were not even held in the name of any person or entity against whom the Mayers have a judgment should really be the end of any attempt by them to enforce their judgments against the JPMorgan Chase accounts.

38.     Moreover -- completely apart from the fact that the JPMorgan Chase accounts are not in the names of the judgment debtors -- the Mayers' position contradicts the manner in which this Court and all parties have been dealing with those accounts in both the criminal case and the present action.  Significantly, the Mayers' assertion that the money in at least two of the JPMorgan Chase accounts belongs to Messrs. Vilar and Tanaka -- the entire basis for their claimed lien -- contradicts numerous admissions made by those defendants that they had no beneficial interest in the assets in the JPMorgan Chase accounts, and that to the degree that they ever exercised any dominion and control over those accounts (for example, by their signatory authority), they did so only as constructive trustees for the Investors, who were the beneficial owners of the assets in question.

39.     As this Court is aware, Messrs. Vilar and Tanaka have repeatedly acknowledged that the JPMorgan Chase accounts belong to the Investors.  The only JPMorgan

---

[12]     That turnover proceeding was commenced by the Mayers in State Court and removed to this Court under Index No. 12-cv-05240.

Chase accounts that Messrs. Vilar and Tanaka appear to have ever claimed as their personal property are the accounts entitled "Amerindo Investment Advisors Inc. Money Purchase Plan and Trust" and "The Trustees of the Amerindo Adv (UK) Ltd. Retirement Benefits Scheme." However, the Mayers apparently do not assert any liens against these two accounts. Rather, as discussed above, they seek to have their judgment satisfied against the assets in the accounts in the names of "Amerindo Technology Growth Fund II Inc." and "Amerindo Management Inc." There has never been any suggestion that the assets in these two accounts belong to Messrs. Vilar and Tanaka in their individual capacities.

40.     The admissions by Messrs. Vilar and Tanaka that the JPMorgan Chase accounts contain assets beneficially owned by the Investors were made most clearly in their briefs submitted to the Second Circuit on the appeal of their criminal convictions. Thus, in his brief, Mr. Vilar made the following admissions and arguments:

- That the assets contained in the JPMorgan Chase accounts in the name of various Amerindo entities was held in trust by the defendants as fiduciaries and they never acquired any true ownership interest in these assets. (Vilar Appellate Brief, pp. 203-204.)

- That the Investors, as the beneficiaries of a constructive trust, have an interest in these accounts "that is superior to defendants…." (Vilar Appellate Brief, p. 205.)

- That the assets in the amounts "should be returned to the investors…." (Vilar Appellate Brief, p. 225.)

41.     Similarly, in his own appellate brief, Mr. Tanaka stated as follows:

- That the value of the assets in the JPMorgan Chase accounts was sufficient to cover the losses suffered by all of Investors. (Tanaka Appellate Brief, p. 108.)

- That it is only the criminal prosecution and the SEC action "which have kept the assets from the investors." (Tanaka Appellate Brief, p. 110.)

42.     The creditors of a person or entity who holds assets in trust for a third party beneficial owner are not entitled to satisfy their claim against the trustee by resorting to the

assets held in trust. *S.E.C. v. Am. Bd. of Trade, Inc.*, 654 F. Supp. 361, 367 (S.D.N.Y. 1987) *aff'd*, 830 F.2d 431 (2d Cir. 1987) (citing *Kinnison v. Guar. Liquidating Corp.*, 18 Cal. 2d 256, 264, 115 P.2d 450, 454 (1941) ("The fact that an agent deposits the funds of his principal in a bank account which stands in the agent's name does not give the agent any interest which can be subjected to the payment of his debts. Proof that the money in fact belongs to another will defeat an attempt by the creditors of the agent to seize the deposit.")). *See also In re Ames Dept. Stores, Inc.*, 274 B.R. 600, 614 (Bankr. S.D.N.Y. 2002) *aff'd sub nom. LFD Operating, Inc. v. Ames Dept. Stores, Inc.*, No. 02-CV-6271 (SHS), 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004) *aff'd sub nom. In re Ames Dept. Stores, Inc.*, 144 F. App'x 900 (2d Cir. 2005) ("[A] trustee holds bare legal title to property for the benefit of one or more beneficiaries who hold equitable title or interest in the trust property[,]" and where a trustee is in bankruptcy, assets held in trust are not part of the bankrupt estate and thus not reachable by the trustee's creditors in the bankruptcy proceeding.).

43.    It is respectfully submitted that on the basis of the above authorities, and the undisputed facts discussed above, the Mayers have no lien on any of the assets which the Receiver is proposing to distribute, and should therefore be treated in the same manner all of the other Investors.

## V.    THE APPLICATION OF CLAIMANTS' PROPOSED METHODOLOGY TO THE CLAIMS BEING CONSIDERED BY THE RECEIVER

44.    For the convenience of the Court, we have prepared the attached Exhibit E in order to illustrate -- in broad terms -- how we believe application of our methodology would affect the aggregate distributions due to the GFRDA and the ATGF Investors. As that Exhibit shows, the GFRDA amounts shown by the Receiver aggregate approximately $18 million. If one assumes that interest accrued since that time (even at a generous rate far above the market),

this figure can be rounded off to an estimated $20 million. In terms of the assets available, paragraph 32(b) above refers to the figure of $72 million that the Receiver has identified thus far. Assuming some additional amount is realized from the sale of the privately-held securities, the account previously held at SG Cowan and additional funds from the Cayman Islands (*supra*, n. 8), we are assuming that this figure would rise to $80 million -- a round number which we are using for illustrative purposes. Of course, the actual number would depend on further developments in this matter.

45.     Of the total of $80 million in assets used in this hypothetical illustration, $20 million would go into the GFRDA bucket and $60 million would go into the ATGF bucket. The GFRDA amount would go to the individual GFRDA Investors based upon the principal and accrued interest attributable to each claim comprising that total. The $60 million ATGF bucket would be allocated among the ATGF Investors in the proportion that the shares owned by each one bears to the total. Exhibit E shows that total of outstanding ATGF shares as the 680,500 figure used by the Receiver in his Exhibit A.[13] The allocation to each Investor would be $60 million multiplied by a fraction the numerator of which is his/her/its ATGF shares, and the denominator of which is the total number of shares owned by all ATGF Investors whose claims are recognized by this Court.

46.     We list each claim considered by the Receiver and state for each: whether we agree with the Receiver's revised valuations; and, if we object, the basis for the objection.

(a)     E. Ronald Salvitti, M.D., Claim No. 1 -- Claimants respectfully submit that this claim should be valued based on the 91,993.83 ATGF shares owned.

---

[13]     To the degree that this Court disallows the claim of any ATGF Investor, this total would decrease, and the proportional allocation to each ATGF Investor whose claim is allowed would therefore increase.

(b)      John Preetzman-Aggerholm, Claim No. 2 -- Claimants have no objection to the revised valuation of this claim at $234,745.76.

(c)      QGCI Nominees Limited, Claim No. 3 -- Claimants respectfully submit that this claim should be valued based on the 1,642.46 ATGF shares owned.

(d)      Lisa and Debra Mayer, Claim No. 4 -- Claimants object to the ATGF portion of the Mayers' claim allowed by the Receiver in the amount of $341,472.00 in the absence of any evidence that the Mayers actually invested in ATGF (as opposed to receiving ATGF shares by transfer from Mr. Vilar).  With regard to the GFRDA portion of the Mayers' claim, Claimants have no objection to the revised valuation of the GFRDA portion of this claim in the amount of $7,317,029.33.

(e)      Elizabeth Knope, Claim No. 6 -- Claimants object to the Receiver's revised valuation of this claim in the amount of $5,021.00, since it appears to be based on an investment in Rhodes Capital, which is not part of this proceeding.

(f)      Michael Walsh, Claim No. 7 -- Claimants respectfully submit that this claim should be valued based on the 7,635.56 ATGF shares owned.

(g)      Surinder Rametra, Claim No. 8 -- Claimants respectfully submit that this claim should be valued based on the 1,957.98 ATGF shares owned.

(h)      Sheridan Securities, Claim No. 9 -- Claimants respectfully submit that this claim should be valued based on the 16,917.57 ATGF shares owned.

(i)      James Charles, Claim No. 10 -- Claimants respectfully submit that this claim should be valued based on the 22,400.00 ATGF shares owned.

(j)      Ariadna Sanchez, Claim No. 11 -- Claimants object to the Receiver's revised calculation of this claim in the amount of $2,076,274.00, and respectfully submit that accrued interest in the amount of $36,961.00 should be eliminated.[14]

(k)      Robin Sayko, Claim No. 12 -- Claimants respectfully submit that the ATGF portion of this claim should be based on the 5,400 ATGF shares owned.  Claimants object to the remainder of the revised valuation ($81,280) on the ground that it is based on an investment in Rhodes Capital, which is not part of this proceeding.

(l)      Donald and Marilyn Walsh, Claim No. 13 -- Claimants respectfully submit that this claim should be valued based on the 7,372.67 ATGF shares owned. Claimants object to the remainder of the revised valuation ($6,280.00) on the ground that it is based on an investment in Rhodes Capital, which is not part of this proceeding.

(m)      Frank Harris, Claim No. 14 -- Claimants object to the Receiver's revised valuation of this claim in the amount of $47,400.00 to the extent the aforesaid figure includes accrued interest (which is not separately stated).

(n)      Charles Kaye, Claim No. 15 -- Claimants respectfully submit that this claim should be valued based on the 1,630.18 ATGF shares owned.

(o)      Alfred Heitkonig, et al., Claim No. 16 -- Claimants respectfully submit that the ATGF portion of this claim should be based on the 90,000 ATGF shares owned. Claimants object to the GFRDA portion of this claim in the amount of $3,164,899.13 and respectfully submit that the accrued interest in the amount of $133,088.24 should be eliminated.

(p)      The Winsford Corporation, Claim No. 17 -- Claimants respectfully submit that this claim should be valued based on the 51,396.62 ATGF shares owned.

---

[14]      Even where the amounts in dispute are relatively small, Claimants respectfully submit that their objections are appropriate as a matter of consistency and principle.

(q)     <u>Peter Sweetland, Claim No. 18</u> -- Claimants respectfully submit that this claim should be valued based on the 1,194.32 ATGF shares owned.

(r)     <u>John W. Sweetland, Sr., Claim No. 19</u> -- Claimants respectfully submit that this claim should be valued based on the 113,859.84 ATGF shares owned.

(s)     <u>Timothy Sweetland, Claim No. 20</u> -- Claimants respectfully submit that this claim should be valued based on the 2,823.54 ATGF shares owned.

(t)     <u>John W. Sweetland, Jr., Claim No. 21</u> -- Claimants respectfully submit that this claim should be valued based on the 1,194.32 ATGF shares owned.

(u)     <u>Anthony W. Gibbs, Claim No. 22</u> -- Claimants respectfully submit that this claim should be valued based on the 17,746.25 ATGF shares owned.

(v)     <u>Patricia A. Kabara, Claim No. 23</u> -- Claimants respectfully submit that the ATGF portion of this claim should be based on the 2,810.38 shares owned.  Claimants object to the Receiver's allowance of any portion of this claim based on Rhodes Capital.

(w)     <u>National Investors Group Holdings, Ltd., Claim No. 24</u> -- Claimants respectfully submit that this claim should be valued based on the 7,799.61 ATGF shares owned.

(x)     <u>Angelica Jordan, Claim No. 25</u> -- As the Receiver recognized in paragraph 45 of the Motion, Ms. Jordan had no interest in ATGF or GFRDA.  Rather, $2,656,168.00 of her claim is based on something the Receiver describes as "Amerindo International Venture Fund I, individual equity portfolio."  This entity is not a subject of this proceeding, and for that reason, we respectfully submit that this portion of the claim should be

disallowed.[15]   Claimants also object to the GFRDA portion of this claim in the amount of $665,259.19 and respectfully submit that accrued interest in the amount of $23,539.94 should be eliminated.

(y)     Paul Marcus, Claim No. 29-a -- Claimants respectfully submit that this claim should be valued based on the 146,105.04 ATGF shares owned.[16]

(z)     The Deane J. Marcus Trust, Claim No. 29-b -- Claimants respectfully submit that this claim should be valued based on the 20,559.00 ATGF shares owned.

(aa)    The Steven E. Marcus Trust, Claim No. 29-c -- Claimants respectfully submit that this claim should be valued based on the 20,559.00 ATGF shares owned.

(bb)    The Cheryl Marcus Podhaizer Trust, Claim No. 29-d -- Claimants respectfully submit that this claim should be valued based on the 24,931.05 ATGF shares owned.

(cc)    The Eve S. Marcus Children's Trust, Claim No. 29-e -- Claimants respectfully submit that this claim should be valued based on the 946.40 ATGF shares owned.

(dd)    Imagineers Profit Sharing Plan, Claim No. 30 -- Claimants respectfully submit that this claim should be valued based on the 6,941.16 ATGF shares owned.

(ee)    Lily Cates, Claim No. 32 -- Claimants object to this claim in its entirety because Ms. Cates did not invest in either ATGF or GFRDA.   Paragraph 53 of the Motion describes Ms. Cates's claim as based on "Rhodes Capital, SBIC."   This entity is not a

---

[15]    Because any claim by Ms. Jordan is really a claim against Messrs. Vilar and Tanaka in their individual capacities, it should be made against their personal assets -- not assets held in trust for the benefit of the GFRDA and ATGF Investors.

[16]    Mr. Marcus claimed an additional 30,000 shares which the Receiver has disallowed. That claim was based upon the losses he suffered as a result of the delay by Amerindo in redeeming certain of this ATGF shares (which declined in value during the period of delay).   Mr. Marcus is not waiving his claim, but realizes that this point in the proceeding is not the appropriate time to submit evidence on this subject.

subject of this proceeding, and for that reason, we respectfully submit that this claim should be disallowed in its entirety.[17]   Moreover, to the degree that any portion of Ms. Cates's claim is allowed, the Court should disallow the amounts described on her statement from Amerindo as "Accumulated Dividends & Interest Earned Account" in the amount of $3,071,661.08 and "Interest on SBIC Deposit" in the amount of $200,000.00.

(ff)   <u>Robert Cox, Claim No. 31</u> -- Claimants have no objection to the Receiver's revised valuation of this claim in the amount of $85,248.21 but respectfully submit that accrued interest in the amount of $121.61 should be eliminated.

(gg)   <u>Graciela Lecube Chavez</u> -- Claimants object to the Receiver's revised valuation of this claim in the amount of $48,434.12 to the extent the aforesaid figure includes accrued interest (which is not specified).

(hh)   <u>Los Angeles Opera</u> -- In paragraph 10 of the Motion, the Receiver states that he is giving the Los Angeles Opera an opportunity to file a Proof of Claim.   In the event any such Proof of Claim is filed, Claimants believe that it should be disallowed in its entirety unless the Los Angeles Opera can demonstrate that it actually invested money in either ATGF or GFRDA.  If the entity received such interests by transfer by Mr. Vilar, it had no right to receive what he could not give, so the claim should not be recognized.

## VI.   THE ADDITIONAL MATTERS THAT CLAIMANTS BELIEVE THE COURT SHOULD DIRECT THE RECEIVER TO ADDRESS

47.   As noted above, the Receiver has informed counsel for the Claimants that he is now in the process of seeking to obtain funds attributable to two additional categories of investments beneficially owned by the Investors -- a fund in the Cayman Island (which the

---

[17]   Because any claim by Ms. Cates is really a claim against Messrs. Vilar and Tanaka in their individual capacities, it should be made against their personal assets -- not assets held in trust for the benefit of the GFRDA and ATGF Investors.

27

Receiver has estimated to be valued at approximately $4 million); and publicly-traded but restricted securities (which the Receiver has estimated to be valued in excess of $45 million once the restrictions are lifted).  In addition, the JPMorgan Chase accounts contain certain privately-held securities which may be saleable.

48.     We are confident that the Receiver will proceed diligently with his efforts to realize the value of these assets.  However, to the degree that the Receiver encompasses any legal or practical barriers in doing so, we respectfully submit that an Order of this Court directing him to complete these tasks may make it easier for him to accomplish these objectives. Consequently, we request that such an Order be entered.

49.     We are also aware that the time expended by the Receiver and his staff thus far in this matter equates to or exceeds the fees previously allowed by the Court.  Claimants would support any application made by the Receiver for a reasonable additional fee allowance necessary to convert into cash both the fund in the Cayman Islands and the restricted stock.

## VII.   CONCLUSION

50.     We hope that the Court finds this Response helpful in considering the Receiver's Motion and Amended Motion.  We know that the Court is aware that the Investors have been without access to the money they invested in ATGF and GFRDA since May 2005 despite years of effort seeking recovery.  We are thankful that this proceeding has now reached the stage where distributions can begin, and we respectfully submit that this should start with no further delay.

Dated: New York, New York
      February 27, 2014

BALLARD SPAHR STILLMAN & FRIEDMAN,
LLP

By _____
                    Julian W. Friedman (JF 6010)
425 Park Avenue
New York, New York 10022
(212) 223-0200

*Attorneys for Claimants Paul Marcus, The Deane J.
Marcus Trust, The Steven E. Marcus Trust, The
Cheryl Marcus Podhaizer Trust and The Eve S.
Marcus Children's Trust*

NASDAQ Composite Pricing history

| Date | Open | High | Low | Close | Avg Vol | Adj Close* |
|------|------|------|-----|-------|---------|-----------|
| 2-Jan-14 | 4,160.03 | 4,246.55 | 4,044.76 | 4,103.88 | 2,263,246,600 | 4,103.88 |
| 2-Dec-13 | 4,065.66 | 4,177.73 | 3,979.59 | 4,176.59 | 3,227,604,700 | 4,176.59 |
| 1-Nov-13 | 3,932.45 | 4,069.70 | 3,855.07 | 4,059.89 | 1,833,598,500 | 4,059.89 |
| 1-Oct-13 | 3,774.18 | 3,966.71 | 3,650.03 | 3,919.71 | 1,963,340,800 | 3,919.71 |
| 3-Sep-13 | 3,622.64 | 3,798.76 | 3,593.62 | 3,771.48 | 1,844,675,000 | 3,771.48 |
| 1-Aug-13 | 3,654.18 | 3,694.19 | 3,573.57 | 3,589.87 | 1,557,407,700 | 3,589.87 |
| 1-Jul-13 | 3,430.48 | 3,649.35 | 3,415.23 | 3,626.37 | 1,719,631,800 | 3,626.37 |
| 3-Jun-13 | 3,460.76 | 3,488.31 | 3,294.95 | 3,403.25 | 2,057,933,000 | 3,403.25 |
| 1-May-13 | 3,325.35 | 3,532.04 | 3,296.50 | 3,455.91 | 1,868,743,100 | 3,455.91 |
| 1-Apr-13 | 3,268.63 | 3,328.79 | 3,154.96 | 3,328.79 | 1,767,663,600 | 3,328.79 |
| 1-Mar-13 | 3,143.54 | 3,270.30 | 3,129.40 | 3,267.52 | 1,769,299,000 | 3,267.52 |
| 1-Feb-13 | 3,162.94 | 3,213.60 | 3,105.36 | 3,160.19 | 1,988,840,000 | 3,160.19 |
| 2-Jan-13 | 3,091.33 | 3,164.06 | 3,076.60 | 3,142.13 | 1,962,783,800 | 3,142.13 |
| 3-Dec-12 | 3,029.21 | 3,061.82 | 2,951.04 | 3,019.51 | 1,753,986,000 | 3,019.51 |
| 1-Nov-12 | 2,987.54 | 3,033.85 | 2,810.80 | 3,010.24 | 1,861,356,100 | 3,010.24 |
| 1-Oct-12 | 3,130.31 | 3,171.46 | 2,961.16 | 2,977.23 | 1,817,800,000 | 2,977.23 |
| 4-Sep-12 | 3,063.25 | 3,196.93 | 3,040.24 | 3,116.23 | 1,872,861,500 | 3,116.23 |
| 1-Aug-12 | 2,956.72 | 3,100.54 | 2,890.85 | 3,066.96 | 1,613,204,700 | 3,066.96 |
| 2-Jul-12 | 2,938.41 | 2,987.94 | 2,837.72 | 2,939.52 | 1,737,529,500 | 2,939.52 |
| 1-Jun-12 | 2,810.13 | 2,942.28 | 2,726.68 | 2,935.05 | 1,879,992,300 | 2,935.05 |
| 1-May-12 | 3,044.79 | 3,085.40 | 2,774.45 | 2,827.34 | 1,922,548,100 | 2,827.34 |
| 2-Apr-12 | 3,085.94 | 3,128.25 | 2,946.04 | 3,046.36 | 1,771,358,000 | 3,046.36 |
| 1-Mar-12 | 2,979.11 | 3,134.17 | 2,900.28 | 3,091.57 | 1,750,883,600 | 3,091.57 |
| 1-Feb-12 | 2,830.10 | 3,000.11 | 2,825.19 | 2,966.89 | 1,994,932,500 | 2,966.89 |
| 3-Jan-12 | 2,657.39 | 2,834.30 | 2,627.23 | 2,813.84 | 1,855,622,500 | 2,813.84 |
| 1-Dec-11 | 2,615.67 | 2,674.53 | 2,518.01 | 2,605.15 | 1,630,203,800 | 2,605.15 |
| 1-Nov-11 | 2,607.31 | 2,730.39 | 2,441.48 | 2,620.34 | 1,944,674,700 | 2,620.34 |
| 3-Oct-11 | 2,401.19 | 2,753.37 | 2,298.89 | 2,684.41 | 2,121,923,300 | 2,684.41 |
| 1-Sep-11 | 2,583.34 | 2,643.37 | 2,414.31 | 2,415.40 | 2,144,659,000 | 2,415.40 |
| 1-Aug-11 | 2,791.45 | 2,796.24 | 2,331.65 | 2,579.46 | 2,564,059,100 | 2,579.46 |
| 1-Jul-11 | 2,775.08 | 2,878.94 | 2,724.99 | 2,756.38 | 1,979,209,500 | 2,756.38 |
| 1-Jun-11 | 2,829.39 | 2,834.05 | 2,599.86 | 2,773.52 | 2,019,538,100 | 2,773.52 |
| 2-May-11 | 2,881.28 | 2,887.75 | 2,739.85 | 2,835.30 | 2,119,866,600 | 2,835.30 |
| 1-Apr-11 | 2,796.67 | 2,876.83 | 2,706.50 | 2,873.54 | 2,024,012,500 | 2,873.54 |
| 1-Mar-11 | 2,791.08 | 2,802.32 | 2,603.50 | 2,781.07 | 2,041,148,200 | 2,781.07 |
| 1-Feb-11 | 2,717.61 | 2,840.51 | 2,705.54 | 2,782.27 | 2,170,254,700 | 2,782.27 |
| 3-Jan-11 | 2,676.65 | 2,766.17 | 2,663.64 | 2,700.08 | 2,108,703,500 | 2,700.08 |
| 1-Dec-10 | 2,535.19 | 2,675.26 | 2,535.19 | 2,652.87 | 1,696,976,800 | 2,652.87 |
| 1-Nov-10 | 2,520.45 | 2,592.94 | 2,459.79 | 2,498.23 | 2,057,668,500 | 2,498.23 |
| 1-Oct-10 | 2,386.82 | 2,517.50 | 2,332.46 | 2,507.41 | 2,076,593,300 | 2,507.41 |
| 1-Sep-10 | 2,142.75 | 2,400.06 | 2,141.95 | 2,368.62 | 2,095,484,200 | 2,368.62 |

EXHIBIT A

| | | | | | | |
|---|---|---|---|---|---|---|
| 2-Aug-10 | 2,283.32 | 2,309.43 | 2,099.29 | 2,114.03 | 1,994,470,400 | 2,114.03 |
| 1-Jul-10 | 2,110.75 | 2,307.60 | 2,061.14 | 2,254.70 | 2,192,808,500 | 2,254.70 |
| 1-Jun-10 | 2,244.79 | 2,341.11 | 2,105.26 | 2,109.24 | 2,311,604,000 | 2,109.24 |
| 3-May-10 | 2,472.32 | 2,503.00 | 2,140.53 | 2,257.04 | 2,968,435,500 | 2,257.04 |
| 1-Apr-10 | 2,411.68 | 2,535.28 | 2,383.77 | 2,461.19 | 2,731,889,000 | 2,461.19 |
| 1-Mar-10 | 2,247.40 | 2,432.25 | 2,247.33 | 2,397.96 | 2,492,358,200 | 2,397.96 |
| 1-Feb-10 | 2,155.81 | 2,251.68 | 2,100.17 | 2,238.26 | 2,374,673,100 | 2,238.26 |
| 4-Jan-10 | 2,294.41 | 2,326.28 | 2,140.34 | 2,147.35 | 2,564,021,500 | 2,147.35 |
| 1-Dec-09 | 2,162.23 | 2,295.80 | 2,155.96 | 2,269.15 | 1,841,222,200 | 2,269.15 |
| 2-Nov-09 | 2,047.42 | 2,205.32 | 2,024.27 | 2,144.60 | 2,043,167,500 | 2,144.60 |
| 1-Oct-09 | 2,111.77 | 2,190.64 | 2,040.21 | 2,045.11 | 2,413,632,700 | 2,045.11 |
| 1-Sep-09 | 2,001.30 | 2,167.70 | 1,958.04 | 2,122.42 | 2,490,170,000 | 2,122.42 |
| 3-Aug-09 | 1,998.35 | 2,059.48 | 1,929.64 | 2,009.06 | 2,203,232,300 | 2,009.06 |
| 1-Jul-09 | 1,846.12 | 2,009.81 | 1,727.05 | 1,978.50 | 2,239,760,900 | 1,978.50 |
| 1-Jun-09 | 1,796.09 | 1,879.92 | 1,753.78 | 1,835.04 | 2,451,192,200 | 1,835.04 |
| 1-May-09 | 1,719.29 | 1,774.33 | 1,664.19 | 1,774.33 | 2,490,867,000 | 1,774.33 |
| 1-Apr-09 | 1,504.87 | 1,753.61 | 1,498.54 | 1,717.30 | 2,454,997,100 | 1,717.30 |
| 2-Mar-09 | 1,356.13 | 1,587.00 | 1,265.52 | 1,528.59 | 2,347,197,200 | 1,528.59 |
| 2-Feb-09 | 1,460.85 | 1,598.50 | 1,372.42 | 1,377.84 | 2,356,521,000 | 1,377.84 |
| 2-Jan-09 | 1,578.87 | 1,665.63 | 1,434.08 | 1,476.42 | 2,102,509,500 | 1,476.42 |
| 1-Dec-08 | 1,496.09 | 1,602.92 | 1,398.07 | 1,577.03 | 1,870,050,400 | 1,577.03 |
| 3-Nov-08 | 1,718.89 | 1,785.84 | 1,295.48 | 1,535.57 | 2,248,462,600 | 1,535.57 |
| 1-Oct-08 | 2,075.10 | 2,083.20 | 1,493.79 | 1,720.95 | 2,824,966,900 | 1,720.95 |
| 2-Sep-08 | 2,402.11 | 2,413.11 | 1,983.73 | 2,091.88 | 2,576,151,400 | 2,091.88 |
| 1-Aug-08 | 2,326.83 | 2,473.20 | 2,280.93 | 2,367.52 | 1,954,377,100 | 2,367.52 |
| 31-Jul-08 | 2,311.33 | 2,353.39 | 2,309.64 | 2,325.55 | 4,633,020,000 | 2,325.55 |
| 1-Jul-08 | 2,274.24 | 2,353.39 | 2,167.29 | 2,325.55 | 37,660,900 | 2,325.55 |
| 2-Jun-08 | 2,514.82 | 2,549.94 | 2,290.59 | 2,292.98 | 2,288,785,700 | 2,292.98 |
| 1-May-08 | 2,416.49 | 2,551.47 | 2,416.49 | 2,522.66 | 2,139,831,400 | 2,522.66 |
| 1-Apr-08 | 2,306.51 | 2,451.19 | 2,266.29 | 2,412.80 | 2,038,801,800 | 2,412.80 |
| 3-Mar-08 | 2,271.26 | 2,346.78 | 2,155.42 | 2,279.10 | 2,337,740,000 | 2,279.10 |
| 1-Feb-08 | 2,392.58 | 2,419.23 | 2,252.65 | 2,271.48 | 2,408,646,500 | 2,271.48 |
| 2-Jan-08 | 2,653.91 | 2,661.50 | 2,202.54 | 2,389.86 | 2,763,113,300 | 2,389.86 |
| 3-Dec-07 | 2,654.91 | 2,734.82 | 2,553.99 | 2,652.28 | 1,960,397,000 | 2,652.28 |
| 1-Nov-07 | 2,835.00 | 2,835.63 | 2,539.81 | 2,660.96 | 2,513,625,200 | 2,660.96 |
| 1-Oct-07 | 2,704.25 | 2,861.51 | 2,698.14 | 2,859.12 | 2,229,832,600 | 2,859.12 |
| 4-Sep-07 | 2,596.38 | 2,716.75 | 2,536.93 | 2,701.50 | 1,957,217,800 | 2,701.50 |
| 1-Aug-07 | 2,538.50 | 2,627.75 | 2,386.69 | 2,596.36 | 2,333,159,500 | 2,596.36 |
| 2-Jul-07 | 2,617.39 | 2,724.74 | 2,545.90 | 2,546.27 | 2,280,785,200 | 2,546.27 |
| 1-Jun-07 | 2,614.01 | 2,634.60 | 2,534.97 | 2,603.23 | 2,262,320,400 | 2,603.23 |
| 1-May-07 | 2,529.95 | 2,607.90 | 2,510.57 | 2,604.52 | 2,115,423,100 | 2,604.52 |
| 2-Apr-07 | 2,425.36 | 2,562.99 | 2,409.04 | 2,525.09 | 2,089,885,500 | 2,525.09 |
| 1-Mar-07 | 2,377.18 | 2,459.96 | 2,331.57 | 2,421.64 | 2,071,020,400 | 2,421.64 |
| 1-Feb-07 | 2,474.08 | 2,531.42 | 2,395.35 | 2,416.15 | 2,227,421,500 | 2,416.15 |

| | | | | | |
|---|---|---|---|---|---|
| 3-Jan-07 | 2,429.72 | 2,508.93 | 2,394.66 | 2,463.93 | 2,243,760,000 | 2,463.93 |
| 1-Dec-06 | 2,430.75 | 2,470.95 | 2,392.95 | 2,415.29 | 1,824,379,500 | 2,415.29 |
| 1-Nov-06 | 2,373.49 | 2,468.42 | 2,316.82 | 2,431.77 | 1,956,073,300 | 2,431.77 |
| 2-Oct-06 | 2,257.00 | 2,379.29 | 2,224.21 | 2,366.71 | 2,028,942,200 | 2,366.71 |
| 1-Sep-06 | 2,194.56 | 2,273.30 | 2,147.44 | 2,258.43 | 1,955,853,500 | 2,258.43 |
| 1-Aug-06 | 2,080.34 | 2,193.34 | 2,048.22 | 2,183.75 | 1,733,816,900 | 2,183.75 |
| 3-Jul-06 | 2,177.91 | 2,190.44 | 2,012.78 | 2,091.47 | 1,899,380,000 | 2,091.47 |
| 1-Jun-06 | 2,179.82 | 2,233.88 | 2,065.11 | 2,172.09 | 2,085,311,300 | 2,172.09 |
| 1-May-06 | 2,329.79 | 2,352.56 | 2,135.81 | 2,178.88 | 2,183,765,400 | 2,178.88 |
| 3-Apr-06 | 2,352.24 | 2,375.54 | 2,299.42 | 2,322.57 | 2,196,275,700 | 2,322.57 |
| 1-Mar-06 | 2,288.15 | 2,353.14 | 2,239.54 | 2,339.79 | 2,148,650,800 | 2,339.79 |
| 1-Feb-06 | 2,294.11 | 2,313.53 | 2,232.68 | 2,281.39 | 2,064,444,700 | 2,281.39 |
| 3-Jan-06 | 2,216.53 | 2,332.92 | 2,189.91 | 2,305.82 | 2,200,884,000 | 2,305.82 |
| 1-Dec-05 | 2,244.85 | 2,278.16 | 2,200.51 | 2,205.32 | 1,696,538,500 | 2,205.32 |
| 1-Nov-05 | 2,109.89 | 2,269.30 | 2,108.86 | 2,232.82 | 1,796,680,000 | 2,232.82 |
| 3-Oct-05 | 2,152.70 | 2,167.00 | 2,025.58 | 2,120.30 | 1,827,174,200 | 2,120.30 |
| 1-Sep-05 | 2,150.03 | 2,186.83 | 2,093.06 | 2,151.69 | 1,733,383,300 | 2,151.69 |
| 1-Aug-05 | 2,191.49 | 2,219.91 | 2,112.25 | 2,152.09 | 1,559,586,500 | 2,152.09 |
| 1-Jul-05 | 2,060.97 | 2,201.39 | 2,050.30 | 2,184.83 | 1,715,813,000 | 2,184.83 |
| 1-Jun-05 | 2,067.23 | 2,106.57 | 2,039.69 | 2,056.96 | 1,746,991,800 | 2,056.96 |
| 2-May-05 | 1,923.23 | 2,076.80 | 1,916.03 | 2,068.22 | 1,704,864,200 | 2,068.22 |
| 1-Apr-05 | 2,009.09 | 2,021.82 | 1,889.83 | 1,921.65 | 1,883,689,500 | 1,921.65 |
| 1-Mar-05 | 2,057.47 | 2,100.57 | 1,968.58 | 1,999.23 | 1,884,879,500 | 1,999.23 |
| 1-Feb-05 | 2,063.27 | 2,103.45 | 2,023.00 | 2,051.72 | 2,040,173,100 | 2,051.72 |
| 3-Jan-05 | 2,184.75 | 2,191.60 | 2,008.68 | 2,062.41 | 2,247,988,500 | 2,062.41 |
| 1-Dec-04 | 2,104.58 | 2,185.56 | 2,097.86 | 2,175.44 | 2,079,380,900 | 2,175.44 |
| 1-Nov-04 | 1,975.48 | 2,117.89 | 1,969.32 | 2,096.81 | 1,895,570,000 | 2,096.81 |
| 1-Oct-04 | 1,909.59 | 1,984.18 | 1,899.33 | 1,974.99 | 1,791,206,100 | 1,974.99 |
| 1-Sep-04 | 1,833.37 | 1,925.85 | 1,833.33 | 1,896.84 | 1,569,128,500 | 1,896.84 |
| 2-Aug-04 | 1,874.93 | 1,893.13 | 1,750.82 | 1,838.10 | 1,460,116,800 | 1,838.10 |
| 1-Jul-04 | 2,045.53 | 2,045.53 | 1,829.06 | 1,887.36 | 1,772,334,200 | 1,887.36 |
| 1-Jun-04 | 1,978.52 | 2,055.65 | 1,960.26 | 2,047.79 | 1,636,011,900 | 2,047.79 |
| 3-May-04 | 1,928.72 | 1,991.87 | 1,865.40 | 1,986.74 | 1,694,298,500 | 1,986.74 |
| 1-Apr-04 | 1,996.45 | 2,079.12 | 1,919.39 | 1,920.15 | 2,015,611,900 | 1,920.15 |
| 1-Mar-04 | 2,036.92 | 2,069.02 | 1,896.91 | 1,994.22 | 1,928,650,400 | 1,994.22 |
| 2-Feb-04 | 2,072.13 | 2,094.92 | 1,991.05 | 2,029.82 | 1,988,874,700 | 2,029.82 |
| 2-Jan-04 | 2,011.08 | 2,153.83 | 1,999.77 | 2,066.15 | 2,395,193,500 | 2,066.15 |
| 1-Dec-03 | 1,972.97 | 2,015.23 | 1,887.46 | 2,003.37 | 1,693,026,800 | 2,003.37 |
| 3-Nov-03 | 1,941.31 | 1,992.27 | 1,878.07 | 1,960.26 | 1,829,143,600 | 1,960.26 |
| 1-Oct-03 | 1,797.07 | 1,966.87 | 1,796.09 | 1,932.21 | 1,872,176,900 | 1,932.21 |
| 2-Sep-03 | 1,817.92 | 1,913.74 | 1,783.46 | 1,786.94 | 1,989,591,400 | 1,786.94 |
| 1-Aug-03 | 1,731.63 | 1,813.82 | 1,640.88 | 1,810.45 | 1,500,011,400 | 1,810.45 |
| 1-Jul-03 | 1,617.30 | 1,776.10 | 1,598.92 | 1,735.02 | 1,821,410,900 | 1,735.02 |
| 2-Jun-03 | 1,612.10 | 1,686.10 | 1,584.70 | 1,622.80 | 2,045,895,700 | 1,622.80 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1-May-03 | 1,463.00 | 1,599.92 | 1,451.32 | 1,595.91 | 1,939,903,300 | 1,595.91 |
| 1-Apr-03 | 1,347.54 | 1,482.49 | 1,338.23 | 1,464.31 | 1,541,936,100 | 1,464.31 |
| 3-Mar-03 | 1,344.21 | 1,425.73 | 1,253.22 | 1,341.17 | 1,558,727,100 | 1,341.17 |
| 3-Feb-03 | 1,324.74 | 1,352.07 | 1,261.79 | 1,337.52 | 1,354,126,800 | 1,337.52 |
| 31-Jan-03 | 1,308.10 | 1,331.04 | 1,303.64 | 1,320.91 | 3,109,620,000 | 1,320.91 |
| 2-Jan-03 | 1,346.93 | 1,467.35 | 1,303.64 | 1,320.91 | 11,631,800 | 1,320.91 |
| 2-Dec-02 | 1,507.94 | 1,521.44 | 1,327.19 | 1,335.51 | 1,442,352,300 | 1,335.51 |
| 1-Nov-02 | 1,320.95 | 1,497.44 | 1,313.72 | 1,478.78 | 1,825,773,000 | 1,478.78 |
| 1-Oct-02 | 1,180.26 | 1,347.58 | 1,108.49 | 1,329.75 | 1,760,514,700 | 1,329.75 |
| 3-Sep-02 | 1,302.67 | 1,347.27 | 1,160.07 | 1,172.06 | 1,535,629,000 | 1,172.06 |
| 1-Aug-02 | 1,322.47 | 1,426.76 | 1,205.68 | 1,314.85 | 1,480,935,400 | 1,314.85 |
| 1-Jul-02 | 1,457.04 | 1,459.84 | 1,192.42 | 1,328.26 | 2,130,498,600 | 1,328.26 |
| 3-Jun-02 | 1,613.50 | 1,621.50 | 1,375.53 | 1,463.21 | 1,960,673,500 | 1,463.21 |
| 1-May-02 | 1,683.76 | 1,759.33 | 1,560.29 | 1,615.73 | 1,885,692,700 | 1,615.73 |
| 1-Apr-02 | 1,834.59 | 1,865.37 | 1,640.97 | 1,688.23 | 1,851,823,600 | 1,688.23 |
| 1-Mar-02 | 1,745.49 | 1,946.23 | 1,742.08 | 1,845.35 | 1,814,213,500 | 1,845.35 |
| 1-Feb-02 | 1,928.83 | 1,942.15 | 1,696.55 | 1,731.49 | 1,892,543,100 | 1,731.49 |
| 2-Jan-02 | 1,965.18 | 2,098.88 | 1,851.49 | 1,934.03 | 1,947,595,700 | 1,934.03 |
| 3-Dec-01 | 1,915.13 | 2,065.69 | 1,898.98 | 1,950.40 | 1,847,711,000 | 1,950.40 |
| 1-Nov-01 | 1,705.52 | 1,965.09 | 1,683.99 | 1,930.58 | 1,912,218,000 | 1,930.58 |
| 1-Oct-01 | 1,491.45 | 1,792.87 | 1,458.41 | 1,690.20 | 1,990,586,900 | 1,690.20 |
| 4-Sep-01 | 1,802.29 | 1,836.19 | 1,387.06 | 1,498.80 | 2,196,254,000 | 1,498.80 |
| 1-Aug-01 | 2,051.56 | 2,103.16 | 1,777.11 | 1,805.43 | 1,463,923,000 | 1,805.43 |
| 2-Jul-01 | 2,156.76 | 2,181.05 | 1,934.67 | 2,027.13 | 1,639,729,500 | 2,027.13 |
| 1-Jun-01 | 2,131.12 | 2,264.58 | 1,973.70 | 2,160.54 | 1,840,429,000 | 2,160.54 |
| 1-May-01 | 2,116.24 | 2,328.05 | 2,052.41 | 2,110.49 | 1,968,128,100 | 2,110.49 |
| 2-Apr-01 | 1,835.22 | 2,202.86 | 1,619.58 | 2,116.24 | 2,233,857,000 | 2,116.24 |
| 1-Mar-01 | 2,126.30 | 2,243.78 | 1,794.21 | 1,840.26 | 2,129,923,100 | 1,840.26 |
| 1-Feb-01 | 2,771.57 | 2,796.89 | 2,127.50 | 2,151.83 | 2,026,881,000 | 2,151.83 |
| 2-Jan-01 | 2,474.16 | 2,892.36 | 2,251.71 | 2,772.73 | 2,460,813,800 | 2,772.73 |
| 1-Dec-00 | 2,644.09 | 3,028.75 | 2,288.16 | 2,470.52 | 2,343,947,500 | 2,470.52 |
| 1-Nov-00 | 3,316.51 | 3,480.01 | 2,523.04 | 2,597.93 | 1,948,484,700 | 2,597.93 |
| 2-Oct-00 | 3,714.48 | 3,714.48 | 3,026.11 | 3,369.63 | 2,103,428,600 | 3,369.63 |
| 1-Sep-00 | 4,252.15 | 4,259.87 | 3,614.66 | 3,672.82 | 1,837,269,000 | 3,672.82 |
| 1-Aug-00 | 3,760.95 | 4,208.73 | 3,521.14 | 4,206.35 | 1,527,220,400 | 4,206.35 |
| 3-Jul-00 | 3,950.59 | 4,289.06 | 3,615.79 | 3,766.99 | 1,621,434,500 | 3,766.99 |
| 1-Jun-00 | 3,471.95 | 4,073.73 | 3,459.85 | 3,966.11 | 1,609,944,000 | 3,966.11 |
| 1-May-00 | 3,930.18 | 3,982.38 | 3,042.66 | 3,400.91 | 1,471,168,600 | 3,400.91 |
| 3-Apr-00 | 4,494.89 | 4,572.84 | 3,227.04 | 3,860.66 | 1,933,246,300 | 3,860.66 |
| 1-Mar-00 | 4,732.82 | 5,132.52 | 4,355.69 | 4,572.83 | 1,970,373,400 | 4,572.83 |
| 1-Feb-00 | 3,961.07 | 4,698.46 | 3,911.84 | 4,696.69 | 1,886,677,000 | 4,696.69 |
| 3-Jan-00 | 4,186.19 | 4,303.15 | 3,711.09 | 3,940.35 | 1,746,434,500 | 3,940.35 |
| 1-Dec-99 | 3,341.10 | 4,090.61 | 3,321.57 | 4,069.31 | 1,454,508,600 | 4,069.31 |
| 1-Nov-99 | 2,970.93 | 3,469.35 | 2,967.63 | 3,336.16 | 1,442,987,100 | 3,336.16 |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 1-Oct-99 | 2,729.04 | 2,978.63 | 2,632.01 | 2,966.43 | 1,148,873,800 | 2,966.43 |
| 1-Sep-99 | 2,752.33 | 2,897.53 | 2,684.70 | 2,746.16 | 1,073,526,600 | 2,746.16 |
| 2-Aug-99 | 2,638.31 | 2,819.90 | 2,442.22 | 2,739.35 | 964,422,700 | 2,739.35 |
| 1-Jul-99 | 2,692.96 | 2,874.92 | 2,619.08 | 2,638.49 | 1,037,758,000 | 2,638.49 |
| 1-Jun-99 | 2,467.51 | 2,696.87 | 2,364.59 | 2,686.12 | 951,638,600 | 2,686.12 |
| 3-May-99 | 2,546.33 | 2,632.74 | 2,339.12 | 2,470.52 | 960,048,000 | 2,470.52 |
| 1-Apr-99 | 2,493.07 | 2,677.76 | 2,329.87 | 2,542.86 | 1,162,898,000 | 2,542.86 |
| 1-Mar-99 | 2,286.83 | 2,520.63 | 2,235.19 | 2,461.40 | 969,457,300 | 2,461.40 |
| 1-Feb-99 | 2,522.38 | 2,533.44 | 2,224.21 | 2,288.03 | 965,285,200 | 2,288.03 |
| 4-Jan-99 | 2,207.54 | 2,506.68 | 2,192.68 | 2,505.89 | 1,135,956,800 | 2,505.89 |
| 1-Dec-98 | 1,928.51 | 2,200.63 | 1,924.15 | 2,192.69 | 907,377,200 | 2,192.69 |
| 2-Nov-98 | 1,783.71 | 2,025.04 | 1,771.40 | 1,949.54 | 940,209,000 | 1,949.54 |
| 1-Oct-98 | 1,663.30 | 1,781.63 | 1,343.87 | 1,771.39 | 923,540,000 | 1,771.39 |
| 1-Sep-98 | 1,509.01 | 1,769.71 | 1,475.49 | 1,693.84 | 791,514,700 | 1,693.84 |
| 3-Aug-98 | 1,869.72 | 1,874.31 | 1,498.73 | 1,499.25 | 797,615,200 | 1,499.25 |
| 1-Jul-98 | 1,904.24 | 2,028.18 | 1,871.72 | 1,872.39 | 833,545,000 | 1,872.39 |
| 1-Jun-98 | 1,770.37 | 1,898.62 | 1,715.04 | 1,894.74 | 761,886,800 | 1,894.74 |
| 1-May-98 | 1,871.81 | 1,890.80 | 1,742.05 | 1,778.87 | 752,100,500 | 1,778.87 |
| 1-Apr-98 | 1,838.15 | 1,931.83 | 1,788.74 | 1,868.41 | 863,549,000 | 1,868.41 |
| 2-Mar-98 | 1,778.72 | 1,840.83 | 1,708.48 | 1,835.68 | 809,745,400 | 1,835.68 |
| 2-Feb-98 | 1,640.06 | 1,783.74 | 1,640.06 | 1,770.51 | 809,489,400 | 1,770.51 |
| 2-Jan-98 | 1,574.10 | 1,629.54 | 1,465.61 | 1,619.36 | 723,379,500 | 1,619.36 |
| 1-Dec-97 | 1,608.56 | 1,652.84 | 1,486.51 | 1,570.35 | 714,639,500 | 1,570.35 |
| 3-Nov-97 | 1,609.62 | 1,654.43 | 1,508.41 | 1,600.55 | 626,187,800 | 1,600.55 |
| 1-Oct-97 | 1,690.79 | 1,748.78 | 1,465.84 | 1,593.61 | 850,478,200 | 1,593.61 |
| 2-Sep-97 | 1,595.07 | 1,702.49 | 1,595.07 | 1,685.69 | 736,184,700 | 1,685.69 |
| 1-Aug-97 | 1,594.67 | 1,638.26 | 1,545.13 | 1,587.32 | 662,794,200 | 1,587.32 |
| 1-Jul-97 | 1,442.65 | 1,595.76 | 1,432.42 | 1,593.81 | 3,595,800 | 1,593.81 |
| 2-Jun-97 | 1,407.07 | 1,467.29 | 1,375.45 | 1,442.07 | 629,426,100 | 1,442.07 |
| 1-May-97 | 1,263.93 | 1,414.26 | 1,260.94 | 1,400.32 | 648,540,900 | 1,400.32 |
| 1-Apr-97 | 1,211.28 | 1,267.41 | 1,194.16 | 1,260.76 | 595,884,500 | 1,260.76 |
| 3-Mar-97 | 1,306.21 | 1,332.34 | 1,220.40 | 1,221.70 | 620,892,500 | 1,221.70 |
| 3-Feb-97 | 1,383.97 | 1,384.51 | 1,296.88 | 1,309.00 | 669,720,000 | 1,309.00 |
| 2-Jan-97 | 1,292.65 | 1,400.53 | 1,272.34 | 1,379.85 | 670,617,700 | 1,379.85 |
| 2-Dec-96 | 1,294.78 | 1,328.95 | 1,251.03 | 1,291.03 | 596,139,000 | 1,291.03 |

**Amerindo Technology Growth Fund, Inc. - Net Asset Value**

| Date | Net Asset Value | Quarterly Value |
|------|------|------|
| 12/16/1996 | 30.8326 | |
| 4/15/1997 | 26.2816 | |
| 8/15/1997 | 30.3794 | |
| 8/29/1997 | 31.9134 | |
| 9/30/1997 | 34.2015 | |
| 10/15/1997 | 34.4318 | |
| 10/31/1997 | 31.8648 | |
| 11/17/1997 | 32.0355 | |
| 11/28/1997 | 30.2997 | |
| 12/15/1997 | 29.7786 | |
| 12/31/1997 | 32.0844 | 32.0844 |
| 1/15/1998 | 31.5878 | |
| 1/30/1998 | 32.4343 | |
| 2/17/1998 | 33.5318 | |
| 2/27/1998 | 34.1702 | |
| 3/16/1998 | 34.8905 | |
| 3/31/1998 | 36.4338 | 36.4338 |
| 4/15/1998 | 37.5055 | |
| 4/30/1998 | 37.2553 | |
| 5/15/1998 | 35.8971 | |
| 6/15/1998 | 33.3588 | |
| 6/30/1998 | 36.7292 | 36.7292 |
| 7/15/1998 | 38.2057 | |
| 7/31/1998 | 34.5678 | |
| 8/17/1998 | 32.8969 | |
| 8/31/1998 | 29.1956 | |
| 9/15/1998 | 32.3451 | |
| 9/30/1998 | 30.3706 | 30.3706 |
| 10/15/1998 | 30.0935 | |
| 10/30/1998 | 31.6208 | |
| 11/16/1998 | 36.7312 | |
| 11/30/1998 | 36.1971 | |
| 12/15/1998 | 36.2182 | |
| 12/31/1998 | 45.7451 | 45.7451 |
| 1/15/1999 | 49.7374 | |
| 1/29/1999 | 51.7374 | |
| 2/16/1999 | 48.0341 | |
| 2/26/1999 | 51.7955 | |
| 3/15/1999 | 57.8399 | |
| 3/31/1999 | 59.0995 | 59.0995 |
| 4/15/1999 | 63.323 | |
| 4/30/1999 | 64.4959 | |
| 5/17/1999 | 62.868 | |
| 5/28/1999 | 60.2371 | |
| 6/15/1999 | 56.1668 | |

| | | |
|---|---|---|
| 6/30/1999 | 66.5397 | 66.5397 |
| 7/15/1999 | 68.608 | |
| 7/30/1999 | 62.2149 | |
| 8/16/1999 | 63.7312 | |
| 8/31/1999 | 65.4741 | |
| 9/15/1999 | 71.292 | |
| 9/30/1999 | 72.5573 | 72.5573 |
| 10/15/1999 | 74.5423 | |
| 10/29/1999 | 75.9825 | |
| 11/15/1999 | 86.005 | |
| 11/30/1999 | 94.1045 | |
| 12/15/1999 | 107.3429 | |
| 12/31/1999 | 133.1013 | 133.1013 |
| 1/14/2000 | 125.0061 | |
| 1/31/2000 | 123.8362 | |
| 2/15/2000 | 128.5535 | |
| 2/29/2000 | 144.5444 | |
| 3/15/2000 | 140.5017 | |
| 3/31/2000 | 127.6826 | 127.6826 |
| 4/14/2000 | 78.5463 | |
| 4/28/2000 | 95.8728 | |
| 5/15/2000 | 93.5987 | |
| 5/31/2000 | 86.0665 | |
| 6/15/2000 | 106.3654 | |
| 6/30/2000 | 114.1954 | 114.1954 |
| 7/17/2000 | 125.0082 | |
| 7/31/2000 | 107.9529 | |
| 8/15/2000 | 115.3904 | |
| 8/31/2000 | 126.4626 | |
| 9/15/2000 | 118.2671 | |
| 9/29/2000 | 114.8813 | 114.8813 |
| 10/16/2000 | 97.5261 | |
| 10/31/2000 | 93.3182 | |
| 11/15/2000 | 79.8515 | |
| 11/30/2000 | 64.175 | |
| 12/15/2000 | 71.8229 | |
| 12/29/2000 | 67.9856 | 67.9856 |
| 1/31/2001 | 73.0516 | |
| 2/15/2001 | 61.8515 | |
| 2/28/2001 | 50.8433 | |
| 3/30/2001 | 37.5029 | 37.5029 |
| 4/16/2001 | 40.6725 | |
| 4/30/2001 | 48.7768 | |
| 5/31/2001 | 48.3971 | |
| 7/16/2001 | 44.9123 | |
| 7/31/2001 | 42.8167 | |
| 8/15/2001 | 37.0846 | |

| | | |
|---|---|---|
| 8/31/2001 | 30.4616 | |
| 9/28/2001 | 20.0815 | 20.0815 |
| 10/31/2001 | 26.0112 | |
| 11/15/2001 | 31.1566 | |
| 11/30/2001 | 32.0935 | |
| 12/17/2001 | 33.9722 | |
| 12/31/2001 | 34.1609 | 34.1609 |
| 1/15/2002 | 33.9008 | |
| 1/31/2002 | 32.7451 | |
| 2/15/2002 | 28.6007 | |
| 2/28/2002 | 26.8185 | |
| 3/15/2002 | 30.3035 | |
| 3/31/2002 | 31.2818 | |
| 4/15/2002 | 28.2661 | |
| 4/30/2002 | 25.1817 | |
| 5/15/2002 | 23.1402 | |
| 5/31/2002 | 19.4601 | |
| 6/17/2002 | 18.8831 | |
| 6/28/2002 | 16.9251 | 16.9251 |
| 7/15/2002 | 14.9114 | |
| 7/31/2002 | 14.0615 | |
| 8/15/2002 | 13.8629 | |
| 8/30/2002 | 12.8793 | |
| 9/16/2002 | 12.6239 | |
| 9/30/2002 | 11.6948 | 11.6948 |
| 10/15/2002 | 12.4809 | |
| 10/31/2002 | 13.2613 | |
| 11/29/2002 | 14.7497 | |
| 12/16/2002 | 14.3443 | |
| 12/31/2002 | 14.0204 | 14.0204 |
| 1/15/2003 | 15.4695 | |
| 1/31/2003 | 13.5037 | |
| 2/14/2003 | 13.0853 | |
| 3/14/2003 | 13.9551 | |
| 3/28/2003 | 14.5685 | 14.5685 |
| 4/15/2003 | 15.1777 | |
| 4/30/2003 | 15.7888 | |
| 5/30/2003 | 17.3576 | |
| 6/13/2003 | 17.6257 | |
| 6/30/2003 | 18.0473 | 18.0473 |
| 7/15/2003 | 19.335 | |
| 7/31/2003 | 18.4925 | |
| 8/15/2003 | 17.0201 | |
| 8/29/2003 | 18.7535 | |
| 9/30/2003 | 19.1145 | 19.1145 |
| 10/15/2003 | 19.8913 | |
| 10/31/2003 | 19.8013 | |

| | | |
|---|---|---|
| 11/14/2003 | 19.43 | |
| 11/28/2003 | 19.8164 | |
| 12/15/2003 | 19.4871 | |
| 12/31/2003 | 20.7104 | 20.7104 |
| 1/15/2004 | 21.8257 | |
| 1/30/2004 | 21.2005 | |
| 2/17/2004 | 22.1475 | |
| 2/27/2004 | 21.6718 | |
| 3/15/2004 | 20.8188 | |
| 3/31/2004 | 21.89 | 21.89 |
| 4/15/2004 | 22.0116 | |
| 4/30/2004 | 21.1671 | |
| 5/14/2004 | 20.9437 | |
| 5/28/2004 | 21.8052 | |
| 6/15/2004 | 21.9216 | |
| 6/30/2004 | 23.0971 | 23.0971 |
| 7/15/2004 | 21.3493 | |
| 7/30/2004 | 20.0978 | |
| 8/13/2004 | 18.3764 | |
| 8/31/2004 | 19.6898 | |
| 9/30/2004 | 21.5087 | 21.5087 |
| 10/15/2004 | 21.5291 | |
| 10/29/2004 | 21.3576 | |
| 11/15/2004 | 21.8082 | |
| 11/30/2004 | 21.4923 | |
| 12/15/2004 | 22.2201 | |
| 12/30/2004 | 24.42 | 24.42 |
| 1/15/2005 | 22.311 | |
| 1/31/2005 | 20.4758 | |
| 2/15/2005 | 20.4908 | |
| 2/28/2005 | 20.0048 | |
| 3/15/2005 | 19.6685 | |
| 3/31/2005 | 19.9766 | 19.9766 |
| 4/15/2005 | 19.164 | |
| 4/29/2005 | 19.5988 | |

(15)

THIS A CONFIDENTIAL
DOCUMENT TO BE USED FOR
INFORMATIONAL PURPOSES ONLY

# AMERINDO INVESTMENT ADVISORS, INC.

## GUARANTEED FIXED RATE DEPOSIT ACCOUNT

The Date of this Information
Circular is December 19, 1994

San Francisco     New York     Miami     London

PM 000056

EXHIBIT C

# CONTENTS

Summary and Introduction                                    3

Description of Fixed Interest Rate Deposit Account          4

Investment Policies                                         4

Risk Factors                                                8

Taxes                                                       8

Management of the Fixed Deposit Accounts                    9

Costs of Redemption and Purchase                            9

Certificates                                                9

PM 000057

## SUMMARY AND INTRODUCTION

This Information Circular sets forth information that a prospective investor should know before subscribing to the Guaranteed Fixed Rate Deposit Account Program described herein. Investors are advised to read this Circular and retain it for further reference.

These accounts are diversified and consist of predominantly high grade money market instruments supplemented by a limited number of select common stocks in which the firm specializes.

INVESTORS ARE BEING OFFERED:

High Guaranteed Income
Stability of Principal
Liquidity
Professional Management
Immediate Confirmation of Purchases, Redemption, and Quarterly Interest Payments
No Sales or Redemption Charges

These Guaranteed Fixed Rate Deposit Accounts have not been approved or disapproved by the Securities and Exchange Commission, nor has the Commission passed upon the accuracy of adequacy of this Circular. Any representation to the contrary is a criminal offense in the U.S.

(This space is left intentionally blank.)

-3-

PM 000058

## GUARANTEED FIXED INTEREST DEPOSIT ACCOUNT

Clients deposit cash into a designated account in either their name or directly into the Amerindo Investment Venture Fund account at a designated custodian in New York.

Amerindo guarantees to pay a fixed rate of interest typically for either twelve or twenty-four months. The redemption of deposits at face value of principal is also guaranteed by Amerindo. Interest can be paid quarterly; directly to the client's deposit account or to any other account the client designates. Fixed Deposit renewals are subject to renegotiation of the interest rate at maturity.

These deposits typically pay an attractive premium over prevailing market rates.

Clients agree in advance to the prevailing interest rate being offered for any particular fixed maturity period.

Fixed Interest Deposits are invested along the following lines. The majority is invested in a range of very high quality short-term investments such as Treasury bills, Government National Mortgage Association Certificates (GNMAs), Government bonds, Certificates of Deposit (CDs), Money Market Funds, etc. Fixed Interest Deposits are arbitraged amongst these various short-term instruments with the objective of obtaining small capital gains.

The remainder of the funds in the Fixed Interest Deposit Account are invested in publicly traded stocks that fall within Amerindo's principal field of expertise, where it has compiled an outstanding record of over 30% per annum over the past 15 years.

Semi-annual account statements, confirmations of deposit and final statements of account are provided to clients directly. The agreed-upon rate of interest is guaranteed by Amerindo.

Deposit Accounts are capable of being renewed at any time prior to maturity. If the client has not given Amerindo renewal instructions two weeks prior to maturity, the client's deposit will be redeemed at maturity.

## INVESTMENT POLICIES

The investment objective of the Fixed Rate Deposit Account is high current income and high safety of principal with reasonable liquidity.

The Fixed Rate Deposit Accounts invest principally in a broad range of high grade money-market and debt instruments, with maturities generally of one year or less. These instruments include, but are not limited to (a) U.S. Treasury bills and other obligations issued or guaranteed as to instrumentalities; (b) obligations of U.S. and select foreign banks (including certificates of deposit and bankers' acceptances) having total assets at the time of purchase in excess of $2.5 billion; (c) commercial paper and other short-term corporate obligations; (d) prime bank repurchase agreements and variable rate securities; (e) GNMAs; and (f) select common stocks in Amerindo's specialty field of expertise.

-4-

PM 000059

The commercial paper and other short-term corporate obligations purchased will consist of obligations (a) rated Prime-1 by Moody's Investors Service, Inc. ("Moodys") or A-1 by Standard & Poor's Corporation ("S & P") at the date of investment, or (b) of U.S. corporations which at the date of investment have an outstanding debt issue rated Aa by Moody's or AA by S & P. The "other" short-term corporate obligations referred to above include bonds and notes with remaining maturities of one year or less. Commercial paper issues in which the Deposit Account may invest include securities issued by major corporations without registration under the Securities Act of 1933 (the "1933 Act") in reliance on the exemption from such registration afforded by Section 3(a)(3) thereof.

In managing the Fixed Rate Interest Deposits, Amerindo may employ a number of professional money management techniques including varying the composition of the investments and the average weighted maturity based upon its assessment of the relative values of various money market instruments and future interest rate patterns, in order to respond to changing economic and money market conditions and to shifts in fiscal and monetary policy. Amerindo may also seek to improve yield by arbitrage (purchasing or selling securities in order to take advantage of yield disparities that regularly occur in the money market). For example, market conditions frequently result in similar securities trading at different prices. Also, there frequently are yield disparities between the various types of money market securities.

U.S. Government Securities

The U.S. government securities in which investment may be made include direct obligations of the United States Treasury (such as Treasury bills, notes and bonds); and obligations issued by United States government agencies and instrumentalities, including securities that are supported by the full faith and credit of the   United States (such as Government National Mortgage Association certificates), securities that are supported by the right of the issuer to borrow from the United States Treasury (such as securities of the Federal Home Loan Banks) and securities supported solely by the creditworthiness of the issuer (such as Federal National Mortgage Association and Federal Home Loan Mortgage Corporation securities).

Variable Rate Securities

Variable rate securities may be purchased with remaining maturities of one year or more issued by U.S. companies or U.S. agencies or instrumentalities or guaranteed by the U.S. government, so long as such securities comply with conditions established by the Securities and Exchange Commission (SEC) under which they may be considered to have remaining maturities of one year or less. The yield of these securities varies in relation to changes in specific money market rates such as the prime rate. These changes are reflected in adjustments to the yields of the variable rate securities at least semi-annually, and different securities may have different adjustment rates.

Repurchase Agreements

Repurchase agreements are transactions in which an investor purchases a security from a bank or recognized securities dealer and simultaneously commits to resell that security to the bank or recognized securities dealer at an agreed upon price, date, and market rate of interest unrelated to

PM 000060

the coupon rate or maturity of the purchased security.  Securities held subject to repurchase agreements may have maturities in excess of one year, provided the repurchase agreement itself matures in less than one year.

GNMAs

GNMA certificates are securities representing interests in a pool of mortgage loans to residential home buyers made by lenders such as mortgage bankers, commercial banks or savings and loan associations and are either guaranteed by the Federal Housing Administration or insured by the Veterans Administration.  Timely payment of interest and principal on each mortgage loan is backed by the full faith and credit of the U.S. government.  Each pool of mortgage loans is accepted by GNMA, a government corporation within the U.S. Department of Housing and Urban development, prior to the public offering of GNMA certificates representing participations in the pool.

Foreign Securities and Foreign Currencies

The Deposit Account may invest in debt securities of foreign issuers.  Foreign securities held by the Deposit Account may not be registered within the SEC, and the issuers thereof may not be subject to its reporting requirements.  Debt securities are usually selected from the highest rated companies and banks.

The Deposit Account may also engage in select foreign exchange transactions principally involving currency arbitrage in debt instruments.  Foreign exchange rates can either be set by sovereign governments or be free floating.  Exchange rates of most western nations are permitted to fluctuate in value relative to the U.S. dollar.

The market in foreign currencies exists in every large financial center in the world, and primarily consists of trading by the world's international banks.  In contrast to the stock market, the market for foreign currencies is decentralized, essentially free from government regulation, and designed to protect investors.

Foreign currency options provide opportunities for investment and traditionally pose risks to investors as a result of fluctuations in the value of the underlying interests.  Unlike options on stocks or debt securities, which are priced only on the basis of the value of a single underlying entity, foreign currency option prices reflect the value of an exchange rate, which in turn reflects the relative values of two currencies: U.S. dollars and the foreign currency in question.

Select Common Stocks

A relatively small portion of the account, limited to 25%, will be invested in public companies perceived to have the capacity to undergo exceptional growth of earnings.  These companies operate in the fields of high technology of applied science, and generally develop new technologies, markets or related products.  The emphasis on small, technology-oriented companies in essence allows investments in companies in virtually any growth industry.

-6-

PM 000061

Biotechnology is staging a revolutionary breakthrough in commercializable science rarely before witnessed. As a science, biotechnology has already proved itself. Human health care will be revolutionized. However, the drug industry cannot make the leap to the next generation of drugs encompassing the new science of genetic engineering. This is the crux of Amerindo's expectation that this group should be the most exciting and lucrative sector of technology in the ongoing stock market rise that could see the Dow Jones exceed 7500 by the turn of the century.

Hedging Strategies

The Deposit Account may use options on securities and interest rate futures contracts and options on futures contracts (collectively "hedging instruments") with the objective of hedging the Deposit Account's portfolio, i.e., reducing the risk of a decline in the price of securities held by the Deposit Account or the risk of an increase in the price of securities the Deposit Account intends to acquire for its portfolio. The Deposit Account will invest in hedging instruments only for hedging purposes. The Deposit Account's participation in the options or futures markets may involve certain investment risks and transaction costs to which it might not be subject were hedging strategies not employed. The Deposit Account may use the following hedging instruments.

**Options on Debt Securities** (sometimes referred to as "interest rate options") - Options on debt securities are similar to stock options except that interest rate options are traded primarily in the over-the-counter market rather than on any of the several options exchanges.

**Interest Rate Futures Contracts** - An interest rate futures contract is a bilateral agreement pursuant to which two parties agree to take or make delivery of the specific type of debt security of currency called for in the contract at a specified future time and at a specified price. Although interest rate futures contracts by their terms call for actual delivery or acceptance of debt securities, in most cases the contracts are closed out before the expiration date without the making or taking of delivery.

Interest rate futures contracts may be used to hedge against changes in the general level of interest rates. This strategy may minimize the effect of all or part of an increase in the market price of the debt security which the Deposit Account intended to purchase in the future. A rise in the price of the debt security prior to its purchase may either be offset by an increase in the value of the futures contract purchased by the Deposit Account or avoided by taking delivery of the debt securities under the futures contract. Conversely, a fall in the market price of the underlying debt security may result in a corresponding decrease in the value of the futures position. The Deposit Account may sell an interest rate futures contract in order to continue to receive the income from a debt security, while endeavoring to avoid part or all of the decline in market value of that security which would accompany an increase in interest rates. The Deposit Account may purchase a call option on an interest rate futures contract to hedge against a market advance in debt securities which was planned to be acquired at a future date. The purchase of a call option on an interest rate futures contract is analogous to the purchase of a call option on an individual debt security which can be used as a temporary substitute for a position in the security itself. The Deposit Account may also write a covered call option on interest rate futures contracts as a partial hedge against a decline in the price of debt securities held in the Account or purchase put options on interest rate futures contracts in order to hedge the Account against a decline in the value of debt securities held in the Portfolio.

PM 000062

## RISK FACTORS

In selecting securities, the Investment Manager will review and monitor the creditworthiness of each issuer and issue, in addition to relying on ratings assigned by agencies such as S & P or Moody's as indicators of quality. Interest rate trends and specific developments which may affect individual issuers will also be analyzed. Investments in lower rated fixed income securities are generally subject to greater market fluctuation and risk of loss of income and principal than investments in lower yielding fixed income securities. Although the Investment Manager will attempt to minimize the speculative risks associated with investments in such securities through diversification, credit analysis and attention to current trends in interest rates and other factors, investors should carefully review the policies employed and consider their ability to assume the investment risks involved before making their investment.

The income on the Fixed Deposit Account is guaranteed by Amerindo. The firm has been in existence for 14 years and maintains a substantial investment portfolio of its own partnership capital to collateralize any interest rate obligations/deficiencies in total income and trading gains. Unused bank lines of credit provide additional backup relief.

## TAXES

The fixed deposit interest income is taxable at an investor's ordinary U.S. income tax rate. Offshore investors remain tax exempt.

## MANAGEMENT OF THE FIXED DEPOSIT ACCOUNTS

The Investment Manager was organized on May 6, 1979. The firm was founded by Messrs. Alberto W. Vilar and Gary A. Tanaka, who between them have a total of 44 years of investment experience. They are also the controlling shareholders of Amerindo Investment Advisors Inc. ("Amerindo"), a portfolio management firm with offices in London, Miami, New York and San Francisco. Amerindo, whose predecessor was first organized in 1977, manages assets of $3 billion for U.S. and U.K. pension plans, principally Fortune 1000 companies, public pension plans, endowments and large family trusts.

Alberto W. Vilar, 55, began his career with Citibank, N.A. in New York in 1964, and worked there as an International Credit Officer until 1967. From 1967 to 1971, he served as Vice President, Portfolio Manager and Manager of the Investment Management Division of Burnham & Company, Inc. in New York. From 1971 to 1973, he served as Executive Vice president, Portfolio Manager and Director of Equity Strategy at M. D. Sass Investor Services in New York. In 1973, he became Vice President and Portfolio Manager of Endowment Management & Research Corporation in Boston. From 1977 to 1979, he served as Senior Vice President, Director of Research, Chief Investment Strategist and Fund Manager of The Boston Company in Boston. He founded the predecessors of Amerindo Investment Advisors, Inc. and Amerindo Management Limited 1976 and has served since then as a Principal Portfolio Manager. Mr. Vilar holds the degrees of B.A. in Economics from Washington & Jefferson College and M.B.A. and M.S. in Mathematical Economics from New York University, where he also completed the program in Doctoral Studies.

-8-

PM 000063

Gary A. Tanaka, 53, served as Portfolio Manager for Crocker Bank in San Francisco from 1971 to 1977 and as a Fund Manager for Crocker Investment Management Corp. in San Francisco. In 1980, he joined Amerindo Investment Advisors Inc. and Amerindo Management Limited as a Principal Portfolio Manager. Mr. Tanaka holds the degrees of B.S. in Mathematics from Massachusetts Institute of Technology and Ph.D. in Applied Mathematics from the University of London, Imperial College.

## COSTS OF REDEMPTION AND PURCHASE

There will be no costs whatsoever associated with the subscription or redemption of Fixed Rate Deposit Accounts. All custody fees will be paid by the Investment Manager.

## CERTIFICATES

Company certificates representing the amount of the Fixed Deposit Account are issued on request. Statements of account are generally issued on a semi-annual basis with full activity reported. More frequent statements are available on request.

(This space is left intentionally blank.)

PM 000064

AMERINDO
INVESTMENT ADVISORS INC.

DANA E. SMITH

| 399 Park Avenue, 18th Floor | One Embarcadero, Suite 2300 |
|---|---|
| New York, NY 10022 | San Francisco, CA 94111 |
| (212) 371-6360 Tel | Tel (415) 362-0292 |
| (212) 980-5118 Fax | Fax (415) 362-0533 |

PM 000065



EXHIBIT D

**PROPOSED DISTRIBUTION OF ASSETS TO GFRDA & ATGF INVESTORS**
**EXAMPLE ASSUMING $80 MILLION IN TOTAL ASSETS TO BE DISTRIBUTED**

I.   <u>VALUE OF TOTAL ASSETS TO BE DISTRIBUTED</u>

| | Category | $ Value | Basis |
|---|---|---|---|
| 1 | Cash at J.P. Morgan | $ 23,000,000 | J.P. Morgan Statements |
| 2 | Cash in Cayman Islands Bank | $ 4,000,000 | Estimate from Receiver |
| 3 | Publicly-held Stocks | $ 45,000,000 | Estimate from Receiver |
| 4 | Other Assets to be Recovered | $ 8,000,000 | Assumption based on additonal assets to be recovered from: (i) additional cash in Cayman Islands; (ii) liquidation of privately-held securities and cash held at S.G. Cowan & Co. |
| | **Total Assets for Distribution** | **$ 80,000,000** | |

II.   **Pro Forma Distribution**           **$ Value**

| | $ Value | Basis |
|---|---|---|
| **Total Assets for Distribution** | **$ 80,000,000** | Estimate from above. |
| Less: | | |
| **Total GDRFA Value** | **$ (20,000,000)** | Estimate based on valid Principal balances and Accrued Interest |
| **Assets to ATGF Investors** | **$ 60,000,000** | Balance remaining after deducting valid GFRDA Claims from Total Assets for Distribution |
| Total ATGF Shares | 680,000 | Estimate from Receiver |
| **Pro Forma Value per ATGF Share** | **$ 88.24** | |

EXHIBIT F