UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

|  | 05 cv 5231 (RJS) |
|---|---|
| SEC v. Amerindo, et al. | ECF Case |
|  | Declaration In Opposition |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X To Receiver's Application to
Pay JP Morgan On Amerindo
Banking Contracts With Bear Stearns
And In Opposition To Motion To Fix Claims

Vivian Shevitz, under penalty of perjury, hereby declares:

1.      I am counsel to Gary Tanaka and Alberto Vilar (with David Burger) in this case. I make this declaration in opposition to the Receiver's application to pay JP Morgan pursuant to its contract with the Panamanian account holders of the accounts the Receiver supposedly was "receiving." This declaration is also in opposition to the receiver's applications to value claims (DOCS 355 and 370).

2.      On April 4, 2013 defendants, Jane Simkin Smith, and I, sat with Ian Gazes in his office. We told Mr. Gazes *we* had relied on these government documents (as we did not have *any* of our own) in preparing the July 2012 payout proposal – which defendants believed included all known clients -- and directed him to Sharon Levin for information, addresses, and whatever more she could provide.[1] Sharon Levin and Marc Litt had both done previous work, compiling client and redemption lists that were nearly complete (DOC 418-2 (2/4/10, 05cr621); DOC 514 2/21/12 combined criminal and SEC cases).

---

[1] I wrote to Mr. Gazes on 8-14-13, for instance: "You ask for our client contact list and act as if it is a huge secret and must contain names of "other" clients, "out there", not (yet) accounted for. I told you **when we sat in your office on April 4th that all the Amerindo Panama client claims were and are set forth in the July 27, 2012 submission in the SEC case. I also told you the information came from government documents submitted in the SEC case. We suggested you ask Sharon Levin for her list** (she did not share her sources with us, of course) because as Chief of Asset Forfeiture she purported to send notices to investors to file useless petitions for remission, which she then had them withdraw. I sent ...th[is] information by email."

3.      Mr. Gazes and the SEC chose to totally ignore the previous work of prosecutors Litt and Levin, and that of defendants, only to embark on a costly and incomplete methodology which did not even access the government-stored Amerindo U.K. client files as the U.S. Attorney used, or any input from the defendants themselves.   He either did not seek the input of Sharon Levin or he ignored it, as he ignored defendants and their business records.

4.      This is shoddy practice, and is not what was represented to the SEC court.  At a conference on September 27, 2011 in this case (inherited by both Your Honor and myself) at which neither Your Honor nor I was present (Mr. Tanaka was *pro se*), Sharon Levin reported to Judge Swain that the government (and SEC, whose counsel were at the conference) contemplated that "victims" and "investors" would be paid out of the forfeited funds when a final order of forfeiture was entered.  She stated that the government had used (and in a remission forfeiture *would* use) the Amerindo U.K. records in the government's custody, which the government maintained pursuant to the search warrants of the UK offices where the Panama account records were kept.    Until the final order of forfeiture, Ms. Levin's presentation suggested, the government could not give directions to JP Morgan even to hold funds at interest. The only beneficiary was JP Morgan, as investor Marcus' lawyer pointed out.  Though Julian Friedman questioned the seeming unwillingness or impotence to achieve the result of having JP Morgan credit interest on Amerindo Panama accounts, no one contradicted the government's assertion of "inability" to direct Morgan to act as a proper custodian of funds that would be used for restitution to the investors the SEC is supposed to have been "protecting."

5.      Though Gary Tanaka was on the phone and as account owner would have directed JP Morgan to take the actions that according to their contracts JP Morgan was obligated to take, he was not asked to give the directive, and the SEC treated him as if he should have no

voice.  Even after Judge Swain expressed concerns about lack of *management* of the frozen funds the SEC said nothing positive.  Everyone seemed to assume or accept that, unless the US government obtained a final order of forfeiture, JP Morgan could not be forced, asked, or directed, to hold funds at interest, or to restore abandoned accounts, or to itself seek management of the private security holdings in the accounts so that they were maximized.   (Tr.10).   (Why could the SEC not have sought authorization for such an order – or asked JP Morgan's "voluntary" "assistance" in restoring accounts to interest bearing vehicles (as JP Morgan had indicated willingness in 2005 as a "business decision" to "not ...let the money go" (2/5/10 Sentencing Tr. 112-15 (AUSA Litt quoting  someone from Bear Stearns upon being told that the government could not prove fraud proceeds and hence could not legally freeze the assets).

6.     Judge Swain asked about who had investor information – observing that Mr. Tanaka ("inaudible" but on the phone)  was "clearly ... not the custodian of records of the entities at this point."  Judge Swain asked about a "methodology" as well, and Ms. Levin stated:  ".... [M]y office has most of the records because ... there were search warrants done.  So we have the records from the companies and it's from that that we obtain the list" and she stated further that since there were foreign investors "we're very comfortable with providing it to Mr. Tanaka if he knows of additional people we've left off."  (9/23/11 Tr. 10-11).

7.     Present counsel Vivian Shevitz did not then represent Mr. Tanaka (and had not met him) and was not at the conference; Mr. Tanaka had *no counsel* in the case).  However Judge Swain and the SEC, and especially Sharon Levin, made clear that they needed to interface with defense counsel in the criminal case to resolve matters about forfeiture (which is how present counsel "got into" the SEC case originally).  Judge Swain was told that Ms. Levin would need to have discussions with Mr. Tanaka's criminal case counsel as he had no counsel in the SEC case.

3

(The trouble is, he had no counsel in the criminal case either, as the Dershowitz firm was retained only for the appeal, and never appeared in either the SEC case *or* in the District Court criminal action. Ms. Eiger of that firm appeared at one conference, but with investor claims (and Patrick Begos) taking over, and the SEC consenting to nothing the defendants suggested, nothing was resolved.)

8. As Sharon Levin advised Judge Swain at the conference, ***in the event that the... forfeiture is reversed on appeal the defendants would get their money [or] property back."*** (Tr.12). Defendants' title **is** now restored, therefore, and they claim their property with the concomitant management rights in their property as against the SEC receiver Ian Gazes.

9. Instead of acting on behalf of the assets supposedly being "received" by Ian Gazes, Ian Gazes has acted on behalf of the big banks (whom, he told us (at his office on April 4, 2013), are his personal bankers and with whom he has a relationship). Ian Gazes does so despite the evidence that JP Morgan is acting *contrary* to the interests of the Estate and the investors.[2]

---

[2] Mr. Gazes letter to this Court dated February 26, 2013, attaching JP Morgan's "explanation" for charging $5000/month custodial fees, is yet another example of a conflicted, contrary conduct. Sometime prior to February 14th, apparently, Mr. Gazes "asked for a letter substantiating the basis for the custody fee" for the four accounts he "control[s] as Receiver" – specifically asking (now months after he had made the arrangements) whether this was a "standard" fee. Not surprisingly, it is not the "standard" fee: it is a *premium* fee. JP Morgan itself suggests that Mr. Gazes could get "the services you require .... better [and] more economically at a firm that typically provides the type of services you require ...." (One wonders what "special services" Mr. Gazes sought that were not already in place – at *no* additional cost – in the original Bear Stearns' 102 Amrindo prime brokerage facility.) This should have been vetted previously, and is another example of the receiver dissipating, not preserving, the assets.

JP Morgan complains that it would not have had to incur legal expenses on this case if it had not been for the defendants and the problems with the accounts it was holding. However it was JP Morgan's decision to "not let the money go" that caused the problem in the first place. Indeed, Bear Stearns got involved from the beginning, as Kay Lackey told Judge Swain on June 1, 2005 (Tr.29). Bear Stearns, Ms. Lackey said, was "concerned"

about our ability to get a receiver and inquired about
our ability to get an independent decision maker. Because they

4

10. Attached as Exhibit A is part of Government Exhibit UGX- 3512-13, a 3500 exhibit from the criminal case. I attach only the first ten pages of that exhibit – which shows a *pending* NASD Arbitration complaint (NASD Case 07-0159) of investor/"victim" Lily Cates against JP Morgan's predecessor Bear Stearns, preceded by a stipulation between Cates and Bear Stearns' attorney dated August 24, 2007 adopting the "request" of the US Attorney to "stay this arbitration ... pending the conclusion of the criminal trial of Vilar and Tanaka."

11. Lily Cates' arbitration is *pending.* Cates alleges that Bear Stearns acted *in pari delicto* in that it "knowingly assisted" in the taking of "[h]undreds of thousands of these dollars (as well as securities) ... from Lily's Bear Stearns' accounts" to "facilitate Amerindo in the

---

> don't know who the beneficial owners are of these -- in this
> hedge fund, and they only receive directions from Mr. Tanaka or
> Mr. Vilar. And they are concerned about their ability to take
> direction from those individuals at this point in time. They
> are uncomfortable taking direction from those individuals at
> this time, and they have indicated that they think it's
> important to have some kind of independent receiver or some
> individual in some capacity who can help give them direction
> about whether they should be transferring securities between
> accounts, whether they should be selling any securities, and
> how those transactions should be handled. And I bring that up
> just to point out another issue, some of the problems ....

By declining to take "directives" from the account holders and then freezing all the accounts as a "business decision" (2/5/10 Sentencing Tr. 13; GX 3582-16 & Tr. 3482 (Bear Stearns' Peterscak)), JP Morgan made *itself* the *de facto* "default" (mis-)manager of the accounts in its custody. It should be liable under 28 U.S.C. 959 not only for interest and any losses in accounts from failure to take action on privates such as 3PAR Data, but for all the gains defendants could have made by investing the portfolio. (JP Morgan caused over $20 million in *cash* to be trapped in the accounts. Had defendants been "allowed" to invest, they could have achieved gains beyond those evidenced by the *invested* funds shown in the UK Pension Fund account).

That JP Morgan acted *qua* manager, even "owner", is manifest: By letter dated December 20, 2012 Paul Marcus' lawyer wrote to JP Morgan's counsel (Andrea Likwornik Weiss) to direct *it* to "transfer a portion of the shares [Mr. Marcus] owns in Amerindo Technology Growth Fund ... to Trusts for his children." (DOC 363-34, p. 38-39). JP Morgan is thus now the apparent arbiter of who owns shares in the ATGF fund. It – aided by the SEC and now cheer-led and "fed" by the receiver -- allowed no one else to perform the ownership function.

commission of fraud and conversion".  (UGX 3512-13, paras. 2-3).

12.     One must wonder how and why the SEC and its Receiver are so doggedly pursuing claims of JP Morgan when even the "victim" the SEC is supposed to have been protecting since she walked into the offices of the SEC and the US Attorney, has alleged wrongdoing in this very case, against JP Morgan, and in a pending complaint.

13.     Mr. Gazes both failed to use Amerindo records, and failed to take action to hold JP Morgan accountable.  He has also shown little regard for the investors:  he has thrown all their personal, private financial information into the public record, to try to extract *more* from the defendants.  They have waited nine years for the SEC to let the funds go, and now their privacy is also extinguished, and they (like defendants) must engage in more costly litigation.  Accordingly, Ian Gazes should be dismissed as receiver.

14.     The Court should reinstate Robert Knuts if the Court believes it necessary to oversee the defendants' payouts to their own investors, or should allow defendants to "manage out" the remaining assets to make payments they has long supported and report to the Court.  Mr. Knuts' fee application was reasonable and he finished his job admirably, even recommending his own discharge amount to less than this Receiver will cost "the estate."  (See DOC 37, SEC case, Monitor claims fees (including expenses) of about $66,634.00)

15.     The court should not allow further penalization merely to vindicate the SEC's wrongful position.

16.     Defendants are entitled to a jury trial as to the legal claims to defendants' non-forfeited property they assert here, and the contract claims advanced by the receiver as to n.a.v.s', interest rates, and other "dividends" he seeks to pay.

Dated:  February 28, 2014            _____/s_____
                                     Vivian Shevitz