Andrew M. Calamari
Associate Regional Director
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-0095 (Jacobson)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,  :

                     Plaintiff,  :

            - against -  :

AMERINDO INVESTMENT ADVISORS INC.,  :
AMERINDO INVESTMENT ADVISORS, INC.,  :
AMERINDO ADVISORS UK LIMITED,  :
AMERINDO MANAGEMENT INC.,  :
AMERINDO TECHNOLOGY GROWTH FUND, INC.,  :
AMERINDO TECHNOLOGY GROWTH FUND II, INC.,  :
TECHNO RAQUIA, S.A.,  :
ALBERTO W. VILAR, and  :
GARY ALAN TANAKA,  :

               Defendants.  :

-------------------------------------------------------------------------x

ECF CASE

**SECOND
AMENDED COMPLAINT**

05 Civ. 5231 (RJS)

     Plaintiff Securities and Exchange Commission ("Commission") alleges the following

against defendants Amerindo Investment Advisors Inc. ("Amerindo US"), Amerindo Investment

Advisors, Inc. ("Amerindo Panama"), Amerindo Advisors UK Limited ("Amerindo UK")

(collectively "Amerindo"), Amerindo Management Inc. ("AMI"), Amerindo Technology Growth

Fund, Inc. ("ATGF"), Amerindo Technology Growth Fund II, Inc. ("ATGF II"), Techno Raquia,

S.A. ("Techno Raquia"), Alberto W. Vilar ("Vilar"), and Gary Alan Tanaka ("Tanaka")

(collectively, the "Defendants"):

### SUMMARY

1.  The Commission brings this enforcement action against Amerindo (Amerindo US, Amerindo Panama and Amerindo UK, which were all investment advisers), Amerindo's principals, Vilar and Tanaka, and other affiliated entities that Vilar and Tanaka controlled (ATGF, ATGF II, AMI and Techno Raquia, collectively, the "Amerindo Investment Vehicles"). The Defendants, among other things, engaged in a scheme to defraud numerous investors, including an individual client, Lily Cates ("Cates"), investors in Guaranteed Fixed Rate Deposit Accounts ("GFRDAs"), and investors in two offshore hedge funds, ATGF and ATGF II.

2.  Specifically, in approximately June 2002, Vilar solicited Cates, a wealthy investor and close personal friend who resided in New York, New York, to invest $5 million in the Amerindo Venture Fund LP, a limited partnership that was purportedly being organized to qualify and be operated as a Small Business Investment Company ("SBIC"). After Cates transferred $5 million to a brokerage account in the name of AMI at Bear Stearns & Co., Inc., a broker-dealer located in New York, New York ("Bear Stearns"), as Amerindo had instructed, Tanaka directed AMI to transfer her funds to other accounts that Vilar and Amerindo controlled as well as to an unrelated GFRDA investor. When Cates subsequently inquired about her SBIC investment, Vilar misrepresented the status of the SBIC investment, and failed to tell Cates that Vilar, Tanaka, AMI and Amerindo had misappropriated her funds.

3.  Vilar, Tanaka, Amerindo and the Amerindo Investment Vehicles also defrauded other individuals and entities who invested in another product Amerindo offered, GFRDAs. Vilar and Tanaka, as well as other Amerindo employees, solicited clients and others, including U.S. residents, to invest funds in GFRDAs, a product in which Amerindo

2

Case 1:05-cv-05231-RJS   Document 229   Filed 05/25/12   Page 3 of 40

guaranteed that investors would earn a fixed rate of return per year on their investment, and would receive their principal at maturity. Amerindo represented to investors that it would invest at least the majority of their funds in short-term debt instruments and invest the remaining portion in equities. Pursuant to instructions set forth in GFRDA subscription documents, investors generally transferred their funds to an account in the name of Techno Raquia at Bear Stearns. Contrary to their representations, Amerindo largely invested the funds in equity securities, such as emerging technology and biotechnology stocks. Moreover, Vilar, Tanaka, Amerindo and the Amerindo Investment Vehicles commingled GFRDA funds and securities with the ATGF and ATGF II investment vehicles as well as Cates' SBIC investment without disclosing such commingling to investors. At various times, especially during the post-2000 bear market, Amerindo was unable to pay GFRDA investors their promised returns, or to return investors' principal at maturity. Consequently, when investors sought to redeem their GFRDAs, Amerindo generally either refused to honor redemption requests, or redeemed the GFRDAs with other investors' funds taken from unrelated brokerage accounts in, for example, the name of AMI, ATGF and/or ATGF II.

4.    Additionally, Vilar, Tanaka, Amerindo and the Amerindo Investment Vehicles defrauded investors, including U.S. residents, who invested in two offshore hedge funds that Vilar and Tanaka formed, ATGF and ATGF II. According to offering circulars, ATGF and ATGF II planned to invest in emerging growth companies. Rather than solely investing in such securities, however, Vilar, Tanaka and Amerindo co-mingled funds and securities and directed ATGF and ATGF II to transfer funds from the funds' brokerage accounts to other accounts for Vilar's and Tanaka's own business and personal benefit. For example, Tanaka directed ATGF and ATGF II to transfer funds to repay redeeming GFRDA investors and Vilar

3

directed ATGF II to transfer funds for his own personal benefit. In addition, Tanaka authorized ATGF and ATGF II to transfer funds to Amerindo US to, among other things, pay its operating expenses.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(b), Section 21(d)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d)(1), and Section 209 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-9, seeking to restrain and enjoin permanently Vilar, Tanaka, Amerindo US, Amerindo UK, Amerindo Panama, AMI, Techno Raquia, ATGF and ATGF II from engaging in the transactions, acts, practices and courses of business alleged herein.

6.    The Commission seeks a judgment ordering Vilar, Tanaka, Amerindo US, Amerindo UK, Amerindo Panama, AMI, Techno Raquia, ATGF and ATGF II to disgorge ill-gotten gains with prejudgment interest thereon.

7.    The Commission seeks a judgment ordering Vilar, Tanaka, Amerindo US, Amerindo UK, Amerindo Panama, AMI, Techno Raquia, ATGF and ATGF II to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9.

8.    Finally, the Commission seeks any and all other just and appropriate relief.

4

## JURISDICTION AND VENUE

9.   This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Sections 21 and 27 of the Exchange Act, 15 U.S.C. §§ 78u and 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

10.   Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.  Certain of the transactions, acts, practices, and courses of business alleged herein occurred within the Southern District of New York.  For instance, Amerindo US maintained a place of business in New York, New York.  Vilar resided in New York, New York.  Vilar, Tanaka, and Amerindo misappropriated investor funds from accounts at Bear Stearns, and other broker-dealers, located in New York, New York.  Finally, certain victims, including Cates, reside in New York, New York.

11.   Defendants, directly or indirectly, have each made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and/or the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANTS

12.   **Vilar**, age 71, was a resident of New York, New York and is currently incarcerated following his conviction in <u>United States v. Alberto William Vilar and Gary Alan Tanaka</u>, S3 05 Cr. 621 (RJS) (the "Criminal Action") for, among other crimes, conspiracy to commit securities fraud, securities fraud, and investment adviser fraud. Vilar, together with Tanaka, is or was a co-founder, director and/or principal of Amerindo US, Amerindo UK and Amerindo Panama, and various affiliated entities including AMI, Techno Raquia, ATGF and

ATGF II. Vilar is the President of Amerindo US. Vilar had been involved in emerging technology investment strategies for over 25 years.

13. **Tanaka**, age 68, was a resident of London, England and is currently incarcerated following his conviction in the Criminal Action for conspiracy to commit securities fraud, securities fraud, and investment adviser fraud. Tanaka, together with Vilar, is or was a co-founder, director and/or principal of Amerindo US, Amerindo UK, Amerindo Panama, and other affiliated entities, including AMI, Techno Raquia, ATGF and ATGF II. Tanaka is the Executive Vice-President of Amerindo US. Tanaka had been involved in emerging technology investment strategies for over 25 years.

14. **Amerindo US** is a California corporation that had a principal place of business in San Francisco, California. Amerindo US maintained offices in New York, New York and London, England. Amerindo US was a registered investment adviser since 1985, but its registration was cancelled in 2011. Amerindo US served as the investment adviser to numerous clients, including Amerindo Funds, Inc., a registered open-end investment company, with one outstanding series, the Amerindo Technology Fund.

15. **Amerindo UK** is a United Kingdom corporation that had a principal place of business in London, England. Vilar and Tanaka are the sole shareholders, officers and directors of Amerindo UK. At all relevant times, Amerindo UK acted as an investment adviser. According to the United Kingdom's Financial Services Authority's website, Amerindo UK's status is "no longer authorized." Amerindo UK purportedly provided "administrative services" to Amerindo Panama. Tanaka and Renata Tanaka, Tanaka's wife, worked in Amerindo UK's office in London.

16. **Amerindo Panama** is a Panamanian corporation. Amerindo Panama purportedly

maintained its principal office in Panama. At all relevant times, Amerindo Panama acted as

an investment adviser. Vilar and Tanaka are Amerindo Panama's sole directors and

shareholders. Vilar is the President, and Tanaka is the Secretary, of Amerindo Panama.

17. **AMI** is a Panamanian corporation and is the owner of a brokerage account at Bear

Stearns in New York, New York. Vilar is the President of AMI and Tanaka is the Secretary

of AMI. Both Vilar and Tanaka serve as directors of AMI. During the relevant time period,

Tanaka and Vilar had discretionary authority over AMI's account at Bear Stearns, which

included the ability to direct securities transactions in the account and transfer funds and

securities into and out of the account.

18. **ATGF** is an open-end investment company incorporated in Panama. ATGF is the

owner of accounts at Bear Stearns and another broker-dealer, both in New York, New York.

Vilar is the President, and Tanaka is the Secretary, of ATGF, and both Vilar and Tanaka serve

as directors of ATGF. During the relevant time period, Tanaka and Vilar had discretionary

authority over ATGF's account at Bear Stearns, which included the ability to direct securities

transactions in the account and transfer funds and securities into and out of the account.

19. **ATGF II** is an open-end investment company incorporated in Panama. ATGF II

is the owner of accounts at Bear Stearns, United States Trust Company of New York, New

York ("US Trust"), and Smith Barney ("Smith Barney"), broker-dealers in New York, New

York. Vilar is the President, and Tanaka is the Secretary, of ATGF II, and both Vilar and

Tanaka are directors of ATGF II. During the relevant time period, Tanaka and Vilar had

discretionary authority over ATGF II's account at Bear Stearns, which included the ability to

direct securities transactions in the account and transfer funds and securities into and out of

the account.

20. **Techno Raquia** is the owner of an account at Bear Stearns in New York, New York. Tanaka is the Secretary and a director of Techno Raquia, and Vilar and a former Amerindo UK employee are officers and/or agents of Techno Raquia. During the relevant time period, Tanaka and Vilar had discretionary authority over Techno Raquia's account at Bear Stearns, which included the ability to direct securities transactions in the account and transfer funds and securities into and out of the account.

## FACTS

### Vilar and Tanaka Managed the Amerindo Advisory Entities as a Common Enterprise as Part of Their Scheme to Defraud Investors

21. Vilar and Tanaka managed the various Amerindo investment advisory entities, Amerindo US, Amerindo UK, and Amerindo Panama, as a common enterprise.

22. Vilar and Tanaka created confusion among clients and other investors concerning the identity of the Amerindo investment advisory entity with whom they were dealing.

23. For example, the legal names for Amerindo US ("Amerindo Investment Advisors Inc.") and Amerindo Panama ("Amerindo Investment Advisors, Inc.") were nearly identical, with the only difference being that Amerindo Panama's name had a comma between "Advisors" and "Inc."

24. Vilar and Tanaka conducted a portion of the fraudulent schemes described herein through Amerindo US. For example, Vilar, Tanaka and/or others (i) offered ATGF, ATGF II and GFRDA securities from Amerindo US' New York office; (ii) used Amerindo US letterhead to communicate with Cates as well as GFRDA and ATGF investors and others; and (iii) involved Amerindo US employees in the fraudulent schemes.

8

## Amerindo, Vilar, and Tanaka Defrauded Cates

### Cates Became A Client Of Amerindo

25.  Cates, a resident of New York, New York, is an investor who had maintained an investment advisory relationship with Amerindo since 1987.

26.  Vilar and Tanaka led Cates to believe she was a client of Amerindo US and Cates believed she was a client of Amerindo US.  For example, in a March 14, 1988 letter on Amerindo US letterhead, Vilar and Tanaka confirmed to Cates that Amerindo US had agreed to serve as Cates' investment adviser.  Cates also often dealt with Vilar, primarily in Amerindo US' New York offices.

27.  Over time, Cates and Vilar developed a close, almost familial relationship.  Cates placed her trust in Vilar to manage her investments and she made a variety of investments with Amerindo.

28.  Cates received periodic account statements from Amerindo beginning in 1987. The first statements she received were prepared on the letterhead of "Amerindo Investment Advisors Inc." (e.g., Amerindo US) spelled out in large, bolded block letters, and referenced a London address in smaller, unbolded print beneath the block letters.  Beginning with the September 30, 1995 account statement, however, the account statements were prepared on the letterhead of "Amerindo Investment Advisors, Inc." (e.g., Amerindo Panama) spelled out in large, bolded block letters, and referenced a Panama address in smaller, unbolded print beneath the block letters.  Aside from the change in letterhead, the account statements were identical – they contained the same account number and the same investments.

29.  Amerindo personnel never provided notice to Cates of the change in the account

statement letterhead and never explained the change to Cates.

### *Vilar Induced Cates to Invest in a SBIC Fund*

30.  In or about June 2002, Vilar recommended that Cates invest $5 million in a fund that Amerindo US was to manage as an SBIC, and which would seek a license from the Small Business Administration ("SBA").

31.  At Vilar's request, his assistant called Cates and asked her to meet Vilar at his New York, New York apartment and bring her Bear Stearns bond investment portfolio account that was not at that time being managed by Amerindo.  At the meeting, Vilar told Cates that he and Tanaka were starting an investment fund that would invest in technology companies, and that the SBA would provide matching funds.  Vilar explained to Cates that it was quite unusual for the SBA to authorize an investment in technology companies, but that he nonetheless was confident that the application would be approved. Cates agreed to make the investment and, at Vilar's request, she called her advisor and handed the phone over to Vilar to speak with the advisor.

32.  On or about June 20, 2002, Cates caused $5 million to be transferred, as directed, to the AMI account at Bear Stearns.

33.  At the time of her investment, Vilar, Tanaka and Amerindo failed to provide Cates with any documentation concerning the investment, such as a private placement memorandum, subscription agreement, or other document reflecting the investment itself.

34.  Subsequently, Cates did not receive quarterly payments that Vilar had promised to pay from her investments with Amerindo.

35.  In the Fall of 2003, Cates and her advisors questioned Vilar about the investment in the SBIC. Cates and her advisors told Vilar that she needed the promised payments to pay

her expenses.

36. On or about March 25, 2004, Vilar sent a letter on Amerindo US letterhead to

Cates' accountant, which contained the following:

> It is well known that it is next to impossible to get an SBIC for a
> technology-oriented venture capital fund. Amerindo spent years
> applying for such a license at considerable expense, which was
> finally approved about three years ago. Unfortunately, largely due
> to personnel changes at the [SBA] pursuant to our approval, we
> were required to reapply about 18 months ago for the same license.
> While this has taken far longer than we anticipated, we
> nevertheless had to deposit the requisite key money for the SBA,
> which we did. . . . Far more importantly, the prices of technology
> private-placements continued to decline throughout this waiting
> period. This means that we did not use a single penny of Cates'
> investment during this declining period, and if and when, as
> expected, we start to make investments upon securing the renewal
> of our license later this year, we will be looking at the best prices
> probably even seen in the four decade plus history of technology
> based, venture capital.

37. As of September 30, 2004, the statement Amerindo sent to Cates, on Amerindo

Panama letterhead, included an entry "FUNDS ON DEPOSIT WITH SBIC (value date

06.20.02)" that was valued at $5 million, and an entry "INTEREST ON SBIC DEPOSIT" that

was valued at $225,000.

38. On or about October 25, 2004, Vilar sent a memorandum on Amerindo US

letterhead to Cates' attorney to explain the account statement, which Vilar said was prepared

"at our London office." Regarding the entry for "Funds on Deposit with SBIC, for $5

million," Vilar wrote that "[t]echnically this represents an escrow deposit for a technology-

based SBIC. Cates has effectively coinvested with Gary and myself in a new fund that has

been approved for Investment, but the actual funding leverage-supplement has been delayed

owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi

war. This is an eight year fund which we remain extremely optimistic about, given our very

positive view on wireless broadband convergence."

39.   In the Fall of 2004, after Cates raised questions about the SBIC investment, Vilar finally supplied Cates and her advisors with the private placement memorandum for the SBIC fund.  This private placement memorandum indicated that the fund was named the Amerindo Venture Fund, LP.  After reviewing the private placement memorandum, Cates and her advisors determined that it was not an appropriate investment for Cates and requested that her $5 million (plus interest) be returned.

40.   On or about December 9, 2004, Vilar sent Cates' attorney a letter on Amerindo US letterhead stating that "[i]f Cates does not wish to retain the SBIC investment she agreed to make, we will have to undertake on a best efforts basis the sale of her participation to another prospective investor.  As could be expected, we are not at liberty to liquidate that investment on demand, as it constitutes part of the $10 million minimum the General Partner was required to come up with to initiate the fund."  Vilar also wrote that "it is nevertheless quite likely that prospective investors for Cates' investment will now require the commencement of government-matched funding," and that "[t]his unfortunately involves a political timetable completely beyond our immediate control."  Finally, Vilar wrote that "all we can do is keep you posted of our efforts on her behalf to pursue this very unusual request, which, as noted above, will remain constrained by the special funding program attached to it."

41.   Vilar's statements reflected above were materially false and misleading.

42.   Although Amerindo US began the application process to obtain a license, the SBA never approved an application to license the Amerindo Venture Fund, LP, or any other Amerindo-affiliated fund.

43.   Neither the SBA, the Amerindo Venture Fund, LP, nor any other Amerindo

affiliate held Cates' funds in escrow.

44.  Moreover, by approximately March 2004, it was clear that the Amerindo Venture Fund, LP and its investment adviser would not obtain a license.  Specifically, in early 2004, the SBA posted a notice on its website to advise that financing for the Participating Securities SBIC program (from which the Amerindo Venture Fund, LP had planned to seek a license) would terminate on September 30, 2004, and that to be eligible to receive such financing, a potential applicant would need to file an application by March 31, 2004, which no Amerindo affiliated entity did.

### *Amerindo, Vilar, Tanaka and AMI Misappropriated Cates' Funds*

45.  Vilar never invested Cates' funds in the Amerindo Venture Fund, LP or otherwise placed her $5 million investment in escrow pending the SBA's approval of a license.

46.  The AMI account into which Cates' funds were deposited was an existing Amerindo affiliated account, which had been opened years before.  Immediately prior to Cates' $5 million deposit, the account had a zero cash balance and net equity of $330,920.

47.  Amerindo had custody of Cates' funds, and Amerindo failed to segregate Cates' funds and properly maintain her funds in an account in the name of the adviser as agent or trustee for its clients.

48.  Within days of Cates' $5 million transfer, AMI, at Tanaka's direction, began the process of transferring virtually all of Cates' funds out of the AMI account to various other parties and entities.

49.  Specifically, on or about June 25, 2002, Tanaka, while working at Amerindo UK's office in London, sent a letter of authorization ("LOA") on Amerindo US letterhead to Bear Stearns directing AMI to transfer $1 million of Cates' funds from the AMI account to

Vilar's personal checking account, falsely claiming that the transfer represented a "redemption by the above referenced equity partner."

50.  According to bank records for the period from approximately June 9, 2002 through July 8, 2002, Vilar's personal checking account had a balance of approximately $87,564.45 immediately prior to the incoming wire transfer of $1 million on or about June 25, 2002. No other funds were then deposited in the account during the statement period, and the closing balance of Vilar's checking account was approximately $132,677.72. Thus, all but approximately $45,000 of the funds wired into Vilar's checking account from Cates' SBIC investment were dissipated within two weeks of their deposit.

51.  The withdrawals from Vilar's checking account during that two week period included, among others, $540,000 to "Washington and Jefferson," Vilar's alma mater; $177,000 to "American Academy in Berlin"; and various other withdrawals to or for the benefit of Vilar.

52.  Additionally, on or about June 26, 2002, Tanaka sent an LOA on Amerindo US letterhead to Bear Stearns directing AMI to transfer $650,000 of Cates' funds from the AMI account to Amerindo US' business checking account, once again falsely claiming that the transfer represented a "redemption by the above referenced equity partner."

53.  Amerindo US' bank records indicate that within approximately one month, these funds were spent on what appear to be routine business expenses Amerindo US incurred.

54.  Tanaka eventually directed AMI to transfer virtually all of the remaining portion of Cates' funds from the AMI account to other third party bank accounts. In particular, Tanaka sent an LOA on Amerindo US letterhead to Bear Stearns directing a $3.1 million transfer to pay a GFRDA investor's redemption, once again falsely claiming that such transfer

represented a "redemption by the above-referenced equity partner."

*Amerindo, Vilar and Tanaka Misappropriated Cates' Funds From Her Managed Account*

55. In addition to her investment in the SBIC, Cates had other investments with

Amerindo.

56. According to an account statement on Amerindo Panama letterhead, as of June

30, 2003, among other investments, Cates held approximately $2 million in an account at Bear

Stearns that Amerindo managed (the "Managed Account").

57. On or about September 25, 2003, an LOA on Amerindo US letterhead was signed

by Tanaka and, purportedly by Cates, authorizing that $250,000 be journaled from the

Managed Account to the ATGF account at Bear Stearns. Cates did not execute – or authorize

to be executed – the September 25, 2003 LOA.

58. Cates' subsequent account statements from Amerindo did not reflect any

investment in ATGF.

*Amerindo, Vilar and Tanaka Refused to Redeem Cates' Investments*

59. Cates' attorney made a number of written redemption requests with respect to the

SBIC investment as well as Cates' other investments with which Amerindo failed to comply.

For instance, on February 17, 2005, Cates' attorney wrote to Vilar and indicated that Cates

wished to close her Amerindo account.

60. Vilar responded in a February, 23, 2005 letter on his personal letterhead with his

New York apartment listed as the return address. In this letter, Vilar asserted that:

> The Investment Management Agreement requires that the client
> notify the office where the account is lodged of its decision to
> terminate its service in writing. Cates should write a letter to the
> Amerindo office where she has been a client for the better part of
> 20 years, which is: Amerindo Investment Advisors, Inc., Calle
> Elvira Mendez, Vallarino Building, 6[th] Floor

15

> P.O. Box 4415, Panama 5, Republic of Panama. She can also send
> a signed copy of this notification to the London office, which
> coordinates administration.

61. Despite the fact that Cates primarily dealt with Vilar and Tanaka, and did not believe her account was managed by Amerindo Panama, Cates' attorney then sent a request on February 28, 2005 to Amerindo Panama, which was copied to Amerindo offices in New York and London, confirming her intention to close her account.

62. Neither Vilar nor any Amerindo investment advisory entity confirmed receipt of the request, nor did Vilar, Tanaka or any Amerindo investment advisory entity transfer any funds or securities to Cates.

63. After the Commission staff inquired about the status of Cates' investment in response to a complaint, Vilar replied in a May 20, 2005 letter that: "[a]t the present time, there is no common ownership with respect to Amerindo [US] and Amerindo Panama, and no overlap between the directors, officers and employees thereof. The present owners of Amerindo [US] formerly owned Amerindo Panama, but they sold it to its present owners in 2001." This statement directly contradicted Vilar's and Tanaka's repeated representations that they were the sole shareholders and directors of Amerindo Panama (for example, in Amerindo US's 2003 Form ADV (Part II), and a Form 13G filed in February 2005).

### Vilar, Tanaka, Amerindo and the Amerindo Investment Vehicles Offered Investments in GFRDA and ATGF Securities

#### *GFRDA Securities*

64. Vilar, Tanaka and Amerindo offered to clients and other investors an investment called the "Guaranteed Fixed Rate Deposit Account," or GFRDAs. The GFRDAs are securities.

65. Vilar, Tanaka and/or Amerindo personnel prepared numerous versions of the

GFRDA offering circular, including versions in 1986, 1998, and 2002, which indicated that various Amerindo investment advisory entities had a role in offering the GFRDA products to clients and other investors.

66.   For example, the offering circular for the GFRDA program dated June 2002 ("2002 Offering Circular") indicates that "investments . . . are managed by Amerindo Investment Advisors, Inc," but also lists New York and San Francisco addresses for Amerindo US, a London address for Amerindo UK, and a Panamanian address for Amerindo Panama but does not state explicitly elsewhere in the document that the investment manager of the GFRDAs was the Panamian entity.

67.   The 2002 Offering Circular also indicated that "Amerindo" (e.g., Amerindo US) would, for example, employ a number of professional money management techniques to manage the GFRDAs, and guarantee the deposit and the fixed rate of interest.

68.   According to GFRDA offering circulars, subscription documents, and correspondence, GFRDA investors would purchase their GFRDAs by depositing funds to Bear Stearns in New York, typically the Techno Raquia account.

69.   The GFRDA offering circulars provided that the GFRDAs were being offered for a specific term (i.e., one, two or three years) and would earn a fixed rate of interest, generally at a rate substantially above the prevailing rates available from banks and other institutions. Amerindo agreed to pay interest either periodically during the term of the investment or at the conclusion of the term, and was to return the initial deposit at the end of the term. Alternatively, investors could roll over their investment into a new term (subject to renegotiation of the interest rate for the new term). The 2002 Offering Circular noted that Amerindo would guarantee "[b]oth the deposit and the interest rate" associated with each

Case 1:05-cv-05231-RJS   Document 229   Filed 05/25/12   Page 18 of 40

account and that Amerindo was backed by its "two founding partners" (Vilar and Tanaka).

70.   Vilar assured some investors that their GFRDA investments were safe because they were custodied in New York.  The GFRDA offering circular dated July 1, 1986 ("1986 Offering Circular") indicated that "INVESTORS ARE BEING OFFERED:  High Guaranteed Income[,] Stability of Principal[,] Liquidity[,] Professional Management[,] Immediate Confirmation of Purchases, Redemption, and Quarterly Interest Payments[,] No Sales or Redemption Charges."   The GFRDA offering circular dated September 1998 ("1998 Offering Circular"), and the 2002 Offering Circular contained nearly identical language.

71.   The GFRDA offering circulars also described specifically how Amerindo would invest funds received from GFRDA investors.  The 1986, 1998, and 2002 Offering Circulars indicated that the majority of funds in the GFRDA (typically between approximately two-thirds to three-quarters of the funds) would be invested in short term debt instruments, and that the rest (typically between one-quarter and one-third of the funds) would be invested in the stock of growth companies.

### ATGF and ATGF II Securities

72.   Vilar and Tanaka sold shares in ATGF and ATGF II, including to friends and family.  Shares of ATGF and ATGF II are securities.

73.   According to the offering circulars for both ATGF and ATGF II, Amerindo Panama was the investment manager of the funds, and Vilar and Tanaka were the portfolio managers for Amerindo Panama.

74.   The offering circulars directed investors to pay for shares by wiring funds to broker-dealers in New York, New York, including Bear Stearns.

75.   According to ATGF offering circulars, ATGF's principal objective was

purportedly "growth of capital through concentrated investment, primarily in U.S. publicly traded emerging growth companies that are principally in the fields of electronics and healthcare." ATGF II had similar investment objectives to ATGF.

### Vilar, Tanaka, Amerindo and the Amerindo Investment Vehicles Commingled Investor Funds as Part of Their Scheme to Defraud GFRDA and ATGF Investors

76. Vilar, Tanaka, Amerindo and the Amerindo Investment Vehicles engaged in a fraudulent scheme to secretly commingle the finances of the various Amerindo Investment Vehicles without disclosing the commingling to investors and potential investors, even though the Amerindo Investment Vehicles purportedly had different investment strategies (*e.g,* Cates deposited funds in the AMI account for investment in the SBIC; GFRDA investors generally deposited funds in the Techno Raquia account for investment in short-term debt instruments; and investors deposited funds in the ATGF and ATGF II accounts for investment in equity securities).

77. Amerindo had custody of GFRDA, ATGF and ATGF II funds, and failed to segregate the funds and properly maintain the funds in accounts in the name of the adviser as agent or trustee for the respective clients.

78. The commingling of funds began at least as early as 1988. For example, funds were transferred among the Amerindo Investment Vehicles' brokerage accounts at Bear Stearns as follows:

- On April 4, 1988, ATGF transferred $50,000 to Techno Raquia;
- On April 8, 1988, ATGF transferred $30,000 to Techno Raquia;
- On February 12, 1991, ATGF II transferred $500,000 to ATGF to meet a margin call; and
- On September 24, 1991, ATGF transferred $15,100 to AMI to meet a margin call.

79. The commingling continued through at least May 2005. Amerindo employees

signed LOAs authorizing the Amerindo Investment Vehicles to transfer funds and/or securities between these respective accounts at Bear Stearns in order to cover margin calls in the recipient accounts. For example, to cover a margin call, Tanaka directed a transfer of 15,000 shares of OSI Pharmaceuticals from the AMI account to the ATGF II Account on July 21, 2004, and a transfer of 34,100 shares of XM Satellite Radio stock from ATGF II to the AMI account on the same date.

80. In a May 12, 2005 LOA on Amerindo US letterhead, Tanaka directed ATGF II to transfer options on Google stock from its brokerage account at Bear Stearns to the AMI account. In the LOA, Tanaka admitted to commingling funds and securities among the accounts by referring to the Bear Stearns accounts as a type of "omnibus account" and noting that the "items should be able to be journaled freely from one account to the other as has always been the case."

81. Amerindo, Vilar and Tanaka also used funds in ATGF, ATGF II, and AMI accounts to pay GFRDA investors even though they never disclosed to investors that funds in the ATGF, ATGF II or the AMI accounts would be used to pay GFRDA investors.

82. For example, Amerindo and Tanaka satisfied the redemption of Lynx Investments, Ltd. ("Lynx"), a GFRDA investor, entirely from non-GFRDA accounts. In July 2002, Tanaka and/or a former Amerindo UK employee authorized wire transfers totaling approximately $5,832,490 to Lynx from the ATGF II accounts at Bear Stearns and US Trust, the ATGF account at Bear Stearns, and the AMI account at Bear Stearns.

83. In each LOA, Tanaka and/or the former Amerindo UK employee falsely claimed that the transfer represented a "redemption by the above referenced equity partner[,]" despite the fact that Lynx had invested in a GFRDA, rather than ATGF, ATGF II or the SBIC.

84.  By authorizing such transfers, Amerindo and Tanaka commingled the funds and securities of the different Amerindo Investment Vehicles.

### Vilar, Tanaka, Amerindo and the Amerindo Investment Vehicles Misappropriated Investor Assets For Their Own Benefit

85.  Vilar, Tanaka, Amerindo and the Amerindo Investment Vehicles engaged in a fraudulent scheme to misappropriate investor assets and then used at least a portion of these funds for their own personal and business purposes.

86.  In a February 28, 2003 letter from Tanaka and Vilar to the Commission staff, they disclaimed "any direct or indirect record or beneficial interest in any client account managed by Amerindo or any affiliate of Amerindo" other than for fees and any interest in a registered mutual fund.

87.   Vilar and/or Tanaka transferred funds from the Amerindo Investment Vehicles for the benefit of Vilar, Tanaka and Amerindo US, with Tanaka often misrepresenting that the transfers were redemptions of an equity partner, contrary to their representations in the February 28, 2003 letter that they held no interest in the Amerindo Investment Vehicles.

88.  For example, on August 6, 2004, Tanaka executed LOAs transferring $125,000 and $250,000 from AMI and ATGF II accounts at Bear Stearns, respectively, to "Equine Thoroughbreds Limited" for further credit to Agata (a horse Tanaka owned), again misrepresenting that the transfer represented a "redemption by the above referenced equity partner."

89.  Further, Vilar executed LOAs transferring funds from the ATGF II account at Smith Barney in New York, New York, to his own personal bank account in August 2004.

90.  During the period April 27, 1993 through August 18, 2004, the Amerindo Investment Vehicles transferred funds to Vilar and for Vilar's benefit, including at least the

21

following: $1,963,284 from the ATGF account at Bear Stearns; $6,327,228 from the ATGF II account at Bear Stearns; $3,579,228 from the Techno Raquia account at Bear Stearns; $1,249,228 from the AMI account at Bear Stearns; $2,425,000 from the ATGF II account at US Trust; and $233,500 from the ATGF II account at Smith Barney.

91. During the period September 7, 2001 through March 24, 2005, the Amerindo Investment Vehicles transferred funds to Amerindo US, including at least the following: $4,342,311 from the ATGF account at Bear Stearns; $12,249,065 from the ATGF II account at Bear Stearns; $2,870,500 from the Techno Raquia account at Bear Stearns; $2,706,770 from the AMI account at Bear Stearns; and $5,722,432 from the ATGF II account at US Trust.

92. To account for transfers to Amerindo US, the Amerindo investment advisory entities purportedly entered into agreements, such as a series of "Research Supply Agreements." Pursuant to these agreements, Amerindo Panama and Amerindo UK were jointly and severally liable to pay Amerindo US for research that it purportedly provided during the course of the year. The agreements were renewed at the beginning of each fiscal year. The amounts to be paid were left blank, however, and were filled in at the end of the fiscal year to reflect the amounts Amerindo US had already received. These amounts bore little or no relation to the amount of research Amerindo US in fact provided to Amerindo Panama and/or Amerindo UK.

### Vilar, Tanaka and Amerindo Defrauded GFRDA Investors by Failing to Purchase Debt Securities, Commingling Investor Funds, and Misappropriating Funds

93.  Contrary to representations made to GFRDA investors, Amerindo did not purchase short-term debt instruments as, for example, set forth in the GFRDA offering circulars.

94.  Similarly, Vilar, Tanaka and Amerindo did not disclose to investors that GFRDA funds would be co-mingled with non-GFRDA investor funds, for example those from Cates as well as ATGF and ATGF II.

95.  In fact, as of June 30, 2005, the Techno Raquia account at Bear Stearns, where GFRDA investor funds generally were custodied, held assets valued at approximately $300,000 even though the stated value of the GFRDA investments was in the many millions of dollars.

96.  When GFRDAs matured and investors sought their funds, Vilar, Tanaka and Amerindo either failed to make promised interest and/or principal payments to certain GFRDA investors, or used funds from other brokerage accounts, including accounts owned by AMI, ATGF, and ATGF II, to pay certain GFRDA investors.

97.  Vilar, Tanaka and Amerindo engaged in a scheme to defraud numerous investors who had purchased GFRDA securities in the United States, including, but not limited to, the investors described below.

#### Tara Colburn

98.  Tara Colburn ("Colburn"), a personal friend of Vilar's and a resident of California, purchased a $1 million in GFRDA in the United States in February 2000.

99.  Amerindo provided Colburn with the 1998 Offering Circular.

100.  On or about February 7, 2000, Colburn contacted James Meixner at Ayr, Inc.

Case 1:05-cv-05231-RJS   Document 229   Filed 05/25/12   Page 24 of 40

("Ayr") in Northbrook, Illinois, and requested that Ayr send $1 million to Amerindo. Renata Tanaka faxed Meixner instructions to his Northbrook, Illinois office to send a $1 million check to the Techno Raquia account at Bear Stearns. Meixner signed a cover letter and attached a $1 million check drawn on Ayr's bank account and mailed it from Northbrook, Illinois to Bear Stearns in New York, New York. The check was deposited into the Techno Raquia account on or about February 9, 2000.

101.   After making the investment, Colburn expressed misgivings to Vilar. In a November 7, 2002 letter from Vilar to Colburn on Amerindo US letterhead, Vilar explained that Amerindo could not redeem Colburn's GFRDA investment prior to its February 2003 maturity date.

102.   On November 8, 2002, Renata Tanaka sent Colburn a letter on Amerindo Panama letterhead confirming that Colburn had a $1,000,000 GFRDA that would mature on February 9, 2003 and that her $1,000,000 principal and $271,240.25 worth of accumulated interest would be available to be wired to her personal bank account on February 10, 2003.

103.   Amerindo, however, did not wire funds to Colburn on February 10, 2003 as promised.

104.   Moreover, Amerindo never purchased short-term debt instruments for Colburn as Amerindo represented it would in the GFRDA offering circular and in other communications.

105.   When Colburn died on May 23, 2003, she still had not received her principal or interest payments. Instead, following Colburn's death, a trust representing Colburn's estate (the "Trust") brought a civil action against Amerindo US seeking the return of her funds.

106.   In September 2004, the Trust, Amerindo US and Amerindo Panama entered into

a "Mutual Settlement Agreement" whereby Amerindo US and Amerindo Panama promised to make a series of payments to the Trust in the aggregate amount of approximately $1.5 million.

107.  Vilar executed the "Mutual Settlement Agreement" and accompanying agreements on behalf of both Amerindo US and Amerindo Panama and agreed that both entities would be jointly and severally liable for the payments due to the Trust thereunder.

108.  Amerindo made an initial $100,000 payment to the Trust on or about November 8, 2004.

109.  On or about January 21, 2005, ATGF II wired a second payment in the amount of $450,000 to the Trust from its account at Bear Stearns.

110.  Amerindo, Vilar and Tanaka failed to make subsequent payments, as required by the terms of the Mutual Settlement Agreement.

### *The Mayers*

111.  The Mayers, a family whose members were residents of Puerto Rico and New York, were longtime friends of Vilar and investors with Amerindo.

112.  The Mayers invested in a series of GFRDAs beginning in 1988, starting with a $700,000 investment in April 1988.

113.  In July 1998, after Vilar confirmed to the Mayers in a May 18, 1998 letter that the investment was guaranteed by Vilar, Tanaka, Amerindo US and Amerindo Panama, the Mayers invested $1.35 million in a 14% GFRDA with a maturity date of July 21, 1999.

114.  By letter dated December 26, 2000 addressed to the Mayers in Puerto Rico, Renata Tanaka, on behalf of Amerindo, advised the Mayers' that their GFRDA was set to mature.  In the letter, Ranata Tanaka offered to renew the Mayers' GFRDA investment of $11,066,713.44 at a rate of 11% per annum provided that they renewed for a three-year

period.

115.  On or about January 4, 2000, the Mayers agreed to the proposal and signed instructions in Puerto Rico to reinvest $11,066,713.44 in a new GFRDA for a three year period.  The Mayers faxed the instructions from Puerto Rico to Amerindo.  On that same day, the Mayers' investment instructions were forwarded to Amerindo's New York offices.

116.  On or about January 28, 2003, Renata Tanaka sent the Mayers a letter from the Amerindo UK London Office on Amerindo Panama letterhead noting that "as a temporary measure, a regular payment of $50,000 in lieu of your monthly interest payment [of $96,667.74]" would be sent and that Amerindo would "endeavour to send [the Mayers] additional sums of money whenever our cash flow situation allows for it."  Renata Tanaka also stated that the Mayers' interest rate would be retroactively lowered to 8% per annum, effective as of January 1, 2003 through the maturity date of the GFRDA.  The Mayers subsequently sought to redeem their funds.  Amerindo failed to honor any of their redemption requests.

117.  Amerindo never purchased short-term debt instruments for the Mayers as Amerindo represented it would in the GFRDA offering circular and in other communications.

118.  To date, Amerindo has not fully redeemed the Mayers' GFRDA investment.

### *Graciella Lecube Chavez*

119.  Graciella Lecube Chavez ("Chavez") is a resident of New York, New York, and is an 87 year-old diabetic woman.

120.  Chavez was introduced to Vilar by Vilar's stepmother, who worked with Chavez in New York, New York.  Vilar solicited Chavez's initial investment both orally and by letter addressed to Chavez's New York City work address.

26

121. Vilar told Chavez that he would put her in touch with an Amerindo representative in California. Chavez ultimately invested approximately $74,000 of her retirement funds in a GFRDA in approximately July 1989 by sending a check to Amerindo's New York or California office.

122. Chavez continued to maintain this investment and Amerindo UK's London office sent her an account statement on Amerindo Panama letterhead for the period ending January 2002 that showed an account value of $88,434.12.

123. In an October 30, 2003 letter, Chavez wrote to Renata Tanaka at Amerindo's London and Panama addresses and demanded that her account be closed as of November 15, 2003.

124. Amerindo, which never invested Chavez's funds in short-term debt instruments, has not fully redeemed her investment.

### *Robert M. Cox*

125. Robert M. Cox ("Cox") was a resident of San Francisco, California.

126. In or about December 1989, Vilar sent a letter to Cox at his address in San Francisco, California, soliciting Cox to invest the proceeds of a note Cox held on a property owned by Vilar in a GFRDA security. Cox invested in the GFRDA.

127. Amerindo never purchased short-term debt instruments for Cox as Amerindo represented it would in the GFRDA offering circular and in other communications.

128. In late 2004 and 2005, Cox's representative requested to close Cox's account and to have the GFRDA investment redeemed.

129. To date, Amerindo has not fully redeemed Cox's investment.

Case 1:05-cv-05231-RJS   Document 229   Filed 05/25/12   Page 28 of 40

**Vilar, Tanaka, Amerindo, ATGF and ATGF II Defrauded
ATGF and ATGF II Investors by Commingling and Misappropriating Investor Funds**

130.  At no time did Vilar, Tanaka, Amerindo, ATGF and/or ATGF II advise potential
investors that ATGF or ATGF II funds, as applicable, would be co-mingled with funds from
different Amerindo Investment Vehicles, for example those from GFRDA clients, or that
ATGF or ATGF II funds would be used for Vilar's, Tanaka's or Amerindo US' benefit.  As
described above, funds from different Amerindo Investment Vehicles were commingled as
early as 1988 and ATGF funds were used for Amerindo US', Vilar's and/or Tanaka's benefit.

131.  Vilar, Tanaka, Amerindo, ATGF and ATGF II engaged in a scheme to defraud
investors who had purchased ATGF and ATGF II shares in the United States, including, but
not limited to, the investors described below.

*PM*

132.  PM is a resident of New Jersey.

133.  PM befriended Vilar in the late 1980s and opened a managed account with
Amerindo.

134.  In or about 1995, PM sold a business and sought to invest the proceeds, which
were being held in an escrow account at a bank in New Jersey.

135.  PM discussed with Vilar a possible investment in GFRDAs.  Vilar provided PM
with an offering circular both in person and by mail.

136.  PM invested approximately $5 million in GFRDAs on behalf of himself and his
children.  PM was located in New Jersey when he made the investment.

137.  PM met with Vilar in person and spoke with Vilar on the telephone on a regular
basis.

138.  In or about 1998, PM, while in the United States, redeemed substantially all of

28

his investments with Amerindo, including approximately $4.6 million in his and his family's GFRDA investment, and invested the proceeds in shares of ATGF.

139.  Since 2001, PM made several requests to Amerindo to redeem ATGF shares that were unfulfilled.

140.  Statements dated as of August 2004 show that PM and his family owned approximately 213,000 shares of ATGF valued at approximately $4.3 million.

### *JS*

141.  JS, a resident of California, invested in ATGF on behalf of family trusts and corporations.

142.  JS initially invested $1 million on or about January 23, 1990. JS executed the application form in California and, as designated by the application form, wired the funds from Bank of America to the ATGF II account at Bear Stearns. JS' assistant sent the application to Amerindo US' office in Larkspur, California and forwarded a copy to Panama. On February 13, 1990, Vilar wrote to JS and noted that JS would subsequently receive a formal acknowledgment of his subscription in ATGF (rather than ATGF II). In the same letter, Vilar also confirmed that Bear Stearns, "the Fund custodian" had received the subscription on January 24, 1990.

143.  JS and his family entered into additional transactions in the United States.

144.  For example, on or about June 29, 1990, JS executed an application form in California and, as designated by the application form, wired $500,000 from Bank of America to the ATGF II account at Bear Stearns. In addition, on or about February 26, 1991, JS executed an application form in California and, as designated by the application form, wired $500,000 from Bank of America to the ATGF account at Bear Stearns.

145. Although some of JS' funds were wired into the ATGF II account at Bear Stearns, JS received confirmations and correspondence from Amerindo concerning his family's ATGF account.

146. Following Vilar and Tanaka's arrests, JS attempted to redeem his family entities' ATGF investments. To date, Amerindo has not redeemed RS' families' investments.

### RS

147. RS, a resident of Pennsylvania, initially met Vilar through their involvement in Washington and Jefferson College.

148. At a meeting at Vilar's residence in New York, New York, RS and Vilar discussed RS' potential investment in an Amerindo investment vehicle. RS believed that he was investing in ATGF.

149. RS completed an ATGF application form in Pennsylvania and agreed to an initial subscription of $5 million in ATGF. The application form, however, directed prospective investors to wire funds to the ATGF II account at Bear Stearns.

150. On or about July 29, 1999, RS wired $4 million from PNC Bank to the ATGF II account. On or about July 30, 1999, RS wired an additional $1 million from Hilliard Lyons to the ATGF II account. On or about November 12, 1999, RS wired an additional $1 million from PNC Bank to the ATGF II account.

151. Although RS' funds were wired into an ATGF II account, in each instance, RS received a confirmation from Renata Tanaka addressed to his Pennsylvania address confirming purchases of shares of ATGF, not ATGF II.

152. Following Vilar and Tanaka's arrests, RS attempted to contact various Amerindo offices, but Amerindo has not redeemed RS' investments.

Case 1:05-cv-05231-RJS   Document 229   Filed 05/25/12   Page 31 of 40

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5

(Vilar and Tanaka Defrauded Investors)

153.  The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-152.

154.  Vilar and Tanaka directly and indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, in the offer and sale, and in connection with the purchase or sale, of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

155.  As part and in furtherance of the violative conduct, Vilar and Tanaka orchestrated a scheme to defraud Amerindo US, Amerindo UK and/or Amerindo Panama clients. For instance, Vilar and Tanaka converted clients' funds, including Cates' funds. Additionally, Vilar and Tanaka misrepresented, and failed to disclose, material information to clients to induce them to make investments, and to continue to maintain their investments, with Amerindo US, Amerindo UK and/or Amerindo Panama, including Cates, investors in the GFRDAs, and/or investors in ATGF and ATGF II.

156.  Vilar and Tanaka acted knowingly and/or recklessly.

157.  By reason of the foregoing, Vilar and Tanaka, singly or in concert, directly or indirectly, violated and, unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### SECOND CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act, and Rule 10b-5**

(Amerindo US, Amerindo UK and Amerindo Panama, Acting Individually or as a Common Enterprise, Defrauded Investors)

158.  The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-152.

159.  Amerindo US, Amerindo UK and Amerindo Panama, acting individually or as a common enterprise,  directly and indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, in the offer and sale, and in connection with the purchase or sale, of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

160.  As part and in furtherance of the violative conduct, Amerindo US, Amerindo UK, and Amerindo Panama, acting individually or as a common enterprise, participated in a scheme to defraud clients. For instance, Amerindo US, Amerindo UK, and Amerindo

Panama, acting individually or as a common enterprise, converted clients' funds, including Cates' funds. Amerindo also misrepresented, and failed to disclose, material information to clients to induce them to make investments, and to continue to maintain their investments, with Amerindo, including Cates, investors in the GFRDAs, and/or investors in ATGF and ATGF II.

161.  Amerindo US, Amerindo UK, and Amerindo Panama, acting individually or as a common enterprise, acted knowingly and/or recklessly.

162.  By reason of the foregoing, Amerindo US, Amerindo UK, and Amerindo Panama, acting individually or as a common enterprise, singly or in concert, directly or indirectly, violated and, unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of
Section 10(b) of the Exchange Act and Rule 10b-5**

(AMI, Techno Raquia, ATGF and ATGF II Aided and Abetted Violations of the Antifraud Provisions)

163.  The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-152.

164.  Vilar, Tanaka, Amerindo US, Amerindo UK, and/or Amerindo Panama, directly or indirectly, singly or in concert, by the use of any means or instrumentality of interstate commerce, or of the mails, in connection with the purchase or sale of any security, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make

33

Case 1:05-cv-05231-RJS   Document 229   Filed 05/25/12   Page 34 of 40

statements made, in light of the circumstances under which they are made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

165.  AMI, Techno Raquia, ATGF and ATGF II knew that Vilar, Tanaka, Amerindo US, Amerindo UK and/or Amerindo Panama were engaged in a fraudulent scheme and/or that they made material misrepresentations and omissions to investors.

166.  AMI, Techno Raquia, ATGF and ATGF II substantially assisted the fraudulent activity described above.

167.  Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason of the foregoing, AMI, Techno Raquia, ATGF and ATGF II, singly or in concert, directly or indirectly, aided and abetted and unless enjoined will again violate, or aid and abet violations of, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## FOURTH CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

(Amerindo US, Amerindo UK and Amerindo Panama, Acting Individually or as a Common Enterprise, Violated the Antifraud Provisions of the Advisory Act)

168.  The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-152.

169.  Amerindo US, Amerindo UK, and Amerindo Panama, acting individually or as a common enterprise,  directly and indirectly engaged in the business of advising clients as to the advisability of investing in, purchasing or selling securities.

Case 1:05-cv-05231-RJS   Document 229   Filed 05/25/12   Page 35 of 40

170.   Amerindo US, Amerindo UK, and Amerindo Panama, acting individually or as a common enterprise as an investment adviser, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, employed and is employing devices, schemes and artifices to defraud clients, and has engaged and is engaging in transactions, practices and courses of business which operate as fraud and deceit upon these clients.

171.   Amerindo US, Amerindo UK, and Amerindo Panama, acting individually or as a common enterprise, knowingly or recklessly participated in a scheme to defraud clients, and knew or were reckless in not knowing that the material representations and omissions set forth herein were false and misleading.

172.   By reason of the foregoing, Amerindo US, Amerindo UK, and Amerindo Panama, acting individually or as a common enterprise, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

### FIFTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act**

(Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II Aided and Abetted Violations of the Antifraud Provisions of the Adviser Act)

173.   The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-152.

174.   Amerindo US, Amerindo UK and/or Amerindo Panama, investment advisers, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or of the mails, employed and are employing devices, schemes and artifices to defraud clients, and has engaged and are

engaging in transactions, practices and courses of business which operate as fraud and deceit upon these clients, in violation of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

175. Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II, directly or indirectly, singly or in concert, aided and abetted Amerindo US's, Amerindo UK's and/or Amerindo Panama's violations of Sections 206(1) and 206(2) of the Advisers Act.

176. Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II knowingly participated in the scheme to defraud Amerindo clients, and they knew that the representations and omissions set forth herein were false and misleading.

177. Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II provided substantial assistance to Amerindo US, Amerindo UK and/or Amerindo Panama.

178. By reason of the foregoing, Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II, singly or in concert, directly or indirectly, aided and abetted and unless enjoined will again violate, or aid and abet violations of, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## SIXTH CLAIM FOR RELIEF

### Violations of Section 206(4) and Rule 206(4)-2(a) of the Advisers Act

(Amerindo US Violated the Custody Rules)

179. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-152.

180. Amerindo US, directly or indirectly, singly or in concert, violated Section 206(4) of the Advisers Act and Rule 206(4)-2(a). Specifically, Amerindo US engaged in an act, practice or course of business which is fraudulent, deceptive or manipulative, in that

Amerindo had custody of client accounts and it failed to properly maintain the accounts, by, among other things, failing to segregate the clients' securities and funds, and failing to maintain the funds in an account in the name of the adviser as agent or trustee for the client.

181. Amerindo US knowing or recklessly engaged in this act, practice or course of business which is fraudulent, deceptive or manipulative.

182. By reason of the foregoing, Amerindo US, singly or in concert, directly or indirectly, violated, and unless enjoined will again violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2a, 17 C.F.R. § 275.206(4)-2(a).

## SEVENTHCLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 206(4) and Rule 206(4)-2(a) of the Advisers Act**

(Vilar and Tanaka Aided and Abetted Violations of the Custody Rules)

183. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1- 152.

184. Vilar and Tanaka, directly or indirectly, singly or in concert, aided and abetted Amerindo US's violations of Section 206(4) of the Advisers Act and Rule 206(4)-2(a). Specifically, Vilar and Tanaka knowingly provided substantial assistance to Amerindo US in engaging in an act, practice or course of business which is fraudulent, deceptive or manipulative, in that Amerindo US had custody of client accounts and failed to properly maintain the accounts, by, among other things, failing to segregate the clients' securities and funds, and failing to maintain the funds in an account in the name of the adviser as agent or trustee for the client.

185. Amerindo US, Vilar, and Tanaka knowingly engaged in this act, practice or course of business which is fraudulent, deceptive or manipulative.

186. By reason of the foregoing, Vilar and Tanaka, singly or in concert, directly or indirectly, aided and abetted and unless enjoined will again violate, or aid and abet violations of, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2(a), 17 C.F.R. § 275.206(4)-2(a).

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

An Order temporarily and preliminarily, and a Final Judgment permanently, restraining and enjoining Amerindo US, its agents, servants, employees and attorneys and all persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, and each of them, from direct or indirect future violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4), and Rule 206(4)-2(a), 17 C.F.R. § 275.206(4)-2(a).

### II.

A Final Judgment permanently restraining and enjoining Amerindo UK and Amerindo Panama, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from direct or indirect future violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Advisers Act, 15

U.S.C. §§ 80b-6(1) and 80b-6(2).

## III.

A Final Judgment permanently restraining and enjoining Vilar and Tanaka, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from direct or indirect future violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1), 206(2), and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4), and Rule 206(4)-2(a), 17 C.F.R. § 275.206(4)-2(a).

## IV.

A Final Judgment permanently restraining and enjoining AMI, Techno Raquia, ATGF and ATGF II, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from direct or indirect future violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## V.

A Final Judgment ordering Amerindo US, Amerindo UK, Amerindo Panama, Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II to disgorge all ill-gotten gains, plus prejudgment interest that they obtained from their fraudulent conduct.

## VI.

A Final Judgment ordering Amerindo US, Amerindo UK, Amerindo Panama, Vilar, Tanaka, AMI, Techno Raquia, ATGF and ATGF II to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9.

## VII.

Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       May 25, 2012

_____
Neal Jacobson

Attorney for the Plaintiff
Securities and Exchange Commission
3 World Financial Center
New York, New York  10281
Telephone (212) 336-0095 (Jacobson)
Fax: (212) 336-1324

Of Counsel:

Alistaire Bambach
Mark D. Salzberg