Vivian Shevitz
Attorney at Law
46 Truesdale Lake Drive
South Salem, New York 10590
914-763-2122
FAX 888 859-0158
vivian@shevitzlaw.com

March 20, 2014

Hon. Richard J. Sullivan
United States District Judge
Southern District of New York
40 Centre Street
New York, New York 10007

Re: *SEC v. Amerindo, Vilar and Tanaka*, 05 cv 5231 (RJS)
Request to consider this brief supplemental submission

Dear Judge Sullivan,

I respectfully ask Your Honor to please accept this brief letter supplementing five points that I failed to address properly at the March 14, 2014 hearing.   The defendants want to resolve this case and to facilitate the immediate, long-overdue disbursements to their clients.   To that end defendants are concurrently making a proposal to the SEC to settle the case by ceding defendants' interest in the Amerindo Panama assets (which should include substantial surplus if private and public securities are sold in a way to maximize value).   In the meantime, we ask the Court to consider these brief points which bear on investor claims Your Honor is considering.

1. **No ATGF Fraud**:  Your Honor suggested at the hearing that ATGF investors were or must have been defrauded.   There has never been any finding of ATGF "fraud" – indeed *no* ATGF investor (including the Mayers, who have an ATGF as well as a GFRDA investment) has *ever* claimed he was defrauded as to this investment.   In the criminal case, ATGF fraud was not charged and the whole matter of the Bear Stearns accounts was deemed irrelevant.  (See Order DOC 408, indicating the prosecutor's position that these accounts were "not relevant.")

Moreover, the government did not present evidence about record-keeping or accounting by Amerindo Panama in the criminal case.  In the civil case, while the SEC mentioned "fraud" in the amended complaint, it did not *specify* an ATGF fraud against any investors until the second amended complaint but no evidence has been presented to substantiate any such ATGF claim. The summary judgment motion was based principally on the record in the criminal case and was confined to the GFRDA investors and Lily Cates.  (The second amended complaint was filed well after the statute of limitations ran. Under *Gabelli* it was too late to charge ATGF fraud, and under *Morrison* the SEC in any event has no authority to look into that offshore ATGF investment.)  But at bottom, as Mr. Begos' presentation on March 14, 2014 suggested, ATGF "fraud" did not happen.  It is an unwarranted and unsubstantiated "assumption."

Mr. Litt made accusations of what *might* be found vis-à-vis the ATGF investment in a sentencing reply letter filed two days before sentencing. (Doc 418-2).  However, that was supposition and has never been supported (and unfortunately was not addressed by prior sentencing counsel).

2. **Source of Claim to the Substantial Surplus**:  I also failed to deal properly with the foundation of defendants' claim to a surplus in the Amerindo Panama's house accounts.  The specific source of defendants' financial interest in the "investor accounts" appears and is fully disclosed in the ATGF circulars: a 1985 version one in Lily Cates' files (reprinted at the Vilar appeal appendix, VSA I p.10), disclosing a management fee of 2% of assets under management; and a later one in Mr. Litt's sentencing submission, DOC 418-2, p.30, reducing the management fee to 1.75%.  These fees were earned from the time the fund opened in 1984 through the heyday in the dot-com bubble. They amounted to at least $45 million on $750 million invested in the fund. Fees from other investment vehicles such as Rhodes Capital Corp came to an estimated

$20 million.  These fees remained in the "house trading accounts", and accrued fees were re-invested into the firm's public and private stock portfolios.  Amounts are considerable.  The government is in possession of all the Amerindo records (we are not); the records would substantiate these assertions.  Notably, in the criminal case, the government used those records to show a very limited amount of withdrawals by the defendants from the house accounts; it never showed  or even suggested (in either the criminal case or in the civil case) that the defendants withdrew these management fees.

   **3.  House trading accounts v. client accounts**:    There is continuing confusion about who owns the various "accounts"  -- because this was not the subject of litigation or any findings at trial.  There is a difference between the Amerindo house *trading* accounts  (*i.e.,* those at JP Morgan, formerly prime brokerage accounts at Bear Stearns) and the *client* accounts.  When a client provided funds for an investment in Amerindo Panama, the funds were directed to one of the "House Accounts" belonging to Amerindo, through which many different purchases and redemptions were made.  At the same time, the amount of the investment and type was credited on a *client* account, later reflected by account statements sent to the client.   The *trading* accounts at Bear Stearns (and other bank) accounts belonged to Amerindo ("the house") and contained funds commingled in accounts used for trading  or redemption or other inter-Amerindo purposes.  Like a bank.

    No client owned any piece of the trading account.  Once the client of Amerindo Panama invested, the client owned a claim against Panama, not a piece of any trading account.  So, if a theoretical investor, XYZ, opted for shares of the equity fund (ATGF) he would forward funds into one of the accounts designated by Amerindo to receive and contain funds , but at the same time, Amerindo's back office would open a client account, and, when the funds were accepted,

give XYZ a credit on its account for shares of ATGF, determined by the value of the fund that day (a 15th or last day of a month); the client's account statement would show the particular investment, n.a.v., and the total value, at the transaction and on each statement thereafter.  If the client wanted a fixed deposit, those funds were credited at an annual interest rate.  The funds were still invested for trading by Amerindo within its area of specialization.  If a client purchased a fixed deposit account, interest amounts (per annum generally, though sometimes for a two-year fixed term) were also established and reported on client statements.  As one of the investors acknowledged at the hearing Friday March 14, 2014, it was like a CD.   And like a bank issuing a CD, the issuer (Amerindo) invested on behalf of clients through House Trading Accounts.

There are four accounts among those frozen, including one named ATGF and one named ATGF II.  These are internal names of trading accounts; they may be similar to the investment vehicle (ATGF), but as the government acknowledged on appeal, were *not* the investment vehicle.  (Gov. Brief Appeal 10-521 DOC 236 p.202).  They do not belong to the ATGF Fund; nor (as the US Attorney and the SEC maintained, see Responses to the Court's February 7, 2012 Order, 05cr621 DOC 514, p. 1-2; 05cv5231 DOC 201, p. 2) did any investor *own* a piece of any of those trading accounts or any other assets.  The investors own a claim against Amerindo Panama, like any investor in a fund or CD.   And defendants' fees for management of the assets remained in those trading accounts as well; consequently defendants have a claim for the value of those fees reinvested in the House Accounts.

4. **Lily Cates' Mother's Claim Concerns A Fund Owned Not By Amerindo But By Munder**:   Ms. Cates alleges that her mother purchased shares in a mutual fund, which may or may not have happened.  However, the fund in which she purportedly invested (the B2B Fund which merged into the Amerindo Technology Fund [the "Tech D" fund]) was a mutual fund

*managed* by Amerindo US but not owned by it.  Ms. Cates' mother would not have received statements directly *from* Amerindo because it was just the manager, not the owner.  In 2005 the funds managed by Amerindo US were taken over by Munder Capital Management Inc.  If Ms. Cates or her mother's estate is owed money on these accounts, she should investigate through Munder Capital.

     5**. <u>Some Investors Not Contacted:</u>**  Finally, there are a handful of investors who we learned were not contacted by Mr. Gazes and whose claims do not appear on the charts. Defendants believe that they have valid claims. We have raised objections to some who *were* on the receiver's list; again, we do not have the Amerindo Panama accounting records but the government does.

     Thank you for your consideration.

                    Very truly yours,

                    /s/
                    Vivian Shevitz