E3EMSECC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SECURITIES AND EXCHANGE
     COMMISSION,
4
                    Plaintiff,
5
              v.                           05 Civ. 5231 (RJS)
6
     ALBERTO WILLIAM VILAR and GARY
7    ALAN TANAKA,

8                   Defendants.

9    ------------------------------x
                                           New York, N.Y.
10                                         March 14, 2014
                                           3:45 p.m.
11
     Before:
12
                         HON. RICHARD J. SULLIVAN,
13
                                           District Judge
14
                              APPEARANCES
15
     MARK D. SALZBERG
16   NEAL RALPH JACOBSON
          Attorneys for Plaintiff
17
     VIVIAN SHEVITZ
18        Attorney for Defendants

19

20   ALSO PRESENT:  IAN J. GAZES
                     KATHERINE BUCHANAN
21                   ANDREA LIKWORNIK WEISS
                     EDWARD T. SWANSON
22                   PAULA K. COLBATH
                     JULIAN W. FRIEDMAN
23

24

25

E3EMSECC

1           (Case called)

2           MR. JACOBSON:  Neal Jacobson and Mark Salzberg on

3      behalf of the Securities and Exchange Commission.

4           THE COURT:  Good afternoon.  I'll do the defendants

5      and then I'm come to the receiver.  For the defendants.

6           MS. SHEVITZ:  Vivian Shevitz for both defendants David

7      Berger for Mr. Laros who is not able to be here today.

8           THE COURT:  Good afternoon to each of you.  I hope

9      your wrist is all right.

10          MS. SHEVITZ:  For the record, not so great.  This

11     gesture --

12          THE COURT:  The thumbs down gesture.  You look well.

13          MS. SHEVITZ:  I made it anyway.

14          THE COURT:  Thank you.

15          Mr. Vilar and Tanaka.  Good afternoon.

16          Then the receiver is here as well.

17          MR. JACOBSON:  Yes, your Honor.

18          MR. GAZES:  Good afternoon, your Honor, Ian Gazes.

19          THE COURT:  There is a number of number of others who

20     are here today.  I think my law clerk has canvassed who is

21     here.  Many of you have, either yourself or through counsel,

22     made submissions.

23          MS. SHEVITZ:  Can I just put on the record for all the

24     other people, so I have it for the record.  I don't really know

25     who is here and I'd like to have it on the record.

E3EMSECC

```
 1            THE COURT:  It's a public forum, so I don't think
 2   people have to identify themselves for being here.  There is a
 3   number of people who have made submissions.  Those have been
 4   docketed.  There are a number of folks who have indicated they
 5   wish to be heard today, and so I think we should identify them.
 6   My law clerk took the appearances.  It's six people.  The
 7   individuals, mostly attorneys, but I think at least
 8   nonattorney-s, who have spoken to my law clerk and indicated
 9   they may wish to be heard today.  If you could just identify
10   yourselves for the record.

11            John, read off the names and who they represent.
12            THE LAW CLERK:  Andrea Likwornik Weiss, JP Morgan
13   Securities.  Paula Colbath for the Sweetlands and Alfred
14   Heitkonig.  Edward Swanson for Lily Cates.  Julian Friedman for
15   Paul and Dean Marcus.  Patrick Begos for the Mayers family.
16   And Katherine Buchanan for Robin Sayko.
17            THE COURT:  Everyone else is welcome to be here.  It's
18   a public courtroom.  So anyone who wishes to come is certainly
19   welcome to be here.  But those are the ones who indicated they
20   may wish to be heard, and I think all or most of those have
21   made a submission of some kind.

22            Mr. Heitkonig may want to appear on his own behalf.
23            What I propose to do is first hear from the receiver,
24   the receiver has made a couple of motions, original, revised,
25   and then a reply.  I reviewed those.  You have had the benefit
```

E3EMSECC

1    of reviewing also the objections and arguments made by others.

2    I think you addressed most of those in your reply.  If there

3    are other things that you wish to cover, I'll give you an

4    opportunity to do that.

5         Maybe we should use that lecturn over there, which has

6    a microphone.  I think there might be an advantage to that if

7    everyone uses that.  Just tilt it slightly.

8         MR. GAZES:  Good afternoon, your Honor.  I'm very

9    pleased to be here before your Honor.  Having proposed an

10   interim distribution, I know it's been the goal of the court

11   for some time, as well as the various parties, to finally get

12   some funds back to the various investors.  The amended motion

13   was a thoughtful motion in consideration of many conversations

14   with almost all of the parties here today, getting back their

15   feedback and their thoughts in connection with what the

16   proposed distributions should be or not be.  Unfortunately,

17   three or four of those 33 claimants have decided that a

18   different proposed distribution should be applied, but we are

19   all happy to be here to even be discussing a distribution

20   process.

21        THE COURT:  We should be clear that you're talking

22   really about the interim distribution process, and you're at

23   least at this point agnostic as to the final distribution

24   process.

25        MR. GAZES:  That's correct, your Honor.

E3EMSECC

1          You are correct.  Most of my papers set out my

2     position in connection with the various ideas and objections

3     that have been filed before you.  I just want to make sure that

4     it's clear that the funds that I'm holding are in what is known

5     as an ATGF 2 account.  The investment vehicles that were

6     utilized by the investors throughout their investments are ATGF

7     and GFRDA.  There are no investment vehicles that I can

8     identify that were utilized for those investments.  So it

9     clearly appears to me that all funds were commingled, that

10    despite the different investment types, everyone was similarly

11    treated and that the proposal I made to your Honor I believe

12    was the most fairest and most equitable proposal for this

13    interim distribution purposes.

14          The only variation that I would have to that proposed

15    distribution is the Sayko objection had argued because they

16    were a Rhodes investment that it was unfair since their Rhodes

17    investment was converted by the defendants to a GFRDA

18    investment vehicle, which did not exist, according to my

19    records, that she be treated as the other Rhodes investors that

20    they claim would be calculated based on the time of conversion

21    to the GFRDA.  And I've thought about it and I've discussed it

22    with my accountants and we did revise the distribution to just

23    do that, that it did appear that it was not equitable to treat

24    their initial investment as the Rhodes investment when in fact

25    we had a statement from them showing the GFRDA conversion and

E3EMSECC

1    value of those investments.  There were four investors that

2    fall within that category, your Honor, and I do have a revised

3    distribution which ultimately I would submit to your Honor, if

4    you'd like me to, which reflects that revision.

5         Other than that, the only other issue that I wanted to

6    bring to your attention was with JP Morgan there has been a lot

7    of discussion that interest was not being paid on the accounts.

8    As with my accounts now, I'm told that the commercial banks and

9    these types of accounts do not pay interest, even if they sweep

10   the accounts when the interest is 50 basis points or less.  And

11   that is why the bank did not pay interest on the accounts when

12   the fed rate dropped significantly, which it still is a very

13   low rate, no interest is paid on those accounts.

14        THE COURT:  That's in conformity with the agreement or

15   the contract with the bank and the account?

16        MR. GAZES:  I don't know if it specifically provides

17   for that, your Honor.  I didn't see a provision.  But counsel

18   to the bank is here and can address that issue for your Honor.

19   I did ask her to come down here.  And after all, she is seeking

20   to be paid their fees and expenses.

21        THE COURT:  But interest was paid up until --

22        MR. GAZES:  It dropped 50 basis points, your Honor.

23        THE COURT:  Which was approximately when?

24        MR. GAZES:  I believe it was in late 2000s.

25        Ms. Weiss, are you here?

E3EMSECC

1          MS. LIKWORNIK WEISS:  I am here, your Honor.

2          The interest rate on the account is the opening

3    federal funds rate minus 50 basis points.  So since 2009, no

4    interest has been earned on the accounts, given the low rate of

5    interest, and that's why no interest has accrued after December

6    2008.  The statements reflect that interest was credited on the

7    accounts through the end of 2008.

8          THE COURT:  That's an agreement that was just oral or

9    it was part of a written agreement?

10          MS. LIKWORNIK WEISS:  There is a provision in the

11   contract, I believe I cite it in my letter, basically let Bear

12   Stearns, not JP Morgan, set the interest rate.  My

13   understanding, this is an interest rate that is negotiated when

14   the account is opened.  These accounts go all the way back to

15   the late 1980s, I believe.  And I also understand that the

16   interest rate on these accounts is generally consistent with

17   what is paid for similar accounts of this size.

18          THE COURT:  Great.  Thank you.

19          MR. GAZES:  I have nothing more to add at this time,

20   your Honor, unless you have any specific questions for me about

21   the amended motion.

22          THE COURT:  I do have some questions.  But it may be

23   it's best for me to wait until I've heard from the other

24   interested parties, and then maybe some of those questions will

25   be either elaborated upon or they will be fine-tuned.

1          You said there is four other investors who are

2    similarly situated to Sayko?

3          MR. GAZES:  That's correct, your Honor.

4          THE COURT:  Who are they?  Do you know off the top of

5    your head.

6          MR. GAZES:  That would be Michael Walsh; Robin Sayko,

7    who we discussed; Donald and Marilyn Walsh; and Patricia

8    Cabero.

9          We never found an instrument for Rhodes, your Honor,

10   and so the conversion seems to have been taken place by

11   Amerindo.  The claimants, from what I understand, did not even

12   consent or know there was going to be a conversion into a GFRDA

13   supposed investment vehicle.

14         THE COURT:  We have Ms. Cates and Ms. Jordan have made

15   submissions here.  There is an issue as to whether they should

16   also be treated like the rest of the investors or whether they

17   are different because they are not, at least for some of the

18   investments, technically GFRDA or AGTF.

19         MR. GAZES:  Those are some of the issues that are

20   before you.  The ATGF creditors wish you to treat the interim

21   distribution in a way that it satisfies them and the GFRDA

22   wishes to treat it differently.

23         My Pooley method, which I thought was the fairest and

24   most equitable method, was to look at the last statement of the

25   ATGF statements, or the initial investment, whichever I had,

1    and attribute a value to that based on the statements and

2    dollar amount.  And the GFRDA was to use the latest statement

3    showing accrued interest to that date and treat the interim

4    distribution based on the amount reflected in that statement.

5         THE COURT:  Ms. Cates is a $5 million investment, at

6    least one of them came out at trial, related to something

7    different all together.  And so she is not part of the

8    calculation at all for that, right?

9         MR. GAZES:  No.  That would be incorrect.  Ms. Cates

10   was given value for the SBIC investment, I believe, is what you

11   are referring to.  As long as the claimant demonstrated money

12   that was turned over to Amerindo, we gave the claimant a basis

13   for a claim.

14        THE COURT:  That's my question.  That's what I want to

15   make sure, and Jordan as well.

16        MR. GAZES:  That's correct, your Honor.

17        THE COURT:  I may disagree with the calculation or

18   which of the methods that has been set forth, but they are a

19   part of your calculation.

20        MR. GAZES:  Absolutely.

21        THE COURT:  And then I want to ask you at some point

22   about the risk of overpaying.  There is a dispute, obviously,

23   with these two valuation methods that are proposed and

24   identified in your two motions.  Have consequences, at least

25   they look like they would have consequences to the long-term or

1    to the final distribution.

2            This is really about the interim distribution.  And so

3    is there a concern that by adopting one over the other we would

4    be paying out more to certain investors than would be

5    appropriate at the end of the day if we then did a different

6    calculation?  Mr. Marcus has sort of laid out his view as to

7    what we ought to be doing with what's left over.  If there is a

8    surplus, then who gets it?

9            MR. GAZES:  I can only give you a conjecture on how I

10   would deal with the surplus.  It seems to me that the claimants

11   would be entitled to the surplus for certain.

12           THE COURT:  Which claimants?

13           MR. GAZES:  All the claimants.  Each one of the

14   investors would be entitled to share in the surplus.  How we

15   calculate how that surplus distribution would mean that we have

16   paid them back their investment.  So no particular credit would

17   be harmed by the interim distribution because it's really only

18   their investment amount based on their latest statements that

19   they are being paid now, so I don't believe that there would be

20   a prejudice to them.

21           THE COURT:  I think some of the other speakers are

22   probably going to address that again.  Maybe I'll have you come

23   back and respond specifically to points that are raised today

24   that are new or different from what's in their written

25   submissions.

E3EMSECC

1              Has there been any attempt to calculate what Amerindo

2      would have kept as its fees on these things?

3              MR. GAZES:  There has not, your Honor.

4              THE COURT:  Thank you.

5              Did SEC want to be heard now?

6              MR. JACOBSON:  Yes, your Honor, very quickly.

7              THE COURT:  I'll do the parties and then I'll do the

8      claimants and the investors.  I am going to give everybody sort

9      of a tight time leash because I don't want this to go on into

10     the wee hours.  Five minutes should be enough?

11             MR. JACOBSON:  One minute.  I'm just here to let the

12     Court know the Securities and Exchange Commission completely

13     supports the receiver's plan as it was modified.  We believe

14     that due to the vast commingling, the use of the fund by

15     Mr. Vilar and Mr. Tanaka interchangeably, they took funds from

16     certain investment vehicles, paid other investors with those

17     monies.  We don't think there is any way to really disentangle

18     the finances of these companies, and we believe that the best

19     method, the fairest method of distribution is in fact what the

20     receiver has proposed and what we put in our papers, which is

21     trying to figure out to the best ability to find out what the

22     net claim was or the net investment was for the interim

23     distribution.  And we believe at this point that is the fairest

24     way to make the distribution.  So we do support the receiver's

25     plan.

E3EMSECC

1          THE COURT:  Thank you.

2          Ms. Shevitz, if you're more comfortable sitting, bring

3     a microphone close.  Why don't we do that.

4          MS. SHEVITZ:  I would like an opportunity to speak

5     after the other people speak, too.

6          THE COURT:  Maybe.  I am not sure.  Unless you want to

7     wait until they are done.  I am not giving everybody two

8     innings.

9          MS. SHEVITZ:  We are parties here.  Outsiders are

10    speaking and I would like an opportunity to respond to them.

11    Now we have a new valuation and new thing that I have not even

12    seen yet that he is proposing.  I have not seen any of this.

13         THE COURT:  I'm not guaranteeing you that I'm going to

14    give you a chance to respond to everybody.  If you want to wait

15    until everybody else has gone, we can do it that way.

16         MS. SHEVITZ:  I would like to say something now.  I

17    may ask again for an opportunity to respond to other people who

18    are saying different things about these claims here.

19         THE COURT:  You can sit, if you want to sit.  Keep the

20    microphone close so we can hear you.

21         MS. SHEVITZ:  Mr. Gaze said that he spoke to everybody

22    and that's how he developed his numbers.  He did not speak to

23    us.  He did not look at the record.

24         On February 21, 2012, you and Judge Swain signed an

25    order that told the government to come up with the most recent

E3EMSECC

account balances based on the relevant account statement and

other information based on the investments.  These were not

vastly commingled.  The mutual fund was commingled.  Yes.

That's how mutual funds are operated.

          The GFRDAs were also commingled, as is proper in

Panama.  There was nothing commingled with the U.S. entity at

all.  That was all totally separate.  And in 2005, 12/2005, the

SEC monitor gave the U.S. Amerindo a total clean bill of

health.  There was zero commingled between the U.S. and the

Panama operation, zero.

          On February 12, you and Judge Swain told the SEC and

the prosecutors to submit the value of substitute assets.  This

is February 2012, document 512.  This happens to be in the

criminal case, but it was the two captions.  Specifying the

account balances, the account statements.

          Mr. Gazes and the SEC take the position now that the

papers are in disarray.  They are not.  They didn't look at

them.  The only thing that happened was there was some

irregular account statements, but the Amerindo Panama accounts

were kept perfectly validly.

          After this order, Sharon Levin looked at them, as did

Marc Litt, in document 418-2, also filed as 514-5.  These

contained account statements and other information about the

claims, as well as the assets at that time.  Mr. Litt was able

to do that.  The documents are not in disarray.  They just were

E3EMSECC

disregarded.  The government has disregarded every single order

by this court, by Judge Swain, that says give me the accounts

and the account statements.  They are not in disarray.  They

were some of these statements that went to the clients were

irregular, but the larger clients got theirs, their statements,

and there is nothing in disarray.  The commingling doesn't stop

a valid -- I'm sorry.  I'm a little Percoceted up.

THE COURT:  You can sit, if you want.

MS. SHEVITZ:  I don't know if that's going to get my

words back.

The fact of the records.  One of the things that

Mr. Gazes said is everyone is similarly treated.  No.

Everyone's account was kept according to an account that is

maintained, was maintained, and it is in the search records

that Sharon Levin told Judge Swain on 9/23/2011, the transcript

is I believe document 168.  I don't know.  I cited it in my

papers.  All of the documents are there.  Judge Swain said come

up with those.  And the government and the SEC -- the SEC has

repeatedly failed to comply with these repeated orders of the

Court.  There is nothing inascertainable about it.  Not

everyone was similarly treated.  Everybody was treated

according to their account and their particular vehicle and

their particular deal with Amerindo with an account interest

amount that was negotiated.  It dropped when the market rate

dropped.  They were all respected.  Mr. Heitkonig, for

E3EMSECC

1   instance, started out with 13 percent and by the time of the

2   2005, interest rates had dropped, but it's on his account

3   statement, which I've attached in our papers.  Everything is

4   accounted for.  They just didn't look at it.  It is there.

5        The government, Sharon Levin, told Judge Swain on

6   9/23/11, we have the records there.  We have them pursuant to

7   the search.  The government maintains the Amerindo Panama

8   records and if someone would look at them, they are not in

9   disarray, and they were told to provide those.  Now they want

10  to come up with some different evaluation that keeps changing,

11  and I don't know quite how to do it.  The investors were not

12  treated similarly.  They were treated in accordance with their

13  own investments.

14        JP Morgan.  I don't know if it's a matter of contract,

15  they say, this paying interest.  Well, the funds should have

16  been swept into a money market fund.  That was the deal with JP

17  Morgan.  It just happened after they, the SEC, put them out of

18  business and took their ability to direct JP Morgan away.  JP

19  Morgan did whatever it wanted.  Now nobody even knows if it's a

20  matter of contract, but they want to collect fees on that.

21  There is something not fair here.

22        When Rhodes finished, the investors knew that if they

23  wanted to keep their money in Amerindo it was going to be in a

24  different -- they called it vehicle.  Lily Cates, who was

25  dyslexic, didn't know how to call everything a different

E3EMSECC

1   vehicle, so she kept calling her account Rhodes.  But it really

2   is what it is for everybody.  It is on the records, it is

3   validly treated, it is there.  It's not unascertainable.  It's

4   totally ascertainable.  Not only that, all the money we find

5   now is there and there were really no losses based on the 2005

6   account statements.

7          Now, eight years later, nine years later, when the

8   government has refused to come up with the account statements

9   before, and still refuses to, as if it's not their job.  But,

10  your Honor, you signed something, a document telling them to do

11  that, on February 5, 2012, as did Judge Swain.  This has never

12  been complied with.

13         If there is a surplus, what do we do about it?  If

14  there is a surplus, my clients are the claimants as well.

15  After they validly pay the claims based on the May 25 account,

16  which are ascertainable, all you have to do is look at and

17  update the account statements which were there and which relied

18  on by Sharon Levin and by Marc Litt in the two documents I

19  mentioned, 514-5, 221, after your Honor did sign this order,

20  that's what they came up with, Sharon Levin did.

21         THE COURT:  What did she come up with?

22         MS. SHEVITZ:  She came up with a listing of documents

23  at document 514 of accounts, of amounts, of what they knew then

24  subject to verification.  In 514-5, right after your Honor and

25  Judge Swain issued this order.  They came up with amounts.

E3EMSECC

They came up with the account statements that they had.  It was
subject to whatever verification was going to be and nobody
continued verifying it.

THE COURT:  You're repeating this over and over.  You
were about to say that your clients are entitled to everything
that's left over?

MS. SHEVITZ:  The position they have taken since the
beginning and to now is they want the clients paid back on the
May 25 account as of the last date they were able to manage the
money.  Since then, nothing has earned interest.

THE COURT:  Why would it go to your clients?  I don't
understand that, if there are shares in the ATGF account.

MS. SHEVITZ:  After the ATGF was not able to be
managed, the defendants had a fee interest in that.  It doesn't
go on when it's not managed.  They were able to manage this.
For instance, the UK pension -- right now, since 2005, this
money, there has been cash sitting in these accounts.
Nobody --

THE COURT:  That's not clear to me why that makes it
your client's money.  I don't understand how you make that
point several times in your papers.  Somehow, you are arguing
that your clients are the owners of what's in the ATGF account.

MS. SHEVITZ:  It's not an ATGF account.  The names of
the bank account are different than the names of the
investments.  The names of the bank accounts are -- one of them

E3EMSECC

1    is called ATGF, Inc., one of them is called ATGF 2.  They are

2    not the investment vehicles.  They are the names of bank

3    accounts.

4              THE COURT:  What makes your clients the owners?

5              MS. SHEVITZ:  They are the owners of the bank accounts

6    because they are the account owners through another corporation

7    of the accounts at JP Morgan.  They have a fee interest which

8    was not taken out.  Their fees were not taken out for years.

9    So their fees have been an investment in the account.  Their

10   fee interest has been stayed there.

11             Mr. Tanaka hasn't taken a salary since 2002.  While

12   everybody else's accounts, money, was in these accounts, so was

13   theirs.  They want to pay the investors as of the May 25, 2005

14   last date they could manage.  Since then, the interest has been

15   stopped.  Since then, JP Morgan has refused to take any

16   direction from them.  So their fee interest remains in there as

17   claimants, the same as everybody else.  And in Mr. Canute's

18   report, the monitor who found Amerindo U.S. squeaky clean in

19   December 2005, he resigned.  He said he wanted to resign then.

20   He told Judge Swain he should get discharged and any money left

21   over should go to the owners.  That's what happens with these.

22             If they were able to manage this account, like before

23   things were shut down in 2005, at least the UK pension, they

24   had selected stocks in the UK pension as opposed to leaving

25   cash there.  And the stocks have appreciated 332 percent since

E3EMSECC

```
 1   2010.  Because they were somewhat managed, not actively
 2   managed.  When the government shut this down in 2005, JP Morgan
 3   stopped paying interest, JP Morgan refused to take any
 4   direction.  The SEC --
 5          THE COURT:  That's not what JP Morgan is saying.  They
 6   are saying they are paying interest up to 2008.
 7          MS. SHEVITZ:  It was not any negotiated interest.
 8   They wouldn't listen.  They wouldn't talk to the owners of the
 9   fund.  The SEC --
10          THE COURT:  The owners of the fund being whom, your
11   client?
12          MS. SHEVITZ:  Yes.  JP Morgan did not take -- this
13   could have been a negotiated amount.  And what should have
14   happened is the cash should have been swept into a money market
15   account which would then -- which is what the normal -- that's
16   what happened before.  But on day one Mr. Tanaka was told he
17   couldn't give them any direction.  Mr. Salzberg was there from
18   day one sitting in their office during the search and so
19   nothing was able to be managed or appreciated.  So everybody's
20   money has been stifled there when it could have earned 330
21   percent.
22          THE COURT:  Again, it's still not clear to me why
23   you're asserting that your clients are the owners --
24          MS. SHEVITZ:  Because, Judge, Amerindo management is
25   the account owner of those accounts.  That is a corporation
```

E3EMSECC

 1   owned by the defendants.  And, as such, and especially now that

 2   the forfeiture order is vacated, it belongs to them.

 3        THE COURT:  I don't want to do this anymore because I

 4   keep asking why you think it belongs to them and you said

 5   because it belongs to them.  You have a minute, wrap it up

 6   because you are not the only one who wants to speak today.

 7   Anything else would you like to say with respect to the

 8   receiver's motion regarding the interim --

 9        MS. SHEVITZ:  I still don't know what he wants to do

10   now.  I have not seen any new thing with Rhodes.  It's very

11   hard for me to respond.  It's hard for me to respond to

12   shifting motions.  I think Mr. Heitkonig said it well the other

13   day, I don't know whose side he's on.  In our papers, too, we

14   cite Eberhard v. Marcu.  A receiver stands in the shoes of the

15   entity of which he's receiver.  And Eberhard v. Marcu --

16        THE COURT:  I'm familiar with the case.

17        MS. SHEVITZ:  And Mr. Gazes, if he is the receiver of

18   those funds, should have been seeking interest, should have

19   been telling JP Morgan, sweep it into a money market fund.  He

20   is standing in there to maximize --

21        THE COURT:  That's not really addressing what you're

22   arguing for --

23        MS. SHEVITZ:  My argument is that before the

24   restraining order and before the forfeiture order, these were

25   the account holders, Amerindo management owned by these two

E3EMSECC

1    individuals.

2            Now, there is no forfeiture order and the property is

3    reverted.  Property ownership is the right to manage.  They

4    have been deprived of that right and they are still deprived of

5    that right.  And one of the things I wanted to suggest, after

6    an interim distribution, which we are very close to, I think.

7    We agree, for the most part, based on the receiver's first

8    report, except for made-up MAVs, which I have addressed, and

9    interest rates which seem to have extended into perpetuity,

10   which they don't because they were one-year GFRDA fixed-deposit

11   vehicles.  That is also in our papers and it is in the records,

12   the Amerindo Panama records which Marc Litt and Sharon Levin

13   are able to access.

14           THE COURT:  Anything else you would like to say with

15   respect to the proposed interim distribution?

16           MS. SHEVITZ:  Yes.  There is some investors that we

17   had on our list, if you recall, in July 2012.  We made a list.

18   I think it was 2012.  And it was based on Sharon Levin's list

19   because we don't have the records.  But based on Sharon Levin's

20   list, we included some investors in this list which Mr. Gazes

21   does not seem to have accounted for on his listing at all.

22   Some of them have recently contacted me.  I don't want to leave

23   them out in the cold.  On the other hand, it's hard to --

24           THE COURT:  Notice has been given.

25           MS. SHEVITZ:  I don't think they got it.  That's the

E3EMSECC

| 1 | problem.  And now Mr. Gazes is allowing other claims in, after |

1    problem.  And now Mr. Gazes is allowing other claims in, after

2    the fact.  And it's not a fair process --

3         THE COURT:  You are asking for additional people to be

4    included.  Is that what you are asking?  I am not sure I'm

5    following.

6         MS. SHEVITZ:  I'm asking for, after there is a process

7    to go through the Amerindo Panama accounts, I think there

8    should be a review of this.  We are willing to pay an interim

9    payment.  Yes, we are willing to do that, but not based on

10   amounts that don't exist in the records.  These are not

11   unascertainable, Judge.

12        THE COURT:  You have made that point.  I want to hit

13   any points --

14        MS. SHEVITZ:  There are some additional investors that

15   may be entitled to something and there is some investors that

16   Mr. Gazes has seemingly accepted.  For instance, Mr. Charles,

17   who we say is a bogus investor who doesn't have a claim.

18   Mr. Gazes has allowed his claim.

19        THE COURT:  I have seen that.

20        MS. SHEVITZ:  There is also some other people,

21   Mr. Sweetland, who we don't really know, but he doesn't even

22   have an affidavit.  There is some people who don't have

23   affidavits.  It seems arbitrary and capricious.  And without

24   having a basis in the Amerindo records, which exist and Sharon

25   Levin told Judge Swain, are there in her custody, and should be

1    examined, as you said, on February 12.  I don't know how to

2    respond.

3              THE COURT:  I want to hear from the others who were

4    here today.  Let's start with JP Morgan Chase.

5              Come up to the lectern and use the microphone.  Thank

6    you, Ms. Likwornik Weiss.

7              MS. LIKWORNIK WEISS:  Thank you, your Honor.

8              Your Honor, JP Morgan has a contractual lien on these

9    four accounts for payment of its fees and expenses and has made

10   that claim.  Three separate groups of parties have objected:

11   Vilar and Tanaka, the Mayers, and Mr. Marcus.

12             And I will start by saying they have no grounds to

13   object.  This is a contractual claim and they are not parties

14   to the contract.  Despite what Ms. Shevitz says, her clients do

15   not own these accounts.  These accounts are in corporate names.

16   They are controlled by the receiver.  The receiver has not

17   objected to JP Morgan's request for payment under the contract.

18   In fact, he recommends it.  And for that reason alone, the

19   Court should just direct that it be paid.

20             The interest claim has been amply addressed, and I

21   would just like to address the points that Ms. Shevitz made in

22   her papers and a little bit today regarding JP Morgan.

23             With respect to holding the money and not giving her

24   clients access to it in 2005, there was a default under all of

25   these agreements, which you would see if you read them.  And

E3EMSECC

1   she would see if you read them.

2           The SEC came in and claimed securities frauds.  The

3   defendants Vilar and Tanaka were arrested.  JP Morgan had broad

4   and ample remedies at that point to prevent itself from the

5   risk that those actions imposed.  They could have shut the

6   accounts down completely.  They were completely within their

7   rights to not allow these defendants any access to it and that

8   is what they did.

9           With respect to her claim that JP Morgan has not

10  managed the accounts, JP Morgan's job here was not to manage

11  the accounts.  It was a prime broker.  It provided clearing

12  functions.  It provided financing functions.  It provided

13  services to fund managers.  It was not JP Morgan's job to

14  decide how to manage the funds.

15          In her papers Ms. Shevitz claimed that JP Morgan is

16  estopped from seeking funds in this account because it filed an

17  interpleader which it disclaimed them.  As is obvious, your

18  Honor, we claimed the attorneys fees and costs in the

19  interpleader.  We sought to get rid of these accounts through

20  the interpleader and disclaimed only for that purpose, but

21  disclaimed interest in the accounts while claiming our fees.

22  What happened instead was that the Court directed us to hold

23  them and to have the money pass through the forfeiture

24  proceedings, so nothing has been waived.

25          In addition to the claims that Mr. Gazes has

E3EMSECC

 1    submitted, legal fees continue to accrue.  The last submission

 2    puts them up to about $140,000.  They continue to accrue today.

 3    We would very much like to have them stop continue accruing,

 4    but we would ask the Court to direct Mr. Gazes to pay what is

 5    owed for legal fees and costs.

 6           And, of course, lastly, the ongoing custodial fees are

 7    a separate application, not really part of this proceeding, but

 8    JP Morgan is now the custodian, is honoring Mr. Gazes' requests

 9    on a very frequent basis, and that custodial fee should

10    separately be paid.

11           Unless the Court has any questions, I have nothing

12    further.

13           THE COURT:  That's fine.  Thank you very much.

14           MS. SHEVITZ:  I do have --

15           THE COURT:  No.

16           MS. SHEVITZ:  I am not going to be able to respond at

17    all?

18           THE COURT:  You have to understand, this is a

19    recurring problem.  You seem to think you run this courtroom

20    and that you speak at will and that you speak as long as you'd

21    like even if it's just to repeat all points that you have made

22    before.  No.  Stop.  Enough.  I think I've been very patient.

23    But you constantly speak over me.  You constantly interrupt me.

24    You show so little respect for the Court that it's something

25    I'm not used to and I'm not going to tolerate much longer.  So

E3EMSECC

1     stop.

2                We are next going to hear from the Mayer's

3     representative, Mr. Begos.

4                MR. BEGOS:  Thank you, your Honor.  I can tell you I'm

5     very glad that we are here talking about any distribution of

6     money.  It's been such a long time since we thought money was

7     going to be first distributed, and I'm glad we are finally at

8     the cusp of a distribution.

9                There is a couple of points that I just want to make

10    based on what was said so far today before I turn to the

11    specifics of the Mayers' objections.

12               There has been a discussion of paying up until May

13    2005.  As Ms. Shevitz has used that date, I know Mr. Gazes has

14    used it for purposes of valuation for an interim distribution,

15    and I don't think the Court understands it this way.  But I

16    just want to make sure it's on the record.

17               Obviously, all of the claimants are entitled to be

18    paid up until the present.  The fact that Mr. Vilar and

19    Mr. Tanaka were arrested and then convicted doesn't mean that

20    the debts no longer continue to accrue interest or continue to

21    accrue growth.  So to the extent there is money left over, to

22    the extent that there is extra money, quote unquote extra money

23    lying around, obviously, all of the claimants should be paid

24    100 cents on the dollar, including whatever interest they are

25    owed, including whatever growth they are entitled to.

E3EMSECC

1          The Mayers' objections really fall into a couple of

2    parts.  I think to a certain extent, to a great extent, the

3    Mayers contend that they are really unique among the creditors,

4    and that relates to the judgments that they have.  I think the

5    most important, the most significant objection we have here is

6    that the receiver cannot recalculate the amounts that the

7    Mayers have been found to be owed pursuant to their judgments.

8          THE COURT:  You are owed that by the defendants in

9    those cases, in the civil cases in the state.  But the funds at

10   issue here are not the same.

11         So you have a judgment against Mr. Vilar and

12   Mr. Tanaka, certainly.  And to the extent that they have any

13   money coming to them at the end of this process, I guess you

14   get dibs on it, unless there are others who also have claims

15   against them personally.  But I think this was a point that was

16   made by Mr. Gazes in his reply, and I am not sure what your

17   response to that would be.

18         MR. BEGOS:  Couple of responses.  We also have a

19   judgment against Amerindo Investment Advisors, both the

20   American and the Panama entity.

21         But the primary response is to look at the very

22   appointment of Mr. Gazes to begin with.  He was appointed in

23   this case to take control of the assets that were subject to

24   the forfeiture order.  The assets that were subject to the

25   forfeiture order on the criminal action were made subject to a

E3EMSECC

forfeiture order because the government submitted to your Honor

evidence that that was property belonging to Vilar and Tanaka.

That was the only basis that the Court had to make those

substitute assets subject to the forfeiture order.

And I would point specifically in United States motion

to amend the order of forfeiture to include substitute assets,

this is document 444 from May of 2010.  The government asks

that the forfeiture be amended, quote, to include certain

property of defendants Alberto William Vilar and Gary Alan

Tanaka as substitute property.  And it listed specifically the

accounts that are at issue here today.

The Court then issued an order of substitute assets,

that's document number 463, November 9, 2010, and included in

that order a whereas clause:  Whereas the government has

identified the following assets as property of the defendants,

and listed the accounts, and all of the other property that was

turned over.  Then the Court entered orders forfeiting that

property.

THE COURT:  The property belongs to a lot of people

who are in this room, not just the Mayers.  The fact that the

Mayers have a judgment against the defendants doesn't mean that

the property belongs to the defendants.

MR. BEGOS:  What I said, your Honor, is that the

government's motion for substitute assets and the Court's order

of substitute assets were both based, as it had to be, on the

E3EMSECC

1    finding that the property at issue belonged to the defendants.

2    The statute, it's 21 U.S.C. 853, allows for forfeiture of

3    substitute property and states that the Court shall order the

4    forfeiture of any other property of the defendant, so the only

5    basis the Court had for entering an order of substitute assets

6    in the criminal action.

7             THE COURT:  This is not the criminal action.  We are

8    not here for the criminal action.

9             MR. BEGOS:  I understand that, your Honor, but that's

10   the predicate for the receivership.  When the Court appointed

11   Mr. Gazes initially to take possession of the fund, the Court

12   identified the funds as the funds that were subject to the

13   forfeiture in the criminal action.  And then we go to the

14   Court's order giving Mr. Gazes more control, which was the

15   summary judgment decision.  The summary judgment decision is

16   only against Vilar and Tanaka.  The Court has issued no order

17   against ATGF 1, ATGF 2, AMI, and any of the other entities that

18   were codefendants in this action.

19            Although the Court's orders in this action don't

20   specifically say, I hereby appoint Ian Gazes as receiver for

21   Vilar and Tanaka, I think when you look at all of the

22   decisions, when you look at the language of all of the

23   decisions, it's clear that Mr. Gazes has been appointed as

24   receiver or Vilar and Tanaka.

25            THE COURT:  I think you should move on to your next

point, because I don't think you are going to get too far on

that one.

MR. BEGOS:  Very well, your Honor.  I will subsume the

argument about the judgment lien in that as well.

I think the next primary argument relates to the

difference between the victims, who are primarily GFRDA

investors, although Ms. Lily Cates as well, who we didn't

specifically address because her investments are different than

anybody else's, versus the ATGF investors.  We have spelled

this out in your brief.  It so happens that on various points

one of the primary ATGF investors, Mr. Marcus, agrees with our

position that there is a distinction between the GFRDA

investors/victims and the ATGF investors.

THE COURT:  You don't think the ATGF investors are

victims in any sense?

MR. BEGOS:  They have not been established to be

victim.  There was no finding that there was any fraud

committed against them, certainly not in the criminal action

and not in this action.  Right now they are investors.  They

certainly have lost money, but they have not been found by

anybody to be victims.  The SEC, in response to our

objection --

THE COURT:  I don't know what it means to be found as

a victim, but, again, this is a civil case.  This is an SEC

case.

E3EMSECC

1          MR. BEGOS:  I misspoke.  They have not found to have

2     been victims of fraud, your Honor.  The SEC has not established

3     that the ATGF investors were defrauded.  The summary judgment

4     motion related only to what the Court referred to as the

5     testifying victims in the criminal trial, which was primarily a

6     subset of the GFRDA investors.

7          THE COURT:  This is the SEC action.  What we have is

8     the receiver's report, which indicates that assets were

9     commingled, and that some of those assets were used for

10    purposes completely unrelated to the investments, for personal

11    purposes.  It also seems that some of those commingled assets,

12    which is in the name of the ATGF investment vehicle, were used

13    to pay people who were GFRDA investors.  It would seem that the

14    folks who invested in ATGF probably didn't know that their

15    investments and the assets that were bought with those

16    investments were going to be used to pay off other investors

17    who were apparently in a different fund.

18         MR. BEGOS:  That very well may be, and I'm not

19    suggesting that they can't prove or the SEC can't prove that

20    ATGF investors were defrauded or were misled.

21         Part of the point of our objection is, nobody has

22    proved it yet.  When you look at all of the cases regarding

23    distribution in receiverships and evaluating whether people are

24    similarly situated, it looks at whether victims of the fraud

25    are similarly situated.

E3EMSECC

1          The remainder of the point relates to at what level of

2     specificity does the Court determine that investor groups are

3     similarly situated or not, putting the victim of fraud issue

4     aside.

5          The SEC and Mr. Gazes have taken the position that

6     initially Mr. Gazes took the position that ATGF and GFRDA

7     investors were different.

8          THE COURT:  I think on the basis they have different

9     expectations.

10         MR. BEGOS:  Correct.  And we support that.  And the

11    amended motion walked that back and treated everybody the same.

12         Our view is, what the SEC is suggesting is all the

13    Court needs to look at is, are they victims of fraud and was

14    money commingled.  And our view is, under the Second Circuit

15    case law, there are other factors that the Court can and should

16    consider.  Granted, the Court has broad discretion here and

17    virtually whatever the Court does with respect to determining

18    whether people are similarly situated would be affirmed if

19    anybody appealed it.

20         But when the Court looks at the cases that we cited,

21    there are other factors that I think the Court should consider

22    above and beyond just were they both victims of fraud and was

23    money commingled.  Like the relationship.  Were they similarity

24    situated in relationship to the fraud.  Was the treatment of

25    both groups the same.  Were they both looking for the same

E3EMSECC

1    thing.  Were they similarly situated in relationship to the

2    fraudsters.  And were they similarity situated in relationship

3    to the nature of the investments.  When you look at the GFRDA

4    investments versus the ATGF investments, they were just very

5    different vehicles.  The GFRDA investments were much more like

6    lenders.  They had what were effectively certificates of

7    deposit as if you went to a bank, you gave them money, you were

8    earning a stated interest rate for a stated period of time,

9    then it would mature and you would get your money back.  ATGF

10   investors were looking for speculation.  That's what they

11   wanted.  That's what they got.

12        The documents, when you look at the claims, the

13   documents show tremendous volatility in those accounts.  We

14   submit that those differences merit different treatment between

15   the ATGF and the GFRDA investors.

16        THE COURT:  This is for the interim distribution.  And

17   so does it matter for the interim distribution if we can try a

18   different valuation once everything has been accounted for and

19   liquidated?

20        MR. BEGOS:  Your Honor, I certainly support getting

21   money to people sooner rather than later, and I am certainly

22   not going to suggest to you that the Court should spend weeks

23   and weeks and months evaluating these claims before any money

24   gets distributed.  And I think my sense of this is, the Court

25   wants to get this interim distribution made as soon as

E3EMSECC

1    possible.  If it's clear that this is merely an interim

2    distribution, that any calculation that's done now has no

3    effect on what the final calculations are, what the final

4    priorities are, and if, as I suspect is the case, we think that

5    there is going to be enough money left over to address any

6    inequalities that have arisen in the interim distribution, as I

7    think your Honor has already floated that issue, if, I believe,

8    Mr. Gazes has said there may be -- I could be misquoting him.

9    He said there could be tens of millions of dollars in value in

10   these private securities.

11          If there is enough there to rectify any problems in

12   valuation, I think that the Court may very well, in its

13   discretion, say, I am not going to look at the priority issue

14   now.  I am not going to take a fine tooth comb and look at the

15   valuation issues now.  I am going to get money out.  I do still

16   think and I know your Honor disagrees with me on that, I do

17   still think that the Mayers' judgment needs to be given full

18   faith and credit here and that their claim should be valued at

19   the amount of their judgment.

20          With respect to --

21          THE COURT:  Wrap it up because there is a lot of other

22   people.

23          MR. BEGOS:  With respect to JP Morgan, we did object

24   to their claim to the extent they were asking for fees and

25   expenses because, in our view, they had to pay interest.  I'll

E3EMSECC

1    accept the representation of Ms. Weiss that interest was

2    credited pursuant to the agreements and so I don't press that

3    particular objection anymore.  I do point out, though, that to

4    the extent JP Morgan says they have a lien and they deserve a

5    priority, the Mayers also contend they have a lien and they

6    deserve a priority as well.

7            THE COURT:  The problem is, nothing is going to be

8    paid out if they still have the money.

9            MR. BEGOS:  Your Honor, I think, as I said, the Court

10   has broad discretion here and probably even more, given that we

11   are talking about an interim distribution.  I don't want to

12   stand in the way of getting money out to the Mayers or anybody

13   else on a quick basis.

14           Unless the Court has more questions for me.

15           THE COURT:  No, I don't.  Thank you very much,

16   Mr. Begos.

17           Next I would like to hear from Mr. Marcus or his

18   counsel.

19           Mr. Friedman.

20           MR. FRIEDMAN:  Thank you and good afternoon again,

21   your Honor.

22           It is true that we are talking about an interim

23   distribution and it is true that regardless of what your Honor

24   does with respect to the interim distribution, you can change

25   it later.

E3EMSECC

1          But I think that the interim distribution is going to

2     establish a pattern for what happens here.  And, more

3     significantly, I think you can get it right without any

4     complicating factors.  I don't think this is as difficult as

5     some of the other speakers have indicated.  I think that the

6     receiver and the SEC have thrown up their hands.  The receiver

7     and the SEC start from the premises that because the money was

8     commingled, everybody is similarly situated.  And I don't think

9     there is any basis for that conclusion, either in fact or in

10    law.  I think the starting point has to be, what did these

11    claimants invest in?  And as several people have said, and it's

12    really not in dispute, there are two completely different kind

13    of investments here.  GFRDA, as Mr. Begos just said, was a

14    fixed income investment, akin to a certificate of deposit.

15          THE COURT:  I wouldn't waste your time on that.  I

16    know the difference between the two.

17          MR. FRIEDMAN:  ATGF, by contrast, was a mutual fund.

18    It was an equity mutual fund.  My clients bought shares in

19    ATGF.  ATGF, in turn, because the securities.  Those securities

20    could go up, those securities could go down.  If they go up,

21    the ATGF investors or the ATGF shareholders make money, just

22    like the investors in any --

23          THE COURT:  I get all that, believe me.  This is all

24    very salient if there is money left over.  But if there is not,

25    assume that there is only 50 cents on the dollar, and

 1   ultimately we don't know, but it could make a difference,

 2   right?

 3           MR. FRIEDMAN:  It could make a difference, but it

 4   depends, your Honor, on what money leftover means.  The way we

 5   propose, and this is set forth in detail in paragraph 32 of our

 6   original papers, and I take your Honor through the steps.  And

 7   I would like to summarize --

 8           THE COURT:  I've read it.  You don't have to reinvent

 9   the wheel.  Go ahead.

10           MR. FRIEDMAN:  Let me give you the 30,000-foot

11   summary.  The 30,000-foot summary is figure out what the GFRDA

12   people are owed, which is a combination of principal and

13   interest, figure out what is available.  One has to make an

14   assumption, because not all of the money is corralled yet by

15   Mr. Gazes, and I will return to that issue in a second if your

16   Honor will bear with me.

17           But one can assume that there is going to be a total

18   of -- we know there are $23 million now.  Mr. Gazes has

19   represented to me -- represented is the wrong word.  Mr. Gazes

20   has said to me in our conversations that he expects to recover

21   $4 million from the Cayman Islands and approximately $45

22   million from the sale of the publicly-traded but still

23   restricted securities once those restrictions are lifted.

24           If we assume that there is going to be a 70 or $80

25   million total pot, and we know what belongs to the GFRDA

1   people, which I suggest to your Honor will be somewhere between

2   15 and $20 million.  The remainder belongs to the ATGF

3   investors.  And, therefore, one knows the ratio.  Let me round

4   off the numbers.  If $20 million belongs to the GFRDA investors

5   and the total is 80, meaning 60 million belongs to ATGF, then

6   the ratio of any distribution should be in the ratio of 25

7   percent, 20 over 80, to 75 percent.

8           And I respectfully submit, your Honor, that's the fair

9   way to do the interim distribution.  Obviously, there can be a

10  true-up at the end, but I just want to emphasize as strongly as

11  I possibly can that if the receiver's proposal, second

12  proposal, amended proposal, is adopted by this Court for the

13  interim distribution, the only way to do that is to completely

14  ignore the difference between the two kinds of investment.  And

15  what the receiver would be doing is taking those GFRDA

16  investors who are only entitled to principal and interest and

17  giving them the upside of the equity investments made in ATGF

18  because that's what happens if you treat everybody pro rata.

19          The receiver so far is treating everybody pro rata.

20  That could change, but I respectfully submit, it is going to

21  change if your Honor indicates that that's the right way to do

22  it, as I believe you should indicate, even though this is only

23  an interim distribution, because it's really much more than

24  that.

25          With regard to the Mayers, I don't intend to say much.

1    It's in our papers.  As your Honor knows, if you have reviewed

2    the papers, we do not believe they are entitled to priority.

3    We do not believe they get to jump to the front of the line.

4    The relevant case law which we cite in paragraph 20 of our

5    submission gives your Honor broad discretion to do fairness in

6    this situation, and I respectfully submit that's what you

7    should do.

8           With regard to the claim that Messrs. Vilar and Tanaka

9    are somehow entitled to all of the appreciation since May of

10   2005, I don't think there is any basis for it.  I think, in

11   fact, it is hard to take seriously.  What they would be saying

12   is, once they shut down, once they were compelled to shut down

13   Amerindo, suddenly the assets of the investments became their

14   assets.  It makes no sense.

15          Now, since May of 2005, the NASDAQ composite index,

16   which we believe is a fair surrogate for the nature of these

17   investments, has more than doubled.  If your Honor thinks about

18   it, what they are really claiming is that 50 percent of the

19   value of the assets is theirs.  And that's, as I said, very

20   hard to take seriously.  If my clients had invested in ATGF and

21   the value of the ATGF securities went down, my clients and the

22   other ATGF investors would bear that loss.  No GFRDA

23   fixed-income investor would say, I want to share in that loss,

24   but yet they want to share in the upside.

25          THE COURT:  It's not clear that they want to share in

E3EMSECC

1    the upside necessarily.  We are really here for the interim

2    distribution.  But I take your point.  I understand the

3    difference between the two and the difference between their

4    expectations.

5          MR. FRIEDMAN:  I want to turn to something that no one

6    has addressed and that's the work remaining to be done by the

7    receiver.  As I mentioned a moment ago, Mr. Gazes told me that

8    there were about $45 million in restricted securities and the

9    problem is they are very volatile securities.  If they were

10   worth $45 million when Mr. Gazes told that to me, they may be

11   worth less today.  We know what happened to the market

12   yesterday with the reports from the Ukraine and China.  There

13   certainly were less today than they were yesterday, and my

14   concern that those securities should be converted to cash as

15   quickly as possible.

16         And I don't really quite understand why that hasn't

17   been done yet and why it is taking so long to get those

18   restrictions lifted.  I don't think it is that complicated to

19   get restrictions lifted, although my knowledge is less than

20   complete in that regard.

21         But what I would ask your Honor to consider is giving

22   the receiver whatever help he needs to get those restrictions

23   lifted.  And very often an order from this Court has tremendous

24   persuasive power with transfer agents and other people who are

25   in control about whether restrictions get lifted, and we would

E3EMSECC

1    all breathe more comfortably and have time for these

2    interesting debates if we had cash instead of $45 million in

3    volatile securities.

4            So I would hope that your Honor aids Mr. Gazes in

5    converting those securities to cash and in recovering the $4

6    million from the Cayman Islands, which, again, is taking a long

7    time, and I don't know why it's taking such a long time.  I,

8    like everybody in this room, do not want to stand in the way of

9    an interim distribution, but, your Honor, I think you have to

10   look at the bigger picture in determining the way to do that.

11   Thank you.

12           THE COURT:  Thank you very much, Mr. Friedman.

13           Let's hear from Mr. Swanson now.

14           MR. SWANSON:  Thank you, your Honor.  It was easier

15   being a witness than speaking here.

16           Very quickly on a few points.  We do not believe in

17   any priority for the Mayers.  We do not believe there should be

18   any priority at this time for any class of investors.  If there

19   was to be a priority, Ms. Cates deserves it.  She was the one

20   who had $5 million outright stolen from her.

21           THE COURT:  Why would that give her a priority?

22           MR. SWANSON:  It doesn't.  I don't think any investor

23   should have a priority.  We do not believe that any excess

24   should go to Messrs. Vilar and Tanaka.

25           If some day we see in excess -- is convicted of fraud,

E3EMSECC

1    we believe they should not get any benefits from what they did.

2            Sale of restricted securities should not be your

3    problem.  That is something I know about, and I hope the

4    receiver will resolve that quickly.

5            We are fully in support of the receiver's motion and

6    the SEC's motion supporting it.  We thought they were both very

7    well done with one exception.  And the one exception is the

8    claim with respect by my client with respect to her mother.

9            First of all, we filed our requests in two parts.

10   Ms. Shevitz filed an objection to it.  The receiver e-mailed to

11   me his intention to not support it based upon the documents at

12   this time.  However, we would ask the Court to approve it for

13   the following reasons.  First of all --

14           THE COURT:  The it that you are referring to is --

15           MR. SWANSON:  Anna Gladkoff, the mother.

16           First of all, as far as whether Lily would have

17   received those funds, if the Court cares, I have a copy of the

18   last will and testament of Anna Gladkoff, which I could deliver

19   today or file subsequently, which shows that Lily is the only

20   child and received everything.  I don't think that's really an

21   issue.

22           We would ask the judge to permit the late filing and

23   consider the merits, either pro or con, despite the late

24   filing.

25           Lily first remembered it in mid February.  We looked

E3EMSECC

1    to see what documentation there was.  We then filed a proof of

2    claim on February 27 which was received on February 28.  It was

3    filed with the Court and it was filed with Mr. Gazes, and at

4    the request of the Court's clerk we subsequently filed it

5    electronically.

6            Ms. Cates had no memory of it until then.  Her mother

7    died in 2002.  This is 2014.  Lily, as Ms. Shevitz points out,

8    referred to it in 2005 in her meeting with Mr. Litt,

9    Mr. Salzman, and others.

10           I hope I got the name right.  What can I say.  I'm

11   doing this without notes to go as quickly as possible and

12   didn't remember it since.

13           She subsequently went looking to see if there were

14   other documents.  I'm trying to speak quickly to be fast, and

15   so I may slip things.

16           When we filed on February 27, received 28th, we

17   referred to a deposit with Amerindo in January of 2001.  We

18   provided with that filing a handwritten note from Heather at

19   Amerindo.  Ms. Shevitz pointed out in her objection that

20   Heather was a part-time clerk there.  And Heather says:  We

21   have received $250,000 to invest in the name of Ms. Anna P.

22   Gladkoff, care of Lily Cates.  Copies of statements will be

23   sent to her accountants, Bill Shine and Bob Carillo on a

24   quarterly basis, Heather, and it's on Amerindo stationery.

25           This certainly supports the $250,000 that was

E3EMSECC

1   delivered to Amerindo to January 2001 on behalf of Anna

2   Gladkoff.  Lily subsequently found a cancelled check which we

3   delivered to the Court in March in our revised proof of claim.

4   That check, which the Court has a copy of, is made out, it's

5   from Anna Gladkoff, Lily Cates to Amerindo Investments and it

6   says in the memo at the bottom:  Amerindo B2B mutual fund.  And

7   on the backside it shows that it was deposited.  There is

8   actually a reference to a People's Heritage Bank, which I

9   looked up and is in Maine.  Ms. Cates does not have any

10  accounts in Maine and it was written out to Amerindo

11  Investments.  So we have evidence that we have submitted of a

12  second deposit.  Actually, it was the first one in November of

13  2000 of $300,000.  So the total is $550,000.

14          Now, Ms. Shevitz's objection is that there was a

15  government note of a meeting on May 10 at which was attended

16  Marc Litt, Cindy Fraterrigo, Kay Lackey and Mark Salzberg of

17  the SEC.  And in those notes it refers to the money being

18  transferred to Lily.  I have my own notes which I had forgotten

19  about that at that meeting which are a bit more detailed.  I'm

20  happy to submit copies to the Court now or subsequently.  And

21  my notes refer to it.  It goes on to say: First in mom's name,

22  then into L's, Lily's name, at suggestion of Cashmere, who is

23  the tax attorney for Lily and Lily's mother.  Come separately,

24  every quarter, not part of Lily's account.  That was the

25  testimony Lily gave in 2005 to Mr. Litt, Mr. Salzberg and

E3EMSECC

1    others, was that it was in a separate account, came in a

2    separate statement.

3           Now, Lily doesn't remember any more if her name was on

4    it or not, but it was not part of her account.  And, in fact,

5    Ms. Shevitz pointed out earlier today, if I can find my notes

6    quickly enough, that everything is accounted for.  If you look

7    at the Amerindo statements for Lily Cates, there is nothing

8    reflecting a $300,000 deposit for a B2B or any other account in

9    November 2000, and there is no indication in those statements

10   of a deposit in January of 2001 into Lily Cates' Amerindo

11   account.

12          Therefore, we believe that there is clear evidence

13   that Amerindo received two payments on behalf of Anna Gladkoff,

14   one in November for $300,000, one in January of 2001 for

15   $250,000.  Lily, although she saved everything under the sun,

16   thousands of documents were turned over to the government in

17   2005.  She does not have any statements that refer to her

18   mother.

19          Now, we believe that since she, and as Mr. Gazes said,

20   as long as the claimant gives evidence of payment to Amerindo,

21   we gave credit.  Well, here is evidence of payments to

22   Amerindo, a total of $550,000 to Amerindo.  There is no

23   evidence of it going into Lily Cates's account, coming out of

24   an account to either Lily or Anna Gladkoff.

25          We believe until Amerindo or the receiver can find

E3EMSECC

1    evidence which we cannot find that shows our money was

2    somewhere else, Lily, as the heir, sole heir of Anna Gladkoff,

3    should be entitled to a claim, an additional claim for

4    $550,000.  That is our only objection to the receiver's motion.

5    And I thank your Honor for your patience.

6              THE COURT:  Thank you very much, Mr. Swanson.

7              Next, Ms. Colbath.  You or Mr. Heitkonig wishes to

8    speak?

9              MS. COLBATH:  Yes, your Honor.  My client wishes to

10   address the Court directly.

11             THE COURT:  Mr. Heitkonig, please come up.

12             MR. HEITKONIG:  First of all, thank you very much,

13   your Honor, for allowing me to address the Court both verbally

14   and in the past through my written letters to you.

15             I am not going to repeat everything that I wrote in

16   the last letter.  I think that's clear.

17             One of the first questions you asked the receiver was,

18   will the interim distribution affect the whole.  And my worry

19   is that there are several dubious claims.  Ms. Shevitz

20   mentioned the Charles claim.  I believe I read that Soumendra

21   Khain was a friend of Charles.  There was also an account

22   entitled National Investor Holdings, which was a Channel Island

23   company which was struck from the register I think in 2007.

24   Subsequently, another company claimed that the assets were

25   passed to them, but nothing in the claim that was submitted

E3EMSECC

1    showed any evidence of that.  And to add insult to injury,

2    that's an account that would be getting $127 per share of an

3    ATGF account, when our proposed share price would be $21.  I

4    would be very happy with half of that, $63.  But that's really

5    a whole different play.

6            I really would like to cease accounts that had poor to

7    no documentation thoroughly analyzed before an interim

8    distribution.  For example, the national investor holdings is,

9    I think, a Saudi Arabia company.  Charles, for example, I think

10   he lives in Long Island.  If it's found that he made a

11   fraudulent claim, I am sure he will be dealt with by the

12   justice system.  But certain foreign companies, they would make

13   away with monies that should go to the whole.

14           I just wanted to also touch upon the ATGF custodian.

15   I don't understand why the custodian hasn't been investigated

16   or they must bear some guilt in this.  At least if nothing

17   else, their record should bear some light on the accounting

18   situation.  Ms. Shevitz did say this afternoon that the

19   accounts are not in disarray and if they were just looked at,

20   everyone would realize that.  I would certainly favor that

21   funds be awarded or be made available out of our custodial fund

22   for the receiver to continue to investigate these funds.  I

23   think that's very necessary.  And pleased that anything that

24   looks fraudulent or iffy to be put aside before an interim

25   distribution is made.  Because once that's done, if the account

E3EMSECC

1    was fraudulent, this could be several million dollars that are

2    done that should be part of the whole.

3         There is one account in particular which I think

4    illustrates this point.  There is a small account entitled

5    Imagineers Profit Sharing plan.  And these were a very honest

6    and meticulous group.  They had withdrawals in August and

7    December of 2004.  They presented that as part of their claim,

8    which goes on to show that you have certain claims where the

9    documents were from 1999 or even prior to that, in 2000, so on

10   and so forth.

11        That's really the point.  I thank you for allowing me

12   to come up here and that's really --

13        And, finally, I was saddened to hear that Dr. Mayer

14   has passed on.  I just mention that as a human component to

15   this situation.  I can't imagine what it's like for him to

16   leave us without knowing that his funds were safe.  My mom is

17   elderly.  I hope that doesn't happen to her.

18        Again, your Honor, thank you so much for allowing me

19   to address the Court.

20        THE COURT:  Thank you very much, Mr. Heitkonig.  I

21   appreciate your taking the time to be here.

22        Ms. Buchanan, you wish to be heard?

23        MS. BUCHANAN:  Good afternoon.  I promise to be the

24   briefest one here.

25        My one concern is that we have not yet seen their

E3EMSECC

```
1   revised calculations from the receiver, as he discussed
2   earlier.  And we just ask that Ms. Sayko be treated as all
3   other GFRDA investors are being treated in however the Court
4   decides to calculate their interim distributions.  That's
5   really my only concern.
6              THE COURT:  You definitely win for being the shortest.
7              Thank you very much, Ms. Buchanan.
8              Is there anyone who I have not heard from who wished
9   to speak that I overlooked, for whatever reason?
10             Mr. Gazes, it's your motion.  As I customarily do in
11  an oral argument, I'll give you an opportunity to respond to
12  the various points that have been made.
13             MS. SHEVITZ:  Judge, I would like to respond briefly
14  to some new points that were just made.
15             THE COURT:  No.  I'm sorry, Ms. Shevitz.  I think --
16             MS. SHEVITZ:  For instance, Mr. Swanson --
17             THE COURT:  When I say no, that doesn't mean yes, go
18  ahead and talk over me.  I don't know how to say that without
19  pointing out sort of basic lessons of civility, but you don't
20  get to do that, so no.
21             Go ahead, Mr. Gazes.
22             MR. GAZES:  Thank you, your Honor.  I don't want to
23  belabor the points with regard to those issues raised by
24  Mr. Begos.  I think my papers set out fully the basis from
25  which we think they should not be given some priority elevation
```

E3EMSECC

1   so that their claim is somewhat secured against the accounts.

2   I think your Honor clearly understands that.

3          I think the most difficult issue that faced me in

4   particular with regard to determining how to value these claims

5   is, where is the money really coming from to provide for an

6   interim distribution.  And so I only could look to basically

7   one account, an account known as ATGF II.  For me to become a

8   money manager now and start calculating what a GFRDA claimant

9   should have received or what an ATGF claimant should receive

10  when I have no specific investment vehicle to look to to

11  determine an appreciated value, I found it very difficult.

12  There were many scenarios that we looked at.  My accountant is

13  here today to tell you that we must have gone through many

14  configurations on how these monies should be disbursed.

15         The bottom line is, the funds were commingled.  There

16  is no specific investment vehicle for me to identify so that I

17  can pay the GFRDA an interest amount, and there is no specific

18  vehicle that I can pay an ATGF investor, because I don't know

19  what their investments were.  Remember, my funds are in ATGF

20  II.

21         If I followed everybody's reasoning, we would all be

22  right back where my proposed interim distribution is.  Since I

23  only have one pot of money in an account that's not

24  identifiable or traceable to any one specific investor, it's

25  clear that everything was commingled.  We have to treat them

E3EMSECC

similarly because I don't have any differentiating fund to say,

okay, this pot would go to GFRDA and this pot goes to ATGF.

That's why we came up with this scenario.  We thought it would

be most fair to pool it for an interim purpose, and I do

emphasize it is interim, because I cannot discern haw to treat

everybody.  I'm not a money manager.  My job is to figure out

what is the best-case scenario to get everybody back at least

now some portion of what they invested.  People provided

statements that were scant.  Some didn't get any statements.

Some got statements over a course of years and in a lot of

years did not get any statements at all.  Allegations of funds

being used for purposes of paying a GFRDA investor while

utilizing ATGF investment funds.  I believe that they are true,

but I have no certainty of that.

Yes, we could have conducted a forensic examination of

whatever books and records exist well into six figures at cost,

well into over a year to figure out.  I have 30 years of

experience in back-drafting books and records on companies that

we investigate and it takes a long time to figure out with no

certainty that the books and records ultimately will tell us

what the answers are.

Furthermore, it's the criminal defendants who created

the books and records.  So how reliable are those books and

records going to be for me?  How can I say that a particular

investor in a GFRDA account, whose money is now in ATGF II,

E3EMSECC

1    somewhat belongs to them, and I should attribute an interest

2    rate from that account, which may be prejudicial to an ATGF

3    investor whose money is also in the ATGF II account.

4         Bottom line is, the fairest and the best way to treat

5    everybody for this interim purpose and to get money out the

6    door, which I know everybody here supports other than the

7    defendants, who say to the contrary, but I don't agree, is to

8    treat it as a pooling method, give everybody back a portion of

9    what we believe their claim is, and move on to the next step.

10        The reason why the five or six public securities who

11   were listed as private securities have not been sold at this

12   point is because they are restricted.  And you have to go

13   through an agent of the company to get the restrictions lifted

14   and you have to have an entity that's going to sell those

15   stocks for you once they are lifted.  I've been in discussions

16   with JP Morgan.  They have given me a fee structure where they

17   are willing to go out and lift the restrictions for me and then

18   sell the shares for me.  We have sold the Sirius shares and

19   brought in almost 7 or $8 million.  That's the direction we are

20   heading in for the five or six public securities.

21        I've been on hold with the balance of the private

22   securities because it's an enormous amount of money to sell

23   them.  They are not readily saleable on the public market.  You

24   have to go through a secondary market and not many people are

25   willing to do it.  I've been to five financial institutions

E3EMSECC

1    besides JP Morgan to open up accounts for the purposes of

2    liquidating the balance of the securities.  All have declined

3    to take these accounts on, and for various reasons.  Mostly for

4    compliance and regulation reasons.

5         I have no further comments with regard to the specific

6    objections.  I believe I've addressed them in my papers and the

7    SEC has addressed them.  I don't believe that the claims appear

8    to be questionable at this time.  I could, if the Court is

9    inclined, get a declaration from each of the claimants that the

10   claims are all under penalty of perjury, if that would somewhat

11   satisfy some of the parties here in terms of the validity of

12   the claims.  Other than that, most of the claimants have

13   produced documentation in the most part to document what their

14   claim is, and I believe that those claims are valid.

15        With regard to Lily Cates's mother, I didn't state

16   that the claim wasn't valid.  I said I just didn't have enough

17   time to make a determination as to its allowability.  And I

18   think it should just be pushed off for the moment so that we

19   can see if we can come up with further information with regard

20   to that claim.

21        THE COURT:  When you say pushed off for the moment,

22   you mean pushed off until after the interim distribution?

23        MR. GAZES:  Pushed off until the next distribution,

24   and if we can discover in any way the allowability of the

25   claim.  I just can't do that on such short notice.

E3EMSECC

1          THE COURT:  You would say after the initial

2    distribution?

3          MR. GAZES:  Your Honor, we need to get money out the

4    door.  The allowability of that claim for $550,000 should hold

5    up the entire distribution at this time.

6          THE COURT:  The point you made, the point before this

7    one, about the valuation for the sale of the securities that

8    remain held and that would require a secondary market, that's

9    something that will have to be addressed, not just for purposes

10   of the interim distribution.

11         MR. GAZES:  That's correct, your Honor.

12         THE COURT:  Thank you very much, Mr. Gazes.

13         I am going to reserve on this, but not for very long.

14   I am going to rule on the motion within the next couple of

15   weeks, and we will then hopefully start getting money out the

16   door to people who have been waiting a long time.

17         I want to thank everyone for being here today and

18   thank you for making the submissions that you made.  I will

19   certainly take into consideration everything that was said and

20   everything that was submitted and then I'll be in touch.

21         Ms. Shevitz.

22         MS. SHEVITZ:  Could I have five minutes to talk to my

23   clients?

24         THE COURT:  Yeah, five minutes.

25         Marshals, that's okay?  I think that's fair.  Allow

E3EMSECC

1    Ms. Shevitz to speak to her clients for five minutes or so

2    before they are taken out.  That's fine.

3              Thanks.  Have a good day.

4              Ms. Shevitz, I hope your arm is better and everyone

5    have a good weekend.  Thanks.

6                                o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25