# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

————————————

No. 05 Civ. 5231 (RJS)

————————————

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

VERSUS

AMERINDO INVESTMENT ADVISORS INC., *et al.*,

Defendants.

————————————

MEMORANDUM AND ORDER
May 6, 2014

————————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff, the Securities and Exchange Commission ("SEC"), brings this action against Alberto W. Vilar ("Vilar") and Gary A. Tanaka ("Tanaka," and together with Vilar, the "Individual Defendants") and the corporate entities they controlled – Amerindo Investment Advisors Inc. ("Amerindo-US"); Amerindo Investment Advisors, Inc. ("Amerindo-Panama"); Amerindo Advisors UK Ltd.; Amerindo Management Inc.; Amerindo Technology Growth Fund, Inc.; Amerindo Technology Growth Fund II, Inc.; and Techno Raquia, S.A. (collectively, "Amerindo" or the "Entity Defendants," and with the Individual Defendants, "Defendants") – for violations of various anti-fraud provisions of the federal securities laws. The Court has previously entered summary judgment against the Individual Defendants on the SEC's claims that (1) the Individual Defendants violated § 17(a) of the Securities Act of 1933 ("Securities Act"), 17 U.S.C. § 77q(a), § 10(b) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, with respect to Lisa Mayer, Debra Mayer, and Herbert Mayer (collectively, the "Mayers"), Graciela Lecube-Chavez ("Lecube-Chavez"), Tara Colburn ("Colburn"), Robert Cox ("Cox"), and, in Vilar's case only, Lily Cates ("Cates"); and (2) the Individual Defendants aided and abetted violations of § 206(1) and 206(2) of the Investment Adviser Act of 1940 ("IAA"), 15 U.S.C. § 80b-6(1), (2).

*See SEC v. Amerindo Inv. Advisors, Inc.* (*Amerindo I*), No. 05 Civ. 5231 (RJS), 2013 WL 1385013 (S.D.N.Y. Mar. 11, 2013), *modified on reconsideration*, *SEC v. Amerindo Inv. Advisors, Inc.* (*Amerindo II*), No. 05 Civ. 5231 (RJS), 2014 WL 405339 (S.D.N.Y. Feb. 3, 2014). The Court has also entered default judgment against the Entity Defendants on all of the SEC's claims. (Doc. No. 418.) In addition, the Court has appointed a receiver (the "Receiver") to investigate and determine the value of investor assets held by Amerindo and to establish a claims and interim distribution process. (Doc. Nos. 267, 291.)

Now before the Court are (1) the SEC's motions for penalties and remedies against Defendants, seeking disgorgement, civil fines, and, against the Entity Defendants only, a permanent injunction (Doc. Nos. 332, 386, 387); and (2) the Receiver's amended motion to fix investor claims and authorize an interim distribution (Doc. No. 370). For the reasons set forth below, the Court (1) grants the SEC's motions in part and denies them in part; and (2) grants the Receiver's motion.

## I. BACKGROUND

### A. Defendants' Fraud[1]

Defendants are alleged to have been involved in three fraudulent schemes: (1) the Guaranteed Fixed Rate Deposit Accounts ("GFRDA") scheme (SAC ¶¶ 64–71, 76–97); *Vilar*, 729 F.3d at 68, (2) the Amerindo Technology Growth Fund ("ATGF") scheme (SAC ¶¶ 72–97), and (3) the Small Business Investment Company ("SBIC") scheme (SAC ¶¶ 25–63); *Vilar*, 729 F.3d at 68–69.

The GFRDA and the ATGF schemes were closely related. With respect to the former, Defendants told GFRDA investors that GFRDAs were safe investments that offered guaranteed, high, fixed rates of return for set time periods. (SAC ¶¶ 64–71); *Vilar*, 729 F.3d at 68. With respect to the ATGF scheme, Defendants told investors that ATGF was a fund investing in "emerging growth companies" and sold shares to investors who hoped to share in the appreciation realized by the fund. (SAC ¶¶ 72–75.) In reality, Defendants commingled GFRDA and ATGF investors' funds, invested all of the money in volatile stocks, misappropriated some of the funds for the Individual Defendants' benefit, and indiscriminately used the commingled funds to pay investor returns and business expenses as they came due. (SAC ¶¶ 76–97); *Vilar*, 729 F.3d at 68.[2]

In the SBIC scheme, Defendants induced Cates to invest $5 million with Amerindo for a venture known as an SBIC, which purportedly would invest in small businesses with matching funds provided by the Small Business Administration. (SAC ¶¶ 25–32); *Vilar*, 729 F.3d at 68–69. In fact, the Small Business Administration had never agreed to provide matching funds to the SBIC, and Defendants misappropriated Cates's funds for personal and business expenses instead

---

[1] The following facts are drawn from the Second Circuit's decision in the Individual Defendants' criminal appeal, *United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013), and from the SEC's Second Amended Complaint (Doc. No. 229 (the "SAC")). Because the Entity Defendants defaulted, they are presumed to have admitted all of the well-pleaded allegations contained in the SAC. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004).

[2] Although the SAC alleges that all Defendants were involved in the ATGF scheme, as of now only the Entity Defendants have been found liable for that scheme. (*See* Doc. No. 418.)

of investing them.  (SAC ¶¶ 45–63); *Vilar*, 729 F.3d at 69.[3]

## B.  Procedural Background

### 1.  The SEC's Penalties and Remedies Motions

The SEC brought this action on June 1, 2005 (Doc. No. 1) and filed its first amended complaint on November 17, 2005 (Doc. No. 44).  The matter was initially assigned to the Honorable Laura Taylor Swain, United States District Judge, who stayed the matter pending resolution of the criminal case against the Individual Defendants.  (Doc. No. 67.)  On March 21, 2012, this matter was reassigned to my docket, pursuant to Local Rule 14, due to its substantial overlap with the Individual Defendants' criminal trial, over which I presided.  (Doc. Nos. 219, 220.)  On May 25, 2012, the SEC filed the SAC.

On March 11, 2013, the Court granted summary judgment to the SEC on its claims that (1) the Individual Defendants violated § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, with respect to three GFRDA investors – Lecube-Chavez, Colburn, and Cox – and, in Vilar's case only, with respect to Cates as well; and (2) the Individual Defendants aided and abetted violations of § 206(1) and 206(2) of the IAA.  *See Amerindo I*, 2013 WL 1385013.  The Court initially denied the SEC summary judgment on its claims that the Individual Defendants

defrauded another group of GFRDA investors – the Mayers.  *Amerindo I*, 2013 WL 1385013, at *7.  Later, however, on reconsideration, the Court granted the SEC summary judgment on its claims regarding the Mayers as well.  *Amerindo II*, 2014 WL 405339, at *10.  In the March 11 Order, the Court entered a permanent injunction against the Individual Defendants but deferred deciding what additional penalties were appropriate.  *Amerindo I*, 2013 WL 1385013, at *10–13.

On September 11, 2013, the Clerk of the Court entered a Certificate of Default against the Entity Defendants, noting that the Entity Defendants had not answered or otherwise moved with respect to the SAC.  (Doc. No. 305.)  After a hearing held on April 2, 2014, at which none of the Entity Defendants appeared, the Court entered a default judgment against the Entity Defendants.  (Doc. No. 418.)  At that hearing, the Court deferred deciding what penalties were appropriate for the Entity Defendants.

The SEC submitted a motion seeking disgorgement and civil fines against the Individual Defendants on November 22, 2013.  (Doc. No. 332, 334 ("SEC Indiv. Br.").)  The Individual Defendants submitted a memorandum in opposition on February 7, 2014 (Doc. No. 352 ("Indiv. Defs. Opp'n")) and the SEC replied on February 13, 2014 (Doc. No. 361 ("SEC Reply")).  The SEC submitted its motion seeking penalties and an injunction against the Entity Defendants on March 6, 2014.  (Doc. No. 387 ("SEC Entity Br.").)  The Entity Defendants have not submitted a response.

---

[3]  Although the SAC alleges that all Defendants were involved in the SBIC scheme, and the Court found Tanka liable for Cates's losses at his criminal resentencing (Tr. of Apr. 24, 2014 Resentencing ("Sent. Tr.") at 19:12–20:7, *United States v. Vilar and Tanaka*, No. 05 Cr. 621 (RJS)), as of now only the Entity Defendants and Vilar have been found civilly liable for that scheme.  (*See* Doc. No. 418); *Amerindo I*, 2013 WL 1385013 at *14; *Amerindo II*, 2014 WL 405339, at *10.

## 2. The Receiver's Initial Distribution Motion

On July 17, 2012, the Court indicated that it was prepared to appoint a receiver to "value and preserve" Amerindo's assets and to begin "the process of determining how much is owed to victims and investors," and solicited applications and proposals for the receiver appointment. (Doc. No. 232.) After considering various proposals, the Court appointed Ian Gazes as the Receiver on October 16, 2012. (Doc. No. 267.) The Court reaffirmed that Order on March 11, 2013 in its summary judgment decision. *See Amerindo I*, 2013 WL 1385013, at *13–14. The Receiver made his first report and recommendation on May 30, 2013. (Doc. No. 283.) Based on that report, the Court authorized the Receiver to begin an interim distribution process for victims and investors. (Doc. Nos. 290, 291.) The Receiver proposed a distribution procedure in his July 19, 2013 status report (Doc. No. 296), which the Court so-ordered (Doc. No. 297).

The Receiver made his initial motion to fix investor claims and make an interim distribution on February 8, 2014. (Doc. No. 355.) That initial motion proposed different treatment for GFRDA and ATGF investors. In particular, the Receiver proposed that (1) GFRDA claims would be valued at the last account statement amount, minus subsequent distributions, plus the promised GFRDA interest rate through May 2005, and (2) ATGF claims would be valued at the last known ATGF share price multiplied by the number of ATGF shares owned by each investor on May 2005. (*Id.* at 6–7.) Claims for investments in other vehicles, such as SBIC, were valued at the amount of the initial investment. (*Id.* at 20–21.)

After consultation with the SEC, the Receiver submitted an amended motion.

(Doc. No. 370.) The primary change was to move closer to pro rata treatment for GFRDA and ATGF investors. Under the amended motion, GFRDA claims would be valued at the last account statement amount minus subsequent distributions, and ATGF claims would be valued at the initial investment amount minus subsequent distributions or, if the initial investment amount could not be found, the last available statement amount minus subsequent distributions. (*Id.* at 3–4.) The Receiver argued that the amended motion more accurately reflected the commingling of funds and Defendants' similar treatment of all investments regardless of investment type. (*Id.* at 2, 5.)

Several investors and the Individual Defendants submitted objections to the Receiver's amended motion (Doc. No. 376 ("Mayers Obj."), 377 ("Marcus Obj."), 378 ("Sayko Obj."), 379 ("Indiv. Defs. Obj."), 394 ("Cates Obj."), 406), and the SEC submitted a memorandum in support of the Receiver's motion (Doc. No. 391 ("SEC Distr. Mot.")). The Receiver in turn replied to the objections with two submissions. (Doc. Nos. 395, 396.) The Court held a hearing on the motion and objections on March 14, 2014. After the hearing, the Receiver submitted a revised schedule for recognized claims and proposed interim distribution amounts. (Aff. of Ian Gazes, dated Apr. 17, 2014, Doc. No. 422 Ex. A ("Revised Interim Distribution Schedule").)

## II. THE SEC'S PENALTIES AND REMEDIES MOTIONS

The SEC seeks disgorgement and civil fines against all Defendants, and a permanent injunction against the Entity Defendants. The Court addresses each of these in turn.

A. Disgorgement

1. Legal Standard

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (internal quotation marks omitted). Disgorgement "consists of factfinding by a district court to determine the amount of money acquired through wrongdoing . . . and an order compelling the wrongdoer to pay that amount plus interest to the court." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006). Unlike other remedies, disgorgement is not designed to compensate victims or to punish wrongdoers, *id.* at 116 n.25, 117, but is instead meant to deter wrongdoing by "forcing a defendant to give up the amount he was unjustly enriched," *id.* at 117 (internal quotation marks omitted). Disgorgement, in other words, is judicial vindication of the promise that crime does not pay.

To determine the amount of money acquired through wrongdoing, courts apply a two-part burden shifting framework. *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d Cir. 2011); *see also SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996). First, the agency seeking disgorgement must "show that its calculations reasonably approximate[] the amount of the defendant's unjust gains." *Bronson Partners*, 654 F.3d at 368. Once the agency has met that burden, "defendants [can attempt] to show that [the agency's] figures [are] inaccurate," *id.*, or that some of the gains were not the result of wrongdoing, *Razmilovic*, 738 F.3d at 31. Defendants' burden is high, however. If the agency has made a reasonable approximation, "any risk of uncertainty falls on the wrongdoer whose illegal conduct

created the uncertainty." *Bronson Partners*, 654 F.3d at 368 (internal quotation marks omitted); *see also Razmilovic*, 738 F.3d at 31 (holding that the risk of uncertainty falls on the wrongdoer as long as the agency's "measure of disgorgement is reasonable").

In making the disgorgement calculation, the proper focus is revenues, not profits. *See Bronson Partners*, 654 F.3d at 375 ("[W]here the profits from fraud and the defendant's ill-gotten gains diverge, the district court may award the larger sum."). Defendants "are not entitled to deduct costs associated with committing their illegal acts." *Id.* (internal quotation marks omitted). Nevertheless, courts should deduct any money that a defendant returns or has returned to her or his victims. *See id.* at 369; *cf. SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (approving a district court's decision to credit defendants for money they had already paid to victims as part of a private settlement). Defendants are "only required to give back the proceeds of [their] securities fraud once." *SEC v. Palmisano*, 135 F.3d 860, 863 (2d Cir. 1998) (quoting the SEC's brief on appeal).

As part of the disgorgement judgment, a court may order a defendant to pay prejudgment interest to "prevent[] [the] defendant from obtaining the benefit of what amounts to an interest free loan." *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996); *see also SEC v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009) (noting that prejudgment interest is designed to take account of "inflation and the power of money to earn an economic return"). A district court has discretion both in deciding whether to require prejudgment interest and in setting the appropriate interest rate. *See First Jersey Secs.*, 101 F.3d at 1476. Because disgorgement targets wrongful gain only, however, interest should not be

charged after the defendant loses access to the funds and therefore stops benefitting from the assets' earning potential. *See Razmilovic*, 738 F.3d at 36–37.

### 2. Application

#### a. The Individual Defendants

The SEC argues that the Individual Defendants should disgorge $21,303,452 in gains resulting from their frauds on the Mayers, Colburn, and Cates. The SEC is not seeking disgorgement for the frauds on Lecube-Chavez or Cox. The Individual Defendants, in response, raise several objections to the SEC's calculations and to the propriety of any disgorgement whatsoever. The Court first addresses whether the SEC has met its burden to reasonably approximate the amount of gains and then turns to the Individual Defendants' arguments.

#### i. Evaluating the SEC's Calculations

The SEC calculates the wrongful gain from the Mayers, without interest, to be $9,605,984.70. (SEC Indiv. Br. at 5.) This amount is equal to the $11,066,713.44 that the Mayers reinvested in the GFRDA fraud on January 4, 2001, minus $1,310,728.74 paid from Amerindo to the Mayers from 2004 to 2005, and minus $150,000 paid from Amerindo accounts to the Mayers by a stipulation and order in 2009. The SEC supports the calculation of (1) the $11,066,713.44 reinvestment with Amerindo's offer to reinvest the $11,066,713.44 and the Mayers' acceptance of that offer (Decl. of Neal Jacobson, dated Nov. 22, 2013, Doc. No. 333 ("Jacobson 2013 Decl."), Ex. D); and (2) the $1,310,728.74 paid from Amerindo to the Mayers with nine letters from Amerindo authorizing disbursements to the Mayers that total $1,310,728.74 (*id.* Ex. F). The

Order authorizing the $150,000 distribution is located at docket number 369 in the criminal case, *United States v. Vilar and Tanaka*, 05 Cr. 621 (RJS). The Court finds that these calculations are reasonable and well supported, with one exception. Since the SEC submitted its motion, the Court has authorized an additional $50,000 distribution to the Mayers. (Doc. No. 369.) This amount should also be credited against the Individual Defendants' disgorgement, yielding a wrongful gain from the Mayers of $9,555,984.70. With that one modification, the Court finds that the SEC has met its burden.

The SEC calculates the wrongful gain from Colburn, without interest, to be $450,000. (SEC Indiv. Br. at 5.) This amount is equal to the $1,000,000 that Colburn invested in the GFRDA fraud on February 9, 2000, minus $550,000 paid from Amerindo to Colburn's estate. The SEC supports the calculation of (1) the $1 million investment with an affidavit from Colburn's accountant stating that he sent Amerindo $1 million on Colburn's behalf, a fax from Amerindo instructing the accountant where to send the $1 million, a letter from the accountant effecting the transfer to Amerindo, and an Amerindo account statement showing the transfer from Colburn (Jacobson 2013 Decl. Ex. G); and (2) the $550,000 payments with an Amerindo account statement showing a $100,000 transfer to Colburn's estate on November 8, 2004 and a letter from Amerindo directing $450,000 in payment to Colburn's estate on January 21, 2005 (*id.* Ex. H). The Court finds that these calculations are reasonable and well supported and that the SEC has met its burden.

The SEC calculates the wrongful gain to Vilar from Cates, without interest, to be $4,750,000. (SEC Indiv. Br. at 4.) This amount is equal to the $5 million Cates

invested in the SBIC fraud on June 20, 2002, plus $250,000 that Tanaka withdrew from Cates's managed account – a different account than the SBIC investment – on September 25, 2003 by forging her signature, minus a $500,000 redemption paid from the SBIC account to Cates on June 25, 2002.   The SEC supports the calculation of (1) the $5 million investment with Cates's and Amerindo's account statements showing the $5 million transfer from Cates to Amerindo (Jacobson 2013 Decl. Ex. A); (2) the $250,000 theft with the letter from Tanaka – bearing Cates's forged signature – transferring $250,000 from Cates's account to ATGF, a letter from Tanaka, dated the following day, transferring $250,000 from ATGF to Vilar, and Cates's account statement showing the $250,000 transfer (id. Ex. B); and (3) the $500,000 redemption with a letter from Tanaka authorizing the redemption and an Amerindo account statement showing the transfer to Cates (id. Exs. A, C).  The Court finds that these calculations are reasonable and well supported, and that the SEC has therefore met its burden.[4]

The SEC also seeks prejudgment interest on each of the above gains.  For the interest rate, the SEC argues that the appropriate rate is the Internal Revenue Service ("IRS") rate of interest on tax underpayments and refunds. (SEC Indiv. Br. at 6.)  The Second Circuit has previously approved the use of that interest rate to calculate disgorgement, see First Jersey Secs., 101 F.3d at 1476–77,

and the Court finds it to be appropriate here. The SEC further argues that prejudgment interest should run on the Mayers and Colburn gains through May 2005 – when the Individual Defendants were arrested – and should run on the Cates gains through the present. (SEC Indiv. Br. at 6.)  According to the SEC, these different end dates are justified by the different treatment the Individual Defendants gave to Cates's funds and the Mayers' and Colburn's funds. Specifically, the Individual Defendants immediately diverted Cates's money to Vilar – who has enjoyed its use ever since – but commingled the Mayers' and Colburn's money in an ATGF account that has since been frozen.  (Id.)  The Court, however, determines that such a distinction is not warranted.

Different treatment for funds that were commingled in the same fraudulent scheme is inappropriate, even if it is possible to trace remaining funds to particular investors.  Cf. SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 88–89 (2d Cir. 2002) (discounting the "fortuitous fact that the defrauders spent the money of [one of the] victims first" (internal quotation marks omitted)).  Here, Cates's funds and the Mayers' and Colburn's funds were all effectively commingled in the Individual Defendants' scheme.  Although some separate accounts existed, all accounts were used partly to pay Amerindo's business expenses and partly as the Individual Defendants' personal piggy bank.   For instance, Vilar stole some of Cates's funds for himself but used most of it to pay a GFRDA investor.  See Vilar, 729 F.3d at 69. Similarly, according to the SEC's own pleadings, the Individual Defendants used GFRDA funds partly to pay other investors and partly to pay themselves.  (SAC ¶¶ 81, 88–91, 96.)  Indeed, as noted earlier, some of the money stolen from Cates was first transferred to an ATGF account – just as GFRDA funds were – and only later

---

[4] The Court notes that the SEC's calculations of gain from each victim are less than the amount calculated by the Court at the Individual Defendants' criminal resentencing.    (Sent. Tr. at 17:15–20:25.) Nevertheless, because "disgorgement is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions," Bronson Partners, 654 F.3d at 372, the Court declines to order disgorgement above what the SEC seeks.

transferred to Vilar.  (*See* Jacobson 2013 Decl. Ex. B.)  The Court therefore determines that the Cates gains should not be treated differently from the Mayers and Colburn gains, and that prejudgment interest for all wrongful gains should run only through May 2005.[5]

Applying compounding interest to the principal amount of each wrongful gain through May 2005, and taking account of the date of the wrongful gain and of the deductions from each gain discussed above, the SEC calculates that the Individual Defendants owe $2,759,610.51 in prejudgment interest on the Mayers gains, $353,098.75 on the Colburn gains, and for Vilar only, $704,208.06 in prejudgment interest on the Cates gains.[6]  (*See* Jacobson 2013 Decl. Ex. I.)  The Court finds that these calculations are reasonable and well supported and that the SEC has met its burden.

In sum, the SEC has reasonably shown that the Individual Defendants owe disgorgement in the amounts of $12,315,595.21 for the wrongful gains from the Mayers, $803,098.75 for the wrongful gains from Colburn, and for Vilar only,

$5,454,208.06 for the wrongful gains from Cates.

ii.  The Individual Defendants' Responses

The Individual Defendants raise numerous objections to the SEC's calculations.  All are meritless.

The Individual Defendants first argue that the SEC must be seeking legal disgorgement, which is not an available remedy, because the SEC "has not traced and cannot trace moneys invested by any of the 'victims' as to whose investment it seeks disgorgement."  (Indiv. Defs. Opp'n at 4–5.)  The claim that an agency must trace funds to seek disgorgement was considered by the Second Circuit and rejected in *FTC v. Bronson Partners, LLC*, a case the Individual Defendants do not cite or acknowledge.  *See Bronson Partners*, 654 F.3d at 374 (noting that "it is by now so uncontroversial that tracing is not required in disgorgement cases that we recently rejected an argument to the contrary via summary order" (citing *SEC v. Rosenthal*, 426 F. App'x 1, 2011 WL 2271743 (2d Cir. 2011) (table case))).

The Individual Defendants next argue that there is no evidence to support the SEC's calculations.  (Indiv. Defs. Opp'n at 6.)  This is simply untrue, as the SEC has provided documentary evidence to support all of its calculations.  (*See* Jacobson 2013 Decl.)  Moreover, to the extent the Individual Defendants argue that a jury finding is necessary to calculate disgorgement (Indiv. Defs. Opp'n at 7), they are incorrect.  Disgorgement is an equitable remedy and the findings underlying a disgorgement order are made by a court, not a jury.  *See Cavanagh*, 445 F.3d at 116.

The Individual Defendants next argue that the SEC does not distinguish between

---

[5] Arguably, prejudgment interest should run through October 2009, when the accounts were actually frozen, as opposed to May 2005, when the Individual Defendants were arrested.  *See Razmilovic*, 738 F.3d at 36 (holding that prejudgment interest should not be calculated after the assets at issue were "frozen at the behest of the government in connection with the enforcement action").  Nevertheless, the Court declines to order disgorgement above what the SEC seeks.  *See supra* note 4.

[6] The SEC does not provide a calculation for interest through May 2005 for Cates, but does provide calculations for interest through March 31, 2005 ($663,716.42) and through June 30, 2005 ($744,699.69).  (Jacobson 2013 Decl. Ex. I.)  The figure above is an average of the March 31 and the June 30 figures.

legally- and illegally-derived profits because the SEC does not consider that the investors may have not relied on the Individual Defendants' misstatements when investing and instead may have relied on the Individual Defendants' "proven track record of making huge profits for [investors] previously." (Indiv. Defs. Opp'n at 7–9.) Putting aside the absurdity of the claim that investors might not have relied on the Individual Defendants' misstatements that they were properly investing funds – as opposed to misappropriating, commingling, and stealing them – the Individual Defendants fail to meet their burden of showing that some of the gains they derived from the fraud resulted from something other than their wrongdoing. The SEC has provided a reasonable calculation of the Individual Defendants' wrongful gain. The Individual Defendants have provided absolutely no evidence to show that some of that gain was attributable to lawful acts. As such, even if the Individual Defendants are correct that there is uncertainty regarding whether they might have made some gains absent misstatements, that uncertainty must be decided against them. *See Razmilovic*, 738 F.3d at 31.

The Individual Defendants next argue that the SEC's calculations are inconsistent with the position originally taken by the government in the criminal case, in which the government asserted "that the 'proceeds' attributable to the Mayers was $5,800,000" as opposed to approximately $11 million. (Indiv. Defs. Opp'n at 9–11.) This discrepancy is easily explained. The prosecution in the criminal case originally focused on the $5,800,000 that the Mayers initially invested in GFRDA,[7] while the

SEC focuses on the roughly $11 million that the Mayers reinvested in January 2001. For disgorgement, the more appropriate figure is the SEC's $11 million. As the SEC explains, the Mayers could have withdrawn over $11 million from Amerindo in 2001, but chose to reinvest after the Individual Defendants' misrepresented the nature of the investment. (SEC Indiv. Br. at 4; SEC Reply at 5); *cf. United States v. Hsu*, 669 F.3d 112, 122 (2d Cir. 2012) ("On the facts of this case, the investors were given a clear opportunity to withdraw the total amount of their principal and accrued interest, and were induced not to do so by fraudulent promises of continued gain. The reinvestments were thus appropriately counted as loss."). Hence, the Individual Defendants gained $11 million by defrauding the Mayers, and that full amount is disgorgeable.

The Individual Defendants next argue that the SEC failed to deduct "substantial payments to the Mayers in 2001, 2002, and 2003." (Indiv. Defs. Opp'n at 11.) Although it is not entirely clear, the Individual Defendants are presumably referring to the interest payments made on the Mayers' GFRDA investments from 2001 to 2003. (*See* Trial Tr. at 1284:23–1292:4, *United States v. Vilar and Tanaka*, 05 Cr. 621 (RJS).) The Individual Defendants are not entitled to deduct those expenses for two reasons. First, the Individual Defendants promised the Mayers both interest and return of their principal. Instead, the Individual Defendants paid interest but diverted most of the principal. That diversion saved the Individual Defendants the cost of paying the principal back, and the Individual Defendants therefore gained the amount they diverted. *Cf. SEC v. Patel*, 61 F.3d 137, 139–40 (2d Cir. 1995) (considering

---

[7] As mentioned above, *see supra* note 4, at the Individual Defendants' criminal resentencing, the government subsequently took the position that the losses to the Mayers were *higher* than the gains the

SEC now seeks, and the Court agreed. (Sent. Tr. at 17:23–19:11.)

losses avoided as gains). Their payment of interest as promised – as opposed to diverting the interest too – in no way lessens that gain. Second, paying interest was a necessary part of the Individual Defendants' fraudulent scheme. *See United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997) ("[T]he return of money as interest or other income is often necessary for the scheme to continue."). Had Amerindo failed to make those payments, the fraud would likely have collapsed years sooner. Because defendants are not entitled to deduct the expenses of operating their scheme, these interest payments should not be subtracted from a disgorgement award. *See Bronson Partners*, 654 F.3d at 375. Indeed, the Individual Defendants made a similar argument to the Second Circuit in their criminal appeal – that there were no losses because the victims had profited overall from their Amerindo investments – and the Circuit bluntly rejected it. *See Vilar*, 729 F.3d at 96 n.34 ("[D]efendants should not benefit from attempting to ensure the continuation of their scheme or from inducing investors to reinvest certain interest payments received." (citations omitted)).

Finally, the Individual Defendants argue that no jury found that they diverted Cates's funds. (Indiv. Defs. Opp'n at 12–15.) Again, the Individual Defendants ignore that the Court is the fact finder for a disgorgement award. Moreover, in the criminal case, the jury found that Vilar defrauded Cates, and in this civil case, the Court granted summary judgment to the SEC on its claims that Vilar defrauded Cates. Here, based on the evidence provided by the SEC and the evidence the Court observed at the criminal trial, the Court determines that Vilar wrongfully

gained $4,750,000, plus interest, through that fraud. Nothing more is necessary.[8]

*       *       *

Because the Individual Defendants have not shown that the SEC's figures are inaccurate or that any of the gains were legally-derived, the Court adopts the SEC's reasonable calculations. With interest, the Individual Defendants shall be jointly and severally liable for the $13,118,693.96 of wrongful gains from the Mayers and Colburn, and Vilar, but not Tanaka, shall be liable for the $5,454,208.06 of gains from Cates. *See SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009) (Lynch, D.J.) ("Where an individual or entity has collaborated or worked closely with another individual or entity to violate the securities laws, those individuals and/or entities may be held jointly and severally liable for any disgorgement."), *aff'd*, 438 F. App'x 23 (2d Cir. 2011); *see also SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013) (affirming a district court's decision to hold defendants jointly and severally liable for disgorgement). To the extent that the Mayers, the Colburn estate, or Cates are repaid through the Receiver's distributions or through criminal restitution, those repayments will be deducted from the Individual Defendants' liability. *See Palmisano*, 135 F.3d at 863.

### b. The Entity Defendants

The analysis for the Entity Defendants is slightly different. Because the Entity Defendants have defaulted and have still not appeared in the case, they obviously cannot

---

[8] The Individual Defendants also argue that requiring them to pay prejudgment interest for a period after their arrests in 2005 would violate the Double Jeopardy Clause. (Indiv. Defs. Opp'n at 15.) As the Court is not to requiring prejudgment interest after 2005, the Court leaves that argument unaddressed.

rebut the SEC's calculations for disgorgement. Therefore, the Court accepts the SEC's disgorgement calculations to the extent they are reasonable.

The SEC argues that the Entity Defendants should be jointly and severally liable for disgorgement of the gains from the Mayers, Colburn, and Cates. (SEC Entity Br. 15–17.) In light of the central role the Entity Defendants played in the frauds on those investors and the control that the Individual Defendants exercised over the Entity Defendants (SAC ¶¶ 12–24), the Court agrees. *See SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007) (holding an individual and three corporations jointly and severally liable for disgorgement where the individual "was clearly responsible for the activities of all three entities"). Accordingly, the Court holds that the Entity Defendants shall all be jointly and severally liable for the $18,572,902.02 of gains from the frauds on the Mayers, Colburn, and Cates.

The SEC also seeks disgorgement from the Entity Defendants of $11,337,384.76 in gains from ATGF victims, plus prejudgment interest, equal to a $6 million net investment by Ronald Salvitti, a $2 million net investment from John Sweetland Sr. ("Sweetland"), and a $3,337,384.76 net investment by Paul Marcus ("Marcus"). (SEC Entity Br. at 16; Declaration of Neal Jacobson, dated February 28, 2014, Doc. No. 386 ("Jacobson 2014 Decl."), ¶¶ 19–23.) Those figures, however, are at odds with the figures of the Receiver, who has determined that Sweetland's net investment was only $1,874,988.59 and that Marcus's net investment was only $3,025,835.38. (Revised Interim Distribution Schedule.) Because the SEC has, since submitting its motion for disgorgement from the Entity Defendants, indicated that it "fully supports the Receiver's" calculations (SEC Distr.

Mot. at 1), the Court will use the Receiver's numbers. Accordingly, the Court determines that a reasonable approximation of the wrongful gain from the above-named ATGF investors is $10,900,823.97. Using the SEC's calculations of interest, but reducing the interest proportionally to reflect the Receiver's lower investment figures for Sweetland and Marcus, the Court determines that the Entity Defendants must also disgorge $7,096,725.88 in prejudgment interest.[9] Thus, the Entity Defendants must disgorge a total of $17,997,549.85 in gains from the ATGF fraud.

\*       \*       \*

To summarize, the Entity Defendants are all jointly and severally liable for a grand total of $36,570,451.87, equal to $17,997,549.85 in ATGF wrongful gains, $13,118,693.96 in wrongful gains from the Mayers and Colburn, and $5,454,208.06 of wrongful gains from Cates. The Individual Defendants are both jointly and severally liable with the Entity Defendants for the $13,118,693.96 in wrongful gains from the Mayers and Colburn. Vilar, but not Tanaka, is also jointly and severally liable with the Entity Defendants for the $5,454,208.06 of gains from Cates.

---

[9] The SEC calculated $2,361,816.26 in prejudgment interest for the Ronald Salvitti investment, $3,809,994.38 in prejudgment interest for the Sweetland investment, and $1,282,814.05 in prejudgment interest for the Marcus investment. (Jacobson 2014 Decl. Ex. I.) Reducing the Sweetland interest and the Marcus interest to reflect the Receiver's figures yields interest of $3,571,848 for Sweetland (a 6.25% reduction) and $1,163,061.62 for Marcus (a 9.33% reduction). In total for all three investors, this is equal to $7,096,725.88.

### B. Civil Penalties

#### 1. Legal Standard

In addition to disgorgement, federal statutes authorize three increasing tiers of civil fines for violations of the securities laws. *See* 15 U.S.C. §§ 77t(d)(2) (Securities Act), 78u(d)(3)(B) (Exchange Act), 80b-9(e)(2) (IAA). For any violation, a court may impose Tier I penalties – fines of up to the higher of (1) $5,000 for each violation by a natural person or $50,000 for each violation by "any other person," such as a corporation; or (2) the defendant's "gross amount of pecuniary gain." *See* 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i), 80b-9(e)(2)(A). If a violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," a court may instead impose Tier II penalties – fines of up to the higher of (1) $50,000 for each violation by a natural person or $250,000 for each violation by "any other person"; or (2) the defendant's "gross amount of pecuniary gain." 15 U.S.C. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii), 80b-9(e)(2)(B). If a violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," *and* "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," a court may instead impose Tier III penalties – fines of up to the higher of (1) $100,000 for each violation by a natural person or $500,000 for each violation by "any other person"; or (2) the defendant's "gross amount of pecuniary gain." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii), 80b-9(e)(2)(C).[10]

A defendant's gross amount of pecuniary gain is similar to that defendant's disgorgement amount, but with three differences. First, gross pecuniary gain, unlike disgorgement, may consider gains only from frauds occurring within the five-year statute of limitations for civil penalties. *See Gabelli v. SEC*, 133 S. Ct. 1216, 1220–21 (2013) (interpreting 28 U.S.C. § 2462); *Amerindo II*, 2014 WL 405339, at *9 (noting that 28 U.S.C. § 2462 does not apply to disgorgement). Second, because the civil penalties statutes focus on the *gross* amount of pecuniary gain – as opposed to disgorgement, which is focused on simple gains – defendants are not entitled to deduct money returned to victims. Otherwise, a defendant who paid back all gains before judgment could practically nullify the statutory penalty. Third, disgorgement can be awarded jointly and severally, but civil penalties cannot. *See Pentagon Capital*, 725 F.3d at 287–88. Nevertheless, where multiple defendants mutually benefitted from the same gains, the best calculation of a single defendant's gain may be the total gains obtained by the group through that defendant's violations. *See SEC v. Great Am. Techs., Inc.*, No. 07 Civ. 10694 (DC), 2010 WL 1416121, at *2 (S.D.N.Y. Apr. 8, 2010) (in a case where a corporate defendant gained $2.3 million and an individual defendant personally diverted $1 million of that sum, fining the individual defendant based on the full $2.3 million gain), *aff'd*

---

[10] Pursuant to section 31001(s) of the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, § 31001(s), 110 Stat. 1321, 1321-373 (codified as amended at 28 U.S.C. § 2461 note), the SEC adjusts the maximum fine per violation every four years to account for inflation. For violations occurring between December 9, 1996 and February 2, 2001, the maximum fines are 110% of the respective statutory amounts (for instance, the maximum Tier III fines per violation for unnatural persons increased from $100,000 to $110,000), and for violations occurring between February 2, 2001 and February 14, 2005, the maximum fines are 120% of the respective statutory amounts, except for Tier I penalties for natural persons, which are 130% of the statutory amount. *See* 17 C.F.R. §§ 201.1001, .1002; 17 C.F.R. pt. 201, subpt. E, tbls. I, II.

*sub nom. SEC v. Setteducate*, 419 F. App'x 23 (2d Cir. 2011). Hence, there may be some overlap among defendants' gains, and the gains attributed to each defendant may add up to over 100% of total gains.[11]

---

[11] Although no party has raised the issue, the Court notes that one court has construed *Pentagon Capital* to forbid overlap among defendants' gains. *See SEC v. Syndicated Food Serv. Int'l, Inc.*, No. 04 Civ. 1303 (NGG) (VLS), 2014 WL 1311442, at *26 n.22 (E.D.N.Y. Mar. 28, 2014). The Court, however, disagrees. *Pentagon Capital* held only that the civil penalties statute did not allow for joint and several liability, and did not address any limits on the statutory maximums or gain calculations. Certainly, there is no logical inconsistency in forbidding joint and several liability but allowing overlapping gains. As securities laws fines are partially meant to be punitive, *see Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006), it makes sense to hold each defendant responsible for all wrongful gains from the scheme without allowing one defendant's payment of a fine to reduce others' punishment. That, for instance, is precisely the regime in criminal fines. *See* 18 U.S.C. § 3571 (allowing fines based on a group's gain but not authorizing joint and several liability). Moreover, although the civil penalties statutes focus on "gain to such defendant," 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B), 80b-9(e)(2), multiple defendants can, and often do, each benefit from the same dollar of gain. In a conspiracy, members may view payments to other members as an investment that they will, over time, more than recoup. *Cf. SEC v. Contorinis*, 743 F.3d 296, 303 (2d Cir. 2014) (holding that an insider-trading tipper can gain from benefitting a tippee and should therefore be liable for disgorgement of the tippee's gains); *SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998) ("A tippee's gains are attributable to the tipper, regardless [of] whether [direct] benefit accrues to the tipper."). Such group-mindedness underlies the general rule that all members of a conspiracy are liable for all gains to the conspiracy, *see* 18 U.S.C. § 3571(d); *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) ("[A] court may order a defendant to forfeit proceeds received by others who participated jointly in the crime . . . ."), and there is no reason to abandon that rule here. Further, in many situations it will be nearly impossible to determine how the defendants divided their spoils. Often the defendants are the only ones who know for sure, and they may have little incentive to share that knowledge. Indeed,

"Beyond setting maximum penalties, the statutes leave the actual amount of the penalty . . . up to the discretion of the district court." *Razmilovic*, 738 F.3d at 38 (internal quotation marks omitted); *see also* 15 U.S.C. §§ 77t(d)(2)(A) ("The amount of the penalty shall be determined by the court in light of the facts and circumstances."), 78u(d)(3)(B)(i) (same), 80b-9(e)(2)(A) (same). "In exercising this discretion, courts weigh (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Tourre*, No. 10 Civ. 3229 (KBF), 2014 WL 969442, at *11 (S.D.N.Y. Mar. 12, 2014) (internal quotation marks omitted).

### 2. Application

#### a. The Individual Defendants

Tier III penalties are clearly appropriate for the Individual Defendants. As they were convicted of fraud, there is no doubt that their offense "involved fraud." Moreover, although the Individual Defendants claim that losses were not substantial – indeed,

---

where a corporation is involved, the situation may prove even more difficult. Even if all the facts were known or knowable, there may still be no fair way to separate benefit to the corporation from benefit to the corporation's controllers or employees. *Cf. United States v. Peters*, 732 F.3d 93, 102–103 (2d Cir. 2013) (holding that a defendant can be required to forfeit property obtained by a corporation he or she dominates). This case amply demonstrates that problem. With two natural-person defendants and seven corporate defendants, all of which were controlled by the natural-person defendants, any division of gain among them would be purely arbitrary.

that no investor suffered any loss (Indiv. Defs. Opp'n at 19–20) – the Court is unpersuaded. The Mayers, Colburn, and Cates, to say nothing of Lecube-Chavez and Cox, have not had access to their money for well over a decade. In that time, Herbert Mayer, Cox, and Colburn have died. Even if investors can be paid now because the stock market has rebounded since 2005, that lucky stroke cannot undo the losses the Individual Defendants inflicted. The Court therefore determines that losses were substantial – and at the very least that the Individual Defendants' scheme involved a significant risk of substantial loss – such that a Tier III penalty is appropriate.

Under a Tier III penalty, the Court may set a civil penalty as high as the gross amount of pecuniary gain. In light of the close cooperation between the Individual Defendants, the Court determines that the best calculation of each Individual Defendants' gain is the total gain to the scheme generated by each's wrongdoing. Accordingly, the gross pecuniary gain to Vilar is the disgorgement amount from Cates and the Mayers (the Colburn fraud falls outside the statute of limitations) with the $200,000 in post-arrest distributions to the Mayers added back in, equal to $17,969,803.27. The gross pecuniary gain to Tanaka is the disgorgement amount from the Mayers with the $200,000 in post-arrest distributions to the Mayers added back in, equal to $12,515,595.21.

To determine the appropriate fine within the statutory range, the Court weighs the five factors discussed above. The Court has previously held that the first four factors "weigh heavily in favor of imposing civil penalties" in this case. *Amerindo I*, 2013 WL 1385013, at *12. The only factor the Court has not considered is whether the fine should be reduced because of the Individual Defendants' financial condition. The Court

now holds that the Individual Defendants' financial condition, whatever it is, does not support a reduced fine. The Individual Defendants have claimed that they are entitled to millions of dollars from the Receiver's accounts, and it is plausible that they would legitimately be entitled to some amount in management fees. Moreover, the SEC contends that the Individual Defendants are the beneficiaries of a well-funded pension in the United Kingdom. (SEC Indiv. Br. at 9; Jacobson 2013 Decl. Ex. J.) Even if the Individual Defendants are entitled to nothing from the Receiver's accounts, however, the heavy weight of the other four factors outweighs any inability to pay. The Individual Defendants knowingly lied to numerous investors over the course of many years and brazenly stole millions of dollars. Further, to this day they insist that they did nothing wrong, and have done everything in their power to prevent repayment to their victims. (Sent. Tr. at 50:10–54:18.) Even if they have no money now, a harsh penalty is necessary to reflect the seriousness of the violations, to account for the Individual Defendants' subsequent behavior, and to deter others from considering following in the Individual Defendants' path. *See Official Comm.*, 467 F.3d at 81. The Court therefore awards civil penalties of $10,000,000 against both Individual Defendants, the same fine the Court imposed in the criminal case.

b. The Entity Defendants

Because the Entity Defendants were involved in the same violations as the Individual Defendants, a Tier III penalty is similarly appropriate for the Entity Defendants. Moreover, the factors that weighed in favor of a heavy fine against the Individual Defendants equally weigh in favor of a heavy fine against the Entity Defendants. In addition, even though the final factor – whether the penalty should be

reduced due to the defendant's demonstrated current and future financial condition – could be a mitigating factor, the defendant normally bears the burden of demonstrating that her or his financial condition justifies a reduced fine. Here, the Entity Defendants have defaulted and therefore have not made any showing that their financial condition justifies a reduced fine. The Court therefore awards the maximum penalty against each of the Entity Defendants of $17,969,803.27, equal to the gains from the Mayers and Cates, the only victims falling within the statute of limitations.

## C. Permanent Injunction

### 1. Legal Standard

The SEC may seek permanent injunctive relief for violations of the Securities Act, Exchange Act, and IAA. *See* 15 U.S.C. §§ 77t(b) (Securities Act); 78u(d)(1) (Exchange Act); 80b-9(d) (IAA). A court must grant such relief upon a showing that a defendant has violated the securities laws and that there is a "reasonable likelihood that the wrong will be repeated." *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011) (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972)), *rev'd on other grounds sub nom. Gabelli v. SEC*, 133 S. Ct. 1216, 1220–21 (2013). To determine whether there is a reasonable likelihood that a defendant will commit future violations, courts look to (1) the fact that a defendant has been found liable for illegal conduct; (2) the degree of scienter involved; (3) whether the infraction is an isolated occurrence; (4) whether the defendant continues to maintain that his past conduct was blameless; and (5) whether the defendant might be in a position where future violations could be anticipated. *See SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998).

### 2. Application

The Court previously entered an injunction against the Individual Defendants barring them from committing further violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and § 206(1) and 206(2) of the IAA. *See Amerindo I*, 2013 WL 1385013, at *11. The SEC now seeks a similar injunction against the Entity Defendants. (SEC Entity Br. at 17–18.) The first four factors for determining whether there is a likelihood of future violations clearly weigh in favor of an injunction, as the Individual Defendants' scienter and claims of blamelessness are imputed to the Entity Defendants. Arguably, the Entity Defendants are not in a position to commit future violations, as they apparently have not operated for years. (*Id.* at 18.) Nevertheless, the Entity Defendants still have legal existence, and the Court determines that their inactive status is outweighed by the other factors. The Court therefore permanently enjoins the Entity Defendants from future violations of the securities laws.

## III. THE RECEIVER'S INITIAL DISTRIBUTION MOTION

### A. Legal Standard

District courts have discretion to approve a receiver's proposed distribution plan as long as the plan is "'fair and reasonable.'" *See SEC v. Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009) (Chin, D.J.) (quoting *SEC v. Wang*, 944 F.2d 80, 81 (2d Cir. 1991)), *aff'd sub nom. SEC v. Orgel*, 407 F. App'x 504 (2d Cir. 2010), *and SEC v. Malek*, 397 F. App'x 711 (2d Cir. 2010); *see also Credit Bancorp*, 290 F.3d at 87. In makings its decision, a court may defer to the receiver's choices for the plan's details and should give substantial weight to

the SEC's views regarding a plan's merits. *See Byers*, 637 F. Supp. 2d at 175.

Where a receiver proposes a pro rata distribution to investors, a court should consider whether "[(1)] the funds of the defrauded victims were commingled and . . . [(2)] victims were similarly situated with respect to their relationship to the defrauders." *Credit Bancorp*, 290 F.3d at 88–89. Pro rata distributions are favored when both factors are present, although a court may order a pro rata distribution even absent those factors. *Id.* To be similarly situated, investors' "circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *SEC v. Malek*, 397 F. App'x 711, 716 (2d Cir. 2010). In general, victims are similarly situated with respect to their relationship to the defrauders where (1) the defendant exercised control over all victims' accounts, *see id.*; *Alonso v. Trigueros*, 369 F. App'x 178, 179 (2d Cir. 2010); *see also Credit Bancorp*, 290 F.3d at 88–89 (implying that pro rata distribution would not be appropriate where "assets had somehow been segregated in the manner of true trust accounts and/or had never been placed in the defrauder's control"); and (2) no victim was either part of the scheme or expended her or his own resources to bring the fraud to light, *see CFTC v. Efrosman*, No. 05 Civ. 8422 (KMW), 2009 WL 2958389, at *8 (S.D.N.Y. Sept. 16, 2009); *Gonzalez v. Axess Trade Co., Inc.*, No. 04 Civ. 3762 (RCC), 2005 WL 1384019, at *5 (S.D.N.Y. June 9, 2005).

### B. Application

Objections to the Receiver's motion can be grouped under four rough headings. First, several victims and the Individual Defendants argue that GFRDA and ATGF investors should be treated differently based on their different investment strategies and expectations. (Mayers Obj.; Marcus Obj.; Indiv. Defs. Obj.) Second, the Mayers argue that their claim should receive special treatment because they obtained a state court judgment against some Defendants. (Mayers Obj.) Third, Cates seeks recognition of a claim the Receiver rejected. (Cates Obj.) And fourth, the Individual Defendants argue that certain claims recognized by the Receiver should be rejected.[12] (Indiv. Defs. Obj.) The Court determines that none of these objections require modification of the Receiver's distribution plan.

### 1. Different Treatment for ATGF and GFRDA Investors

The gist of the argument for different treatment of ATGF and GFRDA investors is that the investors were given different promises and had different expectations. Specifically, GFRDA investors were promised and expected a guaranteed, fixed return for a set period of time, while ATGF investors were promised and expected a riskier investment that would last indefinitely and from which they would benefit according to their number of shares. Based on these different expectations, the argument goes, these investors should be compensated differently, with the GFRDA investors being paid in full first, and the ATGF investors enjoying the surplus funds – due to a rising stock market – as shareholders in the fund. (*See, e.g.*, Marcus Obj. at 14–17.)

There are three major problems with this proposal, however. First, the different treatment option could result in drastically different, and potentially inequitable,

---

[12] Robin Sayko submitted an objection that does not fit under any of these headings (Sayko Obj.), but the Receiver has modified his motion to resolve her objection, and the Court therefore does not consider the objection here.

outcomes depending on the current value of the assets, which has not yet been determined. Thus, if there are insufficient funds to pay all investor claims, GFRDA investors would benefit at the expense of ATGF investors, who might get nothing. As a result, because the process of valuing and liquidated Amerindo assets is ongoing, requiring different treatment at this stage could significantly delay any interim distribution. Second, although the ATGF investors bargained for risk, they did not bargain for the risk of fraud. (Or to the extent they did – in the sense that everyone should expect the risk of fraud in any transaction – they did not do so more than GFRDA investors.) Defendants stole from ATGF and GFRDA investors indiscriminately. (SAC ¶¶ 76–97.) There is simply no reason why only ATGF investors should bear the costs of that theft or why ATGF investors should be responsible for paying GFRDA investors' losses. Third, no matter what ATGF and GFRDA investors were promised or expected, the whole operation was a fraud. The reality is that all investor funds went into a single account that was subsequently pilfered. (*Id.*) That kind of commingling and similar treatment is precisely the situation that calls for a pro rata distribution of remaining assets based on each victim's investment amount. *See Credit Bancorp*, 290 F.3d at 88–89; *see also CFTC v. Walsh*, 712 F.3d 735, 751 (2d Cir. 2013) ("We see no error in the district court's determination that the mere choices of different investment vehicles did not mean that the two groups of defrauded investors in this case were meaningfully dissimilar, given, *inter alia*, that both the WGTI and WGTC investors lost money because they were defrauded by the same individual who stole their money, and no one, whether they had invested in the regulated or the unregulated entity, could

find out for a decade." (citations and internal quotation marks omitted)).

Moreover, it bears noting that the Receiver's motion is only for an *interim* distribution. If, going forward, the Receiver determines that Amerindo's assets exceed investor claims, plus interest – for instance, if some of Defendants' risky investments from before 2005 turned out to be winners – it might be appropriate to allocate gains differently to GFRDA and ATGF investors. The Court, however, will address that situation when, and if, it arises. For now, the Court agrees with the Receiver and the SEC that, because of the commingling of assets and the similar treatment of all investor funds, the Receiver's distribution formula is fair and equitable.

## 2. Special Treatment for the Mayers' Claims

While this case was ongoing, the Mayers obtained a judgment in state court against Vilar, Tanaka, Amerindo-US, and Amerindo-Panama for $19,133,299.78, and supplemental judgments against Vilar for $2,530,909.21 and the two corporations for $759,489.30. (Complaint ¶¶ 10–11, *In re Application of Lisa Mayer and Debra Mayer*, 12 Civ. 5240 (RJS), Doc. No 1 Ex. A.) The Mayers now argue that the Receiver must allow their claim in the full amount of their state court judgment and must give their judgment priority over the claims of any other investor.

The Mayers' argument fundamentally misunderstands the nature of the receivership and the distribution. Put simply, it does not matter if the Receiver is bound by the state court judgment or not, because the Receiver has no authority to allow claims or distribute assets. Instead, the ultimate decision of how much to distribute and to whom is the Court's alone.

*See Credit Bancorp*, 290 F.3d at 87.   In making that decision, a court's role is to do equity.   In other words, a court should consider the facts of the case and the underlying merits of victims' claims, not technicalities or legal gamesmanship.   *See Young v. Higbee Co.*, 324 U.S. 204, 209 (1945) ("Equity looks to the substance and not merely to the form.").   As a result, under both New York and federal law, courts are not required to favor one victim over others simply because that one raced to the courthouse and obtained a judgment.   *See United States v. Benitez*, 779 F.2d 135, 138–140 (2d Cir. 1985) (upholding a pro rata distribution to victims even where some victims had obtained a judgment and others had not); *id.* at 139 (noting that New York law does not grant priority to fraud victims who also are judgment creditors over other fraud victims); *see also Rafkind v. Chase Manhattan Bank, N.A.*, No. 92 Civ. 6099 (JSM), 1992 WL 380291, at *2 (S.D.N.Y. Dec. 7, 1992) ("Here, the Rafkinds have a judgment that is predicated on the same fraud that victimized the other possible claimants to the disgorgement fund.   As a matter of equity, they should not be given priority over their fellow victims, and their petition is, therefore, denied.").   Indeed, any other rule would be massively inefficient. Investors would be encouraged to bring individual suits and to fight against each other wastefully for what scraps remained. Allowing courts to cut through formalities, gather all interested parties in one proceeding, and consider all of their interests at once is more efficient and is fairer to all involved.

Moreover, by seeking to execute against the Receiver's assets, the Mayers assume those assets belong to Defendants.   In truth, however, the assets rightfully belong to investors.   *See Benitez*, 779 F.2d at 141 (Van Graafeiland, J., concurring) (stating that judgment creditors have no priority because

they have no interest greater than the fraudster had, and a fraudster has no interest in victims' funds); *see also Stuhler v. State*, 485 N.Y.S.2d 957, 958 (Sup. Ct. 1985) ("[The judgment creditors'] rights in the funds are derived from, and are therefore no better than, those of the [Defendants]. . . . Because [the funds] are fruits of a crime committed by [the Defendants], the [Defendants] can have no interest in those funds."), *aff'd*, 493 N.Y.S.2d 70 (App. Div. 1985).   Of course, the Mayers cannot satisfy their judgment with other investors' money. Nevertheless, to the extent Defendants retain any assets when this process is complete, the Mayers and other creditors may seek to execute against those assets at that time.   *See Rafkind*, 1992 WL 380291, at *2 ("The Rafkinds' judgment entitles them only to surplus money from the disgorgement fund. Because the assets of [the defrauding entity] are frozen, a judgment cannot be enforced against those assets.   If the freeze is lifted, the Rafkinds will [be] entitled to enforce the judgment against assets that remain after the other victims have been paid.").

The Court therefore determines that the Mayers' claim is not entitled to any special treatment.

### 3.  Lily Cates's Additional Claims

Cates submitted a claim for $250,000 that she alleges was invested by her mother in an Amerindo account.  (Cates Obj.)  To support this claim, Cates provides a handwritten note, purportedly from an employee of Amerindo to Cates, acknowledging receipt of $250,000 on Cates's mother's behalf.  (*Id.*)  Cates has also recently submitted an additional claim for $300,000, supported by a cancelled check reflecting a $300,000 transfer from Cates to Amerindo.  (Doc. No. 402.)  At this time, the Court defers to the Receiver's judgment to not recognize these claims

based on the evidence Cates has provided. If Cates is able to provide further support – such as an account statement or more persuasive correspondence relating to these investments – the Receiver may reconsider these claims for subsequent distributions.

### 4. Other Contested Claims

The Individual Defendants object to the validity of several claims, but offer no support for any of their objections beyond speculation. Nevertheless, to help ensure the honesty of the process, the Court will require all claimants to submit to the Receiver an affidavit – substantially similar in form to the template included as Exhibit A to this Memorandum and Order – swearing to the accuracy of all claims and statements made in connection with their claims, subject to the penalties for perjury.

The Individual Defendants have also repeatedly objected to payment to J.P. Morgan, which has submitted a claim for all of its fees associated with maintaining Amerindo's accounts. The Individual Defendants assert that J.P. Morgan has never paid interest on the accounts and therefore should not be paid for any of the time it has held the funds. In fact, J.P. Morgan paid interest through 2008, and has not paid interest since then only because interest rates have dropped below the minimum threshold set by J.P. Morgan's contract with Amerindo. (Doc. No. 397.) The Court therefore concurs with the Receiver and orders that the Receiver pay the J.P. Morgan claims.[13]

*       *       *

---

[13] The Individual Defendants have also accused J.P. Morgan of stealing money from the accounts. (Doc. No. 424.) That accusation, like many other accusations made by the Individual Defendants and their counsel, is unsupported by any evidence before the Court.

Having reviewed the Receiver's motion, all of the objections, and the Receiver's and the SEC's submissions in response, the Court determines that the Receiver's interim distribution, as set forth in the Revised Interim Distribution Schedule, is fair and reasonable.

### IV. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED THAT the SEC's motions for penalties and remedies against Defendants are GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED THAT the Entity Defendants shall be jointly and severally liable for $36,570,451.87 in disgorgement. The Individual Defendants shall be jointly and severally liable with the Entity Defendants for $13,118,693.96. Vilar, but not Tanaka, shall also be jointly and severally liable with the Entity Defendants for an additional $5,454,208.06.

IT IS FURTHER ORDERED THAT the Individual Defendants shall each be liable for $10,000,000 in civil fines pursuant to 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B), and 80b-9(e)(2). The Entity Defendants shall each be liable for $17,969,803.27.

IT IS FURTHER ORDERED THAT the Entity Defendants are enjoined from future violations of the securities laws.

IT IS FURTHER ORDERED THAT, no later than May 16, 2014, the SEC shall submit a proposed judgment reflecting Defendants' liability and the Court's injunction.

IT IS FURTHER ORDERED THAT, no later than May 16, 2014, the SEC shall submit a letter informing the Court of how

19

and whether it intends to move forward on its remaining claims in this action.

IT IS FURTHER ORDERED THAT the Receiver's amended motion for an initial distribution is GRANTED. The Receiver shall distribute funds according to the schedule set forth in the Revised Interim Distribution Schedule. Before distributing any funds to a claimant, however, the Receiver must obtain an affidavit from that claimant swearing to the accuracy of the claim and statements made in connection with the claim.

The Clerk of the Court is respectfully directed to terminate the motions pending at docket numbers 332 and 370.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: May 6, 2014
    New York, New York

\*    \*    \*

The SEC is represented by Neal Jacobsen and Mark D. Salzberg of the Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, New York 10281.

The Individual Defendants are represented by Vivian Shevitz, 46 Truesdale Lake Drive, South Salem, New York 10590.

The Receiver is Ian Gazes of Gazes LLC, 151 Hudson Street, New York, New York 10013.

Lily Cates is represented by Edward T. Swanson of the Law Offices of Edward T. Swanson, 2071 North Altadena Drive, Altadena, California 91001.

Alfred C. Heitkoenig is represented by Paula Kae Colbath of Loeb & Loeb LLP, 345 Park Avenue, New York, NY 10154.

Paul Marcus is represented by Julian W. Friedman of Ballard Spahr Stillman & Friedman LLP, 425 Park Avenue, New York, New York 10022.

Lisa Mayer and Debra Mayer are represented by Patrick W. Begos of Begos Brown & Green LLP, 2425 Post Road, Suite 205, Southport, Connecticut 06890.

Robin Sayko is represented by Thomas J. Hall of Hall & Hall LLP, 57 Beach Street, Staten Island, New York 10304.

J.P. Morgan Securities LLC is represented by Andrea Likwornik Weiss of Levi Lubarsky & Feigenbaum LLP, 1185 Avenue of the Americas, 17th Floor, New York, New York 10036.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5 / 6 / 14

Ex. A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                            Plaintiffs,

              -v-

AMERINDO INVESTMENT ADVISORS
INC., *et al.*,

                            Defendants.

No. 05 Civ. 5231 (RJS)

---

## <u>AFFIDAVIT</u>

State of                    )
                            ) ss.:
County of                   )

I, [              ] being duly sworn, deposes and says:

1.      I have filed a proof of claim or a proof of claim was filed on my behalf or on

behalf of _____with the Court appointed Receiver in connection with the above-

captioned case.

2.      All statements and representations made by me or on my behalf in the proof of

claim, including but not limited to statements regarding the amount and terms of my investments

with the captioned Amerindo entities, are true to the best of my knowledge.

3.      All documents included with the proof of claim are true and correct copies of the

originals to the best of my knowledge.

4.      I acknowledge and understand that this affidavit is being submitted in connection

with the Court's determination of my potential entitlement to a distribution on account of my

proof of claim.

_____

Sworn to before me
This __ day of _____, 2014


_____
    Notary Public