UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
SECURITIES AND EXCHANGE COMMISSION,                               :
                                                                  :
                    Plaintiff,                                    :
                                                                  :   05 Civ. 5231 (RJS)
        v.                                                        :
                                                                  :   ECF CASE
AMERINDO INVESTMENT ADVISORS, INC., *et al.*,                     :
                                                                  :
                    Defendants.                                   :
                                                                  :
------------------------------------------------------------------X

**OBJECTIONS OF CLAIMANTS PAUL MARCUS,
THE DEANE J. MARCUS TRUST, THE STEVEN E. MARCUS TRUST,
THE CHERYL MARCUS-PODHAIZER TRUST AND
THE EVE S. MARCUS CHILDREN'S TRUST TO ADDITIONAL CLAIMS**

Claimants Paul Marcus, The Deane J. Marcus Trust, The Steven E. Marcus Trust, The Cheryl Marcus-Podhaizer Trust and The Eve S. Marcus Children's Trust (the "Marcuses"), by their counsel Ballard Spahr Stillman & Friedman, LLP, hereby file the following Objections to the Additional Claims referred to in paragraph 12 and Exhibit C of the Receiver's Third Status Report dated July 29, 2014. (Docket No. 455) (the "Additional Claims").[1]

**Introduction**

1.  In its August 1, 2014 Order (Docket No. 459) endorsed on the Receiver's Third Status Report, this Court directed as follows: "IT IS HEREBY ORDERED THAT any objections to the Additional Claims shall be filed no later than August 29, 2014." These objections are being filed pursuant to that Order. Each of the Additional Claims listed in Exhibit

---

[1] On August 6, 2014, the Receiver furnished counsel for the Marcuses with the Proofs of Claim filed by each of the Additional Claimants, and those documents are the basis of the objections contained in this submission.

C to the Receiver's Third Status Report is discussed below in the same order as they are discussed in the Receiver's Position in Response to Additional Investor Claims, dated August 27, 2014 (the "Receiver's Response"). First, however, we comment on the Receiver's general approach which, we believe, is inconsistent in certain important respects with this Court's May 6, 2014 Memorandum and Order (Docket No. 432) (the "Order").

2. In the Order, the Court considered the issue of whether ATGF and GFRDA investors should be treated differently at the interim distribution stage of this proceeding. In declining to do so on an interim basis, the Court noted that such different treatment at this point could result in unfairness to investors who are "similarly situated with respect to their relationship to the defrauders…." (Order, p. 16.) In reaching that conclusion, the Court noted that "the different treatment option [that it was rejecting for purposes of the first interim distribution] could result in drastically different, and potentially inequitable, outcomes depending on the current value of the assets, which has not yet been determined." (Order, pp. 16-17.)

3. The Court continued by setting forth the methodology that should be used for the first interim distribution, and its reason for reaching that conclusion:

> The reality is that all investor funds went into a single account that was subsequently pilfered…. That kind of commingling and similar treatment is precisely the situation that calls for a pro rata distribution of remaining assets **based on each victim's investment amount**.

(Order, p. 17) (emphasis supplied). We respectfully submit that, as discussed below, the Receiver's proposed treatment of certain of the Additional Claims varies from the Court's prescribed methodology of focusing "on each victim's investment amount," and in fact sets up two classes of investors that are treated unequally with no rational basis. That discrepancy is

2

best illustrated in the discussions below of the claims of Ms. Acevedo and the Los Angeles Opera.

**Claim No. 34 Christina Lohmann**

4. Ms. Lohmann has filed a Proof of Claim in the amount of $1,394.86.

5. The Marcuses adopt the Receiver's objection to Ms. Lohmann's claim on the ground that she has no interest in the Receivership assets. (Receiver's Response, ¶ 15.)

**Claim No. 35 Ana R. Acevedo**

6. The Receiver has interpreted the claim of Ms. Acevedo as being in the amount of $905,319.20, consisting of three elements: a GFRDA deposit in the amount of $640,934.75; accrued interest in the amount of $24,583.80; and an ATGF investment which the Receiver values at $239,800.65. All of these figures are based upon a March 31, 2002 Statement of Account submitted by Ms. Acevedo with her Proof of Claim, and the Receiver has recommended allowing this full amount. (Receiver's Response, ¶ 16.)

7. The Marcuses respectfully submit that the only portion of Ms. Acevedo's claim that should be allowed is the $60,000 which the documents show to be her original investment in GFRDA. This would be consistent with the Court's May 6 Order directing that interim distributions be made pro rata based on each victim's "investment amount." Any additional GFRDA figure shown on the Statement of Account submitted by Ms. Acevedo represents accrued interest, which should not be allowed for interim distribution purposes. This applies both to the $580,934.75 excess (*i.e.*, $640,934.75 minus $60,000) shown on the Statement for Ms. Acevedo's GFRDA account, and the $24,583.80 interest figure (which can only relate to GFRDA, since the ATGF portion of Ms. Acevedo's investment did not bear interest). By recommending the allowance of these additional interest amounts, the Receiver is

3

creating a situation in which GFRDA is being favored over ATGF, rather than following the Court's Order calling for interim distributions to be made on "a pro rata [basis] ... based on each victim's investment amount." Moreover, the excess amount makes no rational sense because in order to grow from $60,000 when she invested on September 30, 1991 to $640,935 on March 31, 2002, Ms. Acevedo's account would have had to receive an interest rate of over 25% compounded annually every year for 10½ years.

8.  Turning to the ATGF portion of the claim, the documents submitted by Ms. Acevedo establish that her original ATGF investment amount was $100,000. We respectfully submit that Ms. Acevedo's ATGF claim should not give rise to any interim distribution because the evidence indicates that she has already received back more than the full amount she invested in ATGF (even though she still owns the bulk of her ATGF shares).

9.  Ms. Acevedo's initial $100,000 investment in ATGF resulted in the issuance to her of 10,164.19 ATGF shares at a price of $9.1206 per share (as set forth in the October 22, 1991 letter included in her Proof of Claim). However, the subsequent Statements of Account that Ms. Acevedo submitted with her claim show that her ATGF share ownership was subsequently reduced to 7,665.82 shares. The only way such a reduction could have occurred would have been a partial redemption of Ms. Acevedo's ATGF position.

10. While we do not know when Ms. Acevedo redeemed 2,498.37 Amerindo shares (10,164.19 - 7,665.82) or the price she received on redemption, the Statements of Account included with Ms. Acevedo's Proof of Claim value her ATGF shares at $48.3971, $42.8167 and $31.2818 between May 2001 and March 2002. Taking the average of those three figures ($40.8318), we respectfully submit that it can be fairly assumed that the redemption resulted in

payment to Ms. Acevedo of $102,012 ($2,498.37 x $40.8318). If the actual figure is less than that, it should be up to Ms. Acevedo to come forward with evidence to that effect.

11.  Since the reasonably assumed amount that Ms. Acevedo received on the partial redemption of her shares exceeded her original $100,000 investment in ATGF, she should not be entitled to any ATGF allowance as part of an interim distribution. Moreover, by recommending the allowance of a $239,800 ATGF claim based on the dollar value of her shares at the time of the March 31, 2002 Statement of Account, the Receiver is valuing a fluctuating asset based on the happenstance of the date of a particular Statement of Account. Once again, he is varying from the "pro rata distribution of remaining assets based on each victim's investment amount" that this Court directed at page 17 of its May 6 Order.

12.  Ms. Acevedo's remaining 7,665.82 shares of ATGF -- even though they provide no basis for an interim distribution because she has already recaptured her invested amount -- would still entitle her to participate in the ultimate distribution that should be made to ATGF shareholders at the conclusion of this matter.

13.  As the Court acknowledged in its May 6 Order, the Marcuses have argued from the outset of the distribution process that the GFRDA investors should get the return of their net principal investments plus interest, and that the balance of the funds available for distribution should go to the ATGF shareholders in proportion to their share ownership. We respectfully submit that this is the only methodology that would take account of the differences in the nature of the two different kinds of investments. See Response and Objections of Marcus Claimants (Docket No. 377, ¶¶ 6-28.)

14.  While the May 6 Order rejected the Marcuses' recommendation for purposes of interim distributions -- stating that both categories of investors should be treated in

the same way "based on each victim's investment amount" until the total value of the assets to be distributed becomes clear -- this Court also stated:

> [I]t bears noting that the Receiver's motion is only for an *interim* distribution. If, going forward, the Receiver determines that Amerindo's assets exceed investor claims, plus interest -- for instance, if some of Defendants' risky investments from before 2005 turned out to be winners -- it might be appropriate to allocate gains differently to GFRDA and ATGF investors. The Court, however, will address that situation when, and if, it arises.

(Order, p. 17.)

15. We are not seeking to reargue at this point the final distribution method that should be adopted. However, we believe that pages 16-17 of the Court's May 6 Order are directly relevant to the Additional Claims. We respectfully submit that if -- as we believe -- Ms. Acevedo has already received, by way of redemption, more than the full amount she invested in ATGF, she should not receive any additional funds on account of her ATGF investment until the Court makes its final determinations of what amount should go to GFRDA and "Other" investors, what amount should go to ATGF investors, and how the latter amount should be allocated among the shareholders in ATGF.

**Claim No. 36 Jacqueline A. Gaztambide**

16. Ms. Gaztambide's claim is for $65,000 based on an investment in ATGF.

17. Like the Receiver (Receiver's Response, ¶ 17), the Marcuses have no objection to this claim.

**Claim No. 37 Maria Dichov**

18. Ms. Dichov's claim is for $1,567,528.62. It should be noted at the outset that -- as revealed in her Proof of Claim -- Ms. Dichov's is Mr. Vilar's former wife.

19. The Marcuses respectfully submit that only $500,000 of Ms. Dichov's claim should be allowed. The Receiver does not vary widely from our position, recommending

an allowance of $517,269.39 by adding accrued interest to this figure. However, the Marcuses respectfully submit that allowing such interest now is inconsistent with this Court's May 6 Order directing that interim distributions be based on each Claimant's "investment amount."

20.  With regard to the balance of Ms. Dichov's claim, there is no evidence that Ms. Dichov actually invested any amount in excess of the $500,000 for which she included a wire transfer request in her Proof of Claim. While she relies on an August 17, 2001 letter from Mr. Vilar "agreeing to transfer $2,520,000 as part of divorce settlement," and then goes on to claim: "I used these funds to purchase shares in the ATGF," there is no proof that Ms. Dichov actually made that investment. Although Ms. Dichov has submitted a Statement of Account showing ownership of ATGF shares valued (as of May 31, 2004) at $1,050,259.23 -- and the Receiver has been willing to accept Statements of Account from other Claimants as evidence of an investment -- it is respectfully submitted that the Receiver is correct in refusing to apply the same approach to Ms. Dichov because of her tie to Mr. Vilar, and her admission in her Proof of Claim that the money she allegedly invested in ATGF came from him as part of their divorce settlement.

21.  Mr. Vilar had personal obligations to Ms. Dichov growing from their former marital relationship, and it would have been both very easy (since he was in total control) and cheaper (since he would not have had to pay her any of his personal funds) for him to satisfy those obligations by transferring ATGF shares directly to her. Mr. Vilar had no ownership interest in ATGF so there was nothing he could rightfully transfer to Ms. Dichov, but such conduct on his part would certainly have been consistent with the manner in which Mr. Vilar dealt with ATGF as his personal piggybank. (See Order, p. 2.)

22.    The Receiver has recommended rejecting any portion of Ms. Dichov's claim in excess of $500,000 "in light of Ms. Dichov's personal relationship with Mr. Vilar...." (Receiver's Response, ¶ 20.) We agree, but this is not the sole ground on which this portion of her claim should be rejected. In addition, the rejection should be based upon the absence of any evidence that Ms. Dichov actually invested any of her personal funds in excess of $500,000.

**Claim No. 38 Los Angeles Opera**

23.    With regard to the claim of the Los Angeles Opera, the Receiver recommends allowing a claim in the amount of $721,240.25, which is derived by starting with a $1 million GFRDA investment, adding accrued interest of $271,240.25, and subtracting from that total $550,000 in distributions that were made. (Receiver's Response, ¶¶ 21, 23.)

24.    The Marcuses object to this claim as being filed too late in this proceeding to be allowed. In the alternative, they object to the allowance of any portion of this claim in excess of $450,000.

25.    It is clear from Attachment 1 to the Los Angeles Opera Proof of Claim that the Opera is not really an independent claimant based on any investment made in its own name. Rather, the Opera's claim is based on the fact that the Trustee of the Tara Glynn Colburn Trust authorized that payment be made to the Opera of any distributions attributable to Ms. Colburn's February, 2000 GFRDA deposit in the amount of $1 million.

26.    There can be little doubt that Ms. Colburn's claim was known to all concerned well prior to the September 20, 2013 deadline originally fixed by this Court for the filing of Proofs of Claim in this proceeding. In fact, at page 3 of its May 6 Order, this Court explicitly referred to the fact that its March 11, 2013 grant of the SEC's motion for summary judgment was based in part on Ms. Colburn's investment. The Opera has provided no

justification for the fact that it let the September 2013 deadline established by this Court for filing claims to pass even though Ms. Colburn's claim was specifically mentioned in an opinion by this Court six months earlier.

27.     However, if the Court is prepared to ignore the delay in the filing of the Opera's claim, we respectfully submit that it should limit that claim to $450,000.

28.     Ms. Colburn invested $1 million and $550,000 was paid back to her Trustee pursuant to a settlement agreement entered into in a lawsuit filed by the Trustee. The Marcuses respectfully submit that the $550,000 repaid to the Trust should be deducted from the $1 million invested by Ms. Colburn to calculate her "investment amount" (Order, p. 17) of $450,000. That is exactly what this Court did in calculating the Defendants' wrongful gain from Ms. Colburn (Order, p. 6), and we believe the same approach should be followed here.

29.     Any allowed amount in excess of $450,000 can only be accrued interest. If the Opera is permitted to recover any such amount now, it would be in a position to receive double interest. The reason is that in dealing with the claims made by GFRDA investors, the Receiver intends to add interest from the time of their investment until May 2005 (when Amerindo ceased operations), and to also calculate interest from May 2005 forward. See, for example, Exhibit C annexed to the Receiver's Affidavit of April 17, 2014 (Docket No. 422 at 422-3). To premise such a calculation on an amount that already includes some accrued interest would create a preference in favor of the GFRDA investors -- the precise result which this Court's May 6 Order seeks to avoid.

30.     As is true of Ms. Acevedo, the Los Angeles Opera should not be treated differently from other Claimants in this proceeding by having the principal amount of its claim artificially inflated by an accrued interest figure -- a figure which is then itself used as a basis for

a subsequent interest calculation, resulting in interest on interest. It is respectfully submitted that in order to avoid this result, the Court should limit the Opera's claim to $450,000.

31. Moreover, to hold otherwise -- and to follow the Receiver's approach of basing the calculation of the Los Angeles Opera claim on a figure derived from a lawsuit that the Colburn Trustee brought and subsequently settled -- would be to give the Opera the exact same "special treatment" that this Court has already rejected with regard to the Mayers' claims. (Order, pp. 17-18) ("[C]ourts are not required to favor one victim over others simply because that one raced to the courthouse and obtained a judgment.").

**Claim No. 39 Anna Gladkoff**

32. Ms. Cates has filed a Proof of Claim on behalf of Ms. Gladkoff, her deceased mother. According to Exhibit C, this claim is in the amount of $300,000. However, the supporting documentation submitted (consisting of two letters from Edward Swanson, Ms. Cates' lawyer) indicates that the claim may actually be in the amount of $550,000.

33. The Marcuses respectfully submit that Ms. Gladkoff's claim should be disallowed in its entirety, rather than allowing the $300,000 that the Receiver recommends.

34. The $550,000 allegedly invested by Ms. Cates' mother is discussed at pages 18-19 of this Court's May 6 Order. The Court "defer[red] to the Receiver's judgment to not recognize these claims based on the evidence Cates has provided." It went on to say: "If Cates is able to provide further support -- such as an account statement or more persuasive correspondence relating to these investments -- the Receiver may reconsider these claims for subsequent distributions."

35. Ms. Cates has not submitted any account statements. In fact, page 2 of Mr. Swanson's April 4, 2014 letter to the Court acknowledges that she has no such statements.

Therefore, she has failed to come forward with the first of the two types of additional evidence that the Court stated might satisfy her burden.

36. The inquiry remaining is whether she has come forward with the second -- "more persuasive correspondence relating to these investments." Of the two letters submitted by Mr. Swanson, the first one (dated March 11, 2014) was before the Court at the time of the March 14, 2014 hearing in this matter. Therefore, that letter cannot be the required additional "more persuasive correspondence."

37. That only leaves Mr. Swanson's April 4, 2014 letter. However, this letter merely repeats the arguments contained in Mr. Swanson' earlier letter, and made by him when he appeared before the Court at the March 14 hearing. Therefore, it is respectfully submitted that Ms. Cates' attempt to renew her claim on behalf of her mother should be rejected once again, since the evidence before the Court is really no different now than it was on May 6 when the Court adopted the Receiver's decision not to recognize this claim.

**Claim No. 40 David Mainzer**

38. Mr. Mainzer has made no specific claim and has provided no evidence that he actually invested any money. Even his own claim form refers only to a "subscription agreement."

39. The Receiver recommends that Ms. Mainzer's claim should be disallowed "absent further documentation." (Receiver Response, ¶ 25.) However, even if there was such documentation, the Marcuses respectfully submit that any claim by Mr. Mainzer should nevertheless be disallowed in its entirety.

40. Mr. Mainzer was a shareholder and employee of Amerindo, and we have located public press reports indicating that he was the Chief Operating Officer. While he has

11

been accused of no wrongdoing, we respectfully submit that his intimate involvement with Amerindo and the Defendants means that no claim on his part should be allowed. And, as noted above, no such claim has really been made.

Dated: New York, New York
       August 29, 2014

>BALLARD SPAHR STILLMAN & FRIEDMAN, LLP
>
>By_____
>       Julian W. Friedman (JF 6010)
>425 Park Avenue
>New York, New York 10022
>(212) 223-0200
>
>*Attorneys for Claimants Paul Marcus, The Deane J. Marcus Trust, The Steven E. Marcus Trust, The Cheryl Marcus Podhaizer Trust and The Eve S. Marcus Children's Trust*