UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____X
**SECURITIES AND EXCHANGE COMMISSION**     \*
                                           \*
          **Plaintiff**                 \*
                                           \*
          v.                           \*   **Civ. 05-5231 (RJS)**
                                           \*   **ECF CASE**
**AMERINDO INVESTMENT ADVISORS INC.,** *et al.*,  \*
                                           \*
          **Defendants.**              \*
_____X

### HEITKOENIG CLAIMANTS' OBJECTIONS TO RECEIVER'S MOTION FOR AN ORDER AUTHORIZING AND DIRECTING A SECOND INTERIM DISTRIBUTION

Claimants Alfred Heitkoenig, Elna Charlotte Olga a/k/a Elna Heitkoenig, and Maaike Olga Maria Hickok a/k/a Maaike Heitkoenig (the "Heitkoenig Claimants"), by their attorneys, Loeb & Loeb LLP, hereby submit the following Objections to the Receiver's Motion for an Order Authorizing and Directing a Second Interim Distribution, dated October 31, 2014 (Dkt. No. 499) (the "Receiver's Motion").

**Clarification Regarding Value of Receivership Assets and Inclusion of the UK Benefit Scheme Accounts**

Despite the late stage of these proceedings, it is unclear from the Receiver's numerous, prior filings what he anticipates the total value of all receivership assets to be that will be available for distribution to Claimants. For example, the Receiver's filings in this receivership, including his instant Motion and his Third Status Report (Dkt. Nos. 455 and 499, respectively) make no mention of a very significant asset, namely the assets in the JPMorgan Chase accounts standing in the name of The Trustees of the Amerindo Adv. (UK) Ltd. Retirement Benefits Scheme (the "UK Benefit Scheme"). *See also,* Receiver's Response to Objection to Additional Investor Claims (Dkt. No. 477), Receiver's Motion for an Order (A) Clarifying the Designation of Receivership Assets and other relief (Dkt. No. 491). The issue of the UK Benefit Scheme

accounts was specifically raised by the Heitkoenig Claimants in their August 28, 2014 letter to the Court (Dkt. No. 463, at p. 1), but the Receiver, inexplicably, chose not to address it in his responsive pleading. *See* Response to Objections to Additional Claims, dated September 19, 2014 (Dkt. No. 477, at ¶¶ 3-4). Significantly, and as noted above, the Receiver failed to discuss the UK Benefit Scheme accounts in his Third Status Report, wherein he had a section headed "Identification and Liquidation of Receivership Assets" (Dkt. No. 459, at ¶¶ 13-18).

The UK Benefits Scheme accounts were clearly identified in this Court's Order of Forfeiture of Substitute Assets, dated November 9, 2010. *See* Dkt. No. 463 in S.D.N.Y. Action No. S3 05 Cr. 621 (RJS). Conservatively, it is estimated that these accounts hold assets valued at more than $10 million. Since the UK Benefit Scheme assets were the subject of Defendants' commingling and fraud, they should be part of the receivership assets to be distributed to Claimants. Accordingly, it is respectfully submitted that the Receiver be required to state his position concerning whether the UK Benefit Scheme accounts are part of the receivership assets and, if so, what their current value is. If the Receiver is of the view that the UK Benefit Scheme accounts are not part of the receivership assets, he should fully explain the basis for his exclusion of these accounts from the assets available for distribution.

In addition, there appears to be a major discrepancy (of approximately $450,000) in the Receiver's financial calculations. Specifically, in the Receiver's Second Status Report, dated October 13, 2013, he reported that he had approximately $21,000,000 in distributable assets on hand (Dkt. No. 314, at p. 3, ¶ 11). Thereafter, in his Third Status Report (at Exhibit D), the Receiver reported a November 7, 2014 stock sale of Sirius XM Radio Inc. stock with net sale proceeds of $1,071,477.65. Thus, prior to the First Interim Distribution, the Receiver had on hand $22,071,477.65. The Receiver then made the following distributions: the First Interim Distribution (of $18,718,060.86), the JPMorgan legal fees (of $206,047.81), and allowed

administrative costs (of $155,972.46). Following these disbursements, the Receiver should have had a cash balance of $3,353,417.65. However, in the instant Motion, the Receiver reports a cash balance immediately following the First Interim Distribution of only $2,757,066.95 (Dkt. No. 499, at p. 3, ¶ 7). Furthermore, in his Third Status Report, the Receiver reported cash proceeds of $14,400,804.73 from various sales of publicly-traded companies (Dkt. No. 455, at p. 4, ¶ 14 and Exh. D). As the chart below demonstrates, after the described transactions, the Receiver should have $17,392,201.25 in cash on hand. However, his instant Motion reports a cash balance of only $16,942,215.20, a discrepancy of **$449,986.05**. The Receiver's Motion provides no explanation for this huge discrepancy. A summary of the amounts reported by the Receiver and leading to the discrepancy are set forth below:

| 1 | **RECEIVER'S SECOND STATUS REPORT (10/04/2013; Dkt. No. 314)** at page 3, ¶ 11: | $21,000,000.00 |
|---|---|---|
| 2. | **RECEIVER'S THIRD STATUS REPORT (7/29/2014; Dkt. No. 455)**<br>a)  EXHIBIT D: trade date Nov. 7, 2013<br>b)  at p. 3, ¶ 10: First Interim Distribution<br>c)  at p. 3, ¶ 11: Receiver disbursements through June 23, 2014 | 1,071,477.65<br>(18,718,060.86)<br>(206,047.81) |
| 3. | **RECEIVER'S MOTION FOR SECOND INTERIM DISTRIBUTION (10/31/14; Dkt. No. 499)** at p. 3, ¶ 7: allowed administrative costs<br>* it is unclear whether any of these costs are included in 2(c) above | (155,972.46) |
| 4. | **RECEIVER'S THIRD STATUS REPORT (7/29/2014; Dkt. No. 455)**<br>EXHIBIT D: stock sales in July 2014 | 14,400,804.73 |
|  | **TOTAL AMERINDO RECEIVERSHIP ASSETS** | $17,392,201.25 |
|  | **TOTAL AMERINDO RECEIVERSHIP ASSETS REPORTED BY RECEIVER IN INSTANT MOTION (Dkt. No. 499, at p. 3, ¶ 7)** | $16,942,215.20 |
|  | **DISCREPANCY AMOUNT** | **$449,986.00** |

Moreover, in the Receiver's Third Status Report, the Receiver states that his Exhibit H to that Report is a "schedule of all actual and **potential** cash assets in the estimated aggregate amount of $24,904,396.00" (Dkt. No. 45, at p. 6, ¶ 20) (emphasis added).  However, Exhibit "H" is entitled simply "Cash".  The Receiver's Exhibit "H" makes no mention of any of the following receivership assets:

1)   The additional shares of Sirius XM Radio, Illumina, Alexion Pharmaceuticals or Dick's Sporting Goods referenced in paragraph 15 of the Third Status Report (Dkt. No. 455, at p. 4, ¶ 15);

2)   The shares of 18 private companies identified in paragraph 16 of the third Status Report with an "estimated aggregate value of…….is $15,816,682.00" (Dkt. No. 455, at p. 5, ¶ 16);

3)   The 13 privately-held companies discussed in paragraph 17 (which do not even have an assigned value at this late date of these proceedings) (Dkt. No. 455, at p. 5, ¶ 17);[1] and

4)   No mention is made anywhere of the UK Benefit Scheme, which is expected to be worth more than $10,000,000.[2]

The Heitkoenig Claimants remain very concerned with the Receiver's extended delay in selling the private securities and other instruments because, among other reasons, an unexpected market correction may substantially impair their value.  The Heitkoenig Claimants respectfully request that the Court set a deadline by which the Receiver must (1) liquidate the remaining non-cash assets or (2) make a submission explaining why the Receiver has not been able to do so.  In

---

[1] Valuation and liquidation of the private company securities should be undertaken by the Receiver promptly so the Court and the Receiver will know the true amount available for distribution, since the amount for distribution should impact the method adopted by the Court and the Receiver to value the Claims and distributions.

[2] Although it is not stated expressly by the Receiver, it appears that the shares of the 7 publicly-traded companies referenced in paragraph 14 of his Third Status Report, with proceeds of $15,472,282.38, may be included in Exhibit H.  The Receiver should so clarify.

addition, we respectfully request that the Receiver be required to address the UK Benefit Scheme accounts and the other discrepancies raised herein.

**Understatement of Heitkoenig Claims**

Following the Receiver's allowance of numerous late filed claims, the Heitkoenig Claimants submitted a corrected, amended Proof of Claim, since their original Proof of Claim had inadvertently understated the correct amount of their claim by $824,221.83.  The Receiver has not taken a position on the Heitkoenig Claimants' amended Proof of Claim.  The Heitkoenig Claimants respectfully request that their amended Proof of Claim be accepted and approved, and be utilized in determining the amount of their Second Interim Distribution.  There is no legitimate reason for the Heitkoenig's amended Proof of Claim, which was properly supported and documented, not to be accepted in full by the Receiver, especially in light of the numerous incomplete and/or questionable claims that the Receiver has accepted and approved for distribution from other parties.

**The Receiver's "Pooling Method of Net Contribution Amounts" Methodology is Fundamentally Unfair and Inappropriate, and Should be Rejected with Respect to ATGF Claimants**

The Heitkoenig Claimants object to the methodology the Receiver continues to use, namely, the Pooling Method of Net Contribution Amounts ("NCAP Method") (which appears to have been determined by the SEC, rather than the Receiver).  *Compare* Dkt. No. 355 with Dkt. No. 370.  The Receiver's current methodology results in ATGF shareholders receiving different share prices for their ATGF investments, which is fundamentally unfair, as well as easily subject to manipulation by Claimants.  The unfair effect of the Receiver's flawed methodology was previously described in detail by the Heitkoenig Claimants in their Post-Hearing Objections to Claims (Dkt. No. 412, at pp. 13-15, ¶ IV(F)), where they specifically addressed the Proof of Claim submitted by Anthony W. Gibbs as illustrative of the inequities in utilizing the NCAP

5

Method, rather than a uniform ATGF share price. For the Court's ready reference, an excerpt from Heitkoenig Claimants' Post-Hearing Objections to Claims relating to the Gibbs' Claim is attached hereto as Exhibit A.

Furthermore, the Heitkoenig Claimants fully support and join in the Objections filed by the Marcus Claimants to the Receiver's Motion for a Second Interim Distribution (Dkt. No. 504). As established in the Marcus' Objections, as well as the prior filings of the Heitkoenig Claimants, absent application of one, uniform share price for ATGF shares, it is likely that many ATGF Claimants will be overpaid in the Second Interim Distribution proposed by the Receiver. Accordingly, the Heitkoenig Claimants respectfully submit that the Receiver's current valuation method (the NCAP Method) should be rejected and a uniform ATGF share price utilized to value the claims of each of the ATGF Claimants.

**WHEREFORE**, ALFRED C. HEITKOENIG, ELNA HEITKOENIG, and MAAIKE HEITKOENIG respectfully submit that:

1. The assets in the JPMorgan Chase account in the name of The Trustees of the Amerindo Adv. (UK) Ltd. Retirement Benefits Scheme should be part of the receivership assets and available for distribution to the Claimants in this receivership proceeding and the Receiver should clarify his financial calculation as detailed above;

2. The Heitkoenig Claimants' Amended Proof of Claim should be accepted in its entirety and utilized when determining the amount of their Second Interim Distribution; and

3. A uniform ATGF share value should be used in valuing ATGF allowable claims.

Dated: New York, New York
November 17, 2014

                      Respectfully submitted.

                      **LOEB & LOEB LLP**

                      s/ Paula K. Colbath
                      Paula K. Colbath
                      345 Park Avenue
                      New York, NY 10154
                      Tel. 212.407.4905
                      Fax: 212.937.3189
                      E-mail: pcolbath@loeb.com

NY1310170.2

# EXHIBIT A

# EXHIBIT A

## FROM HEITKOENIG CLAIMANTS'
## POST-HEARING OBJECTIONS TO CLAIMS

F.    <u>Anthony W. Gibbs (Gazes #22)</u>

Mr. Gibbs includes documentation from mid-1991 thru late 1999 in support of his claim. This claim is objectionable and must be disallowed due to incomplete and questionable documentation. Mr. Gibbs' documentation is unreliable, since it is dated more than a decade before Amerindo's operations ceased in May 2005. At a minimum, Mr. Gibbs should be required to submit a declaration concerning why he has no other documentation supporting his claim.

The Gibbs' claim is also important because it demonstrates the inequities that arise out of the Receiver's proposed ATGF claim valuation method as proposed in his Amended Motion and supported by the SEC.

First, under the initial Motion filed by the Receiver, the Gibbs allowable claim for the initial distribution was $367,524.84, which represented the number of ATGF shares, 17,746.25, multiplied by the ATGF NAV that was applied to all ATGF investor claimants in the Receiver's first proposal, $21.70 per share. The initial calculation was an equitable initial distribution; namely, that all ATGF investor claimants receive an equal ATGF NAV per share valuation and that ATGF NAV ($21.70) be multiplied by the verified number of outstanding shares of each Amerindo ATGF investor claimant.[3]

---

[3] The Heitkoenigs assert that the ATGF NAV is understated at $21.70, and that this issue merits further investigation and study, which has yet to be done after nine years. Indeed, to the best of the Heitkoenigs knowledge, there has been no study or investigation of the ATGF investment vehicle, the ATGF investor claimants, or the ATGF Custodian, Bear, Stearns & Co. It is believed that if such an investigation was completed, the investigation would establish that the ATGF NAV is a multiple of $21.70. The Heitkoenigs' support an award of fees to the Receiver to enable him to thoroughly investigate these ATGF issues.

1

Under the valuation in the initial Motion, as shown above, the allowable claim would have been $367,524.84. However, under the valuation method utilized in the Receiver's Amended Motion (initiated and/or endorsed by the SEC), Mr. Gibbs is set to receive $1,287,619.98 (assuming he is required to properly document his claim) – an increase of 350%.

Under the Receiver's revised proposed method of valuation (set forth in his Amended Motion), an ATGF investor's claim is (inconceivably) valued at either 1) the original amount contributed (in some instances, amounts dating back approximately 20 years), or 2) the last statement presented by the Amerindo ATGF investor claimant. A further review of Mr. Gibbs' claim shows the unfairness of this approach:

In his claim, Mr. Gibbs includes an August 7, 1991 fax from Defendant Vilar, which states "The Net Asset Value as of July 31, 1991 of the Amerindo Technology Growth Fund is $8.3539. The value of 19,213 shares is thus $160,510.00. Since the inception date of June 16, 1985, the Fund has increased 60.5%." This demonstrates that Mr. Gibbs purchased his shares somewhere between June 16, 1985 and July 31, 1991 at a price somewhere between $5.00 (60.5% of $8.35) and the NAV of July 31, 1991 of $8.3539.

Mr. Gibbs' POC states "I do not have a recollection or records as to when and how much was invested. The records, which I do have, incorporated herewith, reflect the value of my account as of November 16, 1999 was $1,287,618.98."[4]

Assuming for purposes of this illustration, Mr. Gibbs had documentation showing he purchased his shares sometime in 1991 at an NAV of $8 per ATGF share, his stated POC would be for 17,426.25 ATGF shares and thus at $8 per share. His claim amount would be $139,410, but the Receiver now values Mr. Gibbs' claim at $1,287,619.98. Some claims are valued by the

---

[4]The Heitkoenigs disagree with any valuation of the Gibbs' claim based on purported investments during the period from 1985-1991.

2

Receiver at the amount originally invested by certain ATGF investor claimants and other ATGF investors' claims are valued by the Receiver using their last statement submitted, which is inequitable. Again, using the example of Mr. Gibbs' account, this shows a variation in value between the two (2) valuation methodologies of 924%.

In the Heitkoenigs' ATGF POC claim, they submitted their last five Amerindo statements of account (as directed by the Receiver's clear instructions in the POC). These Amerindo statements were dated June 30, 2000, June 30, 2001, December 31, 2002, May 31, 2002 and May 31, 2004. The ATGF NAV in the latest Amerindo statement received is $21.8052 and their 90,000 ATGF shares are valued by the Receiver at $1,962,468.

However, had the Heitkoenigs ignored the Receiver's instructions and included only Amerindo statements from the 1990's and included their June 30, 2000 Amerindo statement as their "last" Amerindo statement received, their 90,000 ATGF shares would be valued by the Receiver at an ATGF NAV of $114.1954 for a Heitkoenig ATGF claim of $10,277,586 – an increase of 524%. Given the wide variations in the nature and type of documentation supporting the various claims and the susceptibility of fraudulent claims, a uniform methodology should be used.

The Heitkoenigs respectfully submit that the only equitable valuation method is that one ATGF NAV apply to all ATGF investor claimants.