UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



SECURITIES AND EXCHANGE
COMISSION,

                Plaintiff,

-v-

AMERINDO INVESTMENT ADVISORS
INC., *et al.*,

                Defendants.

No. 05-cv-5231 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

    Now before the Court is a motion by Ian J. Gazes, the Court-appointed Receiver (the "Receiver"), for an Order authorizing a second interim distribution of funds in partial satisfaction of allowed investor claims (the "Second Interim Distribution"). (Doc. No. 499.) For the reasons set forth below, the Receiver's motion is granted.

A. Background

    The Court assumes the parties' familiarity with the facts of the case and summarizes only those relevant to the instant motion. On February 24, 2014, the Receiver filed a motion to fix investor claims. (Doc. No. 370.) On May 6, 2014, the Court issued a Memorandum and Order, which, *inter alia*, granted the Receiver's motion and approved the Receiver's proposed method for valuing investor claims (the "NCA Method"). (Doc. No. 432 (the "May 6 Order").) According to the NCA Method, GFRDA claims are valued at the last account statement amount minus subsequent distributions, and ATGF claims are valued at the initial investment amount minus subsequent distributions, or, if the initial investment amount cannot be determined, at the last available statement amount minus subsequent distributions. (*Id.* at 4.) On July 29, 2014, the

Receiver filed a status report that, among other things, informed the Court that seven additional investor claims (the "Additional Claims") had been filed. (Doc. No. 455.) The Court then ordered the Receiver to submit a letter informing the Court as to his position on the Additional Claims and invited other claimants to do the same. (Doc. No. 459.) The Court received the Receiver's response (Doc. No. 466) and objections from four parties (Doc. Nos. 463, 464, 467, 468), as well as a reply to the objections (Doc. No. 477) and a supplemental submission from the Receiver (Doc. No. 493). On October 16, 2014, the Court approved the Additional Claims in amounts set forth in that Order. (Doc. No. 495.)

On October 31, the Receiver filed the instant motion for an Order authorizing a Second Interim Distribution, in amounts as set forth in Exhibit A to the motion. Like the First Interim Distribution, the proposed Second Interim Distribution is based on the NCA Method. (Doc. No. 499 & 499-1.) In response to this motion, objections were filed by Defendants (Doc. No. 501 (the "Defendants' Objections")); Paul Marcus, The Deane J. Marcus Trust, The Steven E. Marcus Trust, The Cheryl Marcus-Podhaizer Trust, and The Eve S. Marcus Children's Trust (the "Marcus Claimants") (Doc. No. 504 (the "Marcus Objections")); Lisa and Debra Mayer (the "Mayer Claimants") (Doc. No. 505 (the "Mayer Objections")); and Alfred Heitkoenig, Elna Charlotte Olga, a/k/a Elna Heitkoenig, and Maaike Olga Maria Hickok, a/k/a Maaike Heitkoenig (the "Heitkoenig Claimants") (Doc. 506 (the "Heitkoenig Objections")). Additionally, a response to the objections of the Marcus Claimants was filed by Maria Dichov, Jacqueline Gaztambide, and Ana R. Acevedo (Doc. No. 508). The Receiver submitted a reply to all the objections. (Doc. No. 509 (the "Reply").)

B. Discussion

The objections to the proposed Second Interim Distribution primarily target the NCA Method for valuing investor claims for the distribution. Accordingly, the Court addresses those objections first and then turns to the other objections.

1. Objections to NCA Valuation Method

Defendants and the Marcus, Mayer, and Heitkoenig Claimants all object to the Receiver's use of the NCA Method in valuing claims for the Second Interim Distribution. As noted previously, the Court approved the NCA Method for the First Interim Distribution as the more equitable approach for valuing claims "because of the commingling of assets and the similar treatment of all investor funds" by Defendants. (May 6 Order at 17.) The Court found that there was no basis for treating ATGF shareholders differently than GFRDA shareholders at the interim distribution stage, and that in light of Defendants' indiscriminate conduct, a pro rata distribution based on investment amount – or as near to pro rata as could be determined – was appropriate. (*Id.* at 16–17.) As none of the objections received by the Court in response to the Receiver's motion undermine this previously articulated conclusion, the Court determines that the NCA Method remains appropriate for the reasons stated in the May 6 Order.[1]

The Marcus Claimants object "that certain ATGF Claimants may receive Interim Distributions greater in amount than the total to which the Court *ultimately* determines they are entitled." (Marcus Objections at 2–3 (emphasis added).) But this concern is misplaced. Although the May 6 Order acknowledged that it might be appropriate to allocate gains

---

[1] The Marcus Claimants also contend that the NCA Method can be "abuse[d]" if (1) "ATGF Claimants who invested when the shares were at their highest price chose to base their claims on their original investment amounts – rather than submitting subsequent statements they received showing lower per share values," or (2) "Claimants who submitted monthly statements chose earlier ones showing high share valuation, and conveniently ignored subsequent statements showing lower figures." (Marcus Objections at 7–8.) As to the first possibility, given that the NCA Method is keyed toward the original investment amount, the posited scenario would plainly not be "abuse." As to the second, claimants must submit declarations "swearing to the accuracy of the claim" in order to receive a distribution (May 6 Order at 20), thereby limiting the potential for the abuses stressed by the Marcus Claimants.

differently between GFRDA and ATGF investors at a later stage of the distribution process (May 6 Order at 17), the Court made no suggestion that a different valuation method would apply retroactively to investors' *principal*. Rather, a new method would be considered only in the event that there is a *surplus*, over and above the principal. That is, once the investors have had their principal paid out in full pursuant to the NCA Method, it may be appropriate to allocate money left over, if any, in a different way. Accordingly, the Marcus Claimants' fears as to the risk of overpayment, and the potential need for a "clawback," are not justified.

### 2. Defendants' Objections

In addition to vague objections to the Receiver's "arbitrary determinations" and to a bank error that the Receiver's motion already addressed, Defendants object – as they did when the Court sought submissions regarding the Additional Claims – to the claim of Anna Gladkoff, submitted by Ms. Gladkoff's daughter, Lily Cates, as Gladkoff's heir (the "Gladkoff Claim"). (Defendants' Objections at 3–4.) Defendants argue that Gladkoff's initial investment was in the Amerindo B2B Mutual Fund, which merged into the Amerindo Technology Fund, and was subsequently transferred to Munder Capital – and is thus not part of the Receivership. (*Id.*) Supposedly in support of this argument, Defendants reference a newly-discovered court filing by Cates from a different proceeding that purports to demonstrate Cates's and her lawyers' understanding that the "Amerindo Technology Fund" became the "Munder Internet Fund," and assert that this understanding precludes the Gladkoff Claim as against Receivership assets. (*Id.*) However, the Gladkoff Claim was not permitted to proceed on the basis that Gladkoff and Cates did not *know* about Munder Capital; rather, it was allowed to proceed because there is no evidence that Gladkoff's $300,000 investment was in the B2B Mutual Fund in the first place, and because there is evidence indicating that the investment was in one of the funds subject to the Receivership. Specifically, the named payee on Gladkoff's investment check is "Amerindo

4

Investments" (Doc. No. 466-7), and Cates's lawyer, Edward Swanson, submitted a letter on September 16, 2014 informing the Court that Munder's managing director/general counsel told him that there was no account in Gladkoff's or Cates' name in any of the funds transferred from Amerindo to Munder (Doc. No. 473). While the passage of time and Defendants' non-maintenance of investment records have rendered the record sparse, the Court is satisfied that the Gladkoff Claim is no less documented than other claims, and should be allowed to proceed. Accordingly, this objection is denied.

### 3. Heitkoenig Objections

The Heitkoenig Claimants object to (1) the lack of clarity as to whether the assets in the UK Benefit Scheme accounts constitute receivership assets, (2) a discrepancy in the Receiver's calculations, and (3) an alleged understatement of the Heitkoenig Claim. (*See* Heitkoenig Objections.) As to the first two objections, the Court is satisfied that the Receiver's Reply appropriately addressed the status of the UK Benefit Scheme accounts and the accuracy of the Receiver's calculations regarding the purported discrepancy highlighted in the Heitkoenig Objections.

As to the alleged understatement of the Heitkoenig Claim, the Heitkoenig Objections assert that "the Heitkoenig Claimants submitted a corrected, amended Proof of Claim, since their original Proof of Claim had inadvertently understated the correct amount of their claim by $824,221.83," which they contend should be used to determine the amount of their Second Interim Distribution. (*Id.* at 5.) In his Reply, the Receiver countered that "*no* actual proof of claim was ever filed or received. Rather, Mr. Heitkoenig submitted a letter to the Court asserting he was entitled to an amount greater than that proposed by the Receiver for the First Interim Distribution." (Reply (citing Doc. No. 431).) Although the Receiver referenced a letter from Alfred Heitkoenig dated May 1, 2014 reflecting this purported entitlement (*see* Doc. No. 431),

the Court concludes that the Heitkoenig Claimants were instead referring to a different letter from Alfred Heitkoenig, dated August 28, 2014 (Doc. No. 463). In that letter, Mr. Heitkoenig argued that because Amerindo unilaterally lowered the interest rate on the Heitkoenig Claimants' GFRDA account – initially from 15% down to 13%, then to 11%, at which time Mr. Heitkoenig began demanding return of the principal, and then eventually down to 5% – the Heitkoenig Claimants should be entitled to recalculate accrued interest at a rate of 11%, resulting in a $824,221.83 increase to their GFRDA claim. Although the Receiver did not directly respond to these contentions, the Court ultimately finds the Heitkoenig Claimants' argument to be unpersuasive. First of all, many other GFRDA investors had their interest rates unilaterally reduced, so the Heitkoenig Claimants are not in a unique position in this regard. Second, had the Heitkoenig Claimants actually been able to take their money out of the GFRDA and invest it in a manner similar to that which was promised by Defendants – that is, had they invested between two-thirds and three-quarters of their investment in short-term debt instruments and the remaining one-quarter to one-third in the stock of publically traded emerging growth companies, *see United States v. Vilar*, 729 F.3d 62, 68 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2684 (2014) – it is very unlikely that the return on their investment would have been higher than their rate of accrual under the GFRDA.[2] Accordingly, the Court declines to recalculate the Hietkoenig Claims and the claims of other GFRDA investors in this manner. While the Court is sympathetic to the concerns of the Heitkoenig Claimants and all other GFRDA and ATGF investors, the fact remains that no distribution plan will be perfect. Nevertheless, the Court finds that the proposed

---

[2] For comparison, had they invested in two Vanguard funds that would combine to have the same profile as promised by Defendants with respect to the GFRDA – that is, had they invested 65–75% of their assets in Vanguard Short-Term Bond Index Fund Investor Shares (VBISX) and 25–35% in Vanguard Growth Index Fund Investor Shares (VIGRX) – the Heitkoenig Claimants would have fared substantially worse than they did under the reduced rates unilaterally imposed by Defendants. During that period, VBISX increased by 2.87%, while VIGRX *decreased* by 32.38%. In contrast, the Heitkoenig Claimants accrued interest at rates between 5% and 11% throughout this period.

distribution plan is fair and reasonable in light of the nature of Defendants' scheme and the passage of time since the fraudulent activity underlying this action. *See SEC v. Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009).

### C. Conclusion

Having reviewed the Receiver's motion, all of the objections and responses, and the Receiver's Reply, the Court determines that the Receiver's proposed Second Interim Distribution, as set forth in the Second Interim Distribution Schedule, is fair and reasonable. Accordingly, IT IS HEREBY ORDERED THAT the Receiver's motion for a Second Interim Distribution is GRANTED. The Receiver shall distribute funds according to the schedule set forth in the Second Interim Distribution Schedule. The Clerk of the Court is respectfully directed to close the motion pending at docket entry number 499.

SO ORDERED.

Dated:   December 30, 2014
         New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE