UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| SECURITIES and EXCHANGE COMMISSION | 05 cv 5231 (RJS) |
| | DECLARATION |
| v. | |
| | in support of |
| AMERINDO INVESTMENT ADVISORS Inc, | Reconsideration of |
| Et al. | Order (DOC 510) |

_____

Vivian Shevitz, under penalty of perjury, hereby declares:

1.   The Court approved the receiver's second distribution (DOC 510, 2/31/14). The Court should reconsider.

2.   <u>There is a stay in effect</u>:  The Court overlooked the stay of distribution of substitute assets issue by the United States Court of Appeal for the Second Circuit. (DOC 38, 13-2527, 13-2550).   The stay has never been dissolved.  The SEC's position that it does not apply to it or its receiver is unfounded.  It is misleading the Court.

3.   The sole authority for the receiver to be holding the funds in the first place is that they are the properties designated substitute assets previously.  The Receiver so stated to the Grand Cayman Court.  The stay applies in this case.

4.   <u>The receiver's methodology, imposed by the SEC, is unjustified and is subject to appeal</u>:  The receiver's methodology for valuing claims is subject to the pending appeal before the Second Circuit. (14-2425). Even its long-standing clients have now argued that the methodology is contrary to their investments, and contrary to

standard investment industry norms.  Because the SEC's method relies on client-based documents, it has encouraged "gaming" among clients for their personal gain by using selected client statements.

5.  As Mr. Marcus states, the receiver and SEC should go back and use the best evidence – the Amerindo Panama books and records – which the SEC refused to look at (see DOC 201) in determining values of investor claims.   (E.g., DOC 504).

6.  The passage of time does nothing to justify the SEC's refusal to evaluate the books and records:  the funds of Amerindo Panama have been frozen since Day One, and the books and records have been held in government custody.  Indeed the express purpose of the MLAT and the UK search was to obtain those records.  The SEC's refusal to look at them or allow the receiver to do so is unjustified, as is the reliance on SEC v. Byers, 637 F. Supp.2d 167, 174 (S.D.N.Y. 2009):  unlike Byers, this was not a Ponzi debtor and (as Judge Newman noted at the argument on the appeal in the criminal case, 10-521) this debtor was not insolvent.  The fact that there are funds to pay investors now (despite the wrongful destruction of 98% of defendants' assets in Amerindo U.S.) is a testament to that.

7.  Further, it is only *ipse dixit* of the SEC that supports any theory that GFRDA and ATGF investors were treated "the same."  Clients have told the Court the SEC is wrong about this.  (DOC 504, 505, 506).  Clients were treated on the basis of the investment types they had purchased.  Account statements submitted in the claims

process and earlier by the prosecutor show this.  The books and records of Amerindo Panama would and do make this point clear.

8.  Nor does any "commingling" change this.  Contrary to the SEC's superficial objection to "commingling", Amerindo Panama investors were not Advisory clients and did not expect segregated accounts.

9.  "Commingling" as done here was consistent with foreign laws under which Amerindo Panama operated its securities business.  The Second Circuit has noted that it is a practice that itself is not "nefarious."

10. The SEC has not allowed litigation of this issue in this case. [1] "Commingling"

---

[1] Second Circuit decisions have noted that commingling is normal in the securities industry, and as long as proper accounting is used, there is nothing nefarious.  As noted in Capital Management Select Fund, Ltd., 680 F.3d 214 (2d Cir. 2012), customers seek out foreign investments to increase their returns through brokers' ability to commingle and leverage assets, as was done by Amerindo Panama.  The Court wrote:

> … [A]t least in the United States, brokers' rehypothecation activities have long been restricted by federal and state law, and by rules promulgated by the principal stock exchanges.  These restrictions generally limit a broker's ability to commingle its customers' securities without their consent ….

> The upshot of these restrictions is that in the United States, brokers and investors alike are limited in the amount of leverage that is available to amplify returns… .[S]ince the development of globalized capital and credit markets, investors have sought to avoid these limitations by seeking unrestricted margin financing through, among other sources, unregulated offshore entities. …
> ***

was not part of the criminal case, was not tried or fleshed out, and was injected by

the SEC without analysis.   SEC commingling rules do not apply to offshore

securities businesses. Section 30(b) Exchange Act, quoted in *Morrison*.

   11.  The GFRDA circulars, overlooked by the SEC and the Court, made clear

---

RCM Customers' securities and other property deposited in their
accounts were not segregated but were commingled in a fungible pool.
As a result, no particular security or securities could be identified as
being held for any particular customer. Such a practice is common in
the brokerage industry. *See Levitin v. PaineWebber, Inc*., 159 F.3d 698,
701 (2d Cir. 1998) ("Customer accounts with brokers are generally not
segregated, e.g. in trust accounts.  Rather, they are part of the general
cash reserves of the broker."); U.C.C. § 8-503 cmt. 1   ("[S]ecurities
intermediaries generally do not segregate securities in such fashion that
one could identify particular securities as the ones held for
customers."); …("[W]hen [customers of broker- dealers] leave free
credit balances with a broker-dealer the funds generally are not
segregated and held for the customer, but are commingled with other
assets of the broker-dealer and used in the operation of the business.").

Levitin v. Paine Webber, Inc., 159 F.3d 698 (2d Cir. 1998), was even more
specific; pooling assets and retaining earnings is not nefarious (footnotes omitted):

      …. The practice of broker-dealers commingling funds securing
short sales and retaining earnings from the use of such funds is long-
standing. It is mentioned in texts that are over two-generations old, ….
…[T]he practice of a financial institution using money deposited with
it to obtain earnings is neither unknown nor unexpected, much less
nefarious. That is precisely how banks make money. Some bank
accounts are not interest-bearing--e.g., most checking accounts--even
though the balances in such accounts are used by banks to earn money.
Even interest-bearing bank accounts--and money market accounts with
brokers for that matter--do not return to the investor the amount earned
but rather pay a contractual rate. None of these routine practices is
regarded as deceptive or even unusual. …

that monies would be commingled in pooled venture accounts, which would allow

greater returns.  GX3035-B (pasted below), one of the Offering Circulars ignored by

the SEC. states that clients' cash would be deposited either in their names "or directly

into the Amerindo …Venture Fund), which was a pooled account for Fixed

Deposits), and that they would earn a specific interest rate "subject to renegotiation

… at maturity."

<u>GUARANTEED FIXED INTEREST DEPOSIT ACCOUNT</u>

Amerindo offers three types of fixed deposit accounts.

The three types of client fixed deposit accounts described below are
pooled into three master accounts which are lodged with various
custodians.

<u>1. Cash Account</u>

Clients deposit cash into a designated account in either their name or
directly into the Amerindo International Venture Fund account at one of
Amerindo's custodians in New York. Amerindo's principal pooled account
for Fixed Deposits, the Amerindo International Fixed Venture Fund, is
further sub-custodied at various New York City banks, such as Chase
Manhattan Bank, Citibank, N.A.

Amerindo guarantees to pay a fixed rate of interest typically for either
twelve or twenty-four months. Interest can be paid quarterly directly to
the client's deposit account or to any other account the client wishes.
Fixed Deposit renewals are subject to renegotiation of the interest rate
at maturity.

These deposits pay an attractive premium over prevailing market rates.

12. Records of clients' Panama investments that the SEC refuses to reference

show that the back office of Amerindo UK, whose operations were regularly

inspected and passed by British financial authorities, were proper and appropriate

accounting mechanisms for all the investments.  No one looked at the books and

records, at trial, or afterward.  Nonetheless, the Second Circuit's affirmance of the

mail fraud count was on the basis that the government had *not* proved that the Cates account statement was itself false.  Other than management fees owed to defendants (and their reinvestment) for amounts attributable to ATGF management, defendants had no funds of their own commingled with investor funds.  The fact of commingling is no basis to dispense with evaluation of the Amerindo Panama investors' claims based on its books and records.

13. Nor, the records show, were there "unilateral" reductions of any GFRDA investor's rate of interest.  As shown in the pasted GFRDA circular, above, GFRDA investments were subject to a per annum rate of interest.  Panama GFRDA investors opted for those rates because the rates offered by Amerindo Panama were above market rates.  The Court's statement in DOC 510 that "many other GFRDA investors had their interest rates unilaterally reduced" is unsupported.  The Amerindo records would show mutual acceptance of rates of interest for years.   The same is true of Mr. Heitkoenig.  He is well aware of the precipitous steady decline in interest rates from all-time high 1990's levels, during which time he was regularly paid generous interest rates, while protected by the Amerindo guarantee.

14. Ironically, the Court concluded (DOC 510 p.6) that, had the GFRDA investors' funds been invested "as "promised by Defendants" ("between two-thirds and three-quarters … in short term debt instruments and the remaining one-quarter to one-third in the stock of publically traded emerging growth companies"), their

returns would have been *less* than the above-market interest rates the Amerindo investors received (and would receive in a fair distribution premised on the account records.)  The Court's conclusion that the manner of investment *increased* returns, instead of reducing them, is the best refutation of loss causation in this case.   The Court of Appeals will be considering this.

15. The receiver's methodology and his/the SEC's decision to simply avoid looking at the Amerindo books and records is subject to the pending appeal before the Second Circuit (14-2425).  (At the same time the receiver has not maximized assets.  To the contrary, the initial "cap" at $50,000 for receiver expenses has been exceed tenfold already.  His expense have magnified because acceding to the SEC, he has refused to look at them).  Unless the SEC moves to dissolve the stay issued previously, it and its receiver should are bound by the stay imposed previously by the Court of Appeals.  The stay remains in effect.

16. <u>Contrary to the court's conclusion, there is evidence (Ms. Cates' own words) that her mother's investment was in the B2B fund.</u>  At p. 4 the Court wrote that it was approving the Cates $300,000 claim because "there is no evidence that Gladkoff's $300,000 investment was in the B2B Mutual Fund in the first place."  Ms. Cates said so herself.

17. At the March 14, 2014 hearing, page 44, Edward Swanson said: "Lily subsequently found a cancelled check which we delivered to the Court in March in

our revised proof of claim.   That check, which the Court has a copy of, is made out,

it's from Anna Gladkoff, Lily Cates to Amerindo Investments and it says in the

memo at the bottom: Amerindo B2B mutual fund."   DOC 466-7 (Cates' late claim)

contains a photocopy of the canceled check (pasted below).   The memo "Amerindo

B2B Mutual Fund" is in Ms. Cates' handwriting.



18. The Court has been misled.   The Court of Appeals will soon be considering

the receiver's methodology, prompted, as it was, by the SEC's instruction to him to

treat this as a Ponzi case.  More to the point, the Court of Appeals stayed the distribution of the property called "substitute assets." This Court's decision to allow another distribution of the substitute assets now should be reconsidered.  Even if the Second Circuit stay were not in effect, the court should itself grant a stay.

January 6, 2015

/s/

Vivian Shevitz