UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| SECURITIES and EXCHANGE COMMISSION | 05 cv 5231 (RJS) |
| | CROSS MOTION FOR RECUSAL, |
| v. | RELEASE OF UK PENSION |
| | ACCOUNT, FOR A STAY, and |
| AMERINDO INVESTMENT ADVISORS Inc., | for CJA FUNDS *nunc pro tunc*. |
| | And DECLARATION |
| _____ | in opposition to receiver |
| | motions 548 and 549 |

1. Motion to Recuse/Disqualify For Partiality and the Appearance of Partiality: In light of Judge Richard J. Sullivan's continued allowance (see DOC 547) of SEC/receiver applications to take more and more of defendants' "substitute assets" by way of appealed, disputed receivership rulings, involving arbitrary valuations and unnecessary "work", and where Judge Sullivan's increase of defendants' sentences in the criminal case *because* of "resistance" to the receiver and the receivership, defendants' **move**[1] pursuant to 28 U.S.C. 455(a) and (b) for recusal.

2. Judge Sullivan is required to step aside.  Asked to rule on further receivership motions to grab property, Judge Sullivan is unable to be impartial, and/or gives the public perception of partiality, given (i) his increase in defendants' sentence in the criminal case on the basis of their litigation positions in *this* civil case, (ii) admitted *ex parte* communications with the SEC/receiver (Tr. October 25, 2013)[2] which then formed the basis for the *sua sponte*

---

[1] This Court has apparently dispensed with requirement of Notice of Motion, and also the previously-invoked requirement of pre-motion conference.  We raised these objections to the previous "motion" filed by CBIZ, supported by the SEC; the Court ignored the procedural failings and granted the requested "relief" (taking defendants' property).  The receiver has made additional motions (DOCS 548 and 549) again without a notice of motion or a pre-motion conference.  Since the Court has waived requirements for motions in this case, defendants(-appellants) make this motion in the same manner that the SEC and its receiver have made such motions.

[2] As discussed in the Second Circuit Brief (DOC 95, 14-2425, incorporated by reference), at the October 25, 2013 Judge Sullivan said he "ha[d] seen [the letters]" critical of the SEC but on an *ex parte* basis (Oct 25, 2013 DOC 326 p.21).  Acting on communications by the SEC and/or

1

sentencing increase in the criminal case), and (iii) Judge Sullivan's refusals to allow any litigation on the merits of defendants' constitutional ineffectiveness/government misconduct claims (DOCS 560-1, DOC 671, 05cr621; see DOCS 694 (ineffective claim too late) and 698 (ineffective claim premature) – instead, forcing defendants to suffer further incarceration and loss of property, though consideration of the claims of unconstitutional proceedings could result in vacatur and the return of property (relief that should have been afforded (if not when the SEC Monitor exonerated defendants' business in December 2005 (DOC 48), then when the substitute asset order was vacated.)

3. Judge Sullivan's impartiality not only *can be*, but *has been* reasonably questioned. In Second Circuit briefs, quoted below, filed for Gary Tanaka and Alberto Vilar (14-1452 (DOC 94), 14-1453 (DOC 84)), new counsel call for reversal of unconstitutionally vindictive sentences (including a patently illegal fine) and remand to a different judge (and for time-served sentence) in the face of a failure to identify "offense conduct" causing purported "losses".[3]

---

the receiver, Judge Sullivan stated he had contemplated a "gag order or an order preventing it" but "ha[d]n't held anybody in contempt;" he refused to even place the letters he had reviewed (in camera/*ex parte*) in evidence much less hold a hearing. At resentencing Judge Sullivan again refused a hearing, though he increased sentences and imposed an illegal fine on the basis of those *ex parte/*in camera proceedings. At the same October 25, 2013 conference counsel raised Due Process concerns objecting to the SEC's unilateral decision to deprive defendants of any and all information on which the receiver was going to base valuations and actions including investor claims (DOC 326, Tr.28-29). Judge Sullivan "agreed" that it was and is not necessary to give the defendants (parties to this proceeding) backup or allow them to participate in a "claims" process.

[3] Attorney Barry Leiwant's brief (14-1452, DOC 94) states this (at ecf pp 22,53 -57):

…[T]he court violated the due process norms of *North Carolina v. Pearce*, 395 U.S. 711 (1969) and its progeny when it increased Mr. Tanaka`s prison term in large measure because his lawyer defended him vigorously but properly in the coordinate civil securities fraud case brought against him by the SEC. And the court imposed a massive increase in Mr. Tanaka's fine out of an apparent, but inappropriate, desire to ensure he would be penniless when he is finally released from prison. These actions present at a minimum the appearance of vindictiveness at resentencing.

As discussed in those briefs, Judge Sullivan has been hostile to, and unconstitutionally used, defendants' positions (including specifically resistance to the non-independent receiver and the SEC)[4] to further punish the defendants and foster the SEC's (and this Court's) agenda of

---

In addition, they punish Mr. Tanaka for exercising his basic civil rights to appeal and to defend his civil case ….

      At the *de novo* resentencing ordered by this Court, the judge appeared to rigidly adhere to his prior findings, refusing even to order an updated presentence report. The court also appeared to be vengeful, increasing Mr. Tanaka`s prison term by 20% and his fine from $25,000 to $10 million without any warning and without the government having asked for a longer sentence. … . To a disinterested observer it would appear that the court was unable to resentence the defendants dispassionately and take a fresh view of the case after the reversal.   …

        Discussing the increased [illegal] fine, the court made statements that indicated its annoyance at the possibility that the defendants might be left with any assets at the end of the case [in accordance with the SEC's position, expressed immediately after Judge Sullivan indicated in 2010 that he had committed a $36.7 million "error" in imposing forfeiture, that, regardless of the facts, defendants must give up *all* "substitute assets",] even after the investors recovered their full restitution (over $26 million, including interest) and even if the defendants managed to pay the enormous forfeiture the court also imposed (over $20 million).

      The court thus appeared to believe a $10 million fine was needed to assure that Mr. Tanaka would be destitute when he finally left prison. 5.56.

      These comments create the impression that the court, angry at a partial reversal by this Court or angry at the defendants and their lawyer, was intent on imposing a harsh sentence. The court certainly seemed unwilling to put aside its "previously-expressed views or findings ...." ….

      [4] Michael Bachrach's brief for Vilar (DOC 84, 14-1453) states this (ecf pp. 61-64):

      Indeed, while Judge Sullivan stated that he would not use the civil litigation against the defendants, that it exactly what he then proceeded to do.   …

      … I have to agree with the government, that the defendants' conduct has seemed designed at every step to slow down the distribution process and to punish the investors, particularly those who testified against you at trial. …

      Judge Sullivan then continued by listing a litany of Ms. Shevitz's actions zealously defending the defendants' in their parallel civil litigation, thereby confusing Vilar's right to defend himself in the civil case with a "lack of remorse"  ….:

3

...

rendering defendants destitute, and, while getting to that foregone result, making it impossible for them to defend -- stripping them of "all" assets though it is now clear that, contrary to AUSA Litt's/ SEC counsel's "beliefs" in bringing this case, investor funds were not lost or stolen. (See Gazes' Fourth report, DOC 554, 8/6/15, disclosing "finding" some $60-70 million in Panama assets that have *always* been "there.") This Court has refused to allow development or litigation of valid claims that defense counsel failed to undertake *any* investigation of defendants' assets or investor claims). Had the SEC backed off from its DAY ONE refusal to allow defendants' stewardship over their assets, or had this Court ordered it, defendants would have been able to "find" and liquidate assets (not all in the Bear-Stearns' accounts, but as seen (DOC 554) in other invested locations) to the extent necessary redeem

---

You refused to consent to allowing a distribution to investors in the civil case back in January of 2012. Ms. Shevitz, on your behalf, submitted letters refusing that consent. The government submitted letters saying that you were obstructing any attempts to get early payment. This is in the civil case, the docket 177, 187, 190, and 187. At the hearing I held with Judge Swain on January 10 of 2012 there was a lot of talk about you saying you wanted to get investors paid but you shot down every idea that was proposed with the inevitable result that nothing happened….

You've made numerous attempts to stay the civil case [pending resolution of the criminal appeal]…. You've opposed the appointment of a receiver insisting, what I can only say preposterously, that you be given control of the funds or that you be allowed to [choose] the receiver…. You've refused to cooperate with the receiver at every turn, have consistently endeavored to slow him down and delay the return of assets to the investors…. (S.Tr. 50-51) (VA.313-VA.314); but see SEC v. Amerindo, 14-2425 (2d Cir.), Defendant-Appellant's Opening Brief on Appeal (disputing Judge Sullivan's characterizations of defense conduct in the SEC case, and explaining how Judge Sullivan's characterizations were incorrect).[]

To a disinterested observer, however, each of Judge Sullivan's examples are examples of zealous advocacy by an attorney defending a civil litigation, not lack of remorse by a criminal defendant in his separate – albeit related – criminal case.

Indeed, although Judge Sullivan appeared to acknowledge that, pursuant to Pearce, he was not permitted to increase Vilar's criminal sentenced based upon the fact that Vilar was exercising his right to defend against the allegations contained in the civil case, see S.Tr. 49 (VA.312) …Judge Sullivan's "acknowledg[ments]" were then completely contradicted by both his words and his actions.

their investors' accounts (or continue managing them for the investors' (and defendants' own) future benefits --as investor Paul Marcus stated three times was his wish).

4. <u>Further Motions and Objections</u>:  This motion also (again) seeks (a) release of the UK Pension account owned by a UK entity against which there is no judgment -- wrongfully restrained, wrongfully held, and not part of the receivership estate, but (as disclosed in Gazes' time records (DOC 549-3) and nowhere else) – which is now the subject of stealth effort (through hiring of London counsel and who-knows-what-else) apparently for the purpose of enforcing the SEC's notion that it has a right to confiscate all defendants' property; (b) a stay of all further proceedings in this case pending appeal of all the rulings (including receivership rulings already appealed and those subject to appeal under 28 U.S.C 1292 in these criminal and civil cases; and (c) an award of CJA fees for counsel fighting the SEC and this Court's attempt to take all their "substitute assets".

5. Given Judge Sullivan's record statements (see footnote 4, quoting sentencing statements) that acts of seeking a stay and resisting the receiver's plans to take property justify an extra year's jail time and a fine designed to render defendants' penniless, Judge Sullivan should recuse himself so that an uncompromised judge can decide these motions.

6. This declaration also is defendants'/appellants' opposition to Ian Gazes' motions to compel and authorize JP Morgan to turn over original stock certificates of private equities held in accounts belonging to Amerindo's Panama entities.  By the motion the SEC seeks to turn over these stocks to Gazes' conflicted "advisors" "operating" with no serious oversight.  Allowing these advisors – CBIZ (which employs trial witness Kassimir) or Oxis (with disclosed ties to SEC counsel Salzberg) -- to sell these private equities without *any* prior independent valuation would be a further arbitrary unconstitutional confiscation.

7. With its flurry of motion practice, it seems the SEC and its receiver are in a hurry to take what they can get this Court to approve now (confident that this Court will continue to favor their positions); they no doubt recognize, given the recent filing of appellate briefs, that the Court of Appeals may well find that they have *no* right to have done what they are doing. Moreover, they have not even complied with the court's *original* order, starting in 2010 (DOC 408, 05 cr 621), calling for valuation of the private equities – but this Court has Ok'd it. At the October 25, 2013 conference, this Court – having conferred with the receiver *ex parte* – excused the receiver from doing this task, adopting the position *qua* witness (DOC 326): "THE COURT: These private equities are hard to value."

8. Difficult for Gazes, yes. His professionals refused to do it. But not difficult for David Ross, who accomplished this task in 2009 with a comprehensive, detailed valuation that has never been discredited (see DOC 408, 05cr621). The Court was told that Ross could have updated valuations cheaply and efficiently. The SEC said "no"; and on that basis the Court appointed this receiver who has compromised his own principles concerning a "fair" distribution (DOCS 355, 370), deferred to the SEC and the Court, cumulated work, and started a feeding frenzy to reward his friends using defendants' assets.

9. Defendants object to any order allowing or authorizing JP Morgan to turn over the stock certificates, owned by defendant entities, for the receiver and his "professionals" to use in non-transparent, non-arms-length sale without any independent valuation. These matters are under appeal. There should be a stay.

<u>The Receiver's /SEC's grab for another hit from defendants' assets without any meaningful consideration of their procedures or the bona fides of what they are doing.</u>

10. This Court has just approved the SEC handing over $151,000 to CBIZ against objections that its work was illegitimate and did not benefit the "receivership estate" – objections this Court

6

addressed with the facile statement that it is not *"always"* necessary to use the entity's books and records in that (as a technicality as opposed to a principled analysis) a different statutory provision is involved in the *Madoff /2427 Parent* valuation case. Judge Sullivan wrote that the SEC's/receiver's/CBIZ's methods are perfectly reasonable to "ensure fairness and reasonableness" of the distribution "ultimately selected by the Court." (DOC 547, entering Order approving payout and ignoring arguments incorporating Second Circuit cases (see DOCS 540-546).[5]

11. Here, of course, the use of the Amerindo account statements was *not* among the methodologies considered by the receiver or the SEC at any time in the process. The SEC and receiver have stated they have never seen the books and records (DOCS 201, 355). *Madoff/Parent* makes clear that use of actual records is *the* fairest way to proceed. Failure to have used the extant books and records when the prosecutor used them previously, is arbitrary and irrational (see incorporated DOC 545, response concerning books and records). "Ultimate selection" of the method designed not to achieve a fair distribution, but rather to strip the defendants of assets, cannot be a reasonable choice. (The matter is on appeal).

12. The Court has shown that it will not depart from the SEC's view of *any* of the disputed matters in this case. It "selects" whatever is the preference of the SEC without any question or serious consideration. The SEC did not even offer the Court that option among the "choice" of reasonable distribution mechanisms because it *did not want* to use the books and records. If it had done so, it would have been clear that there are substantial assets to which the defendants

---

[5] We incorporate by reference DOCS 543-545, objections and response to CBIZs and Neal Jacobson's "requests" to hand over funds to do the SEC's "work" of sidestepping the Amerindo Technology Growth Fund n.a.v., changing the predetermined (and agreed to) interest rates of GFRDA clients that appear on the Amerindo statements, and creating arbitrary claim figures while failing *ever* to look at the books and records.

7

are entitled. The SEC wants to leave the defendants penniless; the Court has stated that that is its goal too. (If this Court is not dedicated to protecting the defendants' interests, certainly the SEC cannot be counted on for achieving a "reasonable" method given its stated aims of total confiscation.)

13. The SEC should not be the "selector" of "winners" and "losers" among Amerindo investors when there is, and always has been, sufficient funds to pay all Amerindo investors the amounts of the account statements that the SEC has refused to even consider. The Court's rejection of the use of books and records, because the SEC did not want to use them, is what is unreasonable here.

14. We thus oppose the receiver's request for another $160,000-plus (and still counting) for himself, noting that in his later-filed Fourth Report (DOC 554), he admits to paying JP Morgan an enormous amount for custodial and other fees when JP Morgan unilaterally took steps to end the Bear-Stearns agreement to put funds in interest bearing vehicles and *not* charge custodial fees (while it uses defendants' funds as it sees fit).

15. This Court has stated its belief that anything defendants do to oppose the receiver warrants punishment. So it is perhaps only "for the record" that we once again state the confiscatory nature of these proceedings and the abject failure of Due Process in these proceedings, in which the SEC manipulates and controls its receiver as if an ALJ judge in an administrative proceeding subject to no oversight in its administrative proceedings – or worse.

16. Among the issues raised on appeal is that the SEC and this Court have deprived the defendants of fair notice and an opportunity to be heard as to every aspect of this case. Starting on DAY ONE, through false premises and a failure of investigation, the SEC stripped defendants of their assets and effectively shut down Amerindo US and by extension Amerindo Panama and

UK through an all-records search, public pronouncements of massive theft, and installation of a Monitor (whose exoneration of Amerindo US six months later has been ignored as if it never happened). And it did all this – as we have advised in submissions repeatedly "bounced" for perceived technical "wrongs"[6] – without serving or notifying Mr. Vilar or Mr. Tanaka, in their absence, and without any lawyer present representing them.

17. Then, the SEC convinced this Court to cut defendants out of the loop, saying it's OK to deprive them of notice and an opportunity to be heard even as to the bases of any SEC "remedy". (October 25, 2013 Tr. (approving Jacobson "plan" to punish defendants by depriving them of input and even of information). This is before the Court of Appeals (DOC 95, 14-2425).

18. The SEC continues to "litigate" by stealth (consistent with its abilities in the Administrative sphere – but this is a federal civil proceeding): Using its receiver as accuser, examiner, and justifier, and employer of *de facto* "staff" for the SEC's positions, we learn – only from the receiver's time records[7] – that Gazes seemingly hired a London lawyer to go after a non-

---

[6] The Court faulted counsel for "too many pages" or "too many words", or submissions made too late, or prematurely, in order to dismiss defendants' constitutional claims without adjudicating them. (DOCS 560-1, 644, 648). The SEC "gets around this" by having Ian Gazes or CBIZ report, only through entries in voluminous time records, the actual state of their "activity" (e.g., time records, 549-3, 536 and exhibits thereto) -- burying in "time records" the facts that they are using discredited valuations, hiring UK counsel, and a lot more objectionable conduct.

All the while *pro bono* counsel for the defendants / appellants (and the men whom the Court calls the "individual defendants," whom the Court incarcerated vindictively, "get to" review and evaluate these submissions by which the government takes "substitute assets", without use of their own funds and without CJA funds. The Court has created and endorsed a tilted playing field with the "ball" being substitute assets held despite vacatur of the substitute asset forfeiture order.

[7] Here are troubling entries in Gazes' time records that should be explained:

1/23/2015 IJG conf with atty re pension plan liquidation 0.60 150.00
2/3/2015 IJG conf with UK counsel re pension plan dissolution 0.40 100.00
3/30/2015 IJG review proposal by UK counsel to liquidate pension 0.60 150.00
4/13/2015 IJG conf with UK special counsel re liquidation process 0.50 125.00

9

receivership asset, "held" only pursuant to a vacated "substitute asset forfeiture" order that is no longer in effect and at that, was "justified" solely by a motion for a restraining order in the criminal case, the stated purpose of which was preserving asset for the then-anticipated "forfeiture" sought by AUSA Litt of over $80 million.

19. This use of an SEC receiver for the SEC's purposes -- as a party to litigation – of "collecting" a judgment through use of a receiver, as an "adjunct" to its desire (shared by this Court, per its statements imposing criminal and civil penalties) to take all defendants' property regardless of the facts, is not authorized by law. See *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1103 (2d Cir. 1973) (authorized purposes of SEC receiver discussed).

20. How can this be justified? Since the SEC/Receiver did not *ask* for this authority in any motion, it has never been litigated on the public record (though the Court's expressed disdain for defendants' litigation against this receivership suggests its foregone response).

21. Surely the receiver did not do this on his own – or did he? Who is the lawyer? What are the terms? Did Gazes misrepresent his authority, as he did in the Cayman court?[8] More importantly, *why*, and on what conceivable basis, is the receiver purporting to deal with an asset that is *not* part of the receivership estate, is owned a foreign entity in the UK, was never the property of defendants, was never "commingled" with Panama assets (but was only

---

4/24/2015  IJG review letter from London counsel and reply 0.40 100.00
7/8/2015 IJG review London proposed engagement letter 0.50 125.00
7 /13/2015 IJG conf with atty from London re pension liquidation 1.30 325.00
7/15/2015 IJG emails with offer from Oxis and reply 0.50 125.00
7/22/2015 IJG review revised engagement agreement with London counsel
  IJG email to SEC re status and engagement of London counsel

[8] The Court authorized the receiver to go after property in the Cayman Island when the Cayman fund is *not* on the substitute asset forfeiture list. Gazes told the Cayman Court he had authority under the substitute asset forfeiture order, but did not say it was vacated or that the case is on appeal. This Court said nothing about the misrepresentation.

managed by them), and the "holding" of which is "authorized" only by a vacated substitute asset forfeiture order in a criminal case?  The obvious purpose of this effort -- the SEC's desire, and apparently that of the court -- to (vindictively) just *take* property -- cannot justify this blatant misuse of an SEC receiver.  We demand a public hearing.

<u>The Court should release the UK Pension from all restraints and order JP Morgan to "allow" the Pension's administrators to trade and act as owners of this non-receivership property</u>

22. As we – and the UK Administrator – have asked in the past, the Court should release the UK Pension.  There has never been a legitimate reason to hold this property.

23. At the same time this Court has released all sorts of other property to the receiver so that he, and the SEC, can use it. (E.g., DOC 533, selectively releasing property held by US Bank with the statement that the post-conviction restraining order was "superseded" "in the first instance" by the Substitute asset forfeiture order in the criminal case.")

24. These arbitrary actions are unconstitutional and are subject to a pending appeal. In the meantime this Court should direct JP Morgan, the government, the SEC, and all concerned, that it has *no* right to hold, and no justification to control or try to effect control (much less through an SEC receiver), of non-receivership foreign-held property.  The UK Pension fund should be immediately released.  No funds should go to the receiver, his professionals, or any UK lawyer, for this unconstitutional exercise in international "judgment enforcement" (or whatever terms the SEC may use to justify its action).

<u>The Court should have granted and should recognize that this matter should be stayed.</u>

25. Shortly after defendants filed a notice of appeal, in July 2014, we sought a stay of further proceedings and actions involving distribution by the receiver of defendants' (substitute) assets.  This Court went forward citing (in DOC 458, 8/4/14) <u>United States v. Rodgers, 101</u>

F.3d 247 (2d Cir. 1996) and ruling – as the SEC asked -- that it could continue to take defendants' property in the receivership because the Court had not entered a final order concerning the receivership and so "any appeal would therefore be improper."

26. The Court was wrong. Receivership orders are appealable even if not "final judgments". 28 USC §1292 provides for jurisdiction in the Court of Appeals over "**(2)** Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes… such as directing sales or other disposals of property…"

27. Here, the receivership orders not only *are* appealable; they are the subject of the pending appeal.   (DOC 95, appeal 14-2425).   This Court is proceeding without jurisdiction. This should stop.  There should be a stay.

This Court should recuse itself

28. As discussed, this Court has stated expressly that resistance to this receivership justifies *punishment*, not fair evaluation. It has done so on the basis (in part) of *ex parte/in camera* submissions.

29. There is at least an appearance (if not the reality) that this Court has not been and cannot be fair and impartial.  See *ISC Holding AG v. Nobel Biocare Finance AG,* 688 F.3d 98, 4 107 (2d Cir. 2012) ("the is whether an objective and disinterested observer, knowing and understanding all of the facts and circumstances, could reasonably question the court's impartiality").  (While recusal is required even if there is an appearance of, and not actual, partiality – a standard met easily upon review of this Court's statements at the resentencing in the criminal case -- the endorsement and action on the basis deep-seated antagonism and bias is justified based on the *ex parte /in camera* submissions to which the Court admitted and upon which it acted to defendants' substantial detriment.  As suggested in *ISC,* where an

"opinion" rests on *ex parte/in camera* information that is "memorable" and of substance, a determination of bias from extrajudicial sources is justified.[9] Here, as noted, at the October 25, 2013 hearing, Judge Sullivan admitted consideration and discussion of defendants' writings on an *ex parte/in camera* basis (see October 25, 2013 Tr.); he then cited these letters in increasing in defendants' sentences (and at no time provided a hearing). The Court acted on the basis of opinions not "properly" acquired during the course of the judicial proceeding.)

30. Present counsel previously attempted to seek recusal of Judge Sullivan in both this civil case and the criminal case based on bias demonstrated to that time. (Now there is even more concrete evidence that any semblance of fairness no longer resides in this Court).

31. When the SEC told Judge Sullivan that counsel's motion for recusal was (to use its favorite word) "frivolous", Judge Sullivan would not even allow counsel to make the motion for recusal in this civil case, citing the Court's pre-motion conference requirement, and then failing to afford such conference.

32. Counsel now brings this motion for recusal. In *Eisemann v. Greene*, 204 F.3d 393, 397 (2d Cir. 2000) the Court of Appeals made clear that a Court cannot bar a proper motion. To the extent that this Court would impose a pre-motion conference requirement, though it was

---

[9] The Court upheld refusal to recuse in that case but only because – unlike here, where Judge Sullivan added a year's jail time and imposed an unconstitutional fine on the basis of the letters reviewed *in camera* – "no `opinion'" could be formed on the basis of the brief *ex parte* communication involved in that case. The Court wrote (688 F.3d 98, 108): "There is no indication here that the district judge came to have an opinion— favorable or unfavorable—regarding ISC or the merits of its petition as a result of the Matetsky conference. Nor has ISC demonstrated that the conference was of a sort to make this likely. As the district court noted in denying the motion to recuse, no "'opinion' could be formed on the basis of the *in camera* communication." 759 F.Supp.2d at 291. Matetsky's concern about his position, according to the district court, was itself "speculative, recognizing that the problem [he was experiencing with his client] might reflect only a lack of needed cooperation." *Id*. Indeed, the information disclosed was sufficiently unmemorable that the judge had completely forgotten it …."

waived for CBIZ, the SEC, and its receiver, this Court has already rejected a *conference* on the matter. The motion is proper under *Eisemann.*

33. If this Court denies relief to defendants and /or grants it to the SEC, the Court should allow appellants time to seek a stay and mandamus in the Court of Appeals.

34. During this time, the Court should also reconsider its previous denial of CJA fees for defense of this case under the "fairness" prong (if nothing else) of Fed.R.Civ.P. 60 and should order that CJA fees should be paid, *nunc pro tunc*. This playing field is not level.

What Effective Counsel Would Have Uncovered Had They Properly Evaluated Defendants' Panama assets and/or required AUSA Litt and the SEC to do so:

35. Before concluding we briefly address the shocking result of the Court's refusal to allow the claim of ineffective assistance /SEC misconduct to go forward. As discussed repeatedly and ignored, counsel failed to investigate the Amerindo assets – an investigation necessary for a proper defense of a forfeiture allegation in a criminal case, especially one in which the clients were accused of stealing all the assets but an SEC Monitor exonerated the essence of defendants' business, its US Advisory firm (98% of defendants' business). (DOC 48).

36. Gazes' Fourth Status Report (DOC 554) shows the depth of the prosecutor's false premises of theft. Gazes says that assets of Amerindo Panama amount to $60 million, possibly $70 million. The offsets are Amerindo client redemption obligations of around $40 million -- which the receiver and SEC have ratcheted to $52 million using questionable and unconventional accounting and investment methodology after three iterations.

37. A proper inquiry by trial counsel would have put the lie to the government's accusations of massive theft. A jury, as well as Judge Karas and Judge Sullivan, should have known this.

38. Instead of allowing defendants to show counsel's ineffectiveness or the government's false premises, this Court has heaped punishment on defendants for even suggesting that there was

a viable defense. Instead of protecting defendants' constitutional rights, this Court has protected the prosecution, the prosecutor, and the SEC lawyers who started this case.

39. There are stated reasons to doubt this Court's impartiality. There should be a stay and this Court should recuse itself. The Court should authorize CJA fees for defense of "substitute assets" in this "civil" case and should release the UK Pension account to its rightful owner.

40. Finally, my clients have not yet seen had an opportunity to see Gazes' Fourth report (DOC 554), which was just filed at the end of last week and has not made it to FCI Fort Dix yet. Counsel may seek to supplement these papers based on information in that Report and its exhibits.

 Dated:  South Salem, New York
August 10, 2015                                              /s/      Vivian Shevitz