

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------------X
                                  :

SECURITIES AND EXCHANGE COMMISSION,     :

            Plaintiff,                  :

                                  :      **05 Civ. 05231 (RJS)**

      v.                            :

                                  :      **ECF CASE**

AMERINDO INVESTMENT ADVISORS, INC., *et al.*,   :

               :

          Defendants.              :

                                  :

----------------------------------------------------------------------------X

### OPPOSITION OF MARCUS CLAIMANTS TO MOTION BY UNITED STATES OF AMERICA FOR A PROPOSED PRELIMINARY ORDER OF FORFEITURE AS TO SUBSTITUTE ASSETS

       Claimants Paul Marcus, The Deane J. Marcus Trust, The Steven E. Marcus Trust, The Cheryl Marcus-Podhaizer Trust and The Eve S. Marcus Children's Trust (the "Marcus Claimants"), by their counsel Ballard Spahr LLP, respectfully submit this Memorandum in opposition to the Motion for a Proposed Preliminary Order of Forfeiture as to Substitute Assets (the "Motion") filed by the United States of America in the action pending before this Court captioned *United States of America v. Alberto William Vilar and Gary Alan Tanaka*, 05-cr-621 (RJS) (the "Criminal Action"). Although the Marcus Claimants are not parties to the Criminal Action, this Court has granted them the right to respond to the Government's Forfeiture Motion. (*SEC v. Amerindo*, 05-cv-5231 (RJS)) (the "SEC Action") (Dkt. No. 707)

       We respectfully submit that the SEC Action and the Criminal Action are sufficiently intertwined so that Orders entered in one are highly likely to have an effect on the other, and that the overall effects should be considered by the Court in ruling on motions made in

either action.  Such consideration here leads to the conclusion that the Motion should be denied at this time for the following reasons:

- Granting the Motion would disrupt the orderly continuation of the Receivership proceedings being conducted in the SEC Action.

- Granting the Motion could, as a practical matter, deprive the Marcus Claimants and other investor claimants of their ability to appeal relevant Orders entered in the SEC Action.

- Granting the Motion would result in duplicative litigation that would waste judicial resources and could lead to potentially inconsistent results.

- The Government has not shown it is entitled to the requested Order.

- There is no need at this point for the remedy the Government seeks.

**The Status of the Receivership Proceeding**

There is no dispute that the funds recovered by the Receiver – both the amount he has already distributed, as well as what he now holds – result from: (i) funds invested by various individuals in Amerindo entities managed by Messrs. Vilar and Tanaka, the defendants in the Criminal Action (the "Defendants"); and (ii) the appreciation of those invested funds because they were used to purchase securities some of which rose in value.[1]

It is the appreciation in the value of some of the securities that the Defendants purchased with the investors' money that led to the ability of the Receiver to recover more than the total invested funds, and to return to all recognized claimants an amount in excess of their original investments.  As the Court is aware, the Receiver was authorized to make three interim

---

[1]    Contrary to the view of the situation that prevailed at the time the Criminal Action and the SEC Action were initiated (see Amended Complaint in SEC Action, ¶¶ 3, 4, 93, 133, 174; Indictment in Criminal Action, ¶¶ 34, 41(e)), the conduct of the Defendants did not constitute a conventional Ponzi scheme in which the proceeds received from "new" investors disappeared because they were used to pay returns to "old" investors.  Instead, the funds invested were actually used by the Defendants to purchase securities, and some of those securities turned out to be profitable investments.

distributions which collectively totaled over $54 million – the amount invested with Defendants by all of the investors whose claims were allowed.   (SEC Action, Dkt. No. 669, p. 2)[2] Thereafter, the Court approved an Inflation Adjustment Distribution in the amount of $13.8 million to "compensate the Allowed Investors for the diminished value of their principal...." (SEC Action, Dkt. No. 669, pp. 5-6)

At the time of that approval – in other words, after the three interim distributions of principal, but before the Inflation Adjustment was actually distributed – the Receiver was holding $24.3 million.  (SEC Action, Dkt. No. 669, p. 2)  Subtracting the Inflation Adjustment distribution of $13.8 million that he subsequently made, he would have been left with $10.5 million.   Based on the Government's statement on page 7 of the Motion, that number has apparently now increased to $12.9 million – presumably as a result of additional recoveries by the Receiver and/or further appreciation in the value of assets he was already holding.

## The Court's Prior Distribution Orders

Up to this point, the issues considered by the Court in its prior Orders authorizing the interim distributions involved what claims should be recognized, and how two categories of claimants should be treated – the investors in the Amerindo Technology Growth Fund ("ATGF"); and the investors in Guaranteed Fixed Rate Deposit Accounts ("GFRDA").  As the Court is aware, the Marcus Claimants have argued that in this unusual case in which there are sufficient assets on hand to restore all of the investors to the situation that would have prevailed had there been no criminal conduct by the Defendants, the allocation between the ATGF and GFRDA investors should reflect the nature of the bargain each investor made -- what each group thought it was purchasing.

---

[2]    In fact, while the ATGF investors' claims were capped at the amount they invested, the allowed GFRDA claims included interest accrued to date.

Because the GFRDA investments were in the nature of debt, we argued that this category of claimants should receive their principal, their contractual interest for the periods of time specified in their investment contracts, and a reasonable rate of interest for subsequent periods. By contrast, the ATGF investors believed they were investing in an equity mutual fund, the value of the shares of which would go up or down with fluctuations in the value of the securities which the managers of the fund purchased. In the event that the Defendants had engaged in no criminal conduct but all of the securities purchased with the investors' funds had turned out to be worthless, the ATGF equity investors would have had no claim, and would have lost their entire investments. But the opposite occurred – while most of the approximately 100 investments were worthless, about 20 turned out to be very profitable.[3] Because the ATGF claimants believed they were investing in an equity mutual fund – in which they assumed the risk that the securities purchased would decline in value, but correspondingly stood to gain if those securities appreciated – the Marcus Claimants argued that the ATGF investors should receive the full value of the securities held by Amerindo less than the principal and interest paid to the GFRDA investors.

This Court rendered a number of rulings dealing with the Marcus Claimants' argument that the ATGF and GFRDA investors should be treated differently. First, on May 6, 2014, the Court recognized that all of the funds used by the Defendants to purchase securities in the Amerindo accounts were investor funds (SEC Action, Dkt. No. 432, pp. 16-17), but ruled that the first interim distribution should be pro rata to each recognized claimant – regardless of whether they invested in ATGF or GFRDA. It went on to say as follows:

---

[3]   That appreciation is what led to the situation in which the Receiver was able to recover approximately $80 million -- $26 million more than was invested by the ATGF and GFRDA investors together, and $13 million more than those investors have been paid, even after the Inflation Adjustment allowed by the Court.

> If, going forward, the Receiver determines that Amerindo's assets
> exceed investor claims, plus interest – for instance, if some of
> Defendants' risky investments from before 2005 turned out to be
> winners – it might be appropriate to allocate gains differently to
> GFRDA and ATGF investors.  The Court, however, will address
> that situation when, and if, it arises.

(SEC Action, Dkt. No. 432, p. 17)

On December 31, 2014 and May 20, 2016, the Court issued Orders approving second and third interim distributions using the same pro rata method for all allowed claims. (SEC Action, Dkt. Nos. 510, 618)  Finally, on July 14, 2017, the Court ruled that the Inflation Adjustment should be paid proportionately all claimants based on the amount they invested – regardless of whether they intended to invest in ATGF or GFRDA.  In doing so, the Court stated that the SEC was "unclear whether profits on a defendant's ill-gotten gains ... can be paid to harmed investors," and therefore was requesting that all investors be treated similarly "at this time."  (SEC Action, Dkt. No. 669, p. 3) (citations omitted)  Consistent with the SEC's position that the law on this issue is unclear, "the Court conclude[d] that the Marcus Claimants' request for an award of 'profits' or 'appreciation' on their investments is unjustified **at this time**."  (SEC Action, Dkt. No. 669, p. 15) (emphasis supplied)[4]

The Marcus Claimants and others appealed the Court's rulings.  On January 8, 2018, the Court of Appeals issued an Order denying the SEC's motion to dismiss the Marcus Claimants' appeals from the Orders entered by this Court on December 31, 2014, May 20, 2016 and July 14, 2017, and staying those appeals "until the district court enters an order approving a

---

[4]     The Court itself stated the issue as "far from clear ... that the ATGF investors – including the Marcus Claimants -- are entitled to priority over GFRDA investors or the numerous other creditors ... including the SEC, which has money judgments against all Defendants and ... the victims awarded restitution in the criminal case...."  (SEC Action, Dkt. No. 669, p. 14)  The Government's forfeiture motion would have the Court decide now what it deemed "far from clear" in July 2017, and to make that decision with no further evidence and no guidance from the Second Circuit.

final distribution plan and/or dissolving the receivership." *Securities and Exchange Commission v. Marcus, et al.*, Case No. 17-2534, Document No. 165, page 2.

No Order "approving a final distribution plan and/or dissolving the receivership" has been entered by this Court. We believe there are several possible reasons why this is so. The most obvious is that the Receiver is still holding $12.9 million attributable to appreciation of the securities purchased with funds invested by the ATGF and GFRDA claimants. The Court's statement in its July 14, 2017 Order that whether the Marcus Claimants are entitled to "profits" or "appreciation" on their investments cannot be determined "at this time" contemplates that the issue would be revisited at a later time. We believe this is one reason that a final distribution plan is premature.

Second, we believe there may be significant assets the Receiver has not yet recovered, consisting of publicly-traded securities that were not sold at all, or positions that were not liquidated completely. (SEC Action, Dkt. No. 645, ¶¶ 38-42)

Finally, we respectfully submit that there is an additional important reason that the Receivership should not yet be terminated. That reason is the existence of an account held in the name of the "Trustees of the Amerindo Advisors (UK) Ltd. Retirement Benefits Scheme." In a letter to the Court dated August 11, 2017, the SEC listed "the monetization and distribution of the Retirement Benefits Scheme" as one of the "significant matters remaining in the SEC action...." (SEC Action, Dkt. No. 672, p. 1)

With respect to that remaining issue, the Marcus Claimants submitted to both the Receiver and the Court evidence indicating that the Retirement Benefits Scheme account contained securities purchased with funds invested by the ATGF claimants. In paragraphs 44-47 of the Objections to the Receiver's Motion for a Fourth Interim Distribution, they described the

Retirement Benefits Scheme Account as "a significant additional asset which we believe should ultimately benefit the ATGF Investors." (SEC Action, Dkt. No. 645, ¶ 44)  They went on to explain the evidence on which that claim was based.  That evidence consists of reports sent to the ATGF investors listing publicly-traded securities that the Defendants stated were owned by the ATGF shareholders.  Crucially, however, those securities did not appear in the relevant monthly statements for the ATGF accounts themselves.  Instead, the exact same securities appeared in the Retirement Benefits Scheme account statements for the same time periods.  We believe that the presence in the Retirement Benefits Scheme account of assets belonging to the ATGF investors demonstrates that this account should be made part of the Receivership – or, at the very least, that a careful examination should be made of how the securities in this account were funded.

In a letter to the Court dated May 21, 2018, the Receiver noted the existence of the Retirement Benefits Scheme account, but described it as a "non-Investor Account." (SEC Action, Dkt. No. 699)  However, we respectfully submit that this is a determination that should be made by the Court and not the Receiver – especially where the latter has provided no basis for his conclusion.  The need to resolve this issue is one more reason that the Receivership proceeding should not be terminated at this time.  Yet, this will be the practical effect if the Motion is granted.

## ARGUMENT

### THE MOTION FOR A PROPOSED PRELIMINARY ORDER OF FORFEITURE AS TO SUBSTITUTE ASSETS SHOULD BE DENIED

**A.  Granting the Motion Would Disrupt the Orderly Conduct of the Receivership Proceeding**

The Motion ignores the issues discussed above that remain to be resolved in the Receivership proceeding.  On the contrary, it focuses on "the victims in [the] criminal action."

(Motion, p. 6)   While the Government describes the disbursements by the Receiver as being made to these victims "among others," the Government acknowledges that its intention is to recommend the distribution of only "the balance of $771,502 [that] remains to compensate the victims under the Court's restitution order in the criminal case." (Motion, p. 7)

The Government makes no reference to compensating any investors that do not fall within the narrow definition of "victims … in the criminal case." However, that is the entire purpose of the Receivership proceeding, since only a small number of the investors whose claims have been recognized by this Court fall within that definition, and most of the allowed claimants were not "victims" under the criminal charges on which the Defendants were tried.

Simply put, the Receiver's work is far from completed.   There has been no application, much less a Court order, as to what should be done with the $12.9 million presently held by the Receiver.   There has been no accounting by the Receiver, and no application for a final distribution order.   Nor have the parties taken any other affirmative steps to wind up the Receivership.

While we acknowledge that the Court has inherent authority to adjudge the Receiver's balance forfeitable, we have not been able to locate a case where such a decision was made prior to a final distribution order and dissolution of the receivership.   Indeed, the cases we have been able to locate have been to the contrary.   *E.g.*, *SEC v. Provident Capital Indemnity, Ltd.*, No. 11-cv-00045 (JAG), 2015 WL 13646920 (E.D.Va., Sept. 30, 2015) (granting receiver's motion to approve a final distribution of assets, close the receivership and discharge the receiver prior to "pay[ing] any remainder of the Receivership assets to the United States Marshal for payment towards the asset forfeiture judgment against the defendant [] in the parallel criminal case.").

8

**B.    Granting the Motion Could Deprive the Marcus Claimants of
Their Practical Ability to Appeal Orders Entered in the SEC Action**

While the Motion makes passing reference to the Court's July 14, 2017 Order

approving the Fourth Interim Distribution (Motion, p. 6), it makes no mention of the fact that the

Marcus Claimants appealed that Order and the earlier Orders directing the prior interim

distributions, or that their appeal was stayed, rather than dismissed or resolved on the merits.

The Motion ignores the fact that the pending appeal concerns the very same funds that the

Government now seeks to obtain as substitute assets.

It is respectfully submitted that as a matter of judicial economy and fairness to the

parties, the appeal should be determined before there is any decision on forfeiture.  The reason is

that if the Marcus Claimants are correct and the Second Circuit determines that the full amount

recovered by the Receiver should have been distributed to the investors, then there would be no

excess to be forfeited to the Government.  If the Government is permitted to seize those funds, a

decision in favor of the Marcus Claimants on the appeal could well be rendered moot, since there

will be no assets left for the Receiver to distribute in accordance with that decision.  What makes

far more sense from the point of view of judicial efficiency and fairness is to deny the Motion

with leave to renew after the Second Circuit appeal is decided.

**C.    Granting the Motion Would Result in Duplicative
Litigation That Would Waste Judicial Resources
And Could Lead to Inconsistent Results**

If the Motion is granted, there is a risk of inconsistent results.  The Motion

acknowledges, as it must, that under the relevant forfeiture statute rules, the Government must

provide notice of its intent to dispose of the forfeited property to known interested third parties,

who would then have the opportunity to petition the Court for a hearing to determine the validity

of their claims. (Motion, p. 9)  To have the investors' claims litigated pursuant to the provisions

governing forfeiture will result in duplication of the procedures that have already taken place in this Court. Moreover, in the event the appealed Orders are reversed, those issues will have to be revisited in subsequent proceedings in this Court.

The Government goes on to state that any forfeited assets "will not be disposed of by the Government until all third party claims are resolved by the Court." (Motion, p. 9) But once that occurs, the Government makes clear that it "will apply the total value of the Substitute Assets towards both Defendants' outstanding Money Judgments." (Motion, p. 9) However, whether the GFRDA and ATGF investors have a prior claim to those funds which takes precedence over their use to satisfy the judgments against the Defendants can only be determined after the Second Circuit decides the pending appeal. This is further reason that the forfeiture motion should follow the decision on the pending appeal, rather than precede it.

**D.    The Government Has Not Established that Forfeiture is Appropriate**

Since the funds in possession of the Receiver are directly traceable to investments made by the claimants – and were held by the Defendants only in their status as fiduciaries – Defendants' possession of these funds did not give them a claim of ownership. They did not have any ownership interest in these assets.

Moreover, the Government's interest in such assets does not vest retroactively to the date of the original criminal act. *United States v. Peterson*, 820 F. Supp. 2d 576, 584 (S.D.N.Y. 2011). To be sure, district courts in the Second Circuit are divided as to when the Government's interest in such property vests. *See United States v. Egan*, 654 F. App'x 520, 521 n.1 (2d Cir. 2016). However, in a recent case in this district, the Court held that the Government cannot acquire an interest in substitute property until it satisfies its evidentiary burdens under 21 U.S.C. § 853(p). *United States v. Espada*, 128 F. Supp. 3d 555, 566 (E.D.N.Y. 2015) (holding

that because "plain text of the criminal forfeiture statute requires the government to demonstrate, prior to obtaining substitute assets, that the offense property cannot be obtained as a result of any act or omission of the defendant," the Government "cannot acquire an interest in substitute property" until it has met that burden). In this case, the Government has not yet met that burden. As such, the Receiver's interest in the funds he holds vested *before* the government's interest for purposes of 21 U.S.C. § 853(n)(6)(A).

**E.      There Is No Need at This Point for the Remedy the Government Seeks**

We respectfully submit that the equities presented by the forfeiture motion favor the investors, rather than the Government. They took risks and would have lost all of their money in the event that the Defendants' investments proved to be imprudent. The fact that the investments resulted in a return in excess of the amount necessary reimburse all of the investors for their principal, and to give them an additional return based on inflation, does not mean that the excess funds currently held by the Receiver should be treated as a windfall. Rather, that amount should be used to truly make the investors whole – to return to them the amounts they would have received in the absence of Defendants' fraud as the benefit of the bargain they made when they invested their funds.

We respectfully submit that the Receiver's balance should not be delivered to the Government at this time. The Marcus Claimants are not defendants in this action, are not party to any of the criminal activities alleged in this action, and are not requesting that the remaining assets be returned to the Defendants or to any entities that they might control. Much to the contrary, the Marcus Claimants simply suggest that the assets remain with the Receiver so that after the decision on the pending appeal, the Court can supervise how, if at all, these funds ought to be distributed to the investors whose claims have been allowed.

To be sure, "[i]t is well-established that a district court has broad powers and wide discretion in overseeing the administration of a receivership." *SEC v. Amerindo Investment Advisors Inc.*, No. 05-cv-5231, 2016 WL 10821985, at \*2 (S.D.N.Y. May 20, 2016) (internal citation and quotations omitted). However, it is also the case that once appointed pursuant to the court's broad equitable discretion, a Receiver is tasked with "restor[ing] to a defrauded entity or defrauded persons that which was fraudulently diverted from its or their custody and control." *SEC v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y.2005). The Receiver is a Court-appointed fiduciary who is duty-bound to protect and ensure that the victims be compensated for their losses to the fullest extent possible.

The funds at issue here are safe, and forfeiture at this time would serve no purpose. There can be no fear that the assets in possession of the Receiver may become unavailable to the government for reasons other than those fairly litigated. The full opportunity for such litigation is exactly what the Marcus Claimants are seeking by requesting that the Court deny the Motion at this time.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny the Government's Motion in Support of Proposed Preliminary Order of Forfeiture as to Substitute Assets.

Dated: New York, New York
       September 28, 2018

BALLARD SPAHR LLP

By_____

      Julian W. Friedman (JF 6010)
1675 Broadway
New York, New York 10019
(212) 223-0200

*Attorneys for Claimants Paul Marcus, The Deane J.
Marcus Trust, The Steven E. Marcus Trust, The
Cheryl Marcus Podhaizer Trust and The Eve S.
Marcus Children's Trust*

13