UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| -v- | No. 05-cv-5231 (RJS) |
| AMERINDO INVESTMENT ADVISORS INC., *et al.*, | |
| Defendants. | |
| | ORDER |
| UNITED STATES OF AMERICA | |
| -v- | |
| ALBERTO WILLIAM VILAR, *et al.*, | No. 05-cr-621 (RJS) |
| Defendants. | |

RICHARD J. SULLIVAN, Circuit Judge:

The Court in receipt of the attached petition from Angelika Jordan, dated October 23, 2019, and the two attached petitions from Laurie Christov, dated November 15, 2019. The Clerk of the Court is respectfully requested to docket these petitions. IT IS HEREBY ORDERED THAT the government shall submit a letter to the court responding to these most recent petitions and outlining its proposed next steps in this matter no later December 6, 2019.

SO ORDERED.

Dated:     November 27, 2019
           New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

Angelika Jordan
1009 Springfield Drive
Millbrae, California 94030

Judge Richard J. Sullivan
US District Court SDNY
500 Pearl Street
New York, New York 10007

RE: Case Number 05 Cr. 621 (RJS)

1. NAME OF CLAIMANT: This claim is being presented by Angelika Jordan, a US citizen and California resident with an address of 1009 Springfield Drive, Millbrae, California 94030. Any written communications in connection with this claim should be copied to this address. I, Angelika Jordan, do not have an email address. You may email Michael Baldwin-Sotomayor on my behalf at msotomayor333@gmail.com.

2. TIME, CIRCUMSTANCES OF ACQUISITION OF, AND RIGHT, TITLE OR INTEREST IN, THE PROPERTY: My husband and I invested in Amerindo beginning in the 1980s. My husband passed away in 2001. The account has been in my name since his death. I had sole interest in those investments supporting this claim, and today I have sole interest in this claim.

3. HOW THIS CLAIM WAS GENERATED: After reviewing the cases involving Amerindo, Alberto William Vilar and Gary Alan Tanaka, Geoffrey S. Berman, United States Attorney for the Southern District of New York, and Alexander J. Wilson, Co-Chief, Money Laundering and Transnational Criminal Enterprises Unit, and Assistant United States Attorney, sent me a letter via Michael Baldwin-Sotomayor dated August 16, 2019, but received much later, about three weeks ago. Berman and Wilson notified me to petition for a hearing to adjudicate the validity of my interest in the property.

4. ACCOUNT NUMBER: The account number is D886-D1F-152. Kenneth Riffle, who was the marketing director of Amerindo Investment Advisors from 1982 to 1995, indicates that this account number was always used, whether the account was domiciled in San Francisco, London or Panama. Mr. Riffle told me, Angelika Jordan, that Alberto William Vilar and Alan Tanaka verified to him, Mr. Riffle, that this was the account number used for me, Angelika Jordan, as well as my husband. Mr. Riffle indicates that both founders of Amerindo also maintained accounts in Panama. Alberto William Vilar told me, Angelika Jordan, and my husband that the account was moved to Panama because Alberto William Vilar and Gary Alan Tanaka had full discretionary trading authority in Panama.

5. AMOUNT OF CLAIM: The amount of this claim is for $13,586,784.29, representing the February 1, 2014 value of the equities account of $3,741,575, if this portfolio (i) held all stocks that still traded as of February 1, 2014, (ii) held all stocks still trading as of February 1, 2014, into which they were exchanged (at any time between March 31, 2002 and February 1, 2014) due to subsequent merger and acquisition activity, OR (iii) reinvested proceeds of cash distributions

into the QQQ, the ETF that mirrors the 100 largest nonfinancial companies in the NASDAQ. Amerindo specialized in the tech sector, and the QQQ is aligned with the sectors in which Amerindo participated. In other words, the claim is rolling forward the $3.741,575 from March 31, 2014, to February 1, 2014, which we understand is the cutoff date for valuation. No attempt was made to add and reinvest dividends, as these positions are in companies which typically do not pay dividend (JNPR being a current exception), nor was any attempt made to subtract the impact of Federal and state taxes on realized gains. For this latter reason, an award under this claim should withhold Federal and state taxes, and Angelika Jordan can provide her social security number prior to the distribution of such award.

6.  AMOUNT NOT CLAIMED: As disclosed on the March 31, 2002 statement, there was an amount for the investment in the Amerindo Guaranteed Fixed income Fund (AGFIIF) with an 8% per annum coupon (it appears as $665,359.19 plus $23,539.94 in interest for the then first quarter of 2002). Carried forward to May 25, 2005, that amount was $884,123,41 and $1,675,533.49 at September 20, 2013. See Sec. & Exch Comm'n v Amerindo Inv. Advisers Inc, UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORKJul 14, 2017No. 05-cv-5231 (RJS) (S.D.N.Y. Jul 14, 2017.

7.  KEY DOCUMENTS: Presented herewith are the following documents in support of the claim:

a) A new spreadsheet named Angelica Jordan which brings forward to February 1, 2014 the value of her equities account of $3.741,575 as of March 31, 2002, using the decision rules outlined above in paragraph 3. You will note that the spreadsheet uses borders for key numbers that either relate to the $3.741,575 valuation or which cell in the spreadsheet contains a formula for adjustment in cases where there was a stock split, merger/acquisition or some other corporate activity.

b) An old spreadsheet prepared by Kenneth Riffle upon which the foregoing spreadsheet was based. The new spreadsheet (i) corrects one error (AMZN split BEFORE 3/31/2002, not after that date), (ii) corrects the valuation of each stock holding and total portfolio value as of 3/31/2002 in new column H, and adds borders to key cells where adjustments are necessary as indicated above.

c) The last statement issued by Amerindo to Angelika Jordan dated March 31, 2002.

d) In addition to these documents, Michael Baldwin-Sotomayor has in his possession some Amerindo statements for this account that are older than March 31, 2002. These statements are not germane to substantiating the amount of this claim. In the event the court desires to review all of the available statements in order to substantiate the documentable history of this account, Michael Baldwin-Sotormayor is prepared to forward such statements promptly when requested.

8. WHY MORE RECENT STATEMENTS ARE NOT SUBMITTED: Across many years, requests were made of Alberto William Vilar, Gary Alan, and Renata Tanaka for statements. Alberto William Vilar at one point said to Angelika Jordan that he was not aware Renata Tanaka had not been sending out statements. The fact pattern of Amerindo failing to prepare and issue statements is well known to this Court.

9. PERSONS ASSISTING WITH THIS FILING: The persons who prepared this claim and/or a separate, successful claim for fixed income are:

Roel Campos, former Securities and Exchange Commissioner from 2002 to 2007, has been a partner at Hughes, Hubbard and Reed.

Kenneth Riffle was the director of marketing for Amerindo Advisors from 1982 to 1995. Angelika Jordan and her deceased husband were among the first clients Kenneth Riffle brought to Amerindo.

Michael Baldwin-Sotomayor was a broker/dealer representative in the 1980's-1990's, primarily at Bear Stearns & Co., where he was one of the persons who handled the commercial relationship with Amerindo. Mr. Baldwin is the person to whom any verbal and written communications about this claim should be addressed.

10. ATTESTATION: I, Angelike Jordan, certify under penalty of perjury that the foregoing is true and correct. I have relied on Roel Campos, Kenneth Riffle and Michael Baldwin-Sotomayor to prepare this and a prior successful claim.

*a.j.*
ANGELIKA JORDAN

DATED: October 23, 2019

Cc:

U.S. District Court SDNY
Pro Se Intake Unit
Room 105
40 Foley Square
New York, New York 10007

# AMERINDO INVESTMENT ADVISORS, INC.

AVENIDA SAMUEL LEWIS,
EDIFICIO PLAZA OBARRIO
APARTADO 5215
PANAMA 5 PANAMA
TEL: (507) 264-9673
FAX: (507) 264-9667

## STATEMENT OF ACCOUNT

Mrs A. Jordan
1009 Springfield Drive
Milbrae, CA 94030
USA

| Client Account Number | Reference |
|---|---|
| D886-D1F-152 | F |

| Statement Period | |
|---|---|
| Opening 01.01.02 | Closing 03.31.02 |

| Closing Account Balances | |
|---|---|
| Cash $19,097.09 | Equities ---------- |
| Fixed Deposits $665,259.19 | External $2,637,071.45 |

**Financial Account Summary**
$3,321,427.73

| Type of Investment | Price | Amount |
|---|---|---|
| FIXED DEPOSIT ACCOUNTS | | |
| AMERINDO INTERNATIONAL VENTURE FUND 1 | | |
| (GUARANTEED @ 8% P.A. VALUE DATE 09.21.01) | | $665,259.19 |
| INTEREST 09.21.01 TO 03.31.02 | | $ 23,539.94 |
| | | |
| EQUITIES | | |
| PORTFOLIO | | $2,637,071.45 |
| | | |
| EXTERNAL CUSTODY ACCOUNTS | | |
| | | |
| MISCELLANEOUS / CASH | | |
| CASH | | $19,097.09 |
| | | |
| TOTAL | | $3,321,427.73 |

# AMERINDO INVESTMENT ADVISORS INC.
## UNREALIZED GAINS AND LOSSES
### West Alphabetical Order

| Date | Quantity | Security | Unit Cost | Total Cost | Price | Market Value | Unrealized Gain/Loss |
|---|---|---|---|---|---|---|---|
| **COMMON STOCK** | | | | | | | |
| 08-23-98 | 20,000 | Actuate Inc. | | 71,250.00 | 7.22 | 144,400.00 | 73,150.00 |
| 02-25-99 | 5,000 | Amazon.com. | | 305,000.00 | 14.30 | 71,500.00 | -233,500.00 |
| 12-04-00 | 6,809 | Applied Micro Circuits | | 198,687.50 | 8.00 | 54,472.00 | -144,215.50 |
| 04-30-01 | 5,000 | Biogen | | 320,500.00 | 49.06 | 245,300.00 | -75,200.00 |
| 02-17-93 | 6,000 | Cephalon Inc | | 66,000.00 | 60.00 | 360,000.00 | 294,000.00 |
| 02-06-91 | 2,480 | Chiron | | 30,025.00 | 20.00 | 49,600.00 | 19,375.00 |
| 01-23-01 | 7,500 | Corvis | | 191,250.00 | 1.25 | 9,367.50 | -181,882.50 |
| 08-17-01 | 10,000 | Homestore.com | | 217,000.00 | 2.70 | 27,000.00 | -190,000.00 |
| 06-20-01 | 1,500 | Human Genome Sci. | | 93,562.50 | 21.79 | 32,685.00 | -60,877.50 |
| 05-18-98 | 10,000 | IDEC Pharmaceuticals | | 58,625.00 | 64.30 | 643,000.00 | 584,875.00 |
| 11-07-01 | 2,500 | Inclone Systems | | 155,000.00 | 24.63 | 61,575.00 | -93,425.00 |
| 10-17-01 | 5,000 | Juniper Networks | | 113,125.00 | 12.62 | 63,100.00 | -50,025.00 |
| 05-02-00 | 12,500 | LookSmart | | 301,562.50 | 3.23 | 40,375.00 | -261,187.50 |
| 05-16-01 | 10,000 | ONI Systems | | 341,250.00 | 6.17 | 61,700.00 | -279,550.00 |
| 12-30-99 | 4,125 | Peoplesoft Inc. | | 90,000.00 | 36.53 | 150,686.25 | 20,686.25 |
| 04-29-98 | 10,000 | Siebel Systems | | 601,187.50 | 32.61 | 326,100.00 | -258,912.50 |
| 07-21-00 | 5,000 | Sycamore Networks | | 383,150.00 | 3.95 | 19,750.00 | -364,000.00 |
| 11-30-99 | 10,000 | WebMD Corporation | | 480,000.00 | 7.68 | 76,800.00 | -403,200.00 |
| 07-20-99 | 10,810 | Yahoo | | 213,500.00 | 18.47 | 199,660.70 | -13,839.30 |
| | | | | 3,741,975.00 | | 2,637,071.45 | -1,104,903.55 |

**CASH AND EQUIVALENTS**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Cash & Equivalents | | 19,097.09 | | 19,097.09 | |
| | | | | 19,097.09 | | 19,097.09 | |

**TOTAL PORTFOLIO** | | | | | | | -1,104,903.55 |

# AMERINDO INVESTMENT ADVISORS, INC.

AVENIDA SAMUEL LEWIS,
EDIFICIO PLAZA OBARRIO
APARTADO 3215
PANAMA 5 PANAMA
TEL: (507) 264-9673
FAX: (507) 264-9667

## STATEMENT OF ACCOUNT

Mrs A. Jordan
1009 Springfield Drive
Milbrae, CA 94030
USA

| Client Account Number | Reference |
|---|---|
| D886-D1F-152 | F |

| Statement Period | | |
|---|---|---|
| Opening 01.01.02 | Closing 03.31.02 | |
| Closing Account Balances | | |
| Cash $19,097.09 | Equities ----------- | |
| Fixed Deposits $665,259.19 | External $2,637,071.45 | |
| Financial Account Summary $3,321,427.73 | | |

| Type of Investment | Price | Amount |
|---|---|---|
| FIXED DEPOSIT ACCOUNTS | | |
| AMERINDO INTERNATIONAL VENTURE FUND I | | |
| (GUARANTEED @ 8% P.A. VALUE DATE 09.21.01) | | $665,259.19 |
| INTEREST 09.21.01 TO 03.31.02 | | $ 23,539.94 |
| | | |
| EQUITIES | | |
| PORTFOLIO | | $2,637,071.45 |
| | | |
| EXTERNAL CUSTODY ACCOUNTS | | |
| | | |
| MISCELLANEOUS / CASH | | |
| CASH | | $19,097.09 |
| | | |
| TOTAL | | $3,321,427.73 |

Amerindo Investment Advisors
Avenida Samuel Lewis
Edificio Plaza Obarrio
Apartado 5215
Panama 5 PANAMA
(507) 264-9673
(507) 264-9667 fax

2/1/2014

| Date | Quantity | Original Ticker | Security | New Ticker | Unit Cost | Total Cost | Price |
|---|---|---|---|---|---|---|---|
| 8/23/1998 | 20,000.00 | BIRT | Actuate Inc | BIRT | $ 3.56 | $ 71,200.00 | $ 8.01 |
| 2/25/1999 | 10,000.00 | AMZN | Amazon.com | AMZN | $ 62.00 | $ 620,000.00 | $ 401.00 |
| 12/4/2000 | 6,809.00 | AMCC | Applied Micro Circuits[6] | AMCC | $ 29.18 | $ 198,686.62 | $ 11.25 |
| 4/30/2001 | 5,000.00 | BIIB | Biogen | BIIB | $ 64.10 | $ 320,500.00 | $ 344.25 |
| 2/17/1993 | 6,000.00 | CEPH | cephalon Inc[4] | CEPH buyout Teva | $ 11.00 | $ 66,000.00 | $ 81.50 |
| 2/6/1991 | 2,480.00 | CHIR | Chiron[5] | CHIR takeover by Novartis | $ 12.19 | $ 30,231.20 | $ 48.00 |
| 1/23/2001 | 7,500.00 | BWNG | Corvis[7] | LVLT takeover of Broadwing | $ 25.50 | $ 191,250.00 | $ 70.00 |
| 8/17/2001 | 10,000.00 | MOVE | Homestore.com[9] | MOVE | $ 21.70 | $ 217,000.00 | $ 17.35 |
| 6/20/2001 | 1,500.00 | HGSI | Human Genome Science[8] | HGSI taken over by GSK | $ 62.37 | $ 93,555.00 | $ 14.25 |
| 5/18/1998 | 10,000.00 | IDPH | IDEC Pharmaceuticals[3] | BIIB Takeover | $ 5.81 | $ 58,100.00 | $ 344.25 |
| 11/7/2001 | 2,500.00 | IMCL | Imclone Systems[2] | LLY Takeover | $ 62.00 | $ 155,000.00 | $ 70.00 |
| 10/17/2001 | 5,000.00 | JNPR | Juniper Networks | JNPR | $ 22.62 | $ 113,100.00 | $ 21.66 |
| 5/2/2000 | 12,500.00 | LOOK | LookSmart | LOOK | $ 24.12 | $ 301,500.00 | $ 0.81 |
| 5/16/2001 | 10,000.00 | ONIS | ONI Systems[10] | CIEN takeover | $ 34.12 | $ 341,200.00 | $ 27.75 |
| 12/30/1999 | 4,125.00 | PSFT | Peoplesoft, Inc.[11] | ORCL buys PSFT | $ 31.52 | $ 130,020.00 | $ 26.50 |
| 4/29/1998 | 20,000.00 | SEBL | Siebel Systems | ORCL buys SIEBel | $ 6.72 | $ 134,400.00 | $ 10.66 |
| 7/21/2000 | 5,000.00 | SCMR | Sycamore Networks | SCMR | $ 76.75 | $ 383,750.00 | $ 0.50 |
| 11/30/1999 | 20,000.00 | WBMD | WebMD Corp | WBMD | $ 48.00 | $ 960,000.00 | $ 35.95 |
| 7/20/1999 | 21,620.00 | YHOO | Yahoo[1] | YHOO | $ 19.75 | $ 213,500.00 | $ 37.25 |
| | | | | | | | |
| | | | | Total Portfolio Value | 1 | 1 | 1 |

Cash    19,097.09

Angelika Jordan
Amerindo Investment Advisors INC.
31-Mar-02
Portfolio Holdings
Client Account Number D886-D1F-152

Dividends

| Market Value | | |
|---|---|---|
| $ | 160,200.00 | |
| $ | 4,010,000.00 | 9/1/99 2-1 split |
| $ | 19,150.31 | |
| $ | 1,721,250.00 | |
| $ | 489,000.00 | Cash Buyout 81.50*6000 shs on 10/14/11 |
| $ | 119,040.00 | Cash buyout 48.00 5/20/06 |
| $ | 525,000.00 | Cash buyout 70.00 9/2007 |
| $ | 43,375.00 | |
| $ | 42,750.00 | Cash buyout 14.25 + 1-1 poison pill 5/29/12 |
| $ | 3,442,500.00 | 1-1 stock takeover |
| $ | 175,000.00 | Cash buyout 70.00 10/06/08 |
| $ | 108,300.00 | |
| $ | 10,125.00 | |
| $ | 511,718.88 | Cash buyout 27.75 + 7,104shs CIEN on 6/21/02 |
| $ | 109,312.50 | Cash byout 1/10/05 |
| $ | 557,028.15 | 1-1 poison pill 2/13/03 84.475% conversion to ORCL |
| $ | 28,310.00 | Dividend $25,810 |
| $ | 719,000.00 | 1-1 poison pill 11/14/11 |
| $ | 805,345.00 | 2-1 stock split 5/12/04 |
| $ | 13,596,404.84 | |
| | 19097.09 | |
| **$** | **13,615,501.93** | |

1 - May 12, 2004 2-1 stock split
2 - November 24, 2008 Eli Lily buyout @ $70.00 per share
3 - Merger with Biogen November 2003 1-1 share swap
4 - Taken over by Teva Pharmaceutical October 14, 2011
5 - Taken over by Novartis April 20, 2006
6 - reverse stock split 1-4 on December 11, 2007
7 - Corvis changed its name to Broadwing which was sold in Sept 2007 to Level 3.
8 - HGSI was taken over by GSK on 8/6/2012, Poison pill 1+1 split 7/16/12, total 3000 shares
9 - Homestore.com changed name in February 2006, reverse split 1 to 4 11/21/2011
10 - CIENA took over ONI Systems on 6/21/02 for 27.75
11 - Peoplesoft bought by Oracle January 2005 for 26.50

Notes: If you have the cutoff date it will take me some work, but I think I can get the prices for everything for that period of time. Anything that was bou or IDEC would have to compound at AIA IRR from that period to the cutoff period. Some stocks like HGSI was selling at 80.00 a share in 2005 so it would
.more work and I can do that on Monday after work

Cash Management
Starting period from date to ending 10/25/13 time.

| Stock | Date | Amount | S&P 500 % | QQQ Index % | S&P Ending MV | |
|---|---|---|---|---|---|---|
| Chiron | 5/20/2006 | $ 119,040.00 | 62.86% | 121.75% | $ 193,868.54 | S&P Added |
| LVLT | 9/14/2007 | $ 525,000.00 | 35.64% | 76.59% | $ 712,110.00 | |
| HGSI | 5/29/2012 | $ 42,750.00 | 41.92% | 39.89% | $ 60,670.80 | QQQ Added |
| IMCL | 10/6/2008 | $ 175,000.00 | 118.69% | 176.50% | $ 382,707.50 | |
| ONIS | 6/21/2002 | $ 511,718.88 | 123.79% | 242.70% | $ 1,145,175.68 | Realized Value |
| PSFT | 1/10/2005 | $ 109,312.50 | 78.60% | 127.98% | $ 195,232.13 | Realized Value |
| | | $ 1,482,821.38 | | | $ 2,689,764.65 | |
| | | | | | $ 1,482,821.38 | |

Net out cash payments

Market appreciation if reinvested in S&P 500 Index or QQQ Index     $ 1,206,943.27

|  |  |
|---|---|
| $ | 1,206,943.27 |
| $ | 14,822,445.20 |
| $ | 2,254,796.53 |
| $ | 15,870,298.47 |

ught out like Ciena
l require some

| QQQ Ending MV | |
|---|---|
| $ | 263,971.20 |
| $ | 927,097.50 |
| $ | 59,802.98 |
| $ | 483,875.00 |
| $ | 1,753,660.60 |
| $ | 249,210.64 |
| **$** | **3,737,617.91** |
| $ | 1,482,821.38 |
| **$** | **2,254,796.53** |

Amerindo Investment Advisors
Avenida Samuel Lewis
Edificio Plaza Obarrio
Apartado 5215
Panama 5 PANAMA
(507) 264-9673
(507) 264-9667 fax

**REVIEWED OCTOBER 2019**

| Date | As of 3/31/02 Quantity | As of 2/1/2014 Adj Quantity | Original Ticker | Security | New Ticker | Unit Cost | Per 3/31/02 Total Cost |
|---|---|---|---|---|---|---|---|
| 8/23/1998 | 20,000.00 | 20,000.00 | BIRT | Actuate Inc | BIRT | $ 3.56 | $ 71,250.00 |
| 2/25/1999 | 5,000.00 | 5,000.00 | AMZN | Amazon.com | AMZN | $ 62.00 | $ 310,000.00 |
| 12/4/2000 | 6,809.00 | 6,809.00 | AMCC | Applied Micro Circuits[6] | AMCC | $ 29.18 | $ 198,687.50 |
| 4/30/2001 | 5,000.00 | 5,000.00 | BIIB | Biogen | BIIB | $ 64.10 | $ 320,500.00 |
| 2/17/1993 | 6,000.00 | 6,000.00 | CEPH | cephalon Inc[4] | CEPH buyout Teva | $ 11.00 | $ 66,000.00 |
| 2/6/1991 | 2,480.00 | 2,480.00 | CHIR | Chiron[5] | CHIR takeover by Novartis | $ 12.19 | $ 30,225.00 |
| 1/23/2001 | 7,500.00 | 7,500.00 | BWNG | Corvis[7] | LVLT takeover of Broadwing | $ 25.50 | $ 191,250.00 |
| 8/17/2001 | 10,000.00 | 10,000.00 | MOVE | Homestore.com[9] | MOVE | $ 21.70 | $ 217,000.00 |
| 6/20/2001 | 1,500.00 | 3,000.00 | HGSI | Human Genome Science[8] | HGSI taken over by GSK | $ 62.38 | $ 93,562.50 |
| 5/18/1998 | 10,000.00 | 10,000.00 | IDPH | IDEC Pharmaceuticals[3] | BIIB Takeover | $ 5.81 | $ 58,125.00 |
| 11/7/2001 | 2,500.00 | 2,500.00 | IMCL | Imclone Systems[2] | LLY Takeover | $ 62.00 | $ 155,000.00 |
| 10/17/2001 | 5,000.00 | 5,000.00 | JNPR | Juniper Networks | JNPR | $ 22.63 | $ 113,125.00 |
| 5/2/2000 | 12,500.00 | 12,500.00 | LOOK | LookSmart | LOOK | $ 24.13 | $ 301,562.50 |
| 5/16/2001 | 10,000.00 | 10,000.00 | ONIS | ONI Systems[10] | CIEN takeover | $ 34.13 | $ 341,250.00 |
| 12/30/1999 | 4,125.00 | 4,125.00 | PSFT | Peoplesoft, Inc.[11] | ORCL buys PSFT | $ 31.52 | $ 130,000.00 |
| 4/29/1998 | 10,000.00 | 10,000.00 | SEBL | Siebel Systems | ORCL buys SIEBel | $ 6.72 | $ 67,187.50 |
| 7/21/2000 | 5,000.00 | 5,000.00 | SCMR | Sycamore Networks | SCMR | $ 76.75 | $ 383,750.00 |
| 11/30/1999 | 10,000.00 | 20,000.00 | WBMD | WebMD Corp | WBMD | $ 48.00 | $ 480,000.00 |
| 7/20/1999 | 21,620.00 | 21,620.00 | YHOO | Yahoo[1] | YHOO | $ 9.88 | $ 213,500.00 |
| | | | | | | | $ 3,741,975.00 |

Cash   19,097.09

Total Portfolio Value

Angelika Jordan
Amerindo Investment Advisors INC.
31-Mar-02
Portfolio Holdings
Client Account Number D886-D1F-152

| Price | Market Value | 2/1/2014 Dividends | |
|---|---|---|---|
| | 2/1/2014 | 2/1/2014 Dividends | |
| $ 8.01 | $ 160,200.00 | | |
| $ 401.00 | $ 2,005,000.00 | | 9/1/99 2-1 split |
| $ 11.25 | $ 19,150.31 | | |
| $ 344.25 | $ 1,721,250.00 | | |
| $ 81.50 | $ 489,000.00 | | Cash Buyout 81.50*6000 shs on 10/14/11 |
| $ 48.00 | $ 119,040.00 | | Cash buyout 48.00 5/20/06 |
| $ 70.00 | $ 525,000.00 | | Cash buyout 70.00 9/2007 |
| $ 17.35 | $ 43,375.00 | | |
| $ 14.25 | $ 42,750.00 | | Cash buyout 14.25 + 1-1 poison pill 5/29/12 |
| $ 344.25 | $ 3,442,500.00 | | 1-1 stock takeover |
| $ 70.00 | $ 175,000.00 | | Cash buyout 70.00 10/06/08 |
| $ 21.66 | $ 108,300.00 | | |
| $ 0.81 | $ 10,125.00 | | |
| $ 27.75 | $ 511,718.88 | | Cash buyout 27.75 + 7,104shs CIEN on 6/21/02 |
| $ 26.50 | $ 109,312.50 | | Cash byout 1/10/05 |
| $ 10.66 | $ 278,514.08 | | 1-1 poison pill 2/13/03 84.475% conversion to ORCL |
| $ 0.50 | $ 28,310.00 | | Dividend $25,810 |
| $ 35.95 | $ 719,000.00 | | 1-1 poison pill 11/14/11 |
| $ 37.25 | $ 805,345.00 | | 2-1 stock split 5/12/04 |
| | $ 11,312,890.77 | | |

1

19097.09

$ 11,331,987.86

1 - May 12, 2004 2-1 stock split
2 - November 24, 2008 Eli Lilly buyout @ $70.00 per share
3 - Merger with Biogen November 2003 1-1 share swap
4 - Taken over by Teva Pharmaceutical October 14, 2011       Realized Value
5 - Taken over by Novartis April 20, 2006
6 - reverse stock split 1-4 on December 11, 2007
7 - Corvis changed its name to Broadwing which was sold in Sept 2007 to Level 3.
8 - HGSI was taken over by GSK on 8/6/2012, Poison pill 1+1 split 7/16/12, total 3000 shares
9 - Homestore.com changed name in February 2006, reverse split 1 to 4 11/21/2011
10 - CIENA took over ONI Systems on 6/21/02 for 27.75       Realized Value
11 - Peoplesoft bought by Oracle January 2005 for 26.50

Cash Management
Starting period from date to ending 10/25/13 time.

| Stock | Date | Amount | S&P 500 % | QQQ Index % | S&P Ending MV |
|---|---|---|---|---|---|
| Chiron | 5/20/2006 | $ 119,040.00 | 62.86% | 121.75% | $ 193,868.54 |
| LVLT | 9/14/2007 | $ 525,000.00 | 35.64% | 76.59% | $ 712,110.00 |
| HGSI | 5/29/2012 | $ 42,750.00 | 41.92% | 39.89% | $ 60,670.80 |
| IMCL | 10/6/2008 | $ 175,000.00 | 118.69% | 176.50% | $ 382,707.50 |
| ONIS | 6/21/2002 | $ 511,718.88 | 123.79% | 242.70% | $ 1,145,175.68 |
| PSFT | 1/10/2005 | $ 109,312.50 | 78.60% | 127.98% | $ 195,232.13 |
| | | $ 1,482,821.38 | | | $ 2,689,764.65 |

Net out cash payments       $ 1,482,821.38
Market appreciation if reinvested in S&P 500 Index or QQQ Index       $ 1,206,943.27

Notes: If you have the cutoff date it will take me some work, but I think I can get the prices for everything for that period of time. Anything that was bought to compound at AIA IRR from that period to the cutoff period. Some stocks like HGSI was selling at 80.00 a share in 2005 so it would require some more wor after work.

|  | S&P Added | $ | 1,206,943.27 |
|  |  | $ | 12,538,931.13 |
|  | QQQ Added | $ | 2,254,796.53 |
|  |  | $ | 13,586,784.39 |

out like Ciena or IDEC would
e work and I can do that on

| QQQ Ending MV | |
| --- | --- |
| $ | 263,971.20 |
| $ | 927,097.50 |
| $ | 59,802.98 |
| $ | 483,875.00 |
| $ | 1,753,660.60 |
| $ | 249,210.64 |
| **$** | **3,737,617.91** |
| $ | 1,482,821.38 |
| **$** | **2,254,796.53** |


# Laurie Christov

**825 College Blvd. #327 Oceanside, CA 92057 Ph 310 503-0224 email: laurie.christov@yahoo.com**

<u>VIA CERTIFIED RETURN RECIEPT</u>                                    November, 15, 2019
Judge Richard J. Sullivan
Unites States District Court
Southern District of New York
Clerk's Office
500 Pearl Street
New York, NY 10007


Re: United States v. Alberto Vilar and Gary Alan Tanaka
05 Cr. 621(RJS)

Dear Judge Sullivan,

    I am writing you today in regards to the above referenced case to request that my name be added to the list and placed on the Docket of # 05 Cr. 621 (RJS) as a legal interested party to the property that has been ordered forfeited to the United States pursuant to Federal Statute Title 21, United States Code 853, Section N3. I am the surviving spouse of Latchezar Christov, one of the claimants of the above referenced case who is now deceased.

    Enclosed is a copy of my marriage certificate and my husband's death certificate for your file. I also have enclosed a copy of the Amended Proof of Claim Form that was sent to the Receiver, Ian Gazes, dated July 7, 2015. This request was to amend the list (Claimant 27) and be put in my name Lauranne Christov, after the death of my husband on January 16, 2015.

    Enclosed you will find a copy of the letter of the Preliminary Order of Forfeiture as to Substitute Assets sent by the U.S. Department of Justice, United States Attorney, Southern District of New York dated November 1, 2019. According to the letter I have the right to petition for a hearing to adjudicate the validity of my interest in the property with the Court within 30 days of the receipt of the notice

    Alternatively, a petition is now being filed as a legal interested party through the Pro se Intake Unit, United States District Court, Room 105, 40 Foley Square, New York, New York, 10007.

    I appreciate your prompt attention in this matter as time is of the essence.

Sincerely,

*Lauranne Christov*

Lauranne Christov

# COUNTY OF SAN DIEGO

### CERTIFICATE OF DEATH

3052015012779 — STATE FILE NUMBER

3201537001156 — LOCAL REGISTRATION NUMBER

**DECEDENT'S PERSONAL DATA**

1. NAME OF DECEDENT—FIRST (Given): LATCHEZAR
2. MIDDLE: —
3. LAST (Family): CHRISTOV

AKA, ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST): LUCKY CHRISTOV

4. DATE OF BIRTH mm/dd/ccyy: 03/22/1937
5. AGE Yrs.: 77
7. SEX: M

8. BIRTH STATE/FOREIGN COUNTRY: BULGARIA
10. SOCIAL SECURITY NUMBER: —
11. EVER IN U.S. ARMED FORCES?: YES [X] NO ☐ UNK
12. MARITAL STATUS/SRDP (at time of death): MARRIED
13. DATE OF DEATH mm/dd/ccyy: 01/16/2015
14. HOUR: 1240

14A. LOCATION – Highest Level Attained: BACHELOR
14B. WAS DECEDENT HISPANIC/LATINO/A(SPANISH)?: YES ☐ NO [X]
15. DECEDENT'S RACE: BULGARIAN

17. USUAL OCCUPATION – Type of work for most of life. DO NOT USE RETIRED: STOCK BROKER
18. KIND OF BUSINESS OR INDUSTRY: INVESTMENT BANKING
19. YEARS IN OCCUPATION: 30

**DECEDENT'S USUAL RESIDENCE**

20. DECEDENT'S RESIDENCE (Street and number, or location): 1625 APPALOOSA
21. CITY: OCEANSIDE
22. COUNTY/PROVINCE: SAN DIEGO
23. ZIP CODE: 92057
24. YEARS IN COUNTY: 30
25. STATE/FOREIGN COUNTRY: CA

**NEXT OF KIN**

26. INFORMANT'S NAME, RELATIONSHIP: LAURANNE CHRISTOV, WIFE
27. INFORMANT'S MAILING ADDRESS: 825 COLLEGE BLVD 327, OCEANSIDE, CA 92057

**SPOUSE/SRDP AND PARENT INFORMATION**

28. NAME OF SURVIVING SPOUSE/SRDP—FIRST: LAURANNE
29. MIDDLE: CHRISTINE
30. LAST (BIRTH NAME): YOUNG

31. NAME OF FATHER/PARENT—FIRST: LUBEN
32. MIDDLE: —
33. LAST: CHRISTOV
34. BIRTH STATE: BULGARIA

35. NAME OF MOTHER/PARENT—FIRST: LILIANNA
36. MIDDLE: —
37. LAST (BIRTH NAME): KISILENCHEV
38. BIRTH STATE: BULGARIA

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

40. DISPOSITION DATE mm/dd/ccyy: 01/23/2015
41. PLACE OF FINAL DISPOSITION: 1/2 RES LAURANNE CHRISTOV, 825 COLLEGE BLVD APT 327, OCEANSIDE, CA 92057

41. TYPE OF DISPOSITION(S): CR/RES
42. SIGNATURE OF EMBALMER: NOT EMBALMED
43. LICENSE NUMBER: —

44. NAME OF FUNERAL ESTABLISHMENT: ACCU-CARE CREMATION CENTER
45. LICENSE NUMBER: FD1528
46. SIGNATURE OF LOCAL REGISTRAR: WILMA WOOTEN, MD
47. DATE mm/dd/ccyy: 01/23/2015

**PLACE OF DEATH**

101. PLACE OF DEATH: RESIDENCE
102. IF OTHER THAN HOSPITAL, SPECIFY ONE: Decedent's Home [X]

104. COUNTY: SAN DIEGO
105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number or location): 1625 APPALOOSA
106. CITY: OCEANSIDE

**CAUSE OF DEATH**

107. CAUSE OF DEATH

IMMEDIATE CAUSE (A): ARTERIOSCLEROTIC HEART DISEASE — Time Interval: YRS
108. BIOPSY PERFORMED?: YES ☐ NO [X]

(B): HYPERTENSION — Time Interval: YRS
109. BIOPSY PERFORMED?: YES ☐ NO [X]

110. AUTOPSY PERFORMED?: YES ☐ NO [X]

111. USED IN DETERMINING CAUSE?: —

112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107: AORTIC STENOSIS, PAROXYSMAL ATRIAL FIBRILLATION

113. WAS OPERATION PERFORMED FOR ANY CONDITION (ITEM 107 OR 112)? IF YES, list type of operation and date: NO
113A. IF FEMALE, PREGNANT IN LAST YEAR: YES ☐ NO ☐ UNK ☐

**PHYSICIAN'S CERTIFICATION**

114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED

Decedent Attended Since: 03/02/2007
Decedent Last Seen Alive: 01/05/2015

115. SIGNATURE AND TITLE OF CERTIFIER: FRANKLIN GALEF MD
116. LICENSE NUMBER: G36816
117. DATE mm/dd/ccyy: 01/21/2015

118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE: FRANKLIN GALEF MD, 130 CEDAR RD STE 220, VISTA, CA 92083

**CORONER'S USE ONLY**

119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED
120. INJURED AT WORK?: YES ☐ NO ☐ UNK ☐
121. INJURY DATE mm/dd/ccyy: —
122. HOUR 24 HOURS: —

123. MANNER OF DEATH: Natural ☐ Accident ☐ Homicide ☐ Suicide ☐ Pending Investigation ☐ Could not be determined ☐

124. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.): —

125. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury): —

126. LOCATION OF INJURY (Street and number, or location, and city, and zip): —

127. SIGNATURE OF CORONER / DEPUTY CORONER: ▶
128. DATE mm/dd/ccyy: —
129. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER: —

**STATE REGISTRAR**

A: __ B: __ C: __ D: __ E: __

*D10001000284041I*

FAX AUTH.#: __

CENSUS TRACT: __

County of San Diego –Health & Human Services Agency – 3851 Rosecrans Street. This is to certify that, if bearing the OFFICIAL SEAL OF THE STATE OF CALIFORNIA, the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED. Required fee paid.

DATE ISSUED: January 27, 2015



WILMA J. WOOTEN, MD
REGISTRAR OF VITAL RECORDS
County of San Diego

This copy not valid unless prepared on engraved border displaying seal and signature of Registrar



*A002818703*


# COUNTY OF LOS ANGELES • REGISTRAR-RECORDER

## LICENSE AND CERTIFICATE OF MARRIAGE
MUST BE LEGIBLE—MAKE NO ERASURES, WHITEOUTS, OR OTHER ALTERATIONS

STATE FILE NUMBER — LOCAL REGISTRATION NUMBER: **13534**

**GROOM PERSONAL DATA**

| 1A. NAME OF GROOM—FIRST (GIVEN) | 1B. MIDDLE | 1C. LAST (FAMILY) | 2. DATE OF BIRTH—MONTH, DAY, YEAR |
|---|---|---|---|
| LATCHEZAR | | CHRISTOV | MAR 22, 1939 |

| 3. RESIDENCE—STREET AND NUMBER | 3B. CITY | 3C. ZIP CODE | 3D. COUNTY—IF OUTSIDE CALIFORNIA ENTER STATE | 4. STATE OF BIRTH |
|---|---|---|---|---|
| 607 SKYLINE TRAIL | TOPANGA | 90290 | LOS ANGELES | BULGARIA |

| 5 MAILING ADDRESS—IF DIFFERENT | 6. NUMBER OF PREVIOUS MARRIAGE | 7A. LAST MARRIAGE ENDED BY: | 7B. DATE—MONTH, DAY, YEAR |
|---|---|---|---|
| | 1 | ☐ DEATH ☒ DISSOLUTION ☐ ANNULMENT | MAR 7, 1972 |

| 8A. USUAL OCCUPATION | 8B. USUAL KIND OF BUSINESS OR INDUSTRY | 9. NUMBER OF HIGHEST GRADE COMPLETED |
|---|---|---|
| INVESTMENTS | SECURITIES | 17 OR COLLEGE 13-17*) |

| 10A. FULL NAME OF FATHER | 10B. STATE OF BIRTH | 11A. FULL MAIDEN NAME OF MOTHER | 11B. STATE OF BIRTH |
|---|---|---|---|
| LUBEN CHRISTOV | BULGARIA | KISSELINCHEN, LILLIANA | BULGARIA |

**BRIDE PERSONAL DATA**

| 12A. NAME OF BRIDE—FIRST (GIVEN) | 12B. MIDDLE | 12C. CURRENT LAST (FAMILY) | 12D. MAIDEN LAST (FAMILY) IF OTHER THAN 12C | 13. DATE OF BIRTH MONTH, DAY, YEAR |
|---|---|---|---|---|
| LAURANNE | CHRISTINE | YOUNG | | APRIL 27, 1961 |

| 14A. RESIDENCE—STREET AND NUMBER | 14B. CITY | 14C. ZIP CODE | 14D. COUNTY—IF OUTSIDE CALIFORNIA ENTER STATE | 15. STATE OF BIRTH |
|---|---|---|---|---|
| 607 SKYLINE TRAIL | TOPANGA | 90290 | LOS ANGELES | CA |

| 16 MAILING ADDRESS—IF DIFFERENT | 17. NUMBER OF PREVIOUS MARRIAGES | 18A. LAST MARRIAGE ENDED BY: | 18B. DATE—MONTH, DAY, YEAR |
|---|---|---|---|
| | 0 | ☐ DEATH ☐ DISSOLUTION ☐ ANNULMENT | |

| 19A. USUAL OCCUPATION | 19B. USUAL KIND OF BUSINESS OR INDUSTRY | 20. NUMBER OF HIGHEST GRADE COMPLETED (1-12 OR COLLEGE 13-17*) |
|---|---|---|
| INTERIOR DESIGN | INTERIOR DESIGN | 17 |

| 21A. FULL NAME OF FATHER | 21B. STATE OF BIRTH | 22A. FULL MAIDEN NAME OF MOTHER | 22B. STATE OF BIRTH |
|---|---|---|---|
| EDWARD PARK YOUNG, JR. | CA | JACQULINE JAY CURRIE | MICHIGAN |

**AFFIDAVIT**

WE, THE UNDERSIGNED, AN UNMARRIED MAN AND UNMARRIED WOMAN, STATE THAT THE FOREGOING INFORMATION IS CORRECT AND TRUE TO THE BEST OF OUR KNOWLEDGE AND BELIEF, THAT NO LEGAL OBJECTION TO THE MARRIAGE NOR TO THE ISSUANCE OF A LICENSE IS KNOWN TO US, AND HEREBY APPLY FOR A LICENSE AND CERTIFICATE OF MARRIAGE.

| 23. SIGNATURE OF GROOM ► | 24. SIGNATURE OF BRIDE ► |
|---|---|
| *Lath Christ* | *Lauranne C. Young* |

**LICENSE TO MARRY**

AUTHORIZATION AND LICENSE IS HEREBY GIVEN TO ANY PERSON DULY AUTHORIZED BY THE LAWS OF THE STATE OF CALIFORNIA TO PERFORM A MARRIAGE CEREMONY WITHIN THE STATE OF CALIFORNIA TO SOLEMNIZE THE MARRIAGE OF THE ABOVE NAMED PERSONS. REQUIRED CONSENT FOR THE ISSUANCE OF THIS LICENSE ARE ON FILE.

| 25A. ISSUE DATE MONTH, DAY, YEAR | 25B. LICENSE EXPIRES AFTER MONTH, DAY, YEAR | 25C. LICENSE NUMBER | 25D. COUNTY OF ISSUE |
|---|---|---|---|
| MAY 10, 1990 | AUGUST 8, 1990 | WE 43270 | LOS ANGELES |

| 25E. SIGNATURE OF COUNTY CLERK | 25F. |
|---|---|
| FRANK S. ZOLIN | by ◄ *R. Earley* DEPUTY |

**WITNESS(ES) (ONE REQUIRED)**

| 26A. SIGNATURE OF WITNESS | 26C. ADDRESS—STREET AND NUMBER | 26C. CITY, STATE AND ZIP CODE |
|---|---|---|
| *signature* | 68 N ARROYO BLVD | PASADENA, CA 91105 |

| 27A. SIGNATURE OF WITNESS | 27B. ADDRESS—STREET AND NUMBER | 27C. CITY, STATE AND ZIP CODE |
|---|---|---|
| *signature* | 68 N. ARROYO BLVD | PASADENA CA 91105 |

**CERTIFICATION OF PERSON SOLEMNIZING CEREMONY**

28. I HEREBY CERTIFY THAT THE ABOVE-NAMED BRIDE AND GROOM WERE JOINED BY ME IN MARRIAGE IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA

| ON June 2 19 90 | 28A. SIGNATURE OF PERSON SOLEMNIZING MARRIAGE | 28B. RELIGIOUS DENOMINATION |
|---|---|---|
| AT Los Angeles, Los Angeles, CALIFORNIA | *V. Rev. James N. Adams* | Greek Orthodox |
| CITY OR TOWN COUNTY | 28C. NAME AND OFFICIAL TITLE OF PERSON SOLEMNIZING MARRIAGE V. Rev. James T. Adams, Dean St. Sophia Cathedral | |
| | 28D. MAILING ADDRESS AND ZIP CODE 1324 So. Normandie Ave. Los Angeles, CA 90006 | |

**LOCAL REGISTRAR OF MARRIAGES / COUNTY RECORDER**

| 30. SIGNATURE OF LOCAL REGISTRAR | 31. DATE ACCEPTED FOR REGISTRATION |
|---|---|
| *Charles Weissburd* | JUN 18 1990 |

STATE OF CALIFORNIA, DEPARTMENT OF HEALTH SERVICES, OFFICE OF STATE REGISTRAR

---

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder.



CHARLES WEISSBURD
Registrar-Recorder

DEC 06 1990

19-693318



This copy not valid unless prepared on engraved border displaying the County of Los Angeles Seal and Signature of Registrar-Recorder.

American Bank Note Company — ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 1, 2019

<u>VIA CERTIFIED RETURN RECEIPT</u>

Estate of Latchezar Christov
c/o Lauranne Christov
826 College Boulevard, #327
Oceanside, CA 92057

Re: <u>United States</u> v. <u>Alberto William Vilar and Gary Alan Tanaka</u>
05 Cr. 621 (RJS)

Dear Ms. Christov:

Enclosed is a copy of the Preliminary Order of Forfeiture as to Substitute Assets that has been filed in the above-captioned case in the Southern District of New York. Please note that this is being sent as a substitute for the notice previously mailed on August 22, 2019 to Mr. Latchezar Christov at 360 Lexington Avenue, New York, New York 10017, which was subsequently returned to our office for insufficient address on September 17, 2019.

Pursuant to Title 21, United States Code, Section 853(n), persons other than the defendant who wish to assert a legal interest in property that has been ordered forfeited to the United States must file a petition for a hearing to adjudicate the validity of their alleged interest in the property with the Court within thirty days (30) of the final publication of notice, or receipt of actual notice, whichever is earlier.

In addition, the petition must be signed by the petitioner under penalty of perjury and must set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the claim, and the relief sought.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By: _____
Alexander J. Wilson
Co-Chief, Money Laundering and
Transnational Criminal Enterprises Unit
Assistant United States Attorney
Tel. (212) 637-2453

Enclosure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA          :

       -v.-                          :

                                     :

ALBERTO WILLIAM VILAR and         :
GARY ALAN TANAKA,                 :

          Defendants.         :

                              :

------------------------------------------------------------x

**PRELIMINARY ORDER OF
FORFEITURE AS TO
SUBSTITUTE ASSETS**

05 Cr. 621 (RJS)

<u>RICHARD J. SULLIVAN</u>, Circuit Judge:

       WHEREAS, on or about August 15, 2006, ALBERTO WILLIAM VILAR and

GARY ALAN TANAKA (collectively, the "Defendants") were charged in a twelve-count

Superseding Indictment, S3 05 Cr. 621 (KMK) (the "Indictment"), with engaging in a

conspiracy to commit securities fraud, investment adviser fraud, mail fraud, wire fraud, and

money laundering, in violation of Title 18, United States Code Section 371 (Count One);

securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17,

Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2

(Counts Two and Three); investment adviser fraud, in violation of Title 15, United States Code,

Sections 80b-6 and 80b-17 and Title 18, United States Code, Section 2 (Count Four); mail fraud,

in violation of Title 18, United States Code, Sections 1341 and 2 (Counts Five); wire fraud, in

violation of Title 18, United States Code, Sections 1343 and 2 (Counts Six and Seven); money

laundering, in violation of Title 18, United States Code, Sections 1957 and 2 (Counts Eight

through Eleven); and making false statements in violation of Title 18, United States Code,

Sections 1001(a) and 2 (Count Twelve);

       WHEREAS, the Indictment contained a forfeiture allegation seeking, pursuant to

Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section

2461, the forfeiture of any and all property, real and personal, that constitutes or is derived from

proceeds traceable to the commission of the offenses, including but not limited to at least

$19,706,363.74 in United States currency, representing the proceeds obtained as a result of the

charged securities, mail, and wire fraud offenses charged in the Indictment (Counts 1 through 7);

and seeking, pursuant to Title 18, United States Code, Section 982, the forfeiture of any and all

property, real and personal, involved in the charged money laundering offenses, including all

property traceable to such property, including but not limited to at least $5,000,000 in United

States currency (Counts 8 through 11);

      WHEREAS, the Indictment also included a substitute asset provision providing

that if, as a result of the Defendant's actions or omissions, forfeitable property is unable to be

located or obtained, the United States will seek, pursuant to Title 21, United States Code,

Section 853(p), the forfeiture of any other property of the Defendant;

      WHEREAS, on or about November 19, 2008, a jury returned a guilty verdict

against Defendant Vilar on all twelve counts of the Indictment and against Defendant Tanaka on

Counts One, Three and Four of the Indictment;

      WHEREAS, on or about April 25, 2014, the Court entered Preliminary Orders of

Forfeiture/Money Judgment, which made final as to each Defendant a money judgment in the

amount of $20,578,855.28 representing the amount of proceeds obtained as a result of the

offenses charged in the Indictment, for which the Defendants were found guilty (the "Money

Judgments");

      WHEREAS, the Court finds that, due to the acts or omissions of each Defendant,

the proceeds of the offenses cannot be located upon the exercise of due diligence, have been

2

transferred, sold to or deposited with a third party, have been placed beyond jurisdiction of the

Court, or have been commingled with other property which cannot be divided without difficulty;

WHEREAS, the Government has identified the following assets in which the

Defendants have an ownership interest:

a.   J.P. Morgan Chase brokerage account numbers:

i.   102-17995 MOL, held in the name of Techno Raquia, S.A., Ian Gazes
Receiver c/o Gazes LLC;

ii.   102-01485 MOL, held in the name of Amerindo Management Inc.,
sub-Account M26, Ian Gazes Receiver c/o Gazes LLC;

iii.   102-01495 MOL, held in the name of Amerindo Technology Growth
Fund II, Inc., Ian Gazes Receiver c/o Gazes LLC;

iv.   102-15833, held in the name of Olafson, Inc., Ian Gazes Receiver c/o
Gazes LLC;

iii.   102-25612, held in the name of Amerindo Investment Advisors, Inc.
Money Purchase Plan and Trust Alberto Vilar TTEE DTD 5/1/94 c/o
Gazes LLC Ian Gazes; and

b.   Approximately $273,611.89 in funds formerly held by @Ventures
Management, LLC for the benefit of Amerindo Technology Growth Fund
II, Inc.

(collectively, the "Substitute Assets").

IT IS HEREBY ORDERED THAT:

1.   All of the Defendants' right, title and interest in the Substitute Assets are

hereby forfeited to the United States of America, for disposition in accordance with the law,

subject to the provisions of Title 21, United States Code, Section 853(n).

2.   Pursuant to Title 21, United States Code, Section 853(n)(1), Rule 32.2(b)(6) of

the Federal Rules of Criminal Procedure, and Rules G(4)(a)(iv)(C) and G(5)(a)(ii) of the

Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions, the

United States is permitted to publish forfeiture notices on the government internet site,

3

www.forfeiture.gov. This site incorporates the forfeiture notices that have been traditionally published in newspapers. The United States forthwith shall publish notice of this Preliminary Order of Forfeiture of Substitute Assets for at least thirty (30) consecutive days. Any person, other than the Defendant, claiming interest in the Substitute Assets must file a Petition within sixty (60) days from the first day of publication of the notice on this official government internet web site, or no later than thirty-five (35) days from the mailing of actual notice, whichever is earlier.

3.    The published notice of forfeiture shall state that the petition (i) shall be for a hearing to adjudicate the validity of the petitioner's alleged interest in the Substitute Assets, (ii) shall be signed by the petitioner under penalty of perjury, and (iii) shall set forth the nature and extent of the petitioner's right, title or interest in the Substitute Assets, the time and circumstances of the petitioner's acquisition of the right, title and interest in the Substitute Assets, any additional facts supporting the petitioner's claim, and the relief sought, pursuant to Title 21, United States Code, Section 853(n).

4.    Pursuant to 32.2 (b)(6)(A) of the Federal Rules of Criminal Procedure, the Government shall send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding.

5.    Upon adjudication of all third-party interests, this Court will enter a Final Order of Forfeiture with respect to the Substitute Assets pursuant to Title 21, United States Code, Section 853(n), in which all interests will be addressed. All Substitute Assets forfeited to the United States under a Final Order of Forfeiture shall be applied towards the satisfaction of the Money Judgment.

6.    Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate

or dispose of forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas.

7.    The Court shall retain jurisdiction to enforce this Preliminary Order of Forfeiture as to Substitute Assets, and to amend it as necessary, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

8.    The Clerk of the Court is respectfully directed to forward three certified copies of this Preliminary Order of Forfeiture as to Substitute Assets to Assistant United States Attorney Alexander J. Wilson, Chief of the Money Laundering and Asset Forfeiture Unit, United States Attorney's Office, One St. Andrew's Plaza, New York, New York 10007.

SO ORDERED.

Dated:        August 2, 2019
              New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

July 7, 2015

Ian J. Gazes, Receiver
Gazes LLC
151 Hudson Street
New York, New York 10013

> **RE:** **SEC v. Amerindo Investment Advisors Inc., USDC Case No. 05 Civ. 5231**
> **Claimant:  LatchezarChristov, Claim No. 27**
> **Amendment to Claim**

Mr. Gazes,

I am the surviving spouse of Latchezar Christov who is a claimant in the above referenced receivership.  Mr. Christov died on January 16, 2015.  Enclosed is a certified copy of Decedent's death certificate for your file.   I am a successor in interest to this claim, referenced as Claim 27 on the Receiver's Claims Register, also enclosed.

This letter is sent for the purpose of amending the claim to substitute in as Claimant in light of Mr. Christov's passing.  A copy of the claim submitted on September 19, 2013 is also enclosed for your reference.

My address and phone number are:

Lauranne Christine Christov

825 College Blvd #327
Oceanside, CA 92057

310-503-0224

Please advise what if any other information is required to perfect amendment of this claim in the respects stated above.

Warmest regards,

Lauranne Christine Christov

Enclosures

SEC v. AMERINDO INVESTMENT ADVISORS INC., et al., 05 Civ. 5231-RJS (DNR)

CLAIMS REGISTER OF ALL PROOFS OF CLAIM SUBMITTED TO RECEIVER BY THE SEPTEMBER 20, 2013 BAR DATE

| No. | Claimant | Shares* | Fund(s)** | Principal Funds** | Pre 5/25/05 Profits*** | Pre 5/25/05 Distributions | Post 5/25/05 Profits |
|---|---|---|---|---|---|---|---|
| 1 | E. Ronald Salvitti, M.D. | 91,993.83 | ATGF | $6,000,000.00 | $6,000,000.00 | $0.00 | Unknown |
| 2 | John Preetzmann - Aggerholm | 243,902.43 | GFRDA | $279,745.76 | $198,140.10 | $45,000.00 | $992,502.73 |
| 3 | OGCI Nominees Limited a/k/a Quilter Goodison Ltd. f/k/a Quilter Cheviot Limited | 1,642.46 | ATGF | $95,000.00 | -$60,984.65 | $0.00 | Unknown |
| 4 | Lisa Mayer & Debra Mayer c/o Begos Brown & Green LLP | | GFRDA | $11,972,910.93 | $836,350.40 | $1,153,867.26 | $26,920,054.14 |
| | | 14,784.21 | ATGF | $446,168.79 | Unknown | Unknown | Unknown |
| 6 | Elizabeth Knope | Unknown | Unknown | $84,774.05 | Unknown | None | Unknown |
| 7 | Michael Walsh | 6,057.22 | ATGF | $251,812.46 | Unknown | None | Unknown |
| 8 | Surinder Rametra | 1,957.98 | ATGF | $250,000.00 | Unknown | None | Unknown |
| 9 | Sheridan Securities | 16,917.57 | ATGF | $500,000.00 | None | None | None |
| 10 | James Charles | 22,400.00 | ATGF | $175,726.14 | $271,749.70 | None | Unknown |
| 11 | Ariadana Sanchez | 6,057.22 | GFRDA | $100,000.00 | $1,976,275.64 | Unknown | Unknown |
| 12 | Robin Sayko | 6,057.22 | ATGF | $251,812.46 | $23,920.53 | None | Unknown |
| 13 | Donald & Marilyn Walsh | 6,057.22 | ATGF | $251,812.46 | Unknown | None | Unknown |
| 14 | Frank Harris | | GFRDA | $550,000.00 | Unknown | None | Unknown |
| 15 | Charles Kaye | 1,630.18 | ATGF | $174,988.00 | $208,146.00 | none | Unknown |
| 16 | Alfred Heitkonig for himself and on behalf of Elna Charlotte Olga a/k/a Elna Heitkoenig and Maaike Maria Hickok a/k/a Elna Heitkoenig | 90,000.00 | ATGF, GFRDA | $6,875,896.73 | Unknown | Unknown | $7,479,156.40 |
| 17 | The Winsford Corporation | Unknown | ATGF | $1,500,000.00 | None | None | Unknown |
| 18 | Peter Sweetland | 1,194.32 | ATGF | $41,670.47 | Unknown | Unknown | Unknown |
| 19 | John Sweetland | 113,859.84 | ATGF | $22,846,496.00 | Unknown | Unknown | Unknown |
| 20 | Timothy Sweetland | 2,823.54 | ATGF | $191,671.47 | Unknown | Unknown | Unknown |
| 21 | John Sweetland | 1,194.32 | ATGF | $41,670.47 | Unknown | Unknown | Unknown |
| 22 | Anthony W. Gibbs | Unknown | ATGF | $1,287,618.98 | Unknown | $30,395.04 | Unknown |
| 23 | Patricia A. Kabara | 6,057.72 | ATGF; Rhodes Capital | $251,812.46 | Unknown | $189,403.00 | Unknown |
| 24 | National Investors Group Holdings Ltd. f/k/a NIG-Ameritech Ltd. | 7,799.61 | ATGF | $1,000,000.00 | Unknown | None | Unknown |
| 25 | Angelica Jordan | Unknown | GFRDA, other | $5,252,226.64 | Unknown | Unknown | $7,356,893.16 |

SEC v. AMERINDO INVESTMENT ADVISORS INC., et al., 05 Civ. 5231-RJS (S.D.N.Y.)
CLAIMS REGISTER OF ALL PROOFS OF CLAIM SUBMITTED TO RECEIVER BY THE SEPTEMBER 20, 2013 BAR DATE

| No. | Claimant | Amount | | | | | |
|---|---|---|---|---|---|---|---|
| 29a | Paul Marcus | 146,105.04 | ATGF | $8,451,040.96 | Unknown | Unknown | Unknown |
| 29b | The Deane J. Marcus Trust | 20,559.00 | ATGF | $200,131.51 | Unknown | Unknown | Unknown |
| 29c | The Steven E. Marcus Trust | 20,559.00 | ATGF | $200,131.51 | Unknown | Unknown | Unknown |
| 29d | The Cheryl Marcus-Podhaizer Trust | 20,559.00 | ATGF | $200,131.51 | Unknown | Unknown | Unknown |
| 29e | The Eve S. Marcus Children's Trust | 946.40 | ATGF | $30,000.00 | Unknown | Unknown | Unknown |
| 30 | Imagineers Profit Sharing Plan | 6,941.16 | ATGF | $169,503.13 | Unknown | Unknown | Unknown |
| | | | | $49,424,752.89 | $9,453,597.72 | $1,418,665.30 | $42,748,606.43 |

\* Many Claimants asserted they did not receive regular account statements. Claimants therefore determined their respective Share amount from account statements received some time after the initial investment.

\** Claimants often determined the Principal Fund amount from based net asset values reflected in statements issues at point after their initial investment.

\*** Individual claimants employed a wide variety of data sources and methods to determine pre and post 5/25/05 Profits.

## NON-INVESTOR CLAIMS

| No. | Claimant | Amount | Notes |
|---|---|---|---|
| 5 | Traveler's Bond and Financial Products c/o Sherrie Monteiro, Recovery Management Unit | $1,000,000.00 | Claimant does not assert any claim based on investment but for repayment of defense costs advanced to Vilar and Tanaka |
| 26 | The Amerindo Advisories UK Ltd Retirement Benefits Scheme | $10,551,153.00 | Claimant does not assert any claim based on investment but for the fund value of JP Morgan 102-05012, held in the name of The Trustees of the Amerindo Advisors (UK) Ltd. |
| 27 | Latchezar Christov | None | Claimant does not assert any claim based on investment but for "finder's fee" for introducing potential clients to Amerindo. |
| 28 | J.P. Morgan Securities LLC | None | Claimant does not assert any claim based on investment but for legal fees and expenses incurred by claimant in connection with various litigations, investigations and proceedings |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

AMERINDO INVESTMENT ADVISORS INC.,
AMERINDO INVESTMENT ADVISORS, INC.,
AMERINDO ADVISORS UK LIMITED,
AMERINDO MANAGEMENT INC.,
AMERINDO TECHNOLOGY GROWTH FUND, INC.,
AMERINDO TECHNOLOGY GROWTH FUND II, INC.,
TECHNO RAQUIA, S.A.,
ALBERTO W. VILAR, and
GARY ALAN TANAKA,

Defendants.

05 Civ. 5231 (RJS)

ECF CASE

## AMENDED PROOF OF CLAIM FORM

Please fill in the information below and supply the supporting documents requested as an attachment to this proof of claim form. This should be received in hand by the Court appointed Receiver for Amerindo Investment Advisors (Panama) *et al.*, whose name and address is below, so as to be received in hand on or before September 20, 2013, 5:00 P.M. (Eastern Standard Time) by (a) certified mail, return receipt requested, or (b) overnight courier, or (hand delivery):

Ian J. Gazes, Esq.
Gazes LLC
151 Hudson Street
New York, New York 10013

Debtor means one or more of the Amerindo entities captioned above in which you gave Principal Funds.

Principal Funds means all funds given to the Debtor(s) and NOT returned to you.

Profits mean the appreciated value of the Principal Funds. By way of example only, earned interest if you held promissory notes and NOT paid to you.

If you are not sure of a fact, please so state the fact you are not sure about, and provide the best documentation you have including copies of Amerindo

statements for at least three months prior to and after the dates indicated below.

---

## PART A

Please answer the questions below and submit together with this completed form any written agreements between you and the Debtor(s) as concerns the establishment and/or opening of an account with the Debtor(s) (include Amerindo statements for three (3) months prior to the date indicated and after) and Profits prior to May 25, 2005.

## THIS PORTION OF THE PROOF OF CLAIM ONLY COVERS PRINCIPAL FUNDS AND PROFITS AS OF MAY 25, 2005

1. Your name, address, email address and phone number, including the name of any entity through which you provided Principal Funds with the Debtor(s). If your name or address had changed, please specify.  LAURANNE CHRISTINE CHRISTOV
   Address: 825 College Blvd. # 327, Oceanside, CA 92057
   Phone: 310 503-0734

2. Name and address of Debtor(s) (Amerindo entity) in which you gave the Principal Funds and the intended Amerindo entity if the recipient entity is different.
   See attached claim referenced as Claim 27 on Receiver's Claim Register

   Please specify and provide documents reflecting the transmittal of Principal Funds to the Debtor(s).   See attached claim referenced as Claim 27 on Receiver's Claim Register

3. Details including the amount and supporting documentation related to Principal Funds you claim as of May 25, 2005 including any Amerindo statements for three (3) months prior to May 25, 2005 and after, if any:   $2,100,000 - See attached claim referenced as Claim 27 on Receiver's Claim Register

4. Details including the amount and supporting documentation related to any Profits you claim as of May 25, 2005:   $2,100,000 - See attached claim referenced as Claim 27 on Receiver's Claim Register

5. Did you receive any distributions from the Debtor on account of your Principal Funds you claim as of May 25, 2005?   NO

If yes please specify any and all distributions and include any payments to third parties by the Debtor(s) on your behalf.

Please attach three (3) statements you received from the Debtor(s).

Please provide copies of all documents that support your claim as of May 25, 2005. Documents could include but are limited to promissory notes, itemized statements of your accounts, cancelled checks, wire transfer confirmations, letters, contracts, judgments, and security agreements. If the claim is secured please attached all document supporting same.

Please answer the questions below and submit together with this completed form any written agreements between you and the Debtor(s) as concerns the establishment and/or opening of an account with the Debtor and appreciated value after May 25, 2005.

## PART B

## THIS PROOF OF CLAIM ONLY COVERS PRINCIPAL FUNDS AND PROFITS AFTER MAY 25, 2005

1. Your name, address, phone number, and email address including the name of any entity through which you gave Principal Funds to the Debtor(s) after May 25, 2005. If your name or address had changed, please specify.

2. Name and address of Debtor(s) (Amerindo entity) in which you gave the Principal Funds and the intended Amerindo entity if the recipient entity is different. .

   Please specify and provide documents reflecting the transmittal of Principal Funds to the Debtor(s).

3. Details including the amount and supporting documentation related to Principal Funds you claim after May 25, 2005 (please attach any statements you received after May 25, 2005):

4. Details including the amount and supporting documentation related to any Profits you claim after May 25, 2005:

5. Did you receive any distributions from the Debtor on account of your Principal Funds you claim after May 25, 2005?

If yes please specify any and all distributions and include any payments to third parties by the Debtor(s) on your behalf.

Please attach the last three (3) statements you received from the Debtor(s).

Please provide copies of all documents that support your claim after May 25, 2005. Documents could include but are limited to promissory notes, itemized statements of your accounts, cancelled checks, wire transfer confirmations, letters, contracts, judgments, and security agreements. If the claim is secured please attached all document supporting same.

**Please redact all account numbers other than the last 4 digits on the statement including personal identification numbers such as social security numbers and business EIN numbers.**

DO NOT SEND ORIGINAL DOCUMENTS.

Signature:

_____ I am the account owner         _____ I am the account owner's authorized agent

Please note that, although you may make a claim through an agent, you DO NOT NEED TO HAVE AN AGENT to make this claim, and pay or offer to pay an agent merely to make this claim or obtain payment on your account. Your claim will not be reduced if you do not have an agent.

Print Name: _____
Title: _____
Company: _____
Email: _____
Telephone Number: _____


_____        _____
Signature                       Date

If claim has been assigned please provide the following information:

Name of Assignee: _____
Address of Assignee: _____
Email of Assignee: _____
Tel No. Of Assignee: _____
Date of Assignment: _____



# Laurie Christov

**825 College Blvd. #327 Oceanside, CA 92057 Ph 310 503-0224 email: laurie.christov@yahoo.com**

<u>VIA CERTIFIED RETURN RECIEPT</u>                                          November, 15, 2019
Pro Se Intake Unit
Unites States District Court
Room 104
40 Foley Square
New York, NY 10007

Re: United States v. Alberto Vilar and Gary Alan Tanaka
05 Cr. 621(RJS)

Dear Pro Se Intake Unit,

   I am writing you today to petition the court for a hearing in regards to the above referenced case as a legal interested party to the property that has been ordered forfeited to the United States pursuant to Federal Statute Title 21, United States Code 853, Section N3. I am the surviving spouse of Latchezar Christov, one of the claimants of the above referenced case who is now deceased.  Enclosed is a copy of my Marriage Certificate and my husband's Death Certificate for your file. I have asked Judge Richard J. Sullivan in a letter dated November 15, 2019 to have my name Lauranne Christov added to the list and put on the Docket 05 Cr. 621(RJS). I also have enclosed a copy of the Amended Proof of Claim Form that was sent to the Receiver, Ian Gazes, dated July 7, 2015. This request was to amend the list (Claimant 27) and be put in my name Lauranne Christov, after the death of my husband Latchezar Christov on January 16, 2015. The claim amount at the time was for approximately $2,100,000.

   Enclosed you will find a copy of the letter of the Preliminary Order of Forfeiture as to Substitute Assets sent to me by the U.S. Department of Justice, United States Attorney, Southern District of New York dated November 1, 2019. According to the letter I have the right to petition for a hearing to adjudicate the validity of my interest in the property with the Court within 30 days of the receipt of the notice.

   Enclosed you will also find supporting documents prepared by my husband's lawyer David Richman, who is also now deceased, the original Proof of Claim dated September 19, 2013 sent to Ian Gazes, the Receiver, regarding the Securities and Exchange Commission (SEC) v. Amerindo Investment Advisors Inc, (Amerindo), et al 05 Civ. 5321 (RJS).

   If I could speak to Judge Sullivan, I would say, your Honor, dating back over two decades my husband was tirelessly trying to seek justice from Alberto Vilar and Amerindo for fees that were rightfully owed to him. His case against Amerindo and notably, his longtime friend, Alberto Vilar had proof of such.  He was given an "Interim" award in 2002 by the American Arbitration Association against Amerindo Investment Advisors Inc., for approximately $1,200,000 or 30% of the fees under management with Litton Industries at the time of the award.

The relief my husband sought was put under one condition by the Arbitrator, that he acquire a "no action" letter from the SEC in order to collect. This would require the cooperation of Amerindo Investment Advisors Inc., which of course they did not do. Why should they? They were getting off without paying the award with no legal ramifications. This, your Honor, was not justice. It was a case of the bad guys winning even though they lost. It was an example of the worst case of unjust enrichment. The letter I am writing today is to ask that you consider these facts carefully so that justice might finally be served in this case.

Now, in signing this letter, I attest and declare under penalty of perjury that my petition is not frivolous and the information and statements provided in support of my petition are true and correct to the best of my knowledge and belief, so help me, God.

Sincerely,

*Lauranne Christov*

Lauranne Christov

November 15, 2019





## Laurie Christov

**825 College Blvd. #327 Oceanside, CA 92057 Ph 310 503-0224 email: laurie.christov@yahoo.com**

<u>VIA CERTIFIED RETURN RECIEPT</u>                                      November, 15, 2019

Judge Richard J. Sullivan
Unites States District Court
Southern District of New York
Clerk's Office
500 Pearl Street
New York, NY 10007

<u>Re: United States v. Alberto Vilar and Gary Alan Tanaka</u>
05 Cr. 621(RJS)

Dear Judge Sullivan,

I am writing you today in regards to the above referenced case to request that my name be added to the list and placed on the Docket of # 05 Cr. 621 (RJS) as a legal interested party to the property that has been ordered forfeited to the United States pursuant to Federal Statute Title 21, United States Code 853, Section N3. I am the surviving spouse of Latchezar Christov, one of the claimants of the above referenced case who is now deceased.

Enclosed is a copy of my marriage certificate and my husband's death certificate for your file. I also have enclosed a copy of the Amended Proof of Claim Form that was sent to the Receiver, Ian Gazes, dated July 7, 2015. This request was to amend the list (Claimant 27) and be put in my name Lauranne Christov, after the death of my husband on January 16, 2015.

Enclosed you will find a copy of the letter of the Preliminary Order of Forfeiture as to Substitute Assets sent by the U.S. Department of Justice, United States Attorney, Southern District of New York dated November 1, 2019. According to the letter I have the right to petition for a hearing to adjudicate the validity of my interest in the property with the Court within 30 days of the receipt of the notice

Alternatively, a petition is now being filed as a legal interested party through the Pro se Intake Unit, United States District Court, Room 105, 40 Foley Square, New York, New York, 10007.

I appreciate your prompt attention in this matter as time is of the essence.

Sincerely,

*Lauranne Christov*

Lauranne Christov

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

3052015012779 **CERTIFICATE OF DEATH** 3201537001156

STATE FILE NUMBER / LOCAL REGISTRATION NUMBER

| Field | Value |
|---|---|
| 1. NAME OF DECEDENT—FIRST (Given) | LATCHEZAR |
| 2. MIDDLE | — |
| 3. LAST (Family) | CHRISTOV |
| AKA, ALSO KNOWN AS—INCLUDE AKA IF FIRST, MIDDLE, LAST | LUCKY CHRISTOV |
| 4. DATE OF BIRTH mm/dd/ccyy | 03/22/1937 |
| 5. AGE Yrs. | 77 |
| 6. SEX | M |
| 9. BIRTH STATE/FOREIGN COUNTRY | BULGARIA |
| 11. EVER IN U.S. ARMED FORCES? | NO |
| 12. MARITAL STATUS (at Time of Death) | MARRIED |
| 7. DATE OF DEATH mm/dd/ccyy | 01/16/2015 |
| 8. HOUR (24 Hours) | 1240 |
| 16. EDUCATION | BACHELOR |
| 14/15. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? | NO |
| 13. DECEDENT'S RACE | BULGARIAN |
| 17. USUAL OCCUPATION | STOCK BROKER |
| 18. KIND OF BUSINESS OR INDUSTRY | INVESTMENT BANKING |
| 19. YEARS IN OCCUPATION | 30 |
| 20. DECEDENT'S RESIDENCE | 1625 APPALOOSA |
| 21. CITY | OCEANSIDE |
| 22. COUNTY/PROVINCE | SAN DIEGO |
| 23. ZIP CODE | 92057 |
| 24. YEARS IN COUNTY | 30 |
| 25. STATE/FOREIGN COUNTRY | CA |
| 26. INFORMANT'S NAME, RELATIONSHIP | LAURANNE CHRISTOV, WIFE |
| 27. INFORMANT'S MAILING ADDRESS | 825 COLLEGE BLVD APT 327, OCEANSIDE, CA 92057 |
| 28. NAME OF SURVIVING SPOUSE/SRDP—FIRST | LAURANNE |
| 29. MIDDLE | CHRISTINE |
| 30. LAST (BIRTH NAME) | YOUNG |
| 31. NAME OF FATHER/PARENT—FIRST | LUBEN |
| 32. MIDDLE | — |
| 33. LAST | CHRISTOV |
| 34. BIRTH STATE | BULGARIA |
| 35. NAME OF MOTHER/PARENT—FIRST | LILIANNA |
| 36. MIDDLE | — |
| 37. LAST (BIRTH NAME) | KISILENCHEV |
| 38. BIRTH STATE | BULGARIA |
| 39. DISPOSITION DATE mm/dd/ccyy | 01/23/2015 |
| 40. PLACE OF FINAL DISPOSITION | 1/2 RES LAURANNE CHRISTOV, 825 COLLEGE BLVD APT 327, OCEANSIDE, CA 92057 |
| 41. TYPE OF DISPOSITION(S) | CR/RES |
| 42. SIGNATURE OF EMBALMER | NOT EMBALMED |
| 43. LICENSE NUMBER | — |
| 44. NAME OF FUNERAL ESTABLISHMENT | ACCU-CARE CREMATION CENTER |
| 45. LICENSE NUMBER | FD1528 |
| 46. SIGNATURE OF LOCAL REGISTRAR | WILMA WOOTEN, MD |
| 47. DATE mm/dd/ccyy | 01/23/2015 |

### PLACE OF DEATH

| Field | Value |
|---|---|
| 101. PLACE OF DEATH | RESIDENCE |
| 102. IF HOSPITAL, SPECIFY ONE | |
| 103. IF OTHER THAN HOSPITAL, SPECIFY ONE | Decedent's Home |
| 103. COUNTY | SAN DIEGO |
| 105. FACILITY ADDRESS OR LOCATION WHERE FOUND | 1625 APPALOOSA |
| 105A. CITY | OCEANSIDE |

### CAUSE OF DEATH

| Field | Value | Interval |
|---|---|---|
| 107. IMMEDIATE CAUSE (A) | ARTERIOSCLEROTIC HEART DISEASE | YRS |
| (B) | HYPERTENSION | YRS |
| (C) | | |
| (D) | | |
| 108. DEATH REPORTED TO CORONER? | NO | |
| 109. BIOPSY PERFORMED? | NO | |
| 110. AUTOPSY PERFORMED? | NO | |
| 111. USED IN DETERMINING CAUSE | NO | |
| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 | AORTIC STENOSIS, PAROXYSMAL ATRIAL FIBRILLATION | |
| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? | NO | |

### PHYSICIAN'S CERTIFICATION

| Field | Value |
|---|---|
| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED... | |
| Deceased Attended Since | 03/02/2007 |
| Deceased Last Seen Alive | 01/05/2015 |
| 115. SIGNATURE AND TITLE OF CERTIFIER | FRANKLIN GALEF MD |
| 116. LICENSE NUMBER | G36816 |
| 117. DATE | 01/21/2015 |
| 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | FRANKLIN GALEF MD, 130 CEDAR RD STE 220, VISTA, CA 92083 |

### CORONER'S USE ONLY

| 123. INJURY DATE mm/dd/ccyy | 124. HOUR |
|---|---|

### STATE REGISTRAR

*01000100028408411*

County of San Diego —Health & Human Services Agency— 3851 Rosecrans Street. This is to certify that, if bearing the OFFICIAL SEAL OF THE STATE OF CALIFORNIA, the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED, Required fee paid.

DATE ISSUED: January 27, 2015



WILMA J. WOOTEN, MD
REGISTRAR OF VITAL RECORDS
County of San Diego

This copy not valid unless prepared on engraved border displaying seal and signature of Registrar

*A002818702*

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE





# COUNTY OF LOS ANGELES • REGISTRAR-RECORDER

## LICENSE AND CERTIFICATE OF MARRIAGE
MUST BE LEGIBLE—MAKE NO ERASURES, WHITEOUTS, OR OTHER ALTERATIONS

**13534**

STATE FILE NUMBER | LOCAL REGISTRATION NUMBER

### GROOM PERSONAL DATA

| 1A. NAME OF GROOM—FIRST (GIVEN) | 1B. MIDDLE | 1C. LAST (FAMILY) | 2. DATE OF BIRTH—MONTH, DAY, YEAR |
|---|---|---|---|
| LATCHEZAR | | CHRISTOV | MAR 22, 1939 |

| 3A. RESIDENCE—STREET AND NUMBER | 3B. CITY | 3C. ZIP CODE | 3D. COUNTY | 4. STATE OF BIRTH |
|---|---|---|---|---|
| 607 SKYLINE TRAIL | TOPANGA | 90290 | LOS ANGELES | BULGARIA |

| 5. MAILING ADDRESS—IF DIFFERENT | 6. NUMBER OF PREVIOUS MARRIAGES | 7A. LAST MARRIAGE ENDED BY: | 7B. DATE—MONTH, DAY, YEAR |
|---|---|---|---|
| | 1 | ☐ DEATH ☒ DISSOLUTION ☐ ANNULMENT | MAR 7, 1972 |

| 8A. USUAL OCCUPATION | 8B. USUAL KIND OF BUSINESS OR INDUSTRY | 9. NUMBER OF HIGHEST GRADE COMPLETED |
|---|---|---|
| INVESTMENTS | SECURITIES | 17+ |

| 10A. FULL NAME OF FATHER | 10B. STATE OF BIRTH | 11A. FULL MAIDEN NAME OF MOTHER | 11B. STATE OF BIRTH |
|---|---|---|---|
| LUBEN CHRISTOV | BULGARIA | KISSELINCHEN, LILLIANA | BULGARIA |

### BRIDE PERSONAL DATA

| 12A. NAME OF BRIDE—FIRST (GIVEN) | 12B. MIDDLE | 12C. CURRENT LAST (FAMILY) | 12D. MAIDEN LAST (FAMILY) | 13. DATE OF BIRTH—MONTH, DAY, YEAR |
|---|---|---|---|---|
| LAURANNE | CHRISTINE | YOUNG | | APRIL 27, 1961 |

| 14A. RESIDENCE—STREET AND NUMBER | 14B. CITY | 14C. ZIP CODE | 14D. COUNTY | 15. STATE OF BIRTH |
|---|---|---|---|---|
| 607 SKYLINE TRAIL | TOPANGA | 90290 | LOS ANGELES | CA |

| 16. MAILING ADDRESS—IF DIFFERENT | 17. NUMBER OF PREVIOUS MARRIAGES | 18A. LAST MARRIAGE ENDED BY: | 18B. DATE—MONTH, DAY, YEAR |
|---|---|---|---|
| | 0 | ☐ DEATH ☐ DISSOLUTION ☐ ANNULMENT | |

| 19A. USUAL OCCUPATION | 19B. USUAL KIND OF BUSINESS OR INDUSTRY | 20. NUMBER OF HIGHEST GRADE COMPLETED (1-12 OR COLLEGE 13-17+) |
|---|---|---|
| INTERIOR DESIGN | INTERIOR DESIGN | 17 |

| 21A. FULL NAME OF FATHER | 21B. STATE OF BIRTH | 22A. FULL MAIDEN NAME OF MOTHER | 22B. STATE OF BIRTH |
|---|---|---|---|
| EDWARD PARK YOUNG, JR. | CA | JACQULINE JAY CURRIE | MICHIGAN |

### AFFIDAVIT

WE, THE UNDERSIGNED, AN UNMARRIED MAN AND UNMARRIED WOMAN, STATE THAT THE FOREGOING INFORMATION IS CORRECT AND TRUE TO THE BEST OF OUR KNOWLEDGE AND BELIEF, THAT NO LEGAL OBJECTION TO THE MARRIAGE NOR TO THE ISSUANCE OF A LICENSE IS KNOWN TO US, AND HEREBY APPLY FOR A LICENSE AND CERTIFICATE OF MARRIAGE.

| 23. SIGNATURE OF GROOM | 24. SIGNATURE OF BRIDE |
|---|---|
| ► *Latch Christ* | ► *Lauranne C. Young* |

### LICENSE TO MARRY

AUTHORIZATION AND LICENSE IS HEREBY GIVEN TO ANY PERSON DULY AUTHORIZED BY THE LAWS OF THE STATE OF CALIFORNIA TO PERFORM A MARRIAGE CEREMONY WITHIN THE STATE OF CALIFORNIA TO SOLEMNIZE THE MARRIAGE OF THE ABOVE NAMED PERSONS. REQUIRED CONSENT FOR THE ISSUANCE OF THIS LICENSE ARE ON FILE.

| 25A. ISSUE DATE MONTH, DAY, YEAR | 25B. LICENSE EXPIRES AFTER MONTH, DAY, YEAR | 25C. LICENSE NUMBER | 25D. COUNTY OF ISSUE |
|---|---|---|---|
| MAY 10, 1990 | AUGUST 8, 1990 | WE 43270 | LOS ANGELES |

| 25E. SIGNATURE OF COUNTY CLERK | 25F. |
|---|---|
| FRANK S. ZOLIN | BY ► *R. Enla* DEPUTY |

### WITNESS(ES) (ONE REQUIRED)

| 26A. SIGNATURE OF WITNESS | 26B. ADDRESS—STREET AND NUMBER | 26C. CITY, STATE AND ZIP CODE |
|---|---|---|
| *Frank* | 68 N ARROYO BLVD | PASADENA, CA 91105 |

| 27A. SIGNATURE OF WITNESS | 27B. ADDRESS—STREET AND NUMBER | 27C. CITY, STATE AND ZIP CODE |
|---|---|---|
| *Sala Adams* | 68 N. ARROYO BLVD | PASADENA CA 91105 |

### CERTIFICATION OF PERSON SOLEMNIZING CEREMONY

28. I HEREBY CERTIFY THAT THE ABOVE-NAMED BRIDE AND GROOM WERE JOINED BY ME IN MARRIAGE IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA

| 29A. SIGNATURE OF PERSON SOLEMNIZING MARRIAGE | 29B. RELIGIOUS DENOMINATION (IF CLERGY) |
|---|---|
| ► *V. Rev James T. Adams* | Greek Orthodox |

29C. NAME AND/OR OFFICIAL TITLE OF PERSON SOLEMNIZING MARRIAGE (TYPE OR PRINT)
V. Rev. James T. Adams, Dean St. Sophia Cathedral

| ON | June | 2 | 90 | AT | Los Angeles | Los Angeles | CALIFORNIA |
|---|---|---|---|---|---|---|---|
| | MONTH | DAY | YEAR | | CITY OR TOWN | COUNTY | |

29D. MAILING ADDRESS AND ZIP CODE
1324 So. Normandie Ave. Los Angeles, CA 90006

### LOCAL REGISTRAR OF MARRIAGES (COUNTY RECORDER)

| 30. SIGNATURE OF LOCAL REGISTRAR | 31. DATE ACCEPTED FOR REGISTRATION |
|---|---|
| *Charles Weissburd* | JUN 18 1990 |

---

This is to certify that this document is a true copy of the official record filed with the Registrar-Recorder.

*Charles Weissburd*

CHARLES WEISSBURD
Registrar-Recorder

DEC 06 1990

19-693318

This copy not valid unless prepared on engraved border displaying the County of Los Angeles Seal and Signature of Registrar-Recorder.



American Bank Note Company    ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

November 1, 2019

<u>VIA CERTIFIED RETURN RECEIPT</u>

Estate of Latchezar Christov
c/o Lauranne Christov
826 College Boulevard, #327
Oceanside, CA 92057

Re: <u>United States</u> v. <u>Alberto William Vilar and Gary Alan Tanaka</u>
05 Cr. 621 (RJS)

Dear Ms. Christov:

Enclosed is a copy of the Preliminary Order of Forfeiture as to Substitute Assets that has been filed in the above-captioned case in the Southern District of New York. Please note that this is being sent as a substitute for the notice previously mailed on August 22, 2019 to Mr. Latchezar Christov at 360 Lexington Avenue, New York, New York 10017, which was subsequently returned to our office for insufficient address on September 17, 2019.

Pursuant to Title 21, United States Code, Section 853(n), persons other than the defendant who wish to assert a legal interest in property that has been ordered forfeited to the United States must file a petition for a hearing to adjudicate the validity of their alleged interest in the property with the Court within thirty days (30) of the final publication of notice, or receipt of actual notice, whichever is earlier.

In addition, the petition must be signed by the petitioner under penalty of perjury and must set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the claim, and the relief sought.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By: _____
Alexander J. Wilson
Co-Chief, Money Laundering and
Transnational Criminal Enterprises Unit
Assistant United States Attorney
Tel. (212) 637-2453

Enclosure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                        :

UNITED STATES OF AMERICA        :

             -v.-                    :

ALBERTO WILLIAM VILAR and    :
GARY ALAN TANAKA,
                                    :
                 Defendants.      :
                                    :

-------------------------------------------------------x

**PRELIMINARY ORDER OF
FORFEITURE AS TO
SUBSTITUTE ASSETS**


05 Cr. 621 (RJS)

<u>RICHARD J. SULLIVAN</u>, Circuit Judge:

        WHEREAS, on or about August 15, 2006, ALBERTO WILLIAM VILAR and

GARY ALAN TANAKA (collectively, the "Defendants") were charged in a twelve-count

Superseding Indictment, S3 05 Cr. 621 (KMK) (the "Indictment"), with engaging in a

conspiracy to commit securities fraud, investment adviser fraud, mail fraud, wire fraud, and

money laundering, in violation of Title 18, United States Code Section 371 (Count One);

securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17,

Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2

(Counts Two and Three); investment adviser fraud, in violation of Title 15, United States Code,

Sections 80b-6 and 80b-17 and Title 18, United States Code, Section 2 (Count Four); mail fraud,

in violation of Title 18, United States Code, Sections 1341 and 2 (Counts Five); wire fraud, in

violation of Title 18, United States Code, Sections 1343 and 2 (Counts Six and Seven); money

laundering, in violation of Title 18, United States Code, Sections 1957 and 2 (Counts Eight

through Eleven); and making false statements in violation of Title 18, United States Code,

Sections 1001(a) and 2 (Count Twelve);

        WHEREAS, the Indictment contained a forfeiture allegation seeking, pursuant to

Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section

2461, the forfeiture of any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to at least $19,706,363.74 in United States currency, representing the proceeds obtained as a result of the charged securities, mail, and wire fraud offenses charged in the Indictment (Counts 1 through 7); and seeking, pursuant to Title 18, United States Code, Section 982, the forfeiture of any and all property, real and personal, involved in the charged money laundering offenses, including all property traceable to such property, including but not limited to at least $5,000,000 in United States currency (Counts 8 through 11);

WHEREAS, the Indictment also included a substitute asset provision providing that if, as a result of the Defendant's actions or omissions, forfeitable property is unable to be located or obtained, the United States will seek, pursuant to Title 21, United States Code, Section 853(p), the forfeiture of any other property of the Defendant;

WHEREAS, on or about November 19, 2008, a jury returned a guilty verdict against Defendant Vilar on all twelve counts of the Indictment and against Defendant Tanaka on Counts One, Three and Four of the Indictment;

WHEREAS, on or about April 25, 2014, the Court entered Preliminary Orders of Forfeiture/Money Judgment, which made final as to each Defendant a money judgment in the amount of $20,578,855.28 representing the amount of proceeds obtained as a result of the offenses charged in the Indictment, for which the Defendants were found guilty (the "Money Judgments");

WHEREAS, the Court finds that, due to the acts or omissions of each Defendant, the proceeds of the offenses cannot be located upon the exercise of due diligence, have been

transferred, sold to or deposited with a third party, have been placed beyond jurisdiction of the

Court, or have been commingled with other property which cannot be divided without difficulty;

WHEREAS, the Government has identified the following assets in which the

Defendants have an ownership interest:

a.   J.P. Morgan Chase brokerage account numbers:

   i.   102-17995 MOL, held in the name of Techno Raquia, S.A., Ian Gazes
        Receiver c/o Gazes LLC;

   ii.  102-01485 MOL, held in the name of Amerindo Management Inc.,
        sub-Account M26, Ian Gazes Receiver c/o Gazes LLC;

   iii. 102-01495 MOL, held in the name of Amerindo Technology Growth
        Fund II, Inc., Ian Gazes Receiver c/o Gazes LLC;

   iv.  102-15833, held in the name of Olafson, Inc., Ian Gazes Receiver c/o
        Gazes LLC;

   iii. 102-25612, held in the name of Amerindo Investment Advisors, Inc.
        Money Purchase Plan and Trust Alberto Vilar TTEE DTD 5/1/94 c/o
        Gazes LLC Ian Gazes; and

b.   Approximately $273,611.89 in funds formerly held by @Ventures
     Management, LLC for the benefit of Amerindo Technology Growth Fund
     II, Inc.

(collectively, the "Substitute Assets").

IT IS HEREBY ORDERED THAT:

1.   All of the Defendants' right, title and interest in the Substitute Assets are

hereby forfeited to the United States of America, for disposition in accordance with the law,

subject to the provisions of Title 21, United States Code, Section 853(n).

2.   Pursuant to Title 21, United States Code, Section 853(n)(1), Rule 32.2(b)(6) of

the Federal Rules of Criminal Procedure, and Rules G(4)(a)(iv)(C) and G(5)(a)(ii) of the

Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions, the

United States is permitted to publish forfeiture notices on the government internet site,

www.forfeiture.gov. This site incorporates the forfeiture notices that have been traditionally published in newspapers. The United States forthwith shall publish notice of this Preliminary Order of Forfeiture of Substitute Assets for at least thirty (30) consecutive days. Any person, other than the Defendant, claiming interest in the Substitute Assets must file a Petition within sixty (60) days from the first day of publication of the notice on this official government internet web site, or no later than thirty-five (35) days from the mailing of actual notice, whichever is earlier.

3.     The published notice of forfeiture shall state that the petition (i) shall be for a hearing to adjudicate the validity of the petitioner's alleged interest in the Substitute Assets, (ii) shall be signed by the petitioner under penalty of perjury, and (iii) shall set forth the nature and extent of the petitioner's right, title or interest in the Substitute Assets, the time and circumstances of the petitioner's acquisition of the right, title and interest in the Substitute Assets, any additional facts supporting the petitioner's claim, and the relief sought, pursuant to Title 21, United States Code, Section 853(n).

4.     Pursuant to 32.2 (b)(6)(A) of the Federal Rules of Criminal Procedure, the Government shall send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding.

5.     Upon adjudication of all third-party interests, this Court will enter a Final Order of Forfeiture with respect to the Substitute Assets pursuant to Title 21, United States Code, Section 853(n), in which all interests will be addressed. All Substitute Assets forfeited to the United States under a Final Order of Forfeiture shall be applied towards the satisfaction of the Money Judgment.

6.     Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate

or dispose of forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas.

      7.   The Court shall retain jurisdiction to enforce this Preliminary Order of Forfeiture as to Substitute Assets, and to amend it as necessary, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

      8.   The Clerk of the Court is respectfully directed to forward three certified copies of this Preliminary Order of Forfeiture as to Substitute Assets to Assistant United States Attorney Alexander J. Wilson, Chief of the Money Laundering and Asset Forfeiture Unit, United States Attorney's Office, One St. Andrew's Plaza, New York, New York 10007.

SO ORDERED.

Dated:      August 2, 2019
              New York, New York

                                                  RICHARD J. SULLIVAN
                                                  UNITED STATES CIRCUIT JUDGE
                                                  Sitting by Designation

July 7, 2015

Ian J. Gazes, Receiver
Gazes LLC
151 Hudson Street
New York, New York 10013

> RE:    *SEC v. Amerindo Investment Advisors Inc., USDC Case No. 05 Civ. 5231*
>          *Claimant: LatchezarChristov, Claim No. 27*
>          *Amendment to Claim*

Mr. Gazes,

I am the surviving spouse of Latchezar Christov who is a claimant in the above referenced receivership. Mr. Christov died on January 16, 2015. Enclosed is a certified copy of Decedent's death certificate for your file. I am a successor in interest to this claim, referenced as Claim 27 on the Receiver's Claims Register, also enclosed.

This letter is sent for the purpose of amending the claim to substitute in as Claimant in light of Mr. Christov's passing. A copy of the claim submitted on September 19, 2013 is also enclosed for your reference.

My address and phone number are:

Lauranne Christine Christov

825 College Blvd #327
Oceanside, CA 92057

310-503-0224

Please advise what if any other information is required to perfect amendment of this claim in the respects stated above.

Warmest regards,

*Lauranne Christov*

Lauranne Christine Christov

Enclosures

SEC v. AMERINDO INVESTMENT ADVISORS INC., et al., 05-cv-5231-RJS (DNR)

CLAIMS REGISTER OF ALL PROOFS OF CLAIM SUBMITTED TO RECEIVER BY THE SEPTEMBER 20, 2013 BAR DATE

| No. | Claimant | Shares* | Fund(s) | Principal Funds** | Pre 5/25/05 Profits*** | Pre 5/25/05 Distributions | Post 5/25/05 Profits |
|---|---|---|---|---|---|---|---|
| 1 | E. Ronald Salvitti, M.D. | 91,993.83 | ATGF | $6,000,000.00 | $6,000,000.00 | $0.00 | Unknown |
| 2 | John Preetzmann - Aggerholm | | GRDA | $279,745.76 | $198,140.10 | $45,000.00 | $992,502.73 |
| 3 | QGCI Nominees Limited a/k/a Quilter Cheviot Limited f/k/a Quilter Goodison Ltd. | 1,642.46 | ATGF | $95,000.00 | -$60,984.65 | $0.00 | Unknown |
| 4 | Lisa Mayer & Debra Mayer c/o Begos Brown & Green LLP | | GRDA | $11,972,910.93 | $836,350.40 | $1,153,867.26 | $26,920,054.14 |
| 6 | Elizabeth Knope | 14,784.21 / 243,902.43 | ATGF / Unknown | $446,168.79 / $84,774.05 | Unknown / Unknown | Unknown / Unknown | Unknown / Unknown |
| 7 | Michael Walsh | Unknown | Intouch | Unknown | Unknown | Unknown | Unknown |
| 8 | Surinder Rametra | 6,057.22 | ATGF | $251,812.46 | Unknown | Unknown | Unknown |
| 9 | Sheridan Securities | 1,957.98 | ATGF | $250,000.00 | None | None | Unknown |
| 10 | James Charles | 16,917.57 | ATGF | $500,000.00 | None | None | Unknown |
| 11 | Ariadana Sanchez | 22,400.00 | GRFDA | $175,726.14 | $271,749.70 | Unknown | Unknown |
| 12 | Robin Sayko | 6,057.22 | ATGF | $100,000.00 | $1,976,275.64 | None | Unknown |
| 13 | Donald & Marilyn Walsh | 6,057.22 | ATGF | $251,812.46 | $23,920.53 | None | Unknown |
| 14 | Frank Harris | Unknown | GRFDA | $50,000.00 | Unknown | None | Unknown |
| 15 | Charles Kaye | 1,630.18 | ATGF | $174,988.00 | $208,146.00 | none | Unknown |
| 16 | Alfred Heitkoenig, for himself and on behalf of Elna Charlotte Olga a/k/a Elna Heitkoenig and Maaike Maria Hickok a/k/a Heitkoenig | 90,000.00 | ATGF, GRFDA | $6,875,896.73 | Unknown | Unknown | $7,479,156.40 |
| 17 | The Winsford Corporation | Unknown | ATGF | $1,500,000.00 | Unknown | None | Unknown |
| 18 | Peter Sweetland | 1,194.32 | ATGF | $41,670.47 | Unknown | Unknown | Unknown |
| 19 | John Sweetland | 113,859.84 | ATGF | $2,846,496.00 | Unknown | Unknown | Unknown |
| 20 | Timothy Sweetland | 2,823.54 | ATGF | $191,671.47 | Unknown | Unknown | Unknown |
| 21 | John Sweetland | 1,194.32 | ATGF | $41,670.47 | Unknown | Unknown | Unknown |
| 22 | Anthony W. Gibbs | Unknown | ATGF | $1,287,618.98 | Unknown | $30,395.04 | Unknown |
| 23 | Patricia A. Kabara | 6,057.72 | ATGF, Rhodes Capital | $251,812.46 | Unknown | $189,403.00 | Unknown |
| 24 | National Investors Group Holdings Ltd. f/k/a NIG-Amertech Ltd. | 7,799.61 | ATGF | $1,000,000.00 | Unknown | None | Unknown |
| 25 | Angelica Jordan | Unknown | GRFDA, other | $5,252,226.64 | Unknown | None | $7,356,893.16 |

SEC v. AMERINDO INVESTMENT ADVISORS Inc., et al., 05 Civ. 5231 (RJS) (S.D.N.Y.)

CLAIMS REGISTER OF ALL PROOFS OF CLAIM SUBMITTED TO RECEIVER BY THE SEPTEMBER 20, 2013 BAR DATE

| 29a | Paul Marcus | 146,105.04 ATGF | $8,451,040.96 | Unknown | Unknown | Unknown |
| 29b | The Deane J. Marcus Trust | 20,559.00 ATGF | $200,131.51 | Unknown | Unknown | Unknown |
| 29c | The Steven E. Marcus Trust | 20,559.00 ATGF | $200,131.51 | Unknown | Unknown | Unknown |
| 29d | The Cheryl Marcus-Podhalzer Trust | 20,559.00 ATGF | $200,131.51 | Unknown | Unknown | Unknown |
| 29e | The Eve S. Marcus Children's Trust | 946.40 ATGF | $30,000.00 | Unknown | Unknown | Unknown |
| 30 | Imagineers Profit Sharing Plan | 6,941.16 ATGF | $169,503.13 | Unknown | Unknown | Unknown |
| | | | $49,424,752.89 | $9,453,597.72 | $1,418,665.30 | $42,748,606.43 |

\* Many Claimants asserted they did not receive regular account statements. Claimants therefore determined their respective Share amount from account statements received some time after the initial investment.

\*\* Claimants often determined the Principal Fund amount from based net asset values reflected in statements issues at point after their initial investment.

\*\*\* Individual claimants employed a wide variety of data sources and methods to determine pre and post 5/25/05 Profits.

NON-INVESTOR CLAIMS

| No. | Claimant | Amount | Notes |
| --- | --- | --- | --- |
| 5 | Traveler's Bond and Financial Products c/o Sherrie Monteiro, Recovery Management Unit | $1,000,000.00 | Claimant does not assert any claim based on investment but for repayment of defense costs advanced to Vilar and Tanaka |
| 26 | The Amerindo Advisories UK Ltd Retirement Benefits Scheme | $10,551,153.00 | Claimant does not assert any claim based on investment but for the fund value of JP Morgan 102-05012, held in the name of The Trustees of the Amerindo Advisors (UK) Ltd. |
| 27 | Latchezar Christov | None | Claimant does not assert any claim based on investment but for "finder's fee" for introducing potential clients to Amerindo. |
| 28 | J.P. Morgan Securities LLC | None | Claimant does not assert any claim based on investment but for legal fees and expenses incurred by claimant in connection with various litigations, investigations and proceedings |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

AMERINDO INVESTMENT ADVISORS INC.,
AMERINDO INVESTMENT ADVISORS, INC.,
AMERINDO ADVISORS UK LIMITED,
AMERINDO MANAGEMENT INC.,
AMERINDO TECHNOLOGY GROWTH FUND, INC.,
AMERINDO TECHNOLOGY GROWTH FUND II, INC.,
TECHNO RAQUIA, S.A.,
ALBERTO W. VILAR, and
GARY ALAN TANAKA,

Defendants.

05 Civ. 5231 (RJS)

ECF CASE

## AMENDED PROOF OF CLAIM FORM

Please fill in the information below and supply the supporting documents requested as an attachment to this proof of claim form. This should be received in hand by the Court appointed Receiver for Amerindo Investment Advisors (Panama) et al., whose name and address is below, so as to be received in hand on or before September 20, 2013, 5:00 P.M. (Eastern Standard Time) by (a) certified mail, return receipt requested, or (b) overnight courier, or (hand delivery):

Ian J. Gazes, Esq.
Gazes LLC
151 Hudson Street
New York, New York 10013

Debtor means one or more of the Amerindo entities captioned above in which you gave Principal Funds.

Principal Funds means all funds given to the Debtor(s) and NOT returned to you.

Profits mean the appreciated value of the Principal Funds. By way of example only, earned interest if you held promissory notes and NOT paid to you.

If you are not sure of a fact, please so state the fact you are not sure about, and provide the best documentation you have including copies of Amerindo

statements for at least three months prior to and after the dates indicated below.

---

## PART A

Please answer the questions below and submit together with this completed form any written agreements between you and the Debtor(s) as concerns the establishment and/or opening of an account with the Debtor(s) (include Amerindo statements for three (3) months prior to the date indicated and after) and Profits prior to May 25, 2005.

# THIS PORTION OF THE PROOF OF CLAIM ONLY COVERS PRINCIPAL FUNDS AND PROFITS AS OF MAY 25, 2005

1. Your name, address, email address and phone number, including the name of any entity through which you provided Principal Funds with the Debtor(s). If your name or address had changed, please specify.  LAURANNE CHRISTINE CHRISTOV
   Address: 825 College Blvd #327, Oceanside, CA 92057
   Phone: 310 503-0224

2. Name and address of Debtor(s) (Amerindo entity) in which you gave the Principal Funds and the intended Amerindo entity if the recipient entity is different.
   See attached claim referenced as Claim 27 on Receiver's Claim Register

   Please specify and provide documents reflecting the transmittal of Principal Funds to the Debtor(s).      See attached claim referenced as Claim 27 on Receiver's Claim Register

3. Details including the amount and supporting documentation related to Principal Funds you claim as of May 25, 2005 including any Amerindo statements for three (3) months prior to May 25, 2005 and after, if any.      $2,100,000 - See attached claim referenced as Claim 27 on Receiver's Claim Register

4. Details including the amount and supporting documentation related to any Profits you claim as of May 25, 2005:      $2,100,000 - See attached claim referenced as Claim 27 on Receiver's Claim Register

5. Did you receive any distributions from the Debtor on account of your Principal Funds you claim as of May 25, 2005?      NO

If yes please specify any and all distributions and include any payments to third parties by the Debtor(s) on your behalf.

Please attach three (3) statements you received from the Debtor(s).

Please provide copies of all documents that support your claim as of May 25, 2005. Documents could include but are limited to promissory notes, itemized statements of your accounts, cancelled checks, wire transfer confirmations, letters, contracts, judgments, and security agreements. If the claim is secured please attached all document supporting same.

Please answer the questions below and submit together with this completed form any written agreements between you and the Debtor(s) as concerns the establishment and/or opening of an account with the Debtor and appreciated value after May 25, 2005.

## PART B

## THIS PROOF OF CLAIM ONLY COVERS PRINCIPAL FUNDS AND PROFITS AFTER MAY 25, 2005

1. Your name, address, phone number, and email address including the name of any entity through which you gave Principal Funds to the Debtor(s) after May 25, 2005. If your name or address had changed, please specify.

2. Name and address of Debtor(s) (Amerindo entity) in which you gave the Principal Funds and the intended Amerindo entity if the recipient entity is different. .

   Please specify and provide documents reflecting the transmittal of Principal Funds to the Debtor(s).

3. Details including the amount and supporting documentation related to Principal Funds you claim after May 25, 2005 (please attach any statements you received after May 25, 2005):

4. Details including the amount and supporting documentation related to any Profits you claim after May 25, 2005:

5. Did you receive any distributions from the Debtor on account of your Principal Funds you claim after May 25, 2005?

If yes please specify any and all distributions and include any payments to third parties by the Debtor(s) on your behalf.

Please attach the last three (3) statements you received from the Debtor(s).

Please provide copies of all documents that support your claim after May 25, 2005. Documents could include but are limited to promissory notes, itemized statements of your accounts, cancelled checks, wire transfer confirmations, letters, contracts, judgments, and security agreements. If the claim is secured please attached all document supporting same.

**Please redact all account numbers other than the last 4 digits on the statement including personal identification numbers such as social security numbers and business EIN numbers.**

DO NOT SEND ORIGINAL DOCUMENTS.

Signature:

_____ I am the account owner       _____ I am the account owner's authorized agent

Please note that, although you may make a claim through an agent, you DO NOT NEED TO HAVE AN AGENT to make this claim, and pay or offer to pay an agent merely to make this claim or obtain payment on your account. Your claim will not be reduced if you do not have an agent.

Print Name: _____
Title: _____
Company: _____
Email: _____
Telephone Number: _____


_____          _____
Signature                                              Date

If claim has been assigned please provide the following information:

Name of Assignee: _____
Address of Assignee: _____
Email of Assignee: _____
Tel No. Of Assignee: _____
Date of Assignment: _____

LAW OFFICES

# DAVID M. RICHMAN

FRED I. SONNENFELD
JUDITH R. RICHMAN
MARVIN W. WEINSTEIN
BRAD EVAN SERLEN
OF COUNSEL

360 LEXINGTON AVENUE
NEW YORK, N.Y. 10017
(212) 687-1425
FACSIMILE (212) 682-6425
E-MAIL: drichman@sonnrichlaw.com

September 19, 2013

Ian J. Gazes, Receiver
Gazes LLC
151 Hudson Street
New York, New York 10013

Re:     Securities and Exchange Commission (SEC) v.
        Amerindo Investment Advisors Inc.  (Amerindo), et al  05 Civ. 5231 (RJS)

Dear Mr. Gazes:

On behalf of Mr. Latchezar ("Lucky") Christov I submit this "Finder Fee Claim" for your consideration.  As it does not track the parameters you set for "Investor claims, I have prepared a chronology and a narrative that set forth the details of Mr. Christov's claim.

In a nutshell, the claim dates back to the mid 1980's when Alberto Vilar, Amerindo's founder and CEO approached Mr. Christov and asked him to introduce Amerindo to his customers for its investment advisory services.  A compensation agreement was reached in which Amerindo agreed to pay Mr. Christov a finder's fee commission of 30% of all fees Amerindo collected from clients Mr. Christov brought in (**Exh "A"** ).

After several years of marketing Amerindo to Christov's customers, on or about June 30, 1994 Litton Industries (Litton), retained Amerindo as one of its investment advisors.  However, Amerindo failed to inform Litton of its fee sharing arrangement with Mr. Christov as required by the Solicitor's Rule in Investment Advisors Act of 1940 ('40 Act) particularly by the "Solicitor's Rule, 206(4)-3 which required Amerindo to tell Litton of its fee sharing arrangement with Mr. Christov.  When Mr. Christov told Amerindo that he believed he could cure their mistake his "offer" was rejected.  Amerindo, instead, instructed their lawyers to deal with the problem instead of complying with the '40 Act.  Amerindo's lawyers concocted a phony, false and utterly disingenuous "contract" which purported to pay Mr. Christov for introducing Amerindo to various unions (**Exh B** ).  Mr. Christov failed completely in this union endeavor. Despite trying to cover up its mistake(s) Amerindo paid him over $1.2 million dollars under the guise of success with the unions.  Coincidentally, this tracked precisely to the amount Amerindo owed to Mr. Christov for Litton's business.

In the latter 90's Mr. Christov learned that two Litton affiliates became customers of Amerindo. The stock market also heated up and the Litton account grew to about $650 million. Yet, Amerindo stopped its payments to Mr. Christov relying on an "illegality" agreement ensuing out of the failure of Amerindo to comply with its duties under the Solicitor's Rule. In April, 2000 Mr. Vilar cut off all payments to Mr. Christov claiming they were illegal and Mr. Christov should have known this (**Exh ©** ).

In August, 2000, Mr. Christov commenced an arbitration proceeding. Amerindo trial to stay the proceeding. Its motion was denied.

The hearing began in February 2002. It resulted in an interim award on May 14, 2002 (**Exh "E"** ). In a showing of utter "chutzpah" despite offering a variety of disingenuous arguments to avoid paying Mr. Christov. Amerindo brazenly "concede[d] that ... (it) .... could have taken the steps necessary to make payment to Christov lawful..." but it did not (**Exh "F"**). Yet, even though the Arbitrator directed Amerindo to provide "cooperation" to Mr. Christov in seeking "no action" relief from the SEC (**Exh "E"**) Amerindo's lawyers argued, disingenuously, that it did not "refuse" to provide Christov with the cooperation noted in the interim award, rather, since it was "not" aware of any cooperation that was, "necessary" (for Christov to seek relief from the SEC) it did not "refuse" to cooperate with him.(**Exh "G"**) This was utter nonsense.

Very truly yours,

David M. Richman

DMR:ea
enclosure

ps: We respectfully request that you consider the annexed exhibits be incorporated by Reference to this submission.

cc:     Lucky Christov

# ABRIDGED CHRONOLOGY

**1960's**  Alberto Vilar ("AV") and Lucky Christov ("LC") met in New York City.

**1970's**  LC moves to California and becomes an "Institutional Broker".

**1970's thru 1980's**  AV works at Citibank with former roommate of LC (Reid Thompson). In 1980's AV calls LC seeking introductions to LC's clients for his investment advisory business. LC agrees. He introduces some clients to AV. LC asks AV for written agreement setting forth his share of commissions. On May 5, 1990 AV complies (**Exh A** ). During this period LC pursues Litton for Amerindo -- never provides investment advice, merely follows up on Amerindo's efforts.

**July 1, 1994**  Litton retains Amerindo as one of its money managers. However Amerindo fails to disclose its fee sharing arrangement with LC.

**Mid 1995**  LC calls Amerindo about Litton related payment...he speaks to CFO Joaquin Garcia Larrieu (JGL) who expresses surprise -- JGL says LC's deal with Amerindo violates '40 Act -- JGL speaks to AV who directs JGL to pay LC.... AV directs JGL to speak to (their lawyer) -- Rick Cohen Esq. He drafts a letter and back dates it to August 15, 1994(**Exh T** ) -- Cohen testified the letter was to "blow up" the May 3, 1990 fee sharing letter ...(**Exh Y** )

**Mid 90's**  When JGL told LC of Amerindo's failure to disclose to Litton their fee sharing arrangement LC asks for documents needed for parties to comply with the '40 Act --so he would "give them" to Litton -- his request was refused. JGL told him although it was "too late" for SEC compliance Amerindo was dealing with the problem.

**Mid to Late 90's**  At AV's direction Rick Cohen drafts letters to cover up the false mechanism Amerindo would use to pay LC -- LC did not know of these legal problems. In a letter dated January 1, 1998 (**Exh B** )LC was to get irregular amounts as retainers for allegedly providing "Taft Hartley" consulting services  -- Instead of so called even numbers  (eg. $100,000 or $250,000 etc... Amerindo calculated what is owed to LC for the previous years commissions for Litton. Amerindo never asked LC for Taft Hartley reports -- yet Amerindo paid LC almost $1 million dollars just for 1996, 1997 and 1998... Conveniently the retainer letters used payments that matched the 30% LC was promised for his customer introductions... the money had nothing to do with labor unions.

| | |
|---|---|
| **1998-1999** | LC learns that Amerindo was introduced to two of Litton's affiliates. Since Amerindo previously paid LC when an associate of a customer he introduced to Litton became a customer of Amerindo he demanded to be paid for these new Litton accounts. LC's request was rejected. Moreover Amerindo admitted its illegal behavior ("we readily concede that Amerindo failed to take the steps necessary to make payment to Christov lawful") (**Exh F** ). |
| **2000 – 2002** | • The arbitration hearing took place in February 2002 resulting in an interim award on May 14, 2002 (**Exh** *E* ). |
| | • The arbitrator directed Amerindo to provide LC all "necessary cooperation" to enable him to try to obtain a "no action" letter from the SEC which would permit an award to LC of some $2.3 million (**Exh** *E* ). Amerindo claimed disingenuously that LC did not "need" its cooperation. It never provided any. |
| | • Therefore Amerindo claimed, it had "no duty" to help Mr. Christov. (**Exh** *G* **Heller letter to arbitrator** ) In the absence of Amerindo's cooperation the SEC rejected LC's request for "no action" relief. |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

AMERINDO INVESTMENT ADVISORS INC.,
AMERINDO ADVISORS UK LIMITED,
AMERINDO MANAGEMENT INC.,
AMERINDO TECHNOLOGY GROWTH FUND, INC.,
AMERINDO TECHNOLOGY GROWTH FUND II, INC.,
TECHNO REQUIA, S.A.,
ALBERTO W. VILAR, and
GARY ALAN TANAKA,

Defendants.

05 Civ. 5231 (RJS)

ECF CASE

PROOF OF CLAIM OF
LATCHEZAR CHRISTOV

## CLAIM OF LATCHEZAR CHRISTOV

This claim is submitted on behalf of Latchezar ("Lucky") Christov (sometimes "Claimant" or "Mr. Christov"), against Amerindo Investment Advisors Inc. ("Amerindo"), arising out of Amerindo's refusal to pay Mr. Christov a finder's fee for having introduced it to Litton Industries as a client for whom Amerindo managed "money". At all times relevant Amerindo was an "investment" advisor subject to the requirements of (both) the Investment Company Act of 1940 and the Investment Advisors Act of 1940 (15 U.S.C.A. §80b-1, *et. seq.*) (the "40 Act") while Mr. Christov was an institutional stock broker/financial advisor.

1

## DISCUSSION OF CHRISTOV'S CLAIM

The material facts are not in dispute. Amerindo was a duly registered investment advisor subject to the statutory requirements of the Investment Company Act of 1940 and the Investment Advisers Act of 1940 (15 U.S.C.A. §80b-1, *et. seq.*) (the "40 Act").

Alberto Vilar was a friend of Mr. Christov, having met him through Mr. Christov's college roommate. In the mid-1980's, Mr. Vilar called Mr. Christov, seeking to have him introduce his network of clients to Mr. Vilar to see if they were interested in investing with Mr. Vilar.

Between the 1980's and early 1990's, Mr. Christov was able to solicit only Mr. John Sweetland to invest with Amerindo; who paid Mr. Christov a 30% (of 1%) finder's fee. When Mr. Sweetland introduced his friend Dude Crain to Amerindo it paid Mr. Christov a finder's fee. They continued to pay him for both clients for years.

On May 3, 1990 Amerindo gave Mr. Christov a contract in which it promised to pay him 30% of the fees it received from accounts he brought to them (the "1990 Agreement") (**Exh.** A).

Mr. Christov's activities for Amerindo were informal, sporadic and rendered exclusively for Amerindo. Mr. Christov never held himself out as a '40 Act solicitor. It was Amerindo's statutory duty to "supervise" Mr. Christov's activities but, the record shows, it failed to supervise Mr. Christov in any manner at all.

Although, Mr. Christov first introduced Amerindo to Litton Industries, Inc. ("Litton") sometime in the late 1980's it was not until 5 to 6 years later that Litton decided to employ Amerindo as one of its money managers. When Litton announced this arrangement Mr. Christov told his Litton contact, Ms. Elizabeth Guasti, that he would share in Amerindo's fees. She was pleased for Mr.

Christov but she asked if this fee sharing would increase Litton's costs. She was assured it would not.

In late 1994 or early 1995, Mr. Christov asked Amerindo about getting paid his (30 %) share of the fees it was collecting from Litton. During conversations with Litton's Chief Financial Officer, Mr. Joaquin Garcia-Larieu ("Mr. Garcia"), Mr. Christov discovered for the first time that Amerindo had not complied with the disclosure requirements of the "Solicitor's Rule", (206(4)-3 of the '40 Act). In fact Mr. Christov was completely unaware of the '40 Act. Mr. Christov asked Mr. Garcia to let him give Litton the required documents. He was told "it was too late." Instead of approaching Litton with proper disclosure documents, Amerindo used a series of phony "consulting agreements" drafted by Rick Cohen, Esq. one of their attorneys, using a "Taft Hartley" scheme (**Exh B** )as a device to cover up their problem of paying Mr. Christov."[1] Commencing in mid-1995 and until 2000, Amerindo paid Mr. Christov about $1 Million it owed him for Litton but on the basis of the '90 Agreement not the Taft Hartley documents.

Moreover, due to the stock market's extraordinary performance in 1999, the parties stipulated at the arbitration hearing that, Amerindo would owe Mr. Christov over $2.2 Million for Litton from 1999 -2007 (**Exh H** ) In response, Amerindo stopped payments to Mr.Christov. as of April 13, 2013 (**Exh D** ).

---

[1]     The first of these agreements which was back dated to August 15, 1994 (Exhibit I) purported to contain a release whose purpose was to "blow up" the '90 Agreement although Amerindo (Exhibit August 15, 1994 letter) never disclosed this directly to Mr. Christov through Mr. Vilar or Mr. Richard Cohen, Esq. the companies lawyer see Mr. Cohen's testimony (Exhibit J - p. 549-568).

# MR. CHRISTOV'S CLAIM

During the arbitration hearing the parties stipulated that a sum of $2,282,838 would be paid to Mr. Christov for the years 1999 through 2001 based on a finding that Amerindo was liable to him (**Exh H**).

Applying the hedge funds industries' typical billing formula ("1/10%") 1% of the net asset value Amerindo managed for Litton in 1999 Amerindo earned it a fee of approximately $7 Million, 30% of which added up to about $2.1 Million for Mr. Christov. The formula worked like this: the advisor earns 1% of the net asset value of the assets under its management and another 10% of the profits earned by the advisor. Rather than become enmeshed in a mind numbing exercise the parties stipulated to use the 1% figure to simplify things. Using $700 million as a starting point Amerindo's fee to Litton would be approximately $7.0 million. This would cause Amerindo to owe Mr. Christov some $2.1 million ($7.0 million x 30% = $2.1 million).

An arbitration demand was served by Christov in mid-August, 2000 (**Exh "D"**). The parties proceeded to mediation even though counsel for both parties had been engaged unsuccessfully in settlement talks for more than sixty days. After mediation failed, Amerindo moved in Supreme Court to stay the arbitration proceeding. This motion was denied.

The arbitration hearing was held in February 2, 2002. Amerindo's failure to comply with the Solicitor's Rule coupled with its decision to use the phony Taft Hartley maneuver (**Exh B**) estops it from relying on an "illegality" defense to Mr. Christov's claim. Moreover, Amerindo lacks standing to use the '40 Act as its defense because the Supreme Court has held that the '40 Act relates only to

4

"investment advisory" contracts and, since this matter does not involve an investment advisory contract (between Amerindo and Mr. Christov) Amerindo must look elsewhere for a defense.

Had Amerindo provided Litton with disclosure documents – it conceded it could have done so (**Exh F**) and had it timely sought "no-action" relief from the SEC there is reason to conclude that Amerindo could have protected Mr. Christov's right to be paid. Instead, it deceived Mr. Christov into believing their scheme was a lawful way for it to pay him. It should now be estopped from arguing that its contracts are unlawful. To do less will unjustly enrich Amerindo by some $3 Million Dollars.

## A.    AMERINDO CANNOT RELY ON THE '40 ACT FOR ITS DEFENSE

This is not a case between an investment advisor and one of its clients. Therefore, Amerindo cannot invoke an "investment advisor's" argument and therefore it should be barred from employing the '40 Act in its flawed attempt to assert a defense to Mr. Christov's claim. The Supreme Court so held in Trans America Mortgage Advisors, Inc. ("TAMA") v. Lewis, 444 U.S. 11, 62 L.Ed. 2d 146 (1979), when it determined the '40 Act"…was intended to benefit (only) the clients of investment advisors (not the advisor itself).

Since the contracts in this case are between Amerindo and Mr. Christov and, moreover, since no one is seeking a rescission of those contracts "…(Amerindo)… cannot use the Investment Advisers Act to avoid payment to Mr. Christov under the independently valid agreement (the '90 Agreement).

5

## B. AMERINDO IS ESTOPPED FROM RELYING ON AN "ILLEGALITY" DEFENSE BECAUSE ITS OWN CONDUCT CREATED THE SITUATION IT NOW SEEKS TO IMPROPERLY EXPLOIT

Amerindo has acknowledged that it was, aware of the constraints of the Solicitor's Rule (**Exh F** ). Amerindo either consciously or negligently breached its duty to Mr. Christov. It should not be permitted to enrich itself by its failure to protect his rights to share in fees from Litton.

By inducing Mr. Christov to accept payment under the phony Taft Hartley agreements about which (their lawyer) Rick Cohen, admitted were created so Amerindo could hide its sloppy and unlawful business practices from the SEC (**Exh J** ).

The New York's Court of Appeals has held that where a wrong (such as Mr. Christov's (ignorant) failure to deliver disclosure documents is merely *malum prohibitum*, and does not endanger the protected party (Litton - not Amerindo), Mr. Christov is entitled to recover when confronted by an inappropriate "illegality" defense. In <u>Rosasco Creameries v. Cohen</u>, 276 N.Y. 274 (1937), an unlicensed milk dealer could recover the reasonable value of milk it sold to licensed dealers when the court declared:

> Illegal contracts are generally unenforceable except where contracts which violate statutory provisions <u>are merely *malum prohibitum*, the general rule does not always apply.</u> If the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract and <u>the denial of relief is wholly out of proportion to the requirements of public policy</u> or appropriate individual punishment, the <u>right to recovery</u> will <u>not be denied</u> (citation omitted). (emphasis added)

<u>Rosasco</u> has been followed in the following cases:

6

(a)     <u>Charlebois v. J.M. Weller Associates, Inc.</u>, 72 N.Y.2d 587, 535 N.Y.S.2d 356 (1988), where the Court of Appeals upheld a builder's right to recovery in the face of an "illegality" defense because, "...<u>forfeitures by operation of law are strongly disfavored as matters of public policy</u>" (emphasis added). The defendant's effort <u>to use a licensing statute as a "...sword</u> for personal gain <u>rather than as a shield </u>for the public good will <u>not be countenanced</u> in the name of...public <u>policy slavishly applied</u>". Particularly where the defendants' attorney prepared the contract and the defendants "reaped the fruits of the contract".

(b)     In <u>Lloyd Capital Corp. v. Henchar</u>, 80 N.Y.2d 124, 589 N.Y.S.2d 396 (1992), the plaintiff lender loaned $60,000 to the defendant who refused to repay the loan relying on an "illegality" defense. This decision affirmed the "overriding general policy" designed to prevent "people (like Amerindo) from getting other people's (Mr. Christov's) property for nothing..."; and

(c)     In <u>Benjamin v. Koeppel</u>, 85 N.Y.2d 549, 626 N.Y.S.2d 982 (1998), the Court of Appeals permitted an attorney, who had failed to comply with a statutory registration requirement, to recover payments from a law firm pursuant to a fee sharing agreement. The Court refused to permit the defendant law firm from using "public policy" as a 'sword' for personal gain...." stating that to deny recovery would produce a remedy that is "wholly out of proportion with requirements of public policy (citing <u>Rosasco</u>)." Moreover, the Court said that it "...ill-becomes the defendants, who are bound by the Code of Professional Responsibility, to seek to avoid, on 'ethical' grounds the obligations of an agreement to which they freely assented and from which they reaped the benefits."

Amerindo cannot argue honestly that its 1990 agreement to pay Mr. Christov for introducing it to Litton (**Exh.** A) was "unlawful on its face." Nor can Amerindo argue properly that for Mr. Christov to earn his share of their fees he had to "engage in unlawful conduct." The anti-fraud

7

content of the "Solicitor's Rule" was enacted to protect Litton from Amerindo – not Amerindo from Mr. Christov. The only illegality that might be charged to Mr. Christov concerned his mere failure to give Litton a disclosure document, a failing that is the direct result of Amerindo's "being asleep at the wheel" then Mr. Christov's ignorance of the law.

If anything, the '40 Act's "Solicitor's Rule's" emphasis on an advisor's supervisory responsibility supports a finding that it was Amerindo's failure to discharge its supervisory duties that led to (try to) "blow up" Amerindo's May 1990 agreement with Mr. Christov. Amerindo was not trying to protect Christov's contractual rights under the '90 Agreement, rather Mr. Cohen conceded he was trying to protect Amerindo from its own "schlocky" practices (**Exh__J__** ). Under the circumstances, Mr. Christov should not suffer a "forfeiture by operation of law" that is "wholly out of proportion to the requirements of public policy." That would unjustly enrich Amerindo.

**HAVING PAID MR. CHRISTOV FOR LITTON FOR FIVE YEARS – AMERINDO SHOULD BE BARRED FROM ASSERTING IT HAS NO LAWFUL OBLIGATION TO MR. CHRISTOV.**

Equitable estoppel precludes one from:

> "Denying or asserting the contrary of a material fact which by its words or conduct, affirmatively or negatively, intentionally or through culpable negligence, induces another excusably ignorant of the true facts and who has a right to rely upon the words or conduct in question and in so doing changes his position in a way that he will suffer an injury in the inducing party's denial or belatedly asserted contrary position was allowed to stand."

See, 57, N.Y.Jur.2d, Estoppel, Ratification and Waivers, §13 et. seq. (at p. 17).

8

The inducing party (Amerindo) "may not, (even) innocently, mislead another and then (try to) claim the benefit of its deception." *See*, Triple Cities Construction Co. v. Maryland Casualty Co., 4 N.Y.2d 443, 448, 176 N.Y.A.2d 292 (1958) ["Actual intent to mislead or defraud" is not essential. It is more than sufficient to establish that the party to be estopped "knows or has reason to believe that its words or conduct will cause injury" to the other.

## MR. CHRISTOV DID NOT RELEASE AMERINDO WHEN HE SIGNED THE TAFT-HARTLEY AGREEMENTS

Having "engineered" the deception that induced Mr. Christov to believe that Amerindo's Taft-Hartley agreements created a lawful means to pay him for "finding" Litton, Amerindo cannot be allowed to relying on its own unlawful conduct to defeat Mr. Christov's claim.

Mr. Cohen testified that he crafted the "Taft-Hartley" agreements to do "what the boss ordered me to do" (pay Lucky) while "blowing up" the '90 Agreement (**Exh J** ). Although Amerindo never disclosed his motives to Mr. Christov, it was under a duty to. Mr. Garcia conceded this when he delivered the first Taft-Hartley agreement to Mr. Christov for signature. Amerindo told Mr. Christov that by signing the "Taft-Hartley" agreements he would be forfeiting his contractual right to receive Litton payments "for as long as" Amerindo maintained the account in exchange for a mere $75,000.

The manipulation of the fiduciary relationship between Amerindo and Christov is a valid reason to permit payment to Mr. Christov. In short, Amerindo's superior economic position imposed a duty to deal with Mr. Christov in "good faith" when trying to blow up their '90 Agreement. Amerindo knew this because it enjoyed the "superior and influential" position. After all, it collected the money and it - alone - decided when and how much it would pay.

It had a duty to be honest with Mr. Christov. It did not discharge that duty. It produced "a false impression" by burying Mr. Christov's arcane "release language" in its proposals by deliberately using that language to "convince" Mr. Christov that it was honestly seeking his consent to rescind their '90 Agreement although it knew Mr. Christov would never knowingly give up millions for a mere $75,000. Having elected to be vague and ambiguous, Amerindo cannot take advantage of its duplicitous acts.[2]

Mr. Christov testified at the arbitration hearing that he "trusted Mr. Garcia...because he told me he was going to do something and take care of it. I took that to mean exactly that. I couldn't imagine him setting up a sham payment scheme, why would he?"

Amerindo's real concern about paying Mr. Christov for 1999 resulted from the stock market's "hot" performance in 1999. When Mr. Vilar wrote the April 13, 2000 e-mail, (**Exh C**) he had to be aware that Amerindo had just finished its best quarter ever. The Litton account had grown to over $650 Million. Litton's advisory fee (just for the 1st quarter) was almost 2.0 Million. At 30%, Amerindo "owed" Mr. Christov over $600,000 for that quarter alone.

## MR. CHRISTOV WAS NOT REQUIRED TO BE LICENSED AS A SOLICITOR

---

[2]     The following illustrates how courts often refuse to enforce releases that are the product of deception or misunderstanding:

In Cahill v. Regan, 5 N.Y.2d 292, 299, 184 N.Y.S.2d 348 (1959), the Court rejected a release because the parties were "not concerned with the same issues." In Stone v. Aronwald & Pykett, 275 A.D.2d 706, 713 N.Y.S.2d 198 (2nd Dept. 2000), the Appellate Division refused to enforce a release where the parties "continued to litigate" after the release was executed. In New Again Construction v. City of New York, 351 N.Y.S.2d 895, 899 (Kings, 1974), the court estopped the City from relying on a release obtained as a result of "unconscionable conduct" where the City's agent insisted on an abandonment of the (plaintiff's) claim. ("An intent to release a claim gratuitously will not be inferred unless the intent ...is clearly and unequivocally expressed and where unilateral mistake is present.") (emphasis added).

At the hearing, Mr. Cohen testified that California "required" Mr. Christov to be a "licensed" solicitor to legitimize his role in securing the Litton account for Amerindo.[3] Respectfully, this appears not to be the law and it serves merely to confuse the situation. Mr. Cohen failed to identify any statute that proved his point.

Mr. Christov was only a "part time" solicitor and (we believe) that neither federal nor state statutes require the licensing of these (types of) solicitors because the registered advisor must supervise their activities. In fact, Mr. Christov was duly "licensed" by the NASD. He had a Series 24 license which in turn required him to have a Series 7 license.

All Amerindo need do (in 1994) was give Mr. Christov the requested ('40 Act) disclosure documents for Litton. It never did and it now seeks to shift blame to Mr. Christov for its malfeasance.(**Exh K**, Letter to SEC re: Amerindo refusal to cooperate with Mr. Christov and it's ridiculous rationale for its refusal-i.e, since "counsel did not see the necessity" for Amerindo's cooperation there was" no reason" for Amerindo to adhere to the arbitrators directive).

In point of fact SEC addressed this issue:

> "In...Release (No. 615), the Commission expressed the view that a solicitor who engaged in solicitation activities in accordance with paragraph (a)(3)...would be a person <u>associated</u> with an investment advisor and therefore <u>would not be required to register</u> as an advisor under the Advisers Act <u>solely as a result</u> of those activities. The <u>Commission's view</u> that such solicitors would be associated persons of an advisor <u>was based upon the investment advisor's responsibility to supervise</u> the activities of the solicitors." (emphasis added)

---

[3]    "...we need...to make Lucky our associated person for purposes of the California corporate securities law...or Lucky will have to demonstrate that he is or become registered as an investment adviser under the California statute" (599).

11

Clearly, the SEC's view is that the <u>investment advisor's responsibility</u> is to <u>oversee</u> the activities of third-party solicitors. This eliminates the need for a solicitor to register. Because California follows federal law, it recognizes too, for instance, that attorneys, CPA's and (other) "persons associated" with an investment advisor" need <u>not</u> register where investment advice is given "incidentally" and where it is clear that the person is not doing so "as part of a regular business." No one could conclude that Mr. Christov held himself out to Litton as the source of investment advice that was being given as part of his business.

In short, because there is no rule or regulation that requires a solicitor to register, Mr. Christov's claim is not diminished by this argument.

## CONCLUSION

For the foregoing reasons, Mr. Christov is entitled to an award for 30% of the fees Amerindo has collected from Litton.

Dated:   New York, New York
         September 19, 2013

Respectfully submitted,

DAVID M. RICHMAN, ESQ (DR - 4960)
*Attorney for the Claimant*
**LATCHEZAR CHRISTOV**
360 Lexington Avenue
New York, New York 10017
Telephone:  (212) 687-1425
Facsimile :  (212) 682-6425
e-mail: drichman@sonnrichlaw.com

12

# VERIFICATION

STATE OF CALIFORNIA          )
                             )  ss.:
COUNTY OF SAN DIEGO          )


      LATCHEZAR CHRISTOV, being duly sworn, deposes and says:

      I am the claimant in this matter; and

      I have read the foregoing claim and know the factual contents thereof, and I believe

the matters stated therein to be true.

Dated: San Diego, California
      September 17, 2013


                                  LATCHEZAR CHRISTOV


Sworn to before me this
      day of September, 2013

_See attached_
    Notary Public

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of San Diego

On 9/17/2013 before me, Katelyn N. Steinmetz Notary Public,
<span>(Here insert name and title of the officer)</span>

personally appeared Latchezar Christov

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Katelyn N. Steinmetz

Signature of Notary Public

(Notary Seal)

KATELYN N. STEINMETZ
Commission # 1976507
Notary Public - California
San Diego County
My Comm. Expires May 10, 2016

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

Verification of
(Title or description of attached document)

Claim
(Title or description of attached document continued)

Number of Pages 1 Document Date 9/17/13

(Additional information)

### CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

_____
(Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
    - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
    - ❖ Indicate title or type of attached document, number of pages and date.
    - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

Exhibit A

## AMERINDO INVESTMENT ADVISORS INC.

# CONFIDENTIAL

May 3, 1990

Mr. Latchezar Christov
Managing Partner
The Western Group, Inc.
356 North Camden Drive
Beverly Hills, CA 90210

Dear Lucky:

I am indeed pleased to confirm the compensation scheme we discussed relating to the amount we are willing to pay you for accounts you bring us.

We will pay you 30% of all fees, management and incentive, we collect for as long as we maintain the account.

Management fees are calculated quarterly in arrears; incentive fees are payable annually in arrears.

We greatly appreciate your continued, long established support for our firm. We strongly encourage you to take advantage of our excellent long term record (30.3% over 10 years, without a down year) plus the ongoing bull market in our specialty technology sector to introduce prospective clients to our service.

Best regards.

Sincerely,

Albert W. Vilar



Exhibit B



# AMERINDO
INVESTMENT ADVISORS INC.

399 Park Avenue, 22nd Floor
New York, NY 10022
Tel (212) 371-6360
Fax (212) 371-6988

January 1, 1998

**CONFIDENTIAL**

Mr. Latchezar Christov
607 Skyline Trail
Topanga, CA 90290

Re:     Client Solicitation

Amerindo wishes to confirm the terms by which it would engage you to, and be willing to compensate you further should you, refer new clients to us as set forth below. You shall be entitled as set forth herein to receive fees and commissions as set forth below for your services in soliciting New Clients for us, as follows:

1.     **Retainer.** Amerindo hereby engages you, for a term ending on December 31, 1997, to attempt to identify for solicitation and thereafter, upon authorized placement of a potential New Client's name on Exhibit 1 as provided below, to solicit, New Clients as such term is defined below, and agrees to pay you a retainer of $348,000, payable as follows: and $87,000 upon each of April 1, 1998, July 1, 1998, October 1, 1998, and December 31, 1998; with it being understood and agreed, however, that this retainer shall be fully recoupable from and against the first monies which would otherwise be due you as commissions under Section 2, below, so that no such commissions shall accrue or become payable until the full amount of the foregoing retainer has been recouped.

2.     **Commissions.**

(a)     As used herein, the term "New Client" means and refers only to the following persons or firms:

(i) Those firms or persons who (a) are listed in Exhibit 1 attached hereto, (b) are introduced to us by you, and (c) pursuant to written investment advisory contracts executed on or before July 1, 1999, become clients of ours substantially with your assistance and without substantial assistance from any of our other representatives or employees engaged to solicit new clients, with it being understood that the term "New Client" for purposes of this clause (i) does not mean or refer to any person or firm not meeting all of the criteria set forth in this clause (i); and

(ii) Any other firms or persons who (a) you propose in writing to us to add to Exhibit 1, (b) we, Amerindo, agree (in the exercise of our sole and absolute discretion) in writing to add to that list, (c) are introduced to us by you, and (d) pursuant to written investment advisory contracts executed on or before the first anniversary of their being added to such Exhibit with Amerindo's written consent, become clients of ours substantially with your assistance and without substantial assistance from any of our other representatives or employees engaged to solicit new clients, with it being understood that the term "New Client" for purposes of this clause (ii) does not mean or refer to any person or firm not meeting all of the criteria set forth in this clause (ii). It is also understood and agreed that





PETITIONER'S
EXHIBIT
7

AMER00015

even if we, Amerindo, agree to add a person or firm to the aforesaid list, Amerindo may and shall be permitted, if it chooses, to add such person or firm to the list based on a reduced schedule of commissions, which reduced schedule Amerindo shall set forth on such list.

(b)     It is expressly understood and agreed that you shall have absolutely no authority to contact any person by any means for the purposes of exploring the possibility of such person's becoming a client of ours unless you have first obtained the prior written consent of the Chief Operating Officer of Amerindo to contact that specific person, and you shall have no right to represent to any person that you are our agent for any purpose whatsoever unless the prior written consent of the Chief Operating Officer of Amerindo is obtained with respect to the person as to which you desire to make any such representation. It is also expressly understood and agreed that, notwithstanding anything contained to the contrary herein, the term "New Client" shall only mean and refer to persons or firms who become separate discretionary account clients of Amerindo itself, and not to any persons or firms who become clients of or investors in any affiliate of Amerindo, including any investment company or investment partnership organized or sponsored by Amerindo (with the term "company" having, for such purposes, the meaning ascribed to it in the Investment Company Act of 1940).  As used in this agreement, references to "Amerindo" are to Amerindo Investment Advisors Inc., a California corporation.

(c)     With respect to each New Client, you shall receive (i) an amount equal to 20% of the Notional Fees (as such term is hereinafter defined) earned with respect to such Client for the three (3) year period commencing on the Initial Funding Date (as defined below) and (ii) an amount equal to 10% of the Notional Fees (as such term is hereinafter defined) earned with respect to such Client for the three (3) year period thereafter, and your entitlement to any commissions or other payments in respect of any such Client shall thereafter cease.

(d)     For purposes of computing the amount of commissions which you will be entitled to be paid pursuant hereto, Notional Fees shall be considered earned for the period with respect to the actual fees to which they relate are earned, regardless of when payment of such actual fees is actually made (with it being understood that the timing of payment of such commissions shall be calculated and paid, with respect to each applicable Client, within thirty (30) days after the receipt by us of fees from such Client).

(e)     The term "Notional Fees" means the amount which would have been earned by us with respect to that Client for a given period based on the fee structure actually in place with that Client had the value of the assets under management for that Client for the period in question been equal to the value of the assets under management by us for that Client at the date on which we are first funded with such Client's account ("the Initial Funding Date") (which value is herein referred to as the "Initial Funding Date Value"), as adjusted on the first day of each calendar month following the calendar month in which the Initial Funding Date occurred, as follows:

(i) down (a) to reflect withdrawals by the Client subsequent to the Initial Funding Date of any assets under management in the account, other than withdrawals of net



assets added to the account in question by reason of managed account growth during the period commencing on the Initial Funding Date, and/or (b) to reflect diminution in value attributable to depreciation of assets under management other than by reason of withdrawals by the client, and

(ii) up to reflect the amount of any increase in the value of assets under management which is attributable to any additional Client funding of the account which is effected during the 18 month period which commences upon the earlier of (a) the Initial Funding Date and (b) execution by the Client of its advisory agreement.

(f) All valuations of client assets for purposes of this paragraph shall be made in the same manner as they are made for the client in question and such determinations shall be binding. Except as set forth above, you shall not be entitled to any compensation of any kind whatsoever, including by way of reimbursement of expenses.

(g) You expressly agree to obtain and maintain any and all registrations, licenses and similar authority necessary to conduct your activities pursuant to this agreement, to comply fully with all applicable laws, rules and regulations pertinent to your activities hereunder and, without limiting the generality of the foregoing:

(i) To deliver a copy of our current "brochure" which is required by Section 275.204-3 of the Regulations of the Securities and Exchange Commission promulgated pursuant to the Investment Advisors Act to each prospective client on your first meeting with such prospect, and thereafter from time to time to deliver such prospect, on the first meeting after any change in the brochure, a copy of the new brochure;

(ii) To deliver to each prospective client on your first meeting with such prospect, a copy, in the form attached hereto as Exhibit 2, of the written disclosure document required under Paragraph 206(4)-3(b) of the Investment Advisers Act (the "Solicitors Rule"), and thereafter from time to time to deliver to such prospect, on the first meeting after any change in that disclosure document, a copy of the new document;

(iii) To obtain, in connection with each and every delivery of a brochure or disclosure document, a signed and dated acknowledgement of the receipt thereof by the prospect, and promptly to furnish copies of all such acknowledgements to us; and

(iv) To maintain sufficient written documents and records as may appear reasonably necessary to demonstrate your compliance with the foregoing.

(h) You represent that you are not a person described in Paragraph (a)(1)(ii) of the Solicitors Rule.

You agree that you shall not, for so long as you have the potential to earn any compensation hereunder, make use of any of our proprietary customer lists to solicit any business or clients for any other person or firm. You further agree that you shall pre-clear with us actual copies of any marketing materials which you propose to present to any person

in connection with your marketing the services or products of Amerindo, as well as copies of any other materials which may be deemed to be "advertising" under the Investment Advisors Act and the Regulations thereunder, and you shall provide us with a written quarterly report on the last day of each calendar quarter setting forth the names of any person to whom such material has been given and describing the material delivered.

This letter represents the entire agreement between us pertaining to the subject matter hereof. There are no warranties, representations or other agreements between us in connection with the subject matter hereof except as set forth or referred to herein. The agreement contained herein shall bind and enure to the benefit of the successors, assigns, personal representatives, heirs and legatees of the respective parties. The agreement contained herein may be amended or modified only by the written agreement of each of us. You and we agree that this document has been executed and delivered in the State of California and shall be construed, enforced and governed by the laws thereof. In the event of any action, suit or proceeding brought under or in connection with this agreement, the prevailing party therein shall be entitled to recover, and the other party hereto agrees to pay, the prevailing party's costs and expenses in connection therewith, including reasonable attorneys fees. Your contact at Amerindo for purposes of this arrangement shall be its Chief Operating Officer.

Very truly yours,

AMERINDO INVESTMENT ADVISORS INC.

President

Alberto W. Vilar

AGREED:

_____
Latchezar Christov

Dated: _____, 1997.

(4)

Exhibit C

OBINFAIPO,0,127,127SCO.75,0,75,OWU10A

Subj:   **Letter from Alberto Vilar**
Date:   4/13/00 8:37:31 AM Pacific Daylight Time
From:   jolsher@AMERINDO.com (Johanna Olsher)
To:     LChristov@aol.com ('LChristov@aol.com')

**CONFIDENTIAL**

April 13, 2000

Lucky Christov
607 Skyline Trail
Topanga, CA  90290

Dear Lucky:

I am responding briefly to the matter of your fees.

Way back when, we agreed to pay you a fee for John Sweetland, because he invested in our offshore fund. The SEC does not regulate finders' fees with respect to offshore funds which leaves us free to do what we want.

The issue of paying fees on Litton is entirely different. The SEC is extremely specific about how this can be done. There is only one way in which we are permitted to pay a fee on a US account. We have to get Litton to sign a SEC industry form in which they authorize our payment to you, including the amount of the payment, the time the payment will be made, and the percentage of our commission. Unfortunately, there are no exceptions to this rule. We probably took a casual, if not outright erroneous view of this matter, in the interest of compensating a good friend, namely you, but you should have known this too. Now the situation is very different. Litton is a very visible large account and we are a very visible investment advisor. I don't have to tell you that any serious infraction of SEC regulations could close us down. We are not going to compromise our license for anything or anyone.

One way of looking at the situation is that you benefited enormously from what we were not permitted to do by law. We could have you talk to Rick Cohen, our longtime trusted counsel in Los Angeles, about the danger we face in proceeding with this arrangement. In fact, your compensation adds further salt to the wound, as our standard third party remuneration agreement specifies that the agreed upon commission is based on original funds contributed and not on any capital appreciation. Moreover, we pay all the fees in full for three years, which is then reduced by half for the next five years, at which time it ends.

If I had an easy solution, I would communicate it to you. You complain about the pain of being paid late, but given the risk we took of exposing ourselves to SEC sanctions, and the exception we made at our expense, you really miss the point. We stuck our necks out for you, which in retrospect was extremely foolish on our part. We also gave you whatever moral support we could during your SEC ordeal.

I am happy to consider suggestions that you have, provided they fall within the law.

Sincerely,

Alberto0BLTLA1,4LA1,2SP1PW1ZPE< =f LA }OK⊥¦ ¦FU1462,98PMOPEI√┐ ┐n L'√┐┐ m LiPM2ACO,7RF1,8,8 0,C

**PETITIONER'S EXHIBIT**

20

AMER00021

# American Arbitration Association
## Commercial Arbitration Rules

To institute proceedings, please send two copies of this demand *and the arbitration agreement*, with the filing fee as provided in the rules, to the AAA. Send the original demand to the respondent.

### DEMAND FOR ARBITRATION

DATE: August 7, 2000

TO: Name __AMERINDO INVESTMENT ADVISORS INC.__
Address __399 Park Avenue__ (of the Party on Whom the Demand Is Made)
City and State __New York, New York__ ZIP Code __10022__
Telephone (212) __371-6360__ Fax __(212) 371-6988__
Name of Representative __Alberto Vilar, President__ (If Known)
Representative's Address __399 Park Avenue, New York, NY 10022__
Name of Firm (If Applicable) __AMERINDO INVESTMENT ADVISORS INC.__
City and State __New York, NY__ ZIP Code __10022__
Telephone ( ) __See Above__ Fax __See Above__

The named claimant, a party to an arbitration agreement contained in a written contract, dated __August 15, 1994__ and providing for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration thereunder.

THE NATURE OF THE DISPUTE: BREACH OF CONTRACT; UNJUST ENRICHMENT (Exhibit "A") BREACH OF FIDUCIARY DUTY

THE CLAIM OR RELIEF SOUGHT (the Amount, if Any): Accounting to determine the true amount of commissions due claimant both presently and in the future and, pursuant to Rule 23, as published in the Commercial Dispute Resolution Procedures (as Amended and Effective January 1, 1999), an Order directing Amerindo Investment Advisors Inc. to produce all documents in its files regarding the calculation, billing and collection of its fees to the accounts involved in this dispute dating back to 1990.

DOES THIS DISPUTE ARISE OUT OF AN EMPLOYMENT RELATIONSHIP? ☒ Yes ☐ No

TYPES OF BUSINESS: Claimant __Investment Consultant__ Respondent __Investment Advisor__

HEARING LOCALE REQUESTED: __New York, New York__ (City and State)

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association at its __New York City__ office, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

Signed _____ (May Be Signed by a Representative) Title __Attorney for Claimant__

Name of Claimant __LATCHEZAR CHRISTOV__
Address (to Be Used in Connection with This Case) __607 Skyline Trail__
City and State __Topanga, California__ ZIP Code __90290__
Telephone (310) __455-3056__ Fax __(310) 455-0835__
Name of Representative __David M. Richman, Esq.__
Name of Firm (If Applicable) __N/A__
Representative's Address __360 Lexington Avenue__
City and State __New York, NY__ ZIP Code __10017__
Telephone (212) __687-1425__ Fax __(212) 682-6425__

☐ MEDIATION is a nonbinding process. The mediator assists the parties in working out a solution that is acceptable to them. If you wish for the AAA to contact the other parties to ascertain whether they wish to mediate this matter, please check this box (there is no additional administrative fee for this service).

Form C2-2R

# EXHIBIT A

## NATURE OF THE DISPUTE

### THE PARTIES

The claimant, Mr. Latchezar Christov (sometimes, "Mr. Christov"), is a California resident who, at all times relevant, was engaged in the investment business. His activities, as they pertain to this dispute, involved his employment by the respondent, Amerindo Investment Advisors Inc. ("Amerindo"), to act as a solicitor to introduce Amerindo to clients who would utilize Amerindo's investment advisory services.

The respondent, Amerindo, upon information and belief, was, at all times relevant, a California corporation licensed to do business in New York. Amerindo maintains its "headquarter" offices at 399 Park Avenue in New York City. Its Chairman, Alberto W. Vilar (sometimes, "Mr. Vilar"), jointly owns Amerindo with Gary Tanaka (sometimes, "Mr. Tanaka"). Its Chief Financial Officer ("CFO") is Mr. Joaquin Garcia-Larieu (sometimes "Mr. Garcia-Larieu").

Amerindo is a licensed investment advisor, as defined in the Investment Companies and Advisers Act of 1940 (see, 15 U.S.C.A. §80a-1, *et. seq.* ("Investment Company Act") and 15 U.S.C.A. §80b-1 ("Investment Advisers Act" or "IAA-40")).[1] Its business activities are regulated by the Securities and Exchange Commission ("SEC") pursuant to rules and regulations promulgated by the SEC (see, 17 C.F.R. Part 275-"Rules and Regulations, Investment Advisers Act of 1940"- Exhibit "A").

---

[1]    Amerindo is both a domestic and "off-shore" investment advisor that manages "money" for high net worth individuals (who sometimes elect to have their "money" managed in "off shore" hedge funds) and corporations who (as in this case) are responsible for their employees' pension funds.

## THE NATURE OF THE DISPUTE

Mr. Christov and Amerindo's senior management (Messrs. Vilar and Tanaka) have known each other since the 1970's. During the later part of the 1980's, the parties concluded that Mr. Christov could play a role as a "solicitor" for Amerindo that would inure to their mutual benefit. The parties agreed that Mr. Christov would function as an Amerindo "solicitor," primarily in California, where he had been living and had been working for many years as a stock broker and financial consultant to institutional and personal clients.

In May, 1990, Amerindo entered into a fee-commission "splitting" arrangement with Mr. Christov in which it agreed to pay him a commission of "...thirty percent of all fees, management and incentive, ...[it]...collect[ed]...for as long as...[it]...maintained...account[s]...." that Mr. Christov introduced to it. (The "May '90 agreement") (Exhibit "B").

Despite this promise - and despite having paid Mr. Christov more than $1.2 million in commissions between 1990 and 1999 - Amerindo, in May, 2000, without prior notice to Mr. Christov, informed him that it would no longer make commission payments to him even though it was (and continues) to collect fees from clients introduced to it by Mr. Christov. These "Christov accounts" have grown from (approximately) $1 million dollars (in 1990) to a sum believed to exceed $300 million dollars (in 1999). In a nutshell, Amerindo's decision to stop paying Mr. Christov commissions was due to two factors; the first was that the accounts became so large that Amerindo would owe him millions of dollars which sum would continue to grow "for as long as (Amerindo) maintained the accounts" and, secondly, Amerindo recently admitted to Mr. Christov that the method it employed to compensate him violated SEC regulations. (Exhibit "C").

The May '90 agreement requires an accounting of Amerindo's records to determine the fees it collected from the accounts in this case, Litton Industries and two of its affiliates, Western Atlas and Unova (hereinafter collectively "the Litton accounts"), and the account of Mr. John Sweetland, from 1990 through the present, to determine if Amerindo has correctly compensated Mr. Christov to date and how much they shall owe Mr. Christov going forward.

## THE SWEETLAND ACCOUNT

Within months of signing the May '90 agreement, Mr. Christov introduced Mr. John Sweetland to Amerindo. At the time, Mr. Sweetland transferred a sum believed to be $1 million dollars for Amerindo to manage in one of its "off shore" accounts.

During these past nine years, and pursuant to its obligations in the May '90 agreement, Amerindo has paid Mr. Christov, without fail, an annual commission, for the Sweetland account, from one of its "off-shore" bank accounts. The amounts paid should equal 30% of all of the "fees" Amerindo collected from Mr. Sweetland. However, Amerindo has never provided Mr. Christov with an "accounting" of the Sweetland account; therefore, he cannot be certain he has been paid all that is rightfully due him.

The commissions paid to Mr. Christov for the Sweetland account were paid in two segments - the first, which was paid in the first half of each year supposedly represented the "management" segment of Amerindo's fee; the second segment supposedly representing the "incentive" portion of Amerindo's fee, was paid to Mr. Christov during the second half of the (same) year.

This year, despite paying Mr. Christov the first segment of his "Sweetland" commission, Amerindo refused to pay the second (or incentive) portion after Mr. Christov's

repeated demands claiming that Mr. Christov "released" his claim to these commissions in 1994. (See Exhibit "H"). Although it refused to pay Mr. Christov the "incentive" segment, Amerindo ignores the fact that it has regularly paid Mr. Christov commissions for this account ranging between $25,000 and $50,000 per year since 1990.

Amerindo had a "habit" of not only failing to timely notify Mr. Christov of the amount of commissions due him each year, it would fail to pay him timely the commissions due him. Mr. Christov complained repeatedly to Messrs. Vilar, Tanaka and Garcia-Larieu. Consequently, in January of this year Mr. Christov went to New York City to meet with Amerindo's CFO, Mr. Garcia-Larieu, specifically to discuss alternatives to the parties' commission formula. These discussions ranged from such ideas as making offshore payments to a "buy out" of Mr. Christov's May '90 agreement.

He was asked to develop "suggestions" to enable Amerindo to deal with the issue because Amerindo knew that it had failed to comply with the SEC's rules regarding this fee splitting arrangement, which failure (Amerindo believed) jeopardized its SEC license. In fact, Amerindo knew that it was obliged to obtain Litton's consent to share its fees with Mr. Christov. It repeatedly ignored this requirement and only when its May 1990 arrangement obligated it to pay Mr. Christov millions of dollars did it, for the first time, rely on its own misfeasance to avoid discharging its debt to Mr. Christov.

**THE LITTON ACCOUNT UNDER MANAGEMENT
AT AMERINDO HAS GROWN TO INCLUDE TWO
OTHER LITTON "AFFILIATES" (WESTERN ATLAS
AND UNOVA) AND NOW IS BELIEVED TO EXCEED
OVER $300 MILLION**

In 1994, Litton Industries became a client of Amerindo when it transferred approximately $30 million dollars of its employees' pension funds to Amerindo for it to

manage after Mr. Christov introduced Ms. Elizabeth Maes-Guasti - then a senior Litton executive responsible for managing Litton's employee pension funds - to Mr. Vilar. The first "piece" (of Litton money) was delivered in mid-1994; the second "piece" was delivered several months later.

Between 1995 and 1997, Amerindo was introduced to two other "Litton accounts," Western Atlas and Unova, who delivered (on information and belief) millions of dollars of their employees' pension funds to Amerindo for it to manage. The precise amounts delivered to Amerindo by these Litton affiliates is presently incapable of being estimated because Amerindo has refused to comply with Mr. Christov's repeated requests for a full accounting of the Litton accounts.

Upon information and belief, Amerindo has failed to pay Mr. Christov any commissions (management or incentive) for the Western Atlas and Unova accounts. We believe it also has failed to pay him any commissions for the "incentive" fees it collected from Litton. Moreover, Mr. Christov also alleges that the amounts paid to him since 1995 do not reflect 30% of the management portion of the fees collected from Litton. Only a full accounting will properly determine what is owed him.

## AMERINDO'S DISINGENUOUS BASIS
## FOR REFUSING TO PAY MR. CHRISTOV

Amerindo charges its clients a 1% "management fee" as well as an "incentive" fee when agreed upon. Upon information and belief, all three Litton accounts agreed to pay Amerindo both a "management" and an "incentive" fee for its services. Thus, on the assumption that Amerindo was managing $100,000,000 of "Litton money" in 1996, Mr. Christov should have received a commission of at least $300,000 in 1997 since

Amerindo's fees are paid by its clients "in arrears" (i.e., it would "receive" its 1996 fees from Litton in 1997).

In fact, Amerindo paid Mr. Christov $356,000 in 1997. Rather than disclose this arrangement to Litton and report it to the SEC,[2] Amerindo elected to describe this sum as a "retainer payment" to Mr. Christov and paid it to him ("in arrears") supposedly to obtain "new customers" for Amerindo in 1997. (See Exhibit "D").

Although Mr. Christov was unable to "solicit" new clients for Amerindo in 1997, in 1998 Amerindo paid Mr. Christov a $348,000 "retainer" (Exhibit "E"). Upon information and belief, this sum represented approximately 30% of the "management" fees Amerindo collected from Litton for 1997.

This "scenario" was repeated in 1999. However, Amerindo reduced Mr. Christov's 1999 "retainer" to $248,000. (Exhibit "F"). When he asked about this, Mr. Christov was told by Mr. Garcia-Larieu that the $100,000 reduction was based on Amerindo's decision to pay him, in 1997 and 1998, sums that were actually due him in 1995 and 1996, respectively, based on fees Amerindo received from the Litton accounts in 1995 and 1996. In other words, Amerindo had failed to pay Mr. Christov in 1995-96 what it owed him for those years, making up the difference in 1997-98. Thus, the $100,000 downward "adjustment" in 1999, according to Mr. Garcia-Larieu, was designed to reflect Amerindo's belief that the "catch up" payments for 1995-96 were finished.

In the aforementioned January 2000 meeting, Mr. Christov requested an accounting from Mr. Garcia-Larieu to confirm this. It has not occurred.

---

[2]

The SEC "solicitor rule" requires an investment adviser not only to furnish a client with a written disclosure statement regarding all fee splitting arrangements it has with the account's solicitor, it requires the adviser to retain the disclosure documents in its files. Upon information and belief, Amerindo has failed to do this..

SEC regulations require investment advisers, such as Amerindo, to report fee sharing arrangements with its solicitors. C.F.R. §275-206(4)-3 specifically regulates "cash payments" for client solicitations. (See Exhibit "A" at p. 770). Amerindo recently admitted to having committed a serious legal mistake in this context (see Exhibit "C"- the e-mail from Mr. Vilar to Mr. Christov, dated April 13, 2000)[3] and now relies on its "mistake" to support its decision not to pay Mr. Christov.

Where there is a lawful fee sharing arrangement, an investment adviser is obliged to do three things: first, it must provide the client a disclosure document which describes the fee arrangement with the solicitor. It must then obtain the client's written consent to the disclosed fee arrangements, and, third, it must make a *bona fide* effort to ascertain whether the solicitor has complied with the fee arrangement by his disclosure of the arrangement to the client in a document that, per industry standards, is typically provided to the solicitor by the investment adviser. Amerindo did none of these things, although it acknowledged its obligations in Exhibits **D, E,** and **F.**

Since SEC Regulations require Amerindo to retain copies of both the client acknowledgment and the solicitor disclosure document, Amerindo also has violated C.F.R. §275.204-2(a)(15). (Exhibit "A" at p. 758).

---

[3]
    Mr. Vilar's reference to Mr. Christov's "SEC ordeal" in this e-mail is "explained" by Mr. Christov's California counsel, Mr. John Van de Kamp, in his 1995 letter which is annexed as Exhibit "G".

## CORRESPONDENCE REGARDING
## PAYMENTS TO MR. CHRISTOV

In response to Mr. Christov's persistent requests for an "accounting" of the Litton accounts, and despite paying him more than $1.2 million dollars throughout the 1990's (some $1,000,000 for "Litton" and, a sum believed to exceed, $250,000 for the "Sweetland" account), Amerindo will surely claim it does not owe Mr. Christov commissions for either account. In fact, nothing is further from the truth.

In 1994, about the time Litton became a client of Amerindo's, Mr. Christov was presented with a letter agreement regarding an "idea" the parties had been discussing. Amerindo wanted Mr. Christov to introduce it to labor unions for Amerindo to try to manage "Taft-Hartley" accounts. The letter, dated August 15, 1994 (Exhibit "H"), purportedly reflected an agreement to pay Mr. Christov $75,000 to prepare a survey of the "Taft-Hartley market" and a "strategy for "...[its]...entry into that market and thereafter to provide continuous consulting services in that regard through and until August 14, 1996."[4]

---

[4]

At page "2" of Exhibit "H", Amerindo inserted the following language:

"You agree that this Agreement is in full and final release and settlement of any and all claims, charges and the like which you may have against Amerindo or its affiliated entities or persons for compensation of any kind. In that regard, you waive any and all rights or benefits which you may have under the terms of the California Civil Code Section 1542, which provides as follows:

'A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.'

This letter represents the entire agreement between us pertaining to the subject matter hereof. There are no warranties, representations or other agreements between us in connection with the subject matter hereof except as set forth or referred to herein."

Exhibit E

# AMERICAN ARBITRATION ASSOCIATION
Arbitration Tribunal

In the Matter of the Arbitration between:

Re: 13 181 00762 00
    LATCHEZAR CHRISTOV
    and
    AMERINDO INVESTMENT ADVISORS INC.

## INTERIM AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated August 15, 1994, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, render this INTERIM AWARD, as follows:

In view of the nature of this matter, and the fact that this is an Interim Award, it is appropriate to address a number of the issues raised by counsel, and explain the reasons for the result reached:

1. The prior conduct of the parties and the history of payments by Amerindo Investement Advisors Inc. (hereinafter referred to as "Amerindo") to Latchezar Christov (hereinafter referred to as "Christov") clearly establish that Amerindo recognized an obligation to Christov pursuant to the May 3, 1990 letter with respect to the Litton Account. Accordingly, I reject Amerindo's contention that Christov did not "bring" the Litton account to Amerindo.

2. With respect to the Western Atlas (or Unova) account, the evidence does not support Christov's claim to a commission.

3. The releases found in the "consulting" letters do not serve to terminate the future obligations arising under the May 3, 1990 letter agreement. Nothing in those documents, which were drafted by Amerindo's counsel, terminates the letter agreement. I do not accept Amerindo's argument that the releases extinguish future rights arising under the existing letter agreement, since they do not specifically so provide. Further, each consulting agreement was intended to compensate Christov for the payment due for a prior year. I read the release language only as extinguishing the claim for that prior year.

4. It is my view, however, that Christov may not recover any sums due with respect to the Litton account because payment would violate one or more of the applicable Investment Advisors Rules. Since there has not been compliance with the applicable Rules, Christov may not compel payment. (I reject Amerindo's argument that the California Rule also bars payment to Christov.)



In the Matter of the Arbitration between:

Re: 13 181 00762 00
    LATCHEZAR CHRISTOV
    and
    AMERINDO INVESTMENT ADVISORS INC.

5.   There appears to be some possibility that the bar of the applicable Rule may be lifted by a "no action" letter or waiver obtained from the SEC or other regulatory body, either by Christov or Amerindo. If this were to occur, I would then hold that Christov is entitled to payment. Absent such a waiver, however, Christov is like any other unlicensed vendor of services, who cannot recover because of a lack of licensure.

6.   Christov should be afforded an opportunity to obtain relief from the disability he now suffers by making an application to the appropriate regulatory agency. In order to enable him to do so, I direct that Amerindo provide him with all necessary cooperation and that Amerindo file the application in its name, if that is so required.

7.   Should the application be successful, payment should be made to Christov. Whether the payment would be retroactive or prospective only will depend on the terms of the regulatory agency's ruling, if any.

8.   Either party may apply for appropriate supplemental relief, if necessary, with respect to any application, or to determine the amount due if Christov is successful.

9.   Christov is entitled to payment in full on the Sweetland Account. The unpaid amount is $44,422.15, at a minimum. There appears to be an issue as to whether there are "incentive fees" which would increase this amount. Since incentive fees clearly are covered, the amount set forth above should be increased by 30% of those fees, if any. The parties are to confer as to this issue and try to reach an agreement as to the amount. If they cannot, upon application to me I will either determine the matter on written submission or schedule a hearing.

10.   Interest on the amount owing on the Sweetland account shall be computed at nine percent per annum, commencing 30 days after the date each payment of a fee was received by Amerindo. The parties should agree on those amounts. If they are unable to do so, the procedure set forth in paragraph 9 will govern.

11.   Jurisdiction is retained for the purposes set forth above.

12.   Each party shall bear its own attorneys fees and expenses.



In the Matter of the Arbitration between:

Re: 13 181 00762 00
    LATCHEZAR CHRISTOV
    and
    AMERINDO INVESTMENT ADVISORS INC.

The filing fee of the American Arbitration Association ("the Association") in the amount of $2,000.00 shall be borne as incurred and all other administrative fees and expenses of the Association totaling $1,689.34 and the compensation of the Arbitrator totaling $5,900.00 up to the point of the Interim Award shall be borne equally by the parties. Shall there be any additional costs of the arbitration, the Arbitrator will assess at that time.

This Award will stay in full force and effect until such time as a final Award is rendered.

___5/14/02___
Date

                             _____
                             Joseph H. Einstein

State of New York   }
                 }    SS:
County of New York  }

I, Joseph H. Einstein, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

___5/14/02___
. Date

                             _____
                             Joseph H. Einstein

Exhibit F

court's holding applies fully here -- equity does not intervene to permit an illegal act. That, of course, is also the teaching of the California cases discussed above that hold that equity will not grant an unlicensed person compensation made illegal by statute.

### b)    Christov is Hardly Entitled to Equitable Relief

Christov's actions do not entitle him to seek equity. Although we readily concede  that Amerindo failed to take the steps necessary to make payment to Christov lawful, that is true of Christov as well and he, after all, was the one seeking and claiming a right to compensation.

Christov's own admissions reveal that he was, among other things, a solicitor for investment advisors. He was a seasoned and licensed securities professional who knew that investment advisers were regulated by the SEC. He dispensed investment advice for compensation. Nevertheless, he took no steps whatsoever to determine the requirements for an investment adviser's solicitor to be paid or the regulatory demands on his activities as an adviser. Since he could have solved the legal compensation issue himself by requesting a conforming contract and providing Litton with a disclosure statement, his own lack of diligence and, indeed, negligence, is one cause of his dilemma. Equity does not intervene to save a party from his own negligence.

Moreover, Christov's disability from September 1995 onward arises from his own felonious conduct. Equity has no place intervening to shield a party from his own felonies. The doctrine of unclean hands precludes equitable relief in these circumstances.

36

Exhibit G

# HellerEhrman
ATTORNEYS

December 9, 2002

Kevin J. Toner
Shareholder
ktoner@hewm.com
Direct (212) 847-8755
Main (212) 832-8300
Fax (212) 763-7600

*Via Facsimile & U.S. Mail*

Joseph Einstein, Esq.
Goodkind Labaton Rudoff & Sucharow
100 Park Avenue
New York, NY 10017-5563

Re:  Christov vs. Amerindo Investment Advisers, Inc. ("Amerindo")

Dear Mr. Einstein:

Mr. Richman's December 3, 2002, letter substantially mischaracterizes the facts and Amerindo's position.

Your Interim Award directs Amerindo to provide to Christov such cooperation as might be "necessary" for him to seek whatever regulatory relief he deems appropriate and to file an application in its name "if that is so required." Amerindo has not failed to comply with that directive, nor has it refused to do so.

When Mr. Richman inquired about Amerindo's cooperation, I did not state that Amerindo would not cooperate. Rather, I told Mr. Richman that Amerindo's obligation was to provide "necessary" cooperation and that I was not aware of any cooperation that was, in fact, necessary for Christov to seek regulatory relief. I indicated to him that simple research revealed that solicitors such as Christov had sought "no-action" relief from the SEC Solicitor Rule in the past. Indeed, some of those cases had been cited in the briefs in the arbitration. Accordingly, Amerindo's cooperation was not necessary for Christov to seek such relief, and an application in its name was not "required." Mr. Richman did not dispute Amerindo's position at the time and did not indicate that any cooperation from Amerindo was necessary. His December 3 letter still fails to set forth any reason why Amerindo's cooperation is necessary for Christov to seek whatever relief he deems appropriate.

As for Ms. Smythe, my letter to her is quite clear--she too failed to set forth any reason why Amerindo's cooperation was necessary to Mr. Christov's "exemptive application" to the SEC. To the contrary, Ms. Smythe's letter reveals on its face that Mr. Christov could and would seek exemptive relief from the SEC without cooperation or assistance from Amerindo. Once again, neither Ms. Smythe nor Mr. Richman suggest any reason why that analysis is incorrect. As for the remainder of my letter, it responded to the hostile, accusatory and threatening tenor of Ms. Smythe's letter. Amerindo believes that Ms. Smythe's proposed letter to the SEC was substantially inaccurate and misleading, as well as defamatory. It was entirely proper for Amerindo to call her attention to those inaccuracies.

Heller Ehrman White & McAuliffe LLP  120 West 45th Street  New York, NY 10036-4041  www.hewm.com

New York  Washington D.C.  Madison WI  San Francisco  Silicon Valley  Los Angeles  San Diego  Seattle  Portland  Anchorage
Hong Kong  Singapore  Affiliated Offices:  Milan  Paris  Rome

Joseph Einstein, Esq.
December 9, 2002
Page 2

Amerindo is thus in full compliance with the Interim Award. The failure of Mr. Richman's letter to set forth any reason why Amerindo's cooperation or any specific act is necessary to Christov's application is a telling admission that there are no such reasons or acts. Christov has his own tactical reasons why he has not yet sought regulatory relief, and is unfairly accusing Amerindo in order to garner further -- unjustified -- relief from the AAA.[1]

Respectfully yours,

*Kevin J. Toner*

Kevin J. Toner
Shareholder

12/9/02 4:47 PM ()

---

[1] Although Amerindo is in full compliance with the Interim Award, we respectfully observe that this letter is not an admission that the Interim Award is valid and enforceable. In that regard, we note that the 1994 release agreement was the sole basis for Christov's assertion of arbitrability. Yet, the Interim Award finds that the 1994 Agreement did not apply to the claims at issue. Having found that Christov's claims were not within the scope of the only arbitrable agreement, there was no longer a basis for requiring Amerindo to arbitrate them.

Exhibit H

1          GARCIA-LARRIEU-DIRECT

2     became solicitor agreements.

3                You didn't really care what

4     they said as long as you were advised they

5     were legal and you could pay Mr. Christov,

6     would that be a fair summary of your

7     position?

8                THE WITNESS:  Well, I think I

9     cared as far as it was something that

10    would be of substance and benefit to the

11    firm.

12                THE ARBITRATOR:  The purpose of

13    these agreements was to get the money to

14    Mr. Christov that Mr. Vilar told you to

15    get to him?

16                THE WITNESS:  Mr. Vilar wanted

17    to take care of Lucky, but at the same

18    time we can put him to work for us and do

19    some things which would benefit us.

20                THE ARBITRATOR:  Thank you.

21                Why don't we take about seven

22    or eight minutes.

23                (Recess taken.)

24                MR. RICHMAN:  Amerindo and

25    Mr. Christov will stipulate based on fees

GARCIA-LARRIEU-DIRECT

collected by Amerindo for the Litton

account for the years 1999 through 2001,

if liable, Amerindo would owe Mr. Christov

the sum of $2,282,838 at a 30 percent rate

of its collections.

With respect to the Western

Atlas/Unova account, that being the same

account with a name change, based upon

collections from 1995 through that part of

2001, that they remained a customer of

Amerindo, based upon the fees it

collected, if found liable, it would pay

Mr. Christov the sum of $927,679 at the 30

percent collection rate.

The two numbers when added

together would add up to the sum of

3,210,517.

THE ARBITRATOR:  You are going

to give me a similar calculation as to

Sweetland?

MR. RICHMAN:  I don't have that

here, but, yes.

THE ARBITRATOR:  But would you

be able to do that and the other fellow?

GARCIA-LARRIEU-DIRECT

1

2          MR. RICHMAN:  Crain, as it

3    turns out, is not an issue in the case,

4    because we didn't know this until we saw

5    the discovery, he redeemed his stock

6    around December 1998, so it turns out if

7    the calculations are correct on the

8    percentages, we got paid, we wouldn't get

9    anything for '99 or 2000.

10         THE ARBITRATOR:  Okay.

11         MR. TONER:  We will attempt to

12   do so and I anticipate we will be able to

13   do that.

14         THE ARBITRATOR:  Thank you.

15   CROSS-EXAMINATION

16   BY MR. RICHMAN:

17        Q.    Is it your testimony that this

18   notional commission rate is an industry

19   standard?

20        A.    I think it is.

21        Q.    And it is based upon an

22   original amount invested by a client?

23        A.    Original amount, and in some

24   cases, consideration given for additional

25   funds added to the account.

Exhibit I

AMERINDO
INVESTMENT ADVISORS INC.

San Francisco, California 94111-3162
TEL (415) 362-0292
FAX (415) 362-0533

August 15, 1994

**CONFIDENTIAL**

Latchezar Christov
100 Wilshire Blvd.
Suite 1620
Santa Monica, CA 90401

Dear Lucky:

Amerindo wishes to confirm that you have agreed to provide certain consulting services to us as specified herein, and you have agreed to render such services. Specifically, you have agreed to research and prepare for us a survey of the Taft-Hartley market for money management services and a strategy for our entry into that market, and thereafter to provide us with continuing consulting in that regard through and until August 14, 1996. Your written survey shall be presented to us on or before the first anniversary of the date of this Agreement, and you shall thereafter be required to consult with us at our request for up to fifteen hours per month but no more than that in any one month.

As full compensation to you for your consulting services hereunder, you shall receive from us a $75,000 fee, payable $15,000 on March 15, 1995, $10,000 on March 31, 1995, $25,000 on your presentation of your written survey and in a final installment $25,000 on March 15, 1996. You shall not be entitled to any compensation of any kind whatsoever except for the foregoing and except that you shall also be entitled to reimbursement of your reasonable expenses which are approved by us in writing in advance.

In performance hereunder you are an independent contractor. You shall perform all services hereunder according to your own means and methods of work and to the best of your abilities, which shall be in your exclusive charge and control and shall not be subject to our control or supervision excepting as to the results of work or as otherwise required by applicable law. You shall not have, nor shall you hold yourself out as having, any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of, or binding upon us, and the agreement represented hereby shall not constitute you as a partner or shareholder or joint-venturer with us, nor shall it be construed as conferring upon you any right to become such. You shall not undertake any solicitation activities comprehended within the scope of Rule 204-3 under the Investment Advisors Act. You will not be privy to our investment decisions or recommendations until those decisions and recommendations are made available to the public generally.





We shall not make any deduction from the fees to be paid you, including, but not limited to, social security, withholding taxes, unemployment insurance and other such deductions. You assume full responsibility for all such taxes, contributions and assessments and for workers' compensation insurance, agree to indemnify us with respect thereto and agree to meet all requirements which may be specified under regulations of administrative officials or bodies charged with enforcement of any relevant state or Federal act. You also agree to furnish us, upon request, a certificate or other evidence of compliance with the state or Federal laws governing contributions, taxes and assessments on payrolls.

You agree that this Agreement is in full and final release and settlement of any and all claims, charges and the like which you may have against Amerindo or its affiliated entities or persons for compensation of any kind. In that regard you waive any and all rights or benefits which you may have under the terms of the California Civil Code Section 1542, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

This letter represents the entire agreement between us pertaining to the subject matter hereof. There are no warranties, representations or other agreements between us in connection with the subject matter hereof except as set forth or referred to herein. The Agreement contained herein shall bind and enure to the benefit of the successors, assigns, personal representatives, heirs and legatees of the respective parties. The agreement contained herein may be amended or modified only by the written agreement of each of us. You and we agree that this document has been delivered in the State of California and shall be construed, enforced and governed by the laws thereof. You and we agree to use all reasonable efforts to resolve amicably any controversy or claim arising out of or relating to this Agreement, and in that regard agree that we shall initially submit any controversy or claim which has gone unresolved for more than thirty (30) days to a mutually satisfactory New York or San Francisco mediation service for one-time mediation. In the event any controversy or claim cannot be resolved by agreement or such mediation, or in the event that a mediation service cannot be agreed upon, the parties mutually agree to arbitration in San Francisco, California, or New York, New York, in accordance with the rules of the American Arbitration Association in effect as of the date of this Agreement (which are incorporated by reference herein), and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction. The arbitration shall proceed in the absence of any party which, after due notice, fails to be present or fails to obtain an adjournment. The Parties shall have the right to conduct discovery pursuant to the provisions of the California Code of Civil Procedure, and the aforesaid arbitration requirement shall not operate to preclude either party before from seeking or obtaining injunctive relief in a court of competent jurisdiction. In the event of any action, suit or proceeding brought under or in connection with this agreement, the prevailing party therein shall be entitled to recover, and the other party hereto

③

AMER00009

agrees to pay, the prevailing party's costs and expenses in connection therewith, including reasonable attorneys fees.

Very truly yours;
AMERINDO INVESTMENT ADVISORS INC.

By: 

Agreed, confirmed and accepted as of this 15th day of August, 1994.

Latchezar Christov

IN042:H

**SIGN HERE**

COHEN-DIRECT

did you come to represent Amerindo

Investment Advisors?

    A.    Yes.

            I came to represent them in

1985.

            I had first met Alberto Vilar

in 1983, late 1983, when he was introduced

to me by a mutual friend of Mr. Christov

and mine, and he was reintroduced to me by

this gentleman, Mr. Krieger, in 1984.

            He was looking to have my

system, the California State Teachers

Retirement System, engage him for money

management and I explained to him on both

those occasions that we could not engage

him because he was not registered as an

investment advisor in the United States

and that was a precondition to our hiring

him.

            He met that with disbelief, he

asked if he could talk to somebody who

really knew and had authority to make

these decisions, and I told him that that

is kind of why they called me chief

COHEN - DIRECT

executive officer.

He continued meeting that with disbelief through all of 1984 and in the winter, beginning of 1985, he called me up when I was back in private practice and he asked if I would be interested in registering him as an investment advisor in the United States because there were apparently some other folks who shared the view that I had shared with him about the necessity of registration.

I had suggested before I was succinct, that answer probably wasn't succinct, but at least amusing.

Q. You mentioned that you had met Mr. Vilar through, at least as I understood it, a common associate of Mr. Christov's.

Apart from that introduction, when was the next time you came to be aware of Mr. Christov?

A. Oh, I don't even know for sure whether I knew Lucky before that first introduction.

COHEN-DIRECT

I had certainly heard Lucky's name before that first introduction, but what I do remember clearly is that I knew Lucky personally sometime during my tenure at California Teachers, because typically I would join Mr. Krieger for lunch on Friday afternoons at the Bistro Gardens and Lucky would be either sitting at our table or some very attractive women at a nearby table and at some point he would come over and we would all be drinking Crystal together.

MR. RICHMAN: Christov or Crystal?

THE WITNESS: Crystal; we never imbibed Lucky himself.

Q. What was the nature of your professional involvement with Amerindo from the 1985 period onward after you registered them as a domestic investment advisor?

A. It was an evolving involvement as Amerindo's presence in this country evolved.

COHEN-DIRECT

That involvement now, for instance, it has culminated with my firm's being essentially international outside general counsel.

But it began in 1985, and I believe that year, 1985, I may have billed Amerindo 4,000 or $5,000, perhaps even less, because my only involvement that I actually recall that year with them was the actual act of registering them, which is quite simple, it is filling out a form.

By the next year, 1986, I believe I consulted with them in the review of a solicitors agreement which had been proposed to them.

Also, I also consulted with them, there was some other question that came up, there were two issues that year, and so 1986 wasn't much either.

By 1987 I think that they finally got their first U.S. client, at which point I actually got to review a contract for them, an advisory agreement, and from there, in 1987, gradually I got

COHEN-DIRECT

1
2  more and more work.

3        The work really took off for

4  them probably in 19 -- began really

5  taking off in 1994 and reached a crescendo

6  in 1997 through 1999, because at that time

7  I was doing more venture capital

8  investments for them than I can even

9  recount at this point.

10       So it was an evolving

11  involvement that took on all kinds of

12  forms and transformations throughout the

13  years.

14       Q.    Did you come to know that

15  Mr. Christov was asserting an entitlement

16  to fees as a solicitor for Amerindo in or

17  about 1994 or '95?

18       A.    I would not describe it as my

19  coming to know that he was asserting an

20  entitlement to fees.

21       I will tell you what happened.

22       Q.    Please do.

23       A.    And then you can try to put

24  another label on it, but I don't think

25  your label is accurate.

COHEN-DIRECT

I was sitting in my office one
morning early, as is my want, I always get
there early to start drafting agreements
because it is very hard for me to draft
and review agreements when the phone is
ringing and so forth, so I was there early
before my secretary got there, this is
when I had my own firm, and my partners
were located in San Francisco and I was
located in Santa Monica, so I was all by
myself.

The phone rang and it was
Joaquin, that would be Joaquin Garcia whom
everyone here got to meet the other day.

Joaquin said to me, "Alberto
wants to pay Lucky on Litton," and I said,
"What do you mean Alberto wants to pay
Lucky on Litton," and he said, "He wants
to pay him on Litton," and I said, "Well,
is there some kind of agreement," and he
said, "Oh, Alberto says that he agreed to
pay Lucky on Litton."

I said, "Well, does the
agreement comply with 2064-3 and did Lucky

COHEN-DIRECT

deliver a disclosure statement."

Now, it may seem a little weird to you that I would ask Joaquin a section number like that, but it just so happens that at this time we had recently both of us cause to become very, very familiar with this particular statutory section, which is why I suspect Joaquin was calling me in the first place, he knew all about the deal, about what you have to do if you want to pay a solicitor and he called me because he was worried about it, he -- so, anyway, Joaquin says, "We can't pay him, can we," and I said, "No, we can't pay him," and as a matter of fact, when Joaquin called me and said Alberto wants to pay him on Litton and I said -- my first reaction was, pardon my French, "oh, shit," because I surmised immediately, knowing the score, the way Alberto would do things, that, A, there would be no agreement that complied with 2064-3, and, B, I doubted very seriously whether anybody had complied with the

COHEN-DIRECT

1

2   disclosure statement delivery requirement

3   of 2064-3.

4           So I surmised immediately that

5   I had a problem, Joaquin confirmed for me

6   in our conversation that we had just the

7   problem I suspected we were going to have,

8   because here is what the problem was.

9           The problem was two things;

10  first of all, as I surmised, in my view,

11  payment "on Litton" would be illegal, and

12  problem No. 2, my boss, if you will, i.e.,

13  the big deal at Amerindo, wanted to pay

14  the man under circumstances where it was

15  not lawful to pay the man, so that was a

16  problem, because Amerindo was become more

17  and more important to me and every single

18  time I had to tell Alberto, who tends to

19  be a very willful person, no, you can't do

20  thus and such, it would develop into a big

21  pain in my professional neck.

22          Okay, so, anyway, as I had

23  surmised, it was a problem, it was a big

24  problem, and I didn't know what to do and

25  I was particularly concerned about it



1              COHEN-DIRECT
2    because Amerindo started out with a very,
3    very small presence and conducting itself
4    a little sloppily vis-a-vis regulatory
5    issues.
6              As they grew bigger and
7    bigger -- and at this point they had
8    achieved some pretty considerable
9    notoriety, very considerable notoriety, I
10   anticipated that they were going to be
11   more and more in the regulatory spotlight
12   and I had thought that I had recently been
13   successful in clearing up all of these
14   2064-3 issues and here I was suddenly with
15   another pile of the same kind of issue in
16   my lap and I was really at that point
17   trying to stay ahead of the curve, so that
18   was the first conversation.
19             So, as I say, and this is why I
20   corrected you, I did not learn that Lucky
21   was asserting an entitlement to be paid, I
22   think is the way you put it; what I
23   learned was that the boss was telling me
24   that Lucky needed to be paid.
25        Q.    What happened next.



COHEN-DIRECT

A. What happened next was I sent Joaquin off telling him we couldn't pay and Joaquin had -- so Joaquin goes off and I get another call, similar circumstances, early morning in my office, blah, blah, blah, and he says, "Well, Alberto says figure out a way to get him paid."

So I had a conversation with Joaquin trying to structure a theory whereby we could pay Lucky the amount that Alberto was wishing to pay him.

So I said, "Joaquin, look, I can't pay him" --

MR. RICHMAN: I just want to object for the record that the operation of this witness' mind --

THE ARBITRATOR: It is all right, we will take it.

MR. RICHMAN: Okay.

A. I said, "Joaquin, here is what we can do, I can't pay him," and when I say I can't pay him, I don't mean like I was going to pay him, I as Amerindo in

COHEN-DIRECT

this context, I said, "I can't pay him on
that contract, but what I can do is I can
pay him if we can figure out something
going forward that he can provide us
without too much effort that will be worth
this amount that Alberto wants to get to
him, but what can he provide us."

        I do not remember if it was
this call or whether yet another telephone
call from Joaquin came, but I do remember
this; either on that call or on another
telephone call Joaquin says we can pay him
for Taft-Hartley, and I said, "What do you
mean we can pay him for Taft-Hartley," and
Joaquin said, "We can pay him for
consulting with us on Taft-Hartley
business."

        Now, this was a very helpful
thing for me to hear, because I knew
independently that Amerindo and Alberto
wanted to pursue Taft-Hartley business,
because we were getting really neat
business, we were getting governmental
business, we were getting private pension

COHEN-DIRECT

plan business, but we had not penetrated
the Taft-Hartley market at all and Alberto
had expressed to me that he was interested
in that kind of business, I had even joked
with him, I said earlier before we went on
the record, that I don't know why Alberto
keeps me around, because we are sort of
like Patty Duke and her cousin, the other
one, who was the one who liked ballet, but
I told Alberto I couldn't imagine the
union pension plans hiring him because he
was a big republican and he came off like
a republican.

But, anyway, he really wanted
to pursue this business, so as soon as
Joaquin said the Taft-Hartley thing, I
said, "You know what, that is a great
idea, let's think about that."

So I told Joaquin what we
wanted was, and I would draw this up, was
a real contract that required real stuff,
and we created, I think, and this is what
we have been referring to as the first
Taft-Hartley contract, we created what I

COHEN-DIRECT

think is a real contract requiring real
duties that had a real world reference,
vis a vis Amerindo's needs and desires.

The contract consisted of two
components that were very important to me
in its crafting; one component was that
Lucky would actually have to write us a
report so that at the end of the day if
people asked me what was this payment for
I would say it was for the Taft-Hartley,
he had to write me a report and we needed
a report, this is real life.

And the other thing was that
Lucky had to commit to us a designated
amount of time, because I didn't want to
be making a significant payment so the guy
writes a report and then it doesn't
require any particular level of service,
so I think I put in there that he had to
work for us at our call up to but no more
than 15 hours a month.

And then the third component of
the agreement that I proposed was that I
was going to -- and this is the word I



COHEN-DIRECT

1

2    used with Joaquin -- I needed to blow up

3    the old agreement, and the reason why I

4    needed to blow up the old agreement was,

5    as I just testified to this a few minutes

6    `ago, I thought that I had cleared up all

7    of this 2064-3 crap, sorry, but anyway,

8    what I was trying to do was -- in 1992

9    the SEC came in and we got --

10          MR. RICHMAN:   '92?

11       A.      In 1992 the SEC came in for a

12    routine audit, they came in in 1989, they

13    came in again in 1992, and each time we

14    got what I considered to be longish

15    deficiency letters, mostly dealing with

16    kind of picayune stuff that was dumb and

17    could easily be corrected, and I felt a

18    lot like not only did those deficiencies

19    reflect on Amerindo, but they reflected on

20    me professionally, so I was taking a

21    personal pride kind of interest in this

22    stuff and I didn't want this other thing

23    hanging out there.

24          So I wanted to blow up the old

25    agreement and I also wanted to do what

COHEN-DIRECT

1
2  Alberto needed me to do, which was to get
3  Lucky the payment that Alberto said he
4  wanted to get to Lucky.
5        Q.     Did you have a discussion with
6  Mr. Vilar on --
7        A.     May I interrupt you?
8        Q.     Sure.
9        A.     When I say I wanted to blow it
10 up, I don't know if I specified or not,
11 that my mechanism for blowing it up was
12 the release that appears in the agreement.
13             The reason why I wanted to
14 interrupt you was that this is an
15 important point, at least in my mind; that
16 release happens not to be the longest
17 release that I ever read in the whole
18 world, but what I didn't want to do -- in
19 crafting the release, I wanted to make
20 sure I blew up the agreement, but on the
21 other hand, I didn't want to draw that
22 much attention to the rest of the world to
23 any infirm agreement, because I wanted
24 this next SEC review to be a good one and
25 I wanted to blow up the agreement with an

COHEN-DIRECT

agreement that I could show to the SEC
which wouldn't attract a whole bunch of
new questions about this whole old infirm
agreement.

And I want to say one more
thing, too -- I got a lot to say -- the
one thing more that I want to say is this;
as I say, I don't know whether the theory
of the Taft-Hartley engagement came up on
the second telephone call or the third,
but there was a third telephone call, and
by the time of the third telephone call
with Joaquin, when he came back to me and
he said, "Yeah, you know, this agreement
will work," I said, "Joaquin, I want to be
very clear about something, did you do
what I told you to do, did you explain to
Lucky what we were doing here, did you
tell Lucky what the deal was, that this
was new services, did you tell Lucky that
we were blowing up the old agreement and
did he understand it," and Joaquin said,
"Yes, I specifically told him all that,"
and I said, "Because, Joaquin, I don't

COHEN-DIRECT

want ever Lucky" -- and this is me saying it, I never spoke to Lucky personally about this -- "I don't want Lucky coming back ever and complaining to me or you that he didn't understand what is going on here," and Joaquin said it was taken care of.

THE ARBITRATOR: At the time you drafted the first Taft-Hartley agreement dated in 1994, you had in front of you this May 3, 1990 agreement, which I guess is Respondent's Exhibit 3?

THE WITNESS: Joaquin had faxed that to me; I said, "Joaquin, is there a written agreement," and he said, "Yes," and I said, "Send it to me."

THE ARBITRATOR: So when you drafted the first of the Taft-Hartley agreements and obviously the subsequent one, you had this?

THE WITNESS: Yes, and that is what I meant specifically when I told Joaquin about blowing up the old agreement.

COHEN-DIRECT

1

2          THE ARBITRATOR:  I understand.

3    BY MR. TONER:

4          Q.    Did you have any discussions

5    with Mr. Vilar at around this time with

6    respect to these matters?

7          THE ARBITRATOR:  Let me ask one

8    other question; did you have any

9    discussion with Mr. Christov concerning

10   any of these agreements?

11         THE WITNESS:  I never spoke

12   with Mr. Christov about any of these

13   agreements or his relationship with

14   Amerindo.

15         THE ARBITRATOR:  I'm sorry, go

16   ahead.

17         Q.    The question I asked is whether

18   you discussed these matters --

19         THE WITNESS:  I'm sorry, can I

20   just tell you one more followup to that

21   question, Mr. Einstein.

22         It was because I was not

23   speaking with Mr. Christov directly and

24   knew I wouldn't be, because I don't feel

25   as though it is appropriate for a lawyer

COHEN-DIRECT

1

2    to speak to the other guy directly, it is

3    because of that that I was very insistent

4    with Joaquin about the need for him to

5    tell Lucky what it was we were doing with

6    this new Taft-Hartley agreement.

7              THE ARBITRATOR:  Okay,

8    continue.

9         Q.    Did you have any conversations

10   with Mr. Vilar about what was going on

11   with respect to the first Taft-Hartley

12   agreement at around the time of that

13   agreement?

14        A.    I have got asthma going on, so

15   I am trying to propel air; I am not

16   talking too loud, I am?

17              THE ARBITRATOR:  You can speak

18   lower if you want to, it is not necessary,

19   or you can talk as loud as you want.

20        A.    Again, I can't answer your

21   question yes, simply because I am not sure

22   I would frame what happened exactly the

23   way you asked it.

24              Vilar called me on something

25   unrelated, again, same old situation, me

COHEN-DIRECT

in the office about 7:30 one morning, and

he called, I don't even remember what it

was he was calling about.

At the end of the conversation

he said to me -- because this is the way

he always talks --  "I don't know if you

know about this, but I wanted to be able

to pay Lucky Christov," and I interrupted

him and I said, "It is already taken care

of, Joaquin and I have worked it out," and

he said, "Good, I am glad to hear that,"

and I said, "Yes, Lucky is going to write

a Taft-Hartley report and he is going to

consult with us on Taft-Hartley business,

that is how we are going to get him the

payment," and then I said to him, and I

apologize for this, Lucky, it is not that

I don't like you, but it was my job, I

said to him, "Before you go, just let me

ask you one thing, why in the world are we

paying this guy," and he said, "Because

Lucky has been a very good friend to this

firm for a long time and he is having some

difficulties now," and I interrupted him

Exhibit K

## LAW OFFICES
# DAVID M. RICHMAN

FRED I. SONNENFELD
JUDITH RICHMAN
OF COUNSEL

580 LEXINGTON AVENUE
**NEW YORK, N.Y. 10017**
(212) 687-1425
FACSIMILE (212) 682-6425

March 5, 2003

Nadya B. Roytblat, Esq.
Assistant Director
Office of Investment Company Regulation
U.S. Securities and Exchange Commission
450 Fifth Street, N.W., Mail Stop 0506
Washington, D.C. 20549

Re:     *Request for Meeting*

Dear Ms. Roytblat:

I am writing to request a meeting with you and your staff regarding an application for exemption (the "Application") from the provisions of rule 206(4)-3 of the Investment Advisers Act of 1940 (the "Advisers Act") that I intend to file on behalf of my client, Mr. Latchezar Christov. As detailed more fully below, Mr. Christov's Application is necessitated solely by the actions of a SEC registered investment adviser who seeks to avoid its contractual obligations through reliance on its failure to comply with the requirements of the Advisers Act. I believe a meeting would be helpful in explaining to you and your staff the complex history and circumstances behind Mr. Christov's Application and the reasons why exemptive relief should be granted.

## I.     Background

Amerindo Investment Advisors Inc. ("Amerindo"), an investment adviser registered with the SEC under the Advisers Act, is utilizing the requirements of rule 206(4)-3 of the Advisers Act as both a sword and as a shield regarding its liability to Mr. Christov for certain finder's fees. For example, beginning in the mid-1980's, Amerindo:

- Engaged Mr. Cristov to introduce clients to Amerindo for a fee despite the fact that Amerindo, by its own admission, "failed to take the steps necessary to make payment to [Mr.] Christov lawful";

- Readily entered into a lucrative investment advisory arrangement with a large, sophisticated institutional client, Litton Industries, Inc. ("Litton"), that was introduced to Amerindo by Mr. Christov despite Amerindo's knowing failure to comply with the requirements of rule 206(4)-3;

# DAVID M. RICHMAN

Nadya B. Roytblat, Esq., Assistant Director
U.S. Securities and Exchange Commission
Page 2
March 5, 2003

- Refused to remedy or disclose to Litton its failure to comply with the requirements of rule 206(4)-3, despite Mr. Christov's offer to remedy the situation by delivering disclosure documents to Litton on a timely basis, but, rather, structured alternative payment mechanisms to Mr. Christov the specific amounts of which were tied to the Litton account; and

- Now, despite five years of prior payments to Mr. Christov, refuses to fulfill its contractual obligations to Mr. Cristov on the theory that it is somehow prohibited from making such payments to Mr. Cristov by virtue of its own failure to comply with the requirements of rule 206(4)-3.[1]

These facts were recently considered by Mr. Joseph Einstein, an arbitrator with the American Arbitration Association, who rejected Amerindo's claim that it had no contractual obligations to Mr. Christov with respect to the Litton account (the "Arbitration"). In finding for Mr. Christov in an Interim Award entered on May 14, 2002, Arbitrator Einstein held that Amerindo's "prior conduct...and [its] history of payments......to [Mr.] Christov established that Amerindo clearly "recognized an obligation to [Mr.] Christov......with respect to the Litton account." However, Arbitrator Einstein stated that he could not compel Amerindo to fulfill the contractual obligations to Mr. Christov because payment with regards to the Litton account could violate "one or more provisions of the Investment Adviser Rules." Recognizing that Mr. Christov should be "afforded an opportunity to obtain relief from the disability he now suffers," Mr. Einstein required Amerindo to provide Mr. Christov with "all necessary cooperation" in obtaining relief from the SEC, including "making an application to the appropriate regulatory agency" in Amerindo's name. Amerindo has not done so.

Rule 206(4)-3 makes it unlawful, except under specific circumstances and subject to certain conditions, for a registered investment adviser to make cash payments to a solicitor who directly or indirectly solicits for or on behalf of the investment adviser.[2] Rule 206(4)-3 under the Advisers Act

---

[1]    During an arbitration hearing conducted during February, 2002, Amerindo relied on a 1995 plea agreement between Mr. Christov and the U.S. Government, charging Mr. Christov with participation in a money laundering conspiracy, as one of the reasons for non-payment with regards to the Litton account. This argument is without merit, however, because both Mr. Christov's solicitation activities and the appointment by Litton of Amerindo took place before the 1995 plea agreement was entered into by Mr. Christov and the U.S. Government.

[2]    Advisers Act Release No. 688, 1978 SEC LEXIS 1103 (Jul. 12, 1979) (adopting release).

# DAVID M. RICHMAN

Nadya B. Roytblat, Esq., Assistant Director
U.S. Securities and Exchange Commission
Page 3
March 5, 2003

was promulgated by the Securities and Exchange Commission ("SEC") pursuant to the specific authority of the SEC in section 206(4) of the Advisers Act to "prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."[3] It was not promulgated to enable investment advisers to avoid their contractual obligations.

## II. Discussion

On May 3, 1990, Mr. Alberto Vilar, president of Amerindo, sent Mr. Christov a letter (the "Letter") promising to pay Mr. Christov "30% of all fees, management and incentive" for all accounts introduced by Mr. Christov. However, Mr. Vilar failed to advise Mr. Christov that Mr. Christov would be acting as a solicitor for Amerindo pursuant to rule 206(4)-3 of the Advisers Act nor did Mr. Vilar instruct Mr. Christov to comply with the requirements of rule 206(4)-3.

According to both Arbitrator Einstein and Ms. Elizabeth Maes-Guasti, Litton's institutional funds administrator from 1975-1995, Mr. Christov was responsible for bringing the Litton account to Amerindo. Ms. Maes-Guasti testified at the Arbitration hearing that from the mid-1980's to 1994 when Litton hired Amerindo, Mr. Christov regularly (i) arranged for meetings between Ms. Maes-Guasti and Mr. Vilar, (ii) provided Ms. Maes-Guasti with brochures regarding Amerindo and Amerindo's philosophy, style and performance, and (iii) contacted Ms. Maes-Guasti regularly with Amerindo related developments and updates. In May 1994, the Litton Investment Committee voted to appoint Amerindo as one of its money managers and Litton and Amerindo entered into an advisory contract as of July 1, 1994. Shortly after Litton appointed Amerindo, Mr. Christov orally disclosed to Ms. Maes-Guasti that he would be compensated for bringing the Litton account to Amerindo. Ms. Maes-Guasti was not surprised or alarmed by this arrangement but, rather, told Mr. Christov that she was "happy" for him.

Direct testimony at the arbitration hearing from Rick Cohen, Esq., counsel for Amerindo, reveals that Amerindo was well aware of the fact that it had failed to take measures to make payments to Mr. Christov for the solicitation of Litton lawful under the Advisers Act.[4] When Mr. Cohen was first told that Mr. Vilar "wanted to pay [Mr. Christov] on Litton" he was "very concerned" because "knowing . . . the way [Mr. Vilar] would do things," Mr. Cohen "doubted very seriously whether anybody had complied with the disclosure statement delivery requirement of

---

[3]  Section 206(4) of the Advisers Act, 15 U.S.C. 80b-6(4).

[4]  In fact, Amerindo conceded this particular "point" in one of its post-hearing Briefs.

# DAVID M. RICHMAN

Nadya B. Royiblat, Esq., Assistant Director
U.S. Securities and Exchange Commission
Page 4
March 5, 2003

206(4)-3." Mr. Cohen stated that he immediately recognized that this failure was "a big problem" and that he was "particularly concerned about it because Amerindo . . . [was] conducting itself a little sloppily vis-a-vis regulatory issues." Mr. Cohen noted that, despite "clearing up" several prior rule 206(4)-3 issues for Amerindo, the problem with Mr. Christov was yet "another pile of the same kind of issues."

Amerindo and its attorney made no effort to address directly the known rule 206(4)-3 deficiencies. Rather, Amerindo and its counsel structured creative alternative vehicles to pay Mr. Christov for his solicitation services. Mr. Vilar, in his direct testimony, acknowledged that, despite Amerindo's knowing failure to comply with the requirements of rule 206(4)-3, he desired to "come up with some way in which [Amerindo] could give some compensation" to Mr. Christov in connection with the Litton account. Mr. Garcia-Larrieu, Amerindo's former Chief Financial Officer, explained in his testimony at the hearing that Amerindo paid Mr. Christov through a series of service contracts ("Consulting Agreements") that were structured by Amerindo between 1996-1999. Under these Consulting Agreements, Mr. Christov performed very nominal consulting services in exchange for fees totaling some $975,000 that were directly "tied to the Litton Account." Mr. Garcia-Larrieu calculated the fees by starting with an "estimate or . . . . . knowledge of fees collected from Litton" and then "apply the rate, 30 percent" (the "30% Calculation") agreed to by Mr. Vilar in his (May 3, 1990) Letter. These fees started at $75,000 per year and increased to as high as $348,000 per year as performance in the Litton account increased.

Between 1994 and 2000, the Litton account grew from approximately $35 million to approximately $600 million in assets under management. In an April 13, 2000 e-mail to Mr. Christov, Mr. Vilar stated that Amerindo would no longer pay Mr. Christov any fees with respect to the Litton account. In this e-mail, Mr. Vilar admitted that Amerindo had taken a "casual, if not outright erroneous view of the matter" in the past and had made an "exception" for Mr. Christov that could expose Amerindo to "SEC sanctions." However, because Amerindo no longer desired to share with Mr. Christov the substantial fees it collected from the Litton account, Mr. Vilar conveniently cited to its non-compliance with rule 206(4)-3 as an excuse for future non-payment.

Arbitrator Einstein found Amerindo's arguments unpersuasive and stated that the "prior conduct of the parties" as well as the "history of payments by Amerindo" to Mr. Christov clearly established that "Amerindo recognized an obligation to Mr. Christov."

As noted in the release adopting Rule 206(4)-3, and in subsequent requests for no-action relief under the Rule, the Commission's intention in adopting Rule 206(4)-3 was to create a "means

# DAVID M. RICHMAN

Nadya B. Roytblat, Esq., Assistant Director
U.S. Securities and Exchange Commission
Page 5
March 5, 2003

reasonably designed to protect [investors from] fraudulent practices" in connection with referral arrangements. I do not believe that the rule was promulgated to serve as a vehicle for registered investment advisers to avoid their contractual obligations to individuals who provide them with valuable business and services.

## III.    Conclusion

I would like the opportunity to discuss the merits of Mr. Christov's Application. Although I do not seek to excuse Amerindo's failure to comply with the requirements of 206(4)-3, it is patently unfair to allow Amerindo to profit from its non-compliance. In that vein, however, I urge the SEC not to initiate enforcement proceedings against Amerindo seeking disgorgement of the advisory fees received from the Litton arrangement. In this case, because Litton was a highly sophisticated knowledgeable institutional investor, oral disclosure of the solicitation arrangement was provided and Litton received the services paid for by its advisory fees, I believe the most equitable result would be to grant an exemption that would allow Arbitrator Einstein to enforce the terms of Mr. Christov's solicitation arrangement.

I will call your office to discuss scheduling the proposed meeting. In the interim, if you have any questions, please do not hesitate to call.

Sincerely,

David M. Richman

DMR:lmb

cc:     Mr. Latchezar Christov

bcc:    Marianne K. Smythe, Esq.
        Wilmer, Cutler & Pickering

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ECF CASE

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

AMERINDO INVESTMENT ADVISORS INC.,
AMERINDO ADVISORS UK LIMITED,
AMERINDO MANAGEMENT INC.,
AMERINDO TECHNOLOGY GROWTH FUND, INC.,
AMERINDO TECHNOLOGY GROWTH FUND II, INC.,
TECHNO REQUIA, S.A.,
ALBERTO W. VILAR, and
GARY ALAN TANAKA,

Defendants.

---

## PROOF OF CLAIM OF
## LATCHEZAR CHRISTOV

---

DAVID M. RICHMAN

*Attorney for* L. Christov

*Office and Post Office Address, Telephone*
360 LEXINGTON AVENUE
NEW YORK, N.Y. 10017
(212) 687-1425

---

Service of a copy of the within                                    is hereby admitted.

Dated,

Attorney(s) for

---

Sir: —Please take notice
☐ NOTICE OF ENTRY
that the within is a *(certified)* true copy of a
duly entered in the office of the clerk of the within named court on                                    19

☐ NOTICE OF SETTLEMENT
that an order                                    of which the within is a true copy will be presented for
settlement to the HON                                    one of the judges
of the within named court, at
on                      19      at                      M

Dated,

Yours, etc.

DAVID M. RICHMAN

*Attorney for*

*Office and Post Office Address)*
To                                    360 LEXINGTON AVENUE
NEW YORK, N.Y. 10017
Attorney(s) for

PRIORITY MAIL
FLAT RATE
POSTAGE REQUIRED

UNITED ST
POSTAL SE

VISIT US AT USP
ORDER FREE SUPPLIE

PRIORITY®
★ MAIL ★

FROM: Lauranne Christou
825 College Blvd #327
Oceanside, CA 92057

TO:
Pro Se Intake Unit
United States District Co
Room 164
40 Foley Square
New York, N.Y. 10007

Label 228, March 2016

FOR DOMESTIC AND INTERNATI

To schedule free
Package Pickup,
scan the QR code.

USPS.COM/PICKUP

Retail

US POSTAGE PAID
$10.40

Origin: 92083
11/16/19
0582020083-13

PRIORITY MAIL 2-DAY®

1 Lb 5.50 oz

1006

C014

EXPECTED DELIVERY DAY: 11/18/19

SHIP
TO:
40 FOLEY SQ
STE 104
NEW YORK NY 10007-1507

USPS SIGNATURE® TRACKING NUMBER

9510 8154 5911 9320 4452 11

■ When used internationally, a customs
declaration label may be required.

* Domestic only

■ Date of
■ USPS Tr
internati
■ Limited
■ Pick up
■ Order su

EP14F Oct 2018    OD: 12 1/2 x 9 1/2

P S 0 0 0 0 1 0 0 0 0 0 1 4

S FIRMLY TO SEAL

This envelope is made from post-consumer waste. Please recycle - again.