UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

-v-

AMERINDO INVESTMENT ADVISORS
INC., *et al.*,

                Defendants.

No. 05-cv-5231 (RJS)

OPINION & ORDER

---

RICHARD J. SULLIVAN, Circuit Judge:

    Before the Court is a motion by the Securities and Exchange Commission (the "SEC") requesting that the Court approve a *pro rata* distribution of the remaining receivership assets to both the investors and the SEC. (Doc. No. 817.) The Court is also in receipt of various letters filed by interested third parties opposing portions of the SEC's proposal. (Doc. Nos. 825–27, 829.)[1] For the reasons discussed below, the Court GRANTS in part and DENIES in part the SEC's motion and orders that the remaining receivership assets be distributed solely to the SEC in partial satisfaction of its outstanding penalty judgment against the defendants.

                **I.**    **Background**

    The Court assumes the parties' familiarity with the facts and procedural history of this case, which are set forth in numerous prior orders (*see, e.g.*, Doc. Nos. 272, 348, 432, 510, 618), as well as in the Second Circuit's opinion affirming the final judgments, *SEC v. Amerindo Inv. Advs.*, 639

---

[1] Unless otherwise specified, all record citations are to Dkt. 05-cv-5231.

F. App'x 752 (2d Cir.), *cert. denied*, 136 S. Ct. 2429 (2016).  Accordingly, the Court will provide background only as necessary to decide the instant motion.

In 2005, the SEC brought this civil action against Alberto Vilar and Gary Tanaka (the "Individual Defendants"), along with a corporate entity under their control, for violating federal securities laws in connection with their fraudulent investment schemes.  (Doc. No. 1.)  Later that year, the SEC amended its complaint to add several additional entities (collectively, the "Entity Defendants," and together with the Individual Defendants, "Defendants"), including ATGF II.  (Doc. No. 44.)  In a parallel proceeding, a grand jury in the Southern District of New York indicted the Individual Defendants on one count of conspiracy to commit securities fraud and eleven substantive counts of securities fraud, investment advisor fraud, mail fraud, wire fraud, and money laundering.  (Dkt. 05-cr-621 (the "Criminal Action") Doc. Nos. 16, 133.)  The Individual Defendants were ultimately convicted by a jury in 2009, prompting this Court to enter a restraining order freezing assets of various entities and accounts connected to their fraud.  (Criminal Action Doc. No. 364.)

In 2013, the Court granted the SEC's motion for partial summary judgment and found Defendants civilly liable for various securities violations.  (Doc. Nos. 272, 348, 432.)  Under its equitable powers to remedy such violations, the Court ordered that each Defendant disgorge millions of dollars in fraudulent profits, pay a sizable civil penalty to the SEC, and return funds to victims through a court-established receivership (the "Receivership").  (*See* Doc. No. 272 at 12; Doc. No. 432 at 19; Doc. No. 433 at 3–4; Doc. No. 434 at 3–4; Doc. No. 435 at 5–6.)  The Court then appointed a receiver (the "Receiver") over the assets frozen in the criminal proceedings and instructed him to carry out a distribution plan for returning those assets to the victims.  (Doc. No. 272.)  During the course of the Receivership, the Court approved four interim distributions to the defrauded investors, ultimately returning the entirety of the investors' principal in the amount of $54,404,467.83, plus an inflation adjustment of $13,849,639.27.  (*See generally* Doc. No. 669.)  Because the Court ordered

that the Receivership distributions would "offset" the disgorgement judgments (Doc. No. 433 at 3–4; Doc. No. 434 at 3–4; Doc. No. 435 at 5–6), Defendants eventually paid off their disgorgement judgments in full (Doc. No. 806 at 3). To date, however, Defendants have not paid their penalty judgments to the SEC. (*Id.*)

On December 21, 2020, the Court issued a post-judgment writ of garnishment (the "Garnishment Order"), pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3205, against assets controlled by Citibank, N.A. ("Citibank"), American Stock Transfer & Trust Co., LLC. ("AST"), and Equiniti Trust Co. d/b/a EQ Shareowner Services ("EQ" and, collectively, the "Garnishees"), on the civil penalties of $17,969,803.27 owed to the SEC by each of the Entity Defendants, including ATGF II. (Doc. No. 763.) The Garnishees filed their answers to the Garnishment Order, identifying certain property as owned by ATGF II and within the Garnishees' possession, custody, or control (the "Garnishment Assets"). (Doc. Nos. 767, 769, 770–71.) The Garnishees did not claim any exemptions, objections, defenses, or offsets, either for themselves or on behalf of ATGF II.

On March 2, 2021, the SEC moved for a disposition order, which prompted objections by Defendants AGTF II, Vilar, and Tanaka; interested third parties in the SEC action, Lisa and Debra Mayer (the "Mayers"); and a group of third-party claimants in the SEC action affiliated with investor Paul Marcus (the "Marcus Claimants"). (Doc. Nos. 773, 775, 785, 786; Criminal Action Doc. Nos. 940, 942.) On January 3, 2022, the Court issued an order resolving the SEC's motion and the objections. (Doc. No. 798.) As relevant here, the Court determined that "the Garnishment Assets are, in fact, Receivership Assets" and that they should not be moved to be part of the forfeiture proceeding in the Criminal Action since they "are not subject to either of the operative forfeiture orders that were entered in the [C]riminal [A]ction" and the government had "disclaimed any intention of pursuing the Garnishment Assets." (*Id.* at 7.) Additionally, the Court directed the SEC

3

to submit a letter proposing next steps to bring the Garnishment Assets under the control of the Receivership. (*Id.* at 8; *see also* Doc. Nos. 802, 803, 810, 812.)

On May 17, 2022, the Court ordered the turnover of the Garnishment Assets to the Court Registry Investment System ("CRIS") account for this case. (Doc. No. 813.) Pursuant to that order, the Garnishees deposited the Garnishment Assets, then-totaling $8,748,832.49, in the CRIS account (the "Distribution Fund"). Shortly thereafter, the Court ordered the SEC to provide further information on its proposal for the distribution of the former Garnishment Assets – and directed interested third-parties to respond to the SEC's submission. (Doc. No. 815.) The SEC did so, filing a motion requesting that the Court (1) appoint Miller Kaplan Arase LLP ("Miller Kaplan") as Tax Administrator and Distribution Agent over the Distribution Fund (Doc. No. 817 at 2–5) and (2) authorize a *pro rata* distribution plan to both the investors and the SEC, "based on the investors' allowed claim amounts and the [SEC's] $17,969,803.27 penalty judgment against ATGF II" (*id.* at 5). The Mayers, the Marcus Claimants, John Preetzmann-Aggerholm, and Alfred Heitkonig filed letters objecting to various aspects of the SEC's distribution plan, but not to the recommendation that Miller Kaplan be appointed Tax Administrator and Distribution Agent. (Doc. Nos. 825–27, 829.) Accordingly, the Court approved the appointment of Miller Kaplan and reserved decision on distribution. (Doc. No. 830.)

## II.    Analysis

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies." (Doc. No. 432 at 5 (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013)).) To that end, a district court has ample discretion to "craft[] a remedy for violations of the [federal securities laws]." *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997). For instance, when a district court seeks to punish defendants for their frauds, a district court may choose to impose civil penalties. *See Razmilovic*, 738 F.3d at 38. In addition, district courts

may "order[] culpable defendants to disgorge their profits." *Id.* at 31 (internal quotation marks omitted). Unlike other remedies, disgorgement is not designed to compensate victims or to punish wrongdoers, *SEC v. Cavanagh*, 445 F.3d 105, 116 (2d Cir. 2006), but is instead meant to deter wrongdoing by "forcing a defendant to give up the amount he was unjustly enriched," *id.* at 117 (internal quotation marks omitted); *see also Fischbach Corp.*, 133 F.3d at 175 ("Although disgorged funds may often go to compensate securities fraud victims for their losses, such compensation is a distinctly secondary goal."). Finally, in order to directly compensate victims, a district court may elect to appoint a receiver, *see SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010), "to restore to . . . defrauded [investors]" funds that were "fraudulently diverted from . . . their custody and control," *SEC v. Malek*, 397 F. App'x 711, 713 (2d Cir. 2010) (quoting *SEC v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005)).

Here, the Court elected to impose all three remedies, a decision that was affirmed in full on appeal. *See Amerindo*, 639 F. App'x at 754–55. At this stage, two of these remedies have been fully discharged. Due to the remarkable efforts of the Receiver, over $68 million has been returned to the investors – a total that fully compensates each of them for their principal investments, plus a generous inflation adjustment. (*See* Doc. No. 798 at 4 n.3; Doc. No. 669 at 19.) Through these distributions back to investors, Defendants also have disgorged tens of millions of dollars and fully satisfied the disgorgement judgments previously ordered by the Court. (*See* Doc. No. 806 at 3.)

To date, however, Defendants have not satisfied their $17 million penalty judgment to the SEC. In other words, while the other remedies imposed by the Court have been discharged through the Receivership, the civil penalties remain outstanding.

Accordingly, the Court concludes that the former Garnishment Assets in the Distribution Fund shall be distributed to the SEC in order to partially satisfy its $17 million penalty judgment against ATGF II.

5

As a threshold matter, this distribution is consistent with the SEC's longstanding position – "entitled to deference" by the Court, *SEC v. Byers*, 637 F. Supp. 2d 166, 175 (S.D.N.Y. 2009) – that "there is no clear legal basis" to distribute additional surplus funds to investors. (*See* Doc. No. 817 at 5; Doc. No. 655 at 2); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262, 2265, 2267 (2024) (explaining that courts should still defer to agencies under *Skidmore* where appropriate). Indeed, the investors have already been fully compensated for their principal investments, plus an adjustment for inflation that exceeded the Federal Post-Judgment Interest Rate. (*See* Doc. No. 798 at 2; Doc. No. 640 at 6 nn.6–7.) And Defendants have fully satisfied their disgorgement obligations. (*See* Doc. No. 806 at 3.) In order to return additional funds to the investors, the Court must have some legal basis to do so. But a further distribution of surplus funds would be the equivalent of ordering the disgorgement of *additional* funds beyond Defendants' already-fixed disgorgement obligations, which Defendants have fully satisfied. (*See* Doc. No. 432 (determining Defendants' disgorgement liability based on their unjust gains).) The Court is aware of no authority – nor do the parties provide any – that would permit such a retroactive expansion of Defendants' disgorgement obligations. In fact, while the Second Circuit has stated that a receiver may use surplus funds to distribute an "inflation adjustment," *see CFTC v. Walsh*, 712 F.3d 735, 755 (2d Cir. 2013), it has never suggested that receivers may distribute leftover profits to investors. If there are surplus funds left over after the Receiver has compensated the investors and Defendants have satisfied their disgorgement obligations, then that surplus must either be returned to Defendants or, as here, used to satisfy the SEC's outstanding penalty judgment.

In sending the former Garnishment Assets to the SEC, the Court acknowledges that it initially channeled the former Garnishment Assets into the Receivership instead of granting outright the SEC's original request to receive those assets to satisfy its penalty judgment. (*See* Doc. No. 798 at 1–2.) But as the Court explained in that order, the fact that the former Garnishment Assets were

6

Receivership Assets did not extinguish the SEC's interest in the former Garnishment Assets. (*See id.* at 7.) It meant only that the SEC's "interest [in the former Garnishment Assets] should be considered alongside those of the investors, who likewise claim an interest in the property." (*Id.*) Now that the parties, including the investors, have submitted briefing as to how those Assets should be disposed of, the Court is persuaded that the former Garnishment Assets in the Distribution Fund should in fact be distributed to the SEC in partial satisfaction of its outstanding judgment, as the SEC originally proposed.

Although the claimants make various arguments as to why they should enjoy priority over the SEC, none has merit. For starters, the Marcus Claimants insist, without authority, that the Distribution Fund should go to the investors as opposed to the SEC. (*See* Doc. No. 829 at 1–2.) As already explained, there is no basis for such a surplus distribution, either through the equitable Receivership or through the already-satisfied disgorgement judgments. And as the Court indicated when it first approved the inflation adjustment in 2017, there is no good reason to dole out extra payouts to investors – who have already been repaid in full on their principal investments – while the SEC's penalty judgment sits unpaid. (Doc. No. 669 at 14 ("[I]t is far from clear . . . that . . . investors [like] the Marcus Claimants . . . are entitled to priority over . . . numerous other creditors who are still owed funds by Defendants, including the SEC, which has money judgments against all Defendants.").)

The Marcus Claimants fare no better in arguing that they are entitled to additional payouts because they invested in the Amerindo Technology Growth Fund ("ATGF"), which touted higher returns (at higher risk) than the so-called Guaranteed Fixed Rate Deposit Accounts ("GFRDA"). As a threshold matter, district courts enjoy "equitable authority to treat all the fraud victims alike (in proportion to their investments) and order a *pro rata* distribution." *Walsh*, 712 F.3d at 749 (alterations omitted) (quoting *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88 (2d Cir. 2002)). The

Court sees no good reason to depart from that baseline here. Even though the ATGF and GFRDA investors were induced into investing on different terms, the reality is that those terms were equally illusory promises; after receiving the funds, Defendants pooled all of those funds – ATGF and GFRDA alike – into a single account that was indiscriminately tapped to buy various assets. (*See* Doc. No. 432 at 17; Doc. No. 669 at 12.) In fact, the Second Circuit has approved a *pro rata* distribution to unwind a similar fraud where the defendants likewise duped their victims into buying into "different investment vehicles" but then commingled the funds into a single fraudulent scheme. *Walsh*, 712 F.3d at 751. To be sure, the court there acknowledged that some frauds might call for disparate treatment when returning assets to investors, such as where one group was told that their investments would be used to trade securities while another was told that their investments would simply be held in an account for safekeeping. *See id.* (citing *SEC v. Enter. Tr. Co.*, 559 F.3d 649 (7th Cir. 2009)). But Defendants' fraud is distinguishable, since both the ATGF and GFRDA investors were conned into investing on false promises of sizable returns. Even if those promises differed slightly, they offered equally illusory tales of returns and risk and do not justify disparate treatment here. Indeed, "a trustee or receiver devising a distribution plan is not required to apportion assets in conformity with misrepresentations and arbitrary allocations that were made by the defrauder, otherwise the whim of the defrauder would control the process that is supposed to unwind the fraud." *Id.* at 749 (alterations and internal quotation marks omitted).

      Nor is the Court persuaded by the Marcus Claimants' contention that they deserve an additional payout because they are entitled to a constructive trust over the former Garnishment Assets. Put simply, recognizing a constructive trust here would undermine the entire structure of the Receivership, just as the Second Circuit has warned it would do for bankruptcies. *See In re Flanagan*, 503 F.3d 171, 182 (2d Cir. 2007). As with a bankruptcy, the purpose of the Receivership here is to devise and execute an orderly and fair distribution of the assets held by Defendants. *See*

*Malek*, 397 F. App'x at 713. That process would be "clearly thwart[ed]" if each victim could simply claim "privileg[e]" over certain assets by asserting a constructive trust over them, thereby carving out a portion of the assets for themselves and leaving little if anything for the Receiver to distribute. *Flanagan*, 503 F.3d at 182. The Court declines the Marcus Claimants' invitation to turn the Receivership on its head.

Equally unavailing is the Mayers' argument that they should be given priority over other investors, and over the SEC, because they have state-court judgments against some of the Defendants. (*See* Doc. No. 827.)[2] Once again, the purpose of a receivership in an SEC action is to return assets to victims in a fair and orderly manner. *See Malek*, 397 F. App'x at 713. And as the Court has noted previously, it would be "massively inefficient" to "encourage[]" individual investors to "bring individual suits and to fight against each other wastefully for what scraps remained." (Doc. No. 432 at 18); *see also SEC v. Santillo*, 327 F.R.D. 49, 51 (S.D.N.Y. 2018) ("[I]t would be contrary to the fair and equitable treatment of all victims . . . to incentivize individual investors who have been defrauded to bring their own actions to secure early judgment and beat out other defrauded investors."). Permitting the Mayers to leapfrog their peers would mean that "funds would be distributed on the basis of who won the race to the courthouse, rather than on the harm each investor suffered." *Santillo*, 327 F.R.D. at 51. Accordingly, "the proper procedure is to allow the SEC to bring its action and secure any appropriate judgment, and then to allow the judgment to be divided fairly among those who were defrauded." *Id.*[3]

---

[2] The Court has already rejected the Mayers' argument that they deserve special treatment because of the help they provided to investigatory authorities in bringing Defendants to justice. (*See* Doc. No. 669 at 15.)

[3] At its discretion, the SEC may even elect to distribute its penalty judgment back to the defrauded investors under 15 U.S.C. § 7246(a), the so-called Fair Fund provision. *See Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 82–83 (2d Cir. 2006).

In rejecting the Mayers' argument here, the Court recognizes that the Mayers took priority over the government in the ancillary forfeiture proceedings in the Criminal Action. (Criminal Action Doc. No. 1037.) But there is good reason for the Mayers' special status there: the government *conceded* that the Mayers had a superior interest in the disputed assets, and even entered into a settlement agreement with the Mayers to that effect. (Criminal Action Doc. No. 1010 at 6.) The SEC has made no such concessions here, much less in a binding settlement. Moreover, while the Mayers had a secured judgment against the defendants in the Criminal Action, they have no judgment at all (much less a secured one) against ATGF II, the former holder of the Garnishment Assets. The SEC does. The Court sees no good reason to grant the Mayers preferential treatment – especially over the SEC – when they do not even have a judgment against the relevant entity.

Last, Heitkonig and Preetzman-Aggerholm renew their objections to the Court's valuation methodology, arguing that Defendants unilaterally reduced their GFRDA interest rates and that the Receiver undervalued their ATGF investments. (*See* Doc. No. 826 at 1–4; Doc. No. 825; *see also* Doc. No. 355 at 14; Doc. Nos. 194, 431, 463.) But as already discussed, district courts have "equitable authority to treat all the fraud victims alike" unless there are truly stark differences among classes of victims – which is not the case for ATGF and GFRDA investors. *Walsh*, 712 F.3d at 749 (alterations and internal quotation marks omitted). And while Defendants may well have cut the interest rates on Heitkonig and Preetzman-Aggerholm's GFRDA accounts, that is true of many of the GFRDA investors and thus cannot justify special treatment here. (*See* Doc. No. 510 at 6.)

At bottom, the Court recognizes that the investors have sincere reasons why they believe they are uniquely situated and entitled to a greater share of a limited pie. But there is no rigid rule for resolving those conflicts, and the Court remains convinced that it has properly exercised its "broad equitable discretion" in crafting a remedy that is fair. *Fischbach Corp.*, 133 F.3d at 175. The Court did so here by fashioning a three-part remedy that returned investors' principal investments,

disgorged ill-gotten gains, and imposed a civil penalty for the wrongdoing. And because two of those three remedies have already been carried out, all that remains is to discharge the SEC's penalty judgment. Although various investors object to that final step, the Court has fully considered their arguments and, in its discretion, declines to depart from the remedial course it charted at the outset.

### III. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED THAT the SEC's motion requesting a distribution of the former Garnishment Assets from the Distribution Fund is GRANTED as to the SEC but DENIED as to the investors. IT IS FURTHER ORDERED THAT Distribution Agent Miller Kaplan shall submit, by October 4, 2024, (1) a motion for disbursement of funds from the Distribution Fund to pay any outstanding and estimated federal taxes, and (2) a motion for disbursement of funds from the Distribution Fund to pay any remaining administrator fees and expenses. Upon resolution of those motions and disbursement of such funds, the Court will direct the transfer of any remaining money in the Distribution Fund to the SEC, to be remitted to the United States Treasury. Finally, IT IS ORDERED THAT the Receivership is hereby dissolved.

SO ORDERED.

Dated: September 17, 2024
New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation